

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HERBERT FRANCL, Derivatively on Behalf of RAMBUS INC., | ) ) ) | No. |
| Plaintiff, | ) ) | |
| v. | ) ) | **VERIFIED DERIVATIVE COMPLAINT** |
| PRICEWATERHOUSECOOPERS, | ) ) | |
| Defendant, | ) ) | |
| -and- | ) ) | **JURY TRIAL DEMANDED** |
| RAMBUS INC., a Delaware Corporation. | ) ) | |
| Nominal Defendant. | ) ) | |

Plaintiff Herbert Francl, by his attorneys, submits this Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Rambus Inc. ("Rambus" or the "Company") on behalf of the Company against its independent auditor ("PriceWaterhouseCoopers" or "PWC").

2.      Plaintiff made a demand on its board of directors on August 30, 2006 (the "Demand") to bring claims against professionals employed by the Company who were responsible for the Company's actual and potential damages.

3.      Plaintiff has received no response from the Company's board of directors to his Demand.

4.      During June 20, 2000 through August 27, 2007 (the "Relevant Period"), PWC was engaged by the Company to audit its financial statements and render opinions or reports related thereto.

5.      With respect to its audit engagements, PWC represented to the Company, the public and regulators that it conducted them in accordance with applicable professional standards and issued unqualified audit reports. The Company included or incorporated by reference PWC's audit reports in its filings with the United States Securities and Exchange Commission.

6.      In contrast to PWC's independent audit reports during the Relevant Period, the Company's accounting did not comport with generally accepted accounting principles ("GAAP"), PWC's audits were not in accordance with professional standards and the Company's PWC-audited financial statements cannot be relied on and must be restated.

7.      The Company has already expended considerable resources and now estimates that restatements to its PWC-audited financial statements will involve charges exceeding $200 million and has warned that those historical financial statements cannot be relied on.

8.      Plaintiff, derivatively on behalf of the Company, alleges claims against PWC for breach of contract and professional negligence in connection with its audits of the Company's annual financial statements, its review of interim quarterly financial statements, its audits of the Company's internal controls and its communications related thereto, all during the Relevant Period.

2

## JURISDICTION AND VENUE

9.      This verified shareholder derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

10.     Plaintiff Francl is a citizen of, and domiciled in Spain.  Defendant is not a citizen of Spain.  The nominal defendant, Rambus Inc., is a Delaware corporation with its principal place of business in California.

11.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This action is not brought collusively to confer jurisdiction on this Court which it would otherwise not have.  PWC is headquartered in this District, and has received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

13.     Plaintiff Herbert Francl is, and was at times relevant hereto, an owner and holder of Rambus common stock.  Mr. Francl resides in Banyoles, Spain.

14.     Nominal defendant Rambus is a Delaware corporation with its principal executive offices located at 4440 El Camino Real, Los Altos, California.  Rambus manufactures and licenses chip interface technologies.  The Company's chip interface technologies are designed to improve the time-to-market and performance of its customers' semiconductor and system products for computing, communications and consumer electronics applications.

15.     Defendant PriceWaterhouseCoopers LLP ("PWC") is a firm of certified public accountants with its principal place of business at 300 Madison Avenue, New

York, New York. At all times during the Relevant Period, PWC was retained by Rambus as its independent registered public accountant. PWC provided auditing, accounting and tax related services to Rambus, including, but not limited to, conducting audits of the Company's year-end financial statements, reviews of the Company's quarterly financial statements, acquisition services, tax consultations, tax return preparation, technical tax advice and Form S-8 filings. PWC also rendered audits of effectiveness of Rambus' internal controls over financial reporting for fiscal years ending 2004 and 2005. The Company's DEF 14A's during the Relevant Period indicate that PWC was paid over $2.7 million for its services during the Relevant Period.

## BACKGROUND OF THE COMPANY

16.    Rambus was founded in 1990. Geoff Tate served as the Company's CEO from 1995 until his abrupt resignation from that position in January 2005. Mr. Tate also served as the Company's Chairman until he resigned in August 2006.

17.    According to the Company's SEC filings, the Company invents and licenses chip interface technologies that are foundational to nearly all digital electronics products. The Company's chip interface technologies are designed to improve the time-to-market, performance, and cost-effectiveness of its customer's semiconductor and systems products for computing, communications and consumer electronics applications.

18.    The Company's SEC filings during the Relevant Period characterize the Company's industry and business as highly risky, with its viability as an ongoing business depending on its ability to quickly innovate and gain acceptance for its technologies in a high risk industry based on work innovated, managed and sold by motivated personnel and on other factors highlighted in its risk disclosures.

19.     The Company's Form 10-K for the fiscal year ended September 30, 2001,

Item 1, identifies the following risk factors, among others:

- The Company's business is subject to a variety of additional risks which could materially adversely affect quarterly and annual operating results, including: [....]; announcements or introductions of new technologies or products by the Company or the Company's competitors; delays or problems in the introduction or performance of enhancements or of future generations of the Company's technology [...]; personnel changes, particularly those involving engineering and technical personnel [....]
- Rapid technological Change; Reliance on Fundamental Technology; Importance of Timely New Product Development.
- Competition.  The semiconductor industry is intensely competitive [....]
- Dependence on Key Personnel.  The Company's success depends to a significant extent on its ability to identify, attract, motivate and retain qualified technical, sales, marketing, finance and executive personnel [....]

