# REPORT OF THE SPECIAL LITIGATION COMMITTEE

# OF THE BOARD OF DIRECTORS OF RAMBUS INC.

**J. THOMAS BENTLEY**
**ABRAHAM D. SOFAER**
**Special Litigation Committee**

HELLER EHRMAN LLP
Norman J. Blears
George H. Brown
Lawrence S. Achorn
Counsel to the Special Litigation Committee

## I.    INTRODUCTION

In October 2006, Rambus Inc ("Rambus" or the "Company") announced that the Audit Committee of its Board of Directors ("Audit Committee") had concluded, after intensive investigation, that a significant number of stock options granted to its employees had been misdated. The options misdating required the restatement of the Company's financial statements for a period covering several years and precipitated the filing in the United States District Court for the Northern District of California of class action and individual securities fraud lawsuits against the Company and shareholder derivative suits filed in the name of the Company. The financial costs to the Company of the investigation, restatement, and litigation are substantial.

On October 18, 2006, Rambus's Board of Directors established a Special Litigation Committee ("SLC") to determine how the Company should respond to the derivative actions. After an exhaustive investigation and careful consideration, and in light of settlement agreements it has reached with several individuals, the SLC finds that it is in the best interest of Rambus that all claims should be terminated and dismissed with prejudice against the named defendants in the derivative actions with the exception of claims against Ed Larsen — the Company's former Vice President of Human Resources. The SLC has concluded that the claims against Mr. Larsen should be litigated in the context of the pending consolidated derivative action where he has already been named as a defendant. The SLC intends further to ask the court to stay proceedings against Mr. Larsen until any related governmental inquiries have been concluded.

The SLC finds that it is not in the best interest of the Company to pursue the claims asserted against the other defendants named in the derivative actions and that those claims should be dismissed. First, the SLC has entered into settlement agreements with Geoff Tate, Gary Harmon, Robert Eulau and David Mooring. Mr. Tate was the Chief Executive Officer of Rambus from 1990 through early 2005, and the sole member

of the Stock Option Committee of the Board of Directors from May 1997 to October 2003. Mr. Harmon served as the Company's Chief Financial Officer from March 1993 through mid-2001. Mr. Eulau served as the Company's Chief Financial Officer from mid-2001 through February 2006. Mr. Mooring served as the Vice President of several of the Company's business units from 1991 through December 1999, and as the Company's President from December 1999 until January 2004. Mr. Mooring was also a member of Rambus's Board of Directors from December 1999 through May 2006. The SLC has concluded the settlements with these individuals, which are conditioned upon the dismissal of the claims asserted against them in the derivative actions, are in the best interest of the Company. The SLC believes that the aggregate value of the settlements discussed herein exceeds $6.5 million in cash and cash equivalents and substantial additional value to the Company relating to the relinquishment of claims to over 2.7 million stock options.[1]

Second, the SLC has concluded that it is not in the best interest of the Company to pursue the claims against J. Thomas Bentley, Sunlin Chou, and Abraham D. Sofaer — all current non-executive members of the Board of Directors (and two of whom constitute the current SLC). These individuals were not affiliated with the Company at the time of the events at issue, and no evidence exists of any involvement by any of these individuals in any of the relevant activities. The SLC has concluded the claims against them are frivolous, and would fail both for a lack of evidence of any wrongdoing and an exculpatory provision in the Company's articles of incorporation which permits money damages claims against directors only for breach of the duty of loyalty or for actions taken in bad faith. It would not be in the Company's interest to pursue those claims, which would impose significant costs on the Company and unjustifiably distract the

---

[1] See details at Section V.C. below.

Company from its current business. Accordingly, the SLC has concluded those claims should be dismissed.

Third, the SLC has concluded that it is not in the best interest of the Company to pursue the claims asserted in the derivative actions against Harold Hughes, who has been a member of the Board of Directors since June 2003, and has served as the Company's Chief Executive Officer and President since January 2005. The SLC has found no evidence of any bad faith or improper behavior by Mr. Hughes concerning the matters under review, and during his tenure as Chief Executive Officer there have been no material instances of improperly dated stock options at the Company. Mr. Hughes is critical to execution and implementation of the Company's business strategy and to management of the Company's key customer relationships. Pursuing claims against Mr. Hughes would not only be unjustified on the merits, but would entail significant costs to the Company and, because of his extremely important role at the Company, would be highly disruptive of the ongoing conduct of the Company's business. Accordingly, the SLC has concluded that those claims should be dismissed.

Fourth, the SLC has concluded that it is not in the best interest of the Company to pursue the claims against Mark Horowitz, who has been a member of Rambus's Board of Directors since co-founding the Company in March 1990, and who has served as its Chief Scientist since May 2005. Dr. Horowitz is and has been critical to the Company's success. He is the inventor of the main technology on which the Company is based. Dr. Horowitz had no direct responsibilities with respect to the stock option granting process and had no knowledge of any improperly dated options. While Dr. Horowitz received one insubstantial mispriced stock option grant in his capacity as an employee, the evidence does not suggest that he had any role in or awareness of that mispricing, and Dr. Horowitz has voluntarily agreed to the repricing of that grant. The SLC has concluded that the claims asserted against Dr. Horowitz in the derivative actions would

Rambus Special Litigation Committee                    3
Final Report

fail both for a lack of evidence of any wrongdoing and the exculpatory provision in the Company's articles of incorporation. It would not be in the Company's interest to pursue those claims, which would impose significant costs on the Company and unjustifiably distract the Company from its current business. Accordingly, the SLC has concluded that those claims should be dismissed.

Fifth, the SLC has concluded that it is not in the best interest of the Company to pursue the claims against the five current or former non-executive members of Rambus's Board of Directors who served on its Compensation Committee — William Davidow, PhD., Bruce Dunlevie, P. Michael Farmwald, PhD., Charles Geschke, PhD., and Kevin Kennedy, PhD. The SLC has concluded that the claims against those individuals would fail both because of a lack of evidence of any wrongful intent or bad faith conduct by those individuals, and because of the exculpatory provision in the Company's articles of incorporation. It would not be in the Company's interest to pursue those claims, which would impose significant legal costs on the Company, and would unjustifiably distract the Company from its current business. Accordingly, the SLC has concluded that those claims should be dismissed.

Finally, the SLC has concluded that it is not in the best interest of the Company to pursue the claims against the remaining three individuals named as defendants in the derivative actions and that those claims should be dismissed. Those individuals are: John Danforth, Senior Legal Advisor and former Senior Vice President, General Counsel, and Secretary for the Company; Laura Stark, the Company's Senior Vice President, Platform Solutions; and Sobodh Toprani, formerly the Company's Senior Vice President, New Ventures. Although the exculpatory provision in the Company's articles of incorporation does not extend to officers of the Company, the SLC has concluded the claims asserted against those individuals in the derivative actions would nonetheless fail for lack of evidence of wrongdoing. It would not be in the Company's interest to pursue

such claims, which would impose significant costs on the Company, and unjustifiably distract the Company from its current business. Accordingly, the SLC has concluded that those claims should be dismissed.

The SLC's conclusions are based upon its mandate to choose the course of action that, in the exercise of the SLC's business judgment, is in the best interest of Rambus, taking into account the merits of all potential claims against the named individuals, the costs of pursuing such claims as present a reasonable likelihood of success, and the balance of advantages and disadvantages possible for the Company from proposed settlements of the claims. In coming to its decisions, the SLC reviewed the specific facts regarding each of the individual defendants and his or her role in the underlying events against the backdrop of the law applicable to the claims asserted against them, as well as how any particular course of action would affect the Company. In each case, the SLC reached the decision it believes is in the best interest of the Company.

## II.    BACKGROUND

Beginning in March 2006, an academic study and numerous subsequent press reports began to publicize the likely widespread occurrence of accounting and corporate governance irregularities with respect to the granting of stock options and other equity awards at over 100 companies, many in the high-tech sector. One such report was published in May 2006, and made observations about the timing of certain Rambus stock option grants. Subsequently, in May 2006, Rambus management conducted an initial review which uncovered apparent irregularities in past stock option grants. Management reported its findings to the Audit Committee and the full Board of Directors.

On May 30, 2006, Rambus announced that the Audit Committee, with the assistance of independent legal counsel and accounting experts, had commenced an internal investigation of the Company's past stock option grants and other potentially related issues. The Audit Committee retained Heller Ehrman LLP as its independent

legal counsel, and Heller Ehrman LLP engaged the outside accounting firm of Ernst & Young LLP to assist in the investigation.

On June 27, 2006, Rambus announced that the Audit Committee (consisting of Messrs. Bentley, Sofaer, and Chou) had reached a preliminary conclusion that the actual measurement dates for certain stock option grants issued in prior years differed from the recorded grant dates for such awards. On July 19, 2006, Rambus announced that as a result of the independent investigation, it expected to restate its previously issued financial statements for the fiscal years 2003, 2004, and 2005 to correct errors related to accounting for stock-based compensation expenses, and that non-cash stock-based compensation expenses should have been recorded with respect to those stock option grants in an amount that was material.

On August 15, 2006, Rambus announced the resignation of Geoff Tate from its Board of Directors. Mr. Tate was Chief Executive Officer of Rambus from 1990 through 2005, and the sole member of the Stock Option Committee[2] from its inception in connection with the Company's initial public offering until it was dissolved in late 2003.

On October 19, 2006, Rambus announced that the Audit Committee had substantially completed its investigation with respect to the dating of Rambus' stock option grants and had presented its findings to the Board of Directors. The Audit Committee determined that a significant number of Rambus stock option grants were not correctly dated and accounted for, with the vast majority of the incorrectly dated grants occurring between 1998 and 2001. The Audit Committee found that virtually all of the incorrectly dated stock option grants fit into three categories:

---

[2] The Stock Option Committee of Rambus's Board of Directors was authorized to approve and administer the issuance of stock options to the Company's non-executive employees. A separate committee of the Board, the Compensation Committee, was charged with approving stock option grants to executives.

Rambus Special Litigation Committee
Final Report                                6

- The recorded grant dates for a substantial number of stock options granted between 1998 and 2001 differed from the appropriate measurement dates.

- From 1999 through 2003, there was a regular practice for grants to new hire non-executive employees of selecting as the grant date that date between the employee's start date and the end of the quarter on which the closing price of Rambus stock on the Nasdaq market was the lowest. On certain occasions, employees had formal employment start dates preceding the dates on which they actually began working for Rambus. The result of these practices was that the Company recorded incorrect measurement dates for those grants.

- The strike prices for stock options granted on three occasions during 2003 and 2004 were set on the same dates as Board of Directors or Compensation Committee meeting dates at which a pool of stock options was discussed. The allocations of the stock option pools to individuals had not been completed as of the dates of those meetings and, consequently, Rambus recorded incorrect measurement dates for those grants.

