SCHIFFRIN & BARROWAY LLP
Eric L. Zagar
Robin Winchester
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
ezagar@sbclasslaw.com
rwinchester@sbclasslaw.com
tkao@sbclasslaw.com

LERACH COUGHLIN STOIA
GELLER RUDMAN & ROBBINS LLP
Travis E. Downs III (148274)
Benny C. Goodman III (211302)
Thomas G. Wilhelm (234980)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
travisd@lerachlaw.com
bennyg@lerachlaw.com
twilhelm@lerachlaw.com
      - and -
Shawn A. Williams (213113)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4535
shawnw@learachlaw.com

Lead Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | | |
|---|---|---|
| In re RAMBUS INC. DERIVATIVE LITIGATION | ) ) ) | Master File No. C-06-3513-JF |
| This Document Relates to: | ) ) ) ) ) ) | **AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| ALL ACTIONS | ) ) ) | **JURY TRIAL DEMANDED** |

[Caption continued on following page.]

HOWARD CHU and GAETANO RUGGIERI, )
Derivatively on Behalf of RAMBUS INC., )
                            )
                      Plaintiffs, )
                            )
       vs. )
                            )
GEOFF TATE, JOHN D. DANFORTH, )
ROBERT K. EULAU, GARY HARMON, ED )
LARSEN, DAVID G. MOORING, LAURA S. )
STARK, SUBODH TOPRANI, J. THOMAS )
BENTLEY, WILLIAM H. DAVIDOW, )
BRUCE DUNLEVIE, P. MICHAEL )
FARMWALD, CHARLES GESCHKE, )
MARK HOROWITZ, HAROLD HUGHES, )
KEVIN J. KENNEDY, ABRAHAM SOFAER )
and SUNLIN CHOU, )
                            )
                    Defendants, )
                            )
       – and – )
                            )
RAMBUS INC., a Delaware corporation, )
                            )
                 Nominal Defendant. )
————————————————————————)

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought on behalf of nominal defendant Rambus Inc. ("Rambus" or the "Company") against its entire Board of Directors (the "Board") and certain current and former top executive officers.  By this action, plaintiffs seek to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law, which have virtually destroyed Rambus' once valuable corporate franchise.

2.      On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3.      At the Senate Finance Committee Hearing, the Chairman of the Securities and Exchange Commission ("SEC"), Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."

4.      In his statement before the Senate Finance Committee Deputy Attorney General Paul J. McNulty, stated, "The practice of stock option backdating to conceal information from corporate boards and regulatory authorities can only be seen as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders. . . . For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

5.      On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white

example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

6.      Rambus has **admitted** that its officers and directors committed the egregious misconduct denounced by these government officials.  Specifically, in a June 27, 2006 press release, Rambus admitted that "***the actual measurement dates for certain stock option grants issued in prior years differ from the recorded grant dates for such awards***."  Then on October 19, 2006, Rambus confirmed its earlier conclusion and ***admitted to actual option backdating***.

7.      As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Rambus, the Defendants (as defined herein) colluded with one another to:

a.      improperly backdate dozens of grants of Rambus stock options to former Rambus President and Chief Executive Officer Geoff Tate, and several other Rambus executives, in violation of the Company's shareholder-approved stock option plans;

b.      improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

c.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.      produce and disseminate to Rambus shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

8.      As a result of Defendants' egregious misconduct, Rambus has sustained millions of dollars in damages, and Tate and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

11.      Lead Plaintiff Howard Chu is, and was at all relevant times, a shareholder of nominal defendant Rambus.

12.     Lead Plaintiff Gaetano Ruggieri is, and was at all relevant times, a shareholder of nominal defendant Rambus.

13.     Nominal defendant Rambus is a Delaware corporation with its principal executive offices located at 4440 El Camino Real, Los Altos, California 94022.  According to its public filings, Rambus invents and licenses chip interface technologies that are foundational to nearly all digital electronics products.  Although Rambus is incorporated in Delaware, Rambus' principal place of business, assets, and employees are all in California.  Moreover, Rambus had at least 500 shareholders of record at all relevant times hereto.

14.     Defendant Geoff Tate ("Tate") served as Chairman of the Board of Rambus from January 2005 until his resignation in August 2006, and as a part-time executive employee from January 2005 to January 2006.  He also served as Rambus' Chief Executive Officer from May 1990 to January 2005 and as its President and a director from May 1990 to December 1999.

15.     Defendant John D. Danforth ("Danforth") has served as Rambus' Senior Vice President, General Counsel and Secretary since October 2001.

16.     Defendant Robert K. Eulau ("Eulau") served as Senior Vice President, Finance, and Chief Financial Officer of Rambus from July 2001 to February 2006.

17.     Defendant Gary Harmon ("Harmon") served as Rambus' Senior Vice President, Finance, Chief Financial Officer, and Secretary from December 1999 to July 2001.  Harmon also served as Rambus' Vice President of Finance, Chief Financial Officer, and Secretary from March 1993 to December 1999.

18.     Defendant Ed Larsen ("Larsen") served as Rambus' Senior Vice President, Administration from December 1999 to 2003 and as its Vice President, Human Resources from September 1996 to December 1999.

19.     Defendant David G. Mooring ("Mooring") served as a director of the Company from December 1999 to May 10, 2006.  He also served as Rambus' President from 1999 to 2004 and served in a variety of other executive roles at Rambus from 1991 to 2006.  Mooring discontinued his role as an executive officer in February 2005 and was a part-time employee of Rambus assisting on licensing, corporate development, and strategy until May 2006.

20.     Defendant Laura S. Stark ("Stark") has served as Rambus' Senior Vice President, Platform Solutions since February 2005 and previously served as its Vice President, Memory

Interface Division from 2000 to 2005. She also served as the Company's Strategic Accounts Director and Vice President, Alliances and Infrastructure from 1996 to 2000.

21.     Defendant Subodh Toprani ("Toprani") served as Rambus' Senior Vice President, New Ventures from December 1999 to July 2000. Toprani had also served as Vice President and General Manager of the Logic Products Division of Rambus from March 1997 to December 1999, and as its Vice President, Marketing from May 1994 to March 1997.

22.     Collectively, Defendants Tate, Danforth, Eulau, Harmon, Larsen, Mooring, Stark, and Toprani are referred to herein as the "Grantee Defendants."

23.     Defendant J. Thomas Bentley ("Bentley") has served as a director of Rambus since March 2005 and as the Chairman of the Audit Committee of the Board (the "Audit Committee") since May 2005.

24.     Defendant William H. Davidow, Ph.D. ("Davidow") served as a director of Rambus from March 1990 to May 2005 and served as Chairman of the Board of Directors from March 1990 to January 2005. Davidow was designated a Director Emeritus from May 2005 to June 2006. He also served as a member of the Compensation Committee of the Board (the "Compensation Committee") from 1997 to October 2002 and as a member of the Audit Committee from 1997 to May 2005.

25.     Defendant Bruce Dunlevie ("Dunlevie") has served as a director of Rambus since its founding in March 1990. Dunlevie has also served as a member of the Compensation Committee since 1997 and served as a member of the Audit Committee from 1997 to March 2005.

26.     Defendant P. Michael Farmwald, Ph.D. ("Farmwald") has served as a director since co-founding Rambus in March 1990 and as a member of the Compensation Committee since March 2005.

27.     Defendant Charles Geschke ("Geschke") served as a director of the Company from February 1996 to March 2005.  He also served as a member of the Audit Committee from February 1996 to July 2003 and as a member of the Compensation Committee from February 1996 to March 2005.

28.     Defendant Mark Horowitz, Ph.D. ("Horowitz") has served as a director since co-founding Rambus in March 1990 and has served as Chief Scientist since May 2005.  Horowitz also served as Rambus' Vice President from March 1990 to May 1994.

29.     Defendant Harold Hughes ("Hughes") has served as Chief Executive Officer and President of Rambus since January 2005 and as a director since June 2003.  Hughes also served as a member of the Audit Committee from July 2003 to January 2005.

30.     Defendant Kevin J. Kennedy ("Kennedy") has served as a director of Rambus since April 2003 and is the current Chairman of the Board.  Kennedy also served as a member of the Compensation Committee from 2003 to 2006.

31.     Defendant Abraham Sofaer ("Sofaer") has served as a director of Rambus and as a member of the Audit Committee since May 2005.

32.     Defendant Sunlin Chou ("Chou") has been a director of Rambus since March 2006.

33.     Collectively, defendants Tate, Farmwald, Horowitz, Geschke, Davidow, and Dunlevie are referred to herein as "Grantor Defendants."

