Timothy J. Burke (181866)
service@ssbla.com
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel:    (310) 209-2468
Fax:    (310) 209-2087

Howard T. Longman (*Admitted Pro Hac Vice*)
tsvi@aol.com
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

Gary S. Graifman (*Admitted Pro Hac Vice*)
ggraifman@kgglaw.com
KANTROWITZ, GOLDHAMER & GRAIFMAN
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977-6216
Tel:    (800) 660-7843
Fax:    (845) 356-4335

*Co-Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE RAMBUS SECURITIES CLASS ACTION LITIGATION | ) Master File No. C06-4346 JF<br>)<br>) **CLASS ACTION**<br>)<br>) **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR TRIAL BY JURY** |

# TABLE OF CONTENTS

Table of Contents ............................................................................................ i

NATURE AND SUMMARY OF THE ACTION ................................................ - 1 -

JURISDICTION AND VENUE .......................................................................... - 8 -

PARTIES ............................................................................................................ - 8 -

CLASS ALLEGATIONS ................................................................................... - 14 -

SUBSTANTIVE ALLEGATIONS .................................................................... - 16 -

A.    The Defendants Knowingly or Recklessly Directly Violated The Company's
      Stock Option Plan ................................................................................... - 19 -

B.    The Backdating of Options Which Took Place Before The Start of the Class
      Period Directly Impacted the Financial Results Reported During the Class Period ..... - 23 -

C.    Defendants Concealed Their Backdating of Stock Options Thus Rendering
      Rambus' Proxy Statements Materially False and Misleading ...................... - 24 -

D.    Defendants' Backdating of Options Rendered The Company's Annual Reports on
      Form 10-K  Filed with the SEC During  the Class Period Materially False and
      Misleading ............................................................................................ - 28 -

E.    Defendants' Backdating of Options Rendered The Company's Quarterly  Reports
      on Form 10-Q Materially False and Misleading ....................................... - 44 -

F.    The Backdating of Options Had A Dramatic Impact on Rambus' Reported Net
      Income As Well as Numerous Significant  Balance Sheet Accounts In Violation
      of GAAP ............................................................................................... - 47 -

      1.    Misstated Compensation Expense ................................................ - 48 -

      2.    Financial Statement Balances Affected By The APB 25 Compensation
            Expense Improper Accounting ..................................................... - 51 -

      3.    Related Compensation Expense Disclosure Misstatements and Omissions ..... - 52 -

      4.    Misstated Tax Liability and Expense ............................................ - 53 -

      5.    Items Affected by the Tax Misstatements ..................................... - 55 -

      6.    Executive/Director Compensation Misstatements and Omissions ............. - 56 -

      7.    Misstated Equity Accounts .......................................................... - 57 -

      8.    Balance Sheet Items Materially Affected ...................................... - 59 -

      9.    Income Statement Items Materially Affected ................................. - 61 -

      10.   "Statement of Cash Flow" Items Affected .................................... - 62 -

      11.   Internal Control Misstatement ..................................................... - 64 -

12. Misstated Changes in Beneficial Ownership, Per Form 4s ............................ - 66 -

PRICEWATERHOUSE COOPERS' LIABILITY ............................................................... - 71 -

SUBSTANTIVE ALLEGATIONS ..................................................................................... - 71 -

A. The Independent Auditor, Pricewaterhouse Coopers Deliberately And/Or Recklessly Disregarded The Numerous Red Flags Informing It About Defendants' Backdated Option Scheme And Its Effect On The Company's Financial Statements ......................................................................................................... - 71 -

1. PWC's Fiscal Year 2001 Opinion .................................................... - 73 -

2. PWC's Fiscal Year 2002 Opinion .................................................... - 74 -

3. PWC's Fiscal Year 2003 Opinion .................................................... - 75 -

4. PWC's Fiscal Year 2004 Opinion .................................................... - 76 -

5. PWC Fiscal Year 2005 Opinion ...................................................... - 76 -

6. Internal Control Misrepresentations ............................................... - 82 -

7. PWC Failed to Follow GAAS in Performing the Audits ................. - 84 -

8. Due Professional Care – AU §230 .................................................. - 85 -

9. PWC Failed to Adequately Plan the Audit – AU §311 ................... - 86 -

10. PWC Failed to Properly Consider Internal Controls – AU §319 .... - 88 -

11. PWC Failed to Obtain Sufficient Competent Evidential Matter – AU §326 .... - 91 -

12. PWC Failed to Properly Assess the Risk of Fraud in the Audit – AU §316 .... - 93 -

13. Audit Risk and Materiality in Conducting an Audit – AU §312 ...... - 93 -

14. Materiality - 94 -

15. Audit Risk - 95 -

16. Adherence to GAAP – AU §410 ..................................................... - 98 -

17. Adequacy of Disclosures – AU §431 .............................................. - 99 -

18. Reportable Conditions – AU §380 ................................................ - 100 -

19. PWC Should Have Issued an Adverse Opinion on Rambus' Financial Statements - 101 -

20. Conclusion .................................................................................... - 101 -

THE TRUTH IS DISLCOSED ........................................................................................ - 102 -

ADDITIONAL SCIENTER ALLEGATIONS ................................................................ - 104 -

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

A.     Scienter Based On Defendants' Significant Insider Sales ............................................ - 104 -

B.     Scienter And Knowledge Is Also Established By Participation Of Individual Defendants on Key Committees Directly Involved With Stock Option Grants ......... - 109 -

C.     Scienter And Knowledge Is Also Established By The Financial Motive Of Individual Defendants in The Transactions .................................................................. - 110 -

D.     The Filing Of False Form 4's Containing Misrepresentations By Individual Defendants Is Further Evidence Of Scienter ........................................................ - 112 -

APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ............................. - 112 -

FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE10b-5 PROMULGATED THEREUNDER (Against All Defendants) ................................ - 113 -

FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT (Against Rambus and the Individual Defendants) .......................................................................... - 115 -

VIOLATION OF 14(a) OF EXCHANGE ACT AGAINST DEFENDANT PWC ................ - 116 -

AGAINST THE INDIVIDUAL DEFENDANTS PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT .................................................................................... - 118 -

PRAYER FOR RELIEF ................................................................................................. - 119 -

JURY TRIAL DEMANDED .......................................................................................... - 119 -

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, submit this Consolidated Amended Class Action Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     Lead Plaintiff Ronald L. Schwarcz ("Lead Plaintiff") and the named plaintiffs hereinbelow (collectively "Plaintiffs") bring this action on behalf of all persons who suffered damages through the purchase of securities of Rambus, Inc. ("Rambus" or the "Company") between December 04, 2001 and July 18, 2006, inclusive (the "Class Period"), including sellers of Rambus put options during the Class Period (the "Class").   This action seeks to recover damages for violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") from Rambus and the Individual Defendants, who were members of the Board of Directors of Rambus (the "Board"), or were executive officers of Rambus.   During the Class Period, the Individual Defendants signed misleading and inaccurate quarterly reports on Form 10-Q, annual reports on Form 10-Ks and/or authorized the issuance of false or misleading Proxy Statements. Plaintiffs assert similar claims against Rambus' public accountant during the relevant period, who opined on its financial statements as having been truthful and adequate following and audit thereof.

2.     Plaintiffs' allegations are made on information and belief based, among other things, upon: (a) the investigation conducted by and through their attorneys; (b) review and analysis of filings made by Rambus with the Securities and Exchange Commission (the "SEC"); (c) review and analysis of press releases, public statements, news articles, securities analyst reports and other articles dealing with Rambus; and (d) other publicly available information.

3.     This action arises from the surprising public revelation that Rambus' directors and officers engaged in a scheme and course of conduct to hide from public disclosure, by use of their positions of control and power, the improper award of substantial and immediate benefits to directors, officers and other employees of the Company, worth hundreds of millions of dollars, in the form of back dated stock option grants.  This long running practice, which began in 1998, resulted in, among other things, drastic and material overstatement of multiple facets of the Company's financial performance and assets in its SEC filings and other public statements, which remained hidden from the investing public until May 30, 2006 when the Company suddenly announced it had

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   begun an internal investigation into the practice of backdating of stock options, which it also

2   acknowledged would have a materially detrimental effect on the Company's previously filed

3   financial statements. On October 19, 2006, Rambus announced it would have to restate its financial

4   statements and would make charges in excess of $200 million.

5          4.      In fact, Rambus and the Individual Defendants only began to disclose the previously-

6   hidden backdating options practices because they knew such practices could no longer be concealed

7   in light of the numerous and widespread investigations into similar practices at other public

8   companies which were taking place at that time. Although the United States Department of Justice

9   and the SEC have been investigating over 130 companies for backdating of options,[1] the backdating

10  of options at Rambus singularly stands out for the enormity of the amounts of money involved, in

11  relation to the size of the Company's revenues, the audacious way it was conducted by the top

12  executives of the Company, and the direct and indisputable damages it caused to purchasers of

13  Rambus securities during the Class Period.

14         5.      First, the magnitude of the restatement, over $200 million, resulting from the

15  improper backdating of options has been acknowledged by defendant Rambus and its Audit

16  Committee, and is enormous by any standard, but especially in light of the size and earnings of

17  Rambus.  The total earnings of the Company from 1998 through the First Quarter of 2006 were less

18  than $120 million.  The Company's total shareholder equity totaled approximately $340 million as of

19  the most recently filed financial statements and annual revenues were just $157 million. Thus, it is

20  apparent that the scheme to award backdated stock options, and thereby grossly overstate the

21  Company's financial performance and assets, materially enhanced the Company's ability to report

22  quarter after quarter of illusory profits.

23         6.      Second, Lead Plaintiff and members of the proposed Class suffered damages as a

24  result of purchasing (or in the case of sellers of put options, selling) Rambus securities which were

25  _____

26  [1] "Scandals Claim Growing Number of General Counsel", by D.M. Osbourne, New York Law
    Journal, January 18, 2007.

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1   artificially inflated by grossly understating expenses (and thus grossly overstated earnings) and by

2   direct misrepresentations and active concealment of the way Rambus rewarded its executives

3   through backdated stock option grants.  As described below, Rambus' shares dropped each time

4   new or additional information was publicly disclosed regarding the existence, nature, degree and

5   magnitude of the illegal backdating of options at Rambus.  Class-wide damages amount to hundreds

6   of millions of dollars.

7         7.     Third, Defendant Geoffrey Tate, the Company's Chairman and CEO comprised the

8   entire Rambus Stock Option Committee for the period February 1997 through October 2003, even

9   though the Company's 1997 Stock Option Plan (the "Plan") restricted grant-making authority to at

10  least two persons, both outside directors or, alternatively, to the Board itself.  The Individual

11  Defendants knew that Tate occupied this position in blatant violation of the dictates of the Plan, as

12  Tate was not a "committee" of outside directors." Thereafter, the Compensation Committee became

13  directly responsible for the granting of options under the Plan.  The Stock Option Committee, and

14  the Compensation Committee, had authority, subject to Board oversight, to grant employee stock

15  options.  During this time, up to January 2005, Defendant Tate was also Chief Executive Officer of

16  the Company, and Chairman of the Board of Directors, as well as one of the largest recipients of

17  such backdated option grants. On or about January 5, 2007, Rambus acknowledged this wrongdoing

18  by announcing that approximately 2.7 million stock options granted to Defendant Tate, who has

19  since left the Company, were terminated, further confirming the improper and undisclosed manner in

20  which they were awarded.  According to its latest Proxy Statement, just these options were worth

21  approximately $12.4 million.  These facts are compelling for a variety of reasons, not the least of

22  which is that Defendant Tate can not even begin to claim he did not know how the options were

23  granted since, as to those granted prior to October 2003, *he was involved in granting them.*

24        8.     According to Rambus' publicly filed documents and statements during the Class

25  Period, when stock options were awarded, the exercise price of the options was the same as the stock

26  price at which the stock traded on the day of the stock option award.  In this way, the executives of a

27  company have their interests aligned with the shareholders, whose holdings are diluted each time an

28  option is exercised.  However, the interests of Defendant Tate and others who received backdated

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  stock options were not aligned with the shareholders since they received an immediate profit without

2  having to work to improve the Company's stock price performance.  As will be demonstrated herein,

3  their primary interest was in rewarding themselves in a way which required them to conceal their

4  acts, thus defrauding Lead Plaintiff and members of the proposed Class.

5          9.     As alleged herein, and as admitted by defendants, stock option grants to various

6  officers and directors were granted on a certain date, and then "back dated" to make it appear that

7  they were granted on a date that the stock price was lower.  For example, if the grant was made on

8  the last day of a year, December 31, but the price was lower earlier in that same month, the grant

9  date would be falsely represented to be that earlier date, and the exercise price set at that earlier

10  price, so as to mask the practice of arranging for executives to receive an illicit instant profit (which

11  instant profit would have required a charge against earnings).  This improper backdating resulted in

12  option grants with lower exercise prices and thereby improperly increased the value of the options

13  and improperly reduced the amounts the recipients of these options had to pay the Company upon

14  exercise of the options.  The public disclosures made by Rambus during the Class Period also

15  violated the Company's shareholder-approved and publicly disclosed stock option plans, corporate

16  governance guidelines and standards of business conduct, and its conflicts of interest policy.

17          10.    The Defendants' misrepresentations are blatant and undeniable. For example,

18  Rambus' Proxy Statements filed with the SEC during the Class Period, stated:  "Unless otherwise

19  indicated, options were granted at an exercise price equal to the fair market value of the Company's

20  Common Stock at the date of grant."  Because on the *actual* date that backdated options were

21  granted to a recipient, the trading price of the stock (*i.e.,* its "fair market value") was *higher* that the

22  exercise price of the option, the aforementioned statement repeated in Rambus Proxy Statements

23  issued during the Class Period, was undeniably materially false and misleading.

24          11.    Defendants also engaged in massive insider selling which demonstrates graphically

25  how defendants reaped the fruits of this wrongful practice before public disclosures could be made

26  and constitutes clear evidence of their motive for engaging in the impermissible backdating of

27  options.  In total, defendants sold hundreds of thousands of shares of Rambus during the Class

28  Period for proceeds of approximately $177,101,582.  Recipients of illegally backdated stock options,

- 4 -

1    Defendants Robert K. Eulau, David Mooring and John D. Danforth alone, received proceeds from

2    sales of Rambus shares of approximately $100 million and Defendant Tate received proceeds of

3    approximately $15.9 million from sales of Rambus shares during the Class Period.

4           12.    In fact, in this case the facts establishing <u>scienter</u> are overwhelming. During the

5    relevant period, in addition to what they gained from their stock sales, Rambus' President and a

6    Director, David Mooring, its Chief Financial Officer, Robert Eulau, and its General Counsel, John

7    D. Danforth, as well as CEO Geoffrey Tate, received huge amounts of backdated options for

8    Rambus shares. By 2004, defendants' backdating scheme had yielded stock option grants to the

9    Company's executive officers worth tens of millions of dollars. Thus, virtually the entire executive

10   management of the Company were direct and personal beneficiaries of the alleged wrongdoing. The

11   existence of "motive" is undeniable. Scienter can also be shown by allegations of actual knowledge,

12   and these highly sophisticated business executives can not credibly suggest they were not aware of

13   how these options were being awarded. Therefore, any conclusion other than the one that above

14   defendants knowingly signed materially false financial statements, filed with the SEC and

15   disseminated to the public, which contained statements directly contradicting the actual practice, and

16   one which benefited them substantially and directly, is utter fantasy. Moreover, they cannot

17   maintain that they exercised due care in ensuring that all Proxy statements issued during the Class

18   Period was wholly complete and accurate.[2]

19          13.    The far-reaching effects of the defendants' backdating scheme permeates multiple

20   aspects and facets of Rambus' publicly-filed Form 10-K's and 10-Q's and taints those documents

21   throughout. Such misrepresentations resulted in misstatements of the expenses set forth in the

22   financial statements in each of the Form 10-K's for the years 2001, 2002, 2003, 2004 and 2005 as

23   well as the interim Form 10-Q's during that period, as will be described herein. The

24   misrepresentations effected the statement of operations (income statements) in each of those filings,

25

26   _____

27   [2] The "required state of mind" for claims under §14(a) and Rule 14a-9, which pertain to claims for false and misleading
     Proxy Statements, is negligence. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 (N.D. Cal.
28   2000).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the tax deferred assets in each of these filings, the amount of shareholder equity, the assertions and representations as to the existence of adequate internal controls, the ability to take certain tax deductions for "performance-based" stock option grants pursuant to the applicable Internal Revenue Code provisions and representations as to executive compensation and grants of stock options under the Stock Option Plan, also as set forth in each of the Company's SEC filings.  In addition, the Company's financial statements on Form 10-K filings for the years 2001, 2002, 2003, 2004 and 2005 as well as the 10-Q filing for the first quarter of 2006; as well as interim financials, were rendered false and misleading because, in violation of Generally Accepted Accounting Principles ("GAAP"), defendants, inter alia, understated expenses for the reporting period, since if the exercise price at the time of the actual grant is below the market price on that date (as it was here), the difference, according to GAAP, must be expensed by the Company, which **it was not**, resulting in understating expenses and thus overstating net income.

14. The continuing investigation of the Audit Committee of Rambus' Board of Directors (the "Audit Committee") has determined that the Company must absorb substantial charges of at least $200 million to correct the errors which will more than wipe out all past profits reported. Because Rambus has failed and refused to file its restated financial statements, despite deadlines from certain regulatory agencies (e.g., NASDAQ), Plaintiffs intend to further amend and/or supplement their complaint to plead new and supplemental facts concerning the restated financial statements for financial results during the Class Period once such documents are filed by Rambus and made publicly available.

15. On May 30, 2006, Rambus announced that the Audit Committee had commenced an internal investigation into the timing of the Company's stock option practices issued in or before 2003.  The Company has also announced that the Audit Committee had uncovered discrepancies between the dates that some stock options went on the books and the dates that they should have been recorded under applicable accounting rules.  As reported in *BizJournal.Com* on May 31, 2006, this announcement caused a 6.11% drop in Rambus' common stock price to $24.26.

16. On June 27, 2006 it was announced late in the afternoon that Rambus may have to restate earnings for prior periods due the back dating of option grants.  As a direct result, Rambus

1   common shares fell another 5% in after hours trading.  The June 28, 2006 edition of <u>The Wall Street</u>

2   <u>Journal</u> reported that a preliminary board review found improperly dated stock-option grants that

3   may lead to a restatement of prior financial results: "Rambus's board 'has reached a preliminary

4   conclusion that the actual measurement dates for certain stock option grants issued in prior years

5   differ from the recorded grant dates for such awards,' the Company said."  On June 27, 2006

6   Rambus common stock traded at $23.13 per share, but on news of the above announcements Rambus

7   common shares declined to close at $20.55 per share on June 28, 2006.

8        17.    On July 13, 2006, Rambus stated in a press release that it would hold a conference

9   call on July 19 to announce its second quarter financial results, but that this call would focus on

10   revenues, since the Company would not be able to finalize its results until the Audit Committee

11   completed its investigation of the granting of options.

12        18.    On the morning of July 19, 2006, Rambus announced that it would restate results for

13   2003, 2004 and 2005, which are included in the Company's Annual Report on Form 10-K for the

14   year ended December 31, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of

15   these fiscal years and the financial statements included in the Company's Quarterly Report on Form

16   10-Q for the first quarter of fiscal year 2006.  The restatement was required, Rambus reported,

17   because it would incur significant "costs" in connection with errors in its stock-option accounting.

18   Therefore, its results from 2003 through December 31, 2005 could no longer be relied upon.  The

19   Company also said that it may have to delay filing of its SEC Form 10-Q for its quarter ending June

20   30, 2006.  Rambus also noted in its Form 8-K filing of this date that it would also record

21   "significant" investigation expenses.

22        19.    Following the July 19 announcements and as a direct result thereof, Rambus

23   common shares declined 15%, or $2.99, to $16.61 in trading on the NASDAQ market, thereby

24   further damaging Plaintiffs and members of the Class.

25        20.    The enormity of the backdating options become further clarified on October 19, 2006,

26   when Rambus announced that its Audit Committee determined that the Company's backdating of

27   options would cause a massive restatement in excess of $200,000,000.  The October 19th Press

28   Release states: "The Audit Committee examined over 200 stock option granting actions from the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1 time of Rambus' initial public offering through the commencement of the investigation in late May

2 2006. The Audit Committee has determined that a significant number of the stock option grants were

3 not correctly dated or accounted for. The vast majority of incorrectly dated grants, both in terms of

4 number of shares of common stock and financial accounting impact, occurred between 1998 and

5 2001. Rambus preliminarily estimates that the aggregate pre-tax, non-cash stock-based

6 compensation charges in connection with these stock option grants will be in excess of $200

7 million."

8 **JURISDICTION AND VENUE**

9     21.    Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the

10 "Exchange Act") [15 U.S.C. §78aa] and 28 U.S.C. §§1331, 1337.  The claims asserted herein arise

11 under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §78n(a),

12 78j(b) and 78t(a)], and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R.

13 §240.10b-5 and 17 C.F.R. §240.14a-9.

14     22.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C.

15 §78aa and 28 U.S.C. §1391(b) and (c). Venue is proper in this District because the corporate

16 defendant Rambus has its headquarters in this District and many of the acts and practices complained

17 of herein occurred in substantial part in this District.

18     23.    In connection with the acts, transactions and conduct alleged herein, defendants used

19 the means and instrumentalities of interstate commerce, including the United States mails, interstate

20 telephone communications and the facilities of the national securities exchanges and markets.

21 **PARTIES**

22     24.    Lead Plaintiff Ronald L. Schwarcz purchased shares of Rambus and engaged in

23 transactions of Rambus securities during the Class Period, as set forth in the certification of Ronald

24 L. Schwarcz, and suffered damages thereby.

25     25.    Plaintiffs W.R. Capital Group, Rick Fournier, and the William K. Langfan Trust

26 purchased shares of Rambus or engaged in transactions of Rambus securities, and suffered damages

27 thereby, during the Class Period as set forth in their certifications previously filed with this Court _

28

26.     Defendant Rambus is a Delaware corporation with its principal executive offices located at 4440 El Camino Real, Los Altos, California 94022.  According to its public filings, Rambus is a technology licensing company specializing in the invention and designing of high-speed chip interfaces.  Rambus is a supplier of process control and yield management solutions for the semiconductor manufacturing and related microelectronics industries.  Rambus' stock is publicly traded on the NASDAQ under the ticker symbol RMBS.

27.     Defendant Harold Hughes ("Hughes") has served as Chief Executive Officer of the Company since January 2005 and has been a director of the Company since June 2003.  He also served as interim Chief Financial Officer of the Company for the period March 2, 2006 to on or about April 11, 2006.  Hughes also signed the Company's annual 10-K Reports for the years 2004 and 2005, authorized the issuance of the Company's Proxy Statements for that period, as well as certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Since at least as early as June 2003, he served as a member of the Audit Committee and served as its Chairman until January 9, 2005, at which time Hughes discontinued his service on the Audit Committee when he was elected by the Board to serve as Chief Executive Officer of the Company.  Hughes, as Chief Executive Officer, certified pursuant to SOX**,** the Company's Form 10-Q's, including the accuracy of the financial statements, results of operations and internal disclosure controls and procedures in the Form 10-Q's for the reporting period ended June 30, 2005 to the 10-Q for the reporting period ended March 31, 2006, under Section 906 of SOX.    Defendant Hughes sold 50,547 shares of Rambus Common Stock for proceeds of $670,321.25 during the Class Period while in possession of material adverse information regarding Rambus.

28.     Defendant Robert K. Eulau ("Eulau") served as the Senior Vice President of Finance and Chief Financial Officer of Rambus for the period from May 2001 until his resignation effective on or about March 2, 2006.  Eulau signed the Company's annual 10-K Reports during the Class Period.  Eulau also signed all of the relevant annual Form 10-Q Reports for the Period from May 2001 and certified in the Form 10-Q's the accuracy of the financial statements, result of operations and internal disclosure controls and procedures, from the 10-Q for the reporting period ended December 31, 2002 to the 10-Q for the reporting period ended September 30, 2005, under Section

- 9 -

1  906 of SOX.  Defendant Eulau received backdated stock-option grants as set forth hereinbelow at

2  Paragraph 50.  Defendant Eulau sold 584,112 shares of Rambus Common Stock for proceeds of

3  $15,844,600.966 during the Class Period while in possession of material adverse information

4  regarding Rambus.

5        29.    Defendant Geoffrey Tate ("Tate") served as Rambus Chief Executive Officer from

6  May 1990 through January 2005.  From May 1990 through December 1999 he was also the

7  Company's President.  From January 2005 through May 2006 he served as a part-time executive

8  employee, and as Chairman of the Board.  Tate resigned from the Board on or about August 15,

9  2006, after having served as a director since 1990. Tate was also the sole member of the Stock

10  Option Committee from on or about February 1997 until October 2003, when the Board of Directors

11  dissolved the Stock Option Committee and vested its power and authority in Rambus' Compensation

12  Committee of its Board of Directors (the "Compensation Committee").  Tate, as the sole member of

13  the Stock Option Committee, had the authority, subject to the oversight of the Board, to administer

14  the issuance of stock options under the Company's 1997 Stock Plan and the 1999 Non-Statutory

15  Stock Option Plan.  In addition, Tate had the authority to administer the issuance of common stock

16  equivalents under the 1997 Stock Plan.  Tate received backdated stock-option grants as set forth

17  hereinbelow at paragraph 50.  Tate also signed all of the relevant annual Form 10-K Reports, and, as

18  Chief Executive Officer, certified in the Form 10-Q's the accuracy of the financial statements,

19  results of operations and internal disclosure controls and procedures in the Form 10-Q's for the

20  reporting period ended December 31, 2002 to the 10-Q for the reporting period ended September 30,

21  2004, pursuant to SOX and authorized the issuance of all of the Company's Proxy Statements during

22  the entire Class Period. Defendant Tate sold 799,200 shares of Rambus Common Stock for proceeds

23  of $15,903,390.690 during the Class Period while in possession of material adverse information

24  regarding Rambus.

25        30.    Defendant Bruce Dunlevie ("Dunlevie") is currently a director of the Company.

26  Dunlevie has served as a Director of the Company since its inception in March 1990.  Since at least

27  as early as 1998, Dunlevie served, and currently serves, as a member of the Compensation

28  Committee of the Company, of which he was Chairman as of the last Proxy Statement issued by the

1    Company.  From at least as early as October 2001, until he resigned on March 11, 2005, Dunlevie

2    served as a member of the Audit Committee.  He has been a General Partner of the venture capital

3    firm Benchmark Capital since May 1995 and a General Partner in the venture capital firm Merrill,

4    Pickard, Anderson & Eyre since 1989.  Dunlevie also signed the annual 10-K Reports during the

5    Class Period and authorized the issuance of all of the Company's Proxy Statements during the entire

6    Class Period. Defendant Dunlevie sold 66,000 shares of Rambus Common Stock for proceeds of

7    $3,939,645.00 during the Class Period while in possession of material adverse information regarding

8    Rambus.

9        31.    Defendant P. Michael Farmwald ("Farmwald") has served as a Director of the

10   Company since co-founding the Company in March 1990 to present.  On January 25, 2005,

11   Farmwald was appointed to the Audit Committee, and served there as of the last Proxy Statement

12   issued by the Company.  He was appointed to the Compensation Committee during October 2002,

13   and served there until July of 2003, and then was reappointed to the Compensation Committee on

14   March 11, 2005.  In addition, he had served as Vice President and Chief Scientist of Rambus from

15   March 1990 to November 1993.  Farmwald also signed the Company's annual 10-K Reports during

16   the Class Period and authorized the issuance of the Company's Proxy Statements during the Class

17   Period.  Defendant Farmwald sold 1,202,700 shares of Rambus Common Stock for proceeds of

18   $33,028,010.393 during the Class Period while in possession of material adverse information

19   regarding Rambus.

20       32.    Defendant John D. Danforth ("Danforth") served as Senior Vice-President, General

21   Counsel and Secretary of the Company from October 2001 to July 27, 2006, when he resigned those

22   positions.  Thereafter, he served as Senior Legal Advisor to Rambus.  Danforth, in his capacity as

23   Secretary, signed the Company's Proxy Statements during the Class Period on behalf of the Board of

24   Directors.  Danforth received backdated options, as set forth hereinbelow at Paragraph 50.  On

25   January 5, 2007, Rambus announced that it had determined that Danforth's stock option grants dated

26   October 8, 2001, with an exercise price of $8.00 per share should have been set an exercise price of

27   $11.72 per share and the Company and Danforth entered into an agreement to amend the stock

28   option grants to increase the price of his remaining unexercised shares.  According to the press

- 11 -

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  release, the Company said the stock options were backdated by eight days and that the October 8,

2  2001 stock option grants to Danforth were part of the improperly dated options which required

3  restatement of Rambus' financial statements.  Danforth was a Section 16 officer of Rambus at the

4  time he received the stock options. Defendant Danforth sold 310,140 shares of Rambus Common

5  Stock for proceeds of $10,458,825. during the Class Period while in possession of material adverse

6  information regarding Rambus.

7          33.     Defendant David Mooring ("Mooring") was a director of the Company since

8  December 1999 until May of 2006.  He signed all the Company's annual 10-K Reports during the

9  Class Period and authorized the issuance of the Company's Proxy Statements during the Class

10 Period.  From 1999 to 2004, Mooring was President of Rambus. Mooring received backdated stock-

11 option grants as set forth hereinbelow at Paragraph 50.  Defendant Mooring sold 2,185,379 shares of

12 Rambus Common Stock for proceeds of $74,283,738. during the Class Period while in possession of

13 material adverse information regarding Rambus.

14         34.     Defendant Mark Horowitz ("Horowitz") has served as a Director of the Company

15 since co-founding Rambus in March 1990.  He has also served as a Vice President from March 1990

16 to May 1994.  Horowitz signed all of the Company's annual 10-K Reports during the Class Period as

17 well as authorized the issuance of the Company's Proxy Statements during the Class Period.

18 Defendant Horowitz sold 671,420 shares of Rambus Common Stock for proceeds of $15,470,176.

19 during the Class Period while in possession of material adverse information regarding Rambus.

