1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James M. Kelley      Tel:    (408) 867-3391
Miki W. Larsson      Fax:    (408) 872-1464
14390 Douglass Lane
Saratoga, CA 95070    rblegalreport2006@gmail.com

Douglas B. Kelley    Tel:    (408) 929-2142
1887 Saint Andrews Place
San Jose, CA 95132

PRO SE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

JAMES M. KELLEY, M. LARSSON
DOUGLASS KELLEY        Plaintiffs

V.

RAMBUS, INC., PRICEWATERHOUSE
COOPERS, LLP, WILSON SONSINI
GOODRICH ROSATI, LLP, HAROLD
HUGHES, GEOFFREY TATE, DAVID
MOORING, MARK HOROWITZ, PAUL
MICHAEL FARMWALD, BRUCE S.
DUNLEVIE, EDWARD LARSEN, WILLIAM
DAVIDOW, ROBERT EULAU, JOHN
DANFORTH, KEVIN KENNEDY,
CHARLES GESCHKE, MICHAEL
SCHROEDER, SHARON HOLT, KEVIN
DONNNELLY, LAURA STARK,  SUBODH
TOPRANI, SAMIR PATEL, DOES (1-10)

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C-07-01238- JF (HRL)

**PRIVATE SECURITIES COMPLAINT
FOR VIOLATION OF FEDERAL
SECURITIES LAWS AND
CALIFORNIA AND DELAWARE
STATE LAWS**

**CONSOLIDATED COMPLAINT**

**DEMAND FOR TRIAL BY JURY**

## NATURE AND SUMMARY OF THE ACTION

1.      This is a private civil action brought by plaintiffs James M. Kelley, and Miki Wakabayashi- Larsson, and Douglass B. Kelley (collectively Plaintiffs) against Rambus, Inc. ("Rambus" or "The Company"), the Rambus Board of Directors, certain of its senior executives, certain employees (collectively the individual Defendants), PricewaterhouseCoopers, LLP ("PWC") and Wilson Sonsini Goodrich and Rosati, PC (WSGR). All these are referred to collectively as the " Defendants"). In addition, to the named Defendants this complaint alleges that there were other John (Jane) Doe Defendants participating in this stock fraud scheme. This action seeks to recover actual, compensatory and exemplary damages for the wrongs inflicted on the Plaintiff by the Defendants, PWC and WSGR jointly and severally. This complaint alleges that the Defendants who are or were officers and/or directors of Rambus PWC and WSGR colluded with one another in violation of their duties to:

> a)      Improperly backdate grants of Rambus stock options to company officers in violation of the Company's shareholder approved stock option plans and/or IRS Code 162(m).
>
> b)      Improperly grant options and stock by failing to observe multiple requirements for performance based compensation specified by 162 (m)
>
> c)      Improperly account for millions of common stock equivalents and other stock warrants.
>
> d)      Improperly record and account for the backdated options in violation of GAAP.
>
> e)      Improperly audit Rambus in violation of GAAS and GAAP.

1

f) Improperly take tax deductions based on the backdated stock options in violation of IRS Code 26 U.S.C. 162(m)

g) Produce and distribute to Plaintiffs and the market false SEC financial and proxy reports including SEC 10-K, 10-Q , S1,S3, S4 and S8 filings that improperly recorded and accounted for backdated option grants and concealed the backdating of the options and the effects of backdating new employee hire dates.

h) Backdate the hiring dates for new employees in order to grant options at or near the lowest stock price of a quarter in violation of the shareholder approved employee stock option plans and in order to get around the reporting restrictions imposed by the Sarbanes Oxley Act.

i) Backdate the exercise date of vested stock options to reduce their apparent taxable gain to executives and the compensation expense to the company.

j) Spring-load the options grants by scheduling them just before the release of important and positive litigation, licensing and /or product release news in violation of the purpose of the performance based stock option plans.

k) Take illicit possession of approximately $151 million dollars of common stock equivalents before the options had properly vested in Q1 2000.

l) "Willfully and intentionally" conceal a "submarine patent ambush" of the DRAM manufacturers as ruled by the FTC as detailed herein. The concealment of Rambus' unfair business practices enabled the defendants to

2

claim an unimpaired monopoly on the entire synchronous DRAM market and thereby falsely inflate Rambus' stock price.

m)    Issue false and/or misleading press releases concerning the JEDEC SDRAM/DDR patents for the purpose of inflating the stock price.

n)    Have meetings with select private shareholders, stock newsletter services and analysts in violation of regulation FD as well as using certain public shareholders and other agents to deliver false and/or misleading messages from the management.

o)    Using agents on the investments boards to put out the company's materially wrong viewpoint and thereby mislead the plaintiffs.

p)    Receive, exercise and sell Rambus employee stock options while in possession of materially adverse non-public information.

q)    Sell founders stock while in possession of materially adverse non-public information.

r)    Granting options and/or stock while using misappropriated material non-public company information to time the grants, and exercise and sell stock in violation of the 1934 Exchange act and California securities laws.

s)    Violate the 1934 Exchange Act (10-B, 10-B5, 14 a, 18 a and 20).

t)    Violate the California securities laws by attesting to Rambus' materially false financial and registration statements.

u)    File false SEC registration reports in violation of the 1933 Exchange Act.

v)    Violate the total and individual grant authorizations levels of the 1997 Stock Option Plan.

3

1

2        ·

3        2.    This complaint alleges the original individual Defendants specifically Dunlevie,

4   Davidow, Geschke, Tate, and Mooring intentionally and fraudulently concealed material facts

5   from the DRAM industry beginning in the late 1990's concerning a Rambus' scheme to

6   "submarine patent" the JEDEC (Joint Electron Device Engineering Council) standard parts and

7
    later to ambush the DRAM manufacturers. This scheme has been fully described by the FTC
8
9   Commission.[1] Proof of this scheme was revealed on August 2, 2006.[2]

10        The individual Defendants also misled their business partner Hynix[3] into believing that

11  Rambus intellectual property rights did not extend to SDRAM and DDR in order to remove the

12  "other DRAM clause" from the Hynix contract so that Rambus could later charge them much

13  higher royalty rates.

14
          Not only did these defendants mislead the industry they also misled the plaintiffs into
15
16  believing that they had an enforceable patent monopoly on the synchronous. Moreover, they

17  intentionally and willfully concealed these facts from the analysts, the media and the

18  shareholders so that they could profit from this false claim of monopoly for seven years.

19        The intentional effect of these concealments has been to inflate the price of Rambus stock

20  by distorting the perceived value of Rambus JEDEC patent portfolio.

21
          The price of Rambus stock was inflated by the public perception that Rambus had a
22
23  monopoly on both RDRAM and the JEDEC SDRAM and DDR. Rambus carefully cultivated this

24  perception of monopoly through communications to industry analysts and press. This public

25

26  [1] The FTC Commission Opinion, August 2, 2006.
    [2] Had the evidence been available to the CAFC, Rambus initial fraud conviction may not have been easily
27  overturned. Rambus benefited greatly from the concealment of its "unfair business" and antitrust practices.
    [3] This is asserted by Hynix in a conduct case to be tried in Judge Whyte's court.
28                                        4

perception was entirely dependent on the concealment of Rambus' unfair business practices which had they become known would have given rise to equitable estoppel issues. Press releases in early 2000 show that Rambus was promoting this view. As a consequence, Rambus stock soared to over $400 per share.[4]

What Rambus failed to disclose to the plaintiffs was that their scheme to 'ambush" the DRAM manufacturers was subject to equitable estoppel . The litigation record shows that Rambus' outside lawyers had warned Rambus of these equitable estoppel issues many times from 1993 onwards. The record also shows that Rambus management and directors understood the warnings and went ahead with their plan anyway.[5]

Rambus stock price was deflated when Rambus' was adversely impacted by the inevitable litigation losses stemming from their "submarine patent" scheme.[6] This concealment facilitated the Defendants insider-trading scheme. Rambus used the periods of stock price deflation to time the awards of stock and options to insiders and consultants.[7]

The enormous profits from this scheme were further increased by the backdating of the and springloading of option grants and stock and were shared by all the Defendants.

The gross receipts made from the stock option grants by the reporting insiders were in excess of $400,000,000 as demonstrated herein. For all employees, the gross receipts are estimated to be more than 1 billion dollars. These receipts are far greater than the reported profits of the company from 1997 through last 10-K report in 2006 ($59,770,000). Indeed the profits

---

[4] Before a 4:1 split later in 2000.
[5] Indeed, Mr. Karp had given testimony as a Samsung employee that failure to disclose patents to JEDEC could cause equitable estoppel. Also, there is much discussion of this in the FTC evidence.
[6] Infineon pleaded fraud with respect to Rambus obtaining undisclosed patents on JEDEC standards. However, Infineon could not prove the "willful and intentional" mens re requirement under Virginia law and JEDEC contract was ambiguous as to any duty to disclose. Had the evidence disclosed to the FTC been disclosed to Infineon, Infineon would have been able to prove the "willful and intentional" requirement for Virginia fraud.
[7] For example, Rambus issued 6,860,000 common stock equivalents and 2,700,000 option grants in calendar Q1 – 2000 prior to the RDRAM platform launch. Rambus had already issued 2,160,000 options and 2,000,000 common stock equivalents in the previous quarter.

5

1  reported would have been even lower (-$109,398,000) had Rambus accounted for the stock

2  option grants at fair value using FAS123R instead of using APB25.