20.     The Company's Form 10-K for the fiscal year ended September 30, 2002,

Item 1, states, for example:

- *We must respond to rapid technological change in the semiconductor industry by developing new products in a timely manner while relying on our fundamental technology [....]*
- *We face intense competition [....]*
- *We depend on key personnel, particularly  qualified engineers and senior management [....]*

21.     The Company's Form 10-K for the fiscal year ended December 31, 2003,

Item 1, states, for example:

- *We face intense competition that may cause our results of operations to suffer [....]*
- *If we cannot respond to rapid technological change in the semiconductor industry by developing new innovations in a timely and cost effective manner, our operating results will suffer [....]*
- *If we are unable to attract and retain qualified personnel, our business and operations could suffer [....]*

22.     The Company's Form 10-K for the fiscal year ended December 31, 2004,

Item 1, states, for example:

- *We face intense competition that may cause our results of operations to suffer [....]*
- *If we cannot respond to rapid technological change in the semiconductor industry by developing new innovations in a timely and cost effective manner, our operating results will suffer [....]*
- *If we are unable to attract and retain qualified personnel, our business and operations could suffer [....]*
- *While we believe that we currently have adequate internal control procedures in place, we are still exposed to potential risks from recent legislation requiring companies to evaluate controls under Section 404 of the Sarbanes-Oxley Act of 2002 [....]*

23.    The Company's Form 10-K for the fiscal year ended December 31, 2005, Item 1A, states, for example:

- *We face intense competition that may cause our results of operations to suffer [....]*
- *If we cannot respond to rapid technological change in the semiconductor industry by developing new innovations in a timely and cost effective manner, our operating results will suffer [....]*
- *We are leveraged financially, which could adversely affect our ability to adjust our business to respond to competitive pressures and to obtain sufficient funds to satisfy our future research and development needs, and to defend our intellectual property [....]*
- *If we are unable to attract and retain qualified personnel, our business and operations could suffer [....]*

24.    During the Relevant Period, the Company's practice of granting stock options to executives and other employees has been essential to the Company's success, enabling it to attract and retain talented employees and remain competitive in the rapidly evolving semiconductor industry.

25.    The Company filed its 1997 Stock Plan (the "Plan") with the SEC as an exhibit to Form S-8 during June 1997.  One of PWC's predecessors, Coopers & Lybrand LLP, consented to the incorporation by reference in the registration statement of its independent auditor report dated November 1, 1996, except for Note 17 for which the date was March 31, 1997.

26.    In addition to the June 1997 Form S-8 Registration Statement, the Company filed Forms S-8 on April 12, 2002, March 13, 2003, April 29, 2004, and May 2, 2005 in order to register shares for issuance upon exercise of options granted pursuant to the Plan.

27.    Three expressed purposes of the Plan are (a) to attract and retain the best available personnel for positions of substantial responsibility, (b) to provide additional incentive to Employees, Directors, and Consultants, and (c) to promote the success of the Company's business.  (1997 Stock Plan, ¶1)

28.    Stock options granted under the Plan may be Incentive Stock Options or Nonstatutory Stock Options.  (1997 Stock Plan, ¶1)  Incentive Stock Options are defined in the Plan as options "intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder."  (1997 Stock Plan, ¶2(n))

29.    The Plan provides that "Administrator means the Board or any of its Committees as shall be administering the Plan, in accordance with Section 4 of the Plan."  (1997 Stock Plan, ¶2(a))

30.    Section 4 of the Plan provides, in part, "[t]o extent that the Administrator determines it to be desirable to qualify Options granted hereunder as 'performance-based compensation' within the meaning of Section 162(m) of the Code, the Plan shall be administered by a Committee of two or more 'outside directors' within the meaning of Section 162(m) of the Code."  (1997 Stock Plan, ¶4(a)(ii))

31.    Section 9 of the Plan provides, with respect to Option Exercise Price, as follows:

(a) Exercise Price.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following:

  (i) In the case of an Incentive Stock Option

  A. granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per share on the date of grant.

  B. granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

  (ii) In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator.  In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

32.    Section 15 of the Plain provides that "[t]he date of grant of an Option or Stock Purchase Right shall be, for all purposes, the date on which the Administrator makes the determination granting such Option or Stock Purchase Right, or such other later date as is determined by the Administrator...."

33.    The Company's board of directors stated in Rambus's DEF 14A's filed with the SEC during the Relevant Period that the Plan was designed and administered to meet Internal Revenue Code §162(m) requirements.

34.    Section 162(m) limits deductions for executive compensation for public companies to $1 million per year per executive for compensation paid to the top five most highly compensated executives for proxy reporting purposes.  Under Section 162(m), the amount of stock option gains will not be included within the $1 million deduction cap as long as the options are granted under a plan that has a per person per period limit on the number of options that can be granted each year, the options are not in

the money when granted, an independent compensation committee grants them, and there is shareholder approval of the plan. If options are in the money when granted, then the compensation realized by the grantee upon exercise will count towards the $1 million IRS deduction cap. Thus, discounted options are ineligible as performance-based compensation under Section 162(m). Furthermore, discounted options would be treated as "non-qualified defined compensation" under Section 409A, resulting in taxation (and exise taxes) at the time of vesting, rather than exercise. Finally, for incentive stock options to qualify for favorable tax treatment, they must be granted at 100% of the underlying stock fair market value on the date of grant.

35. In October 2001, the Company's board of directors approved a share repurchase program principally to reduce the dilutive effect of employee stock options upon exercise. Accordingly, during the Relevant Period, the Company repurchased at least 8.5 million shares at an average per share price of $13.05, or nearly $111 million.

36. In addition to the highly risky nature of the Company's business, as disclosed in its Forms 10-K, there was evidence available to PWC that would have or did alert it to the heightened risk of irregularities and management override of controls.