Rambus's further disclosed on October 19, 2006, that the results of the Audit Committee's investigation confirmed its previous conclusion that Rambus's financial statements for the fiscal years 2003, 2004, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in Rambus's Quarterly Report on Form 10-Q for the first quarter of fiscal year 2006, should no longer be relied upon and would be restated.[3]

On May 31, 2006, the day after Rambus announced the commencement of the Audit Committee's internal investigation, a shareholder derivative suit was filed in the United States District Court for the Northern District of California, entitled *Chu v.*

---

[3] In addition to the details included in the October 18, 2006 press release, the Company's impending SEC Form 10-K and related filings detail the financial restatement and include extensive discussion of the factual background and related accounting impacts of the investigation. The SLC refers the reader to those disclosures for the factual background. As discussed in the introduction to Section V, the SLC has determined that it is not in the Company's best interest to set forth in a public report the specific factual findings relating to its conclusions due to ongoing pending litigation matters.

*Hughes, et al.*, N.D. Cal. Case No. C 06-3513-JF. A second shareholder derivative suit
entitled *Bibeau v. Hughes et al.* N.D. Cal. Case No. C 06-3921-JF was filed in the same
court on June 23, 2006, and a third, entitled *Ruggieri v. Hughes, et al.* N.D. Cal. Case No.
C 06-4153-RMW was filed on July 5, 2006. By order dated August 9, 2006, the cases
were consolidated for all purposes. The Court's order directed that the consolidated
actions be captioned "*In re Rambus Derivative Litigation*," and directed plaintiffs to file
and serve a consolidated complaint to supersede all existing complaints filed in the
actions. *See* Order Granting Plaintiffs' Motions To Consolidate Related Cases And
Appoint Lead Plaintiff And Lead Counsel, entered August 9, 2006. Plaintiffs filed a
Consolidated Shareholder Derivative Complaint on October 2, 2006, and an Amended
Consolidated Shareholder Derivative Complaint on November 3, 2006.[4]

The Amended Consolidated Shareholder Derivative Complaint ("Derivative
Complaint") asserts claims against a number of current and former officers and directors
of the Company based on the following theories of recovery:

A.   Violation of Section 10(b) of the Securities Exchange Act of 1934 and
     accompanying Rule 10b-5

B.   Violation of Section 14(a) of the Securities Exchange Act of 1934 and
     accompanying Rule 14a-9

C.   Violation of Section 20(a) of the Securities Exchange Act of 1934

D.   Accounting

E.   Breach of Fiduciary Duty and/or Aiding and Abetting Breach of Fiduciary
     Duty

---

[4] On July 24, 2006, another shareholder derivative action was filed in Santa Clara
County Superior Court, *Soffer v. Tate, et. al.*, 1-06-cv-067853. On October 20, 2006, the
court dismissed the *Soffer* complaint in deference to the federal action. In addition, on
August 22, 2006, another shareholder derivative action was filed in Delaware Chancery
Court, *Bell v. Tate, et. al.*, 2366-N. Pursuant to agreement of the parties, the case has
been stayed. All of the individual defendants named in the *Bell* complaint are defendants
in the consolidated federal derivative complaint.

F.      Abuse of Control

G.      Gross Mismanagement

H.      Constructive Fraud

I.      Corporate Waste

J.      Unjust Enrichment

K.      Rescission

L.      Breach of Contract

M.      Violations of California Corporations Code Section 25402/25502.5

N.      Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

## III.    INDEPENDENCE

On October 18, 2006, the Company's Board of Directors approved the formation of the SLC to evaluate potential claims or other actions arising out of the Company's stock option granting activities and to determine in its sole discretion whether pursuit of such claims would be in the best interest of the Company. The Board chose J. Thomas Bentley and Abraham D. Sofaer — two disinterested Board members who already had spent extensive time as members of the Audit Committee investigating the timing of past option grants and other potentially related issues — to comprise the SLC. The SLC engaged Heller Ehrman LLP as its counsel. By appointing two disinterested directors, the Board ensured that the SLC is independent.

### A.    J. Thomas Bentley

Mr. Bentley co-founded the mergers and acquisitions firm SVB Alliant (formerly Alliant Partners) in 1990, and served as a Managing Director thereof until October 2005. Mr. Bentley holds a B.A. degree in Economics from Vanderbilt University and a Masters of Science in Management from the Massachusetts Institute of Technology. In addition to Rambus, Mr. Bentley currently serves on the board of directors of Nanometrics, Inc.

Mr. Bentley joined the Board of Directors of Rambus in March 2005, well after the events underlying the claims asserted in the derivative actions. Prior to joining the Rambus Board, Mr. Bentley had no professional, personal, or familial ties to any of the defendants in the derivative actions which would create a conflict of interest under Delaware law, and he continues to have no such personal or familial ties to any of the defendants. Mr. Bentley has served as Chairman of the Audit Committee since May 2005 and, accordingly, was actively involved in the Company's internal investigation of the timing of past option grants and other potentially related issues.

Mr. Bentley recused himself from the SLC's deliberations and decision-making with regard to how to proceed with respect to the derivative claims brought against him.

**B.    Abraham D. Sofaer**

Mr. Sofaer has been the George P. Shultz Distinguished Scholar and Senior Fellow at the Hoover Institution at Stanford University since 1994. Mr. Sofaer has a long and distinguished career in the legal profession and international law. Prior to assuming his current roles, he served in private practice as a partner at Hughes, Hubbard & Reed in Washington, D.C. and as the chief legal adviser to the U.S. Department of State. From 1979 to 1985, Mr. Sofaer served as a United States District Judge for the Southern District of New York. Prior to that, Mr. Sofaer was a professor at the Columbia University School of Law, and from 1967 to 1969 was an Assistant U.S. Attorney in the Southern District of New York. Mr. Sofaer graduated magna cum laude with a B.A. in history from Yeshiva College and received his law degree from the New York University School of Law where he was editor-in-chief of the NYU Law Review before beginning clerkships with the U.S. Court of Appeals for the District of Columbia Circuit and with Justice William J. Brennan, Jr. in the U.S. Supreme Court. Mr. Sofaer currently serves on two other public boards and is on the international advisory committee for Chugai Pharmaceuticals, a large Japanese pharmaceutical company that is a subsidiary of Roche.

Mr. Sofaer joined the Board of Directors of Rambus in May 2005, well after the events underlying the claims asserted in the derivative actions. Prior to joining the Rambus Board, Mr. Sofaer had no professional, personal, or familial ties to any of the defendants in the derivative actions which would create a conflict of interest under Delaware law, and he continues to have no such personal or familial ties to any of the defendants. Mr. Sofaer has served as a member of the Audit Committee since joining the Board of Directors in May 2005 and, accordingly, was actively involved in the Company's internal investigation of the timing of past option grants and other potentially related issues.

Mr. Sofaer recused himself from the SLC's deliberations and decision-making with regard to how to proceed with respect to the derivative claims brought against him.

**C.    Heller Ehrman LLP**

Heller Ehrman LLP, counsel to the SLC, is one of the nation's premier law firms. The firm is frequently engaged to conduct internal corporate investigations, handle governmental investigations, and conduct litigation in state and federal courts across the country. The firm has served as counsel to numerous special litigation committees of boards of directors. The firm's clients include many of the largest and most sophisticated companies in America. Heller Ehrman has not represented Rambus in any significant matter in the last five years, and has never represented Rambus in any matter involving its stock option granting practices or in any matter in which any of the facts alleged in the derivative actions were in issue. In part because of its independence, Heller Ehrman was retained as legal counsel to the Audit Committee in its internal investigation of the Company's stock option grant practices.

Lead counsel for the SLC, Norman J. Blears, received his J.D. degree from Stanford University Law School, then served as a law clerk to Judge William B. Enright of the U.S. District Court for the Southern District of California. Mr. Blears joined

Heller Ehrman in 1983, and served for six years as co-chair of Heller Ehrman's firmwide Securities Litigation Practice Group. His practice emphasizes complex securities law matters, including securities class actions and corporate governance litigation. He has been a shareholder of the firm since January 1, 1988. Mr. Blears' securities law experience has included the representation of corporations, officers, outside directors and accountants in class actions, shareholder derivative actions and complex coordinated investor lawsuits in both state and federal courts as well as in government regulatory proceedings. He has led successful efforts in all aspects of securities litigation, including jury trial and appeal. He has also conducted many internal investigations and advised board litigation committees. Mr. Blears has served as a court appointed special master and arbitrator in both state and federal court and has served as a lecturer on various programs relating to director and officer liability, shareholder litigation and federal civil procedure.

The SLC has conducted its investigation independently and reached its conclusions free from any biases or extraneous influence. Neither Mr. Bentley nor Mr. Sofaer has any ties to the defendants, personal, professional or familial, that would prevent him from basing his decision in this matter purely on his assessment of what is in the best interest of the Company.

## IV.    SCOPE OF REVIEW

On October 18, 2006, the Company's Board of Directors approved the formation of the SLC to evaluate potential claims or other actions arising from Rambus's stock option granting activities. The SLC was delegated the power to conduct an independent review and evaluation of the merits of the derivative lawsuits brought against the individual defendants and to determine, in its sole discretion, whether it is in the best interest of the Company to commence, prosecute, terminate, and/or compromise litigation against any person or entity arising out of the derivative lawsuits. In connection with its

investigation, the SLC was authorized to avail itself of any and all information prepared or collected by management, employees or agents of Rambus, the Board or any committee thereof, and was charged with reaching its own independent determinations and conclusions regarding the commencement, prosecution, termination, and/or compromise of litigation against any person or entity arising out of the derivative lawsuits, and was not bound by any determinations or conclusions that the Board of Directors or any committee thereof had reached or might in the future reach regarding such matters.

The personal involvement by the members of the SLC in their evaluation of this matter has been exhaustive, involving an in-depth review of a significant volume of documentary evidence, both hard-copy and electronic, as well as participating in or reviewing memoranda of interviews of the relevant Rambus personnel. The SLC made its determinations based on its review of this evidence and the exercise of its business judgment in light of its mandate to choose the course that would be in the best interest of the Company. In making its determinations, the SLC was guided by a number of considerations, including: the merits of the derivative claims; the likelihood of recovery on those claims; the Company's obligations regarding indemnification and advancement of defense costs; the Company's insurance coverage; the Company's current and future business; and the Company's other litigation risks.

### A.    The Audit Committee's Investigation

Both members of the SLC are members of the Audit Committee that investigated the timing of the Company's past option grants and other potentially related issues prior to the SLC's formation. Similarly, Heller Ehrman LLP acted as independent counsel to the Audit Committee in its investigation. As a result, the SLC and its counsel were well versed in the relevant facts and the roles of the individuals in the underlying events prior to the commencement of the SLC's evaluation. The extensive materials gathered by the

Audit Committee in its own in-depth investigation were fully available to the SLC in its investigation.