34.     Collectively, defendants Bentley, Hughes, Kennedy, Sofaer and Chou are referred to herein as "Director Defendants,"

35.     Collectively, the Grantor Defendants, the Grantee Defendants, and the Director Defendants are referred to herein as the "Defendants."

## DUTIES OF THE DEFENDANTS

36.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, and loyalty, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to

make it possible to provide the highest quality performance of its business;

b.      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

39.    Defendants were responsible for establishing and maintaining adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, Defendants were required to:

(1)      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)      transactions are executed in accordance with management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

40.    Rambus' Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things,

a.    Reviewing periodically the Company's accounting and financial reporting processes and internal controls, based on consultation with the Company's management and the independent auditor;

b.    Conducting a review of the annual and interim financial statements and the Company's SEC reports, including Management's Discussion and Analysis. The Committee shall make a recommendation to the Board as to whether the annual, audited financial statements should be included in the Company's annual report on Form 10-K; and

c.    Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release, it being understood that such discussions may, in the discretion of the Committee, be done generally (i.e., by discussing the types of information to be disclosed and the type of presentation to be made) and that the Committee need not discuss in advance each earnings release or each instance in which the Company gives earnings guidance.

## **FACTUAL ALLEGATIONS**

### **Backdating of Stock Option Grants to the Grantee Defendants**

41.    According to Rambus' proxy statements, at all relevant times hereto the Compensation Committee "review[ed] and ma[de] recommendations to the Board of Directors regarding all forms of compensation to be provided to the executive officers and directors of the Company, including stock compensation."

42.    From 1997 to 2001, the Grantor Defendants, based on the recommendations of the Compensation Committee, granted certain Rambus stock options to the Grantee Defendants, as follows:

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 11/05/98 | Tate | $59.3125 | 90,000 |
| | Mooring | $59.3125 | 70,000 |
| | Harmon | $59.3125 | 15,000 |
| | Larsen | $59.3125 | 50,000 |
| | Toprani | $59.3125 | 50,000 |
| 10/20/99[1] | Tate | $15.67 | 1,000,000 |
| | Mooring | $15.67 | 1,000,000 |
| | Harmon | $15.67 | 80,000 |
| | Larsen | $15.67 | 160,000 |
| | Toprani | $15.67 | 120,000 |
| 06/21/01 | Eulau | $9.07 | 500,000 |
| 08/23/01 | Tate | $4.86 | 600,000 |
| | Mooring | $4.86 | 600,000 |
| | Eulau | $4.86 | 125,000 |
| | Larsen | $4.86 | 160,000 |
| 10/08/01 | Danforth | $8.00 | 400,000 |

43.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1999 Non-Statutory Stock Option Plan, 1999 Stock Plan, and 1997 Stock Plan, the exercise price of options shall be no less than the fair market value on the date of the grant, and fair market value is defined as "the closing sales price for such stock . . . for the last market trading day prior to the time of determination."

44.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

45.    Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of

---

[1] The exercise price and the amount of options purportedly granted on October 20, 1999 have been adjusted for the Company's 4-for-1 stock split effective June 15, 2000.

one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

46.     In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just after a sharp drop and just before a substantial rise in Rambus' stock price, as demonstrated in the following charts:

a.     Summary of Option Grants and Surrounding Stock Price Performance

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Purported Grant Date | Stock Price 10 Trading Days After Purported Grant Date | % Rise in Stock Price After Purported Grant Date |
|---|---|---|---|---|
| 11/05/98 | $59.3125 | $64.44 | $77.25 | 30.24% |
| 10/20/99[2] | $15.67 | $17.74 | $21.13 | 34.81% |
| 06/21/01 | $9.07 | $12.25 | $10.16 | 12.02% |
| 08/23/01 | $4.86 | $8.00 | $6.42 | 32.10% |
| 10/08/01 | $8.00 | $8.19 | $9.67 | 20.88% |

---

[2] The exercise price and closing prices pertinent to the options purportedly granted on October 20, 1999 have been adjusted for the Company's 4-for-1 stock split effective June 15, 2000.

b.   Stock Price Performance Surrounding Options Grant Dated 11/05/98



c.   Stock Price Performance Surrounding Options Grant Dated 10/20/99[3]



d.   Stock Price Performance Surrounding Options Grant Dated 06/21/01



---

[3] *See id.*

e.    Stock Price Performance Surrounding Options Grant Dated 08/23/01



f.    Stock Price Performance Surrounding Options Grant Dated 10/08/01



47.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.    Rather, at the behest of the Grantee Defendants, the Grantor Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Rambus stock was lower than the market price on the actual grant dates.    This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Grantee Defendants and improperly

reduced the amount the Grantee Defendants had to pay the Company upon exercise of the options.

48.    According to a statistical analysis conducted by Lead Plaintiffs, there is a 99.7% likelihood that the fortuitous pattern of options grants alleged herein was not the result of random chance.  Indeed, the only explanation that is consistent with the observed pattern is that the options were backdated to coincide with favorable dates when the price of Rambus stock was particularly low.

49.    Defendants' backdating of stock options was particularly egregious in fiscal years 1999, 2000, and 2001, when they backdated options to coincide with some of Rambus' lowest closing prices of those respective years, as demonstrated in the following charts:

a.    Closing Stock Prices of Fiscal Year Ended September 30, 1999



b.    Closing Stock Prices of Fiscal Year Ended September 30, 2000[4]

---

[4] The exercise price and closing prices pertinent to the options purportedly granted on October 20, 1999 have been adjusted for the Company's 4-for-1 split effective June 15, 2000.



c.     Closing Stock Prices of Fiscal Year Ended September 30, 2001



**<u>Rambus' Admissions</u>**

50.    Rambus eventually admitted what the statistics show – that the option grants were in fact backdated.

51.    On July 19, 2006, Rambus issued a press release announcing the restatement of its financial statements in relation to stock-based compensation and ***admitting to actual backdating of Rambus stock options***:

> The audit committee had reached a conclusion that the actual measurement dates for certain historical stock option grants differ from the recorded grant dates for such awards. . . . The audit committee has

determined, based on further analysis, that non-cash stock-based compensation expenses should have been recorded with respect to those stock option grants and recognized over the vesting period of the options, and that the amount of such additional expenses is material.

Further, the audit committee . . . has concluded that its previously issued financial statements for the fiscal years 2003, 2004, 2005, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in the Company's Quarterly Report on Form 10-Q for the first quarter of fiscal year 2006, should no longer be relied upon and will be restated. In addition, the restatement will affect financial statements for prior fiscal years and the Company will reflect those adjustments as a part of the opening balances in the financial statements for the restatement period.

52.     On October 19, 2006, Rambus issued a press release announcing the completion of the Audit Committee's investigation into its historical option granting practices and **_confirming its earlier conclusion that the stock option grants were in fact backdated._**

> Rambus Inc. (NASDAQ: RMBS) today announced that the Audit Committee of its Board of Directors has reported to the full Board of Directors its findings in connection with its independent investigation into historical stock option grants. The Audit Committee examined over 200 stock option granting actions from the time of Rambus' initial public offering through the commencement of the investigation in late May 2006. The Audit Committee has determined that a significant number of the stock option grants were not correctly dated or accounted for. The vast majority of incorrectly dated grants, both in terms of number of shares of common stock and financial accounting impact, occurred between 1998 and 2001. Rambus preliminarily estimates that the aggregate pre-tax, non-cash stock-based compensation charges in connection with these stock option grants will be in excess of $200 million. Rambus' management will continue the work necessary to determine the precise accounting impact of the findings of the investigation and to complete the necessary restatements of Rambus' prior financial reports. . . .
>
> **Background Leading to the Investigation**
>
> Earlier this year, an academic study and numerous subsequent press reports began to publicize the likely widespread occurrence of accounting and corporate governance irregularities with respect to the granting of stock options and other equity awards at over 100 companies, many in the high-tech sector. As a result, in late May 2006, Rambus conducted an initial review which discovered apparent irregularities in past stock option

grants. Management reported its findings to the Audit Committee and the full Board of Directors.

**Commencement of Independent Investigation**

On May 30, 2006, Rambus announced the commencement of the Audit Committee's internal investigation of the timing of stock option grant practices and related accounting issues. Each of the directors on the audit committee had joined the Rambus Board of Directors and Audit Committee after January 1, 2005.

The Audit Committee retained Heller Ehrman LLP as independent legal counsel, and Heller Ehrman LLP engaged the outside accounting firm of Ernst & Young LLP to assist in the investigation.

**Results of the Investigation to Date**

The independent investigation has taken over four months and consisted of a review of over 200 stock option granting actions. The review encompassed over 1.5 million emails and other documents, and over 50 interviews with executive officers, directors, employees and advisors.