20         35.     Defendant Kevin Kennedy ("Kennedy") has served as a Director of the Company

21 since April 2003.  He has served as Chairman of the Board since in or about August 2006. Since July

22 2003 he also has served, and continues to serve, as a member of the Compensation Committee and

23 also serves as a member of the Corporate Governance and Nominating Committee, of which he was

24 the Chairman as of the last Proxy Statement issued by the Company.  Kennedy signed Rambus'

25 2003, 2004 and 2005 annual 10-K Reports and authorized the issuance of the Company's Proxy

26 Statements for 2004 and 2005.

27         36.     Defendant William Davidow ("Davidow") served as a director of the Company since

28 the founding of the Company in March 1990 until May 4, 2005 at which time he was appointed

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  Director Emeritus.  He served as Chairman of the Board of Directors from March 1990 until January

2  2005.  He served as a member of the Audit Committee since as early as 1998 to the present.  He

3  concurrently served on the Compensation Committee from 1998 to October 2002 at which time he

4  resigned from the Compensation Committee.  Davidow signed Rambus' 2001, 2002, 2003 and 2004

5  annual 10-K Reports and authorized the issuance of the Company's Proxy Statements for 2001,

6  2002, 2003, 2004 and 2005.  Defendant Davidow sold 363,702 shares of Rambus Common Stock for

7  proceeds of $8,173,195.412 during the Class Period while in possession of material adverse

8  information regarding Rambus.

9     37.    Defendant Charles Geschke ("Geschke") served as a director of Rambus since

10  February 1996 until he resigned effective March 11, 2005.  He was a member of the Audit

11  Committee from as early as 1998 until July 2003.  He was a member of the Compensation

12  Committee from as early as 1998 and its Chairman from October 2002 until March 11, 2005 when

13  he resigned.  He was a member of the Corporate Governance/Nominating Committee from the time

14  it was formed in October 2002.  Geschke signed Rambus' 2001, 2002, 2003 and 2004 annual 10-K

15  Reports and authorized the issuance of the Company's Proxy Statements for 2001, 2002, 2003 and

16  2004.

17     38.    Collectively, defendants Hughes, Eulau, Mooring, Tate, Dunlevie, Farmwald,

18  Danforth, Horowitz, Kennedy, Chou, Davidow and Geschke are referred herein as the "Individual

19  Defendants."

20     39.    Defendants Davidow, Geschke, Dunlevie, Hughes, and Farmwald are also referred to

21  as the "Audit Committee Directors."

22     40.    Defendants Davidow, Geschke, Dunlevie, Farmwald, and Kennedy are also referred

23  to as the "Compensation Committee Directors."

24     41.    Defendants Tate, Mooring, Danforth and Eulau are also referred to herein as the

25  "Backdated Option Recipients."

26     42.    Defendant Pricewaterhouse Coopers ("PWC") is a firm of certified public accountants

27  with its principal place of business at 300 Madison Avenue, New York, New York.  At all times

28  during the Class Period, PWC was retained by Rambus as its independent registered public

1    accountant.  PWC provided auditing, accounting and tax related services to Rambus, including, but

2    not limited to, conducting audits of the Company's year-end financial statements, acquisition

3    services, tax consultations, tax return preparation, technical tax advice and Form S-8 filing.  Further,

4    PWC rendered audits of effectiveness of Rambus' internal controls over financial reporting for fiscal

5    years ending 2004 and 2005.  In connection therewith, PWC issued unqualified Audit Reports

6    relating to Rambus' financial statements, for inclusion in each of the Company's 10-K  Annual

7    Reports for the years 2001 through 2005, and prior thereto.  PWC opined, in its audit opinions on

8    Rambus' Fiscal years 1998 through 2005 financial statements incorporated in the SEC Forms 10-K's

9    filed for those years, that the Company's financial statements fairly represented the Company's

10   financial condition and results of operations in conformity with GAAP and had been audited by

11   PWC in accordance with Generally Accepted Auditing Standards ("GAAS")   In addition, PWC

12   reviewed the materially false and misleading quarterly financial statements published by Rambus for

13   each of the quarters of fiscal years 2000, 2001, 2002, 2003, 2004 and 2005, and the first quarter of

14   2006.  PWC was paid in excess of $2.5 million for the period 2001 through 2005 for its auditing,

15   accounting and consulting work for Rambus, and substantial sums for its work from 1991 through

16   2000 as well.

17                                  **CLASS ALLEGATIONS**

18          43.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

19   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities

20   of Rambus, or sold put options of Rambus, between December 4, 2001, (the date the Company filed

21   its form 10-K with the SEC for its fiscal year ending September 30, 2001) and July 18, 2006 (the

22   date the Company disclosed that it would restate earnings for 2003 through 2005 because of its

23   practice of backdating options), inclusive and who were damaged thereby.  Excluded from the Class

24   are defendants, the officers and directors of the Company, at all relevant times, members of their

25   immediate families and their legal representatives, heirs, successors or assigns and any entity in

26   which defendants have or had a controlling interest.

27          44.     The members of the Class are so numerous that joinder of all members is

28   impracticable.  During the Class Period, Rambus had more than 100 million shares of common stock

1   outstanding, which were actively traded on the NASDAQ, under the ticker symbol ARMBS," and

2   tens of millions of shares of common stock were traded during the Class Period.  While the exact

3   number of Class members is unknown to plaintiffs at this time and can only be ascertained through

4   appropriate discovery.  Plaintiffs believe that there are hundreds or thousands of members in the

5   proposed Class.  Record owners and other members of the Class may be identified from records

6   maintained by Rambus or its transfer agent and brokerage firms and may be notified of the pendency

7   of this action by mail, using the form of notice similar to that customarily used in securities class

8   actions.

9        45.   Plaintiffs' claims are typical of the claims of the members of the Class as all members

10   of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

11   complained of herein.

12        46.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

13   and has retained counsel competent and experienced in class and securities litigation.

14        47.   Common questions of law and fact exist as to all members of the Class and

15   predominate over any questions solely affecting individual members of the Class.  Among the

16   questions of law and fact common to the Class are:

17              (a)   whether the federal securities laws were violated by defendants' acts as

18   alleged herein;

19              (b)   whether statements made by defendants to the investing public during the

20   Class Period misrepresented material facts about a.) how the Company awarded options to its

21   executives, and b.) whether the Company's financial form 10-K,10-Q, and Proxy Statements, filed

22   with the SEC and other statements made during the Class Period, contained false and misleading

23   statements;

24              (c)   whether the materially misleading statements made by defendants were made

25   intentionally or recklessly and/or (as to statements contained in Proxy Statements) were made

26   negligently; and

27              (d)   to what extent the members of the Class have sustained damages and the

28   proper measure of damages.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

49.     According to Rambus' Proxy Statements, the Compensation Committee "review[ed] and ma[de] recommendations to the Board of Directors regarding all forms of compensation to be provided to the executive officers and directors of the Company, including stock compensation." According to the 1997 Stock Option Plan, under Section 4(a)(v) at p. 4, (entitled "Other Administration"): "Other than as provided above, the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws."   Section 4(a)(ii)(a) of the Plan states: "the Plan shall be administrated by a committee of two or more 'outside directors' within the meaning of Section 162(m) of the Code."

50.     Between fiscal 1998 through 2004[3], the Stock Option Committee and Compensation Committee granted Rambus stock options to the Backdated Option Recipients and certain other executives of the Company, which were made on dates other than the actual grant dates, as set forth hereinbelow:

---

[3] Rambus' fiscal years 2001 and 2002 ended on September 30 of 2001 and 2002, respectively. Fiscal years 2003-2006 ended on December 31.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| RAMBUS Stock Options (1998 thru 2004) | | | |
|---|---|---|---|
| | Purported Grant Date | Number of Options | Exercise Price |
| GEOFF TATE | 11/05/98 | 90,000 | $59.3125 |
| | 10/20/99 | 1,000,000 | $15.6700 |
| | 8/23/01 | 600,000 | $4.8600 |
| | 11/15/01 | 100,000 | $9.3000 |
| | 11/21/02 | 400,000 | $8.6370 |
| | 11/25/03 | 150,000 | $25.1600 |
| | 12/03/04 | 100,000 | $24.0400 |
| | | | |
| DAVID MOORING | 11/05/98 | 70,000 | $59.3125 |
| | 10/20/99 | 1,000,000 | $15.6700 |
| | 8/23/01 | 600,000 | $4.8600 |
| | 11/15/01 | 100,000 | $9.3000 |
| | 11/21/02 | 400,000 | $8.6370 |
| | 11/25/03 | 200,000 | $25.1600 |
| | 12/03/04 | 85,000 | $24.0400 |
| | | | |
| ROBERT K. EULAU | | | |
| | 6/21/01 | 500,000 | $9.0700 |
| | 8/23/01 | 125,000 | $4.86 |
| | 11/21/02 | 80,000 | $8.6370 |
| | 11/25/03 | 30,000 | $25.1600 |
| | 11/25/03 | 40,000 | $25.1600 |
| | 12/3/04 | 60,000 | $24.0400 |
| | | | |
| JOHN D. DANFORTH | 10/08/01 | 400,000 | $8.0000 |
| | 4/10/02 | 50,000 | $7.5000 |
| | 11/21/02 | 80,000 | $8.6370 |
| | 11/25/03 | 70,000 | $25.1600 |
| | 12/03/04 | 70,000 | $24.0400 |
| | 1/30/04 | 100,000 | $31.1600 |
| | 1/30/04 | 40,000 | $31.1600 |
| | 1/30/04 | 20,000 | $31.1600 |
| | | | |
| ED LARSEN | 11/05/98 | 50,000 | $59.3125 |
| | 10/20/99 | 160,000 | $15.6700 |
| | 8/23/01 | 160,000 | $4.8600 |
| | 11/22/02 | 80,000 | $8.6370 |
| LAURA S. STARK | 12/03/04 | 85,000 | $24.0400 |
| | | | |
| GARY HARMON | 11/05/98 | 15,000 | $59.3125 |
| | | | |
| SUBODH TOPRANI | 11/05/98 | 50,000 | $59.3125 |
| | 10/20/99 | 120,000 | $15.6700 |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

51. Contrary to said backdated grants, the Proxy Statements filed and disseminated by Rambus during the Class Period (except for the Proxy Statement for the meeting held in 2006 which contained substantially similar language), which Proxy Statements were approved and authorized by the Board of Directors, and by the Backdated Option Recipients, and which were signed by Defendant Danforth as Secretary of the Company, stated that "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value of [the Company's] Common Stock at the date of grant."

52. Frequently the grants were dated just after a sharp drop in the Company's stock price and before a substantial rise in the Company's stock price. (See Exhibit A attached hereto which shows the exercise price for Rambus shares on the various dates of grant compared to the price of Rambus stock for ten days before and after such grant).

53. For example, the Company's Proxy statement filed with the SEC on March 19, 2004 reported that on November 25, 2003, defendants Tate, Mooring and Eulau, in addition to Rambus officers, John D. Danforth, the Company's Sr. Vice-President, General Counsel and Secretary, and Ed Larsen, the Company's Sr. Vice-President for Administration, received options for 570,000 common shares of Rambus at an exercise price of $25.16, or the price of shares on the date of grant. However, a mere three days later, on November 28, the price had risen to close at $30.00 per share, thus creating an almost instant paper profit for the recipients of these options of nearly $2,753,100.

54. Similarly, on August 23, 2001 options were issued at $4.86 and the next day the price went to $5.67 per share and three days after that, on August 27, to $7.37 per share. More extraordinary, the price of Rambus shares had been $5.35 per share on the day before the option grant date. In fact, the exercise price of $4.86 per share was virtually the lowest trading price of Rambus shares in the 10 days before the option grant date of August 23, 2001 *and* the 10 days after that date (See Exhibit A). Defendants Tate and Mooring each received options to purchase 600,000 shares of Rambus and, over the four day period from the purported date of grant, had options representing instant gains of over **$1.5 million** dollars each. In addition, on that date, Eulau received options to purchase 125,000 shares (See ¶50 above).

55.     The reason for the extraordinary pattern of stock option grants, as alleged herein, is that many, if not all, of the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the defendants, and/or the Stock Option Committee and/or Compensation Committee, defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Rambus stock was lower than the market price on the actual grant dates.

A.     **The Defendants Knowingly or Recklessly Directly Violated The Company's Stock Option Plan**

56.     This improper backdating violated the terms of the Company's shareholder approved Stock Option Plans.  Pursuant to the terms of the Company's shareholder approved Stock Option Plans, the exercise price of options must be no less than the closing price of Rambus stock on the date of grant.  In this way, the executives of a company have their interests aligned with the shareholders, whose holdings are diluted each time an option is exercised.  Backdating improperly increased the value of the options to the Backdated Option Recipients and gave them an immediate paper profit and undisclosed bonus, which undermined the incentive purpose of such options, improperly reduced the amounts the Backdated Option Recipients had to pay the Company upon exercise of the options, unfairly transferred shareholder equity to defendants, and resulted in the Company filing false financial statements, false statements as to Executive Compensation, false statements as to the existence of adequate internal controls, and false statements concerning compliance with applicable sections of the Internal Revenue Code.

57.     On or about June 6, 1997 Rambus filed with the SEC, a Registration Statement on Form S-8 registering its 1990 Stock Plan, 1997 Stock Plan and 1997 Employee Stock Purchase Plan.  The 1997 Stock Plan, contained as an exhibit therein, stated that options granted under the Plan may be Incentive Stock Options or Nonstatutory Stock Options.  The Plan, at Section 9, defines the "Exercise Price" as follows:

    Option Exercise Price and Consideration.

        (a)     Exercise Price.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following:

(i)      In the case of an Incentive Stock Option

        (A)     granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

        (B)     granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant. (emphasis added)

(ii)     In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator. In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, <u>the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant</u>. (emphasis added)

58.      It is clear that Rambus did not comply with numerous provisions of its own 1997 Stock Plan. For example, according to Section 4(a)(ii) of the plan, designated "Section 162(m)":

> To the extent that the Administrator determines it to be desirable to qualify Options granted hereunder as "performance-based compensation" within the meaning of Section 162(m) of the [Internal Revenue] Code, **the Plan shall be administered by a Committee of two or more "outside directors"** within the meaning of Section 162(m) of the Code. [Emphasis added]

59.      According to Rambus' Proxy Statements filed during the relevant period, Rambus designed its 1997 Stock Plan to meet Internal Revenue Code §162(m) requirements.[4] Therefore, the Plan should have been administered by **two or more outside directors**, as is required by §162(m) and the regulations thereunder. Rambus' 1997 Stock Plan stipulated falsely that Rambus' plan would mirror the requirements of §162(m) by providing the oversight of two or more "outside directors". Rambus blatantly disregarded these requirements. In actuality, Tate was the *sole* member of the Stock Option Committee during all relevant times (as admitted by Rambus in the October 19, 2006 8-K). Moreover, CEO Tate had the ability to control the backdated options.

---

[4] See, for example, the Rambus Proxy Statement filed on March 18, 2005, which states, "Our 1997 Stock Plan has been designed and administered to meet these Internal Revenue Code §162(m) requirements."

60.    Further, at Section 2(e) of the Stock Plan, the definition of "Committee" is enumerated as "...a committee of **Directors** appointed by the Board..." [Emphasis added] The plurality of the word "Directors" in the definition provided in the Stock Plan is not ambiguous.  The Stock Plan makes it clear that a committee should be comprised of *more than one* individual, unlike the single member Stock Option Committee to which the Individual Defendants knowingly or recklessly acquiesced and, indeed, caused to be formed.

61.    Rambus failed in numerous other ways to comply with its 1997 Stock Plan with regard to the granting of options.  Section 9(a)(i)(B) of the Stock Plan specifically states:

> In the case of an Incentive Stock Option granted to any Employee ...the per Share exercise price shall be **no less than 100%** of the Fair Market Value per Share ["at the money"] on the date of grant. [Emphasis added]

And Section 9(a)(ii) states:

> In the case of a Nonstatutory Stock Option intended to **qualify as "performance-based compensation" within the meaning of Section 162(m)** of the Code, the per Share exercise price shall be **no less than 100%** of the Fair Market Value per Share ["at the money"] on the date of grant. [Emphasis added]

62.    In both cases, the options granted to the executives and directors under the plan, whether intended as ISOs or NSOs qualifying as performance-based under §162(m), were required by the Plan to be issued "at the money".  The backdating of the options allowed the option grants in question to appear to be "at the money", when in substance they were actually granted with a backdated exercise price lower than the fair market value at the date of grant or "in the money".  By substantively issuing "in the money" options, and masquerading them as options that qualified for §162(m) treatment, Rambus further flouted the requirements of its own Stock Plan.  As a consequence, the markets were deprived of critical knowledge regarding the massive stock compensation Rambus paid to its insider Defendants; the Rambus financial statements were grossly understated because the "in the money" options were not expensed, as required by APB 25; and created, per se, options that would not qualify for treatment under I.R.C §162(m).

63.    As well,  Section 15 of the 1997 Stock Plan, entitled "Date of Grant", states:

> The date of grant of an Option or Stock Purchase Right shall be, for all purposes, **the date on which the Administrator makes the determination** granting such Option or Stock Purchase Right, **or such other later date** as is determined by the Administrator.  **Notice of the determination shall be provided to each Optionee within a reasonable time after the date of such grant.** [Emphasis added]

64.     The above language, taken directly from Rambus' Stock Plan, illustrates how the admitted backdating fraud perpetrated by the Defendants again led to patent non-compliance with its own Stock Plan. The backdating scheme required manipulation of the "Date of Grant," as designated above, and, accordingly, the date of grant listed for the manipulated and improper backdated options violated the requirements stipulated by the Stock Plan.  The Plan does not permit the selection of an earlier date (i.e. backdating), as was required to perpetrate the Defendants' scheme.

65.     Moreover, Rambus and the Individual Defendants failed to comply with the notice requirement as set forth above since, by definition, it would be impossible to notify the optionee of an option grant within a reasonable amount of time when that grant had been backdated.   For example, if a decision were made in December to grant options, but those options were backdated to April, it is impossible to notify the optionee of the grant near the grant date because the actual grant did not take place until eight months later.  This element of the Defendants' deception points to their concomitant scienter in the fraud because each of the Backdated Option Recipients could not have been notified contemporaneously, as required, of options backdated to a much earlier grant date. It is, therefore, inconceivable that they were not aware of the fraud of which plaintiff's complain.  On the contrary, the Individual Defendants' deception required the active participation of each of the Backdated Option Recipients.

66.     Further, Defendants' conduct also violated the terms of the Company's own corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy.  For example, the Company's Code of Business Conduct and Ethics provides that each director, officer and employee may not profit from possession of significant, non-public information; and must engage in "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships." The Code further states that Rambus has a responsibility to communicate effectively with shareholders so that they are provided with full and accurate information in all material respects, about Rambus' financial condition and results of operations.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**B.** **The Backdating of Options Which Took Place Before**
**The Start of the Class Period Directly Impacted the**
**Financial Results Reported During the Class Period**

67.     The backdating of stock options which took place from the Company's fiscal years 1998 through 2000 caused Rambus' publicly filed financials during that period to be materially false and misleading and also caused its publicly filed financials during the Class Period to be materially false and misleading.

68.     During the relevant period, Rambus disclosed that, with regard to accounting for stock options, it utilized APB Opinion No. 25, Accounting for Stock Issued to Employees. APB 25 requires the use of the "intrinsic value method", whereby a corporation recognizes as an expense the aggregate compensation cost for each employee equal to the excess of the market price of the stock over the exercise price of the stock for the number of shares granted on the measurement date. The measurement date is defined as that date on which the number of shares and the exercise price are known. The expense is recognized by the Corporation ratably, on a "straight line" basis, over the service period (years in which the corporation receives the benefit of the employee's services) under the terms of the employee contract. That is, a corporation does not recognize immediately the total employee compensation cost at the time the options are granted. Instead, the total compensation cost is expensed over the years during which the employee must perform work for the company. Generally, the service period is the same as the vesting period as discussed more fully and for the reasons set forth at paragraphs 122 thru 124 herein.

69.     Accordingly, for stock options that were backdated prior to the Class Period (See chart at  paragraph 50), utilizing the appropriate GAAP methodology (i.e. the intrinsic value method), would have required material expense amortization which would continue four years into the future. For example, an option granted on August 1998 would not be fully expensed until August 2002, four years later. Notwithstanding, Rambus did not undertake the appropriate expense recognition, as required by GAAP, throughout the Class Period.

70.     Moreover, each 10-Q and 10-K filed during the Class Period incorporated the financial statements from the two previous years. Therefore, every one of Rambus' 10-Qs and 10-Ks, among other SEC filings and press releases containing financial results, during the Class Period was

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

materially misstated and omitted material disclosures because of the Defendants' backdated option scheme not only because of the backdating of options in the same period as the filing or financial results, but because of prior backdating. (See Exhibit C attached hereto which is incorporated by reference describing pre-Class Period SEC filings and the misleading financial information contained therein.)

**C.     Defendants Concealed Their Backdating of Stock Options Thus Rendering Rambus' Proxy Statements Materially False and Misleading**

71.     Defendants' backdating scheme also rendered the Company's Proxy Statements issued in connection with shareholder meetings held from calendar years 2002 to 2005 materially false and misleading. The Proxy Statements falsely reported the dates of the stock option grants and falsely represented that the options were granted at fair market value. If the option grant was backdated, the options value was not fair from the vantage point of the Company and its shareholders. For example, a report on the 2003 Executive Compensation contained in Rambus' 2004 Proxy Statement falsely represented that "non-cash compensation [to executives] should be closely aligned with shareholder interests." In addition, Rambus' Proxy Statement filed in 2005 was also false and misleading because in it defendants continued to conceal the Company's illicit policy of backdating options.

72.     Rambus issued its Proxy Statement dated December 20, 2001 for the annual meeting of stockholders to be held February 5, 2002. This Proxy Statement disclosed certain information regarding stock options granted to each of the named executive officers for the fiscal year ended September 30, 2001, and stated further, in a footnote, "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value of the Company's Common Stock at the date of grant." This Proxy Statement, which was approved by the Board of Directors, and which was approved by the Backdated Option Recipients and was signed by defendant Danforth, on behalf of the Board of Directors, including defendants Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and Davidow, was false and misleading because the stock options were not granted at an exercise price equal to the fair market value of the stock on the date of the grant, but

1  rather were actually granted at an exercise price below that of the fair market value of the stock on

2  the actual date of grant.

3        73.    For reasons discussed above, the 2001 Fiscal Year Proxy Statement filed with the

4  SEC on December 22, 2001 was, materially false and misleading additionally because the Executive

5  Compensation and/or Director Compensation disclosures and discussion found in it omitted material

6  facts and made misleading statements concerning the amounts indicated for Executive Compensation

7  and/or Director Compensation.

8        74.    Rambus issued its Proxy Statement dated December 19, 2002 for the annual meeting

9  of stockholders to be held January 30, 2003.  This Proxy Statement disclosed certain information

10  regarding stock options granted to each of the named executive officers for the fiscal year ended

11  September 30, 2002, and stated further, in a footnote, "Unless otherwise indicated, options were

12  granted at an exercise price equal to the fair market value of Rambus Common Stock at the date of

13  grant."  This Proxy Statement was approved by the Backdated Option Recipients and was signed by

14  defendant Danforth, on behalf of the Board of Directors, including defendants Tate, Mooring, Eulau,

15  Dunlevie, Farmwald, Horowitz, Geschke and Davidow, was false and misleading because the stock

16  options were not granted at an exercise price equal to the fair market value of the stock on the date of

17  the grant, but rather were actually granted at an exercise price below that of the fair market value of

18  the stock on the actual date of grant.

19        75.    For reasons discussed in detail above, the 2003 Fiscal Year Proxy Statement filed

20  with the SEC on December 19, 2002, was materially false and misleading and additionally because

21  the Executive Compensation and/or Director Compensation disclosures and discussion found in the

22  2003 Proxy Statement omitted material facts and made misleading statements concerning Executive

23  Compensation and/or Director Compensation.

24        76.    On March 19, 2004 Rambus issued its Proxy Statement for its annual meeting of

25  stockholders to be held May 4, 2004.  This Proxy Statement disclosed certain information regarding

26  stock options granted to each of the named executive officers during 2003, and the transitional

27  period October 1, 2002 to December 1, 2002 (due to change of reporting period), including the

28  exercise price and stated further, in a footnote, "Unless otherwise indicated, options were granted at

- 25 -

1    an exercise price equal to the fair market value of our common stock at the date of grant." This

2    Proxy Statement was approved by the Backdated Option Recipients and was signed by defendant

3    Danforth on behalf of the Board of Directors, including defendants Tate, Mooring, Eulau, Dunlevie,

4    Farmwald, Horowitz, Geschke and Davidow, was false and misleading because the stock options

5    that were granted were not granted at an exercise price equal to the fair market value of the stock on

6    the date of the grant, but rather were actually granted at an exercise price below that of the fair

7    market value of the stock on the actual date of grant.

8         77.    The Revised 2004 Fiscal Year Proxy Statement filed with the SEC on March 19,

9    2004, was also materially false and misleading as a result of the material misstatements and

10   omissions by Rambus related to its admitted prolific backdating of options.  Any reference to the

11   above mentioned financial statements and/or their relevant disclosures are per se misleading due to

12   the misleading nature of those financial statements and related disclosures themselves.  Additionally,

13   the Executive Compensation and/or Director Compensation disclosures and discussion found in the

14   Revised 2004 Proxy Statement were materially false and misleading because they omitted material

15   facts and made misleading statements in regard to Executive Compensation and/or Director

16   Compensation.

17        78.    Rambus issued its Proxy Statement dated March 29, 2005 for the annual meeting of

18   stockholders to be held May 3, 2005.  This Proxy Statement disclosed certain information regarding

19   stock options granted including the exercise price to each of the named executive officers during

20   2004 including the purported exercise price, and stated further, in a footnote, "Unless otherwise

21   indicated, options were granted at an exercise price equal to the fair market value of our common

22   stock at the date of grant."  This Proxy Statement was approved by the Backdated Option Recipients

23   and was signed by defendant Danforth on behalf of the Board of Directors, including defendants

24   Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and Davidow, was false and

25   misleading because the stock options were not granted at an exercise price equal to the fair market

26   value of the stock on the date of the grant, but rather were actually granted at an exercise price below

27   that of the fair market value of the stock on the actual date of grant.

28

79.     For reasons discussed in detail above, the 2005 Fiscal Year Proxy Statement filed with the SEC on March 18, 2005, was also materially false and misleading and additionally because the Executive Compensation and/or Director Compensation disclosures and discussion found in the 2005 Proxy Statement omitted material facts and made misleading statements in regard to Executive Compensation and/or Director Compensation.

80.     For reasons discussed above, the Revised 2005 Fiscal Year Proxy Statement filed with the SEC on March 29, 2005 was materially false and misleading as a result of the material misstatements and omissions by Rambus related to its admitted prolific backdating of options and Additionally, the Executive Compensation and/or Director Compensation disclosures and discussion found in the Revised 2005 Proxy Statement were materially false and misleading because they omitted material facts and made misleading statements in regard to Executive Compensation and/or Director Compensation.

81.     Rambus issued its Proxy Statement dated March 28, 2006 for the annual meeting of stockholders to be held May 10, 2006.  This Proxy Statement disclosed certain information regarding stock options granted including the exercise price to each of the named executive officers during 2006.  On page 16 of this Proxy Statement, defendants stated "The Administrator determined the exercise price of options granted under the Incentive Plan, provided the exercise price must be at least equal to the fair market value of our Common Stock on the date of grant."   This Proxy Statement was approved by the Backdated Option Recipients and was signed by defendant Danforth on behalf of the Board of Directors, including defendants Tate, Mooring, Dunlevie, Farmwald, Horowitz, and Davidow, was false and misleading because the stock options were not granted at an exercise price equal to the fair market value of the stock on the date of the grant, but rather were actually granted at an exercise price below that of the fair market value of the stock on the actual date of grant.

82.     The 2006 Fiscal Year Proxy Statement filed with the SEC on March 29, 2006, was materially false and misleading and additionally because the Executive Compensation and/or Director Compensation disclosures and discussion found in the 2006 Proxy Statement omitted

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1  material facts and made misleading statements in regard to Executive Compensation and/or Director

2  Compensation.

3         83.    As described above Rambus' financial statements on Form 10-Q and 10-K filed

4  during the Class Period were materially false and misleading, inter alia, because of backdating of

5  options which took place pre-Class Period, i.e. from fiscal years 1998 through 2000.  Also these

6  Class Period form 10-Qs and 10-Ks were false and misleading because they referenced

7  "comparative" results from prior periods.  Thus, to the extent that Rambus' Class Period SEC filings

8  referenced the 1998-2000 Rambus SEC filings they were false and misleading.  The following 1998-

9  2000 Rambus SEC filings contained false and misleading financial information because of the

10  backdating of options practices.

11        **D.    Defendants' Backdating of Options Rendered The
               Company's Annual Reports on Form 10-K  Filed with the**

12        **SEC During  the Class Period Materially False and Misleading**

13        84.    Defendants' backdating scheme rendered the Company's financial statements on

14  Form 10-K filings for its fiscal years 2001, 2002, 2003, 2004, and 2005, and correspondingly all

15  interim 10-Q, as well as Rambus' Form 10-Q for its 2006 First Quarter to be materially false and

16  misleading.

17        85.    On or about December 4, 2001, the start of the Class Period,  the Company filed its

18  Form 10-K report for the fiscal year ended September 30, 2001 with the SEC ("2001 10-K").  The

19  2001 10-K was signed by Individual Defendants Tate, Mooring, Eulau, Davidow, Dunlevie,

20  Farmwald, Geschke and Horowitz.  The 2001 10-K report was contemporaneously distributed to the

21  public.  The 2001 10-K report contained the Company's comparative financial statements for the

22  current and prior fiscal years which were materially false and misleading and were not prepared in

23  accordance with GAAP due to the improper accounting for stock option grants which were

24  backdated.  As a result, in the 2001 10-K, Rambus' net income and numerous significant balance

25  sheet accounts were overstated and the compensation costs attributable to the backdated stock

26  options were correspondingly understated.