3       Rambus officers, directors[8] and consultants exercised their stock options and sold the

4  stock during periods of stock price inflation as detailed in this complaint. Rambus officers and

5  director granted new options when the price of the stock was at or near low of a quarter and

6  frequently after materially adverse litigation news or prior to the revelation of materially positive

7  news for the Rambus.

8

9       In addition, certain Rambus officers and directors participated in the presentation of

10  materially false news to the media in conference calls and press releases. As a group the

11  defendants benefited greatly from the materially false news because they were able to exercise

12  options and sell stock at greatly inflated prices.

13       In some cases, as described herein, the officers took possession of the options and or

14  common stock equivalents before they actually met the vesting conditions. In certain cases, the

15  executives did not even pay the company the strike price money ostensibly due ( $2,499,000).

16

17       This complaint further alleges that PWC and WSGR "were principals along with the

18  Rambus executives and directors in their acts of financial fraud on the Plaintiffs. These service

19  providers received as yet unaccounted for non-statutory options, warrants and /or stock grants

20  worth millions of dollars.[9]

21       PWC through its long relationship with Rambus lost its "independence" and violated its

22  duties  in "attesting" to the accuracy of Rambus' financial statements and the adequacy of its

23  internal controls. PWC fraudulently, negligently or recklessly concealed the results of their many

24

25

---

[8] It appears that Geschke held most of his directors options at least until he quit.
[9] PWC has not denied receiving such Rambus grants.

26  WSGR is known to have received Rambus stock as is disclosed in the registration statements. But even here the full

27  extent of the holdings and grants are not known because WSGR transferred such stock to one or more forms of WS
Investments.

28

audits of Rambus' financial condition as well as its internal controls. PWC reported to the two most powerful directors[10] during their audit of Rambus internal controls in 2004.

WSGR reviewed and crafted the misleading and false language in many of the SEC reports and attested to the registration filings. These statements were designed to conceal from and confuse the plaintiffs and make the evaluation of these SEC reports extremely difficult.

The Defendants engineered a systematic and wrongful scheme whereby hundreds of millions of dollars of corporate assets were diverted to themselves via the manipulation of grant dates associated with millions of employee stock options. These options were granted to Rambus insiders by Rambus insiders in violation of the employee stock option plans and the wrongdoing was intentionally concealed from the plaintiffs.

It now is clear that there were numerous people with knowledge of the various frauds that Rambus was engaged in from 1997 onwards in the law firms, the accounting firms, the venture capital firms (whose members served as Rambus directors) and that this knowledge was used by these same people and/or others to engage in insider trading of Rambus stock to the great detriment of the plaintiffs.

3.    This complaint is brought under the laws of the United States of America, and the states of Delaware and California Plaintiffs allegations are made on information and belief based upon: (a) an investigation conducted by plaintiffs that began in May 2006 and is on-going; (b) review and analysis of filings made by Rambus with the Securities and Exchange Commission (the "SEC"); (c) review and analysis of press releases, public statements, news articles, securities analyst reports and other articles dealing with Rambus; (d) conversations with company executives and other large shareholders as well as attendance at annual shareholder

---

[10] Dunlevie and Davidow the founding and controlling directors of Rambus from 1990 onwards.

7

1   meetings and (e) other publicly available information. (f) Correspondence with attorneys that had

2   business dealings with Rambus in 1999.

3       4.      Rambus' insiders have the potential for huge gains in the value of their

4   outstanding stock options. The Rambus 2005 10-K that reported the total option grants to insider

5   employees and directors stated (emphasis added):

6   "As of December 31, 2005, a total of 31,744,983 shares of common stock were (of which

7   26,027,517 were outstanding and 5,717,466 were available for future grant) reserved for
    issuance under all stock option plans. As of December 31, 2005 and 2004, options for the

8   purchase of 14,844,322 and 11,968,699 shares, respectively, were exercisable without being
    subject to repurchase by the Company."

9

10  At $100 per share the outstanding stock options would have the value of 2.6 billion dollars.

11  In April 2006, the company stock price reached $46.99 per share and the14,844,322

12  Stock options that were then exercisable had a value of $ 697,534,690.

13      5.      The 2006 insider trading defendants sold over $120 million worth of stock

14  during the January to May 2006 time period. We do not know the full extent of the sales because

15  not all employees are required to report to the SEC.

16

17  We do not know the profit derived by PWC or WSGR since they have not reported any

18  transactions.  The grants of Rambus stock and options to consultants is clearly material to the

19  plaintiffs' evaluation of the credibility of Rambus SEC Reports and yet they were never reported.

20  (As such this is evidence of scienter in that it shows a desire to keep the plaintiffs in the dark)

21  The defendants' profits from the exercise of options and sale of stock exceed the actual

22  revenue from the company and provide powerful motivation for the illicit acts and practices

23
24  complained of herein.

25

26

27

28                          8
                            PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1    6.    The defendants acted largely as a group in their exercise of options and sale of

2    stock during periods when price was inflated.[11]

3    7.    The Rambus employee stock option gains were greatly increased through the

4    manipulation of the perceived value of the company without achieving actual revenue and/or

5    profit performance.

6    This was done by concealment of materially adverse information augmented by the

7    publication of information greatly exaggerating the company's realistic earnings potential.

8

9    For example, the company has timed public statements to the effect that the estimated

10   damages from the AT lawsuit are greater than 10 billion dollars (even though their own court

11   filings show that their estimates were only as high as a billion dollars (not more than 10 billion

12   dollars).

13   At the same time the company also was making statements to the effect that the total

14   available market for Rambus was 1.1 trillion dollars. Such materially false and misleading

15   statements- in the absence of any qualification - serve to inflame speculation in the stock and

16   increase the "perceived value" of the company. The purpose of these statements was to inflate

17

18   the perceived value of the stock and/or support an eroding stock price while the defendants

19   exercised options and sold stock.[12]

20   Once the executive sales were completed, company management made negative

21   comments or no comments at all about the company prospects. For example, Harold Hughes

22   stated during the May 10, 2006 annual shareholders' meeting that the company's PE was too

23

24   high.[13] This behavior by Mr. Hughes, Mr. Danforth, and Sharon Holt  directly supports

25

26   ----

     [11] This is circumstantial evidence of scienter. They all knew when to sell their stock. It was coordinated and
     common knowledge.

27   [12] This is particularly clear in 2000, 2001 and 2006.
     [13] Hughes did this after the 2006 Stock Option Plan had passed after a battle with dissident shareholders.

28                                                         9

plaintiffs' claims that Rambus management was pumping the company prospects while dumping their stock on the public at inflated prices.

8.    Some of the initial acts complained of herein beginning in 1997 fall outside the federal statute of limitations. However, some of the illicit acts originating in those years have continued to within the statute of limitations as the fraudulent options are 5 and 10-year options.

9.    Plaintiffs' losses in the years 1999 to 2002 are brought to this court as equitable issues to the extent that they are outside the state and federal statutes of limitations.

10.    WSGR was added to this complaint after being implicated by common industry client practices in the establishment, maintenance and cover-up of the option and new hire backdating mechanisms at Rambus and after it was determined that the 2005 Convertible bond registration was a violation of the 1933 Exchange Act. WSGR is involved in the options, warrants and stock abuse mechanisms at many other client companies, e.g., Pixar, Brocade, Apple, KLA-Tencor, etc. Indeed, WSGR is implicated in about one half of the 200 "options backdating" cases.

11.    PWC also turned a blind eye to the illicit stock and option grant practices and is also implicated in many other client-backdating cases currently under investigation.[14]

## DISTRICT ASSIGNMENT

12.    A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under § § 10(b), 14(a) and 20(a) of the

---

[14] For example, PWC was Marvel's public accountant.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1  Exchange Act, http://www.sec.gov/divisions/corpfin/34act/sect10a.htm 15 U.S.C. § g78 j(b),

2  78n(a) and 78t(a), and Rule 10 b-5, 17 C.F.R. §240.10 b-1, 17 C.F.R. §240.10 b-5, promulgated

3  there under, and under California and Delaware law for breach of the fiduciary duties of

4  disclosure, loyalty and care and constructive fraud.

5        14.    This Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act,

6  15 U.S.C. § 78 (aa), §78j(b), §78n(a), §78t(a)(e), as well as 28 U.S.C. §§1331 and 1337, This

7

8  Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28

9  U.S.C. § 1367.

10        15.    Venue is proper in this district pursuant to § 27 of the Exchange Act, 15 U.S.C.

11  § 78aa, as well as 28 U.S.C. §1391(b) and (c).

12        16.    A substantial portion of the acts charged herein, including the preparation and

13  dissemination of materially false and misleading information, occurred in substantial part in this

14

15  District. Rambus headquarters is located in and it conducts its business in this District. Further,

16  many of the Defendants are citizens of California and some reside or maintain offices in this

17  District. The Defendants have received substantial compensation in this district.

18        17.    Rambus has availed itself of the rights of a resident corporation by filing a

19  lawsuit in the San Francisco Superior Court (Case No. 04-431105) for violations of the

20  Cartwright Act and the California Business and Professions Code 167200. In that filing Rambus

21  claims California as its principal place of business.

22

23        18.    Venue is proper in this district for PWC because it maintains a San Jose Office

24  and the acts complained of herein were performed in this district. PWC conducts its registered

25  accounting business here and has received substantial compensation in this district.