37. For example, there was non-public evidence that Geoff Tate, not and independent compensation committee, who administered most aspects of the Plan.

38. Moreover, in many instances the timing of purported grant and measurement dates was highly suspicious.

39. Certain of Rambus's fiscal 1999 option grants were dated as of November 5, 1998 at $14.83 per share (split adjusted) – the low of the month. The stock closed as high as $23.59 per share in November 1998 and did not dip to the $14.83 exercise price

during the remainder of 1998. Tate and Mooring received 90,000 and 70,000 options, respectively, at this price. Former CFO Gary Harmon received 15,000 options at this price. Former Senior Vice Presidents Ed Larsen and Subodh Toprani each received 50,000 options at this price. The Company's 1/10/00 DEF 14A states that "[o]ptions were granted at an exercise price equal to the fair market value of the Company's Common Stock at the date of grant."

40. Certain of Rambus's fiscal 2000 option grants were dated as of October 20, 1999 at $15.67 per share – nearly the low of the month when the stock closed between $15.66 and $18.90 per share. The Company's stock price did not dip to the $15.67 exercise price during the remainder of 1999. Tate and Mooring each received one million options at this price. Harmon, Larsen and Toprani received 80,000, 160,000 and 120,000 options, respectively, at this price. The Company's 12/22/00 DEF 14A states that "[u]nless otherwise indicated, options were granted at an exercise price equal to the fair market value of the Company's Common Stock at the date of grant."

41. Certain of Rambus's fiscal 2001 option grants were dated on several dates that were at or near the lowest price of the month in which the options were granted. For example, there were options dated as of June 21, 2001 at $9.07 per share – the low of the month. The stock closed as high as $12.31 per share in June 2001. Former CFO Robert K. Eulau received 500,000 options at $9.07. There were also options dated as of August 23, 2001 at $4.86 per share – again the low for the month. But the stock did not dip to the $4.86 exercise price during at least the next two months. The stock closed as high as $8.88 per share in August 2001. Tate and Mooring each received 600,000 options at this price. Larsen received 160,000 options at this price. The Company's 12/14/01 DEF 14A

states that "[u]nless otherwise indicated, options were granted at an exercise price equal to the fair market value of the Company's Common Stock at the date of grant."

42.    Certain of Rambus's fiscal 2002 option grants were dated as of October 8, 2001 at $8.00 per share – nearly the low of the month when the stock closed as high $11.72 per share.    But the stock did not dip to the $8.00 exercise price during the remainder of the month.    Danforth received 400,000 options at this price.    There were also options dated as of November 15, 2001 at $9.30 per share.    Tate and Mooring each received 100,000 options at this price.    The Company's 12/19/02 DEF 14A states that "[u]nless othersise indicated, options were granted at an exercise price equal to the fair market value of Rambus Common Stock at the date of grant."

43.    The charts below depict the highly suspicious timing of option grants in relation to the Company's stock price charts:









## DUTIES OF PWC AS THE COMPANY'S INDEPENDENT AUDITOR

44.     PWC was retained pursuant to written engagement agreements to conduct audits of the Company's financial statements during the Relevant Period and to audit the Company's internal controls for the Company's fiscal years ended December 31, 2004 and 2005.   In addition, PWC agreed to perform reviews of the Company's interim quarterly financial statements during the Relevant Period.

45.    PWC, as the Company's independent auditor, was required to plan, conduct, and report the results of each audit in accordance with generally accepted auditing standards ("GAAS").

46.    The ten generally accepted auditing standards applicable to PWC's audit services are grouped as general auditing standards, field work standards, and reporting standards.    The general GAAS standards include such things as proper training, supervision, and expertise of the auditors, an independent mind-set, and due professional care.    The field work standards include a proper audit plan and testing of internal controls.    If the initial evaluation of the internal controls of the business shows some weaknesses, then the audit plan must be revised to include more extended work and sampling so that the auditor can determine whether the financial statements initially prepared by management are in fact fairly presented.    (The other option would be for the auditor to withdraw from the engagement.)    The reporting standards include a requirement for informative disclosures and the expression of an opinion.

47.    More particularly, the GAAS general standards require: audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor; in all matters relating to the assignment, and independence in mental attitude is to be maintained by the auditor or auditors; and due professional care is to be exercised in the performance of the audit and the preparation of the report. (AU §150)

48.    The GAAS standards of field work require: the work is to be adequately planned and assistants, if any, are to be properly supervised; a sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed; and sufficient competent evidential matter is to be

obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (AU §150)

49.    The GAAS standards of reporting require: the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP); the report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period; informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and the report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed  (when an overall opinion cannot be expressed, the reasons therefore should be stated; in all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking).  (AU §150)

50.    GAAS require an independent auditor to state whether in his opinion, the financial statements are presented in conformity with generally accepted accounting principles ("GAAP") and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.  (AU §110.01)

51.    The auditor is responsible for planning and performing the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.  (AU §110.02; see AU §§311, 316, 319)

52.     Due professional care is to be exercised in the planning and performance of the audit and the preparation of the audit report. (AU §230.01)

53.     Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting. (AU §230.02)

54.     The auditor is, among other things, required to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (AU §326)

55.     Due professional care requires the auditor to exercise professional skepticism, which requires the gathering and objective evaluation of evidence. (AU §§230.07, 230.08)

56.     Due professional care allows the auditor to obtain reasonable assurance that the financial statements are free of material misstatement, based on sufficient competent evidential matter obtained through a properly planned and performed audit. (AU §§230.11, 230.12)

57.     The exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. (AU §316.13)

58.     The first standard of field work requires that the work is to be adequately planned and assistants, if any, are to be properly supervised. (AU §311.01)