The Audit Committee's investigation focused on the Company's stock option grants for the period beginning on May 14, 1997, the date of the Company's initial public offering, through May 30, 2006 (the "Review Period").  The Audit Committee conducted a factual investigation and accounting analysis with respect to the Company's historical stock option practices during the Review Period including, among other things:  the Company's practices and methodologies for issuing option grants; the legal authority for issuing option grants; the timing of approvals required for each granting action; the timing of allocations of specific numbers of shares to specific individuals; and the conduct of the individuals involved in the relevant processes.[5]

With the assistance of legal counsel from Heller Ehrman and forensic accountants from Ernst & Young LLP, the Audit Committee identified, collected, and reviewed over 1.5 million electronic documents and hundreds of thousands of pages of hard-copy files from 39 current and former employees and directors.  The Audit Committee collected hard-copy documents from the files of the Company's finance, legal, stock administration departments, and human resources departments (including personnel files), as well from individual custodians.  The Audit Committee also collected hard-copy corporate governance documents including Unanimous Written Consents, Board of Directors meeting minutes, Compensation Committee meeting minutes, Stock Option Committee approval memoranda, and SEC forms 3, 4, and 5.

---

[5] The Audit Committee's investigation also focused on a review of the Company's internal controls, potential remedial measures, and recommendations for best practices with respect to stock options in particular.  That portion of the Audit Committee's investigation is not germane to the SLC's investigation.

With respect to electronic documents, the Audit Committee imaged and searched the hard drives of 27 individual custodians and collected and reviewed documents from the shared drives of the Company's human resources, finance, and legal departments. Further, the Audit Committee collected electronic versions of specific categories of documents, including Unanimous Written Consents, Board of Directors meeting minutes, Compensation Committee meeting minutes, Stock Option Committee approval memoranda, and SEC forms 3, 4, and 5. The Audit Committee analyzed the metadata attributes of documents to determine when they were created and to discover any other pertinent history or modifications. Finally, the Audit Committee collected and analyzed data from the Company's Equity Edge database, which was used to track and manage the Company's stock option grants.

In addition to the collection and review of electronic and paper evidence, counsel for the Audit Committee, and in some instances Audit Committee members themselves, conducted interviews of over 50 individuals who potentially had relevant knowledge, including:

**Current and Former Directors:**

| | |
|---|---|
| William Davidow, PhD. | Mark Horowitz, PhD. |
| Bruce Dunlevie | Harold Hughes (also current CEO) |
| P. Michael Farmwald, PhD. | David Mooring (former President) |
| Charles Geschke, PhD. | Geoff Tate (former CEO) |
| Kevin Kennedy, PhD. | |

**Current and Former Officers:**

| | |
|---|---|
| Ira Blumberg | Ed Larsen (former Vice President Human Resources) |
| John Danforth (Senior Legal Advisor and former Senior VP and General Counsel) | Samir Patel |
| Kevin Donnelly | Kent Richardson |

Robert Eulau
(former CFO)

Satish Rishi
(current CFO)

Gary Harmon
(former CFO)

Michael Schroeder
(current Vice President Human Resources)

Sharon Holt

Laura Stark

Robert Kramer

**Current and Former
Human Resources Employees:**

Hayley Gulko

Carrie Ling

Melinda Kaufman

Mark Thomas

**Current and Former Stock
Administration Employees:**

Denise Allen

Loretta Miller

Susan Berry

Laura Scholes

**Current and Former Finance/
Accounting Employees:**

Joanne Bravo

Dani Park

Debbie Daniels

Toral Patel

Julia Krisman

Raquel Peasley

**Other Current Employees:**

Paul Anderson

Nirmal Jain

Akash Bansal

Jean-Marc Patenaude

Wendem Beyene

Leena Singh

Ken Chang

Jared Smith

Melissa Frank

Walter Wang

Bruno Garlepp

Gary Yip

Indri Hariyono

**PwC Auditors:**

Betty Jo Charles

Peter Matutat

Harish Khanna                         Dan Zwarn

**Outside Legal Counsel :**

   Katie Martin                       Tim Sparks

   Aaron Alter

   The factual investigation and accounting analysis phase of the Audit Committee's investigation took over four months. During that time, the Audit Committee met on numerous occasions, both in person and by telephone, interacted closely with its independent counsel, reviewed documents, attended interviews, and asked questions of witnesses. Upon completion of this phase of its investigation, the Audit Committee had reviewed all of the Company's stock option grants during the Review Period, which encompassed approximately 210 separate stock option granting actions relating to approximately 49 million underlying shares. The Audit Committee substantially completed this part of its investigation on October 17, 2006.

   **B.    The SLC's Investigation**

   In the context of their work on the Audit Committee's investigation, the members of the SLC and its legal counsel reviewed a significant volume of email and other documentary evidence relevant to option grants and the conduct of the individuals named as defendants in the derivative actions. In addition, the members of the SLC participated in or reviewed memoranda of interviews of the numerous current or former Rambus personnel, including virtually all of the individuals named as defendants in the derivative actions.

   The SLC took numerous additional steps during its investigation to determine how to proceed with regard to the individuals named as defendants in the derivative actions. In addition to reviewing pertinent evidence collected during the Audit Committee investigation, counsel for the SLC conducted numerous additional targeted document searches to further research the facts regarding the individual defendants' conduct as

accurately as reasonably possible. In addition, counsel for the SLC met with counsel for several of the individual defendants to hear and report to the SLC members those defendants' respective positions on the facts alleged in the claims against them.

The SLC met frequently and interacted closely with its independent counsel to analyze the information it gathered and determine how to proceed with regard to the individual defendants. In-person or telephonic meetings of the SLC were held on at least 20 occasions, and members of the SLC had numerous additional discussions with counsel regarding both the factual and legal aspects of its investigation.

During its deliberations, the SLC reviewed the specific facts regarding each of the individual defendants and his or her role in the underlying events against the backdrop of the legal, procedural, and evidentiary rules applicable to the claims asserted against them, as well as how any particular course of action would affect the Company. In each case, the SLC reached the decision it believed to be in the best interest of the Company.

## V.    CONCLUSIONS

The SLC has determined that it is not in the Company's best interest to set forth detailed factual findings regarding the issues raised in the consolidated derivative actions. Not only has the Company concluded that claims asserted against one defendant in the derivative action should proceed, but the Company also is subject to a pending shareholder class action and two separate individual shareholder actions asserting federal securities fraud claims. The Company's interests in the securities fraud actions will not be well served by providing the Company's litigation opponents with a substantial amount of work product generated by the SLC's counsel. Accordingly, this report states the SLC's conclusions and, with respect to defendants as to whom the SLC believes claims should be dismissed, an explanation of those conclusions. It does not, however, set forth the specific factual findings that led the SLC to these conclusions.

Based on its investigation and deliberations, the SLC has reached the following conclusions:

### A.    Ed Larsen

Ed Larsen is a former officer of the Company. Mr. Larsen served as the Company's Vice President for Human Resources from September 1996 until December 1999, then held the title of Senior Vice President, Administration until his retirement in 2004. The SLC concludes that it is in the best interest of the Company that the claims asserted against Mr. Larsen be maintained in the consolidated derivative litigation. The SLC intends to assert control over the litigation of those claims in the pending derivative action, and intends to ask the court to stay further proceedings until any governmental inquiries involving Mr. Larsen have been completed.

### B.    Robert Eulau

Robert Eulau served as the Company's Chief Financial Officer from May 2001 through February 2006.

The SLC has concluded that certain of the claims asserted against Mr. Eulau may have merit, but also recognizes the inherent uncertainties and costs of litigation. The litigation uncertainties include issues surrounding whether the evidence is sufficient to prove the necessary state of mind element of the various causes of action, the percentage of fault to be attributed to Mr. Eulau, the potential imputation of various facts to the Company, statute of limitations issues, and the ability to prove damages and loss causation, among other things.

As to the unjust enrichment claim asserted in the derivative actions, Mr. Eulau received mispriced grants on two occasions during 2001. The SLC concluded that the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.

Given the uncertainties and costs of litigation as well as the difficulty of obtaining a recovery against Mr. Eulau, the SLC entered into negotiations with Mr. Eulau in an effort to resolve the potential claims against him. On August 14, 2007, the Company and Mr. Eulau entered into an agreement, conditioned upon the dismissal of the claims against Mr. Eulau in the derivative actions, among other things, whereby Mr. Eulau will make a cash payment of $463,256.67. This amount constitutes over 60% of the after tax amount of benefit Mr. Eulau received from improperly priced stock option grants he received in 2001.

The SLC has concluded that it is in the best interest of the Company to settle the claims against Mr. Eulau on these terms, and consequently, concludes that the claims against Mr. Eulau in the derivative actions should be dismissed.

### C.    Geoff Tate

Geoff Tate served as the Company's Chief Executive Officer from May 1990 to January 2005 and as a member of the Board of Directors until August 2006. Mr. Tate also was the sole member of the Stock Option Committee from May 1997 to October 2003.

The SLC has concluded that certain of the claims asserted against Mr. Tate in the derivative actions may have merit, but also recognizes the inherent uncertainties and costs of litigation. The litigation uncertainties include issues surrounding whether the evidence is sufficient to prove the necessary state of mind element of the various causes of action, the percentage of fault to be attributed to Mr. Tate, the potential imputation of various facts to the Company, statute of limitations issues, and the ability to prove damages and loss causation, among other things. The evidence relating to whether Mr. Tate acted with knowledge that the options issued were not properly accounted for is insubstantial.

The SLC also took note of the fact that, although Mr. Tate received mispriced options during his tenure, he did not exercise the vast majority of those options. Prior to the cancellation of Mr. Tate's options, Mr. Tate exercised approximately 28,000 stock options out of the more than 2.7 million that he was granted during the period of his employment.

The SLC has also concluded that Mr. Tate participated in the approval of misdated stock option grants. He knew or should have been aware of the fact that date selection practices were occurring and that the approval memoranda he signed were not properly reflecting the actual approval dates. However, the SLC also concluded that it was reasonable for Mr. Tate to believe that Ed Larsen, the Senior Vice President, Administration, was handling the Company's stock option grants in accordance with the appropriate legal and accounting rules for stock option grants and understood the Company's actual practices.

Accordingly, the SLC entered into negotiations with Mr. Tate in an effort to resolve the potential legal claims.

Mr. Tate has asserted that: During the time period Mr. Tate was Chief Executive Officer, the Company adopted and followed a policy for the grant of options that was flawed and did not account for certain grants properly. While Mr. Tate did not develop the relevant policies, and was not responsible for the accounting judgments, he feels a sense of responsibility as Chief Executive Officer and, given his long tenure and relationship with the Company, readily agreed to assist the Company in defraying some of the expenses it has incurred.