On June 27, 2006, Rambus announced that the Audit Committee had reached a preliminary conclusion that the actual measurement dates for certain stock option grants issued in prior years differ from the recorded grant dates for such awards.

On July 19, 2006, Rambus announced that as a result of the independent investigation, it expected to restate its previously issued financial statements to correct errors related to accounting for stock-based compensation expenses, and that non-cash stock-based compensation expenses should have been recorded with respect to those stock option grants in an amount that was material.

On August 15, 2006, Rambus announced the resignation of Geoff Tate, former Chief Executive Officer of Rambus from 1990 through 2005, from its Board of Directors. Mr. Tate was Chief Executive Officer and the sole member of the Stock Option Committee during the period that the Audit Committee had preliminarily concluded that the majority of stock option irregularities occurred.

On October 17, 2006, the Audit Committee completed its findings with respect to the pricing of Rambus' stock option grants. The Audit Committee presented its findings to the Board of Directors on October 18, 2006. As indicated above, the Audit Committee has determined that a ***significant number of Rambus stock option grants were not correctly dated and accounted for, with the vast majority of incorrectly dated***

*grants occurring between 1998 and 2001*. Virtually all of the incorrectly dated stock option grants fit into three categories:

> Between 1998 and 2001, a substantial number of stock options were granted by Rambus for which the appropriate measurement dates differ from the recorded grant dates. The majority of the non-cash compensation expense associated with Rambus' financial restatement will relate to grants on five dates within this time period.

> In addition, the Audit Committee found that during the period from 1999 through 2003, Rambus had a regular practice for grants to new hire non-executive employees of selecting the lowest price of the quarter between the employee's start date and the end of the quarter. On certain occasions, individual employees had a formal employment start date which preceded the date on which they actually began working for Rambus. The result of this practice was that an employee would receive the new hire grant at a grant price that was lower than the price of the stock on the employee's actual start date.

> Rambus also had three stock option grants during 2003 and 2004 for which the price was set on the same date as a Board of Directors or Compensation Committee meeting date at which a pool of stock options was discussed, but the individual allocations of the stock option pool had not been completed as of the date of those meetings and, consequently, Rambus recorded an incorrect measurement date for those grants.

The results of the investigation confirm the Audit Committee's previous conclusion that Rambus' financial statements for the fiscal years 2003, 2004, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in Rambus' Quarterly Report on Form 10-Q for the first quarter of fiscal year 2006, *should no longer be relied upon and will be restated.* Rambus' management will continue to work to determine the precise accounting impact of the findings of the investigation and to complete the necessary restatements to Rambus' prior financial reports. Rambus will continue to work closely with Rambus' independent accountants in its restatements. Rambus preliminarily estimates that the aggregate pre-tax, non-cash stock-based compensation charges in connection with these stock option grants will be in excess of $200 million. Also as a result of the investigation, Rambus has been unable to file its quarterly report on Form 10-Q for the period ended June 30, 2006, and will not be in a position to file its quarterly report on Form 10-Q for the period ended September 30, 2006 (which is due to be filed with the Securities and Exchange Commission (the "SEC") on November 9, 2006).

Rambus has not yet determined the tax consequences that may result from these matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period.

Rambus will make every effort to file its restated financial statements and its delinquent quarterly reports as soon as practicable after the completion of accounting, tax and legal analyses required as a result of the investigation.

Additionally, Rambus is evaluating Management's Report on Internal Control Over Financial Reporting set forth in Rambus' 2005 Annual Report. Although Rambus has not yet completed its analysis, the results of the investigation confirm Rambus' determination that it is likely that ***Rambus had a material weakness in internal control over financial reporting as of December 31, 2005*** . . . . (emphasis added).

53.     Pursuant to the Company's shareholder-approved stock option plans, the members of the Compensation Committee, Davidow, Dunlevie, and Geschke, made recommendations regarding stock option grants to the full Board, and the Board then made the grants. Accordingly, both the Compensation Committee members and all the other Grantor Defendants had actual knowledge of, and directly participated in, the backdating of stock option grants. Davidow, Dunlevie, and Geschke, who also served on the Audit Committee, further knew that Rambus' financial statements were false and misleading because Rambus accounted for stock option compensation in violation of APB 25 and took tax deductions in violation of Section 162(m).

54.     The backdating of stock options and the falsity of Rambus' financial statements were well-known in Rambus' boardroom throughout the relevant period.  Through their review of the Company's books and records, and meetings and conversations with the Grantor Defendants and other Company personnel, all of the Defendants had actual knowledge of the backdating and the resulting falsity of the Company's financial statements.

## **Defendants' Dissemination of False Financial Statements**

55.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Defendants,

    a.    violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

    b.    violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

    c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

    d.    produced and disseminated to Rambus shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

56.     The Company, with the knowledge, approval, and participation of each of the Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

    a.    Form 10-K405 for year ended September 30, 1999, filed with the SEC on December 23, 1999 and signed by defendants Tate, Mooring, Harmon, Davidow, Dunlevie, Farmwald, Geschke, and Horowitz;

    b.    Form 10-K for year ended September 30, 2000, filed with the SEC on November 30, 2000 and signed by defendants Tate, Mooring, Harmon, Davidow, Dunlevie, Farmwald, Geschke, and Horowitz;

    c.    Form 10-K405 for year ended September 30, 2001, filed with the SEC on December 4, 2001 and signed by defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke, and Horowitz;

d.   Form 10-K for year ended September 30, 2002, filed with the SEC on November 26, 2002 and signed by defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke, and Horowitz;

e.   Form 10-K for year ended December 31, 2003, filed with the SEC on February 13, 2004 and signed by defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke, Horowitz, and Hughes;

f.   Form 10-K for year ended December 31, 2004, filed with the SEC on February 17, 2005 and signed by defendants Hughes, Eulau, Tate, Davidow, Dunlevie, Farmwald, Geschke, Horowitz, Kennedy, and Mooring; and

g.   Form 10-K for year ended December 31, 2005, filed with the SEC on February 21, 2006 and signed by defendants Eulau, Tate, Dunlevie, Farmwald, Horowitz, Mooring, Hughes, Bentley, Sofaer, and Kennedy.

57.   Furthermore, in each of its Form 10-K Annual Reports filed with the SEC for fiscal years 1997 through 2004, the Company, with the knowledge, approval, and participation of each of the Defendants, falsely represented that it followed APB 25 to account for stock-based compensation:

Stock-Based Compensation

Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized. When stock options are granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly. Rambus complies with the disclosure provisions as required under Statement of Financial Accounting Standards No. 123, or SFAS 123, "Accounting for Stock-Based Compensation."

58.   Defendants Tate, Hughes, and Eulau filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that the Annual

Reports of Rambus on Form 10-Ks "fully complied with the requirements of Section 13(a) and 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report[s] on 10-K[s] fairly presents in all material respects the financial conduction and results of operations of Rambus." Defendants Tate, Hughes, and Eulau signed the following certifications:

      a.     Tate and Eulau signed the false Certification for the Form 10-K for the fiscal year ended September 30, 2002 filed on November 26, 2002;

      b.     Tate and Eulau signed the false Certification for the Form 10-K for the fiscal year ended December 31, 2003 filed on February 13, 2004;

      c.     Hughes and Eulau signed the false Certification for the Form 10-K for the fiscal year ended December 31, 2004 filed on February 17, 2005; and

      d.     Hughes and Eulau signed the false Certification for the Form 10-K for the fiscal year ended December 31, 2005 filed on February 21, 2006.

### Defendants' Concealment of Their Misconduct

59.    From 2000 to 2002, the Company, with the knowledge, approval, and participation of each of the Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Grantee Defendants and falsely stated that options were granted to the Grantee Defendants at "fair market value of the stock on the date of the grant," as follows:

      a.     Rambus' proxy statement filed with the SEC on January 10, 2000 falsely reported that options granted to Tate, Mooring, Harmon, Larsen, and Toprani were granted on November 5, 1998, and that the exercise price of these options were "equal to the fair market value of the Company's Common Stock at the date of the grant." In fact, those options were backdated as particularized above in ¶ 47.

      b.     Rambus' proxy statement filed with the SEC on December 22, 2000 falsely reported that options granted to Tate, Mooring, Harmon, Larsen, and Toprani were granted on October 20, 1999,

and that the exercise price of these options were "equal to the fair market value of the Company's Common Stock at the date of the grant."  In fact, those options were backdated as particularized above in ¶ 47.

c.   Rambus' proxy statement filed with the SEC on December 14, 2001 falsely reported that options granted to Tate, Mooring, Eulau, and Larsen were granted on August 23, 2001 and other options granted to Eulau were granted on June 21, 2001, and that the exercise price of these options were "equal to the fair market value of the Company's Common Stock at the date of the grant."  In fact, those options were backdated as particularized above in ¶ 47.

d.   Rambus' proxy statement filed with the SEC on December 19, 2002 falsely reported that options granted to Danforth were granted on October 8, 2001 and April 10, 2002 and options granted to Tate and Mooring were granted on November 15, 2001, and that the exercise price of these options were "equal to the fair market value of Rambus Common Stock at the date of the grant."  In fact, those options were backdated as particularized above in ¶ 47.