27        86.    For reasons discussed above, the Fiscal Year 2001 year-end Form 10-K filed with the

28  SEC on December 4, 2001, was materially false and misleading as a result of the material

1   misstatements and omissions by Rambus related to its admitted backdating of options. Under APB
2   25, the intrinsic value method <u>required Rambus to amortize</u> stock compensation expense on a
3   straight-line basis over a four year period.  Consequently, the 2001 10-K contained numerous
4   material misstatements and omitted material disclosures relating to the Defendants' backdated option
5   scheme. Since the fiscal year 2001 10-K included the audited financial statements for the prior two
6   years, any misstatements or omitted disclosures contained in the financial statements relating to
7   those prior two years were also misrepresented or omitted within the 2001 10-K.  The materially
8   misstated Balance Sheet items include, but are not necessarily limited to, Prepaid and Deferred
9   Taxes of $7.67MM, Total Current Assets of $143.25MM, Deferred Taxes, Long-Term of
10  $44.28MM, Total Assets of $237.79MM, Income Taxes Payable of $18,000, Total Current
11  Liabilities of $22.38MM, Total Liabilities of $46.43MM, Additional Paid-in-Capital of $282.91MM,
12  Deferred Stock-Based Compensation of ($46,000), Accumulated Deficit of ($61.86MM), Total
13  Stockholders' Equity of $191.36MM, and Total Liabilities and Stockholders' Equity of $237.79MM.
14  The materially misstated Income Statement items include, but are not necessarily limited to,
15  Employee Stock-Related Compensation Expense, Total Costs and Expenses of $76.45MM,
16  Operating Income of $40.72MM, Income Before Income Taxes of $49.65MM, Provision for Income
17  Taxes of $18.38MM, Net Income of $31.27MM, Net Income Per Share – Basic of $0.31, and Net
18  Income Per Share – Diluted of $0.29. For reasons discussed in detail above, the materially misstated
19  Statement of Cash Flow items include, but are not necessarily limited to, Net Income of $31.27MM,
20  Non-Cash Employee Stock-Related Compensation, Tax Benefit of Stock Option Exercises of
21  ($13.75MM), Prepaids, Deferred Taxes and Other Assets of $21.38MM, Accounts and Taxes
22  Payable, Accrued Payroll and Other Liabilities of $21.38MM, Net Cash Provided by Operating
23  Activities of $30.57MM, Net Proceeds From Issuance of Common Stock of $10.78MM, Net Cash
24  Provided by Financing Activities of $10.78MM, Net Decrease in Cash and Cash Equivalents of
25  ($18.9MM), and Taxes Paid of $12.97MM.   The Statement of Stockholders' Equity and
26  Comprehensive Income also contained similar misstatements and omissions.
27      87.     Additionally, many of the disclosures and related discussion were materially false and
28  misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123, the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the face of the income statement, disclosures and discussion relevant to SFAS 109 related to Deferred Income Taxes including the balances disclosed for Stock-Based Compensation Expense of $8.03MM, Net Operating Loss Carryover of $7.51MM, Total Deferred Tax Asset of $55.76MM, Valuation Allowance of ($5.92MM), Deferred Tax Assets, Net of $49.83MM, any disclosures or discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of options, or any other information relevant to stock options that failed to disclose the backdating scheme, and any discussion or disclosures relevant to Rambus' Executive Compensation and/or Director Compensation. The detailed discussion provided at paragraphs 117-162 herein sets forth, in depth, the accounting and other technical basis giving rise to the myriad material misstatement and omissions by Defendants.

88.     Also, in the 2001 10-K, the Company stated in a footnote to the financial statements that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, 'accounting for Stock Issued to Employees.'"   Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized.  When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."   In addition, the 2001 10-K expressly incorporated by reference the Executive Compensation section of the Proxy Statement for the 2002 annual meeting (the Dec. 20, 2001 Proxy Statement), including the false misrepresentation that "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value of the Company's Common Stock at the date of grant."  Said representation was a false and misleading statement when incorporated therein.

89.     On or about November 26, 2002 the Company filed its Form 10-K report for the fiscal year ended September 30, 2002 with the SEC ("2002 10-K").  The 2002 10K was signed by Individual Defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke and Horowitz.  The 2002 10-K was contemporaneously distributed to the public including its shareholders.  The 2002 10-K report contained the Company's comparative financial statements for

1    the current and prior fiscal years which were materially false and misleading and were not prepared

2    in accordance with GAAP due to the improper accounting for stock option grants which were

3    backdated.  As a result, in the 2002 10-K, Rambus' net income and numerous significant balance

4    sheet accounts were materially misstated and costs attributable to the backdated stock options were

5    correspondingly understated, according to the accounting principles set forth in paragraphs 118-163.

6            90.     For reasons discussed above, the Fiscal Year 2002 year-end Form 10-K filed with the

7    SEC on November 26, 2002, was materially false and misleading as a result of a cacophony of

8    misstatements and omissions by Rambus related to its admitted prolific backdating of options. Under

9    APB 25, the intrinsic value method requires the amortization of stock compensation expense on a

10   straight-line basis over a four year period.  Consequently, the 2002 10-K contained numerous

11   material misstatements and omitted material disclosures relating to the Defendants' backdated option

12   scheme. Since the fiscal year 2002 10-K included the audited financial statements for the prior two

13   years, any misstatements or omitted disclosures contained in the financial statements relating to

14   those prior two years were also misrepresented or omitted within the 2002 10-K.  The materially

15   misstated Balance Sheet items include, but are not necessarily limited to, Prepaid and Deferred

16   Taxes of $6.07MM, Total Current Assets of $95.93MM, Deferred Taxes, Long-Term of $35.53MM,

17   Total Assets of $232.96MM, Income Taxes Payable of $2,000, Total Current Liabilities of

18   $21.57MM, Total Liabilities of $37.47MM, Additional Paid-in-Capital of $261.74MM,

19   Accumulated Deficit of ($67.16MM), Total Stockholders' Equity of $195.49MM, and Total

20   Liabilities and Stockholders' Equity of $232.96MM.  The materially misstated Income Statement

21   items include, but are not necessarily limited to, Employee Stock-Related Compensation Expense,

22   Total Costs and Expenses of $65.14MM, Operating Income of $31.42MM, Income Before Income

23   Taxes of $38.01MM, Provision for Income Taxes of $13.3MM, Net Income of $24.7MM, Net

24   Income Per Share – Basic of $0.25, and Net Income Per Share – Diluted of $0.24. For reasons

25   discussed in detail above, the materially misstated Statement of Cash Flow items include, but are not

26   necessarily limited to, Net Income of $24.7MM, Stock-Based Compensation, Tax Cost of Stock

27   Option Exercises of ($11,000), Prepaids, Deferred Taxes and Other Assets of $10.5MM, Accounts

28   and Taxes Payable, Accrued Payroll and Other Liabilities of $2.46MM, Net Cash Provided by

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1    Operating Activities of $33.24MM, Net Proceeds From Issuance of Common Stock of $3.52MM,

2    Net Cash Used in Financing Activities of ($20.41MM), Net Decrease in Cash and Cash Equivalents

3    of $22.74MM, and Taxes Paid of $3.1MM.    The Statement of Stockholders' Equity and

4    Comprehensive Income would also contain similar misstatements and omissions.

5            91.    Additionally, many of the disclosures and related discussion were materially false and

6    misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

7    accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123,

8    the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the

9    face of the income statement, disclosures and discussion relevant to SFAS 109 related to Deferred

10   Income Taxes including the balances disclosed for Employee Stock-Related Compensation Expense

11   of $6.83MM, Net Operating Loss Carryover of $43,000, Total Deferred Tax Asset of $47.37MM,

12   Valuation Allowance of ($5.92MM), Deferred Tax Assets, Net of $41.44MM, any disclosures or

13   discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of options,

14   or any other information relevant to stock options that failed to disclose the backdating scheme, and

15   any discussion or disclosures relevant to Rambus' Executive Compensation and/or Director

16   Compensation.   The detailed discussion of this complaint provided at paragraphs 118-163 sets forth,

17   in depth, the accounting and other technical basis giving rise to the myriad material misstatements

18   and omissions by the Defendants.

19           92.    Also, in the 2002 10-K, the Company stated in a footnote to the financial statements

20   that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in

21   accordance with Accounting Principle Board Opinion No. 25, 'Accounting for Stock Issued to

22   Employees.'"   Stock options are generally granted with exercise prices equivalent to fair market

23   value, and no compensation cost is recognized.   When stock options are compensation granted with

24   exercise prices below fair market value, employee stock-related compensation expense is recognized

25   accordingly."   In addition, the 2002 10K expressly incorporated by reference the Executive

26   Compensation section of the Proxy Statement for the 2003 Annual Meeting of Shareholders (e.g., the

27   Proxy Statement dated December 19, 2002), including the false misrepresentation that "Unless

28   otherwise indicated, options were granted at an exercise price equal to the fair market value of the

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  Rambus Common Stock at the date of grant." Said representation was a false and misleading

2  statement when incorporated therein.

3       93.    In connection with the November 2002 10-K, the Company submitted to the SEC the

4  certifications of its principal executive officer, defendant Tate, and its principal financial officer,

5  defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the

6  Sarbanes-Oxley Act of 2002.  Each such certification of defendants Tate and Eulau stated, "Based on

7  my knowledge, this report does not contain any untrue statement of material fact or omit to state a

8  material fact necessary to make the statements made, in light of the circumstances under which such

9  statements were made, not misleading with respect to the period covered by this report."  In addition,

10  both Tate and Eulau certified: that, as the certifying officers, they have (a) "designed such disclosure

11  controls and procedures to ensure that material information relating to [Rambus], including its

12  consolidated subsidiaries, is made known to us by others within those entities, particularly during the

13  period in which this annual report is prepared" (b) "evaluated the effectiveness of [Rambus']

14  disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual

15  report" (c) "presented in this annual report our conclusions about the effectiveness of the disclosure

16  controls and procedures based on our evaluation..." (d) disclosed... to [Rambus'] auditors and the

17  audit committee of [Rambus'] board of directors ... all significant deficiencies in the design or

18  operation of internal controls which could adversely affect the registrant's ability to record, process,

19  summarize and report financial data and have identified for the registrant's auditors any material

20  weaknesses in internal controls;" and (e) "disclosed... to [Rambus'] auditors and the audit committee

21  of [Rambus'] board of directors ... any fraud, whether or not material that involves management or

22  other employees who have a significant role in [Rambus'] internal controls."  These certifications

23  were materially false and misleading for the reasons set forth at paragraphs 159-163 .

24       94.    On or about February 13, 2004 the Company filed its Form 10-K report for the year

25  ended December 31, 2003 ("2003 10-K").  The 2003 10-K was signed by defendants Tate, Mooring,

26  Eulau, Davidow, Dunlevie, Farmwald, Geschke, Horowitz, Hughes and Kennedy.  The 2003 10-K

27  report was contemporaneously distributed to the public including its shareholders.  The 2003 10-K

28  report contained the Company's comparative financial statements for the years 2003 and 2002 and

1 three months ended December 31, 2002 and 2001 which were materially false and misleading and

2 were not prepared in accordance with GAAP due to the improper accounting for stock option grants

3 which were backdated.  As a result, in the 2003 10K Rambus' net earnings and stockholders' equity

4 were overstated and the compensation costs attributable to the backdated options were

5 correspondingly understated, according to the accounting principles set forth in paragraphs 118-163.

6          95.     For reasons discussed above, the Fiscal Year 2003 year-end Form 10-K filed with the

7 SEC on February 13, 2004, was materially false and misleading as a result of a cacophony of

8 misstatements and omissions by Rambus related to its admitted prolific backdating of options. Under

9 APB 25, the intrinsic value method requires the amortization of stock compensation expense on a

10 straight-line basis over a four year period.   Consequently, the 2003 10-K contained numerous

11 material misstatements and omitted material disclosures relating to the Defendants' backdated option

12 scheme. Since the fiscal year 2003 10-K included the audited financial statements for the prior two

13 years, any misstatements or omitted disclosures contained in the financial statements relating to

14 those prior two years were also misrepresented or omitted within the 2003 10-K.  The materially

15 misstated Balance Sheet items include, but are not necessarily limited to, Prepaid and Deferred

16 Taxes of $12.89MM, Total Current Assets of $95.59MM, Deferred Taxes, Long-Term of

17 $43.56MM, Total Assets of $293.09MM, Income Taxes Payable of $53,000, Total Current

18 Liabilities of $34.98MM, Total Liabilities of $53.01MM, Additional Paid-in-Capital of $278.19MM,

19 Accumulated Deficit of ($38.41MM), Total Stockholders' Equity of $240.08MM, and Total

20 Liabilities and Stockholders' Equity of $293.09MM.  The materially misstated Income Statement

21 items include, but are not necessarily limited to, Stock-Based Compensation Expense, Total Costs

22 and Expenses of $90.91MM, Operating Income of $27.29MM, Income Before Income Taxes of

23 $34.15MM, Provision for Income Taxes of $10.93MM, Net Income of $23.22MM, Net Income Per

24 Share – Basic of $0.24, and Net Income Per Share – Diluted of $0.22.  For reasons discussed in

25 detail above, the materially misstated Statement of Cash Flow items include, but are not necessarily

26 limited to, Net Income of $23.22MM, Stock-Based Compensation, Tax Benefit of Stock Option

27 Exercises of $19.24MM, Prepaids, Deferred Taxes and Other Assets of ($18.59MM), Accounts and

28 Taxes Payable, Accrued Salaries and Benefits and Other Accrued Liabilities of $416,000, Net Cash

1  Provided by Operating Activities of $23.41MM, Net Proceeds From Issuance of Common Stock of

2  $25.94MM, Net Cash Used In Financing Activities of ($3.9MM), Net Increase in Cash and Cash

3  Equivalents of $13.35MM, and Taxes Paid.   The Statement of Stockholders' Equity and

4  Comprehensive Income also contained similar misstatements and omissions.

5        96.   Additionally, many of the disclosures and related discussion were materially false and

6  misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

7  accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123,

8  the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the

9  face of the income statement, disclosures and discussion relevant to SFAS 109 related to Deferred

10  Income Taxes including the balances disclosed for Employee Stock-Related Compensation Expense

11  of $1.96MM, Net Operating Loss Carryover of $655,000, Total Deferred Tax Asset of $57.6MM,

12  Valuation Allowance of ($1.96MM), Deferred Tax Assets, Net of $55.64MM, any disclosures or

13  discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of options,

14  or any other information relevant to stock options that failed to disclose the backdating scheme, and

15  any discussion or disclosures relevant to Rambus' Executive Compensation and/or Director

16  Compensation.  The detailed discussion of this complaint provided at paragraphs 118-163 sets forth,

17  in depth, the accounting and other technical basis giving rise to the material misstatements by the

18  Defendants.

19        97.   Also, the Company stated in a footnote to the financial statements that, "Rambus

20  accounts for stock-based awards to employees using the intrinsic value method in accordance with

21  Accounting Principle Board Opinion No. 25, 'Accounting for Stock Issued to Employees.'"  Stock

22  options are generally granted with exercise prices equivalent to fair market value, and no

23  compensation cost is recognized.  When stock options are compensation granted with exercise prices

24  below fair market value, employee stock-related compensation expense is recognized accordingly."

25        98.   In connection with the 2003 10-K, the Company submitted to the SEC the

26  certifications of its principal executive officer, defendant Tate, and its principal financial officer,

27  defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the

28  Sarbanes-Oxley Act of 2002.  Each such certification of defendants Tate and Eulau stated, "Based on

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   my knowledge, this report does not contain any untrue statement of material fact or omit to state a

2   material fact necessary to make the statements made, in light of the circumstances under which such

3   statements were made, not misleading with respect to the period covered by this report."     In

4   addition, both Tate and Eulau certified: that, as the certifying officers, they have (a) "designed such

5   disclosure controls and procedures to ensure that material information relating to [Rambus],

6   including its consolidated subsidiaries, is made known to us by others within those entities,

7   particularly during the period in which this annual report is prepared" (b) "evaluated the

8   effectiveness of [Rambus'] disclosure controls and procedures as of a date within 90 days prior to

9   the filing date of this annual report" (c) "presented in this annual report our conclusions about the

10  effectiveness of the disclosure controls and procedures based on our evaluation..." (d) disclosed... to

11  [Rambus'] auditors and the audit committee of [Rambus'] board of directors ... all significant

12  deficiencies in the design or operation of internal controls which could adversely affect the

13  registrant's ability to record, process, summarize and report financial data and have identified for the

14  registrant's auditors any material weaknesses in internal controls;" and (e) "disclosed... to [Rambus']

15  auditors and the audit committee of [Rambus'] board of directors ... any fraud, whether or not

16  material that involves management or other employees who have a significant role in [Rambus']

17  internal controls." These certifications were materially false and misleading for the reasons set forth

18  at paragraphs 159-162.

19          99.     In addition, the 2003 10-K expressly incorporated by reference the Executive

20  Compensation section of the Proxy Statement for the 2004 Annual Meeting of Shareholders (e.g., the

21  Proxy Statement dated March 19, 2004), including the false misrepresentation that "Unless

22  otherwise indicated, options were granted at an exercise price equal to the fair market value of our

23  common stock at the date of grant." Said representation was a false and misleading statement when

24  incorporated therein.

25          100.    On or about February 17, 2005 the Company filed its Form 10-K report for the year

26  ended December 31, 2004 with the SEC ("2004 10K"). The 2004 10-K was signed by defendants

27  Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke, Horowitz, Hughes and Kennedy.

28  The 2004 10-K was contemporaneously distributed to the public including its shareholders. The

1    2004 10-K report contained the Company's comparative financial statements for the current and

2    prior year which were materially false and misleading and were not prepared in accordance with

3    generally accepted accounting principles due to the improper accounting for stock option grants

4    which were backdated.  As a result, in the 2004 10K, Rambus' net earnings were overstated and the

5    compensation costs attributable to the backdated options were correspondingly understated,

6    according to the accounting principles set forth in paragraphs 118-163.

7            101.    For reasons discussed above, the Fiscal Year 2004 year-end Form 10-K filed with the

8    SEC on February 17, 2005, was materially false and misleading as a result of a cacophony of

9    misstatements and omissions by Rambus related to its admitted prolific backdating of options. Under

10   APB 25, the intrinsic value method requires the amortization of stock compensation expense on a

11   straight-line basis over a four year period.  Consequently, the 2004 10-K contained numerous

12   material misstatements and omitted material disclosures relating to the Defendants' backdated option

13   scheme. Since the fiscal year 2004 10-K included the audited financial statements for the prior two

14   years, any misstatements or omitted disclosures contained in the financial statements relating to

15   those prior two years were also misrepresented or omitted within the 2004 10-K.  The materially

16   misstated Balance Sheet items include, but are not necessarily limited to, Prepaid and Deferred

17   Taxes of $13.86MM, Total Current Assets of $157.18MM, Deferred Taxes, Long-Term of

18   $75.3MM, Total Assets of $376.72MM, Income Taxes Payable of $200,000, Total Current

19   Liabilities of $36.72MM, Total Liabilities of $41.27MM, Additional Paid-in-Capital of $341.08MM,

20   Accumulated Deficit of ($4.85MM), Total Stockholders' Equity of $335.46MM, and Total

21   Liabilities and Stockholders' Equity of $376.72MM.  The materially misstated Income Statement

22   items include, but are not necessarily limited to, Stock-Based Compensation Expense, Total Costs

23   and Expenses of $105.36MM, Operating Income of $39.52MM, Income Before Income Taxes of

24   $47.89MM, Provision for Income Taxes of $14.33MM, Net Income of $33.56MM, Net Income Per

25   Share – Basic of $0.33, and Net Income Per Share – Diluted of $0.30. For reasons discussed in detail

26   above, the materially misstated Statement of Cash Flow items include, but are not necessarily limited

27   to, Net Income of $33.56M, Stock-Based Compensation, Tax Benefit of Stock Option Exercises of

28   $39.46MM, Prepaids, Deferred Taxes and Other Assets of $30.96MM, Accounts and Taxes Payable,

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1    Accrued Salaries and Benefits and Other Accrued Liabilities of $6.64MM, Net Cash Provided by

2    Operating Activities of $43.7MM, Net Proceeds From Issuance of Common Stock of $45.09MM,

3    Net Cash Provided by Financing Activities of $23.43MM, Net Increase in Cash and Cash

4    Equivalents of $6.31MM, and Taxes Paid of $2.49MM.  The Statement of Stockholders' Equity and

5    Comprehensive Income also contained similar misstatements and omissions.

6         102.    Additionally, many of the disclosures and related discussion were materially false and

7    misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

8    accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123,

9    the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the

10   face of the income statement, disclosures and discussion relevant to SFAS 109 and/or Deferred

11   Income Taxes including the balances disclosed for Employee Stock-Related Compensation Expense

12   of $1.MM, Net Operating Loss Carryover of $22.87MM, Total Deferred Tax Asset of $90.07MM,

13   Valuation Allowance of ($1.2MM), Deferred Tax Assets, Net of $88.8.6MM, any disclosures or

14   discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of

15   options, or any other information relevant to stock options that failed to disclose the backdating

16   scheme, and any discussion or disclosures relevant to Rambus' Executive Compensation and/or

17   Director Compensation.  The detailed discussion of this complaint provided at paragraphs 118-163

18   sets forth, in depth, the accounting and other technical basis giving rise to the material misstatements

19   by the Defendants.

20        103.    Also, in the 2004 10-K, the Company stated in a footnote to the financial statements

21   that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in

22   accordance with Accounting Principle Board Opinion No. 25, 'Accounting for Stock Issued to

23   Employees.'"  Stock options are generally granted with exercise prices equivalent to fair market

24   value, and no compensation cost is recognized.  When stock options are compensation granted with

25   exercise prices below fair market value, employee stock-related compensation expense is recognized

26   accordingly."  In addition, the 2004 10K expressly incorporated by reference the Executive

27   Compensation section from the Proxy Statement for the 2005 Annual Meeting of Shareholders (e.g.,

28   the Proxy Statement dated March 18, 2005), including the false misrepresentation that "Unless

- 38 -
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   otherwise indicated, options were granted at an exercise price equal to the fair market value of our

2   common stock at the date of grant." Said representation was false and misleading when

3   incorporated.

4       104.    In connection with the 2004 10-K, the Company submitted to the SEC the

5   certifications of its principal executive officer, defendant Hughes, and its principal financial officer,

6   defendant Eulau, respectively, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to

7   Section 906 of the Sarbanes-Oxley Act of 2002. Each such certification of defendants Hughes and

8   Eulau stated, "Based on my knowledge, this report does not contain any untrue statement of material

9   fact or omit to state a material fact necessary to make the statements made, in light of the

10  circumstances under which such statements were made, not misleading with respect to the period

11  covered by this report." In addition, both Hughes and Eulau certified: that, as the certifying officers,

12  they have (a) "designed such disclosure controls and procedures to ensure that material information

13  relating to [Rambus], including its consolidated subsidiaries, is made known to us by others within

14  those entities, particularly during the period in which this annual report is prepared" (b) "evaluated

15  the effectiveness of [Rambus'] disclosure controls and procedures as of a date within 90 days prior

16  to the filing date of this annual report" (c) "presented in this annual report our conclusions about the

17  effectiveness of the disclosure controls and procedures based on our evaluation..." (d) disclosed... to

18  [Rambus'] auditors and the audit committee of [Rambus'] board of directors ... all significant

19  deficiencies in the design or operation of internal controls which could adversely affect the

20  registrant's ability to record, process, summarize and report financial data and have identified for the

21  registrant's auditors any material weaknesses in internal controls;" and (e) "disclosed... to [Rambus']

22  auditors and the audit committee of [Rambus'] board of directors ... any fraud, whether or not

23  material that involves management or other employees who have a significant role in [Rambus']

24  internal controls." These certifications were materially false and misleading as set forth as

25  paragraphs 159-163.

26      105.    On or about February 21, 2006 the Company filed its Form 10-K report for the year

27  ended December 31, 2005 with the SEC ("2005 10-K"). The 2005 10-K was signed by defendants

28  Hughes, Eulau, Tate, Dunlevie, Farmwald, Horowitz, Kennedy and Mooring. The 2005 10-K was

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   contemporaneously distributed to the public including its shareholders.  The 2005 10-K report

2   contained the Company's comparative financial statements for the prior years which were materially

3   false and misleading and were not prepared in accordance with generally accepted accounting

4   principles due to the improper accounting for stock option grants which were backdated.  As a result,

5   in the 2005 10-K Rambus' net income and numerous significant balance sheet accounts were

6   overstated and the compensation costs attributable to the backdated stock options were

7   correspondingly understated, according to the accounting principles set forth in parahaphs 118-163.

8           106.    For reasons discussed above, the Fiscal Year 2005 year-end Form 10-K filed with the

9   SEC on February 2, 2006, was materially false and misleading as a result of materially false

10  misstatements and omissions by Rambus related to its admitted prolific backdating of options. Under

11  APB 25, the intrinsic value method requires the amortization of stock compensation expense on a

12  straight-line basis over a four year period.  Consequently, the 2005 10-K contained numerous

13  material misstatements and omitted material disclosures relating to the Defendants' backdated option

14  scheme. Since the fiscal year 2005 10-K included the audited financial statements for the prior two

15  years, any misstatements or omitted disclosures contained in the financial statements relating to

16  those prior two years were also misrepresented or omitted within the 2005 10-K.  The materially

17  misstated Balance Sheet items include, but are not necessarily limited to, Prepaid and Deferred

18  Taxes of $3.79MM, Total Current Assets of $169.78MM, Deferred Taxes, Long-Term of

19  $69.06MM, Total Assets of $485.52MM, Total Current Liabilities of $20.61MM, Total Liabilities of

20  $190.52MM, Additional Paid-in-Capital of $327.52MM, Accumulated Deficit of ($30.97MM),

21  Total Stockholders' Equity of $295MM, and Total Liabilities and Stockholders' Equity of

22  $485.52MM.  The materially misstated Income Statement items include, but are not necessarily

23  limited to, Stock-Based Compensation Expense of $2.69MM, Total Costs and Expenses of

24  $135.44MM, Operating Income of $21.76MM, Income Before Income Taxes of $56.59MM,

25  Provision for Income Taxes of $22.92MM, Net Income of $33.68MM, Net Income Per Share –

26  Basic of $0.34, and Net Income Per Share – Diluted of $0.32. For reasons discussed in detail above,

27  the materially misstated Statement of Cash Flow items include, but are not necessarily limited to,

28  Net Income of $33.68MM, Stock-Based Compensation of $2.69MM, Tax Benefit of Stock Option

1    Exercises of $3.59MM, Prepaids, Deferred Taxes and Other Assets of $16.06MM, Accounts and

2    Taxes Payable, Accrued Salaries and Benefits and Other Accrued Liabilities of $382,000, Net Cash

3    Provided by Operating Activities of $33.13MM, Net Proceeds From Issuance of Common Stock

4    Under Stock Option Plan and Stock Purchase Plan of $8.52MM, Net Cash Provided by Financing

5    Activities of $99.72MM, Net Decrease in Cash and Cash Equivalents of ($5.92MM), and Taxes Paid

6    of $1.53MM.  The Statement of Stockholders' Equity and Comprehensive Income would also

7    contain similar misstatements and omissions.

8          107.    Additionally, many of the disclosures and related discussion were materially false and

9    misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

10   accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123,

11   the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the

12   face of the income statement, disclosures and discussion relevant to SFAS 109 and/or Deferred

13   Income Taxes including the balances disclosed for Employee Stock-Based Compensation of

14   $894,000, Net Operating Loss Carryover of $16.46MM, Total Deferred Tax Asset of $73.27MM,

15   Valuation Allowance of ($894,000), Deferred Tax Assets, Net of $72.38MM, any disclosures or

16   discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of options,

17   or any other information relevant to stock options that failed to disclose the backdating scheme, and

18   any discussion or disclosures relevant to Rambus' Executive Compensation and/or Director

19   Compensation.  The detailed discussion of this complaint provided at paragraphs 118-163 sets forth,

20   in depth, the accounting and other technical basis giving rise to the material misstatement by the

21   Defendants.

22         108.    In connection with this 10-K report the Company submitted to the SEC the

23   certifications of its principal executive officer and its principal financial officer a required pursuant

24   to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  Each

25   such certification of defendants Hughes, Eulau, Tate, Dunlevie, Farmwald, Horowitz, and Mooring

26   stated, "Based on my knowledge, this report does not contain any untrue statement of material fact

27   or omit to state a material fact necessary to make the statements made, in light of the circumstances

28   under which such statements were made, not misleading with respect to the period covered by this

report."  In addition, the 2005 10K expressly incorporated by reference the Executive Compensation

section of the Proxy Statement for the Annual Meeting of Shareholders for 2006 (e.g., the Proxy

Statement dated March 28, 2006), including the false misrepresentation that "Unless otherwise

indicated, options were granted at an exercise price equal to the fair market value of our common

stock at the date of grant." Said representation was a false and misleading statement when

incorporated.  In addition, both Hughes and Eulau certified: that, as the certifying officers, they have

(a) "designed such disclosure controls and procedures to ensure that material information relating to

[Rambus], including its consolidated subsidiaries, is made known to us by others within those

entities, particularly during the period in which this annual report is prepared" (b) "evaluated the

effectiveness of [Rambus'] disclosure controls and procedures as of a date within 90 days prior to

the filing date of this annual report" (c) "presented in this annual report our conclusions about the

effectiveness of the disclosure controls and procedures based on our evaluation..." (d) disclosed... to

[Rambus'] auditors and the audit committee of [Rambus'] board of directors ... all significant

deficiencies in the design or operation of internal controls which could adversely affect the

registrant's ability to record, process, summarize and report financial data and have identified for the

registrant's auditors any material weaknesses in internal controls;" and (e) "disclosed... to [Rambus']

auditors and the audit committee of [Rambus'] board of directors ... any fraud, whether or not

material that involves management or other employees who have a significant role in [Rambus']

internal controls."  These certifications were materially false and misleading for the reasons set forth

at paragraphs 159-162 herein.

109.    On or about May 9, 2006 the Company filed its Form 10-Q report for the first quarter

of 2006, for the period ended March 31, 2006 ("2006 1st Qtr 10-Q").  The 2006 1st Qtr 10-Q was

signed by defendant Hughes, as Chief Executive Officer and Satish Rishi, as Chief Financial Officer.

The 2006 1st Qtr 10-Q report contained the financial results of the first quarter of 2006 and

comparative financial information to the three months ended March 31, 2005 which were materially

false and misleading and were not prepared in accordance with GAAP due to the improper

accounting for stock option grants which were backdated.  As a result, in the 2006 1st Qtr 10-Q

Rambus' net earnings, stockholders' equity, value of options, and net income per share (earnings per

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  share) were overstated and liabilities and expenses, compensation costs attributable to the backdated

2  options were correspondingly understated.  Deferred taxes were materially misstated as well.