26        19.    Venue is proper in this district for WSGR because it maintains a Palo Alto

27  Office and the acts complained of herein were performed in this district. WSGR conducts its law

28

business here and has received substantial compensation in this district.

20.    Venue is proper in this district for the individual defendants because all are residents of California and were residents during their tenure at Rambus .

21.    In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PLAINTIFFS' DAMAGE PERIODS

22.    There are two investment time periods addressed by this complaint as follows:

(a) November 1999 to February 2002 (Equitable period)

(b) February 2002 to February 2007. (Statutory period)

During these periods the plaintiffs invested in Rambus securities without knowing of Rambus' misrepresentations, concealments, options violations, insider trading, and other types of fraud and illegal activities. The Plaintiffs attended some of the annual shareholders meetings and voted their stock positions. In addition, Plaintiffs listened to company conference calls, read analysts' and SEC reports and participated in public and private discussions of the company.

If the Plaintiffs had known of the Rambus' fraudulent activities, PWC's false attestations and the involvement of WSGR in establishing and maintaining the mechanism of options, warrants and new hire backdating, Rambus' securities would never have been considered as an investment.

23.    Plaintiffs purchased securities of Rambus and engaged in transactions of Rambus securities during the 5 year statutory federal Period and suffered damages thereby.

24.    Plaintiffs also purchased Rambus securities in late 1999 through 2002 and engaged in transactions of Rambus securities. Plaintiffs seek equitable restitution under the

12

1    common law of the state of California where the Rambus fraudulent acts were committed.

2    **PARTIES**

3

4    25.    PricewaterhouseCoopers, LLP is a registered independent accountant subject to

5    the Public Company Accounting Oversight Board (PCAOB) (www.pcaobus.org). The PCAOB

6    was established under the Sarbanes-Oxley Act of 2002. The services performed by

7    PricewaterhouseCoopers, LLP were performed in the state of California out of the San Jose

8    office.

9    26.    Defendant Wilson Sonsini Goodrich and Rosati, PC is a very large law firm in

10   Santa Clara Valley which is its principal place of business. WSGR has represented Rambus for

11   many years. WSGR prepared Rambus' IPO and Convertible bond SEC registration reports as

12   well as reviewed its SEC 10-K and 10-Q and Proxy reports.[15]

13

14

15   27.    Defendant Rambus is a Delaware corporation with its principal executive

16   offices located at 4440 El Camino Real, Los Altos, California 94022. According to its public

17   filings.

18   28.    Rambus is subject to the laws of the State of Delaware.

19   29.    Rambus is subject to the laws of the state of California because its principal

20   place of business, its assets, and most of its employees are all in California.

21

22   30.    PWC and WSGR are subject to the laws of the state of California because the

23   acts complained of herein were performed in California and they all maintain offices here.

24   WSGR's main office is in Palo Alto California. PWC office is in San Jose California.

25   31.    The individual Defendants are all subject to the laws of the state of California

26

27   ───────────────
[15] (http://www.wsgr.com/WSGR/Index.aspx

28

1  as they have been and are currently residents of the state of California. Thus the common law

2  and California statutory actions brought against the Defendants are based entirely on California

3  law.

4      32.    Rambus is a technology licensing company specializing in the invention and

5  design of high-speed chip interfaces. Since it's founding in 1990, the Company's has patented

6  innovations directed at high-speed chip-to-chip interfaces that have helped the electronics

7

8  industry bring superior products to market. Rambus' stock is publicly traded on the Nasdaq under

9  the ticker symbol RMBS.

10          **INDIVIDUAL DEFENDANTS AND THEIR SCIENTER**

11

12      33.    The following Defendants are referred to herein as the Individual Defendants.

13  The Defendants roles are described in this section along with the basis of their scienter.

14  Additional detailed scienter arguments for additional individual events will be made throughout

15  this complaint as appropriate. This is necessary because the complaint deals with acts and

16  continuing concealments spread over a 10-year period instead of a single event.

17
      34.    Defendant Harold Hughes ("Hughes") has served as Chief Executive Officer

18
   of the Company since 2005 and has been a director of the Company since June 2003. He also

19
   served as interim Chief Financial Officer of the Company for the period March 2, 2006 to April

20

21  11, 2006. From June 2003, he served as a Chairman of the Audit Committee until January 9,

22  2005 when he became CEO.

23      Mr. Hughes was the Audit Committee financial expert as defined in item 401(h) of

24  regulation S-K. Mr. Bentley took over as the Audit Committee financial expert in March 2005.

25
      Rambus continued its illicit option practices in the period from 2003 until February 2007

26
   under Mr. Hughes.  The practices of 'springloading option grants", issuing "false and misleading

27

28                                    14

press releases" (calculated to inflate stock price), and concealing materially adverse information from the shareholders has continued under Mr. Hughes as detailed in this complaint.

Mr. Hughes was aware of the extent of the Rambus' financial misstatements as early as 2004 as a result of his lead role on the Audit Committee. Mr. Hughes presided over an internal audit of Rambus controls in 2004. Mr. Hughes used the results of that internal audit to take the CEO position from Mr. Tate with the backing of Chairman Davidow and Directors Dunlevie, Geschke and Farmwald.[16]

Mr. Hughes in violation of his fiduciary duties (with the consent and approval of directors Davidow, Dunlevie, Mooring, Farmwald, and Geschke[17]) concealed this materially adverse non-public information[18] from the Plaintiffs from at least 2004 through 2006.

Mr. Hughes as a control person concealed this materially adverse information willfully and intentionally for his own personal gain and has benefited thereby.[19] Mr. Hughes accepted option grants and or stock, exercised options and sold stock while in possession of the materially adverse non-public information. Mr. Hughes had full scienter from at least 2004 to the current period.

35.    Defendant Geoffrey Tate ("Tate") served as Chairman of the Board of Directors from January 2005 until his resignation in August 2006. Mr. Tate also served as President, Chief Executive Officer and director of the Company from May 1990 to January 2005. Tate served as a "one man stock option committee" until late 2003.

Mr. Tate owned 6.4 % of Rambus stock pre IPO and 5.6% post IPO.    While this is a significant amount of stock it was insufficient to control the company when contrasted with Dr.

---

[16] Plaintiffs' allegation is based on two confidential sources.
[17] Geschke resigned in 2005.
[18] Specifically, the false financial; reports and internal control failures were concealed along with the illicit option practices.
[19] Mr. Hughes became CEO and obtained millions of dollars worth of options.

15

1  Davidow and Mr. Dunlevie's ownership and control of 53.5 % of Rambus stock before the IPO

2  and 46.6% after the IPO.   Thus, Mr. Tate served at the discretion of Mr. Dunlevie and Dr.

3  Davidow, as did Dr. Farmwald and Professor Horowitz.

4      Mr. Tate had direct knowledge of the illicit stock and option grant practices at Rambus

5  because he helped implement those practices and he executed them in his capacity as CEO and

6  as the "one-man stock option committee".

7

8      Mr. Tate also had direct knowledge of the "new hire employment" backdating practices

9  used by Rambus to get around the Sarbanes-Oxley Act (that was intended in part to eliminate

10  option and stock grant backdating practices).

11      In his capacity as the one-man stock option committee, Mr. Tate had the power to grant

12  options to non-executive employees and service providers without the explicit approval of the

13  Compensation Committee.[20] Many of these options granted by Mr. Tate were backdated as will

14  be detailed herein.[21]

15

16      Mr. Tate had full knowledge from 1997 through 2006 of the Rambus' illegal misconduct

17  as detailed in the FTC ruling. Mr. Tate concealed the "FTC misconduct" from the shareholders

18  for many years and exploited this materially adverse non-public information to his huge

19  advantage.

20      Had this materially adverse information been revealed in late 1999 Rambus stock would

21  never have achieved the inflated price of over $400 per share.[22]

22

23      Mr. Tate also concealed the Rambus "Spoliation" of its records until Judge Payne ruled

24  [20] WSGR has asserted in its "Motion to Dismiss" that Tate could only grant to non-executive employees.
   [21] Non-executive employees and service providers do not have to report their options grants or exercises. However,
25  it is possible to show that they received backdated options the same as the executives by comparing the total grants
   given in the Form 10-K filings at a specific price , e.g., $4.83 with the reported executive grants.
26  [22] Rambus' ability to collect royalties of its JEDEC patent portfolio has been severely limited by the FTC
   Commission ruling. Rambus carefully cultivated the public perception that Rambus had a monopoly due to the
27  JEDEC patent portfolio.
   This false perception was the primary cause of the stock price inflation in the year 2000.

28

Rambus guilty in Infineon versus Rambus.[23] The "spoliation" of Rambus records was intended to continue the concealment of the acts Rambus was found guilty of by the FTC. The time span is now almost 10 years without a complete reckoning. The engineered concealment of the material non-public information was very effective.

Mr. Tate as control person for Rambus from 1990 until 2006 was thoroughly familiar with all of the illicit practices complained of herein and he helped engineer these same practices in order to enrich himself and his associates Dunlevie, Davidow, Mooring, Geschke, Farmwald, Horowitz, Harmon, Eulau, and Danforth.

Mr. Tate was CEO of Rambus from 1990 until 2005 and presided over much of the massive transfer of Rambus capital stock to a handful of Rambus insiders.

Mr. Tate was at all times a control person and had full scienter until his resignation in 2006. Mr. Tate signed many false SEC reports as detailed herein.