59.     In planning, the auditor should consider, among other matters: (a) matters relating to the entity's business and the industry in which it operates; (b) the entity's accounting polices and procedures; (c) the methods used by the entity to process

significant accounting information; (d) planned assessed level of control risk; (e) preliminary judgment about materiality levels for audit purposes; (f) financial statement items likely to require adjustment; (g) conditions that may require extension or modification of audit tests, like the risk of material error or fraud or the existence of related party transactions; (h) the nature of reports to be rendered. (AU §311.03)

60.    In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation. (AU §§319.02, 319.29 – 319.61)  "Internal control" is a process effected by an entity's board of directors, management, and other personnel designed to provide reasonable assurance regarding the achievement of objectives in the following categories:  (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations. (AU §319.06)

61.    The auditor should evaluate the operating effectiveness of controls as part of assessing control risk. (AU §§319.27, 319.62 – 319.83)

62.    If, during the course of the audit, the auditor learns of significant deficiencies in the design or operation of internal control that could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements, the auditor should report those conditions to the audit committee. (AU §325A; see also AU §325)

63.    The concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements in conformity with GAAP while other matters are not important. (AU §312.03)

64.     Financial statements are materially misstated when they contain misstatements resulting from error or fraud whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects in conformity with GAAP. (AU §312.04)

65.     There is no important distinction between errors and fraud when considering the auditor's responsibility to obtain reasonable assurance that the financial statements are free from material misstatement. (AU §312.08) When fraud is detected, the auditor should consider the implications for the integrity of management or employees and the possible effect on other aspects of the audit. (Id.)

66.     Consideration of materiality is influenced by the auditor's perception of the needs of a reasonable person who will rely on the financial statements as recognized in the discussion of materiality in Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information.* (AU §312.10)

67.     As part of planning the audit, there must be a discussion among the audit team members to consider how and where the entity's financial statements might be susceptible to material misstatement due to fraud and to reinforce the importance of adopting an appropriate mindset of professional skepticism. (AU §§316.14 – 316.18)

68.     The auditor is required to gather information necessary to identify risks of material misstatement due to fraud by: (a) inquiring of management and others within the entity about the risks of fraud; (b) considering the results of the analytical procedures performed in planning the audit; (c) considering fraud risk factors; and (d) considering

any other information that may be helpful to determining material misstatement due to fraud. (AU §§316.20 – 316.33)

69.    The auditor is required to use the information gathered to identify risks that may result in a material misstatement due to fraud. (AU §§316.35 – 316.42)

70.    The auditor must evaluate the entity's programs and controls that address the identified risks of material misstatement due to fraud, to assess the risks taking into account this evaluation, and (applying professional skepticism) to respond to the results of the risk assessment. (AU §§316.43 – 316.67)

71.    The auditor must assess the risks of material misstatement due to fraud throughout the audit and to evaluate at the completion of the audit whether the accumulated results of auditing procedures and other observations affect the assessment. (AU §§316.68 – 316.78)

72.    Fraud involving or caused by senior management that causes a material misstatement of the financial statements should be reported directly to the audit committee. (AU §§316.79 – 316.82)

73.    Certain matters related to the conduct of an audit must be communicated to the audit committee and are delineated in AU §§316, 317, 325A and 380.

74.    The audit report shall state whether the financial statements are presented in accordance with generally accepted accounting principles. If limitations on the scope of the audit make it impossible for the auditor to form an opinion as to such conformity, appropriate qualification of the audit report is required. (AU §410)

75.     Informative disclosures in an entity's financial statements are to be regarded as reasonably adequate unless otherwise stated in the audit report.  (AU §431.01)

76.     The presentation of financial statements in conformity with GAAP includes adequate disclosure of material matters related to the form, arrangement, and content of the financial statements and their appended notes.  (AU §431.02)

77.     If management omits from the financial statements and accompanying notes information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and, if practicable, should provide the information in his report unless its omission is permitted by a specific Statement on Auditing Standards.  (AU §431.03)

78.     The auditor's report shall either contain an expression of opinion regarding the financial statements, taken as a whole and with respect to an individual financial statement, or an assertion to the effect than an opinion cannot be expressed. (AU §§508.04 – 508.05)

### PWC ISSUED UNQUALIFIED INDEPENDENT AUDITOR'S REPORTS AND CONSENTED TO INCLUSION OF THEM IN RAMBUS' SEC FILINGS

79.     During the Relevant Period, all of PWC's independent auditor reports were unqualified.

80.     PWC's October 16, 2001 (except as to Note 13, which was as of November 26, 2001) report stated:

> In our opinion, the consolidated financial statements listed in the index appearing under item 14 (a) (1) present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiary at September 30, 2001 and 2000 and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2001, in conformity

with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

81.     PWC's October 9, 2002 (except as to Note 13, which was as of November 22, 2002) report stated:

In our opinion, the consolidated financial statements listed in the index appearing under item 15(a)(1) on page 34 present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at September 30, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

82.     PWC's February 6, 2004 (except as to Note 13, which was as of February 13, 2004) report stated:

In our opinion, the consolidated financial statements listed in the index appearing under item 15(a)(1) on page 41 present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the twelve month periods ended December 31,

2003, September 30, 2002 and 2001 and the three month period ended December 31, 2002 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective October 1, 2002, the Company changed its method of accounting for goodwill upon the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

83.    PWC's February 16, 2005 report stated:

We have completed an integrated audit of Rambus Inc.'s December 31, 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its December 31, 2003, December 31, 2002 and September 30, 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the index appearing under item 15(a)(1) present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2004, for the three month period ended December 31, 2002 and for the year ended September 30, 2002 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of

material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective October 1, 2002, the Company changed its method of accounting for goodwill upon the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control—Integrated Framework issued by COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A

company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

84.     On March 11, 2003, PWC consented to incorporation by reference in the Company's March 13, 2003 Form S-8 of PWC's independent auditor's report dated October 9, 2002 (except as to Note 13), which appeared in Rambus's Form 10-K for the year ended September 30, 2002.