On August 3, 2007, the Company and Mr. Tate entered into an agreement, conditioned upon the dismissal of the claims against Mr. Tate in the derivative actions, whereby Mr. Tate will make a cash payment of $3.9 million and will relinquish any claims, rights, or interests he may have in the Rambus stock options he was previously

granted but which were unexercised as of the time of his resignation from the Board. The original Black Scholes calculations for the grants in question resulted in a valuation of over $43 million as of the time those stock options were issued. As of the time when Mr. Tate failed to meet certain conditions in connection with a conditional agreement to extend his options expiration date, Mr. Tate asserted that the intrinsic value of those options (the market price compared to the exercise price) was in excess of $22 million.

The SLC has concluded that it is in the best interest of the Company to settle the claims against Mr. Tate on these terms and, consequently, concludes that the claims against Mr. Tate in the derivative actions should be dismissed.

### D.    Gary Harmon

Gary Harmon served as the Company's Chief Financial Officer from March 1993 until the middle of 2001. The SLC has concluded that certain of the allegations against Mr. Harmon in the derivative actions may have merit, but that the Company would face a number of considerable obstacles in recovering on the claims including, significantly, the applicable statutes of limitations. In addition, because of the passage of years, there would be very challenging proof problems with respect to important elements of the various causes of action. Those problems include the ability to prove the requisite state of mind requirement, damages, and loss causation for the various causes of action. Furthermore, the SLC took note of the fact that while Mr. Harmon did receive some mispriced options, his actual realized financial benefit from those options was less than $50,000.

Given the impediments to recovery and the inherent uncertainties and costs of litigation, the SLC entered into negotiations with Mr. Harmon in an effort to resolve the potential claims against him.

On August 8, 2007, the Company and Mr. Harmon entered into an agreement, conditioned upon the dismissal of the claims against Mr. Harmon in the derivative

Rambus Special Litigation Committee                22
Final Report

actions, whereby Mr. Harmon will pay $100,000 to the Company. The SLC has concluded that it is in the best interest of the Company to settle the claims against Mr. Harmon on these terms and, consequently, concludes that the claims against Mr. Harmon in the derivative actions should be dismissed.

E.    **J. Thomas Bentley, Sunlin Chou, PhD., and Abraham D. Sofaer**

J. Thomas Bentley, Sunlin Chou, and Abraham D. Sofaer are current non-executive members of Rambus's Board of Directors who joined well after the relevant events underlying the claims asserted in the derivative actions.

Mr. Bentley's background is outlined above. He has been a member of the Board of Directors of Rambus since March 2005, and has served as Chairman of the Audit Committee since May 2005.

Dr. Chou has been a member of the Board of Directors of Rambus since March 2006, and has served as a member of the Audit Committee since April 2006. Dr. Chou served for thirty-four years at Intel Corporation, a semiconductor corporation, most recently as the Senior Vice President and Co-General Manager of the Technology and Manufacturing Group from 1998 to 2005. Dr. Chou holds a B.S., M.S. and E.E. in Electrical Engineering from the Massachusetts Institute of Technology and received a Ph.D. in Electrical Engineering from Stanford University.

Mr. Sofaer's background is outlined above. He has been a member of the Board of Directors of Rambus and served as a member of the Audit Committee since May 2005.

The SLC concludes that it is not in the best interest of the Company to pursue the claims made in the derivative actions against Mr. Bentley, Dr. Chou, or Mr. Sofaer. As noted above, each of these individuals became associated with the Company well after the relevant events underlying the claims asserted in the derivative actions and after it had changed its stock option granting practices. There is no evidence that would support any claim of wrongdoing or unjust enrichment by any of these individuals. Pursuing the

meritless claims asserted in the derivative actions against Mr. Bentley, Dr. Chou, and Mr. Sofaer would only have negative consequences for the Company including significant costs and likely interference with the ongoing conduct of the Company's business. The SLC therefore concludes that it is in the Company's best interest that these claims be terminated.

Mr. Bentley recused himself from the SLC's deliberations and decision-making with regard to how to proceed with respect to the derivative claims brought against him. Mr. Sofaer recused himself from the SLC's deliberations and decision-making with regard to how to proceed with respect to the derivative claims brought against him.

### F.    Harold Hughes

Mr. Hughes has served as Chief Executive Officer and President of Rambus since January 2005, and served as acting Chief Financial Officer of Rambus from March 2006 to April 2006. Mr. Hughes has also been a member of the Board of Directors since June 2003, and served as a member of the Audit Committee from July 2003 to January 2005. Mr. Hughes was a United States Army Officer from 1969 to 1972 before starting his private sector career with Intel Corporation. Mr. Hughes held a variety of positions within Intel Corporation from 1974 to 1997, including Treasurer, Vice President of Intel Capital, Chief Financial Officer, and Vice President of Planning and Logistics. Following his tenure at Intel, Mr. Hughes was the Chairman and Chief Executive Officer of Pandesic, LLC. He also has served on the boards of Berkeley Technology, Ltd. and Xilinx, Inc. He holds a B.A. from the University of Wisconsin and an M.B.A. from the University of Michigan.

The SLC has concluded that pursuing the claims asserted against Mr. Hughes in the derivative actions would be unjustified on the merits (as outlined below), and would also entail significant costs to the Company. Further, because of Mr. Hughes' extremely important role at the Company, such litigation would be highly disruptive of the ongoing

conduct of the Company's business.  As CEO, Mr. Hughes is critical to the execution and implementation of the Company's business strategy and is responsible for its key customer relationships.  Accordingly, the SLC has concluded that those claims should be dismissed.

### 1.    Federal Securities Law Claims

Section 10(b) of the Securities Exchange Act of 1934 and accompanying Rule 10b-5 make it unlawful to defraud a purchaser or seller of securities.  To prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter — that is, "an intent to deceive, manipulate, or defraud."[6]  To prevail under Section 10(b), a plaintiff must prove either intent or "deliberate or conscious recklessness" — i.e., "no less than a degree of recklessness that strongly suggests actual intent."[7]  Proof of negligence, gross negligence, or mere recklessness does not suffice.[8]

While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Mr. Hughes, the scienter requirement is the most obvious among them.  After reviewing the specific facts regarding Mr. Hughes and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence contradicts any claim that he acted with scienter.  The SLC found that at all times Mr. Hughes acted in good faith and there is no evidence of any bad faith or improper behavior by Mr. Hughes.  During his tenure as Chief Executive Officer there have been no material instances of improperly dated stock options at the Company.

---

[6] 15 U.S.C. § 78u-4(b)(2); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).

[7] *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 979 (9th Cir. 1999).

[8] *Id.*

Accordingly, the SLC concludes that the scienter requirement would present an insurmountable obstacle to pursuing Section 10(b) claims against Mr. Hughes.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Mr. Hughes. That statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. Even if Rambus could do so, which is highly uncertain, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Mr. Hughes would be able to make the required prima facie showing (he would testify that he had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Mr. Hughes is for alleged violations of Section 14(a) of the Securities Exchange Act of 1934. That statute regulates the proxy solicitation process and, together with accompanying Rule 14a-9, prohibits the solicitation of proxies by means of materially false or misleading statements. The Derivative Complaint alleges that Mr. Hughes violated Section 14(a) by signing various proxy statements (related to annual shareholder meetings and the election of directors) issued during the period 2000 to 2002 containing misleading statements about the pricing of stock option grants. This claim is frivolous with respect to Mr. Hughes because he was not affiliated with the company during the

period from 2000 to 2002 and therefore could not have participated in the alleged violation.

The SLC therefore concludes that it is not in the Company's best interest to pursue this claim.

### 2. State Law Claims

#### a. Breach of Fiduciary Duty

Although styled in various different ways, most of the remaining counts asserted in the Derivative Complaint are claims for breach of fiduciary duty.[9] Because Rambus is a Delaware corporation, the duties of its officers and directors are defined by Delaware law.[10] Under Delaware law, officers and directors owe the corporation two fiduciary duties which, if violated, may result in liability: the duty of care and the duty of loyalty.[11]

The SLC concludes that the evidence contradicts any claim that Mr. Hughes breached his duty of care to Rambus. In any event, however, Delaware General Law § 102(b)(7) would be an insurmountable obstacle to claims for money damages based on any such alleged breach in his capacity as a director. Under Section 102(b)(7), a corporation may include a provision in its articles of incorporation eliminating the

---

[9] *See* Count 5 ("Breach of Fiduciary Duty and/or Aiding and Abetting), Count 6 ("Abuse of Control"), Count 7 ("Gross Mismanagement"), Count 8("Constructive Fraud"), and Count 14 ("Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information").

[10] *Kamen v. Kemper Fin. Servs. Inc.* 500 U.S. 90, 109 n.10 (1991).

[11] *Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 369-70 (Del. 2006). The duty to act in good faith has sometimes been described as part of a "triad" of fiduciary duties that also includes the duties of care and loyalty. But the Delaware Supreme Court clarified in *Stone* that the requirement to act in good faith "is a subsidiary element, *i.e.,* a condition, of the fundamental duty of loyalty," and that only the duties of care and loyalty, where violated, may directly result in liability. *Id.*

exposure of its directors to money damages for any breach of the duty of care that does not involve intentional misconduct, a knowing violation of law, bad faith conduct, or a transaction from which the director derived an improper personal benefit. Rambus included such a provision in its articles of incorporation, and the SLC has concluded that none of the exceptions to that exculpatory provision would apply to Mr. Hughes.[12] Consequently, even if a breach of fiduciary care could be established as to Mr. Hughes while acting in his capacity as a director, it would be to no avail as money damages would not be recoverable.

The SLC similarly concludes the evidence contradicts a claim that Mr. Hughes breached his duty of loyalty to Rambus. The basis for the duty of loyalty is the principle that officers and directors must act in the best interest of the corporation. An officer or director can breach this duty by engaging in self-dealing, failing to act in good faith or by an egregious and complete failure of oversight. Here, there is no evidence to suggest that Mr. Hughes engaged in self-dealing. Indeed, he neither approved for himself nor received any mispriced stock options. Similarly, the evidence does not suggest any failure to act in good faith or any sustained or systematic failure to exercise oversight. In the context of claims for breach of the duty of loyalty, the Delaware courts have held that "[a] failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interest of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act,

---

[12] Just as the evidence does not support a claim of scienter against Mr. Hughes for Section 10(b) purposes, or controvert a prima facie showing of good faith for Section 20(a) purposes, the evidence also contradicts a claim that Mr. Hughes engaged in intentional misconduct, knowing violations of law, or bad faith conduct. Moreover, no evidence was found suggesting that Mr. Hughes was involved in any questionable transaction from which he derived any personal benefit.

demonstrating a conscious disregard for his duties."[13]  To establish lack of sufficient oversight, the Company would have to show "a sustained or systematic failure of the board to exercise oversight — such as an utter failure to attempt to assure reasonable information and reporting systems exist."[14]  The SLC concludes the evidence contradicts any of the foregoing for purposes of asserting a viable claim for breach of the duty of loyalty against Mr. Hughes.