60.   From 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Forms 4 that falsely reported the dates of stock option grants to the Grantee Defendants, as follows:

a.   Larsen's Forms 4 filed with the SEC on April 23, 2003 and July 21, 2003 falsely reported that options granted to Larsen had been granted on August 23, 2001;

b.   Eulau's Forms 4 filed with the SEC on July 22, 2003 and October 23, 2003 falsely reported that options granted to Eulau had been granted on August 23, 2001;

c.   Larsen's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Larsen had been granted on August 23, 2001;

d.   Eulau's Form 4 filed with the SEC on December 19, 2003 falsely reported that options granted to Eulau had been granted on June 21, 2001;

e.     Mooring's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Mooring had been granted on August 23, 2001;

f.     Larsen's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Larsen had been granted on November 5, 1998;

g.     Danforth's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Danforth had been granted on October 8, 2001;

h.     Mooring's Form 4 filed with the SEC on January 28, 2004 falsely reported that options granted to Mooring had been granted on August 23, 2001;

i.     Eulau's Form 4 filed with the SEC on February 5, 2004 falsely reported that options granted to Eulau had been granted on August 23, 2001;

j.     Danforth's Form 4 filed with the SEC on February 5, 2004 falsely reported that options granted to Danforth had been granted on October 8, 2001;

k.     Mooring's Form 4 filed with the SEC on March 1, 2004 falsely reported that options granted to Mooring had been granted on November 5, 1998 and August 23, 2001.

l.     Larsen's Form 4 filed with the SEC on March 1, 2004 falsely reported that options granted to Larsen had been granted on October 20, 1999.

m.     Danforth's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Danforth had been granted on October 8, 2001;

n.     Eulau's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Eulau had been granted on August 23, 2001;

o.     Danforth's Form 4 filed with the SEC on April 5, 2004 falsely reported that options granted to Danforth had been granted on October 8, 2001;

p.     Eulau's Form 4 filed with the SEC on April 5, 2004 falsely reported that options granted to Eulau had been granted on August 23, 2001;

q.    Stark's Form 4 filed with the SEC on April 29, 2004 falsely reported that options granted to Stark had been granted on August 23, 2001;

r.    Eulau's Form 4 filed with the SEC on May 6, 2004 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

s.    Stark's Forms 4 filed with the SEC on July 22, 2004 and October 22, 2004 falsely reported that options granted to Stark had been granted on August 23, 2001;

t.    Tate's Form 4 filed with the SEC on December 2, 2004 falsely reported that options granted to Tate had been granted on November 5, 1998 and October 20, 1999;

u.    Eulau's Form 4 filed with the SEC on December 2, 2004 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

v.    Eulau's Form 4 filed with the SEC on January 4, 2005 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

w.    Stark's Forms 4 filed with the SEC on May 4, 2005, July 27, 2005, and November 1, 2005 falsely reported that options granted to Stark had been granted on August 23, 2001;

x.    Eulau's Form 4 filed with the SEC on January 9, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

y.    Danforth's Form 4 filed with the SEC on January 10, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

z.    Eulau's Form 4 filed with the SEC on January 10, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

aa.   Danforth's Form 4 filed with the SEC on January 12, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

bb.   Eulau's Forms 4 filed with the SEC on January 12, 2006 and January 18, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

cc.    Danforth's Form 4 filed with the SEC on January 18, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

dd.    Eulau's Form 4 filed with the SEC on January 23, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

ee.    Mooring's Form 4 filed with the SEC on January 26, 2006 falsely reported that options granted to Mooring had been granted on August 23, 2001.

ff.    Stark's Form 4 filed with the SEC on January 26, 2006 falsely reported that options granted to Stark had been granted on August 23, 2001;

gg.    Mooring's Form 4 filed with the SEC on January 31, 2006 falsely reported that options granted to Mooring had been granted on November 5, 1998.

hh.    Danforth's Form 4 filed with the SEC on February 3, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

ii.    Eulau's Form 4 filed with the SEC on February 3, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001;

jj.    Eulau's Form 4 filed with the SEC on February 7, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

kk.    Mooring's Form 4 filed with the SEC on February 21, 2006 falsely reported that options granted to Mooring had been granted on November 5, 1998;

ll.    Mooring's Forms 4 filed with the SEC on February 22, 2006 and February 27, 2006 falsely reported that options granted to Mooring had been granted on November 5, 1998 and October 20, 1999;

mm.    Mooring's Form 4 filed with the SEC on March 2, 2006 falsely reported that options granted to Mooring had been granted on October 20, 1999 and August 23, 2001;

nn.    Danforth's Form 4 filed with the SEC on March 2, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

oo.    Eulau's Form 4 filed with the SEC on March 2, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

pp.    Mooring's Forms 4 filed with the SEC on March 3, 2006 and March 8, 2006 falsely reported that options granted to Mooring had been granted on October 20, 1999;

qq.    Danforth's Forms 4 filed with the SEC on March 22, 2006, March 30, 2006, April 5, 2006, April 7, 2006, and April 12, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

rr.    Stark's Form 4 filed with the SEC on April 28, 2006 falsely reported that options granted to Stark had been granted on November 5, 1998 and August 23, 2001;

ss.    Mooring's Form 4 filed with the SEC on May 3, 2006 falsely reported that options granted to Mooring had been granted on August 23, 2001;

tt.    Danforth's Form 4 filed with the SEC on May 3, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001;

uu.    Stark's Form 4 filed with the SEC on May 3, 2006 falsely reported that options granted to Stark had been granted on November 5, 1998 and October 20, 1999;

vv.    Stark's Form 4 filed with the SEC on May 4, 2006 falsely reported that options granted to Stark had been granted on November 5, 1998;

61.    Defendants continued to conceal their foregoing misconduct until May 16, 2006, when the Center for Financial Research and Analysis identified several companies, including Rambus, at high risk for having backdated options.

## **Defendants' Insider Selling**

62.    Between 2003 and 2006, certain of the Defendants (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom,

sold more than $200 million in Rambus stock, a significant portion of which was obtained

through the exercise of improperly backdated stock options, as demonstrated below:

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE/SHARE | PROCEEDS |
|---|---|---|---|---|
| Danforth | 01/21/04 | 40,000 | $33.10 | $1,324,120.000 |
| | 02/03/04 | 40,000 | $30.01 | $1,200,268.000 |
| | 03/03/04 | 40,000 | $31.66 | $1,266,576.000 |
| | 04/02/04 | 20,000 | $28.46 | $569,132.000 |
| | 01/09/06 | 10,000 | $25.00 | $250,000.000 |
| | 01/11/06 | 10,000 | $30.08 | $300,787.000 |
| | 01/17/06 | 20,000 | $35.38 | $707,666.000 |
| | 02/01/06 | 10,000 | $27.78 | $277,762.000 |
| | 03/01/06 | 5,000 | $31.51 | $157,544.000 |
| | 03/20/06 | 13,005 | $35.00 | $455,175.000 |
| | 03/21/06 | 36,995 | $35.29 | $1,305,505.457 |
| | 03/29/06 | 3,310 | $40.00 | $132,400.000 |
| | 03/30/06 | 2,600 | $40.08 | $104,211.900 |
| | 04/03/06 | 10,000 | $39.33 | $393,300.000 |
| | 04/06/06 | 15,000 | $40.84 | $612,646.500 |
| | 04/07/06 | 15,000 | $41.91 | $628,594.500 |
| | 04/10/06 | 9,090 | $42.03 | $382,070.880 |
| | 05/01/06 | 6,945 | $38.90 | $270,149.388 |
| | 05/01/06 | 3,055 | $38.90 | $118,834.612 |
| | 07/24/06 | 140 | $14.87 | $2,081.800 |
| | | | Total = | $10,458,825.037 |
| Davidow | 07/26/04 | 20,000 | $15.98 | $319,572.000 |
| | 08/18/04 | 20,000 | $15.00 | $300,000.000 |
| | 09/15/04 | 20,000 | $15.00 | $300,000.000 |
| | 10/20/04 | 20,000 | $17.66 | $353,278.000 |
| | 11/15/04 | 20,000 | $19.29 | $385,768.000 |
| | 12/15/04 | 20,000 | $27.47 | $549,314.000 |
| | 01/18/05 | 20,000 | $20.97 | $419,498.000 |
| | 02/15/05 | 20,000 | $18.58 | $371,648.000 |
| | 03/21/05 | 20,000 | $16.40 | $328,028.000 |
| | 05/06/05 | 17,916 | $14.07 | $252,017.206 |
| | 05/06/05 | 12,916 | $14.07 | $181,684.206 |
| | 05/13/05 | 20,000 | $15.00 | $300,000.000 |
| | 05/19/05 | 20,000 | $15.00 | $300,000.000 |