3      110.    For reasons discussed above, the Fiscal Year 2006 First Quarter Form 10-Q filed with

4  the SEC on May 9, 2006[5], was materially false and misleading as a result of  the materially

5  misleading statements and omissions by Rambus related to its admitted prolific backdating of

6  options. The materially misstated Balance Sheet items include, but are not necessarily limited to,

7  Prepaid and Deferred Taxes of $3.79MM, Total Current Assets of $283MM, Deferred Taxes, Long-

8  Term of $80.36MM, Total Assets of $535.64MM, Total Current Liabilities of $26.48MM, Total

9  Liabilities of $195.77MM, Additional Paid-in-Capital of $379.85MM, Accumulated Deficit of

10  ($38.35MM), Total Stockholders' Equity of $339.87MM, and Total Liabilities and Stockholders'

11  Equity of $535.64MM.   The materially misstated Income Statement items include, but are not

12  necessarily limited to, Stock-Based Compensation Expense of $8.38MM, Total Costs and Expenses

13  of $47.71MM, Operating Loss of ($464,000), Income Before Income Taxes of $2.98MM, Provision

14  for Income Taxes of $1.16MM, Net Income $1.82MM, Net Income Per Share – Basic of $0.02, and

15  Net Income Per Share – Diluted of $0.02. The Statement of Cash Flow accounts effected include, but

16  are not necessarily limited to, Net Income of $1.82MM, Stock-Based Compensation of $8.38MM,

17  Tax Benefit of Stock Option Exercises of $12.36MM, Prepaids, Deferred Taxes and Other Assets of

18  ($13.49MM), Accounts and Taxes Payable, Accrued Salaries and Benefits and Other Accrued

19  Liabilities of $6.48MM, Net Cash Provided by Operating Activities of  $19.06MM, Net Proceeds

20  From Issuance of Common Stock of $46.35MM, Net Cash Provided by Financing Activities of

21  $21.99MM, and Net Increase in Cash and Cash Equivalents of $55.83MM.

22      111.    Additionally, many of the disclosures and related discussion were materially false and

23  misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to

24  accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123,

25  the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the

26  _____

27  [5] Rambus is late in issuing certain Forms 10-Q's for its second and third quarter of 2006 due to the options backdating investigation and related restatement.

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

face of the income statement, disclosures and discussion relevant to SFAS 109 and/or Deferred

Income Taxes, any disclosures or discussion related to Rambus' relevant Stock Option Plan(s), the

granting and/or exercise of options, or any other information relevant to stock options that failed to

disclose the backdating scheme, and any discussion or disclosures relevant to Rambus' Executive

Compensation and/or Director Compensation and/or Director Compensation. The detailed discussion

of this complaint provided at paragraphs118-163 sets forth, in depth, the accounting and other

technical basis giving rise to the myriad of breaches by the Defendants relevant to Rule10b-5 and

other, material misstatement and omission parameters.

**E.    Defendants' Backdating of Options Rendered The Company's**
**Quarterly  Reports on Form 10-Q Materially False and Misleading**

112.    Each of Rambus' 10-Q Reports filed during the Class Period with the SEC and

publicly disseminated were false and misleading and contained financial statements and comparative

financial statements which were false and misleading. Under APB 25, the intrinsic value method

requires the amortization of stock compensation expense on a straight-line basis over a four year

period.  Consequently, the all of the class period 10-Qs contained numerous material misstatements

and omitted material disclosures relating to the Defendants' backdated option scheme.

113.     These interim 10-Q Reports included the following: the 10-Q Report for the quarter

ended December 31, 2001, filed on or about January 31, 2002, which report was signed by

Defendant Eulau in  his capacity as Chief Financial Officer;  the 10-Q Report for the quarter ended

March 30, 2002, filed on or about April 30, 2002, which report was signed by Defendant Eulau in

his capacity as Chief Financial Officer;  the 10-Q Report for the quarter ended June 30, 2002, filed

on or about July 30, 2002, which report was signed by Defendant Eulau in  his capacity as Chief

Financial Officer;  The 10-Q Report for the quarter ended December 31, 2002, filed on or about

January 31, 2003, which report was signed by both Defendant Tate in his capacity as Chief

Executive Officer and by Eulau in his capacity as Chief Financial Officer;  the 10-Q Report for the

quarter ended March 30, 2003, filed on or about April 30, 2003, which report was signed by both

Defendant Tate in his capacity as Chief Executive Officer and by Eulau in  his capacity as Chief

Financial Officer;  the 10-Q Report for the quarter ended June 30, 2003, filed on or about July 29,

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   2003, which report was signed by both Defendant Tate in his capacity as Chief Executive Officer

2   and by Eulau in his capacity as Chief Financial Officer;  the 10-Q Report for the quarter ended

3   September 30, 2004, filed on or about October 29, 2004, which report was signed by both Defendant

4   Tate in his capacity as Chief Executive Officer and by Eulau in his capacity as Chief Financial

5   Officer;  the 10-Q Report for the quarter ended March 31, 2005, filed on or about April 29, 2005,

6   which report was signed by both Defendant Hughes in his capacity as Chief Executive Officer and

7   by Defendant Eulau in his capacity as Chief Financial Officer;  the 10-Q Report for the quarter

8   ended June 30, 2005, filed on or about August 2, 2005, which report was signed by both Defendant

9   Hughes in his capacity as Chief Executive Officer and by Eulau in his capacity as Chief Financial

10  Officer;  the 10-Q Report for the quarter ended September 30, 2005, filed on or about November 3,

11  2005, which report was signed by both Defendant Hughes in his capacity as Chief Executive Officer

12  and by Defendant Eulau in his capacity as Chief Financial Officer;  the 10-Q Report for the quarter

13  ended March 31, 2006, filed on or about May 9, 2006, which report was signed by both Defendant

14  Hughes in his capacity as Chief Executive Officer and by Satish Rishi in  his capacity as Chief

15  Financial Officer.

16          114.    The aforementioned interim 10-Q Reports, the misleading contents of which  are set

17  forth in detail in Exhibit B which is incorporated herein, contained the Company's financial

18  statements for the respective three month periods and comparative financial statements for the prior

19  year's operations, which were materially false and misleading and were not prepared in accordance

20  with generally accepted accounting principles due to the improper accounting for stock option grants

21  which were backdated as set forth  in paragraphs 118-163.

22          115.    As a result, the aforestated 10-Q Reports filed during the Class Period, were

23  materially false and misleading and contained a materially false misstatements and omissions by

24  Rambus related to its admitted prolific backdating of options.  Said false and misleading statements

25  with respect to said 10-Q Reports, are particularized on Exhibit "B" annexed hereto and incorporated

26  herein by reference. The materially misstated Balance Sheet items include, but are not necessarily

27  limited to, Prepaid and Deferred Taxes; Total Current Assets; Deferred Taxes; Total Assets; Total

28  Current Liabilities; Additional Paid-in-Capital; Accumulated Deficit; Stockholders' Equity; and

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Total Liabilities. The materially misstated Income Statement items include, but are not necessarily limited to, Stock-Based Compensation Expense; Total Costs and Expenses; Operating Income; Income Before Income Taxes; Provision for Income Taxes; Net Income Per Share. The materially misstated Statement of Cash Flow items include, but are not necessarily limited to, Net Income; Stock-Based Compensation; Tax Benefit of Stock Option Exercises; Prepaids; Deferred Taxes; and Other Assets; Accounts and Taxes Payable; Accrued Salaries and Benefits and Other Accrued Liabilities; Net Cash Provided by Operating Activities; Net Proceeds From Issuance of Common Stock Under Stock Option Plan and Stock Purchase Plan; Net Cash Provided by Financing Activities; and Net Decrease in Cash and Cash Equivalents.. The Statement of Stockholders' Equity and Comprehensive Income also contains similar misstatements and omissions.

116. Additionally, many of the disclosures and related discussion were materially false and misleading including, but not limited to, disclosures related to Rambus' use of APB 25 in relation to accounting for stock options, the "fair value" earnings per share disclosure required by SFAS 123, the disclosure illustrating the calculation of basic and diluted Net Income Per Share as listed on the face of the income statement, disclosures and discussion relevant to SFAS 109 and/or Deferred Income Taxes including the balances disclosed for Employee Stock-Based Compensation; Net Operating Loss Carryover; Total Deferred Tax Assets; any disclosures or discussion related to Rambus' relevant Stock Option Plan(s), the granting and/or exercise of options, or any other information relevant to stock options that failed to disclose the backdating scheme, and any discussion or disclosures relevant to Rambus' Executive Compensation and/or Director Compensation.

117. Commencing with the 10-Q Report for the period ended December 31, 2002 and all future 10-Q Reports thereafter which were filed during the Class Period, the Company submitted to the SEC the certifications of its principal executive officer and its principal financial officer a required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Both the Company's Chief Executive Officer (e.g., Hughes and/or Tate) and Chief Financial Officer (e.g., Eulau) certified in all 10-Q's from the December 31, 2002 10-Q to the most recent 10-Q, that they (a) "designed such disclosure controls and procedures to ensure that material

1    information relating to [Rambus], including its consolidated subsidiaries, is made known to us by

2    others within those entities, particularly during the period in which this annual report is prepared" (b)

3    "evaluated the effectiveness of [Rambus'] disclosure controls and procedures as of a date within 90

4    days prior to the filing date of this annual report" (c) "presented in this annual report our conclusions

5    about the effectiveness of the disclosure controls and procedures based on our evaluation..." (d)

6    disclosed... to [Rambus'] auditors and the audit committee of [Rambus'] board of directors ... all

7    significant deficiencies in the design or operation of internal controls which could adversely affect

8    the registrant's ability to record, process, summarize and report financial data and have identified for

9    the registrant's auditors any material weaknesses in internal controls;" and (e) "disclosed... to

10   [Rambus'] auditors and the audit committee of [Rambus'] board of directors ... any fraud, whether or

11   not material that involves management or other employees who have a significant role in [Rambus']

12   internal controls."  These certifications were materially false and misleading for the reasons set forth

13   in paragraphs 159-163 herein.

14   **F.    The Backdating of Options Had A Dramatic Impact on**
     **Rambus' Reported Net Income As Well as Numerous**
15   **Significant  Balance Sheet Accounts In Violation of GAAP**

16          118.    Rambus' net income was materially misstated, as were numerous significant Balance

17   Sheet accounts, as well as items listed on the Statement of Cash Flows[6] that were incorporated into

18   Rambus' numerous SEC filings from 1998 through 2000 and during the Class Period. Income

19   statement accounts that were materially misstated, include "stock based compensation expense",

20   "total cost and expenses", "operating income", "provision for income taxes", "net income", and "net

21   income per share", among others.  Balance sheet accounts that were materially misstated, e.g.,

22   include "prepaid and deferred taxes", "income taxes payable", "current assets", "deferred taxes,

23   long-term", "total assets", "total current liabilities", "total liabilities", "additional paid-in capital",

24   _____

25   [6] Statement of Cash Flow balances that were materially misstated, include "net income", "stock-
     based compensation", "tax benefit of stock option exercises", "amortization of deferred stock based
26   compensation", "prepaids", "deferred taxes and other assets", "accounts and taxes payable",
     "accrued salaries and benefits", "other accrued liabilities", "net cash provided by operating
27   activities", "net cash proceeds from issuance of common stock", "net cash provided by financing
     activities", and "net increase in cash and cash equivalents", among others.

28

1   "accumulated deficit", "total stockholders equity", and "total liabilities and stockholders' equity",

2   among others.

3               **1.      Misstated Compensation Expense**

4               119.    During the relevant time period, Accounting Principles Board Opinion No. 25,

5   "Accounting for Stock Issued to Employees" ("APB 25") was one of two accepted methods for

6   accounting for stock options.[7]  However, APB 25 was used almost exclusively by Rambus because

7   APB 25 only required expense recognition related to the issuance of stock options in limited

8   circumstances. APB 25 sanctioned the use of the "intrinsic value method" (rather than accounting for

9   options at fair value, as is now *required* by SFAS 123(R)).   Under the intrinsic value method,

10  Rambus' stock option expense should have been calculated as the excess of the market price of

11  Rambus' stock over the exercise price (or "strike price") on the measurement date.    The

12  measurement date is the first date when the number of shares and the exercise price to the optionee

13  become known. It was the measurement date that was fraudulently backdated by the Defendants.

14              120.    Under APB 25, a company is required to recognize stock option based compensation

15  expense when the options are granted "in the money" (i.e. where the exercise price is lower than the

16  fair value of stock on the date of grant).  When "in the money" options are granted, these options are

17  immediately valuable because the exercise price is lower than the fair market value.  Under APB 25,

18  the company would have to recognize the stock option based compensation expense attributable to

19  the difference in value between the exercise price and the market price of the options granted to the

20  employee.

21              121.    By backdating the measurement date to a date when the fair market value (i.e. the

22  stock price) was lower, Rambus was able to avoid recognizing any expense related to the issuance of

23

24  _____

25  [7] Until recently, companies had the option of accounting for stock options using APB 25, the
    "intrinsic value method", or SFAS 123 the "fair value method."  Recently, the FASB issued SFAS
26  123(R), which now requires all companies to account for stock options using the "fair value
    method".

27

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

the options granted, while still providing their directors and officers with undisclosed compensation through the grant of "in the money" options.

122. Through the backdating scheme, Rambus was able to avoid recognizing the required expenses under APB 25 for stock based compensation, while still providing enormous excessive compensation to its directors and officers. Thus, not only was Rambus able to avoid expense recognition in connection with its backdated option scam, but the recipients received inappropriate preferential tax treatment on their ill-gotten remuneration. These tax consequences are discussed more fully below in paragraphs 137-139. Even though the recipients of these options, (including the Backdated Option Recipients) were excessively remunerated, Rambus did not disclose the materially deleterious affects of this exorbitant compensation on its financial results. Consequently, Rambus stock did not decline as a result of the excesses of the Defendants until the truth was revealed with the 2006 disclosures. During the relevant period, Rambus disclosed that, with regard to accounting for stock options, it utilized APB Opinion No. 25, Accounting for Stock Issued to Employees. As previously noted, APB 25 requires the use of the "intrinsic value method", whereby a corporation recognizes as an expense the aggregate compensation cost for each employee equal to the excess of the market price of the stock over the exercise price of the stock for the number of shares granted on the measurement date. The measurement date is defined as that date on which the number of shares and the exercise price are known. The expense is recognized by the Corporation ratably, on a "straight line" basis, over the service period (years in which the corporation receives the benefit of the employee's services) under the terms of the employee contract. That is, a corporation does not recognize immediately the total employee compensation cost at the time the options are granted. Instead, the total compensation cost is expensed over the years during which the employee must perform work for the company. Generally, the service period is the same as the vesting period. According to Rambus' 1997 Stock Plan, the options granted to its employees would vest pursuant to the following schedule set forth in paragraph 123 below.

123. 12.5% of the Shares subject to the Option shall vest six months after the date of grant, and 1/48 of the Shares subject to the Option shall vest each month thereafter so that 100% of the

1  Shares subject to the Option shall be vested four (4) years from the grant date, subject to the
2  Optionee remaining a Service Provider[8] as of such vesting dates.[9]

3        124.     Accordingly, for stock options that were backdated prior to the class period, utilizing
4  the appropriate GAAP methodology (i.e. the intrinsic value method), would have required material
5  expense amortization which would continue four years into the future. For example, an option
6  granted on August 1998 would not be fully expensed until August 2002, four years later.
7  Notwithstanding, Rambus did not undertake the appropriate expense recognition, as required by
8  GAAP, throughout the class period. Moreover, each 10-Q and 10-K filed during the class period
9  incorporated the financial statements from the two previous years. Therefore, every 10-Q and 10-K,
10 among other SEC filings, during the class period was materially misstated and omitted material
11 disclosures because of the Defendants' backdated option scheme. Throughout the class period, the
12 individual Defendants, by disposing of their ill-gotten backdated option shares at obscene profits,
13 continued to receive the fruits of their transgressions. The Defendant's conduct ratified earlier
14 wrongdoing in connection with the backdated option scheme and provides incontrovertible
15 confirmation of their scienter. As well, Rambus, on an ongoing basis, improperly failed to recognize
16 associated stock compensation costs and, therefore, did nothing to alert the marketplace to the
17 Defendants' continuing, avaricious scheme.

18       125.     As a result of this backdating scheme, Rambus' financial statements and the notes and
19 disclosures related thereto were misstated and fundamentally misleading. During the relevant time
20 period, Rambus' SEC filings falsely represented Rambus' compliance with APB 25. For example,
21 the following misrepresentation was made in Rambus' 2002 10K filed with the SEC on November
22 26, 2002, and repeated in Rambus' subsequent 10-K's[10]:

23     Stock-Based Compensation

24

25 _____

26 [8] A Rambus employee, director or consultant. 1997 Rambus Stock Plan at 2(ee).

   [9] Rambus 1997 Stock Plan, at 13(c)

27 [10] Rambus 2002 From 10-K filed with the SEC on November 26, 2002.

28

Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." **Stock options are generally granted with exercise prices equivalent to fair market value [i.e. "at the money"], and no compensation cost is recognized. When stock options are granted with exercise prices below fair market value [i.e. "in the money], employee stock-related compensation expense is recognized accordingly**. Rambus provides additional pro forma disclosures as required under Statement of Financial Accounting Standards No. 123, or SFAS 123, "Accounting for Stock-Based Compensation." [Emphasis added].

126.    The backdating scheme allowed Rambus to make it appear as if the options were being granted, "with exercise prices equivalent to fair market value," so that no expense was required to be recognized.  However, in truth, Rambus was substantively issuing "in the money" options and backdating them to avoid recognizing the proper expenses.  The above disclosure specifically states, "When stock options are granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."  This statement, as it appeared in the various Rambus SEC filings during the relevant period, was patently false.  Rambus did not recognize the appropriate stock option compensation expense to the extent of more than $200 million, an amount that substantially exceeded its entire cumulative net income from 1998 until its 2006 disclosures of the fraud.

### 2.    Financial Statement Balances Affected By The APB 25 Compensation Expense Improper Accounting

127.    Rambus' net income account was materially understated by the nonrecognition of the appropriate stock-based compensation expense.  Had the stock-based compensation expense been properly reflected during the relevant period, that expense would have materially reduced earnings, on a pre-tax basis, dollar for dollar.  However, because Rambus consistently engaged in its backdating scheme, from 1998 onward, the Company avoided proper recognition of stock option expenses. Consequently, Rambus' earnings were consistently overstated.

128.    The deleterious affect on net income also directly impacts the "Net Income Per Share" (a.k.a. earnings per share or EPS) calculation and causes that balance to be materially misstated.  EPS is the measure of a company's earnings on a per share basis (net income minus preferred dividends divided by the weighted average number of common shares outstanding) for a relevant period.  The EPS number is a major indicator of company's profitability, and is widely

1    considered to be the single most important variable in determining share price.  It is also a major

2    component of the price-to-earnings valuation ratio used to facilitate intercompany stock price

3    comparisons between similar companies.  Companies that fall below projected EPS estimates by

4    even one penny often suffer a reduction of stock price.  The "Net Income Per Share" values listed on

5    Rambus' income statements during the relevant period have been materially misstated as a result of

6    Rambus' backdated option scam.

7          129.    Rambus' disclosure related to EPS, as required by SFAS 128, ¶40, was also

8    materially false and misleading because that disclosure is required to provide a reconciliation of the

9    calculation of both basic and diluted EPS.  Because net income is a major component to the EPS

10   calculation and was materially misstated by Rambus, the EPS calculation disclosure was, by

11   definition, incorrect, and therefore false and misleading.   Additionally, the disclosure of EPS

12   required by SFAS 123, ¶45-48 (as if the "fair value method" had been utilized) was materially false

13   and misleading.  SFAS 123, which deals with stock compensation expense, was implemented by the

14   FASB to provide a comparison of EPS as calculated under the "intrinsic value method" versus the

15   "fair value method".   Because the "intrinsic value method" – EPS was materially misstated,  it

16   provides no relevant comparison to the "fair value method" – EPS, and the relevant SFAS 123

17   disclosures are therefore, per se, false and misleading.

18                      **3.    Related Compensation Expense**
                            **Disclosure Misstatements and Omissions**
19

20         130.    Rambus consistently stated in its public SEC filings, including its Proxy Statements,

21   "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value

22   of the Company's Common Stock at the date of grant."[11]  In fact, nowhere in its public disclosures

23   prior to May 30, 2006, did Rambus reveal or even hint that the backdating scheme, or Rambus'

24   issuance of "in the money" options.  On the contrary, the executive compensation disclosures falsely

25   assert that Rambus' practice was to issue "at the money" options, and that issuing "in the money

26   options" would be an exception to be noted, rather than the rule.  Further, many of the executive

27

28   [11] *See, e.g.*, Rambus' Proxy Statement filed with the SEC on December 14, 2001.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

compensation disclosures consistently enabled the fraud by falsely implying certain grant dates through the expiration dates listed on option-related tables.  That is, many of these tables implied the incorrect, backdated grant date as opposed to the correct date of grant via the expiration dates listed.  Moreover, these executive compensation disclosures fail to reflect the massive option giveaway to the Defendants and the extent to which the financial statements were distorted thereby.  Finally, while the executive compensation disclosures specifically reported the number of shares exercised during a relevant time period, they failed to disclose that much of the value received was a result of the issuance of backdated, but otherwise "in the money", option grants in the past.

### 4.     Misstated Tax Liability and Expense

131.    In the October 19, 2006 8-K announcement regarding the results of Rambus' backdated stock-option investigation, the following disclosure was made:

> Rambus has not yet determined the tax consequences that may result from these [backdated stock option] matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period. [Emphasis Added].

132.    Indeed, as discussed below, because of the Internal Revenue Code's radically disparate treatment of incentive stock options ("ISOs") versus nonqualified stock options ("NSOs"), as well as the interplay of such tax treatment with IRC §162(m), dealing with certain employee remuneration in excess of $1 million, the fraudulent mischaracterization of what were ostensibly "at the money" stock options to "in the money" stock options will likely have material negative tax consequences.  Although the precise tax consequences for Rambus' backdated options scam will not be known without further discovery, the market reacted negatively to this major uncertainty as it awaits the results of Rambus' internal investigation and IRS analysis.

133.    The Internal Revenue Code considers ISOs to be "statutory" options that meet the requirements of §421-424.  Generally, there are no tax consequences on the grant of statutory options to an employee unless there is a "disqualifying disposition" of the ISO stock. Subsequent dispositions of ISO exercised stock, subject to holding period requirements, are accorded capital gains treatment.  However, the ostensibly "at the money" (statutory) options that were disclosed by Rambus during at before the Class Period were actually "in the money" options which are properly

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

classified by the Internal Revenue Code as nonstatutory (nonqualified) stock options. The tax

treatment for statutory versus nonstatutory options is considerably different. Nonqualified stock

options are not entitled to preferential tax treatment and are taxed to the employee at ordinary

income rates[12].  Among other things, the payment of such ordinary income required Rambus to

withhold appropriate amounts for income tax and/or FICA upon the exercise of the de facto NSOs

by the recipients.  The enormous amount of ordinary income triggered by the backdated options

triggered the requirement for correspondingly enormous "withholding" tax payments by Rambus to

the IRS.  Such payments were never made by Rambus.  In addition to liability for such payments,

Rambus is subject to interest and penalties on the likely millions of dollars it failed to withhold.

134.    Rambus also falsely represented that the Defendants would receive "performance-

based" compensation pursuant to Internal Revenue Code §162(m),[13] which would arguably entitle

Rambus to substantial tax benefits in the form of related tax deductions.  However, Rambus'

backdated options scheme did not qualify for "performance-based" treatment as defined by the

Internal Revenue Code, contrary to its public disclosures. *See, e.g.* Rambus Proxy Statement filed

on March 18, 2005. Commenting on the tax consequences of the stock-option timing scandal,

Institutional Shareholder Services has stated:

> Under §162(m) of the Internal Revenue Code, at-the-money options are generally
> considered performance-based compensation that is deductible from corporate tax
> returns, even if an executive earns more than $1 million a year… Also, unlike at-the-

---

[12] Indeed, the Individual Defendants' had considerable motive to have their substantial option income characterized as incentive based (i.e. statutory) option income.  By fraudulently mischaracterizing the nonstatutory options as statutory options, the Defendants inappropriately avoided the recognition of enormous amounts of ordinary income relating to the grants, per se, and they also received inappropriate capital gains treatment upon disposition of the related shares.  Such motivation to obtain favorable tax treatment for the Individual Defendants, among other things, provides compelling evidence of their scienter.

[13] §162(m) permits deductions for compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly compensated officers when: 1) the compensation is payable solely on account of the attainment of one or more performance goals; 2) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; 3) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote and a separate shareholder vote before the payment of the compensation; and 4) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

money options, discounted [i.e. backdated] grants are not considered performance-based and may not qualify for tax deductions. Consequently, if a company's grants are later determined to have been discounted without proper disclosure and accounting, the firm could face significant tax penalties and may have to file a restatement to reflect the lost deductions and the cost of those discounted options. Emphasis added.

135.    In his September 6, 2006 article in *The Economist,* SEC Chairman Christopher Cox was quoted as saying:

… for companies that wanted or needed to pay compensation in excess of $1 million per year, the tax code outlawed deducting it if it was paid in a straightforward way through salary, but permitted a deduction if the compensation was paid through at the money options.

136.    As a result, Defendants have subjected the Company to additional liabilities, penalties and interest, and as a result, if and when assessed, many of Rambus' balance sheet and income statement accounts (including, but not necessarily limited to net income, earnings per share, deferred tax assets, retained earnings, as well as numerous false and/or omitted disclosures), will be materially and negatively affected.

### 5.    Items Affected by the Tax Misstatements

137.    The tax consequences of the Rambus' backdated options scheme have a materially negative affect on numerous balance sheet and income statement items. Among other accounts, Rambus' "net deferred tax asset" would be affected by any restatement of tax liability. During the relevant period, Rambus consistently listed the current portion of its deferred tax asset under the current assets section of its balance sheet in an account entitled "Prepaid and Deferred Taxes." Further, Rambus listed the non-current portion of its deferred tax asset in an asset account entitled "Deferred Taxes, Long-Term." Both of these accounts, because they are created by the temporary differences between the tax accounting and GAAP accounting treatment of items including net operating loss carryforwards and stock-based compensation expense, are materially affected by defendants' backdating scheme.[14] In addition, any "Taxes Payable" liability listed on the balance

---

[14] Statement of Financial Accounting Standards No. 109 ("SFAS 109") requires that companies calculate deferred tax assets and deferred tax liabilities (booked on a net basis) that are the result of temporary differences between GAAP accounting and tax accounting.

1 sheet and/or "Provision for Income Taxes" on the income statement are materially affected. This is

2 principally because these financial statement account balances arose from the improper

3 characterization of stock-based compensation engendered by the backdated option scam undertaken

4 by Rambus during the relevant period.

5       138.    In addition to the effects on net income that arise out of the misstated stock-based

6 compensation expense discussed above, net income, and, therefore, earnings per share ("EPS"), are

7 deleteriously affected by the false and misleading "Provision For Income Taxes" reported on

8 Rambus' income statements.

9       139.    Finally, the disclosure of the calculation of the deferred taxes as required by SFAS

10 109, ¶¶44-49, and any related information therein, is, per se, materially misstated, false, and

11 misleading as a result of Rambus' backdated option scheme.

12         **6.**     **Executive/Director Compensation Misstatements and Omissions**

13       140.    The SEC requires, under Item 402 of Regulation S-K, that a company provide in its

14 Proxy Statements or other SEC filings both a Summary Compensation Table and an Option/SAR

15 Grants table disclosing the compensation of its named executive officers. These requirements

16 mandate particularized disclosures involving stock options grants for the previous fiscal year. In the

17 disclosure, a company must delineate "other annual compensation" paid to the named executives that

18 cannot be properly categorized as salary or bonus. This "other annual compensation" amount

19 includes, among other things, "in the money" options granted to the officers in a relevant period[15].

20 Moreover, Item 402 requires the disclosure of the "per-share price of the options" and further

21 requires that if the options are granted "in the money" (i.e. exercise price is less than market price on

22 the date of grant), the market price must be disclosed in a separate column. As a result of the

23 backdating scheme, the Individual Defendants and Rambus failed to disclose that it was actually

24 issuing improperly backdated, "in the money" options to its executives, in such tables.

25

26

---

27 [15] "[a]bove market or preferential earnings on restricted stock options SARs or deferred
compensation" per Item 402(b)(2)(iii)(C)(2) or Regulation S-K.

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

141.    Rambus manipulated the Director and Executive Compensation data disclosed to the public in the very section of each of the Proxy Statements and Form 10-Ks issued and filed during the Class Period and prior thereto, designed to inform shareholders about these matters. Rambus' deception was not confined to one year; rather every single Proxy issued during the Class Period[16] contained the following footnote to the Option Grants table: "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value of our common stock at the date of grant[17]." Such required "indication otherwise" is conspicuously absent from ***all the relevant Proxies and Form 10-Ks*** where Rambus should have disclosed the grant of "in the money" options. Additionally, the Options Grant Table perpetuated the fraud by falsely implying certain grant dates through the expiration dates listed on option-related tables.  Many of these tables implied the incorrect, backdated grant date as opposed to the "correct" date of grant via the expiration dates listed. The table, which is intended to disclose all information relevant to option grants, failed to disclose the massive grants of substantively "in the money" options granted to executives and the corresponding detrimental effects on Rambus' financial statements. Additionally, in a section entitled "Director Compensation," the Company stated, ***in every proxy throughout the period***, that certain non-employee directors had received "at the money" options.  This further misled the markets to believe that Rambus offered only "at the money" options.

### 7.    Misstated Equity Accounts

142.    The "Additional Paid-In Capital" ("APIC") account discloses, in part, the amount of contributed capital held by a company, and is a significant item in the equity section of a reporting entity's balance sheet.  For each reporting date during the relevant time period, Rambus' APIC represented the lion's share of the equity section of its balance sheet.[18]  However, this APIC account

---

[16] The one exception is the 2006 Proxy, issued on March 29, 2006.

[17] Before 2001, the statement read "options were granted at an exercise price equal to the fair market value of our common stock at the date of grant", indicating that options were "at the money" **without exception**.