36.    Defendant David Mooring ("Mooring") was a director of the Company since December 1999 until May 10 of 2006. From 1999 to 2004, Mooring was President of Rambus. Mooring discontinued his role as an executive officer in February 2005 and was a part time employee assisting in licensing, corporate development and strategy until May 2006. Mr. Mooring was a control person for Rambus. Mr. Mooring participated in the management and execution of the deceptive business practices and antitrust activities found by the FTC.

Mr. Mooring worked closely with Mr. Tate and received compensation almost equal to Mr. Tate in 1999 and 2000 as can be seen in the option and common stock equivalent grants on October 20, 1999.

---

[23] "In February 2005, the Virginia court held a four-day bench trial on Infineon's unclean hands defense, which included allegations of litigation misconduct and spoliation of evidence. On March 1, 2005, the Virginia court orally stated that Infineon had proven that Rambus had unclean hands, that Rambus had spoliated evidence, and that dismissal of Rambus' patent infringement case was the appropriate sanction". Rambus' ability to collect royalties from the JEDEC patent portfolio was compromised by its own concealed willful and intentional actions.

17

1    The FTC evidence shows that JEDEC (SDRAM) patent ambush was common knowledge

2  among the executives at Rambus in 1999 and was joked about internally. Mr. Mooring cannot

3  credibly deny of patent ambush and deception. The patent ambush was concealed from the

4  plaintiffs but utilized by Mr. Mooring for inside trading.

5    Mr. Mooring signed many false and misleading SEC filings with full knowledge that they

6  were false as detailed herein.

7

8

9    37.    Defendant Bruce Dunlevie ("Dunlevie") has served as an outside director of the

10  Rambus since March 1990.[24]

11    Mr. Dunlevie owned and or controlled 26.8% of Rambus stock just prior to the IPO in

12  May 1997 as can be seen in Exhibit L. Dunlevie personally owned half of this stock and the rest

13  was held in the name of his venture capital company. Mr. Dunlevie and Dr. Davidow collectively

14  controlled Rambus and its board of directors with 53.5% of the stock outstanding before the IPO

15  and continued to control the company after the IPO with a dominant 46.6% of the stock.[25]

16

17    By contrast, Dr. Farmwald and Professor Horowitz had minority positions of totaling

18  13.7% before the IPO and 11.9% after the IPO.[26] They can be no doubt that Mr. Dunlevie and

19  Dr. Davidow were in full control of Rambus during and after the IPO when the illicit stock and

20  option grant practices were established at Rambus.

21    Dunlevie served as a member of the Compensation Committee from 1997 through 2006.

22  Dunlevie also served as a member of the Audit Committee until he resigned on March 11, 2005.

23

24
_____
[24] Mr. Dunlevie may be considered as a founder and inside director by virtue of his significant ownership of pre and
25  post IPO stock.

26  [25] Mr. Dunlevie together with Dr. Davidow exerted control of Rambus through their ownership of more than 53 %
of the company during the years in which the company's submarine patent scheme was formulated and the options
27  backdating practice began. This is further evidence of early and continuing scienter.
[26] See Exhibit L for pre and post IPO ownership details.

28                                              18

Mr. Dunlevie as one of the two controlling directors participated in the engineering of the illicit practices that have caused Rambus SEC filings and financial reports to be materially false for 10 years. As a member of the Compensation Committee with Dr. Davidow and Dr. Geschke, Mr. Dunlevie engineered and approved the options and stock grant abuses and presided over an egregious transfer of Rambus capital assets to corporate insiders with the assistance of PWC and WSGR.

As a controlling director, long term member of the Audit Committee and also by virtue of his participation as a venture capitalist in many other companies and on many other boards of directors, Mr. Dunlevie was fully aware that Rambus SEC filings were materially false and the reasons why they were materially false. Mr. Dunlevie signed many false SEC filings with full knowledge that they were false as detailed herein.

Mr. Dunlevie was also fully aware of the Rambus unfair business practices as detailed in the FTC Commission Ruling on August 2, 2006. Mr. Tate would not have been able to effectuate this plan without the approval of Mr. Dunlevie. By virtue of being a controlling director of the company, nothing as important as the unfair business practices discovered by the FTC could have been implemented without his full knowledge and consent.

In 2004, Mr. Dunlevie demonstrated further control when he backed Mr. Hughes as CEO to replace Mr. Tate. The results of the PWC internal audit were used by Mr. Hughes to promote his own interests. It was clear by that time that the options backdating scandal was beginning to accelerate in the Silicon Valley and the probability that Rambus would be forced to deal with the abuses was increasing.

PWC in 2004 was reporting the results of its internal control audit to Dr. Davidow and Mr. Dunlevie and Mr. Hughes.

Mr. Dunlevie's Rambus stock (as well as his complicity in the abuses complained of

19

1  herein) provided significant motivation to for him to participate in the continuing cover-up of the
2  both the backdating scandal and the FTC unfair business and antitrust practices.

3      Both PWC and WSGR through the Audit and Compensation Committees reported to
4  Mr. Dunlevie and Mr. Davidow, the two most powerful directors.[27]

5      Mr. Dunlevie has been a General Partner of the venture capital firm Benchmark Capital
6  since May 1995 and a General Partner in the venture capital firm Merrill, Pickard, Anderson &
7  Eyre since 1989.
8

9      As a consequence of Mr. Dunlevie's connections to many other businesses, it is alleged
10  that select people outside Rambus management and board of directors had inside knowledge of
11  Rambus' materially adverse non-public information.

12      This placed these people at a tremendous trading advantage to ordinary shareholders who
13  had no such access to the materially adverse non-public information.

14      Mr. Dunlevie was fully aware of all these illicit practices and therefore had full scienter.
15  Mr. Dunlevie has been a control person of Rambus since 1990.
16

17      38.    Defendant William Davidow ("Davidow") served as a Chairman of the Board
18  of Directors of the Company since the founding of the Company in March 1990 until January
19  2005.  He served as a member of the Compensation committee of the Board ("Compensation
20  Committee") from 1997 to October 2002 and as a member of the Audit Committee from 1997 to
21  May 2005.
22

23      Collectively, Dr. Davidow and Mr. Dunlevie held a controlling interest in Rambus both
24  before and after the IPO in May 1997. [28] As such all other directors and employees of Rambus
25  served at their discretion. Thus the unfair business practices found by the FTC and the egregious

26
[27] Dr. Geschke was also on these committees but did not have as significant a stock position as Davidow and
27  Dunlevie. See Exhibit K.
[28] See Exhibit L for the details of his and Dunlevie's controlling stock positions.
28

1  option and stock grant and backdating practices of the Rambus could not have been formulated,

2  executed and perpetuated without his consent.[29] Moreover, the issuance of 10 years of

3  egregiously false SEC filings could not have happened without his acquiescence or consent.

4      Dr. Davidow turned over his position as Chairman of Rambus board of directors to Mr.

5  Tate in 2005 when Mr. Tate was removed from the CEO position.[30]

6      Dr. Davidow, Mr. Dunlevie and Mr. Hughes served on the Audit Committee during

7
8  2004 when PWC was performing both the internal control audit as well as the annual audit.[31]

9      Dr. Davidow was appointed Director Emeritus May 4, 2005.  He resigned this position in

10  2006 as the options scandal emerged.

11      Dr. Davidow was a control person for Rambus and had full scienter by virtue of his

12  superior position on the Rambus board of directors during the entire period of the abuses.

13      39.    Defendant Charles Geschke ("Geschke") served as a director of Rambus since

14
15  February 1996 until he resigned effective March 11, 2005. He was a member of the Audit

16  Committee from February 1996 until July 2003. He was a member of the Compensation

17  Committee from as early as February 1996 to March 2005. Geschke was Chairman of the

18  Compensation Committee from October 2002. Geschke was fully informed about compensation

19  decisions. He was a member of the Corporate Governance/Nominating Committee from the time

20  it was formed in October 2002. Geschke was a control person for Rambus.

21      Dr. Geschke had full scienter with regard to the illicit stock and option practices at

22
23  Rambus and participated in the concealment of the abuses that the FTC has found. Dr. Geschke

24  held most of his stock during the periods complained of herein.

25  [29] Indeed this allegation is consistent with Dr. Davidow's defense of Mr. Tate and the egregious option grants in 2002 as necessary after the court loss to Infineon in Virginia following the Annual Meeting in 2006.

26  [30] Confidential sources indicate that Mr. Tate was taken completely by surprise by his removal as CEO.

27  [31] Thus the decision to replace Mr. Tate is traceable to Dunlevie and Davidow.

28

1    Dr Geschke participated in the removal of Mr. Tate as CEO in 2005 and had the results o

2 the internal audit giving him full scienter of the abuses.

3    Dr. Geschke does not appear to have exercised options or sold stock during the period of

4 the complaint. It is not known whether Dr. Geschke disposed of his stock[32] after he resigned

5 from Rambus in 2005 as the option scandal was emerging in the valley through WSGR client

6 firms.[33]

7

8    40.    Defendant P. Michael Farmwald ("Farmwald") has served as a Director of the

9 Company since co-founding the Company in March 1990 to present. On January 25, 2005,

10 Farmwald was appointed to the Audit Committee. He was appointed to the Compensation

11 Committee during October 2002, and served there until July of 2003. In addition, he had served

12 as Vice President and Chief Scientist of Rambus from March 1990 to November 1993. Dr.