85.     On April 29, 2004, PWC consented to incorporation by reference in the Company's April 29, 2004 Form S-8 of its independent auditor's report dated February 6, 2004 (except as to Note 13), which appeared in Rambus's Form 10-K for the year ended December 31, 2003.

86.     On April 29, 2005, PWC consented to incorporation by reference in the Company's May 2, 2005 Form S-8 of its independent auditor's report dated February 16, 2005 relating to the financial statements, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appeared in the 2004 Annual Report to Shareholders of

Rambus, which was incorporated by reference in Rambus' Form 10-K for the year ended December 31, 2004.

      87.    PWC's February 21, 2006 report stated:

We have completed integrated audits of Rambus Inc.'s 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2005, and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

 In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of stockholders' equity and comprehensive income, and of cash flows, present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

 Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material

respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control—Integrated Framework issued by COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

88.    In addition, the Company said on October 19, 2006 that its board appointed a special litigation committee to evaluate potential claims and other actions arising from stock option granting activities.

## THE COMPANY'S HISTORICAL FINANCIAL STATEMENTS DID NOT COMPORT WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

89.    GAAP consists of principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.   Regulation S-X, which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

90.    In particular, APB No. 25, "Accounting for Stock Issued to Employees", requires employers to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has an intrinsic value, and the difference between its exercise price and the quoted market price on the measurement date must be recorded as compensation expense to be recognized over the vesting period of the option.   Options that are out-of-the-money on the measurement date need not be expensed.   Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in- or out-of-the-money on the date of grant.

91.    Under well-settled accounting principles in effect for most of the Relevant Period, the Company did not need to record an expense for options granted to employees at the current market price ("at the money").   The Company was, however, required to

record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Company executives and employees with more lucrative "in the money" options, while avoiding having to inform the public about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in related taxes), certain insiders systematically falsified Company records to create the false appearance that options were granted at the market price on an earlier date.

92.    For most of the Relevant Period, the Company accounted for stock options using the intrinsic method described in APB Opinion No. 25, "Accounting for stock Issued to Employees." Under APB Opinion No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in the money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at the money or out of the money on the measurement date need not be expensed. Excluding non-employee directors, APB Opinion No. 25 required employers to record compensation expenses on options granted to non-employees regardless of whether they were in the money or not on the date of grant.

93.    In December 2004, FASB revised its Statement of Financial Accounting Standards ("SFAS") No. 123, "Shared-based Payment," to be effective in June 2005. SFAS No. 123, as revised, eliminated the use of the intrinsic method pursuant to APB Opinion No. 25. Instead, SFAS No. 123 requires a public entity to measure the cost of employee services received in exchange for an award of equity instruments based on the

grant date fair value of the award. The cost is recognized over the period during which an employee is required to provide service in exchange for the award (usually the vesting period).

94.    In late May 2006, following publicity that the Company was among a group of companies that were susceptible to improper accounting for stock options, the Company reportedly conducted an initial review and discovered apparent irregularities in past stock option grants.

95.    On May 30, 2006, the Company issued a news release disclosing that the Company's Audit Committee commenced an internal investigation of the timing of stock option grant practices and related accounting issues.

96.    On October 19, 2006, the Company issued updated disclosures about the status and results of its investigation, noting that its Audit Committee concluded that irregularities relating to dating of stock option grants had occurred.

97.    The Company stated:

The **independent investigation has taken over four months** and consisted of a review of over 200 stock option granting actions. The review encompassed over **1.5 million emails and other documents**, and over **50 interviews with executive officers, directors, employees and advisors**.

On June 27, 2006, Rambus announced that the Audit Committee had reached a preliminary conclusion that the actual measurement dates for certain stock option grants issued in prior years differ from the recorded grant dates for such awards.

On July 19, 2006, Rambus announced that as a result of the independent investigation, it expected to restate its previously issued financial statements to correct errors related to accounting for stock-based compensation expenses, and that non-cash stock-based compensation expenses should have been recorded with respect to those stock option grants in an amount that was material.

On August 15, 2006, Rambus announced the resignation of Geoff Tate, former Chief Executive Officer of Rambus from 1990 through 2005, from its Board of Directors. **Mr. Tate was Chief Executive Officer and the sole member of the Stock Option Committee during the period that the Audit Committee had preliminarily concluded that the majority of stock option irregularities occurred.**

On October 17, 2006, the Audit Committee completed its findings with respect to the pricing of Rambus' stock option grants. The Audit Committee presented its findings to the Board of Directors on October 18, 2006. As indicated above, the Audit Committee has determined that a significant number of Rambus stock option grants were not correctly dated and accounted for, with the vast majority of incorrectly dated grants occurring between 1998 and 2001. Virtually all of the incorrectly dated stock option grants fit into three categories:

•       Between 1998 and 2001, a substantial number of stock options were granted by Rambus for which the appropriate measurement dates differ from the recorded grant dates. The majority of the non-cash compensation expense associated with Rambus' financial restatement will relate to grants on five dates within this time period.