**b.    Corporate Waste/Unjust Enrichment**

The Derivative Complaint also asserts claims for "Corporate Waste" and "Unjust Enrichment," based on identical allegations.  Both assert that all of the defendants have been unjustly enriched via stock option grants and that "[c]ertain of the defendants sold Rambus stock for a profit during the period of deception, misusing confidential non-public corporate information," and should be required to "disgorge the gains, which they have and/or will otherwise unjustly obtain at the expense of Rambus."

Regardless of how they are styled, these claims have several obvious deficiencies.  First, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above.  Second, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.[15]  The Company would not be able to meet this standard for the simple reason that Mr. Hughes never received any mispriced option grants.  The SLC thus concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against

---

[13] *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del. 2006).

[14] *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A. 2d 959, 971 (Del. Ch. 1996).

[15] *Schock v. Nash,* 732 A.2d 217, 232-233 (Del. 1999).

Mr. Hughes. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.    California Corporations Code §§ 25402/25502.5

The final claim asserted in the Derivative Complaint against Mr. Hughes is for violation of California Corporations Code Section 25502.5. That statute provides that an issuer of securities may recover up to three times the profits made by any of its directors, officers or control persons who purchased or sold securities of the issuer on the basis of material non-public information about the issuer.[16]  In any event there is no evidence establishing Mr. Hughes was aware of material nonpublic information at the time he bought or sold any stock. The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Mr. Hughes as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

### d.    Accounting

The Derivative Complaint asserts a claim against all defendants for an equitable accounting. An equitable accounting, however, is not a separate cause of action, but rather is a species of disclosure predicated upon the plaintiff's inability to determine how much money, if any, is due from the defendant.[17]  That is not the situation here. Rather, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Mr. Hughes its damages would be determinable. More fundamentally,

---

[16] As a threshold matter, it is questionable whether Section 25502.5 has any bearing on the existence or extent of a director or officer's liability to a Delaware corporation. *See, In re Sagent Technology, Inc. Derivative Litig.*, 278 F.Supp.2d 1079, 1090-92 (N.D. Cal. 2003).

[17] *See, e.g.,* Corpus Juris Secondum, Accounting, Equitable Jurisdiction and Nature of Remedy, Overview, Generally § 6.

because the SLC has concluded that it is not in the best interest of the Company to pursue claims against Mr. Hughes there is no reason to request an equitable accounting from him.

### G.    Mark Horowitz, PhD.

Mark Horowitz, PhD. has been a member of Rambus's Board of Directors since co-founding the Company in March 1990. Dr. Horowitz served as a Vice President from March 1990 to May 1994, and has served as Chief Scientist since May 2005. Dr. Horowitz has taught at Stanford University since 1984 where he is currently a professor of Electrical Engineering and Computer Science. He holds B.S. and M.S. degrees in Electrical Engineering from the Massachusetts Institute of Technology and received his Ph.D. in Electrical Engineering from Stanford University. Dr. Horowitz is vital to the Company's technological success, and is the inventor of the main technology on which the Company is based.

The SLC has concluded that pursuing the claims asserted against Dr. Horowitz in the derivative actions would not only be unjustified on the merits (as outlined below), but would also entail significant costs to the Company and, because of his current role at the Company, would be highly disruptive and interfere with the ongoing conduct of the Company's business. Accordingly, the SLC has concluded that those claims should be dismissed.

#### 1.    Federal Securities Law Claims

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Dr. Horowitz, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Dr. Horowitz and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that there is no evidence to support a claim

that he acted with scienter. The SLC found no evidence of any bad faith or improper behavior by Dr. Horowitz. Indeed, the evidence indicates that Dr. Horowitz had no direct involvement in the stock option granting process, and there is no evidence that he had knowledge of any improperly dated options. Accordingly, the SLC concludes that the scienter requirement would present an insurmountable obstacle to pursuing Section 10(b) claims against Dr. Horowitz.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Dr. Horowitz. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. Even if Rambus could do so, which is highly uncertain, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Dr. Horowitz would be able to make the required prima facie showing (he would testify that he had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Dr. Horowitz — for alleged violations of Section 14(a) — is meritless. The SLC concludes that it is not in the Company's best interest to pursue this claim.

Most fundamentally, the claim is time-barred. Section 14(a) claims must be brought within three years from the date the challenged proxy statements were

Rambus Special Litigation Committee         32
Final Report

disseminated.[18] The three-year period is absolute and not subject to equitable tolling.[19] Because the last proxy statement challenged in the Derivative Complaint was filed in December 2002, Section 14(a) claims based on alleged inaccuracies in those proxy materials are time-barred.

In addition to the foregoing, the Section 14(a) claim asserted in the Derivative Complaint also has serious substantive defects. The purpose of Section 14(a) is to preserve the integrity of the proxy solicitation process, and to ensure that shareholders voting on corporate proposals are not misinformed. Because Rambus itself has no right to vote, there is an inherent logical flaw in permitting a shareholder to assert a Section 14(a) claim derivatively. While the United States Supreme Court held over forty years ago in *J.I. Case Co. v. Borak*,[20] that Section 14(a) could be asserted derivatively, the Court has subsequently disavowed the open-ended approach it employed there,[21] and it is doubtful whether *Borak*'s logic or result would survive scrutiny under the Court's modern jurisprudence.

Finally, even if the Section 14(a) claim was not time-barred and the company had standing to sue, the claim would founder on the element of causation. To recover damages under Section 14(a), a plaintiff must show that the challenged proxy materials were an "essential link" in the accomplishment of a corporate transaction that injured the

---

[18] *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 421, 424 (D.N.J. 2005) (collecting authorities); *Virginia M. Damon Trust v. North County Fin. Corp.*, 325 F. Supp. 2d 817, 823-24 (W.D. Mich. 2004).

[19] *E.g., Lampf, Pleva, Lipkind, Prupos & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991); *Munoz v. Ashcroft*, 339 F.3d 950, 957 (9th Cir. 2003).

[20] 377 U.S. 426 (1964).

[21] *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

company or its shareholders.[22]  Here, no transaction was made possible by the votes Rambus' shareholders cast in connection with the 2000-2002 proxies.  The only items on those proxies were the election of directors and ratification of the appointment of PwC.  While the Derivative Complaint suggests that the election of directors may serve as the causal link between challenged statements and purported harm to the company because the directors allegedly authorized or permitted misconduct to occur, that theory has been rejected by the courts as too attenuated.[23]

### 2.    State Law Claims

#### a.    Breach of Fiduciary Duty

The SLC also concludes that the evidence does not support a claim that Dr. Horowitz breached his duty of care to Rambus.  Indeed, the evidence indicates that Dr. Horowitz had no direct involvement in the stock option granting process.  Moreover, the exculpatory provision included in Rambus's articles of incorporation pursuant to Delaware General Law § 102(b)(7) would, in any event, be an insurmountable obstacle to claims for money damages based on any such alleged breach.  The SLC has found no evidence that Dr. Horowitz engaged in intentional misconduct, knowing violations of law, or bad faith conduct, or that he was involved in or aware of mispricing of stock option grants to himself.  Thus, none of the exceptions to the exculpatory provision would apply to Dr. Horowitz.  Consequently, no money damages would be recoverable by the Company for a breach of fiduciary duty of care claim.

---

[22] *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000); *General Electric Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992).

[23] *General Electric*, 980 F.2d at 933; *Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984).

The SLC similarly concludes the evidence does not support a claim that Dr. Horowitz breached his duty of loyalty to Rambus. Again, the evidence does not suggest any failure on Dr. Horowitz's part to act in good faith or any sustained or systematic failure on his part to exercise oversight. Moreover, there is no evidence that Dr. Horowitz engaged in self-dealing. While he received one insubstantial mispriced stock option grant, as noted above, there is no evidence that he was involved in or was aware of the mispricing. The SLC therefore concludes the evidence does not support a viable claim for breach of the duty of loyalty against Dr. Horowitz.

### b.    Corporate Waste/Unjust Enrichment

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Dr. Horowitz also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would face difficult issues proving this as to Dr. Horowitz. Dr. Horowitz did receive one insubstantial mispriced option grant, but the lack of evidence that he was aware of the mispricing undermines the notion that his retention of those options would be against the fundamental principles of justice or equity and good conscience. Third, the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.[24]

---

[24] The statute of limitations would present a significant obstacle to recovery on the unjust enrichment claims regardless of whether the court were to apply California's two-year statute of limitations (Cal. Civ. Proc. Code § 339; accord *Perelman v. Deul*, 2002 WL 1797228 (Cal. App. Aug. 6, 2002)) or Delaware's three-year statute of limitations (*Kahn v. Seaboard Corp.*, 625 A.2d 269, 271-77 (Del. Ch. 1993)). The claims were asserted in the derivative actions well after the prescribed time periods, and it does not

*(Footnote continued)*

The mispriced options Dr. Horowitz received were granted in April 2001. The first derivative action was filed in May 2006. Fourth, despite these facts, Dr. Horowitz has voluntarily agreed in principle to the repricing of the options in question.

Under these circumstances, the SLC concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against Dr. Horowitz. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c. California Corporations Code § 25502.5

The final claim asserted in the Derivative Complaint against Dr. Horowitz is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company. Once again, the most obvious obstacle to this claim with respect to Dr. Horowitz is the lack of evidence establishing his awareness of material nonpublic information at the time he bought or sold any stock. The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Dr. Horowitz as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

### d. Accounting

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Dr. Horowitz, its damages would be determinable. More fundamentally, because the SLC has concluded that it is not in the best interest of the Company to pursue claims against Dr. Horowitz there is no reason to request an equitable accounting from him.

---

appear that the necessary facts could be established to invoke the doctrine of equitable tolling.

## H.    David Mooring

David Mooring served as the Vice President of several of the Company's business units from 1991 through December 1999, and as the Company's President from December 1999 until January 2004.  Mr. Mooring was also a member of Rambus's Board of Directors from December 1999 through May 2006.

The SLC has concluded that most of the claims asserted against Mr. Mooring in the derivative actions have no merit, as discussed below.  After reviewing the specific facts regarding Mr. Mooring and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim that he acted in bad faith or engaged in any improper behavior.  The evidence indicates that Mr. Mooring had minimal responsibilities relating to the stock option granting process, and no role in the approval of his own stock option grants.  These facts would present significant obstacles to pursuing each of the claims asserted against Mr. Mooring other than for unjust enrichment.