| | 06/15/05 | 12,870 | $15.00 | $193,050.000 |
|---|---|---|---|---|
| | 05/01/06 | 10,000 | $38.85 | $388,489.000 |
| | 05/02/06 | 10,000 | $38.13 | $381,327.000 |
| | 05/03/06 | 10,000 | $35.66 | $356,574.000 |
| | 05/04/06 | 10,000 | $36.33 | $363,345.000 |
| | 05/05/06 | 10,000 | $36.97 | $369,663.000 |
| | 05/08/06 | 10,000 | $37.02 | $370,158.000 |
| | 05/09/06 | 10,000 | $37.37 | $373,663.000 |
| | 05/11/06 | 10,000 | $33.54 | $335,438.000 |
| | 05/12/06 | 10,000 | $31.71 | $317,068.000 |
| | 05/10/06 | 10,000 | $36.36 | $363,613.000 |
| | | | **Total =** | **$8,173,195.411** |
| Dunlevie | 02/03/04 | 2,000 | $30.11 | $60,220.000 |
| | 02/03/04 | 1,100 | $30.09 | $33,099.000 |
| | 02/03/04 | 900 | $30.10 | $27,090.000 |
| | 02/26/04 | 2,000 | $32.90 | $65,800.000 |
| | 02/26/04 | 2,000 | $32.90 | $65,800.000 |
| | 01/24/06 | 8,000 | $34.91 | $279,260.000 |
| | 01/25/06 | 30,000 | $34.92 | $1,047,522.000 |
| | 01/25/06 | 20,000 | $34.96 | $699,200.000 |
| | 05/03/06 | 4,000 | $35.84 | $143,361.600 |
| | 05/03/06 | 4,000 | $35.80 | $143,217.600 |
| | 05/03/06 | 4,000 | $35.65 | $142,582.800 |
| | 05/03/06 | 4,000 | $35.72 | $142,892.000 |
| | 05/04/06 | 30,000 | $36.32 | $1,089,600.000 |
| | | | **Total =** | **$3,939,645.000** |
| Eulau | 07/18/03 | 3,000 | $18.93 | $56,790.000 |
| | 07/18/03 | 9,090 | $18.91 | $171,891.900 |
| | 07/21/03 | 20,910 | $18.61 | $389,135.100 |
| | 10/21/03 | 30,000 | $25.49 | $764,739.000 |
| | 02/03/04 | 9,444 | $30.01 | $283,383.275 |
| | 02/03/04 | 556 | $30.01 | $16,683.725 |
| | 02/03/04 | 1,592 | $30.01 | $47,770.666 |
| | 03/02/04 | 1,736 | $32.23 | $55,947.808 |
| | 03/02/04 | 8,264 | $32.23 | $266,332.192 |
| | 04/02/04 | 1,736 | $28.46 | $49,400.658 |
| | 04/02/04 | 8,264 | $28.46 | $235,165.342 |
| | 05/04/04 | 8,249 | $20.00 | $164,980.000 |
| | 05/04/04 | 1,736 | $20.00 | $34,720.000 |

| | | | |
|---|---|---|---|
| 05/04/04 | 15 | $20.00 | $300.000 |
| 05/04/04 | 1,870 | $20.00 | $37,400.000 |
| 11/15/04 | 150 | $18.92 | $2,838.000 |
| 11/16/04 | 10,417 | $20.00 | $208,340.000 |
| 11/16/04 | 8,000 | $20.00 | $160,000.000 |
| 11/16/04 | 41,583 | $20.00 | $831,660.000 |
| 12/02/04 | 1,736 | $24.34 | $42,255.802 |
| 12/02/04 | 1,333 | $24.34 | $32,446.420 |
| 12/02/04 | 6,931 | $24.34 | $168,706.778 |
| 01/04/05 | 1,736 | $21.66 | $37,594.642 |
| 01/04/05 | 1,334 | $21.66 | $28,888.971 |
| 01/04/05 | 6,930 | $21.66 | $150,075.387 |
| 11/23/05 | 200 | $15.62 | $3,123.000 |
| 01/05/06 | 15,000 | $22.43 | $336,489.000 |
| 01/05/06 | 15,000 | $22.43 | $336,489.000 |
| 01/06/06 | 5,834 | $22.01 | $128,393.505 |
| 01/06/06 | 9,166 | $22.01 | $201,723.495 |
| 01/06/06 | 5,834 | $22.01 | $128,393.505 |
| 01/06/06 | 9,166 | $22.01 | $201,723.495 |
| 01/09/06 | 8,166 | $23.61 | $192,764.963 |
| 01/09/06 | 6,834 | $23.61 | $161,322.037 |
| 01/09/06 | 8,166 | $23.61 | $192,764.963 |
| 01/09/06 | 6,834 | $23.61 | $161,322.037 |
| 01/10/06 | 15,000 | $27.71 | $415,720.500 |
| 01/11/06 | 65,000 | $30.49 | $1,981,668.000 |
| 01/12/06 | 15,000 | $33.00 | $494,959.500 |
| 01/13/06 | 15,000 | $32.14 | $482,097.000 |
| 01/17/06 | 26,613 | $36.00 | $958,068.000 |
| 01/17/06 | 15,000 | $34.72 | $520,851.000 |
| 01/18/06 | 15,000 | $34.07 | $511,041.000 |
| 01/19/06 | 15,000 | $34.23 | $513,375.000 |
| 01/20/06 | 15,000 | $34.09 | $511,401.000 |
| 01/23/06 | 15,000 | $35.29 | $529,405.500 |
| 01/23/06 | 100 | $36.00 | $3,600.000 |
| 02/01/06 | 1,736 | $27.77 | $48,207.678 |
| 02/01/06 | 1,333 | $27.77 | $37,016.610 |
| 02/02/06 | 43,287 | $27.25 | $1,179,367.301 |
| 03/13/06 | 2,250 | $31.58 | $71,043.750 |
| 03/13/06 | 50 | $31.58 | $1,578.750 |

| | 02/01/06 | 46,931 | $27.77 | $1,303,245.711 |
|---|---|---|---|---|
| | | | Total = | $15,844,600.968 |
| Farmwald | 04/27/06 | 20,000 | $40.29 | $805,752.000 |
| | 04/28/06 | 5,000 | $40.02 | $200,083.000 |
| | 02/27/06 | 50,000 | $31.48 | $1,574,025.000 |
| | 02/27/06 | 15,000 | $31.63 | $474,450.000 |
| | 01/24/06 | 100,000 | $34.13 | $3,413,150.000 |
| | 02/25/05 | 100,000 | $17.62 | $1,762,210.000 |
| | 02/09/05 | 100,000 | $18.06 | $1,806,060.000 |
| | 02/26/04 | 100,000 | $32.73 | $3,272,970.000 |
| | 02/27/04 | 100,000 | $32.34 | $3,234,360.000 |
| | 01/26/04 | 30,000 | $32.50 | $975,000.000 |
| | 01/21/04 | 120,000 | $33.13 | $3,975,924.000 |
| | 11/10/03 | 40,000 | $25.21 | $1,008,520.000 |
| | 08/29/03 | 81,840 | $16.70 | $1,366,777.104 |
| | 08/05/03 | 26,430 | $17.91 | $473,329.584 |
| | 07/31/03 | 16,830 | $18.05 | $303,739.425 |
| | 08/01/03 | 44,400 | $18.02 | $799,874.880 |
| | 08/04/03 | 30,500 | $18.05 | $550,549.400 |
| | 05/16/03 | 110,000 | $15.16 | $1,667,600.000 |
| | 05/19/03 | 90,000 | $15.63 | $1,406,700.000 |
| | 05/12/00 | 20,000 | $193.03 | $3,860,600.000 |
| | 05/03/06 | 2,700 | $35.68 | $96,336.000 |
| | | | Total = | $33,028,010.393 |
| Horowitz | 06/01/05 | 23,692 | $15.41 | $365,200.334 |
| | 05/02/05 | 23,692 | $14.23 | $337,139.529 |
| | 04/01/05 | 23,692 | $15.01 | $355,526.890 |
| | 03/01/05 | 23,692 | $17.38 | $411,802.498 |
| | 02/01/05 | 23,692 | $17.99 | $426,297.264 |
| | 01/03/05 | 23,692 | $23.09 | $547,057.757 |
| | 12/01/04 | 23,692 | $23.52 | $557,342.454 |
| | 11/22/04 | 85,000 | $21.65 | $1,840,250.000 |
| | 11/01/04 | 23,692 | $17.12 | $405,704.177 |
| | 10/26/04 | 23,692 | $16.63 | $394,109.312 |
| | 09/01/04 | 26,660 | $13.04 | $347,521.098 |
| | 08/02/04 | 26,660 | $16.61 | $442,934.572 |
| | 07/01/04 | 26,660 | $17.21 | $458,943.902 |
| | 06/01/04 | 26,660 | $19.08 | $508,608.816 |
| | 05/03/04 | 26,660 | $18.69 | $498,310.058 |