[18] This is especially true considering that Rambus' par stock is valued at $.001.

1    was materially false and misleading during the relevant time period because of the prolific

2    backdating of options.  The exercise of stock options is ultimately reflected in the APIC account.

3    The fact that were backdated resulted in the APIC being, materially false and misleading because the

4    amounts being recorded in that account were substantially misstated.  Additionally, because the truth

5    did not begin to be revealed until near mid-2006, the public was continually misled as to the

6    correctness of the APIC account for the relevant period.  This, when combined with the fact that

7    Defendants continually represented that options were generally issued "at the money," also misled

8    the public to believe that Rambus was receiving an appropriate cash value for the options.  Had the

9    option prices been determined on the legitimate grant dates, such values would have been

10   significantly higher and Rambus would have received substantially more cash upon the exercise of

11   the backdated options.

12        143.    Further, the retained earnings (accumulated deficit) account listed on the balance

13   sheet was consistently and materially misstated, since the net income of the company was materially

14   misstated, as described previously, and the net income balance is transferred into retained earnings

15   (accumulated deficit) when the books are closed at year end.   Clearly, an improper amount of net

16   income was closed into the retained earnings (accumulated deficit) account. Accordingly, the

17   retained earnings (accumulated deficit) account was materially misstated because of its relation to

18   net income.  The misstatement of retained earnings (accumulated deficit) is particularly egregious

19   because the fraud took place over such a lengthy period of time.  Rambus' net income was misstated

20   for each of the respective periods, as a result of the fraud.  Because there was a misstatement of net

21   income during each respective period, the retained earnings (accumulated deficit) account was, also,

22   perpetually misstated.  In addition, because net income is closed to retained earnings (accumulated

23   deficit) at the end of each fiscal year, the amount of misstatement in retained earnings (accumulated

24   deficit) was exacerbated each year, from 1998 through the present.

25        144.    As well, the shareholders and public stockholders were materially misled by the

26   substantially overstated equity reflected in Rambus' financial statements.  The accounts discussed

27   above, and their related misstatements, created concomitant misstatements in other balance sheet

28   accounts including the "Total Stockholders' Equity" account and the "Total Liabilities and

1   Stockholders' Equity" account. Because APIC and the retained earnings (accumulated deficit

2   account) accounts were materially misstated, it, therefore, follows as a corollary that "Total

3   Stockholders' Equity" and "Total Liabilities and Stockholders' Equity" were also misstated, since

4   these accounts include the APIC and retained earnings (accumulated deficit) amounts.  This is

5   relevant because each of these accounts are significant to analysts and are used by investors to

6   undertake ratio analyses and other intercompany comparisons.   For example, the "Total

7   Stockholders' Equity" value is a major component of several widely observed leverage ratios

8   including, among others, the "debt-to-equity ratio" (total debt/total equity) and the "equity

9   multiplier" (total assets/total equity).  These leverage ratios are designed to provide an indication of

10  the long-term solvency of a company and are benchmark criteria for analysis. Such cumulative

11  equity balances will be substantially reduced as a result of the forthcoming accounting restatement

12  engendered by the backdated option compensation scheme.

13              **8.     Balance Sheet Items Materially Affected**

14          145.    As a result of the backdating fraud and its material affect on the deferred tax

15  accounts, the "Total Current Assets" on Rambus' Balance Sheets during the relevant period were

16  also materially affected.  Specifically, any misstatement in the "Prepaid and Deferred Taxes"

17  accounts has a direct material affect on "Total Current Assets", which are itemized separately from

18  long-term assets on the balance sheet.  Current assets are assets that are expected to be converted

19  into cash within one year in the normal course of business, and are important because they are the

20  assets used to fund day-to-day operations and pay ongoing expenses.  Analysis of a company's

21  current assets allows investors, analysts, and creditors to quickly and easily determine a company's

22  liquidity and solvency.  Accordingly, "Total Current Assets" is a heavily relied upon financial metric

23  used in numerous ratios including, but not limited to, the "current ratio" (current assets/current

24  liabilities), which is a measure of short-term liquidity, and "working capital" (current assets minus

25  current liabilities). The materially false and misleading nature of this account had a serious and

26  deleterious affect on the ability to properly analyze Rambus' financial results during the relevant

27  period and investors were substantially mislead by the distortion of this account resulting from the

28  fraud.

146.     Additionally, any misstatement that affected the deferred tax accounts (both current and long term) also had a material effect on the "Total Assets" balance, as listed on Rambus' relevant Balance Sheets for the period.  "Total Assets" is an elementary, yet crucial, consideration in analyzing the overall health of a business.  As with many of the other material effects of the fraud, the effects on "Total Assets" rendered resulting analysis of the financial statements false and misleading.  For example, because of the materially misstated "Total Assets", numerous financial analysis ratios, including, but not limited to, the debt ratio (total debt/total assets) and the "return on assets" (net income/total assets) were materially altered.

147.     Because of the likely effects of the fraud on, among others, the "Taxes Payable" account, Rambus' "Total Current Liabilities" account is, similarly, distorted and rendered materially misleading on the Balance Sheets issued during the relevant time period.  Much like "Current Assets", the "Current Liabilities" balance has critical importance to investors, creditors, and other readers of the financial statements.  Indeed, the current portion of liabilities must be itemized on the balance sheet separately.  "Current Liabilities" communicates the amount of debt that will come due in the current year.  As discussed above, this account has particular value when compared to "Current Assets" because it allows readers to analyze whether current resources (current assets) are adequate to cover current obligations (current liabilities).  Working capital (current assets minus current liabilities), which is an extremely important metric when analyzing a company's liquidity, is also materially effected by the "Total Current Liabilities" account.  Thus, the material effects on this account had significant deleterious consequences for the market's ability to properly analyze Rambus' financial position during the relevant period.

148.     Finally, the "Taxes Payable" and material effects on "Total Current Liabilities" issues as discussed above, led to misstatements in the "Total Liabilities" account on all Balance Sheets issued during the relevant period.  Like "Total Assets", "Total Liabilities" are fundamental to financial reporting and crucial to understanding the overall health of a business; because debt has the potential to "bury" a company, "Total Liabilities" is one of the most closely scrutinized figures on the Balance Sheet.  Comparing assets to liabilities is one of the most fundamental ways to assess both short-term and long-term liquidity.  Further, as discussed previously, the "debt to equity ratio"

1    (total debt/total equity), which relies, in part, on debt disclosed in the "Total Liabilities" section of

2    the balance sheet, was materially affected by the backdating scheme.

3             **9.    Income Statement Items Materially Affected**

4            149.        The understatement of Rambus' stock compensation expense rendered

5    materially false and misleading the "Total Costs and Expenses" account on all the "Statements of

6    Operations" (Income Statements) issued during the relevant period. The misleading nature of this

7    item is relevant because the account is regularly used by analysts and investors to measure, among

8    other things, the relative efficiency of Rambus' "day-to-day" business. Thus, the misleading nature

9    of this item robbed the investing public of one of its most elementary and crucial analytical tools.

10           150.      Additionally, Rambus' omission of "Stock-Based Compensation Expense" and the

11   subsequent effect on "Total Costs and Expenses" lead to a material effect on "Operating Income", as

12   well, which was materially false and misleading on all of Rambus' relevant income statements.

13   "Operating Income" presents company earnings before items less pertinent to the company's main

14   product or service are accounted for, and represents a measure of a company's earning power from

15   ongoing operations. Because "Operating Income" focuses on a company's central operations, it

16   provides a more distilled, "pure" version of company health, free from more extraneous expenses.

17   However, because of the material effects on Rambus' operating income, investors and analysts were

18   precluded from obtaining an accurate picture of Rambus' operations during the relevant period.

19           151.      Further, the understatement and other material income statement effects, as discussed

20   above, ultimately rendered materially misleading the account balance in "Income Before Income

21   Taxes" on all Rambus' income statements during the relevant period. "Income Before Income

22   Taxes" conveys the health of a company's operations before the relatively uncontrollable "Provision

23   for Income Taxes." It is an important and readily used financial metric, which was rendered

24   unreliable by Rambus' backdating fraud.

25           152.      Finally, the "Provision for Income Taxes" was also effected by Rambus' fraud.

26   Because the "Provision for Income Taxes" is an estimate of a company's total income tax liability

27   for the year, based on reported taxable income, this account, too, was materially misstated for the

28   relevant period.

1

### 10.    "Statement of Cash Flow" Items Affected

2       153.    The purpose of "Statement of Cash Flows" is to summarize cash inflows and

3  outflows that a company experiences during a period of time.  It is also a tool used to reconcile the

4  amount of cash a company reports on its balance sheet from the beginning to the end of a specific

5  reporting period.  The "Statement of Cash Flows" reconciles both cash items and non-cash items

6  (those items that show up as expenses on the income statement, but for which no actual cash

7  transactions occurred, e.g. depreciation, amortization, etc.) with the actual cash position of the

8  company.  The three main elements of a "Statement of Cash Flows" are "operating cash flows",

9  "investing cash flows", and "financing cash flows", as discussed below.  The "Statement of Cash

10  Flows" is an important tool used by investors and analysts to evaluate, *inter alia*, a company's true

11  cash position; where the company is spending its cash; the ability to generate cash flow in the future;

12  the ability to meet its debt obligations; the need for external financing; and the reasons for

13  differences between net income and a company's actual cash flows.

14       154.    Defendants' backdating scheme had a significant effect on its "Statement of Cash

15  Flows", in addition to the numerous effects on other relevant financial statements discussed above.

16  For example, since the "Statement of Cash Flows" is designed to reconcile net income to cash, the

17  first item listed on the face of the statement is net income.  However, as discussed above, the net

18  income numbers reported by Rambus during the relevant time period were materially misstated, and

19  as such, the "Statement of Cash Flows" would likewise, be materially misstated.  In addition to this

20  intrinsic flaw, Rambus' relevant cash flow statements contained numerous other material

21  misstatements, as well.  Because Rambus failed to properly expense its stock options per APB 25,

22  the cash flow statements were materially false and misleading. The $200 million stock-based

23  compensation expense that should have been recognized represents a major non-cash expense, which

24  should have then been reconciled to cash on the cash flow statement.

25       155.    In addition, the likely tax consequences, as discussed in Rambus' 8-K and related

26  press release issued on October 19, 2006, of the fraud, will have a material effect on numerous other

27  items on the "Statement of Cash Flows" including, but not necessarily limited to, "Tax Benefit of

28  Stock Option Exercises", "Deferred Taxes", "Prepaid Taxes", and "Taxes Payable".  Further, the

1    cash flow statement also contains supplemental information that includes "Taxes Paid", which is

2    materially false and misleading if, as is likely, the backdating fraud caused Rambus' past tax

3    liabilities to materially change.

4           156.   The total "Net Cash Provided by Operating Activities" was also significantly affected

5    by all of the aforementioned items, since they are aggregated into this total, causing it to be

6    materially false and misleading, as well.  The "operating cash flow" (OCF) balance is very important

7    to both investors and analysts because it provides information as to the amount of cash a company is

8    generating (and using) as a result of its day-to-day operations.  Some analysts argue that OCF is a

9    better measure of a business's true profits than earnings because it is cash flow, not paper earnings,

10   that allows a company to satisfy its obligations.  Moreover, OCF can be used as a measure of the

11   quality of a company's earnings and its solvency.  OCF is also a component of relevant ratios that

12   analysts use for relevant intercompany comparisons, including, but not limited to, the "Current Cash

13   Debt Coverage Ratio" (cash from operations/current liabilities) and "Cash Debt Coverage Ratio"

14   (cash from operations/total liabilities).  Both of these ratios are designed to measure a company's

15   ability to cover its obligations with cash on hand.

16          157.   Additionally, other items on the "Statement of Cash Flows" relevant to the issuance

17   of common stock, because of the existence of misstatements relating to the exercise of options

18   contained in those values, are also materially false and misleading.  Specifically, the item captioned

19   "Net Proceeds from Issuance of Common Stock" was misleading because of the option backdating

20   scheme.  Rambus misled its investors to believe that options were issued "at the money" and the

21   company was, therefore, receiving an appropriate value for the options it issued.  However, the

22   backdating caused the exercise price of the options to be significantly lower than it would have been

23   had the "correct" grant date and "correct" exercise price been used.  In this way, the "Statement of

24   Cash Flows" perpetuated the fraud and was, itself, materially false and misleading.  Similarly to the

25   above, this item would create a material distortion on "Net Cash Provided by Financing Activities",

26   which represents cash flow from external activities, e.g., issuing cash dividends, adding or changing

27   loans, or issuing and/or selling more stock.

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

158.    Finally, the item on Rambus' "Statement of Cash Flows" entitled "Net Increase in Cash and Cash Equivalents" would be materially effected by the misstatement of all of the above as the misstatements in, among others, "Net Cash Provided By Operating Activities" and "Net Cash Provided By Financing Activities" are included in this total, making it likewise, false and misleading.

### 11.    Internal Control Misstatement

159.    During the entire relevant period, Rambus' management represented to the investing public that its financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  In truth, there were material misstatements of numerous items, as discussed in detail above, during the entire relevant period from 1998 through the first quarter of 2006, as a result of the admitted stock option backdating fraud.  These representations about the fairness and accuracy of Rambus' financial statements by the Defendants during the entire relevant period were patently false.

160.    Moreover, during this period, both Rambus and its independent auditor, PricewaterhouseCoopers ("PWC"), made representations regarding the adequacy of Rambus' internal controls.  These representations were made both implicitly, through the unqualified issuance of the financial statements and explicitly, by stating that Rambus' internal control systems were effective.  Internal controls are processes designed to, *inter alia*, "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."[19]  Specifically, from 2003 through the 2006 First Quarter 10-Q, management made the following representation (or similar representations) relating to its internal controls:[20]

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our management, including our CEO and CFO, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31,

---

[19] This language is taken directly from Pricewaterhouse Coopers' own opinion on "Internal Control Over Financial Reporting" issued on Rambus' fiscal year 2005 financial statements.

[20] Rambus 2005 Form 10-K, filed with the SEC on February 21, 2006.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

2005. In making this evaluation, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework.

Based on our evaluation, under the criteria set forth by COSO in Internal Control-Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2005. Our management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein. [Emphasis added]

161.    Further, as noted in Rambus' disclosure, this internal control assessment was audited[21] by Rambus' independent auditor, PWC, whose auditors signed off on both the financial statements and internal controls, and agreed with this assessment:[22]

Also, in our [PWC's] opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control-Integrated Framework issued by COSO. [Emphasis added]

162.    However, even as both management and PWC asserted the effectiveness of Rambus' internal controls, the backdating fraud proliferated, in stark contrast to the Defendants' assertions. Only five months after the 2005 year end, and less than a month after the issuance of the 2006 First Quarter 10-Q, which still reported internal controls to be effective, Rambus' Audit Committee announced the initiation of its stock option backdating investigation. Five months later, on October 19, 2006, Rambus announced that the public could no longer rely upon its currently issued financial statements, 10-Ks and 10-Qs, for 2003, 2004, 2005, and 2006. Further, contrary to its assertions only months prior, Rambus now admitted:

Additionally, Rambus is evaluating Management's Report on Internal Control Over Financial Reporting set forth in Rambus' 2005 Annual Report. Although Rambus has

---

[21] Pricewaterhouse Coopers conducted audits of the "Internal Control Over Financial Reporting" for both fiscal years ends 2004 and 2005 for which it received, in total, more than one million dollars in related fees.

[22] Rambus 2005 Form 10-K, filed with the SEC on February 21, 2006.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   not yet completed its analysis, ***the results of the investigation confirm Rambus'***
    ***determination that it is likely that Rambus had a material weakness in internal***
2   ***control over financial reporting as of December 31, 2005.***

3   ***The results of the independent investigation showed that improvements are needed***
    ***in Rambus' processes for the granting of equity compensation.*** The Audit
4   Committee is working with the Board of Directors, the Compensation Committee
    and management to implement improvements in Rambus' processes and controls
5   over its stock administration programs. [Emphasis added]

6       163.    This statement was in direct conflict with the assertions made throughout the entire

7   relevant period when the backdating fraud was being perpetrated and/or concealed.

8                   **12.    Misstated Changes in Beneficial Ownership, Per Form 4s**

9       164.    Rambus' Forms 4, which are required in order to notify the SEC of a change in

10  beneficial ownership (including the issuance of stock options), filed during the relevant time period

11  were also materially false and misleading and contained information intended to further the

12  concealment of the improper backdating.  The Form 4's filed during the relevant time period listed

13  but did not indicate the backdating scheme that was taking place.  Had the options not been back

14  dated, the exercise prices listed on the relevant Forms 4 would have been materially different.

15  Further, based on representations made by Rambus,[23] the expiration dates listed on the Forms 4 were

16  used to imply the false and improper date of grant as opposed to the "proper" date when the decision

17  to make the option grants was actually made, thereby allowing Rambus to substantively issue "in the

18  money" options while avoiding the proper APB 25 expense and related disclosures. Those were as

19  follows:

20              (a)     Defendant Eulau's Form 4 filed with the SEC on July 22, 2003 and

21  October 23, 2003 falsely reported that options granted to Eulau had been granted on August 23,

22  2001, had an expiration date of August 23, 2011 and an exercise price of $4.86;

23

24  _____

25  [23] Exhibit 4.6 of the Rambus Form S-8 filed with the SEC on June 6, 1997 is a copy of the 1997
    Stock Plan adopted by Rambus.  Item 8, entitled "Term of Option" specifically states that, "In the
26  case of an Incentive Stock Option, the term shall by ten (10) years from the date of grant."  As such
    the grant date is implied to be ten years prior to the expiration date of the options.  Rambus filed
27  improper expiration dates, thereby implying an "incorrect" grant date for the options filed on Forms
    4.
28

1        (b)     Defendant Eulau's Form 4 filed with the SEC on November 26, 2003 falsely

2 reported that options granted to Eulau had been granted on November 25, 2003, had an expiration

3 date of November 25, 2013 and an exercise price of $25.16;

4        (c)     Defendant Tate's Form 4 filed with the SEC on November 26, 2003 falsely

5 reported that options were granted to Tate on November 26, 2003, had an expiration date of

6 November 25, 2013 and an exercise price of $25.16;

7        (d)     Defendant Eulau's Form 4 filed with the SEC on December 19, 2003 falsely

8 reported that options granted to Eulau had been granted on June 21, 2001, had an expiration date of

9 June 21, 2011 and an exercise price of $9.07;

10        (e)     Defendant Mooring's Form 4 filed with the SEC on January 23, 2004 falsely

11 reported that options granted to Mooring had been granted on August 23, 2001, had an expiration

12 date of August 23, 2011 and an exercise price of $4.86;

13        (f)     Defendant Danforth's Form 4 filed with the SEC on November 26, 2003

14 falsely reported that options granted to Danforth had been granted on November 25, 2003 and had an

15 expiration date of November 25, 2013 and an exercise price of $25.16;

16        (g)     Defendant Danforth's Form 4 filed with the SEC on January 23, 2004 falsely

17 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

18 date of October 8, 2011 and an exercise price of $8.00;

19        (h)     Defendant Mooring's Form 4 filed with the SEC on January 28, 2004 falsely

20 reported that options granted to Mooring had been granted on August 23, 2001, had an expiration

21 date of August 23, 2011 and an exercise price of $4.86;

22        (i)     Defendant Eulau's Form 4 filed with the SEC on February 5, 2004 falsely

23 reported that options granted to Eulau had been granted on August 23, 2001, had an expiration date

24 of August 23, 2011 and an exercise price of $4.86;

25        (j)     Defendant Danforth's Form 4 filed with the SEC on February 5, 2004 falsely

26 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

27 date of October 8, 2011 and an exercise price of $8.00;

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1        (k)     Defendant Mooring's Form 4 filed with the SEC on March 1, 2004 falsely

2 reported that options granted to Mooring had been granted on November 5, 1998 and had an

3 expiration date of November 5, 2008 and an exercise price of $59.3125 and that options had been

4 granted to Mooring on August 23, 2001, had an expiration date of August 23, 2011 and an exercise

5 price of $4.86;

6        (l)     Defendant Danforth's Form 4 filed with the SEC on March 4, 2004 falsely

7 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

8 date of October 8, 2011 and an exercise price of $8.00;

9        (m)    Defendant Eulau's Form 4 filed with the SEC on March 4, 2004 falsely

10 reported that options granted to Eulau had been granted on August 23, 2001, had an expiration date

11 of August 23, 2011 and an exercise price of $4.86;

12        (n)    Defendant Danforth's Form 4 filed with the SEC on April 5, 2004 falsely

13 reported that options granted to Danforth had been granted on October 8, 2001,had an expiration

14 date of October 8, 2011 and an exercise price of $8.00;

15        (o)     Defendant Eulau's Form 4 filed with the SEC on April 5, 2004 falsely

16 reported that options granted to Eulau had been granted on August 23, 2001, had an expiration date

17 of August 23, 2011 and an exercise price of $4.86;

18        (p)     Defendant Eulau's Form 4 filed with the SEC on May 6, 2004 falsely reported

19 that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001, and that the

20 latter had an expiration date of August 23, 2011 and an exercise price of $4.86;

21        (q)     Defendant Tate's form 4 filed with the SEC on December 2, 2004 falsely

22 reported that options granted to Tate had been granted on November 5, 1998 and had an expiration

23 date of November 5, 1998 and an exercise price of $59.3125 and that Mooring had been granted

24 options on October 20, 1999 with an expiration date of October 20, 2009 and an exercise price of $

25 $15.67;

26        (r)     Defendant Eulau's Form 4 filed with the SEC on December 2, 2004 falsely

27 reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001, and

28 that the latter had an expiration date of August 23, 2011 and an exercise price of $4.86;

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

(s)     Defendant Eulau's Form 4 filed with the SEC on January 4, 2005 falsely reported that options granted to Eulau had been granted on June 21, 2001, with an expiration date of June 21, 2011 and an exercise price of $9.07 and that Eulau had been granted options on August 23, 2001 and that the latter had an expiration date of August 23, 2011 and an exercise price of $4.86;

(t)     Defendant Eulau's Form 4 filed with the SEC on January 9, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001 with an expiration date of June 21, 2011 and an exercise price of $9.07 and that Eulau had been granted options on August 23, 2001, and that the latter had an expiration date of August 23, 2011 and an exercise price of $4.86;

(u)     Defendant Danforth's Form 4 filed with the SEC on January 10, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001, had an expiration date of October 8, 2011 and an exercise price of $8.00;

(v)     Defendant Eulau's Form 4 filed with the SEC on January 10, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001, and that the latter had an expiration date of August 23, 2011 and an exercise price of $4.86;

(w)     Defendant Danforth's Form 4 filed with the SEC on January 12, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001, had an expiration date of October 8, 2011 and an exercise price of $8.00;

(x)     Defendant Eulau's Forms 4 filed with the SEC on January 12, 2006 and January 18, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

(y)     Defendant Danforth's Form 4 filed with the SEC on January 18, 2006 falsely reported that options granted to Danforth had been granted on October 8, 2001, had an expiration date of October 8, 2011 and an exercise price of $8.00;

(z)     Defendant Eulau's Form 4 filed with the SEC on January 23, 2006 falsely reported that options granted to Eulau had been granted on June 21, 2001;

(aa)    Defendant Mooring's Form 4 filed with the SEC on January 26, 2006 falsely reported that options granted to Mooring had been granted on August 23, 2001, had an expiration date of August 23, 2011 and an exercise price of $4.86;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1          (bb)     Defendant Mooring's Form 4 filed with the SEC on January 31, 2006 falsely

2 reported that options granted to Mooring had been granted on November 5, 1998 and had an

3 expiration date of November 5, 2008 and an exercise price of $59.3125;

4          (cc)     Defendant Danforth's Form 4 filed with the SEC on February 3, 2006 falsely

5 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

6 date of October 8, 2011 and an exercise price of $8.00;

7          (dd)     Defendant Eulau's Form 4 filed with the SEC on February 3, 2006 falsely

8 reported that options granted to Eulau had been granted on June 21, 2001 and August 23, 2001, and

9 as to the latter, had an expiration date of August 23, 2011 and an exercise price of $4.86;

10         (ee)     Defendant Eulau's Form 4 filed with the SEC on February 7, 2006 falsely

11 reported that options granted to Eulau had been granted on June 21, 2001;

12         (ff)     Defendant Mooring's Form 4 filed with the SEC on February 21, 2006 falsely

13 reported that options granted to Mooring had been granted on November 5, 1998 and had an

14 expiration date of November 5, 2008 and an exercise price of $59.3125;

15         (gg)     Defendant Mooring's Forms 4 filed with the SEC on February 22, 2006 and

16 February 27, 2006 falsely reported that options granted to Mooring had been granted on November

17 5, 1998 and had an expiration date of November 5, 2008 and an exercise price of $59.3125 and that

18 Mooring was granted options on October 20, 1999 that had an expiration date of October 20, 2009

19 and an exercise price of $15.67;

20         (hh)     Defendant Mooring's Form 4 filed with the SEC on March  2, 2006 falsely

21 reported that options granted to Mooring had been granted on October 20, 1999 which had an

22 expiration date of October 20, 2009 at an exercise price of $15.67 and that Mooring was also granted

23 options on August 23, 2001, and as to the latter, had an expiration date of August 23, 2011 and an

24 exercise price of $4.86;

25         (ii)     Defendant Danforth's form 4 filed with the SEC on March 2, 2006 falsely

26 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

27 date of October 8, 2011 and an exercise price of $8.00;

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1     (jj)  Defendant Eulau's Form 4 filed with the SEC on March 2, 2006 falsely

2 reported that options granted to Eulau had been granted on June 21, 2001;

3     (kk)  Defendant Mooring's forms 4 filed with the SEC on March 3, 2006 and

4 March 8, 2006 falsely reported that options granted to Mooring had been granted on October 20,

5 1999 which had an expiration date of October 20, 2009 at an exercise price of $15.67;

6     (ll)  Defendant Danforth's forms 4 filed with the SEC on March 22, 2006, March

7 30, 2006, April 5, 2006, April 7, 2006, and April 12, 2006 falsely reported that options granted to

8 Danforth had been granted on October 8, 2001, had an expiration date of October 8, 2011 and an

9 exercise price of $8.00;

10     (mm) Defendant Mooring's Form 4 filed with the SEC on May 3, 2006 falsely

11 reported that options granted to Mooring had been granted on August 23, 2001, had an expiration

12 date of August 23, 2011 and an exercise price of $4.86;

13     (nn)  Defendant Danforth's Form 4 filed with the SEC on May 3, 2006 falsely

14 reported that options granted to Danforth had been granted on October 8, 2001, had an expiration

15 date of October 8, 2011 and an exercise price of $8.00.

16         **PRICEWATERHOUSE COOPERS' LIABILITY**

17           **SUBSTANTIVE ALLEGATIONS**

18  **A.**  **The Independent Auditor, Pricewaterhouse Coopers**
      **Deliberately And/Or Recklessly Disregarded The Numerous**

19      **Red Flags Informing It About Defendants' Backdated Option**
      **Scheme And Its Effect On The Company's Financial Statements**

20

21    165.  PWC was engaged by Rambus to provide independent auditing and accounting

22 services throughout the Class Period and from at least 1991.[24]  In its audit opinions, PWC

23 improperly opined that Rambus' financial statements for fiscal years 2001, 2002, 2003 2004 and

24 2005 were presented in accordance with GAAP and that PWC's audits had been performed in

25 accordance with GAAS.

26

27 [24] PWC was born of a merger with Coopers & Lybrand in the late 1990s, and, as such, technically,
  Rambus' auditor in 1997 and prior was Coopers & Lybrand.

28

166.    PWC consented to the use of its improper audit opinions on Rambus' financial statements for the fiscal years during the Class Period on each Form 10-K.  PWC's issuance of improper audit opinions on Rambus' 2001, 2002, 2003, 2004, and 2005 financial statements and PWC's failure to require revision of Rambus' false financial statements for said years filed with the SEC was in violation of GAAS.

167.    PWC knew, or recklessly disregarded, that Rambus' financial statements were false and misleading and contained material departures from GAAP.  Among other things, PWC knew or recklessly disregarded that (i) the Company's expenses had been understated by in excess of $200 million; (ii) the Company's tax deferred asset was misstated; (iii) the Company's net income was overstated; (iv) despite the Company's representations to the contrary, the stock options granted were not made in accordance with IRC §162(m); (v) the exercise prices for options granted to the Backdated Option Recipients were not valued properly on the dates the grants were actually made, in violation of the Stock Option policy and contrary to the representations made in the Form 10-K's (as incorporated by reference from the Proxy Statements) and in the Proxy Statements during the Class Period; (vi) the process and procedure for granting stock options did not follow the requirements of the Stock Option Plan, a fact PWC knew or, in the absence of reckless disregard, should have known; (vii) the Stock Option Committee was not comprised in the manner required by the Stock Option Plan;  (viii) it failed to confirm that the large number of stock options granted were "in the money" rather than "at the money"; (ix) the large number of stock options granted to the group of Backdated Options Recipients at impossibly fortuitous exercise prices, including the sole member of the Stock Option Committee, should have alerted Defendant PWC, in the absence of reckless disregard, of the fact that said stock options and the manner and method in which they were treated, violated GAAP, the Stock Option Plan, disallowed §162 treatment, and resulted in false and misleading financial statements; (x) that the Company's internal controls over financial reporting and/or the effectiveness of the Company's internal controls over financial reporting were inadequate and ineffective including with respect to the granting of such options, and that its internal control over operations was inadequate.

168.    PWC knew from its audit and review work, or was deliberately reckless with regard to the fact that the Company had material weaknesses in its internal accounting control structure, as subsequently acknowledged, such that no reliance could be placed on the Company's financial reporting system.

169.    PWC falsely endorsed the fairness of Rambus' financial statements because the PWC agents in charge of retaining the Rambus account in PWC's San Francisco office desired to retain Rambus as a client and to continue to generate substantial fees from its engagement and to secure additional business from Rambus, including lucrative tax consulting business.  In fact, PWC, engaged in an internal controls audits, audit of the financial statements, other consulting work, and tax work for Rambus, generating $977,751 in fees for PWC for the year 2004.

170.    PWC served as Rambus' "independent" auditor from 1991 until at least 2006, and prior thereto.[25]  From 2001 through 2005, PWC received in excess of $2,500,000.00 from Rambus, with its fees more then tripling from 2001 to 2002 and almost tripling from 2003 to 2004.  For example, 2001, PWC received $139,500 in fees.  In 2004, just three years later, PWC received $977,751.00 in fees.