13 Farmwald is a control person for Rambus. Dr. Farmwald is defined to be an "inside director" by

14 Rambus in the 1997 Stock Plan. Dr Farmwald is a founder one of the principal shareholders of

15 Rambus and by virtue of his long and intimate association with Rambus has a detailed

16 knowledge of the FTC abuses and the options, stock and backdating abuses at Rambus.

17

18    41.    Defendant Mark Horowitz ("Horowitz") has served as a Director of the

19 Company since co-founding Rambus in March 1990. He also served as a Vice President from

20 March 1990 to May 1994. He has served as Chief Scientist since May 2005.

21    Professor Horowitz as a founding inside director of Rambus was aware of the abuses

22 complained of herein by virtue of his close association with Mr. Dunlevie, Dr. Davidow and Dr.

23 Farmwald from 1990 onwards. It is not alleged in this complaint that Professor Horowitz

24 engineered these practices but it is alleged that he participated in the concealment of the abuses

25

26 _____

27 [32] Dr. Geschke was no longer required to report after his resignation. However, he owned 367,500 shares of Rambus when last reported in February 1,2004.

[33] Brocade, Mercury computers and numerous other WSGR client firms were beginning to be exposed.

28

1   detailed in this complaint and that he also sold stock while in possession of this materially

2   adverse non-public information. The FTC evidence shows that the deceptive unfair business

3   practices were common knowledge at Rambus by 1999.

4       Professor Horowitz was not involved in the Compensation, Audit or Corporate

5   Governance committees at anytime. Professor Horowitz did benefit enormously from selling

6   founder's stock and directors stock at inflated prices due to the concealment of unfair business

7
8   practices as found by the FTC and Judge Payne's court. Professor Horowitz is defined to be an

9   "inside director" by the 1997 Stock Plan.

10

11      42.    Defendant Robert K. Eulau ("Eulau") served as the Senior Vice President of

12  Finance and Chief Financial Officer of Rambus for the period from May 2001 until his

13  resignation effective on or about March 2, 2006. Mr. Eulau was in control of the financial affairs

14  of Rambus from his arrival at the company until his departure.

15
16      Mr. Eulau as a consequence of his position had intimate knowledge of Rambus' false

17  SEC statements and signed the materially false SEC filings as detailed in this complaint. Mr.

18  Eulau motivation was personal gain and he was well compensated by Rambus for performing

19  these illicit services.

20      Rambus continued the backdating practices during Mr. Eulau's term of office. Mr. Eulau

21  had full knowledge of these practices as a consequence of his key financial position in the

22  company.

23
24      Mr. Eulau himself exercised at least 750,000 backdated options in 2006 as clearly

25  demonstrated in Exhibits A and B.

26      Mr. Eulau was the primary officer in charge of Rambus SEC financial reports from the

27  2002 until March of 2006. He signed and attested to the accuracy of these financial reports as

28

1  detailed herein.

2      Mr. Eulau also filed and signed a false Form 4 on 1/18/2006 in connection with these

3  backdated option with strike price of $9.07 (the low price of the quarter). This form was filed 8

4  days after the initial transaction in violation of the Sarbanes Oxley Act.[34] This Form 4 was false

5  because the strike price and the date of grant were incorrect and the options were in the money at

6  the time of the grant.

7      Raquel Peasley filed other Form 4's on Mr. Eulau's behalf that were false because the

8  strike price and the grant date were incorrect and the options were in the money. Thus, Mr. Eulau

9  benefited greatly from the illicit options grants.

10

11     Mr. Eulau was a control person and had full scienter of all the accounting and financial

12  reporting issues. He was also a principal point of contact between PWC and WSGR.

13     43.     Defendant John D. Danforth ("Danforth") served as Senior Vice-President,

14  General Counsel and Secretary of the Company since October 8, 2001 until his demotion in July

15  2006.

16

17     Mr. Danforth as inside counsel had a duty to inquire and take action as well as warn the

18  board  (under part 205) of illicit options backdating and insider trading practices and yet chose

19  instead to participate. Mr. Danforth's demotion or withdrawal was foreshadowed in late 2005 by

20  the negotiation of a severance agreement with Rambus. Mr. Danforth was a control person for

21  Rambus. Mr. Danforth received, exercised and sold millions of dollars worth of backdated

22  options. Mr. Danforth claims that he filed his SEC Form 3 two days after his hiring date of

23  October 8, 2001. But Mr. Danforth had no signed grants on that day because Rambus has

24  admitted that signatures on this grant were not complete until 8 days later.

25

26

27  [34] Insiders are required to report transactions on Form 4 within two business days following the day of the
    transaction.

28                                    24

1    Mr. Danforth defense fails because he did not have the requisite supporting

2  documentation that any competent attorney would have required before filing Form 3 or Form

3  4's. Moreover, he did not correct his SEC filing when the documents authorizing his option

4  grants became available. He has shown that he knows what the reporting requirements are and

5  yet he sought to evade the reporting requirements. Mr. Danforth has full scienter.

6    Mr. Danforth was Rambus' principal attorney in charge of the FTC case and had intimate

7
8  knowledge of the evidence obtained by the FTC against Rambus as well as all the

9  communications between the FTC and Rambus leading up to the adverse findings by the FTC on

10  August 2, 2006. Mr. Danforth having advance warning of an imminent adverse FTC finding

11  against Rambus exercised his backdated options and sold the resulting stock while in possession

12  of this advance adverse information. Moreover, he communicated that knowledge to other

13  executives and directors of Rambus thereby permitting them to also benefit improperly.

14
15    Mr. Danforth also participated with Mr. Hughes and Sharon Holt in making materially

16  false/misleading public statements in conference calls that were designed to support or inflate the

17  price of Rambus stock. He did this while selling his own backdated stock and trying to keep the

18  other shareholders from selling their stock.  These statements are detailed later in this complaint.

19    Mr. Danforth helped conceal the FTC abuses that have devalued Rambus stock from the

20  plaintiffs. He did this while selling most of his backdated options.

21    Mr. Danforth also had intimate knowledge of Rambus' California antitrust lawsuit and

22
23  the damages that a victory in that case would likely bring as well as the costs associated with

24  losing that case. Yet he used that case to pump up the price of Rambus stock without

25  qualification. In 2006, Mr. Danforth was touting $10 billion damages in connection with this

26  case without qualification. He and other executives were selling their stock at the time. Mr.

27  Danforth knew exactly what he was doing. He deceived the Plaintiffs willfully and intentionally

28                                        25

1   as did Mr. Hughes and Sharon Holt.

2       Mr. Danforth seeks to hide behind the 10 B automatic sales plan exemption. However, he

3   was in possession of the materially adverse non-public information at the time he established the

4   plan. The 10 B Automatic sales plans were not intended to provide cover for executives

5   participating in fraud on the other shareholders. The evidence supporting the FTC findings

6   against Rambus was submitted in 2005 and Mr. Danforth examined all the evidence that was

7
    submitted and asked that it be placed under seal so that the other shareholders would not know
8
9   the adverse evidence. Thus the 10 b trading plans adopted by executives and directors in 2005

10  provide no cover for their sales in 2006.

11      Thus the cover-up was willful and intentional on the part of Danforth and the other

12  insider selling executives and directors as a consequence of this concealed adverse FTC

13  evidence. They cannot say that they did not know because they supplied the evidence to the FTC.

14
    Yet they concealed it from the shareholders of the company.
15
16      Mr. Danforth as both Corporate General Counsel and Secretary of the Corporation as

17  well Vice president had special knowledge and a special duty and to ensure that the corporate

18  records were honestly kept. Instead he chose to take advantage of his position for his own

19  personal gain.

20      44.   Defendant Kevin Kennedy ("Kennedy") has served as a Director of the

21  Company since April 2003 and he is currently the Chairman of the Board. He also served, since

22
    July 2003 as a member of the Compensation Committee. Moreover, he serves as a member of the
23
24  Corporate Governance and Nominating Committee, of which he is the Chairman. Mr. Kennedy

25  is a control person for Rambus. Mr. Kennedy was granted 100,000 shares in 2005 and that is

26

27

28

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)

1    more than authorized for directors.[35]  As Chairman of the Board, Mr. Kennedy is well aware that

2    this violated company policy.

3        Mr. Kennedy was fully aware of the damaging evidence given to the FTC in 2005.

4    Yet as Chairman of the Board he did not impose a stock sales and option exercise blackout at the

5    beginning of the year.

6        There is no report of Mr. Kennedy selling any stock in 2006. However, we will see

7
     elsewhere that it was possible for Sharon Holt, WSGR and PWC to not show the disposition of
8

9    their shares by transferring them to trusts or investment entities that had no reporting

10   requirements.

11       Mr. Kennedy and the other directors participated in the willful and intentional cover-up

12   of the financial fraud and the concealment of the adverse FTC evidence from the plaintiffs. He

13   cannot say that he did not know because he authorized the evidence supplied to the FTC. Yet he

14   concealed it from the shareholders of the company.
15

16       Mr. Kennedy also had knowledge as a consequence of his participation in the

17   Compensation Committee. Mr. Kennedy had full scienter.

18       45.    Defendant Laura S. Stark ("Stark") is Sr. Vice President, Platform Solutions.