•       In addition, the Audit Committee found that during the period from 1999 through 2003, Rambus had a regular practice for grants to new hire non-executive employees of selecting the lowest price of the quarter between the employee's start date and the end of the quarter. On certain occasions, individual employees had a formal employment start date which preceded the date on which they actually began working for Rambus. The result of this practice was that an employee would receive the new hire grant at a grant price that was lower than the price of the stock on the employee's actual start date.

•       Rambus also had three stock option grants during 2003 and 2004 for which the price was set on the same date as a Board of Directors or Compensation Committee meeting date at which a pool of stock options was discussed, but the individual allocations of the stock option pool had not been completed as of the date of those meetings and, consequently, Rambus recorded an incorrect measurement date for those grants.

**The results of the investigation confirm the Audit Committee's previous conclusion that Rambus' financial statements for the fiscal years 2003, 2004, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements**

**included in Rambus' Quarterly Report on Form 10-Q for the first quarter of fiscal year 2006, should no longer be relied upon and will be restated**. Rambus' management will continue to work to determine the precise accounting impact of the findings of the investigation and to complete the necessary restatements to Rambus' prior financial reports. Rambus will continue to work closely with Rambus' independent accountants in its restatements. Rambus preliminarily estimates that the aggregate pre-tax, non-cash stock-based compensation charges in connection with these stock option grants will be in excess of $200 million. Also as a result of the investigation, Rambus has been unable to file its quarterly report on Form 10-Q for the period ended June 30, 2006, and will not be in a position to file its quarterly report on Form 10-Q for the period ended September 30, 2006 (which is due to be filed with the Securities and Exchange Commission (the "SEC") on November 9, 2006).

Rambus has not yet determined the tax consequences that may result from these matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period.

Rambus will make every effort to file its restated financial statements and its delinquent quarterly reports as soon as practicable after the completion of accounting, tax and legal analyses required as a result of the investigation.

Additionally, Rambus is evaluating Management's Report on Internal Control Over Financial Reporting set forth in Rambus' 2005 Annual Report. Although Rambus has not yet completed its analysis, the results of the investigation confirm Rambus' determination that **it is likely that Rambus had a material weakness in internal control over financial reporting as of December 31, 2005.**

The results of the independent investigation showed that improvements are needed in Rambus' processes for the granting of equity compensation. The Audit Committee is working with the Board of Directors, the Compensation Committee and management to implement improvements in Rambus' processes and controls over its stock administration programs.

The October 19 news release also reiterated that the delinquency of the Company's SEC filings could result in delisting of the Company's stock from the NASDAQ Stock Market and that the Company had received a notice of purported defaults from the trustee under the indenture governing Rambus Zero Coupon Convertible Senior Notes due February 1, 2010.

98.    On July 26, 2007, the Company issued a news release reporting preliminary revenue results for the second quarter of 2007, and also stating:

> As the restatement of the Company's historical financial reports has not yet been completed, Rambus will not be releasing second quarter earnings today. In addition, Rambus does not expect to be in a position to file its Form 10-Q for the second quarter of fiscal 2007 by the August 9, 2007 filing deadline.
>
> Rambus expects to file its Form 10-K for fiscal 2006 in the third quarter of fiscal 2007. Rambus is making every effort to file its delinquent annual and quarterly reports as soon as practicable.
>
> Additionally, Rambus continues to evaluate its internal control over financial reporting as of December 31, 2006. Although Rambus has not yet completed all of its analysis on its internal control over financial reporting, it has determined that it is highly likely that Rambus had one or more material weakness in internal control over financial reporting as of December 31, 2006. A material weakness is a control deficiency, or a combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

99.    On July 31, 2007, the Company received a notice of acceleration from U.S. Bank National Association, as trustee for the Company's Zero Coupon Convertible Senior Notes due February 1, 2010 ("Notes"). The Notice asserted that the Company's failure to file its Forms 10-Q for the quarters ended June 30, 2006 and September 30, 2006 constituted events of default under Sections 7.2 and 14.1 of the Indenture, dated as of February 1, 2005, between the Company and the Trustee governing the Notes. The Notice indicated that the Trustee had received direction from holders of more than 25% in aggregate principal amount of the Notes outstanding to declare the unpaid principal plus accrued and unpaid liquidated damages, if any, on all of the Notes to be immediately due and payable by the Company in accordance with the Indenture. As of July 31, 2007, if an "event of Default" were to occur, the noteholders would have a right to receive $160

million in aggregate principal amount outstanding plus any additional interest or default interest (which would accrue at a rate of 2% per annum from the date on which full payment of the Notes was due to the date that full payment is made) which may have accrued.

100.    The type of restatements and revisions announced by the Company are to correct for material errors in its previously issued financial statements.  (APB Opinion No. 20, ¶¶7-13)

## PWC'S WRONGFUL CONDUCT

101.    PWC knew and ignored the extraordinary high risk that the Company's financial statements would be materially false and misleading.

102.    PWC knew about the matters identified in the Company's Forms 10-K that depicted it as a highly risky business.

103.    PWC also certainly knew that the granting of stock options was essential to the Company's success and that CEO Tate was the committee of one administering the Stock Plan.

104.    Instead of planning the audit to minimize these risks through extensive testing of management representations, PWC accepted management's assertions as facts. PWC certainly knew the Company was involved in a complex and highly competitive industry. PWC failed to conduct its audits even though it knew, and should have known, what to do, based on its specific knowledge.

105.    PWC should have extended its due professional care and audit skepticism at each stage of the audit engagements.

106.   GAAS required PWC as independent certified public accountants to: evaluate audit risks and design adequate tests and procedures to reduce such risks to an acceptable level; perform tests and procedures in order to form a reasonable basis for their audit opinions; require an extremely high level of objective substantiation for critical management estimates, projections and representations, as risks of potentially material misstated financial statements were high.