As to the unjust enrichment claim asserted in the derivative actions, Mr. Mooring did receive several mispriced option grants.  But the fact that he did not participate in and did not have any role in the stock option granting process for his own grants significantly undermines the notion that his retention of those options would be against the fundamental principles of equity and good conscience.  Furthermore there is no evidence that Mr. Mooring had any awareness that the stock option granting process was flawed.  In addition, the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.[25]  Virtually all of the mispriced options Mr. Mooring received were granted in 2001 and prior.  The first derivative action was filed in May 2006.

The SLC has also concluded that it was reasonable for Mr. Mooring to believe that the Senior Vice President, Administration was handling the Company's stock option

---

[25] See fn 24, *supra*.

grants in accordance with the appropriate legal and accounting rules for stock option grants and understood the Company's actual practices.

Given the inherent uncertainties and costs of litigation as well as the remote likelihood of obtaining any recovery against Mr. Mooring, the SLC entered into negotiations with Mr. Mooring in an effort to resolve the potential claims against him. On July 26, 2007, the Company and Mr. Mooring entered into an agreement, conditioned upon the dismissal of the claims against Mr. Mooring in the derivative actions, among other things, whereby Mr. Mooring will deliver to the Company 163,333 shares of the Company's stock. The SLC has concluded that it is in the best interest of the Company to settle the claims against Mr. Mooring on these terms and, consequently, concludes that the claims against Mr. Mooring in the derivative actions should be dismissed.

### 1.    Federal Securities Law Claims

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Mr. Mooring, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Mr. Mooring and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim that he acted with scienter. The SLC found no evidence of any bad faith or improper behavior by Mr. Mooring. Indeed, the evidence indicates that Mr. Mooring had minimal responsibilities relating to the stock option granting process, and there is no evidence that he had any awareness that the stock option granting process was flawed. Accordingly, the SLC concludes that the scienter requirement would present an insurmountable obstacle to pursuing Section 10(b) claims against Mr. Mooring.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against

Mr. Mooring. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. Moreover, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Mr. Mooring would be able to make the required *prima facie* showing (he would testify that he had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Mr. Mooring — for alleged violations of Section 14(a) — as discussed above, lacks merit and, more fundamentally, is time-barred.

### 2.    State Law Claims

#### a.    Breach of Fiduciary Duty

The SLC also concludes that the evidence does not support a claim that Mr. Mooring breached his duty of care to Rambus. Indeed, as explained above the evidence indicates that Mr. Mooring had no direct involvement in the stock option granting process. Moreover, the exculpatory provision included in Rambus's articles of incorporation pursuant to Delaware General Law § 102(b)(7) would, in any event, be an insurmountable obstacle to claims for money damages based on any such alleged breach. The SLC has found no evidence that Mr. Mooring engaged in intentional misconduct, knowing violations of law, or bad faith conduct, or that he was involved in or aware of mispricing of stock option grants to himself. Thus, none of the exceptions to the

exculpatory provision would apply to Mr. Mooring. Consequently, money damages would not be recoverable for a claim of breach of the fiduciary duty of care.

The SLC similarly concludes the evidence does not support a claim that Mr. Mooring breached his duty of loyalty to Rambus. Again, the evidence does not suggest any failure on Mr. Mooring's part to act in good faith or any sustained or systematic failure on his part to exercise oversight. Moreover, the evidence does not suggest that Mr. Mooring engaged in self-dealing. While he received several mispriced stock option grants, as noted above, there is no evidence that he was involved in or was aware of the mispricing. The SLC therefore concludes the evidence does not support a viable claim for breach of the duty of loyalty against Mr. Mooring.

### b.    Corporate Waste/Unjust Enrichment

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Mr. Mooring also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would face difficult issues proving this as to Mr. Mooring. Mr. Mooring did receive several mispriced option grants, but the lack of evidence that he was aware that the stock option granting process was flawed significantly undermines the notion that his retention of those options would be against the fundamental principles of justice or equity and good conscience. Third, the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.[26] Virtually all of the mispriced options Mr. Mooring

---

[26] See fn 24, *supra*

received were granted in 2001 and prior. The first derivative action was filed in May 2006. Finally, despite these facts, Mr. Mooring has agreed to a settlement of the potential claims by agreeing to return the Company a substantial number of shares of Rambus common stock.

Under these circumstances, the SLC concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against Mr. Mooring. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.     Rescission

The Derivative Complaint purports to assert a cause of action against Mr. Mooring for rescission. Rescission, however, is merely a remedy, not a cause of action. Accordingly, the SLC thus concludes that this claim should be dismissed.

### d.     Breach of Contract

The Derivative Complaint asserts a cause of action against Mr. Mooring for breach of contract, alleging that Mr. Mooring breached his employment agreement and the Company's stock option plan by receiving improperly priced stock options. The SLC has concluded that this claim is without merit. Mr. Mooring's employment agreement contains no provisions relating to options or option pricing. Moreover, the stock option plan provision relating to option pricing (and which is incorporated by reference into stock option agreements) creates obligations and limitations for the stock option plan administrator, not option grantees such as Mr. Mooring. As a result, Mr. Mooring's receipt of allegedly mispriced options does not breach his employment agreement.

The SLC thus concludes that it is not in the best interest of the Company to pursue claims for breach of contract against Mr. Mooring. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

e.    **California Corporations Code § 25502.5**

The final claim asserted in the Derivative Complaint against Mr. Mooring is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company. Once again, the most obvious obstacle to this claim with respect to Mr. Mooring is the lack of evidence establishing his awareness of material nonpublic information at the time he bought or sold any stock.[27] The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Mr. Mooring as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

f.    **Accounting**

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Mr. Mooring, its damages would be determinable. More fundamentally, because the SLC has concluded that it is not in the best interest of the Company to pursue claims against Mr. Mooring there is no reason to request an equitable accounting from him.

I.    **William Davidow, PhD., Bruce Dunlevie, P. Michael Farmwald, PhD., Charles Geschke, PhD., and Kevin Kennedy, PhD.**

William Davidow, PhD., Bruce Dunlevie, P. Michael Farmwald, PhD., Charles Geschke, and Kevin Kennedy, PhD. are current or former non-executive members of Rambus's Board of Directors who serve or served on the Board's Compensation Committee.

Dr. Davidow was a director of Rambus from its inception in March 1990 until May 2005, and served as chairman of the Board of Directors from March 1990 to January 2005. Dr. Davidow served as a member of the Compensation Committee of the Board

---

[27] See also fn 16, supra.

from 1997 to October 2002, and as a member of the Audit Committee from 1997 to May 2005. Dr. Davidow has been a general partner of venture capital firm Mohr, Davidow Ventures since 1985. From 1973 to 1985, he held a number of management positions at Intel Corporation, including Senior Vice President of Marketing and Sales, Vice President of the Microcomputer Division and Vice President of the Microcomputer Systems Division. Dr. Davidow holds A.B. and M.S. degrees in Electrical Engineering from Dartmouth College, an M.S. degree in Electrical Engineering from the California Institute of Technology, and a Ph.D. in Electrical Engineering from Stanford University.

Mr. Dunlevie has served as a director of Rambus since its founding in March 1990, as a member of the Compensation Committee from 1997 to 2006 and as a member of the Audit Committee from 1997 to March 2005. He has been a General Partner of the venture capital firm Benchmark Capital since May 1995, and was a general partner of the venture capital firm Merrill, Pickard, Anderson & Eyre between 1989 and 2000. In addition to Rambus, Mr. Dunlevie also serves on the board of Palm, Inc. and several private companies.

Dr. Farmwald has served as a director of Rambus since co-founding the Company in March 1990, and served as a member of the Compensation Committee from October 2002 through July 2003 and March 2005 to October 2006. Dr. Farmwald founded venture capital firm Skymoon Ventures in 2000, and has co-founded other semiconductor companies including Matrix Semiconductor, Inc. in 1997. Dr. Farmwald holds a B.S. in Mathematics from Purdue University and a Ph.D. in Computer Science from Stanford University.

Dr. Geschke served as a director of Rambus from February 1996 until March 2005, as a member of the Compensation Committee of the Board from February 1996 to March 2005, and as a member of the Audit Committee from February 1996 to July 2003. Dr. Geschke is a co-founder of software company Adobe Systems Incorporated, has

served as a director of that company since 1982, as its Chief Operating Officer from 1986 to 1995, as its President from 1989 to 2000, and as its Chairman since 1997. Prior to 1982, Dr. Geschke held various positions with Xerox Corporation's Palo Alto Research Center, including Manager of the Imaging Sciences Laboratory. He holds an A.B. degree in Classics and an M.S. degree in Mathematics from Xavier University of Ohio, and received his Ph.D. in Computer Science from Carnegie-Mellon University.

Dr. Kennedy has served as a director of Rambus since April 2003, and is currently Chairman of the Board. Dr. Kennedy has served as a member of the Compensation Committee of the Board from July 2003 to the present, with the exception of a short period during mid-2006. Dr. Kennedy is also currently Chief Executive Officer and director at JDS Uniphase Corporation, a communications equipment corporation. From August 2001 to September 2003, Dr. Kennedy was the Chief Operating Officer of Openwave Systems, Inc., a software corporation. Prior to joining Openwave Systems Inc., Dr. Kennedy served seven years at Cisco Systems, Inc., a networking corporation, most recently as Senior Vice President of the Service Provider Line of Business and Software Technologies Division, and 17 years at Bell Laboratories. Dr. Kennedy is also a director of KLA Tencor Corporation.

The SLC concludes that it is not in the best interest of the Company to pursue the claims made in the consolidated derivative actions against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy. As outlined below, the SLC concludes that the derivative claims asserted against these individuals are without merit. The SLC has also concluded that it was reasonable for members of the Compensation Committee to have relied upon the Company's former Senior Vice President of Human Resources and former Chief Financial Officers to ensure that the Company's procedures for issuing and accounting for stock option grants were appropriate.

Moreover, the SLC understands and believes that Dr. Kennedy's extensive business experience, including as CEO of a major technology company, is extremely valuable to Rambus. As current Chairman of the Board, Dr. Kennedy is critical to oversight of the Company's strategic initiatives and overall business direction.

Similarly, Mr. Dunlevie has extensive business experience and has provided invaluable insights and strategic guidance over the years and is expected to continue to be vital to the Company's success.

Dr. Farmwald is a founder of the company and co-inventor of the main technology on which the company is premised. Dr. Farmwald continues to provide valuable technological insight and guidance to the company.

The SLC finds that pursuit of the derivative claims against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy would have negative consequences for the Company including significant costs and substantial and harmful interference with the ongoing conduct of the Company's business that the circumstances do not justify. Accordingly, the SLC concludes that it is in the Company's best interest that these claims be terminated.

### 1.    Federal Securities Law Claims

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy, and their roles in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim that any one of them acted with scienter. In fact, the evidence does not suggest any one of them acted other than in good faith. Accordingly,

the SLC concludes that the scienter requirement would present an insurmountable obstacle to pursuing Section 10(b) claims against these individuals.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. In any event, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy would be able to make the required prima facie showing (they would testify that they had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy — for alleged violations of Section 14(a) — as discussed above, lacks merit and, more fundamentally, is time-barred.