| | | | | |
|---|---|---|---|---|
| | 04/19/04 | 40,000 | $24.82 | $992,800.000 |
| | 04/01/04 | 26,660 | $28.54 | $760,865.736 |
| | 03/01/04 | 26,660 | $32.01 | $853,338.612 |
| | 02/02/04 | 26,660 | $30.39 | $810,216.062 |
| | 01/02/04 | 26,660 | $30.90 | $823,812.662 |
| | 12/22/03 | 17,900 | $26.60 | $476,140.000 |
| | 12/01/03 | 26,660 | $30.60 | $815,827.992 |
| | 11/03/03 | 26,660 | $25.38 | $676,612.138 |
| | 10/28/03 | 26,660 | $24.69 | $658,331.376 |
| | 05/15/03 | 25,000 | $15.53 | $388,250.000 |
| | 07/01/05 | 23,692 | $13.39 | $317,233.511 |
| | | | **Total =** | **$15,470,176.750** |
| Hughes | 07/19/05 | 50,457 | $13.29 | $670,321.25 |
| | | | **Total =** | **$670,321.25** |
| Larsen | 07/17/03 | 10,000 | $19.39 | $193,900.000 |
| | 07/18/03 | 40,000 | $18.69 | $747,600.000 |
| | 10/21/03 | 6,000 | $25.56 | $153,370.200 |
| | 10/21/03 | 20,000 | $25.56 | $511,234.000 |
| | 10/21/03 | 74,000 | $25.56 | $1,891,565.800 |
| | 01/21/04 | 6,180 | $33.12 | $204,681.600 |
| | 01/21/04 | 128,620 | $33.12 | $4,259,894.400 |
| | 01/22/04 | 34,591 | $32.06 | $1,108,977.083 |
| | 01/23/04 | 10,000 | $32.05 | $320,514.000 |
| | 02/26/04 | 14,989 | $33.05 | $495,351.975 |
| | 02/26/04 | 6,380 | $33.05 | $210,844.326 |
| | 02/26/04 | 23,512 | $33.05 | $777,017.522 |
| | 02/26/04 | 20,609 | $33.05 | $681,080.049 |
| | 02/26/04 | 80,284 | $33.05 | $2,653,201.547 |
| | 02/26/04 | 4,226 | $33.05 | $139,659.580 |
| | | | **Total =** | **$14,348,892.083** |
| Mooring | 03/06/06 | 100,000 | $33.64 | $3,363,630.000 |
| | 03/07/06 | 100,000 | $32.76 | $3,275,890.000 |
| | 03/08/06 | 31,450 | $31.19 | $981,073.315 |
| | 03/02/06 | 100,000 | $32.99 | $3,299,100.000 |
| | 03/03/06 | 100,000 | $32.30 | $3,229,680.000 |
| | 02/27/06 | 100,000 | $31.57 | $3,156,620.000 |
| | 02/28/06 | 100,000 | $30.56 | $3,055,710.000 |
| | 03/01/06 | 70,001 | $31.49 | $2,204,597.494 |
| | 03/01/06 | 16,666 | $31.49 | $524,875.671 |

| | | | | |
|---|---|---|---|---|
| | 03/01/06 | 13,333 | $31.49 | $419,906.835 |
| | 02/23/06 | 51,451 | $30.00 | $1,543,530.000 |
| | 02/23/06 | 48,549 | $30.00 | $1,456,470.000 |
| | 02/24/06 | 100,000 | $31.14 | $3,114,040.000 |
| | 02/21/06 | 49,100 | $30.00 | $1,473,201.310 |
| | 02/16/06 | 67,649 | $30.00 | $2,029,470.000 |
| | 01/27/06 | 45,001 | $33.17 | $1,492,539.167 |
| | 01/27/06 | 54,999 | $33.17 | $1,824,140.833 |
| | 01/30/06 | 45,001 | $31.07 | $1,398,230.571 |
| | 01/30/06 | 48,619 | $31.07 | $1,510,645.811 |
| | 01/30/06 | 6,380 | $31.07 | $198,233.618 |
| | 01/31/06 | 43,800 | $30.60 | $1,340,266.860 |
| | 01/24/06 | 100,000 | $34.73 | $3,473,410.000 |
| | 01/25/06 | 8,333 | $34.78 | $289,825.073 |
| | 01/25/06 | 91,667 | $34.78 | $3,188,214.927 |
| | 01/26/06 | 100,000 | $34.75 | $3,475,270.000 |
| | 02/26/04 | 138,663 | $32.93 | $4,565,520.874 |
| | 02/26/04 | 6,821 | $32.93 | $224,583.471 |
| | 02/26/04 | 8,333 | $32.93 | $274,366.525 |
| | 02/26/04 | 6,666 | $32.93 | $219,480.050 |
| | 02/26/04 | 19,033 | $33.00 | $628,089.000 |
| | 01/26/04 | 60,200 | $32.30 | $1,944,670.700 |
| | 01/27/04 | 55,027 | $32.15 | $1,768,914.450 |
| | 01/28/04 | 44,973 | $32.10 | $1,443,754.727 |
| | 01/28/04 | 5,727 | $32.10 | $183,852.163 |
| | 01/21/04 | 264,800 | $33.11 | $8,768,004.640 |
| | 10/30/03 | 71,000 | $25.07 | $1,780,296.600 |
| | 11/03/03 | 29,000 | $25.39 | $736,234.600 |
| | 05/30/03 | 20,000 | $17.87 | $357,400.000 |
| | | | Total = | $74,213,739.285 |
| Stark | 01/21/04 | 41,028 | $32.88 | $1,348,840.631 |
| | 01/21/04 | 25,000 | $33.00 | $825,000.000 |
| | 01/21/04 | 10,000 | $33.11 | $331,100.000 |
| | 04/27/04 | 16,000 | $21.85 | $349,545.600 |
| | 04/27/04 | 10,000 | $21.73 | $217,317.000 |
| | 04/27/04 | 5,000 | $21.61 | $108,062.000 |
| | 07/21/04 | 10,000 | $16.64 | $166,400.000 |
| | 10/21/04 | 10,000 | $17.77 | $177,653.000 |
| | 05/03/05 | 20,000 | $14.11 | $282,158.000 |

|  | 07/25/05 | 10,000 | $13.35 | $133,500.000 |
|---|---|---|---|---|
|  | 10/31/05 | 10,000 | $12.70 | $127,000.000 |
|  | 01/25/06 | 2,000 | $35.11 | $70,224.800 |
|  | 01/25/06 | 10,000 | $35.11 | $351,124.000 |
|  | 01/25/06 | 35,000 | $35.11 | $1,228,934.000 |
|  | 01/25/06 | 1,324 | $35.11 | $46,488.818 |
|  | 01/25/06 | 15,004 | $35.11 | $526,826.450 |
|  | 04/26/06 | 5,000 | $39.85 | $199,271.000 |
|  | 04/26/06 | 5,000 | $39.85 | $199,271.000 |
|  | 04/26/06 | 10,000 | $39.85 | $398,542.000 |
|  | 04/27/06 | 10,728 | $38.71 | $415,228.313 |
|  | 04/27/06 | 9,272 | $38.71 | $358,873.687 |
|  | 04/28/06 | 20,000 | $39.80 | $795,914.000 |
|  | 05/01/06 | 7,392 | $37.94 | $280,466.525 |
|  | 05/01/06 | 12,608 | $37.94 | $478,371.475 |
|  | 05/02/06 | 3,772 | $38.66 | $145,833.818 |
|  | 05/02/06 | 16,000 | $38.66 | $618,595.200 |
|  | 05/02/06 | 228 | $38.66 | $8,814.982 |
|  | 05/03/06 | 19,772 | $36.52 | $722,105.075 |
|  |  |  | **Total =** | **$10,911,461.373** |
| Tate | 10/20/03 | 33,300 | $25.42 | $846,389.430 |
|  | 11/20/03 | 33,300 | $24.64 | $820,502.010 |
|  | 12/22/03 | 33,300 | $26.49 | $882,160.290 |
|  | 01/20/04 | 33,300 | $34.71 | $1,155,926.250 |
|  | 02/20/04 | 33,300 | $33.66 | $1,120,954.590 |
|  | 03/22/04 | 33,300 | $26.67 | $888,114.330 |
|  | 04/20/04 | 33,300 | $25.07 | $834,927.570 |
|  | 05/20/04 | 33,300 | $18.90 | $629,416.620 |
|  | 06/21/04 | 33,300 | $15.98 | $532,223.910 |
|  | 07/20/04 | 33,300 | $17.33 | $577,212.210 |
|  | 08/20/04 | 33,300 | $13.23 | $440,608.950 |
|  | 09/20/04 | 33,300 | $16.59 | $552,300.480 |
|  | 10/20/04 | 33,300 | $16.80 | $559,390.050 |
|  | 11/22/04 | 33,300 | $21.13 | $703,589.040 |
|  | 12/20/04 | 33,300 | $25.69 | $855,590.220 |
|  | 01/20/05 | 33,300 | $20.82 | $693,176.130 |
|  | 02/22/05 | 33,300 | $18.15 | $604,348.380 |
|  | 03/21/05 | 33,300 | $16.75 | $557,798.310 |
|  | 04/20/05 | 33,300 | $13.53 | $450,409.140 |