171.    During this same time period, PWC's independence was compromised by its simultaneously providing non-audit related services, including, but not limited to, tax returns preparation and technical tax advice, to Rambus for which it received substantial fees.  The issue of PWC's compromised independence was expressly identified by Rambus in its 2002 Proxy.

### 1.    PWC's Fiscal Year 2001 Opinion

172.    On October 16, 2001, PWC issued an unqualified audit opinion on Rambus' financial statement for fiscal year 2001, ending September 30, 2001, which was disseminated to the market and to Rambus' shareholders together with the Rambus Proxy Statement for the next Annual Shareholders Meeting in February, 2002.

173.    PWC's opinion stated:

---

[25] *Id.*

"In our opinion, the consolidated financial statements listed in the index appearing under item 14(a)(1) present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiary at September 30,2001 and 2000 and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2001, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide  a reasonable basis for our opinion."

174.    This audit opinion was improper because it failed to disclose that Rambus' net income was materially misstated for the reasons set forth in detail hereinabove concerning the backdating of options, and that the internal controls were inadequate.[26]

## 2.    PWC's Fiscal Year 2002 Opinion

175.    On October 9, 2002, PWC issued an unqualified audit opinion on Rambus' financial statement for fiscal year 2002, ending September 30, 2002, which was disseminated to the market and to Rambus' shareholders together with the Rambus Proxy Statement for the next Annual Shareholders Meeting in January 30, 2003.

176.    PWC's opinion stated:

"In our opinion, the consolidated financial statements listed in the index appearing under item 15(a)(1) on page 34 present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at September 20,2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the

---

[26] PWC performed specific internal control audits in 2004 & 2005 for which it was paid in excess of one million dollars. PWC had a specific obligation to disclose the internal control weaknesses in its relevant opinions regarding internal controls in both 2004 & 2005, respectively.

1  overall financial statement presentation. We believe that our audits provide a
   reasonable basis for our opinion."

2

3  177.    This audit opinion was improper because, among other things, it failed to disclose that

   Rambus' net income was materially misstated for the reasons set forth in detail hereinabove

4  concerning the backdating of options, and that the internal controls were inadequate.[27]

5

6          **3.      PWC's Fiscal Year 2003 Opinion**

7  178.    On February 4, 2004, PWC issued an unqualified audit opinion on Rambus' financial

   statement for fiscal year 2003, ending December 31, 2003, which was disseminated to the market,

8  and to Rambus' shareholders together with the Rambus Proxy Statement for the next Annual

9  Shareholders Meeting in May, 2004.

10

11 179.    PWC's opinion stated:

12 "In our opinion, the consolidated financial statements listed in the index appearing
   under item 15(a)(1) on page 41 present fairly, in all material respects, the financial
13 position of Rambus Inc. and its subsidiaries at December 31, 2003 and 2002, and the
   results of their operations and their cash flows for each of the twelve month periods
14 ended December 31, 2003, September 30, 2002 and 2001 and the three month period
   ended December 31, 2002 in conformity with accounting principles generally
15 accepted in the United States of America. These financial statements are the
   responsibility of the Company's management; our responsibility is to express an
16 opinion on these financial statements based on our audits. We conducted our audits
   of these statements in accordance with auditing standards generally accepted in the
17 United States of America, which require that we plan and perform the audit to obtain
   reasonable assurance about whether the financial statements are free of material
18 misstatement. An audit includes examining, on a test basis, evidence supporting the
   amounts and disclosures in the financial statements, assessing the accounting
19 principles used and significant estimates made by management, and evaluating the
   overall financial statement presentation. We believe that our audits provide a
20 reasonable basis for our opinion.

21 As discussed in Note 2 to the consolidated financial statements, effective October 1,
   2002, the Company changed its method of accounting for goodwill upon the
22 adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and
   Other Intangible Assets"."

23 180.    This audit opinion was improper because, among other things, it failed to disclose

24 that Rambus' net income was materially misstated for the reasons set forth in detail hereinabove

25 concerning the backdating of options, and that the internal controls were inadequate.[28]

26 _____

27 [27] *Id.*

28 [28] *Id.*

### 4.    PWC's Fiscal Year 2004 Opinion

181.    On February 17 , 2005, PWC issued an unqualified audit opinion on Rambus' financial statement for fiscal year 2004, ending December 31, 2004, which was disseminated to the market, and to Rambus' shareholders together with the Rambus Proxy Statement for the next Annual Shareholders Meeting in May, 2005.

182.    PWC's opinion stated:

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the index appearing under item 15(a)(1) present fairly, in all material respects, the financial position of Rambus, Inc. and its subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the two years for the period ended December 31, 2004, for the three month period ended December 31, 2002 and for the year ended September 30, 2002 in conformity with the accounting principles generally accepted in the United States of America.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

Internal control over financial reporting

Also, in on opinion, management's assessment, included in Management Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004....The Company 's management is responsible for maintaining effective internal control over financial reporting based on our audit.

183.    This audit opinion was improper because, among other things, it failed to disclose that Rambus' net income was materially misstated for the reasons set forth in detail hereinabove concerning the backdating of options, and that the internal controls were inadequate.[29]

### 5.    PWC Fiscal Year 2005 Opinion

184.    On February 21, 2006, PWC issued an unqualified audit opinion on Rambus' financial statement for fiscal year 2005, ending December 31, 2005, which was disseminated to the

---

[29] *Id.*

1    market, and to Rambus' shareholders and said 10-K Report was sent to the Rambus shareholders

2    together with the Rambus Proxy Statement for the next Annual Shareholders Meeting in May 2006

3          185.   PWC's opinion stated:

4          Consolidated financial statements

5          In our opinion, the accompanying consolidated balance sheets and the related
consolidated statements of operations, of stockholders' equity and comprehensive

6          income, and of cash flows, present fairly, in all material respects, the financial
position of Rambus, Inc. and its subsidiaries at December 31, 2005 and 2004, and the

7          results of their operations and their cash flows for each of the three years for the
period ended December 31, 2005 in conformity with the accounting principles

8          generally accepted in the United States of America. These financial statements are
the responsibility of the Company's management. Our responsibility is to express an

9          opinion on these financial statements based on our audits.

10         Internal control over financial reporting

11         Also, in on opinion, management's assessment, included in Management Report on
Internal Control Over Financial Reporting appearing under Item 9A, that the

12         Company maintained effective internal control over financial reporting as of
December 31, 2005 based on criteria established in Internal Control-Integrated

13         Framework issued by the Committee of Sponsoring Organizations of the Treadway
Commission (COSO), is fairly stated, in all material respects, based on those criteria.

14         Furthermore, in our opinion, the Company maintained, in all material respects,
effective internal control over financial reporting as of December 31, 2005....The

15         Company 's management is responsible for maintaining effective internal control
over financial reporting and for its assessment of the effectiveness of internal control

16         over financial reporting. Our responsibility is to express opinions on management's
assessment and on the effectiveness of the Company's internal control over reporting

17         based on our audit.

18          186.   This audit opinion was improper because, among other things, it failed to disclose

19    that Rambus' net income was materially misstated for the reasons set forth in detail hereinabove

20    concerning the backdating of options, and that the internal controls were inadequate.[30]

21          187.   As an "independent" auditor, PWC was required to follow Generally Accepted

22    Auditing Standards ("GAAS") that are intended to responsibly ensure an independent, professional

23    opinion of the fairness of the financial statements promulgated by Rambus. Rather than applying

24    GAAS principles, PWC acted with deliberate and/or reckless disregard and breached multiple GAAS

25    standards and requirements, abandoning its professional responsibilities. Had PWC performed its

26

27    [30] *Id.*

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  duties properly and with the standard of care required, the obvious internal control weaknesses and

2  GAAP departures which an audit is designed to uncover would have led PWC to require the proper

3  accounting under GAAP or issue adverse opinions on the aforestated Form 10-K's.

4     188.   Further compromising PWC's independence were conflicts of interest, which arose

5  through PWC's simultaneous provision of non-audit related services for Rambus, for which it

6  received substantial audit, accounting and tax consultation fees.  The issue of PWC's compromised

7  independence was expressly conceded in Rambus' 2002 Proxy.

8     189.   PWC, among other things, recklessly disregarded the requirements of professional

9  care (AU §230); an independence of mental attitude (AU §220); to provide adequate planning for the

10 Rambus audits (AU §311); and  accurately assess the risk and materiality (AU §312) which derived

11 from the Defendants' illegal option compensation scheme.

12    190.   Specifically, PWC did not consider the extreme potential for fraud (AU §316)

13 represented by CEO Tate controlling the stock compensation program, as sole member of the Stock

14 Option  Committee; the fundamental breaches of Rambus' internal controls (AU §319) and the

15 material weaknesses (AU §325) existing in internal controls as were ultimately disclosed by the

16 Rambus Audit Committee in October 2006[31].  Further, PWC did not communicate effectively with

17 the Rambus Audit Committee (AU §380), as it was required to do, or obtain sufficient, competent

18 evidential matter to support its audit findings (AU §326).  PWC did not ensure that the Rambus'

19 financial statements conformed with GAAP (AU §410) or that GAAP principles were applied

20 consistently (AU §420); nor did PWC require its client to make the appropriate disclosures (AU

21 §431) regarding its option compensation scheme.

22    191.   As an "independent" auditor, PWC was required to observe and uphold the standards

23 of GAAS.   AU §312[32], Audit Risk and Materiality in Conducting an Audit, describes the

24 responsibilities of the auditor to identify those account balances that may lead to misstatements.  As

---

[31] See Rambus' Form 8-K, October 18, 2006.

[32] AICPA Codification of Statements on Auditing Standards, Section 312.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1    well, AU §9312A provides guidance on the required interpretation of the term "misstatement". "...a

2    misstatement causes the financial statements not to be in conformity with generally accepted

3    accounting principles.  A misstatement may consist of any of the following:

4           (a)     A difference between the amount, classification, or presentation of a reported

5    financial statement element, account, or item and the amount, classification, or presentation that

6    would have been reported under generally accepted accounting principles.

7           (b)     The omission of a financial statement element, account , or item.

8           (c)     A financial statement disclosure that is not presented in accordance with

9    generally accepted accounting principles.

10          (d)     The omission of information required to be disclosed in accordance with

11   generally accepted accounting principles.

12   192.    Rambus' financial statements were tainted by misrepresentations and omissions

13   during the relevant periods relating to, among other things, its inappropriate accounting for Rambus'

14   fraudulent backdated option scheme.  PWC was required to recognize such pervasive misstatements

15   and omissions and to insist on their appropriate rectification.   Otherwise, PWC could not have

16   issued, as it did, an "unqualified" opinion as to the fairness of the Rambus financial statements.

17   193.    PWC was required, but failed, among other things, to investigate the system of

18   internal controls and procedures that govern the overtly material (both quantitatively and

19   qualitatively) system of option compensation which was designed to benefit Rambus' executive

20   officers, and the Stock Option recipients.

21   194.    GAAS requires that such internal control evaluation by the independent auditor

22   include a detailed analysis of the:

23          (a)     Control environment - which "sets the tone of an organization, influencing the

24   control consciousness of its people";

25          (b)     Risk assessment - which deals with the auditor assessing the relevant risks of

26   particular activity resulting in a material misstatement;

27          (c)     Control activities - which requires the auditor to undertake an analysis of the

28   policies and procedures of the reporting entity designed to protect against misstatement;

(d)     Information and communication - designed to ensure that the exchange of information regarding a particular activity does not result in misstatement; and

(e)     Monitoring - requires the auditor to satisfy itself that appropriate monitoring activities are undertaken by the reporting entity.[33]

195.     In view of the pervasive materiality, from both a quantitative and qualitative perspective, of the massive option compensation scheme undertaken by Rambus for the benefit of its highly paid executive management, PWC was required to, among other things, analyze the policies and procedures relating to such activities and to assess the risk that these activities might engender material misstatements.

196.     Accordingly, PWC was required to review the terms and provisions of Rambus' 1997 Stock Plan, which governed the backdated options throughout the relevant periods.  Under a section of that Plan captioned "Administration of the Plan" it was falsely represented that: "To the extent that the Administrator determines it to be desirable to qualify options granted hereunder as 'performance-based compensation[34]' within the meaning of §162(m) of the Code, the Plan shall be administered by a Committee of two or more 'outside directors' within the meaning of §162(m)."

197.     Rambus' 1997 Stock Plan ostensibly addressed the inherent potential conflict of interest relating to performance-based compensation and, accordingly, required that at least two outside directors oversee any such plan.  Nonetheless, in violation of such intent, CEO Geoff Tate was designated the "sole member of the Stock Option Committee during the period that the Audit Committee had preliminarily concluded that the majority of stock-option irregularities occurred."[35] Indeed, Chief Executive Officer Tate resigned over these issues, among other things.

198.     The high degree of audit risk and materiality in connection with Rambus' massive option compensation scheme should have heightened PWC's scrutiny of the internal control systems

---

[33] See Definition of Internal Control, AU §319.06, .07.

[34] All of the backdated options were mischaracterized by Rambus as "performance-based compensation".

[35] Rambus Form 8-K, October 18, 2006.

that ostensibly governed Rambus' option granting.  CEO Tate, as the sole member of the Stock

Option Committee, had considerable motivation to manipulate this process.  First, Tate as an

intended recipient of this enormously material compensation would be motivated by self-interest.

Secondly, Tate, as well as the other Individual Defendants, would not wish to receive the ordinary

income that would be appropriate in the context of the backdated options which would otherwise, be

accorded NSO/ordinary income tax treatment[36].  Thirdly, Tate, and the Individual Defendants who

were Backdated Option Recipients would have considerable self motivation to elevate earnings per

share by avoiding the APB 25 expensing of the disguised "in the money" options.  The synergistic

relationship between Rambus' earnings and its share price cast an irresistible lure to the Backdated

Options Recipients and/or Individual Defendants, who stood to benefit immensely through the

lucrative option compensation scheme.

199.    As the "independent" auditor, PWC, was required to recognize the inherent conflict of

interest and fundamental breach of Rambus' internal controls policies and procedures in connection

with Tate overseeing the Defendants' stock option compensation.

200.    Further, for at least calendar years 2004 and 2005, PWC was engaged by Rambus to

undertake a separate audit of Rambus' internal control systems in order to ascertain their adequacy.

PWC, as a result of this audit, which was in addition to PWC's formal audit of the Rambus financial

statements, failed to act upon or even recognize the clear red flags which existed.  Notwithstanding,

Rambus' October 18, 2006 Form 8-K disclosed the following:

> Additionally, Rambus is evaluating Management's Report on Internal Control over
> Financial Reporting set forth in Rambus' 2005 Annual Report.  Although Rambus
> has not yet completed its analysis, the results of the investigation confirmed Rambus'
> determination that it is likely that Rambus had a material weakness in internal control
> over financial reporting as of December 31, 2005.

According to the AICPA Codification of Auditing Standards, a "material weakness" is:

> A reportable condition [i.e. a weakness so serious that it must be reported by the
> auditor to the Audit Committee] may be of such magnitude as to be considered a
> material weakness.  A material weakness in internal control is a reportable condition

---

[36] By mischaracterizing the otherwise "in the money" options, the Defendants were able to
falsely obtain favorable tax benefits on what were in fact, NSO options.  However, when they
were mischaracterized as statutory options, they were accorded capital gains treatment.

in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within the time period by employees in the normal course of performing their assigned functions.  Although this section does not require that the auditor separately identify and communicate material weaknesses, the auditor must choose or the client may request the auditor to separately identify and communicate as material witnesses those reportable conditions that, in the auditor's judgment, are considered to be material weaknesses.[37]

### 6. **Internal Control Misrepresentations**

201.    Rambus' Audit Committee acknowledged in Rambus' October 19, 2006 8-K that there existed "material weaknesses" with respect to its financial reporting internal controls that led to a massive overstatement of Rambus' income, numerous omitted  disclosures, and other material misstatements during the period relating to the backdated option scheme.  With the assistance of PWC, Rambus was able to hide from the marketplace the enormous deleterious repercussions of its back dated option scheme on the reported financial results for Rambus.  PWC as the "independent" auditor had a primary responsibility to identify material weaknesses in Rambus' internal controls and, indeed, was paid handsomely to investigate such internal controls and to provide an opinion on their effectiveness. PWC failed miserably in this regard while ignoring and/or refusing to recognize blatant red flags that begged for the "independent" auditor's professional scrutiny.

202.    Rambus' "independent" auditor, PWC, specifically audited Rambus' internal controls in both 2004 and 2005 and made representations that Rambus' internal control system was effective, while falsely indicating that such internal controls could be relied upon. Indeed, PWC was paid for its internal control "audit", e.g. in 2004, more than three times what it was paid for its separate audit of the Rambus financial statements[38].  PWC made affirmative representations both implicitly, by the issuance of unqualified audit opinions, and explicitly, through the language included in PWC's 2004 and 2005 Internal Control Over Financial Reporting audit opinions, which stated Rambus

---

[37] AU §325.15

[38]  The Internal Control Audit fees for 2005 were only 2.6 times those fees charged for the financial statement audit.

1    "maintained, in all material respects, effective internal control over financial reporting" for both

2    years.[39] Nothing could be further from the truth.

3          203.    According to PWC, internal controls are procedures designed to, *inter alia*, "provide

4    reasonable assurance regarding the reliability of financial reporting and the preparation of financial

5    statements for external purposes in accordance with generally accepted accounting principles."[40] For

6    the class period, Rambus' management falsely represented that its internal controls were effective

7    and PWC explicitly concurred, with no exceptions[41].  The independent auditor, PWC, attested that

8    the (now admittedly bogus) representations in Rambus' Report on Internal Control Over Financial

9    Reporting was fairly stated:

10              Also, **in our [PWC's] opinion, management's assessment, included in
                Management's Report on Internal Control Over Financial Reporting appearing
11              under Item 9A, that the Company maintained effective internal control over
                financial reporting as of December 31, 2005** based on criteria established in
12              Internal Control—Integrated Framework issued by the Committee of Sponsoring
                Organizations of the Treadway Commission (COSO), **is fairly stated, in all
13              material respects**, based on those criteria. **Furthermore, in our opinion, the
                Company maintained, in all material respects, effective internal control over
14              financial reporting as of December 31, 2005,** based on criteria established in
                Internal Control—Integrated Framework issued by COSO.[42] [emphasis added]
15
          204.    However, even though both management and PWC asserted the effectiveness of
16
     Rambus' internal controls, the proliferation of the backdated option fraud provides ample and
17
     unequivocal evidence of that dysfunctional internal control system's porous inefficacy.  The rash of
18
     material misstatements and omitted disclosures engendered by the backdating fraud stands in stark
19
     contrast to the public attestations of management and the accountant defendant, PWC, that all was
20

21    _____

22    [39] See PWC's report on Rambus' Internal Control over Financial Reporting for Rambus fiscal year
      end 2004 and 2005.
23
      [40] Language taken directly from PricewaterhouseCoopers' own opinion on "Internal Control Over
24    Financial Reporting" issued on Rambus' fiscal year 2005 financial statements.

25    [41] PricewaterhouseCoopers conducted audits of the "Internal Control Over Financial Reporting" for
      both fiscal year ends 2004 and 2005, for which it received, in total, more than one million dollars in
26    related fees.

27    [42] Rambus 2005 Form 10-K, filed with the SEC on February 21, 2006; similar language is found in
      the Rambus 2004 Form 10-K as well.
28

1    well at Rambus.  Only five months after the 2005 year end, and less than a month after the issuance

2    of the 2006 First Quarter 10-Q, which still reported internal controls to be effective, Rambus' Audit

3    Committee announced the launch of its backdated option investigation.  Five months later, on

4    October 19, 2006, Rambus admitted that the public could not rely upon its financial statements

5    issued for 2003, 2004, 2005, and 2006.  Contrary to its previous assertions, Rambus now

6    acknowledged:

> 7    Additionally, Rambus is evaluating Management's Report on Internal Control Over
> Financial Reporting set forth in Rambus' 2005 Annual Report. Although Rambus has
> 8    not yet completed its analysis, **the results of the investigation confirm Rambus'**
> **determination that it is likely that Rambus had a material weakness in internal**
> 9    **control over financial reporting as of December 31, 2005.**
>
> 10    The results of the independent investigation showed that improvements are needed in
> Rambus' processes for the granting of equity compensation. The Audit Committee is
> 11    working with the Board of Directors, the Compensation Committee and management
> to implement improvements in Rambus' processes and controls over its stock
> 12    administration programs.[43] [emphasis added]

13        205.    This statement is in direct contradiction to the representations made throughout the

14    entire class period when the backdating fraud was being perpetrated and concealed. During that

15    period, by issuing unqualified opinions on Rambus' financial statements, and by attesting that

16    Rambus' internal controls were effective, PWC misled the investing public to believe that Rambus'

17    financial reporting could be relied upon and that Rambus' financial statements were issued in

18    conformity with GAAP.  However, in actuality, there were numerous material departures from

19    GAAP, including Rambus' bogus accounting for stock options under APB 25, during the entire class

20    period.   PWC's representations about the fairness of Rambus' financial statements and the

21    effectiveness of Rambus' internal controls during the class period were entirely unsupported by the

22    actual facts and circumstances and flew in the face of the widespread financial reporting

23    transgressions at Rambus.

24        **7.    PWC Failed to Follow GAAS in Performing the Audits**

25

26

27

[43] Rambus Form 8-K, Exhibit 99.2, filed with the SEC on October 18, 2006.

28

206.    It is apparent, based on, among other things, the unqualified opinions that PWC rendered during the relevant time, that PWC failed to properly conduct its audits in accordance with the requirements of GAAS.  According to the Codification of Statements on Auditing Standards, at AU §150.02, there are ten standards of auditing which have been approved and adopted by the American Institute of Certified Public Accountants (AICPA).  Of these ten standards of auditing, PWC breached a minimum of seven.  The ten standards of auditing are broken down into three separate categories including the general standards (3), the standards of field work (3), and the standards of reporting (4).  It is apparent that PWC breached, at a minimum, one standard of reporting, all three standards of field work, and at least three of the four standards of reporting. These breaches were fundamental and inexcusable and  include, but are not necessarily limited to, the following: the third general standard relating to due professional care; the first standard of field work relating to adequate planning of the audit; the second standard of field work relating to gaining an understanding of internal controls; the third standard of field work relating to obtaining sufficient competent evidential matter; the first standard of reporting relating to whether the client's financials are presented in accordance with GAAP; the second standard of reporting relating to the identification of GAAP departures; and the fourth standard of reporting relating to the expression of an opinion.

### 8.    Due Professional Care – AU §230

AU §230, "Due Professional Care in the Performance of Work", articulates the requirements for the independent auditor to plan and perform his work with "due professional care."  The due professional care requirement imposes a responsibility upon the independent auditor to observe the standards of field work and reporting.[44] Due professional care requires the auditor to exercise professional skepticism as well as obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.

207.    PWC did not exercise due professional care in its audits of Rambus during the class period, as evident through its inappropriate issuance of unqualified opinions in each period,

[44] SAS No. 1, section 230, SAS No. 41, SAS No. 82, SAS No. 99, AU §230.02, Codification of Statements on Auditing Standards.

respectively.  Had PWC exercised the proper level of due professional care in its audits, it would have reported the backdating fraud to Rambus' Audit Committee, and required the proper accounting for stock options per APB 25, and/or issued an adverse audit opinion.  The transgressions and departures from GAAP[45] and GAAS discussed herein provide overwhelming evidence that PWC recklessly failed to plan and perform its audits of Rambus during the class period with the requisite due professional care.

208.   AU §230.07 states that due professional care requires an auditor to exercise professional skepticism throughout the entire audit and defines professional skepticism as "…an attitude that includes a questioning mind and a critical assessment of audit evidence."  Again, it is clear that PWC, as exemplified by its failure to report the backdating fraud and to identify concomitant, massive, financial misstatements, as well as profound weaknesses in Rambus' internal control systems, demonstrably failed to exercise the appropriate degree of professional skepticism that is required by generally accepted auditing standards.  Moreover, AU §230.10 states that, "The exercise of due professional care allows the auditor to obtain *reasonable assurance* that the financial statements are free of material misstatement, whether caused by error or fraud." In view of the overtly material (both quantitative and qualitative) implications of the backdating fraud perpetrated by the Defendants, PWC failed to obtain the reasonable assurance (and, therefore, failed to exercise the due professional care) necessary to properly issue the unqualified opinions that were issued for each and every period relevant to the instant litigation.

### 9.   PWC Failed to Adequately Plan the Audit – AU §311

209.   AU §311 expands upon the first standard of field work relating to the planning and supervision of the audit and sets forth specific parameters for the auditor's independent investigation and analysis.  Audit planning involves developing an overall strategy for the expected conduct and scope of the audit.  The nature, extent and timing of planning vary with the size and complexity of

---

[45] GAAP is the set of conventions, rules and procedures that constitute the professional standards of the accounting profession.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

the entity, experience with the entity, and knowledge of the entity's business.  In planning the audit the auditor should consider, among other things: [46]

- Matters relating to the entity's business and the industry in which it operates;

- The entity's accounting policies and procedures;

- The methods used by the entity to process significant accounting information, including the use of service organizations, such as outside service centers;

- Assessed level of control risk;

- Preliminary judgment about materiality levels for audit purposes;

- Financial statement items likely to require adjustment;

- Conditions that may require extension or modification of audit tests, such as the risk of material error or fraud or the existence of related party transactions; and

- The nature of reports expected to be rendered.

210.    Procedures that an auditor must consider in planning the audit require a review of the records relating to the entity and discussion with other accounting firm personnel and personnel of the entity.  The auditor is also required to obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with GAAS.

211.    Based on the fact that PWC did not identify the backdating fraud, much less report it to management, PWC either failed to assess, or chose to ignore, the abysmal  status of Rambus' internal controls over accounting for stock options and the pervasive risk engendered by allowing CEO Tate to serve as the sole member of the Stock Option Committee.  It is clear that PWC failed to adequately plan its audits in a manner that would  support its audit opinions issued from 1998 to present.   In providing unqualified opinions throughout the class period, and by ignoring its responsibility to exercise due diligence and adequate professional care in planning the audit, PWC enabled the fraud.  Specifically, among other things, PWC failed to properly analyze and/or plan for the assessed level of control risk, as required by AU §311.03(d) (see also the following discussion of internal controls per AU §319).  The only issue that remains is whether PWC deliberately turned a

---

[46] SAS No. 22, SAS No. 47, SAS No. 48, SAS No. 77, AU §311.03, Codification of Statements on Auditing Standards.

1   blind eye to the Defendants' transgressions and, therefore, actively colluded in order to preserve its

2   lucrative professional fee arrangement; or whether PWC's reckless and aggressive disregard for

3   auditing standards caused the accountant defendant to breach its fundamental responsibility to opine

4   competently on the fairness of the Rambus financial statements.

5          **10.    PWC Failed to Properly Consider Internal Controls – AU §319**

6          212.    AU §319 codifies Statement of Auditing Standard (SAS) No. 55 and provides

7   guidance on the independent auditor's consideration of internal controls in a financial statement

8   audit.  SAS No. 55 defines "internal control" as follows:

9          Internal control is a process – effected by an entity's board of directors, management
           and other personnel – designed to provide reasonable assurance regarding the
10         achievement of objectives in the following categories: (a) reliability of financial
           reporting, (b) effectiveness and efficiency of operations, and (c) compliance with
11         applicable laws and regulations.[47]

12
13         213.    Upon establishing internal control objectives, a company must adopt policies and

14  procedures that encourage employees to follow and meet those established objectives.  Per AU

15  §319.07(a) through AU §319.07(e), internal control consists of five interrelated components:

16         (a)     *Control environment* sets the tone of an organization, which influences the

17  control consciousness of its employees.  The control environment is the foundation for all other

18  components of internal control, because it provides discipline and structure.

19         (b)     *Risk assessment* is the process that an entity must conduct to identify and

20  assess any relevant risks to its accounting objectives.  Once this is done, management must

21  determine how the risks should be managed.

22         (c)     *Control activities* are the policies and procedures that help ensure that

23  management directives are carried out.

24         (d)     *Information and communication* are two key elements that help management

25  carry out its accounting responsibilities.  Management must establish a timely and effective process

26  for relaying information.

27  _____
    [47] AU §319.06.
28

       (e)    **Monitoring** is a process that an entity uses to assess the quality of its internal control performance over time.

214.    Rambus had defective systems of internal control relating to its accounting for stock options that failed demonstrably in each of the five areas of internal control highlighted by AU §319. In this case, Rambus' dysfunctional accounting system, including Rambus' complete lack of meaningful checks and balances, permeated its accounting for stock options. The existence of these problems should have heightened the awareness of PWC and caused them to identify and report the blatant financial misstatements. Absent Rambus' correction of the numerous accounting misstatements, PWC would have been precluded from issuing its unqualified opinions on Rambus' financial statements. The absence of PWC's unqualified opinion would have alerted the marketplace to Rambus' widespread defalcations.

215.    The Codification of Statements on Auditing Standards provides guidance to the independent auditor for identifying and reporting conditions that indicate weaknesses in an entity's internal control observed during the course of an audit of the financial statements. According to AU §325, in the course of an audit, an auditor may become aware of matters relating to internal control that should be of interest to the audit committee, referred to as *reportable conditions*. Specifically, these are matters coming to the auditor's attention that, in his or her judgment, should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management and the financial statements. Such deficiencies may involve aspects of any of the five internal control components discussed above.[48] This standard goes on to describe reportable conditions that are considered to be *material weaknesses*, as follows:

> A reportable condition may be of such magnitude as to be considered a material weakness. A material weakness in internal control is a reportable condition in which the design or operation of one or more of the internal control components doesn't reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited

---

[48] AU §325.02

1    may occur and not be detected within a timely period by employees in the normal
2    course of performing their assigned functions.[49]

3    216.    In this case, PWC should have reported that Rambus had fundamental weaknesses in

4    its internal control system relating to its accounting for stock options. Although it did not undertake

5    this required step, PWC, as the independent auditor, continued to improperly issue unqualified audit

6    opinions in reliance on information generated by Rambus' deficient financial reporting systems.