19   Mrs. Stark joined Rambus in 1996 as Strategic Accounts Manager, and held the positions of

20   Strategic Accounts Director and Vice President, Alliances and Infrastructure, before assuming

21   the position of Vice President, Memory Interface Division in October 2000, until February 2005
22
     when she was appointed Vice President, Platform Solutions. Ms. Stark is alleged to have traded
23

24   on misappropriated material non-public Rambus information. Stark's stock holdings are not

25

26   [35] Continuing directors receive an initial 40,000 shares and additional 20,000 shares each year according to the
     company disclosures. This mean that Mr. Kennedy should have received not more than 100,000 shares total.
27   The 2006 Proxy statement shows that he had  152,500 shares. This is more than he should have and it is not a
     number ending in at least five zeros. These extra options are unaccounted for.

28

1    reported on the Proxy Statements until March 11,2005 at which time they were 393,646 shares.

2        Stark as a consequence of her intimate knowledge of Rambus' dealings with the industry

3    Was fully informed of Rambus' plan to do a patent ambush on the DRAM manufacturers'

4    JEDEC standard parts. It was common knowledge at Rambus among the executives and the

5    evidence supporting the FTC findings revealed this for the first time August 2, 2006.

6        Stark concealed this material non-public information but used it to exercise options and

7

8    sell stock at inflated values. Stark knew in the early part of 2006 that she needed to sell as much

9    stock as she could because she expected the stock price to fall when the truth of the FTC and

10   Financial deceptions were revealed. Stark sold outside 10 B trading plans. Stark is an insider

11   trader with full scienter.

12       46.    Michael Schroeder is Vice President, Human Resources. Mr. Schroeder has

13   served as Vice President, Human Resources since June 2004. Mr. Schroeder by virtue of his

14   position is alleged to be an agent of the option grant and new hire backdating practices at

15

16   Rambus.  Mr. Schroeder is alleged to have traded on misappropriated material non-public

17   Rambus information.

18       47.    Samir A. Patel is Sr. Vice President, Product Development and Production. Mr.

19   Patel joined Rambus in 1991. From February 2005 to March 2006, Mr. Patel served as Co-Vice

20   President of Engineering. From November 1999 to February 2005, he served as Vice President

21   of the Memory Interface Division. Mr. Patel held various engineering positions before becoming

22

23   Vice President, Memory Interface Division in November 1999. Mr. Patel is alleged to have

24   traded on misappropriated material non-public Rambus information including the submarine

25   patent scheme.

26       Patel as a consequence of his intimate knowledge of Rambus' dealings with the industry

27   was fully informed of Rambus' plan to do a patent ambush on the DRAM manufacturers'

28

1   JEDEC standard parts. It was common knowledge at Rambus among the executives and the

2   evidence supporting the FTC findings revealed this for the first time August 2, 2006.

3

4        48.    Sharon E. Holt is Sr. Vice President, Sales, Licensing and Marketing. Mrs. Holt

5   has served as Senior Vice President, Sales, Licensing and Marketing (formerly titled, Worldwide

6   Sales and Marketing) since August 2004. Ms. Holt is alleged to have accepted fraudulent option

7   grants while in possession of knowledge of Rambus submarine patent scheme.
8

9        49.    Kevin S. Donnelly is Senior Vice President, Technology Development. Mr.

10  Donnelly joined Rambus in 1993. From October 2000 to February 2005 he served as Vice

11  President, Logic Interface Division. Mr. Donnelly held various engineering positions before

12  becoming Vice President, Logic Interface Division in October 2000. From February 2005 to

13  March 2006, Mr. Donnelly served as Co-Vice President of Engineering. Mr. Donnelly is alleged

14  to have traded on misappropriated material non-public Rambus information including the
15
    submarine patent scheme.
16

17        Donnelly  as a consequence of his intimate knowledge of Rambus' dealings with the

18        industry was fully informed of Rambus' plan to do a patent ambush on the DRAM

19        manufacturers' JEDEC standard parts. It was common knowledge at Rambus among the

20        executives and the evidence supporting the FTC findings revealed this for the first time

21        August 2, 2006.
22
          50.
23

24        51.    Mr. Ed Larsen served as Vice President, Human Resources from September

25  1996.  Mr. Larsen served as  Sr. Vice President, Administration from December 1999 until

26  2003. Mr. Larsen is alleged to have participated and lent his signature to the fraudulent document

27  complained of herein. Mr. Larsen is also alleged to have accepted fraudulent options grants and

28                                                29

1  to have exercised and traded Rambus stock on the basis of misappropriated material non-public

2  information including the submarine patent scheme.

3       52.    Gary Harmon served as Vice President, Finance, Chief Financial Officer and

4  Secretary from March 1993 until December 1999. He was then appointed Vice President,

5  Finance, Chief Financial Officer and Secretary from December 1999 until July 2001. Mr.

6  Harmon resigned as an executive officer July 2001.

7
       Mr. Harmon was a control person during his tenure at Rambus and he is alleged to have
8
   helped prepare the fraudulent SEC registration and financial documents complained of herein
9
10 and lent his signature to many of those documents. He is also alleged to have misappropriated

11 material Rambus information in the exercise and sales of his stock options including the

12 submarine patent scheme.

13
       Mr. Harmon is a main beneficiary of Rambus' financial and FTC deceptions.
14
       53.    Subodh Toprani served as Vice President, Marketing from May 1994 until
15
   March 1997. From March 1997 until December 1999, he was General manager of the logic
16
17 Product division. He was appointed Sr. Vice President, New Ventures in December 1999 until

18 July 2000. Mr. Toprani is alleged to have been involved in the exercise options and sale of

19 Rambus stock using misappropriated material non-public information during his tenure at

20 Rambus. Moreover, he is alleged to have known and participated in the schemes complained of

21 and ruled against by the FTC. The FTC published evidence shows clearly that Toprani by name

22
   was involved in the concealment of the submarine patent scheme and antitrust actions. It also
23
   shows that the executives were fully aware of the legal consequences of Rambus actions should
24
25 they be discovered.

26       54.    Collectively, Defendants Tate, Davidow, Geschke, Dunlevie, Kennedy and

27 Farmwald may be herein as "Compensation Committee Defendants". These were the directors

28                                        30

1  who were responsible for the oversight of the Rambus option grants. Since the made or approved

2  the grants. These directors had full scienter.[36]

3      55.    Because the Compensation Committee and presumably the board of directors

4  delegated some compensation functions to Mr. Tate, Mr. Tate is - as the "one-man" Stock Option

5  Committee- considered part of the Compensation Committee.

6      56.    Defendants Davidow, Geschke, Dunlevie, Hughes,  and Farmwald are also

7
8  referred to as the "Audit Committee Defendants."  These are the directors who were responsible

9  for the oversight of Rambus financial accounting and internal controls.

10     57.    All members of the Audit Committee and the Compensation Committee are

11  "control persons" by virtue of their ability to influence and/or directly control these crucial

12  affairs of the Rambus.

13     58.    The Corporate Governance Committee    Corporate Governance/Nominating

14  Committee was formed in October of 2002, and consists of Drs. Davidow and Geschke and Mr.
15
16  Dunlevie, with Dr. Davidow acting as Chairman of the Committee.

17     The Corporate Governance/Nominating Committee recommends and approves Corporate

18  Governance Guidelines for Rambus to follow. In addition, the Corporate

19  Governance/Nominating Committee makes recommendations to the Board concerning the

20  appointment of directors to Board committees, the selection of Board committee chairs, and the

21  proposal of the Board slate for election.

22
23     59.    For convenience, Exhibit H is a table showing the constitution membership of

24  the Compensation, Audit and Stock Option Committees for each year. This covers both the

25  statutory and the equitable periods of this complaint.

26

27  [36] This scienter argument is very strong because the company transferred over 40% of its capital stock to insiders
    under the approval of the Compensation committee.

28                                    31

60.     The Audit committee meetings were reported as follows:

"The Audit Committee, which met one time during 1997…"
"The Audit Committee, which met four times during fiscal 1998…"
"The Audit Committee, which met four times during fiscal 2000…"
"The Audit Committee, which met four times during fiscal 2001…."
"The Audit Committee held five meeting during 2003."
"The Audit Committee held eight meetings during 2004."
"The Audit Committee held seven meetings during 2005."

61.     Under Delaware corporate law, actions approved by unanimous written

consents are effective on the date of the last signature (Del. C. § 141 (f)). This can be used to

determine the effective date of approval of corporate or committee actions.

62.     The following excerpts report the Compensation committee meetings (from the

SEC filings):

"The Compensation Committee, which met three times during 1997…."

"The Compensation Committee, which met two times during fiscal 1998…"

"The Compensation Committee met 1 times during 2000. "On 4 occasions, the
Compensation Committee by approved certain matters unanimous written consent. "

"The Compensation Committee, which met once during fiscal 2001." "On three
occasions, certain matters were approved by the Compensation Committee by unanimous
written consent."

"The Compensation Committee met 3 times during 2003."

"The Compensation Committee, which met 3 times during 2004…"

"The Compensation Committee, which met four times during 2005."

63.     The Compensation Committee membership is shown in Exhibit H.

64.     The Compensation Committee cannot claim that the obscene stock option and

warrant grants in 1999, 2000 and 2001 escaped their notice. They were so huge that by end of

CY-Q1 of 2000 all Rambus' profits were gone and the company's net income was enormously

32

1 negative.

2    65.    Geschke, Davidow and Dunlevie also constituted the Audit committee during

3 the same years. Thus they had complete knowledge of the company's financial statements and

4 compensation practices. As members of the Audit Committee they had the duty to oversee the

5 preparation of the SEC reports and manage PWC as well as interface with WSGR.