107.   Though PWC represented that it conducted its engagements in accordance with GAAS, PWC did not do so.

108.   The same or substantially the same evidential matter relied on by the Company's Audit Committee to ferret out the truth was available to PWC during each of its audit engagements.

109.   PWC did not perform its work in accordance with all general standards, field work standards and reporting standards.

110.   PWC did not adequately plan and perform its work to obtain reasonable assurance about whether the Company's financial statements were free of material misstatements.

111.   PWC did not exercise due professional care.

112.   PWC did not obtain sufficient competent evidential matter to reasonably support its audit opinions.

113.   PWC did not exercise professional skepticism.

114.   PWC did not obtain a sufficient understanding of the Company's internal controls related to, among other things, stock option grants to plan its audits of the Company's financial statements.

115.    PWC either did not identify material weaknesses in the Company's internal control or, if it did, PWC improperly ignored them.

116.    PWC provided unqualified audit reports when it should not have.

117.    PWC consented to the Company's incorporation by reference of the improper audit reports when it should not have.

118.    PWC knew, or recklessly disregarded, that Rambus' financial statements were false and misleading and contained material departures from GAAP.  Among other things, PWC knew or recklessly disregarded that (i) the Company's expenses were understated by over $200 million; (ii) the Company's tax deferred asset was misstated; (iii) the Company's net income was overstated; (iv) despite the Company's representations to the contrary, the stock options granted were not made in accordance with IRC §162(m); (v) the exercise prices for options granted to the backdated option recipients were not valued properly on the dates the grants were actually made; in violation of the Stock Option policy and contrary to the representations made in the Form 10-Ks incorporated by reference to the Company's Proxy Statements and the Proxy Statements during the Relevant Period; (vi) the process and procedure for granting stock options did not follow the requirements of the Stock Option Plan, a fact PWC knew or, in the absence of reckless disregard, should have known; (viii) it failed to confirm that the large number of stock options granted were "in the money" rather than "at the money"; (ix) the large number of stock options granted to the group of backdated options recipients at impossibly fortuitous exercise prices, including the sole member of the Stock Option Committee, should have alerted PWC, in the absence of reckless disregard, of the fact that said options and the manner and method in which they were treated,

violated GAAP, the Stock Option Plan, disallowed §162 treatment, and resulted in false and misleading financial statements; (x) that the Company's internal controls over financial reporting and/or the effectiveness of the Company's internal controls over financial reporting were inadequate and ineffective including with respect to the granting of such options, and that its internal control over operations was inadequate.

119.    In fact, the Company's financial statements during the relevant period did not comport with relevant GAAP and tax regulations concerning accounting for stock options granted under the Plan. The Company's financial statements also failed to comport with GAAP in at least the following additional respects:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB Opinion No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to existing and potential investors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

## DAMAGES TO RAMBUS

120.    As a result of PWC's wrongful conduct, the Company has suffered and will continue to suffer damage, as follows:

(a) The Company has incurred substantial expenses in connection with audit, tax, and advisory services provided by PWC;

(b) The Company has expended substantial resources related to the Audit Committee's investigation;

(c) In addition, the Company expended nearly $111 million to repurchase shares related to exercises of option grants, many of which were improper;

(d) Moreover, the Company's stock market capitalization has dropped precipitously as a result of news concerning improper options backdating practices;

(e) The Company's stock may be delisted from NASDAQ;

(f) The Company's goodwill and reputation has suffered;

(g) The Company is currently expending resources related to defense of a securities class action lawsuit related to improper options backdating and in response to regulators' inquiries; and

(h) The Company may be subject to fines or penalties related to improper accounting and tax payments.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

121.    Plaintiff brings this action derivatively in the right and for the benefit of Rambus to redress injuries suffered, and to be suffered, by Rambus as a result of PWC's wrongful conduct.

122.    On August 30, 2006, Plaintiff made the Demand on Rambus's Board of Directors. (See Exhibit A)  As of the Demand date, the board was comprised of Kevin Kennedy, J. Thomas Bently, Sunlin Chou, Bruce Dunlevie, P. Michael Farmwald, Penelope A. Herscher, Mark Horowitz, Harold Hughes, and Abraham Sofaer.

123.    Plaintiff demanded that the Board to immediately "commence legal action against those of its officers and directors…who have been responsible for failing to fulfill their fiduciary duties to the Company, reckless mismanagement, and waste of corporate assets."  Additionally Plaintiff demanded that the Company commence litigation against any associated "professional(s) responsible for the Company's actual and potential damages" stemming from the occurrences and substantive allegations as described herein.

124.    Nearly a year has elapsed since the Demand, and the board has not replied to the Demand letter.  On October 18, 2006, Rambus's Board of Directors established a Special Litigation Committee ("SLC") to determine how Rambus should respond to

allegations in certain derivative actions against officers and directors of Rambus. On August 23, 2007, the SLC issued its report. It did not address possible causes of action against PWC. The failure to pursue Rambus's legal rights against PWC is not a valid exercise of business judgment. PWC's failure to properly perform its responsibilities, as detailed herein, with regard to Rambus has cost Rambus millions of dollars for which it is entitled to recompense.

125.    The Demand-made board has appointed an additional director – David Shrigley.

126.    A demand on the Company's current board of directors is excused because it concedes its disqualification from considering a demand in view of the fact that the Company's board announced in October 2006 that it created a Special Litigation Committee.