### 2. State Law Claims

#### a. Breach of Fiduciary Duty

The SLC also concludes that the evidence does not support a claim that Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy breached his duty of care to Rambus. In any event, the exculpatory provision included in Rambus's

articles of incorporation pursuant to Delaware General Law § 102(b)(7) would be an insurmountable obstacle to claims for money damages based on any such alleged breaches. The SLC has found that the evidence contradicts the notion that Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy engaged in intentional misconduct, knowing violations of law, or bad faith conduct, or that they were involved in or aware of mispricing of stock option grants to themselves. Thus, none of the exceptions to the exculpatory provision would apply to Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy. Consequently, even if breaches of fiduciary care could be established as to those individuals it would be to no avail as money damages would not be recoverable.

The SLC similarly concludes the evidence does not support claims that Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy breached their duties of loyalty to Rambus. Again, the evidence does not suggest any failure by Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy to act in good faith or any sustained or systematic failure on their part to exercise oversight. Moreover, the evidence does not suggest that Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy engaged in self-dealing. Indeed, they neither approved for themselves nor received any mispriced stock options. The SLC therefore concludes the evidence does not support viable claims for breach of the duty of loyalty against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy.

**b.    Corporate Waste/Unjust Enrichment**

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, and Dr. Kennedy also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for

unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would not be able to meet this standard with respect to Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy for the simple reason that neither Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, nor Dr. Kennedy received any mispriced option grants. The SLC thus concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.    California Corporations Code §§ 25402/25502.5

The final claim asserted in the Derivative Complaint against Dr. Davidow, Mr. Dunlevie, and Dr. Farmwald is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company (the claim is not asserted against Dr. Geschke or Dr. Kennedy).

The most obvious obstacle to this claim with respect to Dr. Davidow, Mr. Dunlevie, and Dr. Farmwald is the lack of evidence establishing their awareness of material nonpublic information at the time of they bought or sold any stock.[28] The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Dr. Davidow, Mr. Dunlevie, and Dr. Farmwald as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

---

[28] See also fn 16, supra.

### d.  Accounting

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy, its damages would be determinable. More fundamentally, because the SLC has concluded that it is not in the best interest of the Company to pursue claims against Dr. Davidow, Mr. Dunlevie, Dr. Farmwald, Dr. Geschke, or Dr. Kennedy there is no reason to request an equitable accounting from those individuals.

### J.  John Danforth

John Danforth held the General Counsel title at Rambus from October 2001 through July 2006. Mr. Danforth was not directly involved in the stock option granting process at Rambus, and there is no evidence that he had knowledge that the accounting for option grants was incorrect.

The SLC concludes that it is not in the best interest of the Company to pursue the claims made in the consolidated derivative actions against Mr. Danforth. As outlined below, the SLC concludes that the derivative claims asserted against Mr. Danforth would not succeed. Moreover, the SLC finds that pursuit of the derivative claims against Mr. Danforth would have negative consequences for the Company including significant costs and likely interference with the ongoing conduct of the Company's business that the circumstances do not justify. Accordingly, the SLC concludes that it is in the Company's best interest that these claims be terminated.

### 1.  Federal Securities Law Claims

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Mr. Danforth, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Mr. Danforth and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim

that he acted with scienter. The SLC found no evidence of any bad faith or improper behavior by Mr. Danforth. Indeed, the evidence indicates that Mr. Danforth had minimal responsibilities relating to the stock option granting process at Rambus and had no knowledge that the accounting for stock options was incorrect. The SLC has concluded that Mr. Danforth did not knowingly engage in any improper activity relating to the stock option matters investigated by the SLC. Accordingly, the SLC concludes that the scienter requirement would present an insurmountable obstacle to pursuing Section 10(b) claims against Mr. Danforth.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Mr. Danforth. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. Even if Rambus could do so, which is highly uncertain, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Mr. Danforth would be able to make the required prima facie showing (he would testify that he had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Mr. Danforth — for alleged violations of Section 14(a) — as discussed above, lacks merit and, more fundamentally, is time-barred.

2.    **State Law Claims**

a.    **Breach of Fiduciary Duty**

The SLC also concludes that the evidence does not support a claim that Mr. Danforth breached his duty of care to Rambus. Although Mr. Danforth held the General Counsel title at Rambus from October 2001 through July 2006, he had minimal responsibilities relating to the stock option granting process. Mr. Danforth's role in the stock option granting process at Rambus was to recommend the allocation of annual option grants to the employees he supervised, and there is no evidence that he had knowledge that the accounting for options was improper.

The SLC similarly concludes the evidence does not support a claim that Mr. Danforth breached his duty of loyalty to Rambus. Again, the evidence does not suggest any failure on Mr. Danforth's part to act in good faith. Moreover, there is no evidence that Mr. Danforth engaged in self-dealing. While he received one mispriced stock option grant when he was first hired, there is no evidence the he was involved in or was aware of the improper accounting for those options. The SLC therefore concludes the evidence does not support a viable claim for breach of the duty of loyalty against Mr. Danforth.

b.    **Corporate Waste/Unjust Enrichment**

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Mr. Danforth also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would face difficult issues proving this as to Mr. Danforth. Mr. Danforth did receive one option grant which the Company now believes was mispriced, but the lack of evidence

that he was aware of the mispricing undermines the notion that his retention of those options would be against the fundamental principles of justice or equity and good conscience. Third, the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.[29] The mispriced options Mr. Danforth received were granted in October 2001. The first derivative action was filed in May 2006. Fourth, Mr. Danforth has voluntarily agreed to reprice a portion of his mispriced options, and has reached an agreement in principle to settle with the Company any claim for reimbursement of I.R.C. s. 409A liability. The SLC thus concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against Mr. Danforth. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.  Rescission

The Derivative Complaint purports to assert a cause of action against Mr. Danforth for rescission. Rescission, however, is merely a remedy, not a cause of action. Accordingly, the SLC thus concludes that this claim should be dismissed.

### d.  Breach of Contract

The Derivative Complaint also asserts a cause of action against Mr. Danforth for breach of contract, alleging that Mr. Danforth breached his employment agreement and the Company's stock option plan by receiving improperly dated stock options. The SLC has concluded that this claim is without merit. Contrary to allegations in the Derivative Complaint, Mr. Danforth's employment agreement does not contain any provision requiring the exercise price of options to be no less than the fair market value of the Company's stock on the date of the grant. Although the Company's stock option plans and option agreements entered into by and between Mr. Danforth and the Company are

---

[29] See fn 24, *supra*.

incorporated by reference into Mr. Danforth's employment agreement, the provisions therein relating to the exercise price of options create obligations for the option administrator, not option grantees, such as Mr. Danforth. Mr. Danforth did not grant stock options to himself, nor did he have the authority to do so, and his receipt of mispriced options does not constitute a breach by Mr. Danforth's of his employment agreement. The SLC thus concludes that it is not in the best interest of the Company to pursue claims for breach of contract against Mr. Danforth. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### e.    California Corporations Code § 25502.5

The final claim asserted in the Derivative Complaint against Mr. Danforth is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company. Once again, the most obvious obstacle to this claim with respect to Mr. Danforth is the lack of evidence establishing his awareness of material nonpublic information at the time he bought or sold any stock.[30] The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Mr. Danforth as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

### f.    Accounting

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Mr. Danforth, its damages would be determinable. More fundamentally, because the SLC has concluded that it is not in the

---

[30] See also fn17, supra.

best interest of the Company to pursue claims against Mr. Danforth there is no reason to request an equitable accounting from him.

### K.    Laura Stark

Ms. Stark has served as Rambus's Senior Vice President, Platform Solutions since February 2005. From 2000 to 2005, Ms. Stark served as the Company's Vice President, Memory Interface Division, and from 1996 to 2000 she served as the Company's Strategic Accounts Director and Vice President, Alliances and Infrastructure. Ms. Stark's only role in the stock option granting process at Rambus was to recommend the allocation of annual option grants to the employees she supervised, and there is no evidence that Ms. Stark had knowledge that the Company's stock option granting process was flawed or that the accounting for stock options was improper.

The SLC has also concluded that it was reasonable for Ms. Stark to have relied upon the Company's former Senior Vice President of Human Resources and former Chief Financial Officers to ensure that the Company's procedures for issuing and accounting for stock option grants were appropriate.

The SLC concludes that it is not in the best interest of the Company to pursue the claims made in the consolidated derivative actions against Ms. Stark. As outlined below, the SLC concludes that the derivative claims asserted against Ms. Stark are without merit. Moreover, the SLC finds that pursuit of the derivative claims against Ms. Stark would have negative consequences for the Company including significant costs and likely interference with the ongoing conduct of the Company's business that the circumstances do not justify. Ms. Stark is responsible for and critical to the implementation of the Company's strategic marketing plans and the related licensing arrangements that are the major component of Rambus' revenue. Accordingly, the SLC concludes that it is in the Company's best interest that these claims be terminated.

1.    **Federal Securities Law Claims**

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Ms. Stark, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Ms. Stark and her role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim that he acted with scienter. The SLC found no evidence of any bad faith or improper behavior by Ms. Stark. Indeed, the evidence indicates that Ms. Stark had minimal responsibilities relating to the stock option granting process and was not aware that the stock option granting process was flawed or that the accounting for those options was improper. Accordingly, the SLC concludes that the scienter requirement would present a insurmountable obstacle to pursuing Section 10(b) claims against Ms. Stark.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Ms. Stark. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. In any event, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Ms. Stark would be able to make the required prima facie showing (she would testify that she had acted in good faith and did not directly or indirectly induce stock option

backdating) and that the Company, in contrast, would lack evidence to controvert that showing.[31]

The other federal securities law claim asserted in the Derivative Complaint against Ms. Stark — for alleged violations of Section 14(a) — as discussed above, lacks merit and, more fundamentally, is time-barred. In addition, Ms. Stark was not on the Board or otherwise involved in the solicitation of proxies and therefore a Section 14 claim could not be properly maintained against her.

### 2.    State Law Claims

#### a.    Breach of Fiduciary Duty

The SLC also concludes that the evidence does not support a claim that Ms. Stark breached her duty of care to Rambus. Ms. Stark has served as Rambus's Senior Vice President, Platform Solutions since February 2005, served as the Company's Vice President, Memory Interface Division, from 2000 to 2005, and served as the Company's Strategic Accounts Director and Vice President, Alliances and Infrastructure from 1996 to 2000. As noted above, Ms. Stark's did not have any direct role in the stock option granting process at Rambus, and there is no evidence that Ms. Stark had knowledge that the process was flawed or that the accounting was improper.