| | 05/20/05 | 33,300 | $15.17 | $505,034.460 |
|---|---|---|---|---|
| | 06/20/05 | 33,300 | $14.54 | $484,208.640 |
| | 07/20/05 | 33,300 | $13.32 | $443,602.620 |
| | 08/22/05 | 33,300 | $11.52 | $383,685.930 |
| | 09/20/05 | 33,300 | $11.47 | $381,821.130 |
| | | | **Total =** | **$15,903,390.690** |
| | | | **GRAND TOTAL =** | **$202,962,258.235** |

63.    At the time of the stock sales set forth above, the Insider Selling Defendants possessed knowledge of the backdating scheme, which was adverse material non-public information, and sold Rambus common stock on the basis of such information.

64.    Under California law, the Insider Selling Defendants were not permitted to trade on this information without first disclosing the backdating scheme to the public.  Thus, the Insider Selling Defendants are liable for violations of California Corporations Code §§ 25402/25502.5 and federal securities law.

## RAMBUS' FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP

65.    As a result of Defendants' improper backdating of stock options, Defendants caused Rambus to violate GAAP, SEC regulations and IRS rules and regulations.

66.    Rambus' financial results for 1996 through 2005 were included in reports filed with the SEC and in other shareholder reports. In these reports, Defendants represented that Rambus' financial results were presented in a fair manner and in accordance with GAAP.

67.    Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

68.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the

particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### **Violations of GAAP**

69.     During the relevant period, Defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

70.     Under well-settled accounting principles in effect throughout the relevant period, Rambus did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money").  In order to provide Rambus executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

71.     Throughout the relevant period, Rambus accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."  Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over

the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

<u>**Rambus' Forthcoming Restatement Is an Admission of Falsity**</u>

72.     As detailed above, the fact that Rambus expects to revise and restate downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

73.     Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by Rambus are to correct for material errors in previously issued financial statements. APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Rambus' restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather due to errors in previously issued financial statements.  Thus, the expected restatements and revisions are admissions by Rambus that its previously issued financial results and its public statements regarding those results were false and misleading.

**Rambus' GAAP Violations Were Material**

74.    Rambus' false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

75.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*        \*        \*

whether the misstatement masks a change in earnings or other trends

whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*        \*        \*

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

76.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

77.    Rambus' misstatements, by its own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Rambus' Financial Statements Violated Fundamental Concepts of GAAP**

78.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

79.     Further, the undisclosed adverse information concealed by Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Violations of the SEC Regulations

80.     During the relevant period, Defendants caused Rambus to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

81.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any

"[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."  Item 402(c)(2)(iv).

82.     Defendants caused Rambus to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date the Board or Compensation Committee approved the grant.

### Violations of IRS Rules and Regulations

83.     During the relevant period, Defendants further caused Rambus to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Rambus to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

84.     Defendants caused the Company to violate IRS Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

85.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

86.     Defendants caused Rambus to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

87.     Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Rambus' stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

88.     ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not

entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

89.    By improperly treating its backdated options as ISOs, Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

90.    The chart below illustrates Rambus' false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share[5] |
|---|---|---|
| 1997 | $1.981 million | $0.02 |
| 1998 | $6.788 million | $0.07 |
| 1999 | $8.718 million | $0.09 |
| 2000 | ($106.127 million) | ($1.10) |
| 2001 | $31.271 million | $0.29 |
| 2002 | $24.704 million | $0.24 |
| 2003 | $23.221 million | $0.24 |
| 2004 | $33.559 million | $0.33 |
| 2005 | $33.677 million | $0.34 |

91.    Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were backdated or misdated. The Company's executives received a significant number of stock options as compensation during the relevant period.

---

[5] Basic Earning (loss) per share calculations have been retroactively restated to reflect the Company's four-for-one stock split effective June 15, 2000.

## DAMAGE TO RAMBUS

92.    Defendants' backdating scheme has severely and irreparably injured Rambus. The scheme has exposed Rambus to millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, and costs and expenses incurred in connection with the Company's restatement of historical financial results.

93.    On August 16, 2006, Rambus issued a press release announcing a Nasdaq Hearing Request regarding stock delisting:

> Rambus Inc. (NASDAQ: RMBS) today announced that it plans to request a hearing before the NASDAQ Listing Qualifications Panel following the receipt of a NASDAQ Staff Determination notice stating that the Company is not in compliance with NASDAQ Marketplace Rule 4310(c)(14). This notice was received because the Company was not timely in filing its Quarterly Report on Form 10-Q for the period ended June 30, 2006. However, there can be no assurance that the hearing panel will grant the Company's request for continued listing. Pending a decision by the Panel, Rambus' common stock will remain listed on the NASDAQ Stock Market.

> As previously announced, the Audit Committee of the Rambus Board of Directors is conducting an independent investigation to review the Company's historical stock option grant practices and related accounting. The Company had previously disclosed on July 19, 2006 that it would not be able to file its Form 10-Q on time while the investigation is ongoing. The Audit Committee is making every effort to complete its investigation, and the Company will make every effort to file its restated financial reports as soon as practicable after the completion of the investigation.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

94.    In a misguided effort to attract and retain employees in a competitive environment, Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  Defendants' misconduct was unjustifiable and constituted

a gross breach of their fiduciary duties as officers and/or directors of the Company. Specifically, Defendants breached their fiduciary duties by:

      a.     colluding with each other to backdate stock option grants;

      b.     colluding with each other to violate GAAP and Section 162(m);

      c.     colluding with each other to produce and disseminate to Rambus shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.     colluding with each other to file false proxy statements, false financial statements, and false Forms 4 in order to conceal the improper backdating of stock options.

95.    Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Grantee Defendants at the expense of the Company.

96.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, and costs and expenses incurred in connection with the Company's restatement of historical financial results.

97.    As alleged herein, the Grantee Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for substantial profits. Consequently, the Grantee Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

98.     Lead Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and unjust enrichment.

99.     Lead Plaintiffs are owners of Rambus common stock and were owners of Rambus common stock at all times relevant hereto.

100.    Lead Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

101.    As a result of the facts set forth herein, Lead Plaintiffs have not made any demand on the Rambus Board of Directors to institute this action against the Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

102.    At the time this action was commenced, the Board consisted of nine directors: Defendants Bentley, Dunlevie, Farmwald, Horowitz, Hughes, Kennedy, Sofaer, Tate, and Chou. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

   a.    Bentley, because as a director and an Audit Committee member, he knowingly approved the filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

   b.    Dunlevie, because as a Grantor Defendant and a member of the Compensation Committee and Audit Committee at all relevant times he directly participated in and knowingly approved the backdating of stock options and approved the filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

   c.    Farmwald, because as a Grantor Defendant and a director of the Company at all relevant times he directly participated in and knowingly approved the  backdating of stock options and approved the filing of and signed false financial statements and other false SEC filings, as alleged herein,

and therefore is substantially likely to be held liable for the misconduct complained of herein;

d.    Horowitz, because as a Grantor Defendant and a director of the Company at all relevant times he directly participated in and knowingly approved the backdating of stock options and approved the filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

e.    Hughes, because his principal professional occupation is his position as President and Chief Executive Officer of the Company, a position he assumed in January 2005.  In his position as President and Chief Executive Officer, Hughes stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by Defendants Tate, Bentley, Dunlevie, Farmwald, Horowitz, Hughes, Kennedy, and Sofaer, who are currently on the Board.  Also, as a director of the Company, he knowingly approved the filing of and signed false financial statements and other false SEC filings, as alleged herein and therefore is substantially likely to be held liable for the misconduct complained of herein.  Accordingly, Hughes is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Defendants;

f.    Kennedy, because as a director of the Company, he knowingly approved the filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

g.    Sofaer, because as a director and an Audit Committee member he knowingly approved the filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein; and

h.    Tate, because as a Grantee Defendant, he is directly interested in the improperly backdated stock option grants complained of herein.  Also, as a Grantor Defendant and a director of the Company at all relevant times, he directly participated in and knowingly approved the Company's backdating of stock options and approved the filing of and signed false financial statements and other false SEC filings, as alleged herein and therefore is substantially likely to be held liable for the misconduct complained of herein.