7    CEO Tate, as the sole member of the Stock Option Committee violated the express terms of the 1997

8    Stock Plan. The extremely high audit risk and materiality surrounding the accounting for stock

9    options, especially when considering the numerous self-interest motivations Tate (and the other

10   directors) had both personally and on behalf of the company, made it imperative for the independent

11   auditors to scrutinize the related internal control system  and appropriately identify any relevant

12   weaknesses.    The staggering materiality is underscored by contrasting the $200 million

13   understatement of expense  related to improperly backdated options with the less than $120 million

14   in cumulative net income (before taxes) reported by Rambus from 1998 through the most current

15   2006 quarterly report.  Rambus' internal control weaknesses existed during the entire class period.

16   217.    The fundamental abrogation of  internal controls within Rambus permitted the

17   Company's management to improperly account for numerous, material  stock option transactions

18   and led to  false and materially  inflated financial results.  It is clear that PWC failed to give

19   appropriate consideration to the material weaknesses in Rambus' internal controls.  Nor was PWC's

20   dereliction of its responsibilities merely inadvertent.  On the contrary, defendant PWC's overt and

21   transcending failure to identify the profound inadequacies inherent in the Rambus financial reporting

22   system was both reckless and collusive.  Rambus' accounting misrepresentations regarding its stock

23   option expense and vast overstatement of its financial results were made possible by the auditors'

24   fundamental failure  to apply the appropriate  GAAS  and GAAP standards. Had defendant PWC

25   exercised its appropriate professional prerogatives, the plaintiff class would not have been damaged

26

27   _____

28   [49] AU §325.15

1    as it was. This is exacerbated by the fact that PWC was hired specifically to audit the deficient

2    internal controls and, despite being paid more than $1 million for those audits, failed to raise any red

3    flags whatsoever regarding Rambus' manifestly flawed internal control system.

4         218.   Clearly, PWC failed to obtain an understanding of Rambus' internal controls

5    sufficient to properly plan the audit and perform appropriate control testing procedures, as required

6    by AU §319.02. Nor did PWC properly assess control risk, as discussed in AU §319.02 through AU

7    §319.04; or use the information available to properly determine the nature and extent of substantive

8    testing required as a result of the assessed level of control risk per AU §319.05. As a direct result of

9    PWC's failure to gain a sufficient understanding of Rambus' internal controls and improperly

10   assessed control risk levels, PWC did not perform adequate testing of controls as required by

11   GAAS.[50] Had PWC adequately tested controls, it would have caused PWC to perform significantly

12   more substantive testing in this area. Had the audits been conducted in accordance with GAAS, the

13   increased substantive testing would have caused PWC to discover and report the backdating fraud,

14   thereby preventing the false and misleading dissemination of financial information to the markets.

15   Only now, too late, does Rambus seek atonement through its impending accounting restatement.

16   Such action does not repair the damage to investors who were hoodwinked by Rambus' deceptions

17   during the class period.

18              **11.   PWC Failed to Obtain Sufficient
                       <u>Competent Evidential Matter – AU §326</u>**
19

20        219.   AU §326 provides information on the third standard of field work regarding

21   evidential matter. Much of the independent auditor's work in forming an opinion on financial

22   statements consists of obtaining and evaluating evidential matter concerning the reported items in

23   such financial statements. In obtaining evidential matter in support of financial statement assertions,

24   the auditor develops specific audit objectives in the light of those assertions. The independent

25   auditor's objective is to obtain sufficient competent evidential matter to provide the auditor with a

26

27
     ───────────────
28   [50] AU §319.75-.79 specifically discuss performing tests of controls in an audit.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1    reasonable basis for forming an opinion.  The auditor should be thorough in his search for evidential

2    matter and unbiased in his evaluation.[51]

3         220.    Instead of exercising the appropriate degree of professional skepticism, as discussed

4    above, PWC consistently turned a blind eye to the accounting manipulations that materially distorted

5    Rambus' financial results.  The independent auditor defendants clearly did not have "sufficient

6    competent evidential matter" to substantiate the unqualified opinions issued during the class period.

7    Instead, PWC either failed to properly conduct the audit by not obtaining sufficient competent

8    evidential matter, as required by AU §326, or knowingly relied on "evidence" contrived to support

9    the inappropriate accounting for stock options.

10        221.    PWC should have discovered and reported the backdating fraud by reviewing items

11   such as Rambus' relevant Stock Plans; information specifically relating to the granting of options;

12   and minutes from the Board of Directors meetings and any relevant subcommittees of the Board.[52]

13   Especially considering the magnitude of the APB 25 GAAP departures (as affirmed by the

14   magnitude of the impending accounting restatement), the stock options issue should have prompted

15   significant testing in order to obtain sufficient competent evidential matter to support the audit

16   findings. While management representations are part of the necessary evidential matter obtained by

17   an auditor in the course of an audit, "…they [management representations] are not a substitute for

18   the application of those auditing procedures necessary to afford a reasonable basis for an opinion

19   regarding the financial statements under audit."[53] [emphasis added]

20        222.    Had PWC properly planned its audit and, as required, obtained sufficient competent

21   evidential matter during the class period, it would have been precluded from providing unqualified

22   audit opinions for each period because of the material departures from GAAP and the numerous

23

24   _____

25   [51]  SAS No. 31, SAS No. 48, SAS No. 80, AU §326, Codification of Statements on Auditing
     Standards.

26   [52]  AU §326.17

27   [53]  AU §333.02

28

material misstatements and omitted disclosures engendered by Rambus' inappropriate accounting for

stock options under APB 25.

### 12. PWC Failed to Properly Assess the Risk of Fraud in the Audit – AU §316

223.    AU §316 establishes standards and provides guidance to auditors in fulfilling the

responsibility of planning and performing an audit to obtain reasonable assurance about whether the

financial statements are free of material misstatements, whether caused by error or fraud.  This

standard instructs the auditor regarding the characteristics of fraud, the importance of professional

skepticism, identifying and assigning risks of material misstatements due to fraud, responding to the

results of the assessment, evaluating audit evidence, communicating about fraud to management, and

documenting the auditor's consideration of fraud.[54]

224.    It is clear, based on Rambus' own acknowledgment, that the backdating fraud central

to the instant litigation played a major role and had significant, material effects on Rambus' financial

statements during the class period. PWC was manifestly insensitive to not only the possibility of

fraud, but the actual existence of endemic fraud within Rambus' financial reporting system.  By

disregarding professional standards of care, PWC played an essential role in perpetrating the fraud

and misleading investors.

### 13. Audit Risk and Materiality in Conducting an Audit – AU §312

225.    AU §312 provides standards regarding audit risk and materiality in conducting an

audit. Materiality is defined in the FASB Statement of Financial Accounting Concepts No. 2 (CON

2) as the "magnitude of an omission or misstatement of account information that, in the light of

surrounding circumstances, makes it probable that the judgment of a reasonable person relying on

the information would have been changed or influenced by the omission or misstatement."  Audit

---

[54] SAS No. 99, AU §316, Codification of Statements on Auditing Standards.

risk is defined as "the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."[55]

### 14.    Materiality

226.    The SEC also provides authoritative guidance on materiality via its Staff Accounting Bulletin No. 99 (SAB 99).  At the foundation of its analysis, the staff concludes that the use of only quantitative measures in the determination of materiality is imprudent and inappropriate. SAB 99 specifically states that "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  Further,  SAB 99 refers to the FASB's concept of materiality taken from CON 2, as discussed above.

227.    SAB 99 further elaborates on the importance of evaluating not only *quantitative* measures, but *qualitative* measures, as well, by specifically referencing AU §312.11, which states: "As a result of the interaction of quantitative **and qualitative** considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."  [emphasis added]  In fact, the SEC lists specific examples where even a "quantitatively small misstatement" is rendered qualitatively material, including in relevant part:

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

- whether the misstatement changes a loss into income or vice versa

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

- whether the misstatement affects the registrant's compliance with regulatory requirements

---

[55] AU §312.02

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

228.    Rambus' fraud, which festered right underneath PWC's professional nose and, at all times, occurred under PWC's professional watch, engendered numerous misstatements and misleading disclosures (both omitted and misstated) that comport foursquare with what the SEC stipulates as "material". This is true from both a quantitative and a qualitative perspective. As well, there were numerous "trickle down" misstatements (i.e. accounts that were distorted by, for example, the fundamental overstatement of income) which, regardless of their size, would be considered qualitatively material. Any misstatement which derives from an illegal act is, according to SAB 99, per se, material.

## 15.    Audit Risk

229.    Auditors must assess audit risk and materiality together when planning and performing an audit of a company's financial statements, as well as to assist in evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, and in conformity with GAAP. The auditor should consider audit risk and materiality in planning and designing auditing procedures to obtain sufficient competent evidential matter on which to properly evaluate the financial statements.[56]

230.    Audit Risk is made up of three distinct components: inherent risk, control risk, and detection risk. Inherent risk relates to the possibility of a material misstatement of an assertion prior to the consideration of a client's internal control structure. Inherent risk includes such factors as the nature of a business' operations and its structure. Rambus' inherent risk relating to the accounting for stock options was extremely high considering the fact that Tate served as the sole member of the Stock Option Committee and the amounts of stock option compensation routinely granted by Rambus to the Defendants were staggering, in comparison with other income statement balances. It

---

[56] SAS No. 47, SAS No. 82, SAS No. 96, SAS No. 98, AU §312, Codification of Statements on Auditing Standards.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

was not even necessary to be a CPA/auditor to recognize the overriding potential for conflict of interest inherent to Rambus' incestuous stock-option granting process.

231.    Control risk relates to the possibility that a material misstatement will not be prevented or detected on a timely basis by a client's internal control systems.  The amount of control risk found within a company directly affects the level of acceptable detection risk, as discussed below.  In the case of Rambus, control risk was unacceptably high regarding its accounting for stock options, since few, or no, controls existed.  PWC should have been alert to the astronomically high level of control risk for Rambus' accounting for stock options during the class period.

232.    The third and final component of audit risk is detection risk.  Detection risk is the risk that the auditors will fail to detect any material misstatements with their audit procedures.  Put simply, detection risk is the risk that the auditor's procedures will lead them to conclude that a material misstatement does *not* exist when in fact such misstatement *does* exist.  The level of detection risk governs the amount of substantive testing needed to detect misstatements or misrepresentations.  The level of control risk directly relates to the level of acceptable detection risk.  If control risk is extremely high, as was the case with Rambus' accounting for stock options, a correspondingly greater degree of substantive testing would be needed to minimize detection risk.

233.    Auditors must assess audit risk and materiality *together* when planning and performing an audit, as well as in evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, and in conformity with GAAP.  The following diagram depicts the interrelationship between materiality, audit risk, and the determination of prospective audit procedures to be performed as part of the audit engagement:





234.    An auditor must first determine the "materiality threshold" above which a misstatement would render the financial statements as a whole, to be unfair.[57]  This "materiality threshold" is then utilized to analyze the determination of the various components that create audit risk.  It is only after the materiality thresholds and audit risk have been properly assessed that the auditor can develop the necessary procedures to render an opinion on the financial statements.

235.    The numerous accounting transgressions that occurred at Rambus in connection with its accounting for stock options during the class period created such a high level of audit risk pursuant to virtually any reasonable materiality threshold, that it would have caused any competent, "independent" auditor to require a correction of the widespread misstatements or to issue an adverse opinion. PWC must bear the responsibility for the consequences of Rambus' pervasive and material deception because PWC failed abysmally to apply appropriate standards of care in planning and

---

[57] SAS 47 states, "financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly in all material respects, in conformity with generally accepted accounting principles."

conducting the relevant audits.  PWC's gross professional negligence and reckless disregard of professional standards was manifest in the inappropriate unqualified audit opinions that were disseminated, along with Rambus' other disclosures, to the investing public.

236.    The "trickle down" effects of the backdating fraud were such that, in addition to the material departure from GAAP relating to the improper accounting for stock option compensation under APB 25, numerous other accounts and financial statement items were materially effected.  The fact that there were numerous misstatements flies in the face of AU §312.38, which addresses the proper auditing treatment when there are multiple misstatements within a client's financial statements.  AU §312.38 stipulates:

> If the auditor concludes, based on the accumulation of sufficient evidential matter, that the effects of likely misstatements, individually or in the aggregate, cause the financial statements to be materially misstated, the auditor should request management to eliminate the misstatement.  If the material misstatement is not eliminated, the auditor should issue a qualified or an adverse opinion on the financial statements.  Material misstatements may be eliminated by, for example, application of appropriate accounting principles, other adjustments in amounts, or the addition of appropriate disclosure of inadequately disclosed matters.  Even though the effects of likely misstatements on the financial statements may be immaterial, the auditor should recognize that an accumulation of immaterial misstatements in the balance sheet could contribute to material misstatements of future financial statements.

237.    PWC's failure to recognize major material weaknesses in Rambus' financial reporting system and the pervasive misstatements and false disclosures they engendered, was inexcusable.  PWC was required, as the independent auditor, to insist on a correction, or to otherwise alert the marketplace by withholding its unqualified opinion regarding the fairness of the financial statements.  Instead, during the relevant period, PWC consistently and inappropriately supplied unqualified audit opinions that lulled the financial markets into believing that Rambus' reported financial results were fair.  On the contrary, the entire approximately $120 million cumulative net income of Rambus during the relevant period would have been correctly reported as a loss, but for the other Defendants' fraudulent conduct and PWC's acquiescence to their wrongdoing.

### 16.    Adherence to GAAP – AU §410

238.    AU §410 directly relates to the first standard of reporting: "The report shall state whether the financial statements are presented in accordance with generally accepted accounting

1  principles."[58] By providing its attestation that Rambus' financial statements were presented in

2  accordance with GAAP, PWC provided an aura of authenticity to the false picture of financial

3  results which had been painted by the Defendants through their acceptance of Rambus' inappropriate

4  accounting for stock option compensation.  In truth, because of Rambus' incorrect accounting for

5  stock option compensation under APB 25, Rambus' financial statements issued through the entire

6  class period were *not* presented fairly and in accordance with GAAP.[59]  Had PWC issued a proper

7  opinion that stated that Rambus' accounting for stock option compensation under APB 25 was not

8  presented in accordance with GAAP, or if PWC required Rambus to account for stock option

9  compensation correctly under APB 25, Plaintiffs would not have suffered the losses engendered by

10  the fraudulent backdated stock option compensation scheme.  However, by issuing unqualified

11  opinions throughout the class period, PWC recklessly facilitated the fraud.

## 17.  Adequacy of Disclosures – AU §431

13  239.  AU §431 elaborates on the third standard of reporting, and states that "Informative

14  disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise

15  stated in the report."[60]  This standard also goes on to stipulate that proper presentation in conformity

16  with GAAP includes adequate disclosures of material matters.[61]  That is, if the financials do not have

17  adequate disclosures, as was the case with Rambus, the financials cannot properly be deemed to be

18  in conformity with GAAP.  Further, this standard requires that the auditor issue a qualified or

19  adverse opinion if the disclosures are inadequate to meet GAAP standards.[62]

---

21  [58]  SAS No. 1, section 410, SAS No. 62, AU §410.01, Codification of Statements on Auditing
22  Standards.

23  [59]  The improper accounting under APB 25 led to numerous other material misstatements and
    departures from GAAP, as well. These departures include, but are not limited to, APB 25 –
    Accounting for Stock Option Compensation, SFAS 109 issues – Deferred Taxes, numerous
24  misstated expenses, overstated net income, numerous misstated balance sheet accounts, and
    numerous problems with, among other things, Rambus' cash flow statements. See paragraphs 118-
25  163 for a more specific discussion of each of these material GAAP departures.

26  [60]  AU §431.01

27  [61]  AU §431.02

28  [62]  AU §431.03

240.    As discussed previously, numerous Rambus' disclosures relating to the financial statements were fundamentally inadequate and materially false and misleading during the entire class period.  Regardless of the extreme materiality of the inappropriate accounting for stock options and the existence of illegal backdating during the entire class period, Rambus never once disclosed the backdating to the public.  In fact, numerous Rambus disclosures were tainted by the backdating fraud, and because of that fraud were, per se, false and misleading.[63]  Because Rambus' disclosures were inadequate and/or false, the financial statements were, therefore, not presented in conformity with GAAP.  Accordingly PWC should not have issued an unqualified opinion because of the inappropriate accounting for stock option compensation and the resultant inadequate disclosures.

### 18.    Reportable Conditions – AU §380

241.    AU §380 establishes a requirement for the auditor to determine that certain matters relating to the conduct of an audit are communicated to the audit committee.  This section requires the auditor to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial reporting and disclosure process for which management is responsible.[64]

242.    Although there were numerous reportable conditions and material weaknesses in Rambus' internal control system relating to stock option compensation, in general (and specifically relating to the accounting for stock option compensation),  PWC did not call these material weaknesses to the attention of Rambus' Audit Committee, contrary to the requirements of GAAS.  The system of internal controls relevant to the accounting for stock options at Rambus was so dysfunctional as to preclude reliance on the accounting information generated relevant to the granting and accounting for stock options.  As such, PWC fundamentally breached GAAS principles

---

[63]   Rambus' inadequate, false, and misleading disclosures in its relevant financial statements throughout the period include but are not limited to its SFAS 123 disclosure relating to EPS including fair value of stock option expense, its SFAS 128 disclosure relating to EPS, and its SFAS 109 disclosure relating to deferred taxes, among others.  See paragraphs 118-163 for a more specific discussion of Rambus' inadequate, false and misleading disclosures.

[64]   SAS No. 61, SAS No. 89, SAS No. 90, AU §380, Codification of Statements on Auditing Standards.

by accepting accounting information regarding the accounting for stock options that had been compromised by Rambus' lack of internal controls and which engendered numerous material misstatements and omissions. PWC reinforced and abetted the deception of investors by presenting information in the form of audited financial statements which carried PWC's unqualified opinion and, accordingly, attested to their fairness.

### 19. PWC Should Have Issued an Adverse Opinion on Rambus' Financial Statements

243. The Codification of Auditing Standards, at AU §508.58,59 states:

An adverse opinion states that the financial statements do not present fairly the financial position or the results of operations or cash flows in conformity with generally accepted accounting principles. Such an opinion is expressed when, in the auditor's judgment, the financial statements taken as a whole are not presented fairly in conformity with generally accepted accounting principles.

When the auditor expresses an adverse opinion, he or she should disclose in a separate explanatory paragraph(s) preceding the opinion paragraph of the report (a) all of the substantive reasons for his or her adverse opinion, and (b) the principal effects of the subject matter of the adverse opinion on financial position, results of operations, and cash flows, if practicable. If the effects are not reasonably determinable, the report should so state.

244. But for the gross negligence and/or reckless disregard of the accountant defendant, PWC, Rambus would have been required to correct the overwhelmingly material misstatements and omissions attributable to its misconduct regarding the option backdating scheme. Failing that, PWC was required, as indicated above, to render an adverse opinion, along with an appropriate explanation of the effects of the backdated stock compensation scheme on Rambus results of operations, financial position, and cash flows. Had the market's been so informed, as required by GAAS , PWC would not be a defendant in this lawsuit.

### 20. Conclusion

245. If the Rambus audit been planned properly, control risk been assessed properly, and sufficient substantive testing been performed to obtain sufficient competent evidential matter, it would have been patently impossible for PWC to overlook the material weaknesses in Rambus' internal controls over financial reporting as they related to accounting for equity compensation, and the backdating fraud would have been revealed and reported, or else corrected. However, because of

1  PWC's reckless disregard and gross negligence in performing the relevant audits of Rambus'

2  financial statements and Rambus' Internal Control over Financial Reporting, for the periods in

3  question, Rambus was able to succeed in hiding its illegal backdating fraud from the public, until it

4  was "outed" by an independent third party report prepared by the Center for Financial Research &

5  Analysis (CFRA).

6                    **THE TRUTH IS DISLCOSED**

7          246.    On May 30, 2006, Rambus announced that its Audit Committee had commenced an

8  internal investigation of the timing of past stock option grants and other potentially related issues.[65]

9          247.    On May 31, 2006, after news of the Audit Committee's investigation of backdating of

10 stock options, Rambus common shares declined from a close of $25.84 on May 30 to a close of

11 $24.26 on May 31.

12         248.    Subsequently, on June 27, 2006, Rambus announced that the Audit Committee had

13 reached a preliminary conclusion that the actual measurement dates for certain stock option grants

14 issued in prior years differed from the recorded grant dates for such awards.  At that time, Rambus

15 announced that it might have to record additional non-cash charges for stock-based compensation

16 expenses related to those prior periods.  This was also the first time Rambus mentioned the

17 possibility of an accounting restatement.[66] On June 28, 2006, Rambus shares closed at $20.55, down

18 $2.58 from the previous day's closing price of $23.13.

19         249.    The possibility of a restatement became a reality when Rambus issued a press release

20 on July 19, 2006, stating that non-cash, stock-based compensation expense should have, in fact, been

21 recorded with respect certain to improperly backdated option grants, and that the amount of such

22 additional expenses was material. Rambus further announced that its previously issued financial

23 statements (for the fiscal years 2003, 2004, and 2005, including, *inter alia*, 10-Qs and 10-Ks, as well

24 as the first quarter 10-Q issued in 2006) should no longer be relied upon and would be restated.[67]

25 ────────────

26 [65] Rambus Form 8-K, Exhibit 99.1, filed with the SEC on May 31, 2006

27 [66] Rambus Form 8-K, Exhibit 99.1, filed with the SEC on June 27, 2006

28 [67] Rambus Form 8-K, Exhibit 99.1, filed with the SEC on July 17, 2006

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

250.     On July 19, 2006, as a direct result of the news that the Company would restate its results for 2003 through 2005, the Company's common shares declined approximately 15% to $16.61 per share from the prior day's close of $19.60, in active trading on NASDAQ.  As a result of all of the foregoing, plaintiffs and members of the Class have been damaged.

251.     On August 15, 2006, Rambus announced the resignation of Geoff Tate, the CEO of Rambus from 1990 through 2005, from its Board of Directors.  Mr. Tate was the *sole member of the Stock Option Committee* during the period when the majority of the stock option irregularities (backdating) occurred.

252.     On October 19, 2006, the Audit Committee released its findings, which it had presented to the entire Board of Directors the previous day.  According to the press release, the independent investigation, which was completed on October 17th, took more than four months to complete and required the examination of over 200 stock option granting actions, over 1.5 million emails and other documents, and more than 50 interviews with executive officers, directors, employees and advisors. Rambus reported that the Audit Committee had determined that a significant number of the stock option grants were not correctly dated or accounted for (the vast majority of material misrepresentations occurring between 1998 and 2001).  Rambus estimated that the aggregate pre-tax, non-cash stock-based compensation charges in connection with these stock option grants would be in excess of $200 million.[68]

253.     On or about January 5, 2007, Rambus announced that approximately 2.7 million stock options granted to Defendant Tate, who has since left the Company, were terminated, further confirming the improper and undisclosed manner in which they were awarded.

254.     Also on January 5, 2007, Rambus announced that it had determined that Danforth's stock option grants dated October 8, 2001, with an exercise price of $8.00 per share should have been $11.72 per share and the Company and Danforth entered into an agreement to amend the stock option grants to increase the price of his remaining unexercised shares.

---

[68] *Id.*

# ADDITIONAL SCIENTER ALLEGATIONS

### A.    Scienter Based On Defendants' Significant Insider Sales

255.    Certain members of Rambus' management listed below, during the period preceding the May 30, 2006 announcement, sold a total of approximately 2,295,099 artificially inflated Rambus shares, while in possession of materially adverse non-public information regarding the backdating stock options scheme (having participated in same) and the filing of the false financial statements resulting therefrom.  Some of these Individual Defendants were also Backdated Options Recipients, including defendants Mooring, Eulau, Danforth and Tate.  The Individual Defendants who were insider sellers garnered spectacular proceeds of $177,101,582 through the insider sale of Rambus stock (a significant portion of which was obtained through the exercise of the options described herein), as follows:

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE/SHARE | PROCEEDS |
|---|---|---|---|---|
| **Danforth** | 01/21/04 | 40,000 | $33.10 | $1,324,120.000 |
| | 02/03/04 | 40,000 | $30.01 | $1,200,268.000 |
| | 03/03/04 | 40,000 | $31.66 | $1,266,576.000 |
| | 04/02/04 | 20,000 | $28.46 | $569,132.000 |
| | 10/09/06 | 10,000 | $25.00 | $250,000.000 |
| | 01/11/06 | 10,000 | $30.08 | $300,787.000 |
| | 01/17/06 | 20,000 | $35.38 | $707,666.000 |
| | 02/01/06 | 10,000 | $27.78 | $277,762.000 |
| | 03/01/06 | 5,000 | $31.51 | $157,544.000 |
| | 03/20/06 | 13,005 | $35.00 | $455,175.000 |
| | 03/21/06 | 36,995 | $35.29 | $1,305,505.457 |
| | 03/29/06 | 3,310 | $40.00 | $132,400.000 |
| | 03/30/06 | 2,600 | $40.08 | $104,211.900 |
| | 04/03/06 | 10,000 | $39.33 | $393,300.000 |
| | 04/06/06 | 15,000 | $40.84 | $612,646.500 |
| | 04/07/06 | 15,000 | $$1.91 | $628,594.500 |
| | 04/10/06 | 9,090 | $42.03 | $382,070.880 |
| | 05/01/06 | 6,945 | $38.90 | $270,149.388 |
| | 05/01/06 | 3,055 | $38.90 | $118,834.612 |
| | 07/24/06 | 140 | $14.87 | $2,081.800 |
| | | | | |
| | | **DANFORTH TOTAL = $10,458,825.037** | | |
| | | | | |
| **Davidow** | 07/26/04• | 20,000 | $15.98 | $319,572.000 |
| | 01/18/04• | 20,000 | $15.00 | $300,000.000 |
| | 09/15/04• | 20,000 | $15.00 | $300,000.000 |
| | 10/20/04• | 20,000 | $17.66 | $353,278.000 |

| | | | | |
|---|---|---|---|---|
| | 11/15/04• | 20,000 | $19.29 | $385,768.000 |
| | 12/15/04• | 20,000 | $27.47 | $549,314.000 |
| | 01/18/05• | 20,000 | $20.97 | $419,498.000 |
| | 02/15/05• | 20,000 | $18.58 | $371,648.000 |
| | 03/21/05• | 20,000 | $16.40 | $328,028.000 |
| | 05/06/05• | 17,916 | $14.07 | $252,017.206 |
| | 05/06/05• | 12,916 | $14.07 | $181,684.206 |
| | 05/13/05• | 20,000 | $15.00 | $300,000.000 |
| | 05/19/05• | 20,000 | $15.00 | $300,000.000 |
| | 06/15/05• | 12,870 | $15.00 | $193,050.000 |
| | 05/01/06 | 10,000 | $38.85 | $388,489.000 |
| | 05/02/06 | 10,000 | $38.13 | $381,327.000 |
| | 05/03/06 | 10,000 | $35.66 | $356,574.000 |
| | 05/04/06 | 10,000 | $36.33 | $363,345.000 |
| | 05/05/06 | 10,000 | $36.97 | $369,663.000 |
| | 05/08/06 | 10,000 | $37.02 | $370,158.000 |
| | 05/09/06 | 10,000 | $37.37 | $373,663.000 |
| | 05/11/06 | 10,000 | $33.54 | $335,438.000 |
| | 05/12/06 | 10,000 | $31.71 | $317,068.000 |
| | 05/10/06 | 10,000 | $36.36 | $363,613.000 |
| | | | | |
| **DAVIDOW TOTAL = $8,173,195.412** | | | | |
| | | | | |
| **Dunlevie** | 02/03/04•* | 2,000 | $30.11 | $60,220.000 |
| | 02/03/04•* | 1,100 | $30.09 | $33,099.000 |
| | 02/03/04•* | 900 | $30.10 | $27,090.000 |
| | 02/26/04•* | 2,000 | $32.90 | $65,800.000 |
| | 02/26/04•* | 2,000 | $32.90 | $65,800.000 |
| | 01/24/06 | 8,000 | $34.91 | $279,260.000 |
| | 01/25/06 | 30,000 | $34.92 | $1,047,522.000 |
| | 01/25/06 | 20,000 | $34.96 | $699,200.000 |
| | | | | |
| **DUNLEVIE TOTAL = $3,939,645.000** | | | | |
| | | | | |
| **Eulau** | 07/18/03 | 3,000 | $18.93 | $56,790.000 |
| | 07/18/03 | 9,090 | $18.91 | $171,891.900 |
| | 07/21/03 | 20,910 | $18.61 | $389,135.100 |
| | 10/21/03 | 30,000 | $25.49 | $764,739.000 |
| | 02/03/04 | 9,444 | $30.01 | $283,383.275 |
| | 02/03/04 | 556 | $30.01 | $16,683.725 |
| | 02/03/04 | 1,592 | $30.01 | $47,770.666 |
| | 02/03/04 | 1,736 | $32.23 | $55,947.808 |
| | 03/02/04 | 8,264 | $32.23 | $266,332.192 |
| | 04/02/04 | 1,736 | $28.46 | $49,400.658 |
| | 04/02/04 | 8,264 | $28.46 | $235,165.342 |
| | 05/04/04 | 8,249 | $20.00 | $164,980.000 |
| | 05/04/04 | 1,736 | $20.00 | $34,720.000 |
| | 05/04/04 | 15 | $20.00 | $300.00 |
| | 05/04/04 | 1,870 | $20.00 | $37,400.000 |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 11/15/04 | 150 | $18.92 | $2,838.000 |
| | 11/16/04 | 10,417 | $20.00 | $208,340.000 |
| | 11/16/04 | 8,000 | $20.00 | $160,000.00 |
| | 11/16/04 | 41,583 | $20.00 | $831,660.000 |
| | 12/02/04 | 1,736 | $24.34 | $42,255.802 |
| | 12/02/04 | 1,333 | $24.34 | $32,446.420 |
| | 12/02/04 | 6,931 | $24.34 | $168,706.778 |
| | 01/04/05 | 1,736 | $21.66 | $37,594.642 |
| | 01/04/05 | 1,334 | $21.66 | $28,888.971 |
| | 01/04/05 | 6,930 | $21.66 | $150,075.387 |
| | 11/23/05 | 200 | $15.62 | $3,123.000 |
| | 01/05/06 | 15,000 | $22.43 | $336,489.000 |
| | 01/05/06 | 15,000 | $22.43 | $336,489.000 |
| | 01/06/06 | 5,834 | $22.01 | $128,393.505 |
| | 01/06/06 | 9,166 | $22.01 | $201,723.495 |
| | 01/06/06 | 5,834 | $22.01 | $128,393.505 |
| | 01/06/06 | 9,166 | $22.01 | $201,723.495 |
| | 01/09/06 | 8,166 | $23.61 | $192,764.963 |
| | 01/09/06 | 6,834 | $23.61 | $161,322.037 |
| | 01/09/06 | 8,166 | $23.61 | $192,764.963 |
| | 01/09/06 | 6,834 | $23.61 | $161,322.037 |
| | 01/10/06 | 15,000 | $27.71 | $415,720.500 |
| | 01/11/06 | 65,000 | $30.49 | $1,981,668.000 |
| | 01/12/06 | 15,000 | $33.00 | $494,959.500 |
| | 01/13/06 | 15,000 | $32.14 | $482,097.000 |
| | 01/17/06 | 26,613 | $36.00 | $958,068.000 |
| | 01/17/06 | 15,000 | $43.72 | $520,851.000 |
| | 01/18/06 | 15,000 | $34.07 | $511,041.000 |
| | 01/19/06 | 15,000 | $34.23 | $513,375.000 |
| | 01/20/06 | 15,000 | $34.09 | $511,401.000 |
| | 01/23/06 | 15,000 | $35.29 | $529,405.500 |
| | 01/23/06 | 100 | $36.00 | $3,600.000 |
| | 02/01/06 | 1,736 | $27.77 | $48,207.678 |
| | 02/01/06 | 1,333 | $27.77 | $37,016.610 |
| | 02/02/06 | 43,287 | $27.25 | $1,179,367.301 |
| | 03/13/06 | 2,250 | $31.58 | $71,043.750 |
| | 03/13/06 | 50 | $31.58 | $1,578.750 |
| | 02/01/06 | 46,931 | $27.77 | $1,303,245.711 |
| | | | | |
| | **EULAU TOTAL = $15,844,600.966** | | | |
| | | | | |
| **Farmwald** | 04/27/06 | 20,000 | $40.29 | $805,752.000 |
| | 04/28/06 | 5,000 | $40.02 | $200,083.000 |
| | 02/27/06 | 50,000 | $31.48 | $1,574,025.00 |
| | 02/27/06 | 15,000 | $31.63 | $474,450.000 |
| | 01/24/06• | 100,000 | $34.13 | $3,413,150.000 |
| | 02/25/02• | 100,000 | $17.62 | $1,762,210.000 |
| | 02/09/05• | 100,000 | $18.06 | $1,806,060.000 |
| | 02/26/04 | 100,000 | $32.73 | $3,272,970.000 |
| | 02/27/04 | 100,000 | $32.34 | $3,234,360.000 |
| | 01/26/04 | 30,000 | $32.50 | $975,000.000 |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