6    66.    The Compensation/Audit committee knew that Intel was pulling away from

7 RDRAM as the desktop memory standard. The committee who were also board members had to

8

9 approve the enforcement of the JEDEC memory patents. They knew all the material information

10 that would cause the huge inflation in Rambus' stock price and they also knew the materially

11 adverse information that was likely to cause the stock price to deflate. They "willfully and

12 intentionally" chose to conceal the materially adverse non-public information over many years.[37]

13    67.    The huge losses caused by these improper grants along with the their complete

14
knowledge of the material non public Rambus information is strong evidence of scienter on the

15
part of Geschke, Davidow, and Dunlevie during that time period of 1999-2001. It is clear that

16
they participated and engineered the abuses complained of herein during their tenure on those

17

18 committees.

19

20 **The Background of the Options Scandal**

21    68.    The origins of the problems with respect to the illicit option grant abuses date

22 back to the early 90's in Silicon Valley and involve the relationships between entrepreneurial

23 companies and their outside lawyers and accountants. The following New York Times article

24 (July 22,2006) summarizes this well:

25

26

27

[37] The FTC Commission Ruling on August 2, 2006 strongly supports this allegation.

28

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"…The practice of backdating options dates to the early 1990's but took on momentum during the frenzied days of the Internet era, when the competition for available talent was fierce. Numerous Silicon Valley insiders described the practice as routine — so much so that the universe of technology companies ultimately placed under the microscope may well far exceed the dozens already under scrutiny by the Justice Department or the Securities and Exchange Commission, if not both."

"There's been a lot of stuff going on in the Valley since the 1990's that has been pretty fast and loose," said Michael S. Melbinger, an executive compensation lawyer at Winston & Strawn in Chicago. Compensation plans were adopted "during the dot-com boom and bust," he said, "that were just sloppy at best…."

Few outsiders scrutinized these practices, though, and some were unaware of them. Backdating was often "a client-driven strategy with the accounting firms saying, 'Sounds O.K. to me,' " said Allan Koltin, the president of PDI Global, a consulting firm based in Chicago that works with many large accounting firms. "The client put the suggestion out there and the accounting firm, if they were smart enough and could figure out how to agree with the technology firm's perspective, they pretty much won themselves a new client."

69.    WSGR has been taking stock in pre-IPO and post IPO companies since the 1970's. They have taken stock in many companies and the stock is held both in the names of the partners and the WS Investments (which has many different reincarnations). The value of these stock holdings are/were enormous and include names like Google, KLA-Tencor, Brocade, etc.

70.    The failure of PWC to audit and/or to report the results of the audit of the options was not an accident and these problems have long been well known to accounting and

34

1  legal firms in Silicon Valley and have resulted with many companies being forced to restate their
2  fraudulent financial reports.

3      The failure of Rambus corporate counsel WSGR to report to the Board of Directors
4  regarding the illicit actions of the board and the committee of the board as well as their guidance
5  in establishing the illicit practices at Rambus is a subject of this complaint.

6      71.    This action stems from the public revelation that Rambus' directors and officers
7  engaged in a scheme and course of conduct to hide from public disclosure, by use of their
8  positions of control and power, the improper award of substantial and immediate benefits to
9
10 directors, officers and other employees of the Company, worth hundreds of millions of dollars, in
11 the form of back dated stock option grants to the detriment of the company and the public
12 shareholders.

13     72.    This fraudulent scheme began in 1998 and has caused the material
14 misstatement of the Company's income and assets in its SEC financial and proxy reports as well
15 its public statements to the media. This tremendous material fraud was intentionally concealed
16
17 from the investing public until May 30, 2006 when the Company suddenly announced it had
18 begun an internal investigation into the practice of backdating of stock options.

19     73.    On October 19, 2006, Rambus announced it would have to restate its financial
20 statements and would make the charges in excess of $200 million.  In April 2007, Rambus
21 reduced its estimate to 190 million after Mr. Tate's options expired and Mr. Danforth's
22 backdated options were repriced.
23
24     74.    Even though Rambus is a small company, it has been unable to restate its
25 financials because the records necessary to correct the financial statements are not available and
26 may have been destroyed as a consequence of the company massive destruction of documents in
27 1998, 1999 and 2000 when it instituted a document retention/destruction program (DRDP).
28

75.    There were subtle warning signs of this fraud for a number of years that now make sense in retrospect due to Rambus' acknowledgement of the false financial statements.

76.    In addition, the price of Rambus stock was further inflated by Rambus' concealment of the true status of RDRAM as a candidate for an industry standard memory and by the unfair business practices (FTC) associated with Rambus JEDEC patent portfolio in 1999 and 2000.

77.    Defendant Geoffrey Tate, the Company's Chairman and CEO was the "one man" Stock Option Committee for the period February 1997 through October 2003, in violation of the Company's 1997 Stock Option Plan. The 1997 Stock Option Plan restricted grant-making authority to a minimum of two persons, both of whom had to be outside directors or, alternatively, to the Board itself for transactions qualifying for 162 (m) tax deductions.

78.    Dr. Farmwald is designated as an "inside director" in the 1997 stock Plan.

79.    Backdated stock options and in the money stock option grants received by the 4 top executives do not qualify for 162 (m) tax deductions.

The presence of Dr. Farmwald on the Compensation Committee in 2002, 2003, 2005.and 2006 violated the 162 (m) requirement that "the awards are established by a compensation committee consisting solely of two or more "outside directors"

80.    The 1997 Stock Plan follows Section 422 of the Internal Revenue Code of 1986. Backdated options and options not at fair market value do not qualify for the incentive stock option tax deduction.

81.    The "one-man" Stock Option Committee was instituted at Rambus at the suggestion of WSGR. Under the 1997 Stock Plan this committee could issue employee options only to employees other than the top paid executives.

36

82.     There is evidence that WSGR was fully aware of the options backdating practices and that in some cases Sonsini himself has signed off on backdated options at other companies where he was a director as is related herein. There is now overwhelming evidence from other court cases showing that WSGR and/or its agents were beneficiaries of the options backdating and the other practices complained of herein. Rambus own registration filings show that WSGR held Rambus stock.

83.     WSGR was intimately involved in the establishment of Rambus options plans, preparation of SEC reports and contracts as well as corporate governance issues at Rambus.

84.     Beginning in November 2003, the Compensation Committee became directly responsible for the granting of options under the Plan and the Stock Option Committee was discarded.

85.     Foreshadowing the later revelation of the options fraud, on January 13, 2006, the Rambus board of directors entered into an agreement with Mr. Tate that cancelled 665,000 unvested stock options and 500,000 unvested common stock equivalents. Form 8-K (January 18, 2006) states the cancellation agreement (emphasis added):

"This Stock Option and Common Stock Equivalent Cancellation Agreement ("Agreement") is entered into effective as of January 13, 2006 ("Effective Date"), by and between Rambus Inc. (the "Company") and Geoffrey Tate (the "Board Member").

WHEREAS, the Board Member's stock options and common stock equivalent awards provide for continued vesting upon the Board Member's transition from employment and board membership to solely board membership; and

WHEREAS, **the Company has amended its forms of equity awards as of January 2006 to provide that such awards shall cease to vest upon a service provider's [38]transition** from employment and board membership to solely board membership (although stock options, to the extent vested on the date of such transition, will continue to remain exercisable while the service providers continue as board members); and

---

[38] The 1997 Stock Plan defines a "service provider" to be an employee, a director or a consultant.

37

1

WHEREAS, in light of the foregoing, because **the Board Member's employment**

2

**terminated on January 7, 2006 and because the Board Member views this as fair and**

**appropriate, the Board Member has requested that his outstanding stock options and**

3

**common stock equivalent awards be partially cancelled** to conform to the Company's new

forms of equity agreement in this regard; and

4

5

WHEREAS, under the Company's 1997 Stock Plan (the "Plan"), the Company granted

Board Member the following options which are not yet fully vested: an option to purchase

6

600,000 shares of Company common stock ("Shares") on August 23, 2001; an option to

purchase 400,000 Shares on November 21, 2002; an option to purchase 150,000 Shares on

7

November 25, 2003; an option to purchase 200,000 Shares on November 25, 2003; and an option

to purchase 100,000 Shares on December 3, 2004 (collectively the "Options");

8

9

**WHEREAS**, under the Plan, the Company granted the Board Member 250,000 common

stock equivalents on October 20, 1999, which were converted into 1,000,000 common stock

10

equivalents due to the Company's 4-for-1 stock split on June 15, 2000 (the "Common Stock

Equivalents"), 500,000 of which remain unvested"

11

12

86.    The statement (emphasis added) "….WHEREAS, in light of the foregoing,

13

because the Board Member's employment terminated on <u>January 7, 2006</u>…" is false. Mr. Tate

14

CEO employment terminated <u>January 2005</u> not in 2006.

15

16

87.    Rambus stock price closed at $34.25. Thus, Mr. Tates gave options worth

17

$30,717,000 back to Rambus with that agreement.

18

88.    Mr. Tate who actually left Rambus direct employment as CEO January 7, 2005,

19

had over 1,300,000 million unvested in the money options canceled. Mr. Tate was still Chairman

20

of the board at the time of this action. This cancellation of options that had been granted before

21

the change in rules would not have been otherwise forfeit.

22

89.    This massive cancellation of options worth $30,717,000 and the manner in

23

24

which it was done and reported further suggests the improper and undisclosed manner in which

25

they were awarded. Exhibit B reveals that these options have the red flags of option backdating.