127.    To date, the Company's board has not instigated litigation against PWC.

## TOLLING OF THE STATUTE OF LIMITATIONS

128.    The claims alleged herein are timely.

129.    The facts supporting the alleged claims did not come to light until, at the earliest, May 2006, when the possibility of accounting irregularities or errors began to leak into the public's view.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

130.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

131.    Defendant PWC entered into written contracts with the Company to perform audit services.

132.    The Company performed its duties and obligations under said contracts in full.

133.    PWC breached its contractual duties, including the duty of good faith and fair dealing.

134.    As a result of PWC's breaches of its duties, the Company has been damaged.

135.    Plaintiff has made a Demand on the Company's board of directors to bring suit against PWC but the board has not responded.

## SECOND CAUSE OF ACTION

### (Professional Negligence/Malpractice)

136.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

137.    In rendering professional services as the Company's independent auditor, PWC owed a duty to the Company to plan, structure and perform its work in a professional manner, using the degree of care normally used and expected in the accounting and auditing profession.

138.    As a direct and proximate result of PWC's breach of its duties, the Company suffered substantial damages.

139.    Plaintiff has made a Demand on the Company's board of directors to bring suit against PWC, but the board has not responded.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against PWC and in favor of the Company for the amount of damages sustained by the Company as a result of PWC's breach of contract and professional negligence/malpractice;

B.    That any indemnification agreements between PWC and the Company be invalidated;

C.    Declaring that a constructive trust be imposed upon the monies improperly paid to PWC as a result of its wrongful conduct;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

E.    Granting such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  August 27, 2007

**MURRAY, FRANK & SAILER LLP**

By: _____
Brian Murray (BM-9954)
275 Madison Ave., 8th floor
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (2120 682-1892

John G. Emerson, Jr.
Scott Poynter
Christopher D. Jennings
**EMERSON POYNTER**
The Museum Center
500 President Clinton Ave, Ste 305
Little Rock, AR 72201
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

Attorneys for Plaintiff

## **VERIFICATION**

I am the plaintiff in this action. I was a shareholder of the Company during all relevant times, and I am still a shareholder. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have. Additionally, I have read a copy of this complaint, have been advised by counsel, and based upon my personal knowledge and in reliance upon the investigation of my counsel, I believe the allegations of the complaint to be true.

_____
Plaintiff's Signature

Date: August 24, 2007


Banyoles, Spain_____
City and Country of Residence

42

**Exhibit A**



# Emerson Poynter LLP
Attorneys at Law

Little Rock
Houston

Scott E. Poynter, P.A.
Phone: 501.907.2555
Fax: 501.907.2556
scott@emersonpoynter.com

August 30, 2006

Board of Directors                                         <u>Via Overnight Mail</u>
RAMBUS, INC.
4440 El Camino Real
Los Altos, CA 94022

   *Re: Shareholder Demand*

Dear Board of Directors:

  I am writing to you on behalf of our client Herbet Francl, who is a shareholder and has owned shares of Rambus common stock at all relevant times described in this letter. Enclosed is proof of our client's holdings.

  This letter constitutes our client's demand that the Company commence legal action against those of its officers and directors, including each one of you, who have been responsible for failing to fulfill your fiduciary duties to the Company, reckless mismanagement and waste of corporate assets. To the extent there are professionals responsible for the Company's actual and potential damages from the occurrences set out below, our client additionally demands that the Company commence litigation against such persons.

  In sending this demand letter to you, my client and I do not concede that you or any of you are independent, disinterested or otherwise capable of fairly and objectively dealing with these demands. Indeed, we recognize that these demands are futile and that you will most likely select from among yourselves a committee which, with the aid of legal counsel, purportedly conduct an investigation of the matters raised by this letter, thereby seeking to delay accountability on the part of persons responsible for actual and likely damages to the Company.

  Over the past several years, the officers and directors of the Company have breached the fiduciary duties they owe the Company by causing it to be embroiled in multiple instances of serious wrongdoing, which has subjected the Company to huge potential liability in connection with direct claims alleged by the Company's stockholders, costly investigation in response to regulators' inquiries required restatements and damage to Rambus' goodwill and reputation.

  More particularly, the Company has been named as a defendant in class actions pending in California alleging that certain of the Company's directors and officers and the Company violated

the federal securities laws in connection with practices related to manipulation of measurement dates for stock option grants. In fact, the Company's July 19, 2006 press release admitted that (1) actual measurement dates for certain historical stock option grants differ from the recorded grant dates for such awards, (2) previously issued financial statements for the fiscal years 2003, 2004, 2005 and quarterly reports for those fiscal years on the Company's first quarter of fiscal 2006 should no longer be relied on and will be restated, and (3) the Company's internal controls as of December 31, 2005 suffer from material weaknesses. As announced earlier this month, the Company has also delayed its filing of its quarterly report for the period ended June 30, 2006 and has received notification from Nasdaq that it is not in compliance with filing requirements for continued listing on Nasdaq, and may face delisting from the national market, all to the detriment of the Company.

As a result of the foregoing activities, the Company is subject to substantial expenses for steps necessary to investigate and correct its financial records, defend against lawsuits and investigations, engage Nasdaq on the issue of continued listing and defend and/or indemnify certain directors and officers  Those individuals should be held accountable to the Company for damages occasioned by their conduct.

I trust that this letter will be furnished to each member of the Board promptly, as well as to his or her personal legal counsel and presented for consideration at the Company's next Board meeting. I look forward to hearing from you or your legal counsel in response to the demand set forth in this letter.

Sincerely,

Scott E. Poynter

SEP:mr

cc:    Brian Murray
       John Emerson
       Rob Jigarjian
       Herbert Francl