The SLC similarly concludes the evidence does not support a claim that Ms. Stark breached her duty of loyalty to Rambus. Again, the evidence does not suggest any failure on Ms. Stark's part to act in good faith or any sustained or systematic failure on her part to exercise oversight. Moreover, the evidence does not suggest that Ms. Stark engaged in self-dealing. While Ms. Stark received several mispriced stock option grants, there is no evidence that she was involved in the approval of her own grants. The SLC therefore

---

[31] In addition to the concerns discussed above, it is improbable that the Company could show that Ms. Stark — an officer with relatively limited authority — was a "control person" within the meaning of the federal securities laws.

concludes the evidence does not support a viable claim for breach of the duty of loyalty against Ms. Stark.

### b.    Corporate Waste/Unjust Enrichment

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Ms. Stark also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would face difficult issues proving this as to Ms. Stark. Ms. Stark did receive several mispriced option grants, but the lack of evidence that she was aware of the flawed granting practices undermines the notion that her retention of those options would be against the fundamental principles of justice or equity and good conscience. Third, the statute of limitations would present a significant obstacle to any recovery for unjust enrichment.[32] The last of the mispriced options Ms. Stark received were granted in January 2004. The first derivative action was filed in May 2006. Fourth, Ms. Stark has agreed in principle to the repricing of her unexercised options, substantially mitigating the cost to the Company of the mispriced options she was granted and has voluntarily not taken advantage of the 409A reimbursement made available to other current employees.

Given the inherent uncertainties and costs of litigation, as well as the remote likelihood of obtaining any recovery against Ms. Stark, the SLC thus concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust

---

[32] See fn 24, *supra*.

enrichment against her. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.    Rescission

The Derivative Complaint purports to assert a cause of action against Ms. Stark for rescission. Rescission, however, is merely a remedy, not a cause of action. Accordingly, the SLC thus concludes that this claim should be dismissed.

### d.    Breach of Contract

The Derivative Complaint asserts a cause of action against Ms. Stark for breach of contract, alleging that she breached her employment agreement and the Company's stock option plan by receiving improperly priced stock options. The SLC has concluded that this claim is without merit. Ms. Stark's employment agreement contains no provisions relating to options or option pricing. Moreover, the stock option plan provision relating to option pricing (and which is incorporated by reference into stock option agreements) creates obligations and limitations for the stock option plan administrator, not option grantees such as Ms. Stark. As a result, Ms. Stark's receipt of mispriced options does not constitute a breach by her of her employment agreement.

The SLC thus concludes that it is not in the best interest of the Company to pursue claims for breach of contract against Ms. Stark. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### e.    California Corporations Code § 25502.5

The final claim asserted in the Derivative Complaint against Ms. Stark is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company. Once again, the most obvious obstacle to this claim with respect to Ms. Stark is the lack of evidence establishing her awareness of material nonpublic information at the time she

bought or sold any stock.[33] The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Ms. Stark as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

### f.    Accounting

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Ms. Stark, its damages would be determinable. More fundamentally, because the SLC has concluded that it is not in the best interest of the Company to pursue claims against Ms. Stark there is no reason to request an equitable accounting from her.

### L.    Subodh Toprani

Mr. Toprani served as Rambus' Senior Vice President, New Ventures from December 1999 to July 2000. Mr. Toprani also served as Vice President and General Manager of the Logic Products Division of Rambus from March 1997 to December 1999, and as its Vice President, Marketing from May 1994 to March 1997. Mr. Toprani had no role in the stock option granting process at Rambus, and there is no evidence that Mr. Toprani had knowledge of any improperly dated options.

The SLC concludes that it is not in the best interest of the Company to pursue the claims made in the consolidated derivative actions against Mr. Toprani. As outlined below, the SLC concludes that the derivative claims asserted against Mr. Toprani are without merit. Moreover, the SLC finds that pursuit of the derivative claims against Mr. Toprani would have negative consequences for the Company including significant costs and likely interference with the ongoing conduct of the Company's business that the

---

[33] See also fn 16, supra.

circumstances do not justify. Accordingly, the SLC concludes that it is in the Company's best interest that these claims be terminated.

### 1.    Federal Securities Law Claims

As noted above, to prevail on a Section 10(b) claim, a plaintiff must plead and prove the defendant's scienter. While several obstacles would stand in the way of the Company prevailing on Section 10(b) claims against Mr. Toprani, the scienter requirement is the most obvious among them. After reviewing the specific facts regarding Mr. Toprani and his role in the events underlying the allegations in the Derivative Complaint, the SLC has concluded that the evidence fails to support a claim that he acted with scienter. The SLC found no evidence of any bad faith or improper behavior by Mr. Toprani. Indeed, the evidence indicates that Mr. Toprani's had minimal responsibilities relating to the stock option granting process at Rambus. The SLC has concluded that Mr. Toprani did not knowingly engage in any improper activity. Accordingly, the SLC concludes that the scienter requirement would present a insurmountable obstacle to pursuing Section 10(b) claims against Mr. Toprani.

For similar reasons, the SLC concludes it is not in the best interest of the Company to pursue the claims under Section 20(a) of the Securities Exchange Act of 1934 against Mr. Toprani. As noted above, that statute imposes liability on "control persons" for others' violations of the Act. To prevail on a control person claim, Rambus would first have to prove all the elements of a Section 10(b) claim against a primary violator, including scienter, damages, and loss causation, and also avoid having the primary violator's knowledge imputed to the Company. Even if Rambus could do so, which is highly uncertain, the alleged control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Although the defendant bears the burden of proof on the affirmative defense, the SLC concludes that Mr. Toprani would be able to make the

required prima facie showing (he would testify that he had acted in good faith and did not directly or indirectly induce stock option backdating) and that the Company, in contrast, would lack evidence to controvert that showing.

The other federal securities law claim asserted in the Derivative Complaint against Mr. Toprani — for alleged violations of Section 14(a) — as discussed above, lacks merit and, more fundamentally, is time-barred. In addition, Mr. Toprani was not on the Board or otherwise involved in the solicitation of proxies and therefore a Section 14 claim could not be properly maintained against him.

### 2. State Law Claims

#### a. Breach of Fiduciary Duty

The SLC also concludes that the evidence does not support a claim that Mr. Toprani breached his duty of care to Rambus. Mr. Toprani served as Rambus' Senior Vice President, New Ventures from December 1999 to July 2000, served as Vice President and General Manager of the Logic Products Division of Rambus from March 1997 to December 1999, and as its Vice President, Marketing from May 1994 to March 1997. Mr. Toprani had minimal responsibilities relating to the stock option granting process at Rambus, and there is no evidence that Mr. Toprani had knowledge of any improperly dated options.

The SLC similarly concludes the evidence does not support a claim that Mr. Toprani breached his duty of loyalty to Rambus. Again, the evidence does not suggest any failure on Mr. Toprani's part to act in good faith or any sustained or systematic failure on his part to exercise oversight. Moreover, the evidence does not suggest that Mr. Toprani engaged in self-dealing. While Mr. Toprani received several mispriced stock option grants, there is no evidence that he was involved in or was aware of the mispricing. The SLC therefore concludes the evidence does not support a viable claim for breach of the duty of loyalty against Mr. Toprani.

### b.    Corporate Waste/Unjust Enrichment

The claims for corporate waste/unjust enrichment asserted in the derivative actions against Mr. Toprani also have several obvious deficiencies. First, as noted above, a claim for corporate waste is just another variation of a claim for breach of fiduciary duty and would fail in this instance for the reasons outlined above. Second, also as noted above, to state a claim for unjust enrichment a plaintiff must show the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The Company would face difficult issues proving this as to Mr. Toprani. Mr. Toprani did receive several mispriced option grants, but the lack of evidence that he was aware of the mispricing undermines the notion that his retention of those options would be against the fundamental principles of justice or equity and good conscience. Third, the statute of limitations would most likely preclude any recovery on any of the mispriced grants to Mr. Toprani — who received the last grant in question in December 1999.[34]

Under these circumstances, the SLC thus concludes that it is not in the best interest of the Company to pursue claims for corporate waste or unjust enrichment against Mr. Toprani. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

### c.    Rescission

The Derivative Complaint purports to assert a cause of action against Mr. Toprani for rescission. Rescission, however, is merely a remedy, not a cause of action. Accordingly, the SLC thus concludes that this claim should be dismissed.

### d.    Breach of Contract

The Derivative Complaint asserts a cause of action against Mr. Toprani for breach of contract, alleging that he breached his employment agreement and the Company's

---

[34] See fn 24, *supra*.

stock option plan by receiving improperly priced stock options. The SLC has concluded that this claim is without merit. Mr. Toprani's employment agreement contains no provisions relating to options or option pricing. Moreover, the stock option plan provision relating to option pricing (and which is incorporated by reference into stock option agreements) creates obligations and limitations for the stock option plan administrator, not option grantees such as Mr. Toprani. As a result, Mr. Toprani's receipt of mispriced options does not constitute a breach by him of his employment agreement.

The SLC thus concludes that it is not in the best interest of the Company to pursue claims for breach of contract against Mr. Toprani. Such claims lack merit, and would only serve to impose significant costs on the Company and distract it from its current business.

e.   **California Corporations Code § 25502.5**

The final claim asserted in the Derivative Complaint against Mr. Toprani is for violation of California Corporations Code Section 25502.5 — i.e., purchasing or selling Rambus stock on the basis of material non-public information about the Company. Once again, the most obvious obstacle to this claim with respect to Mr. Toprani is the lack of evidence establishing his awareness of material nonpublic information at the time he bought or sold any stock.[35] The SLC thus concludes that it is not in the best interest of the Company to pursue claims for violations of California Corporations Code Section 25502.5 against Mr. Toprani as such claims lack merit and would only serve to impose significant costs on the Company and distract it from its current business.

f.   **Accounting**

As discussed above, all of the records of Rambus are fully available to Rambus and, were it to decide to proceed against Mr. Toprani, its damages would be

---

[35] See also fn 16, supra.

determinable. More fundamentally, because the SLC has concluded that it is not in the
best interest of the Company to pursue claims against Mr. Toprani there is no reason to
request an equitable accounting from him.

## VI.    CONCLUSION

For the foregoing reasons, the SLC concludes that, in the best interest of the
Company, the claims against Ed Larsen should be pursued in the consolidated derivative
action pending in the United States District Court for the Northern District of California
and that the SLC should assert control over the litigation of such claims. The SLC
concludes that the claims alleged against the remaining defendants should be terminated.


DATED: August 23,          SPECIAL LITIGATION COMMITTEE OF THE BOARD
2007                       OF DIRECTORS OF RAMBUS, INC.


By: _____
    Abraham D. Sofaer


By: _____
    J. Thomas Bentley

SV 2291757 v5
(45804.0001)


Rambus Special Litigation Committee          64
Final Report