103.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  As represented

in Rambus' proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to motivate employees by providing compensation that reflects the performance of the Company and "align[s] the interests of the employees with the long-term interests of the stockholders."  However, by granting options with backdated exercise prices, Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Rambus' performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the market at large.

104.    Defendants could have achieved the stated purpose of attracting and retaining "the best available personnel" by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, Defendants were able to placate Rambus' employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

105.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Rambus to potentially massive liability.  Rambus is currently conducting an internal investigation and had admitted to backdating option grants.  The Company also announced that it expects to restate its previously issued financial statements due to errors in accounting for compensation expenses.  Rambus will likely suffer tax liabilities for the additional compensation they will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against All Defendants for
### Violations of § 10(b) and Rule 10b-5 of the
### Securities Exchange Act of 1934 ("Exchange Act")

106.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

107.    Throughout the relevant period, Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to Defendants via improper option grants.

108.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting material facts necessary in order to make the statements made about Rambus not misleading.

109.    Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by Rambus.

110.    Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior

management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

111.    Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding Rambus, which relied on Defendants' fraud in granting the Grantee Defendants options to purchase Rambus common stock.

112.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder and have thereby caused Rambus to sustain damages, as alleged herein.

<u>**COUNT II**</u>

**<u>Against All Defendants for</u>**
**<u>Violations of § 14(a) of the Exchange Act</u>**

113.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

115.    The 2000-2002 Proxy Statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Rambus to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1998.

116.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

117.    The misrepresentations and omissions in the Proxy Statements were material to Lead Plaintiffs in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

118.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against the Grantor Defendants and Director Defendants for
### Violations of § 20(a) of the Exchange Act

119.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

120.    The Grantor Defendants and Director Defendants, by virtue of their positions with Rambus and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Rambus within the meaning of § 20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Rambus to engage in the illegal conduct and practices complained of herein.

# COUNT IV

## Against All Defendants for an
## Accounting

121.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

122.    At all relevant times, Defendants, as directors and/or officers of Rambus, owed the Company and its shareholders fiduciary duties of good faith, care, candor, and loyalty.

123.    In breach of their fiduciary duties owed to Rambus and its shareholders, Defendants caused Rambus, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Rambus.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Rambus and its shareholders.

124.    Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Grantee Defendants.

125.    As a result of Defendants' misconduct, Rambus has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

126.    Lead Plaintiffs demand an accounting be made of all stock option grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Grantee Defendants.

## COUNT V

### Against All Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

127.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.    Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties they owed to the Company.

129.    Defendants have violated fiduciary duties of loyalty, good faith, candor, and independence owed to Rambus and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Rambus and its shareholders.

130.    As demonstrated by the allegations above, Defendants failed to exercise the care required and breached their duties of loyalty, good faith, candor, and independence owed to Rambus and its public shareholders, and Defendants failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

131.    As a proximate result of Defendants' conduct, Rambus has been injured and is entitled to damages.

## COUNT VI

### Against All Defendants for
### Abuse of Control

132.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

133.     Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige, and profit at, and control over, Rambus, and to continue to receive the substantial benefits, salaries, and emoluments associated with their making of or their aiding and abetting the making of, misrepresentations regarding Rambus.

134.     Defendants' conduct constituted an abuse of their ability to control and influence Rambus.

135.     By reason of the foregoing, Rambus has been damaged.

## COUNT VII

### Against All Defendants for
### Gross Mismanagement

136.     Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

137.     Defendants had a duty to Rambus and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosure controls of Rambus.

138.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Rambus in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Rambus' affairs and in the use and preservation of Rambus' assets.

139.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet

Defendants caused Rambus to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Rambus, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Rambus.

140.    By reason of the foregoing, Rambus has been damaged.

## COUNT VIII

### Against All Defendants for
### Constructive Fraud

141.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

142.    As corporate fiduciaries, Defendants owed to Rambus and its shareholders a duty of candor and full accurate disclosure regarding the true state of Rambus' business and assets and their conduct with regard thereto.

143.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Rambus' shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Rambus.  Thus they have committed constructive fraud and violated their duty of candor.

144.    By reason of the foregoing, Rambus has been damaged.

## COUNT IX

### Against All Defendants for
### Corporate Waste

145.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

146.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Rambus, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

147.    Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.

148.    All the payments and benefits provided to the Defendants were at the expense of Rambus.  The Company received no benefit from these payments.  Rambus was damaged by such payments.

149.    Certain of the defendants sold Rambus stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Rambus.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT X

### Against All Defendants for
### Unjust Enrichment

150.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

151.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Rambus, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

152.    Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.

153.    All the payments and benefits provided to the Defendants were at the expense of Rambus.  The Company received no benefit from these payments.  Rambus was damaged by such payments.

154.    Certain of the defendants sold Rambus stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains, which they have and/or will otherwise unjustly obtain at the expense of Rambus.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT XI

### Against the Grantee Defendants for
### Rescission

155.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

156.    As a result of the acts alleged herein, the stock option contracts between the Grantee Defendants and Rambus entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding Grantee Defendants' employment agreements and the Company's stock option plan, which was also approved by Rambus shareholders and filed with the SEC.

157.    All contracts, which provide for stock option grants between the Grantee Defendants and Rambus and were entered into during the relevant period should, therefore, be

rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XII

### Against the Grantee Defendants for
### Breach of Contract

158.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

159.    As a result of the backdating of options granted to them, the Grantee Defendants have breached their employment agreements with Rambus and violated the stock option plan, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for Rambus stock, on the date of the grant.

160.    Rambus and its shareholders have been damaged by the Grantee Defendants' breach of contract.

## COUNT XIII

### Against the Insider Selling Defendants for
### Violation of California Corporations Code §§ 25402/25502.5

161.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

162.    At the time that the Insider Selling Defendants sold their Rambus common stock as set forth herein at ¶ 62, by reason of their high executive and/or directorial positions with Rambus, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Rambus' option backdating, improper accounting, and false financial statements.

163.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Rambus shares at that time.

164.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their Rambus common stock in California in violation of California Corporations Code § 25402.

165.    Pursuant to California Corporations Code § 25502.5, the Insider Selling Defendants, and each of them, are liable to Rambus for damages in an amount up to three times the difference between the price at which Rambus common stock was sold by these defendants, and each of them, and the market value which Rambus common stock would have had at the time of the sale if the information known to these defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT XIV

### Against the Insider Selling Defendants for
### Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

166.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

167.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above and sold Rambus common stock on the basis of such information.

168.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a

proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Rambus common stock.

169.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's net income was materially overstated.  Defendants' sales of Rambus common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

170.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants obtained thereby.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs demand judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' misconduct;

B.    Ordering the Grantee Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

C.    Awarding the Company treble damages as provided by California Corporations Code § 25502.5;

D.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

E.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiffs demand a trial by jury.

DATED: November 3, 2006       LERACH COUGHLIN STOIA
                                  GELLER RUDMAN & ROBBINS LLP


                                  _____/s/ Travis Downs_____
                                  Travis E. Downs III
                                  Benny C. Goodman III
                                  Thomas G. Wilhelm
                                  655 West Broadway, Suite 1900
                                  San Diego, CA 92101
                                  Telephone: (619) 231-1058
                                  Facsimile: (619) 231-7423


                                  Shawn A. Williams
                                  Monique C. Winkler
                                  Maria V. Morris
                                  100 Pine Street, Suite 2600
                                  San Francisco, CA 94111
                                  Telephone: (415) 288-4545
                                  Facsimile: (415) 288-4535


                                  SCHIFFRIN & BARROWAY LLP
                                  Eric L. Zagar
                                  Robin Winchester
                                  Tara P. Kao
                                  280 King of Prussia Road
                                  Radnor, PA 19087
                                  Telephone: (610) 667-7706
                                  Facsimile: (610) 667-7056


                                  *Lead Counsel for Plaintiffs*