| | | | | |
|---|---|---|---|---|
| | 01/21/04 | 120,000 | $33.13 | $3,975,924.000 |
| | 11/10/03 | 40,000 | $25.21 | $1,008,520.000 |
| | 01/29/03 | 81,840 | $16.70 | $1,366,777.104 |
| | 08/05/03 | 26,430 | $17.91 | $473,329.584 |
| | 07/31/03* | 16,830 | $18.05 | $303,739.425 |
| | 08/01/03* | 44,400 | $18.02 | $799,874.880 |
| | 08/04/03 | 30,500 | $18.05 | $550,549.400 |
| | 05/16/03* | 110,000 | $15.16 | $1,667,600.000 |
| | 05/19/03* | 90,000 | $15.63 | $1,406,700.000 |
| | 05/12/00 | 20,000 | $193.03 | $3,860,600.000 |
| | 05/03/06 | 2,700 | $35.68 | $96,336.000 |
| | | | | |
| | | | | |
| | **FARMWALD TOTAL = $33,028,010.393** | | | |
| | | | | |
| **Horowitz** | 06/01/05 | 23,692 | $15.41 | $365,200.000 |
| | 05/02/05 | 23,692 | $14.23 | $337,139.529 |
| | 04/01/05 | 23,692 | $15.01 | $355,526.890 |
| | 03/01/05 | 23,692 | $17.38 | $411,802.498 |
| | 02/01/05 | 23,692 | $17.99 | $$26,297.264 |
| | 01/03/05 | 23,692 | $23.09 | $547,057.757 |
| | 12/01/04 | 23,692 | $23.52 | $557,342.454 |
| | 11/22/04 | 85,000 | $21.65 | $1,840,250.000 |
| | 11/01/04 | 23,692 | $17.12 | $405,704.177 |
| | 10/26/04 | 23,692 | $16.63 | $394,109.312 |
| | 01/01/04 | 26,660 | $17.21 | $458,943.902 |
| | 06/01/04 | 26,660 | $19.08 | $508,608.816 |
| | 05/03/04 | 26,660 | $18.69 | $498,310.058 |
| | 04/19/04 | 40,000 | $24.82 | $992,800.000 |
| | 01/01/04 | 26,660 | $28.54 | $760,865/736 |
| | 03/01/04 | 26,660 | $32.01 | $853,338.612 |
| | 02/02/04 | 26,660 | $30.39 | $810,216.062 |
| | 01/02/04 | 26,660 | $30.90 | $823,812.662 |
| | 12/22/03 | 17,900 | $26.60 | $476,140.000 |
| | 12/01/03 | 26,660 | $30.60 | $815,827.992 |
| | 11/03/03 | 26,660 | $25.38 | $676,612.138 |
| | 10/28/03 | 26,660 | $24.69 | $658,331.376 |
| | 05/15/03 | 25,000 | $15.53 | $388,250.000 |
| | 07/01/05 | 23,692 | $13.39 | $317,233.511 |
| | | | | |
| | **HOROWITZ TOTAL = $15,470,176.416** | | | |
| | | | | |
| **Hughes** | 07/19/05▪ | 50,457 | $13.29 | $670,321.25▪ |
| | | | | |
| | **HUGHES TOTAL = $670,321.25** | | | |
| | | | | |
| **Mooring** | 03/06/06 | 100,000 | $33.64 | $3,363,630.000 |
| | 03/07/06 | 100,000 | $32.76 | $3,275,890.000 |
| | 03/08/06 | 31,450 | $31.19 | $981,073.315 |
| | 03/02/06 | 100,000 | $32.99 | $3,299,100.00 |

| | | | | |
|---|---|---|---|---|
| | 03/03/06 | 100,000 | $32.30 | $3,299,680.000 |
| | 02/27/06 | 100,000 | $31.57 | $3,156,620.000 |
| | 02/28/06 | 100,000 | $30.56 | $3,055,710.000 |
| | 03/01/06 | 70,001 | $31.49 | $2,204,597.494 |
| | 03/01/06 | 16,666 | $31.4 | $524,875.671 |
| | 03/01/06 | 13,333 | $31.49 | $419,906.835 |
| | 02/23/06 | 51,451 | $30.00 | $1,456,470.000 |
| | 02/23/06 | 48,549 | $30.00 | $1,456,470.000 |
| | 02/24/06 | 100,000 | $31.14 | $3,114,040.000 |
| | 02/21/06 | 49,100 | $30.00 | $1,473,201.310 |
| | 02/16/06 | 67,649 | $30.00 | $2,029,470.000 |
| | 01/27/06 | 45,001 | $33.17 | $1,492,539.167 |
| | 01/27/06 | 54,999 | $33.17 | $1,824,140.833 |
| | 01/30/06 | 45,001 | $31.07 | $1,398,230.571 |
| | 01/30/06 | 48,619 | $31.07 | $1,510,645.811 |
| | 01/30/06 | 6,380 | $31.07 | $198,233.618 |
| | 01/31/06 | 43,800 | $30.60 | $1,340,266.860 |
| | 01/24/06 | 100,000 | $34.73 | $3,473,410.000 |
| | 01/25/06 | 8,333 | $34.78 | $289,825.073 |
| | 01/25/06 | 91,667 | $34.78 | $3,188,214.927 |
| | 01/26/06 | 100,000 | $34.75 | $3,475,270.000 |
| | 02/26/04 | 6,821 | $32.93 | $224,583.471 |
| | 02/26/04 | 8,333 | $32.93 | $274,366.525 |
| | 02/26/04 | 6,666 | $32.93 | $291,480.050 |
| | 02/26/04 | 19,033 | $33.00 | $628,089.000 |
| | 01/26/04 | 62,000 | $32.30 | $1,944,670.000 |
| | 01/27/04 | 55,027 | $32.15 | $1,768,914.450 |
| | 01/28/04 | 44,973 | $32.10 | $1,443,754.727 |
| | 01/28/04 | 5,727 | $32.10 | $183,852.163 |
| | 01/21/04 | 264,800 | $33.11 | $8,768,004.640 |
| | 10/30/03 | 71,000 | $25.07 | $1,780,296.600 |
| | 11/03/03 | 29,000 | $25.39 | $736,234.600 |
| | 05/30/03 | 20,000 | $17.87 | $357,400.000 |
| | | | | |
| | **MOORING TOTAL = $74,283,738.585** | | | |
| | | | | |
| Tate | 10/20/03+ | 33,300 | $25.42 | $846,389.430 |
| | 11/20/03+ | 33,300 | $24.64 | $820,502.010 |
| | 12/22/03+ | 33,300 | $26.49 | $882,160.290 |
| | 01/20/04+ | 33,300 | $34.71 | $1,155,926.250 |
| | 02/20/04+ | 33,300 | $33.66 | $1,120,954.590 |
| | 03/22/04+ | 33,300 | $26.67 | $888,114.330 |
| | 04/20/04+ | 33,300 | $25.07 | $834,927.570 |
| | 05/20/04+ | 33,300 | $18.90 | $629,416.620 |
| | 06/21/04 | 33,300 | $15.98 | $532,223.910 |
| | 07/20/04 | 33,300 | $17.33 | $577,212.210 |
| | 08/20/04 | 33,300 | $13.23 | $440,608.950 |
| | 09/20/04 | 33,300 | $16.59 | $552,300.480 |
| | 10/20/04 | 33,300 | $16.80 | $559,390.050 |
| | 11/22/04 | 33,300 | $21.13 | $703,589.040 |
| | 12/20/04 | 33,300 | $25.69 | $855,590.220 |

| | 01/20/05 | 33,300 | $20.82 | $693,176.130 |
| | 02/22/05 | 33,300 | $18.15 | $604,348.380 |
| | 03/21/05 | 33,300 | $16.75 | $557,798.310 |
| | 04/20/05 | 33,300 | $13.53 | $450,409.140 |
| | 05/20/05 | 33,300 | $15.17 | $505,034.460 |
| | 06/20/05 | 33,300 | $15.54 | $484,208.640 |
| | 07/20/05 | 33,300 | $13.32 | $443,602.620 |
| | 08/22/05 | 33,300 | $11.52 | $383,685.930 |
| | 09/20/05 | 33,300 | $11.47 | $381,821.130 |
| | | | | |

**TATE TOTAL = $15,903390.690**

**GRAND TOTAL = $177,101,582.499**

$ Sale made while insider was a member of Rambus Audit Committee
* Sale made while insider was a member of Rambus Compensation Committee
▪ Sale made after insider had been a member of Rambus Audit Committee and while CEO
+ Sale made after Tate had been sole member of Rambus Stock Option Committee

256.    At the time of the stock sales set forth above, the insider selling Individual Defendants possessed knowledge of the backdating scheme, which was adverse material non-public information, and sold Rambus common stock on the basis of such information.

**B.     Scienter And Knowledge Is Also Established By Participation Of Individual Defendants on Key Committees Directly Involved With Stock Option Grants**

257.    Members of the Compensation Committee during all or part of the Class Period, which included Individual Defendants Davidow, Geschke, Dunlevie, Farmwald, and Kennedy (previously defined herein as the "Compensation Committee Directors"), were aware of, or but for their reckless disregard should have been aware of, the backdating options scheme.  The Charter of the Compensation Committee of Rambus states that the purpose of the Compensation Committee is, inter alia, to "recommend and approve appropriate executive compensation" and to "make recommendations to the Board regarding director compensation."  The Committee's Charter states it is charged with annually reviewing and approving for the Chief Executive Officer and executive officers of the Company, the annual salary, bonuses, equity compensation, incentive bonuses and any other benefits, compensation or arrangements.  Therefore, because of their intricate involvement in the formulation and issuance of such options, the Compensation Committee Directors who are Individual Defendants in this action possessed the requisite scienter.

258.    Those defendants who were members of the Audit Committee, which included Individual Defendants Davidow, Geschke, Dunlevie Hughes and Farmwald (previously defined herein as the "Audit Committee Directors") for some or all of the Class Period, were responsible for maintaining, overseeing and certifying the adequacy of internal controls, and therefore, knew, or at a minimum recklessly disregarded, the impermissible option backdating scheme which adequate internal controls of the Company should have detected.  The Audit Committee Charter of Rambus states that the Company has an obligation to insure that it produces and publicly distributes financial statements which are consistent, fairly presented and in conformance with generally accepted accounting principles.  It is the duty of the Audit Committee to oversee the Company's accounting and financial reporting process, its system of internal accounting controls and the auditing of the Company's financial statements.  In addition, members of the Audit Committee whose duty it was to meet periodically with management to review the adequacy of the Company's internal controls, did, or but for their reckless disregard should have, detected and been aware of the illicit option backdating scheme.  Therefore, the Audit Committee Directors who are Individual Defendants in this action possessed the requisite scienter.  In addition, all Directors who permitted Tate to illicitly serve as the sole grantor of stock options, in blatant violation of the terms of the Stock Option Plan, may be inferred to have known or recklessly disregarded the fact that stock options were being used as a vehicle to provide unlawful compensation to certain privileged officers and directors; by permitting Tate to exercise sole authority in this area, officers and directors could reap benefits from the unlawful backdating scheme and at the same time "distance" themselves from the dirty work involved in the actual backdating of options grnts.

C.    **Scienter And Knowledge Is Also Established By The Financial Motive Of Individual Defendants in The Transactions**

259.    The Individual Defendants possessed a substantial financial motive to engage in the misrepresentations and false and misleading statements alleged to have been made herein.

260.    With respect to the Individual Defendants who were also Backdated Options Recipients as alleged herein, being Tate, Mooring, Danforth and Eulau, said defendants improperly obtained stock options at prices which were less than should have been granted under the policy as

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    represented in the filings and less than allowable under the Stock Option Plans through improper

2    manipulation of the date of grant, and thereby stood to make, and did make, spectacular profits in the

3    tens of millions of dollars as a result of the improper backdating process.  The repeated grants to the

4    Backdated Options Recipients at exercise prices that were both fortuitously and implausibly low

5    based on mere chance could not have escaped their personal notice, and this raises a strong inference

6    that they knew or recklessly disregarded that Rambus was granting them options that were

7    backdated.  As officers and directors of the Company, they also knew that this practice was

8    concealed from the investing public, and constituted a fraud on the market.

9       261. The Individual Defendants possessed a substantial financial motive to engage in the

10   misrepresentations and false and misleading statements alleged to have been made herein, in that

11   they were able to use material, non-public information during the period to make massive insiders'

12   sale of substantial shares at inflated prices, as set forth in detail at ¶ 255 hereinabove and as were

13   made by Individual Defendants Danforth, Davidow, Dunlevie, Eulau, Farmwald, Horowitz, Hughes,

14   Mooring and Tate.

15      262. The Individual Defendants possessed a substantial financial motive to engage in the

16   misrepresentations, and false and misleading statements, alleged to have been made herein, in that

17   the Individual Defendants used improper backdated stock options to confer improper and

18   undisclosed bonuses, rather than incentive based, or "performance-based" instruments as

19   represented.

20      263. Individual Defendants including Backdated Option Recipients possessed a substantial

21   financial motive to engage in the misrepresentations and false and misleading statements alleged to

22   have been made herein, because, by illicitly manipulating the stock option dates, they were able to

23   obtain improper favorable tax treatment for Company and to thereby give the illusion of greater net

24   profits, which violated the Internal Revenue Code and to which the Company was not entitled.

25      264. The Individual Defendants who were Backdated Options Recipients, possessed a

26   substantial financial motive to engage in the misrepresentations and false and misleading statements

27   alleged to have been made herein, in that, by illicitly manipulating the stock option dates, they were

28   able to obtain improper, and highly favorable tax treatment for themselves as individual recipients of

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1  the stock options which were granted to them in the money (a fact which was not disclosed), which

2  tax treatment violated the Internal Revenue Code and to which they were not entitled.

3      265.   The Individual Defendants possessed a substantial financial motive to engage in the

4  misrepresentations and false and misleading statements alleged to have been made herein, in that, by

5  illicitly manipulating the stock options they unduly gave the impression that net revenues they were

6  generating for Rambus were higher than they should have been had the true facts been known.

7      266.   The Individual Defendants who were Backdated Options Recipients possessed a

8  substantial financial motive to engage in the misrepresentations and false and misleading statements

9  alleged to have been made herein, in that, by illicitly manipulating the stock option dates, they were

10  able to effect a substantial transfer of equity from shareholders to themselves.

11  **D.    The Filing Of False Form 4's Containing Misrepresentations**
    **By Individual Defendants Is Further Evidence Of Scienter**

12

13      267.   Defendants, including the Company, for the purpose and with the effect of concealing

    the improper option backdating, filed with the SEC Forms 4's that falsely reported the dates of stock
14
    option grants to the Grantee Defendants.  The Form 4's listed an end date and option price which
15
    was both affirmatively false and omitted material facts in that they contained an exercise price which
16
    only existed by virtue of the improper backdating which was not revealed, and included an
17
    expiration date which was improper and was not the true exercise date but for the backdating
18
    scheme.
19
    **APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE**
20
        268.   At all relevant times, the market for Rambus' common stock was an efficient market
21
    for the following reasons, among others:
22
            (a)     Rambus' common stock met the requirements for listing, and was listed and
23
    actively traded on the NASDAQ, a highly efficient and automated market;
24
            (b)     As a regulated issuer, Rambus filed periodic public reports with the SEC and
25
    the NASDAQ;
26
            (c)     Rambus regularly communicated with public investors via established market
27
    communication mechanisms, including through regular disseminations of press releases on the
28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   national circuits of major newswire services and through other wide-ranging public disclosures, such

2   as communications with the financial press and other similar reporting services; and

3          (d)     Rambus was followed by securities analysts, including those who were

4   employed by major brokerage firms, who wrote reports which were distributed to the sales force and

5   certain customers of their respective brokerage firms.  Each of these reports was publicly available

6   and entered the public marketplace.

7          269.    As a result of the foregoing, the market for Rambus' promptly digested current

8   information regarding Rambus from all publicly available sources and reflected such information in

9   Rambus' stock price.  Under these circumstances, all purchasers of Rambus common stock during

10  the Class Period suffered similar injury through their purchase of Rambus' common stock at

11  artificially inflated prices and a presumption of reliance applies

12                              **COUNT I**

13  **FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT**
    **AND RULE10B-5 PROMULGATED THEREUNDER**

14                       **(Against All Defendants)**

15         270.    Plaintiffs repeat and reallege each and every allegation set forth above.  During the

16  Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct that

17  was intended to and/or did: (i) deceive the investing public, including plaintiffs and other Class

18  members, as alleged herein; (ii) artificially inflate  the market price of Rambus common stock; and

19  (iii) cause plaintiffs and other members of the Class to buy Rambus stock at artificially inflated

20  prices.  In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of

21  them, took the actions set forth herein.

22         271.    These defendants:  (a) employed devices, schemes and artifices to defraud; (b) made

23  untrue statements of material fact and/or omitted to state material facts necessary to make the

24  statements not misleading; and (c) engaged in acts, practices and a course of business which

25  operated as a fraud and deceit upon the buyers of Rambus common stock in violation of Section

26  10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.

27         272.    Defendants' material misrepresentations and/or omissions were done knowingly or

28  recklessly.

1       273.    As a result of the defendants' dissemination of deceptive and misleading information

2  regarding the Rambus' practice of backdating options in violation of the Company's own internal

3  policies and procedures and in contradiction to statement made in the Company's filings with the

4  SEC. Furthermore, the backdating of options resulted in understating expenses and thus overstating

5  net income in the Company's financial results contained in Rambus' Form 10-Ks filed with the SEC

6  during the Class Period. In ignorance of the fact that the market price of Rambus' shares were

7  artificially inflated, and relying upon the integrity of the market in which Rambus common stock

8  trades, and/or on the absence of material information that was known to and/or recklessly

9  disregarded by defendants but not disclosed in public statements by defendants during the Class

10  Period, plaintiffs and the other members of the Class bought Rambus common stock during the Class

11  Period at artificially inflated prices and were damaged thereby.

12       274.    At the time of said misrepresentations and omissions, plaintiffs and the other

13  members of the Class were ignorant of the omitted material facts and believed defendants'

14  statements regarding the awarding of options and their financial statements contained in their Form

15  10-Ks to be completely truthful, candid and not deceptive or misleading or suffering from omissions

16  of material facts. Had plaintiffs and the other members of the Class known of the omitted material

17  facts, plaintiffs and the other members of the Class would not have bought their Rambus common

18  stock during the Class Period, or, if they had bought such stock during the Class Period, they would

19  not have done so at the artificially inflated prices which they paid for their Rambus common stock

20  which they bought during the Class Period.

21       275.    By virtue of the foregoing, each of the defendants violated Section 10(b) of the

22  Exchange Act and Rule 10b-5 promulgated thereunder.

23       276.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the

24  other members of the Class suffered damages in connection with their trading in Rambus securities

25  during the Class Period.

26

27

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# COUNT II

## FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
### (Against Rambus and the Individual Defendants)

277.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein, except to the extent such allegation alleges fraud.

278.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act provides that no proxy statement shall contain "Any statement which at the time and in light of the circumstances under which it is made is false and misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading." 17 C.F.R. Section 240.14a-9.

279.    The Proxy Statements for annual shareholder meetings held in 2002 through 2006 violated Rule 14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing Rambus to engage in an option backdating scheme, a fact which the defendants were aware of and participated in from at least 1998.

280.    In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading.

281.    The misrepresentations and omissions in the Proxy Statement were material to plaintiffs in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment and continuation of defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' position, the executive officers' compensation and the Company's compensation policies.

282.    Plaintiffs, and the Class, were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

**COUNT III**

**VIOLATION OF 14(A) OF EXCHANGE ACT AGAINST DEFENDANT PWC**

283.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein, except for those allegations set forth herein of fraud as the within claim is based upon defendant's negligence.

284.     Under Section 14(a) of the Exchange Act it is "unlawful for any person...to solicit *or permit the use of his name to solicit* any proxy or consent or authorization in respect to any security" in contravention of SEC regulations. (Emphasis added).

285.     Wherein Rambus' annual 10-K reports containing Defendant PWC's opinion on Rambus year end financials accompanied its proxy statements delivered to shareholders in connection with the annual shareholder meetings.

286.     Each of the aforestated 10-K annual reports filed during the Class Period herein accompanied each of the respective Proxy Statements of Rambus as stated in each of the Proxy Statements and was incorporated therein.  Thus, the 2001 10-K was sent with the Proxy Statement dated December 20, 2001; the Rambus 2002 10-K was sent with the Rambus Proxy Statement dated December 19, 2002; the Rambus 2003 10-K was sent with the Rambus Proxy statement dated March 19, 2004; the Rambus 2004 10-K was sent with the Rambus Proxy Statement dated March 29, 2005; and the Rambus 2005 10-K was sent with the Rambus Proxy Statement dated March 29, 2006.

287.     Each of the aforestated Form 10-K's of Rambus contained the financial statements which were audited by PWC and which contained the unqualified audit opinion of PWC  which, falsely and misleadingly, attested that the financial statements were presented fairly in all material aspects, in conformity with generally accepted accounting principles and representing that Rambus' financial statements, in all material respects, represented the true and fair financial position of Rambus, the results of operations, and cash flows, and a reasonable assurance that said financial statements were free from material misstatements and prepared in accordance with GAAP.  PWC also opined in the 2004 and 2005 10-K's that the Company maintained effective internal controls over financial reporting and that management's own assessment of its internal controls was effective, including but not limited to reasonable assurance that the maintenance of records, in reasonable

1    detail, accurately and fairly reflected the transactions and disposition of assets of the Company and

2    provided reasonable assurances that transactions were recorded as necessary to permit preparation of

3    financial statements in accordance with GAAP, and provide reasonable assurance regarding

4    prevention or timely detection of unauthorized acquisitions, use or disposition of Rambus' assets that

5    could have a material effect on the financial statements.

6         288.    PWC authorized and permitted the use of its name in the both the Proxy Statements

7    and the Form 10-K's which were sent with each Proxy Statement and contained the audit opinions

8    and opinions of PWC as to financial statements which were false and misleading for the reasons set

9    forth hereinabove at ¶¶'s 165  through 245.

10         289.    The financial statements sent concurrently with the Proxy Statements and the Proxy

11    Statements themselves (which incorporated by reference the applicable Form 10-K as referenced and

12    described in detail hereinabove) contained false and misleading statements which were improperly

13    audited and certified as a result of the negligence of PWC.

14         290.    The Proxy Statements were essential in procurement of the assent and approval of

15    Plaintiffs and the Class to the Proxy Statements request for, among other aspects, approval and

16    election of the Individual Defendants as Directors, PWC as approved auditor of Rambus and the fees

17    therefor, approval of executive officers and executive compensation, approval of the Stock Option

18    Plans (to the extent voted upon in the respective years at issue) and the acquiescence and assent in

19    the statements made in the Proxy Statements as to the stock option grants and executive

20    compensation relating thereto.

21         291.    The misrepresentations and omissions in the Proxy Statements were material to

22    Plaintiffs and the Class voting on each Proxy Statement. The Proxy Statements, including the false

23    misrepresentations and omissions were an essential link in the accomplishment and continuation of

24    defendants' unlawful stock option backdating scheme, as revelations of the truth would have

25    immediately thwarted a continuation of shareholders' endorsement of the directors' position, the

26    executive officers compensation and the Company's compensation policies.

27         292.    PWC knowingly participated in, and/or allowed use of their name in connection with,

28    the solicitation and the distribution of the Proxy Statements and are liable therefor.

293.    As a result of the negligence of PWC, and the material misrepresentations and omissions set forth in the Proxy Statements, Plaintiffs and the Class have been damaged

**COUNT IV**

**AGAINST THE INDIVIDUAL DEFENDANTS PURSUANT TO SECTION 20(A) OF THE EXCHANGE ACT**

294.    Plaintiffs repeat and reallege each and every allegation set forth above.

295.    This claim is asserted against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. '78t(a).

296.    During the Class Period, Individual Defendants Hughes, Eulau, Mooring, Tate, Dunlevie, Farmwald, Horowitz, Kennedy, Danforth, Davidow and Geschke were "controlling persons" of defendant Rambus, within the meaning of Section 20(a) of the Exchange Act.

297.    The Individual Defendants were "controlling persons" of Rambus because, due to the officer and/or director positions they held with Rambus, they had the influence and power over Rambus to cause, and they did cause, Rambus to engage in the wrongful conduct complained of herein, and because they had the power to have prevented Rambus from engaging in the unlawful conduct alleged herein, but they purposely, intentionally and recklessly did not use that power to do so.

298.    As set forth above in Count I, Rambus violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.  By virtue of their status as a "controlling person" of Rambus, the Individual Defendants are liable, to the same extent as is Rambus for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act.

299.    As set forth in Count II, Rambus violated Section 14(a) of the Exchange Act by its acts and omissions.  By virtue of their status as a "controlling person" of Rambus, the Individual Defendants are liable, to the same extent as is Rambus for its violations of Section 14(a) of the Exchange Act, pursuant to Section 20(a) of the Exchange Act.

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   **PRAYER FOR RELIEF**

2          WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as

3   follows:

4          A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a)

5   and (b)(3) of the Federal Rules of Civil Procedure;

6          B.      Finding that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-

7   5 promulgated thereunder and Sections 20(a) and  14(a) by their acts and omissions as alleged in this

8   Complaint;

9          C.      Awarding plaintiffs and the members of the Class damages, together with interest

10  thereon;

11         D.      Awarding plaintiffs and other members of the Class their costs and expenses of this

12  litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

13  and

14         E.      Awarding plaintiffs and other members of the Class such other and further relief as

15  may be just and proper under the circumstances

16  **JURY TRIAL DEMANDED**

17         Plaintiffs demand a trial by jury as to all issues so triable.

18  DATED:  February 14, 2007                    Timothy J. Burke
                                                 STULL, STULL & BRODY
19

20
                                                 By: _____/s/_____
21                                               Timothy J. Burke
                                                 10940 Wilshire Boulevard, Suite 2300
22                                               Los Angeles, CA 90024
                                                 Tel:    (310) 209-2468
23                                               Fax:    (310) 209-2087

24                                               Howard T. Longman
                                                 STULL, STULL & BRODY
25                                               6 East 45th Street
                                                 New York, NY 10017
26                                               Tel:    (212) 687-7230
                                                 Fax:    (212) 490-2022
27

28

- 119 -
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1   Gary S. Graifman
    KANTROWITZ, GOLDHAMER &
2   GRAIFMAN
    210 Summit Avenue
3   Montvale, NJ 07645
    Tel:    (201) 391-7000
4   Fax:    (201) 307-1088

5   ***Co-Lead Counsel***

6   Laurence D. Paskowitz, Esq.
    Roy L. Jacobs, Esq.
7   PASKOWITZ & ASSOCIATES
    60 East 42nd Street, 46th Floor
8   New York, New York 10016
    Tel:    (212) 685-0969
9   Fax:    (212) 685-2306

10  Nancy Kaboolian, Esq.
    ABBEY SPANIER RODD
11  ABRAMS & PARADIS, LLP
    212 East 39th Street
12  New York, New York 10016
    Tel:    (212) 889-3700
13  Fax:    (212) 684-5191

14  William B. Federman, Esq.
    Nicholas G. Farha, Esq.
15  FEDERMAN & SHERWOOD
    10205 N. Pennsylvania
16  Oklahoma City, Oklahoma 73120
    Tel:    (405) 235-1560
17  Fax:    (405) 239-2112

18  Marc I. Gross, Esq.
    THE POMERANTZ LAW FIRM
19  100 Park Avenue
    New York, New York 10017
20  Tel:    (212) 661-1000
    Fax:    (212) 661-8665
21
    ***Attorneys for Plaintiffs***
22

23

24

25

26

27

28

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**