26

90.    Rambus (in order to mislead the public) stated that these options were

27

cancelled at the request of Mr. Tate. According to Rambus' April 2006 Proxy Statement, just

28

38

these cancelled options were worth approximately $30,717,000. Rambus did not disclose that the options were backdated.

91.     These facts are compelling for the attempt to mislead the public into believing that Mr. Tate was conforming to a new company policy going forward when in fact the new policy adopted by the company was to provide cover for the return of the illicit options and to delay the news of the options scandal from reaching the public shareholders and the court.[39]

92.     After, cancelling Mr. Tate's options Rambus executives and directors proceeded to exercise options and sell stock until May 11, 2006. All insider trading and options grants should have been suspended pending resolution of the options fraud. This is strong evidence of scienter on the part of Rambus executives and directors.

93.     Exhibit A shows that other executives received the same option grants as the Mr. Tate's cancelled grants. Mr. Mooring in particular received just as many grants of the same options and was permitted to keep, exercise and sell them. Thus Mr. Mooring was permitted to keep backdated options worth  $30,717,000.

94.     Delaying the revelation of the options scandal was important because Rambus had an infringement trial scheduled, had just issued a new batch of spring-loaded stock options to insiders, and knew that the stock would increase quickly in price because of the new license contract with Fujitsu would be announced and a victory was expected in the patent infringement case.

95.     Executives and directors were leaving and Rambus acted to support the stock price in January, February and March by buying back stock at _inflated prices_ in the open market

---

[39] This is cumulative evidence of scienter on the part the board of directors. They were covering up in advance of the emergence of the options scandal.

1  and touting the company in press releases and through analyst reports supported the stock price

2  as follows:

| Period | Total Number of Shares Purchased | Total Paid | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs |
|---|---|---|---|---|
| 1/01/06 - 1/31/06 | 500,000 | $ 15,187,375 | $    30.37 | 500,000 |
| 2/01/06 - 2/28/06 | 200,000 | 5,767,700 | $    28.84 | 200,000 |

7  These buybacks were not beneficial to the company at those prices. This was obviously intended

8  to support maximum profits for the insiders selling their stock near the same price.[40]

9      96.    Rambus was strongly motivated to conceal the news of the options scandal.

10  Had this materially adverse news been released before completion of the patent infringement

11  trial, the insiders would have been unable to sell their stock at inflated prices. Moreover, it would

12  have become common knowledge in Santa Clara and the fraudulent acts of the Rambus

13  executives may have been used to impeach the character of the testimony of Mr. Tate, Mr.

14

15  Horowitz, Farmwald and others who testified at that trial. Also, the price of Rambus stock would

16  have been severely impacted as was demonstrated later in the year.

17      97.    Defendant Tate cannot credibly claim to ignorance of options, employment

18  date, or exercise date backdating because he was the "one man" Stock Option Committee and a

19  main control person during the period from 1997 through 2004.

20

21      98.    The members of the Compensation and Audit Committees [41]also cannot

22  credibly claim ignorance of these practices. These illicit practices had huge negative impact on

23  the company's capital assets and profits.   These illicit practices were the elephant in the

24  boardroom from 2000 onward.

25

26  _____

[40] This is evidence of a "insider" corporate culture at Rambus that had complete disdain for the company

27  shareholders.
[41] Specifically, Dunlevie, Davidow, Geschke, and Farmwald.

28                                          40

99.    Moreover, neither PWC nor WSGR can claim ignorance when they are collaborating with Rambus in the production of the many 10-K and 10-Q, registration reports and proxy statements that deceptively characterized the backdating practices that have proved so harmful to the company.

100.    Indeed WSGR and PWC closely collaborated in the production of the S-3 registration statement for the convertible bond that was by virtue of its incorporation of the false financial statements fraudulent. Both signed attesting to this registration report under the 1933 Exchange Act and each is liable as a consequence. The names of the writers of that document and other participants are an object of discovery.

101.    During the same period in early January 2006 the board resumed its practice of granting spring-loaded options to company insiders in advance of the announcement of Fujitsu contract and the patent infringement trial.

102.    The granting of "spring-loaded" options is made simple by allowing massive unscheduled options grants and could be completely eliminated by fixing the dates on which option grants are allowed.

103.    2,000,000 deep in the money common stock equivalents (split adjusted) were awarded by employee contract under the 1997 Stock Option Plan to Mr. Tate and Mr. Mooring presumably on October 20, 1999.

104.    An additional grant of more than two million stock options was made to certain unreported employees.

41

105.    Mr. Tate and Mr. Mooring each received another grant of 1,000,000 employee stock options with a strike price of $15.67 also dated on October 20, 1999. This is a violation of the restriction that employees receive no more than 100,000 shares[42] per employee per year.

106.    The Stock Option Committee (aka Tate) had no authority to grant executive stock options according to the proxy statement at that time. Moreover, Tate had no authority to grant beyond 25,000 shares[43] per employee per year. His authority is expressed in the following excerpt from the January 10, 2000 Form DEF 14A (emphasis added).

> "The Stock Option Committee, which was established
> in February 1997, has the authority
> (subject to limitations, if any, which may
> be established by the Company's Board of Directors)
> to administer the issuance of stock options
> under the Company's 1997 Stock Plan (the "1997 Stock Plan")
> and the 1999 NonStatutory Stock Option Plan (the "1999 Stock Plan")
> of up to 25,000 shares per employee per year, other than executive officers."

The phrase "other than executive officers" could mean materially different things as follows:

a)  the stock option Committee has no restriction on the amount of options which can be granted to executives;

b)  the stock option Committee has no authority to issue options to executives;

Choice a) would be in conflict with section 162 (m) of the internal Revenue Code as well as the 1997 Stock Plan because neither Mr. Tate nor Mr. Mooring were outside directors during the relevant periods of time.

107.    It appears that the previous authorization statement was willfully crafted to be ambiguous. The name of the person who originated that misleading statement is an object of discovery.

---

[42] 4:1 split adjusted.
[43] Not split adjusted.

42

108.    The 1997 Stock Option Plan (1997 Stock Plan) was approved on October 27, 1997 and was modified on October 20, 1999 to include authority to issue the Common Stock equivalents. This enabled Tate and Mooring to further increase amount of stock being granted beyond the already huge increase in options grants.

The plan had a maximum number of grants in anyone year limited to 4,000,000 shares[44].

109.    The 1997 Stock Plan states the following limitations:

"The 1997 Plan provides for an annual increase in the number of Shares reserved and available for issuance under the 1997 Plan equal to the lesser of

(i) the number of Shares needed to restore the maximum aggregate number of Shares which may be optioned and sold under the 1997 Plan to 4,000,000 (after giving effect to a four-for-one split of the Registrant's Common Stock effective June 15, 2000),

(ii) four percent (4%) of the outstanding Shares, as of the last business day of such fiscal year, or

(iii) a lesser number of Shares determined by the Board of Directors."

110.    The 1999 Non Statutory Stock Plan (1999 stock plan) was approved October 20, 1999 had a maximum reload of 4,000,000 shares[45] per year as well as a plan limit of 14,800,000 shares.

111.    Both the 1997 Stock Plan and the 1999 Stock Plan were submitted to the SEC as part of a 1933 Exchange Act registrations for approval. The registration statements were attested to by both PWC and WSGR.[46] [47] As a consequence of the inclusion of the false financial statements and proxy statements all these registration statements were false from 1998 onwards in violation of the 1933 Exchange Act.

_____

[44] These are split-adjusted shares following the 4:1 stock split of June 2000.
[45] 4:1 split adjusted.
[46] Form S8 December 22, 1999.
[47] Form S8 June 6, 1997.

43

112.    The 1990 Stock Plan was terminated in May 1997 when the 1997 Stock Plan was approved. The 1990 plan was terminated with the adoption of the 1997 Stock Plan.

113.    The 1997 Stock Plan initially registered 4,000,000 million shares[48] registered as part to the S8 filing. The plan allowed restoration of the 4,000,000 shares for grants in the new fiscal year provided the number of shares outstanding was 100 million or more on the last day of the old fiscal year. Otherwise it was 4% of the outstanding shares.

114.    Exhibit K shows the option grant history as reported on the 10-K and 10-Q reports. It shows that Rambus over issued options under the 1997 and 1999 Stock Plans in both 2000 and 2001. The overage was 2,046,652 shares. The maximum that could have been issued legally was 8 million per year. A total of 18,000,000 shares or about 18% of the company were pledged by grants to insiders by this means in just those two years.

115.    The over granting of stock options is a violation of the 1997 and/or 1999 Stock Options plans limitations as registered with the SEC.

116.    There was no need for the creation of the 1999 Stock Plan that was purportedly created to issue Non-statutory options. The 1997 Stock Plan had the ability to issue the same Non-statutory options.

117.    The purpose of the 1999 Stock Plan was to allow the issuance of another 4,000,000 options per year thus doubling the amount of options that could be issued in any one year. The immediate purpose was to enrich the insiders at Rambus at the expense of the company and the public shareholders. The purpose was accomplished in 2000.

118.    Even the increase in options grants to 8 million maximum per year was not enough. Mr. Tate and Mr. Mooring took another 2,000,000 CSE's that did not count against the 8,000,000 maximum options grant limit in effect after the 1999 Stock Plan was activated.

---
[48] Adjusted for the 4:1 Split.