119. The 1999 Stock plan was approved on October 20, 1999 and supposedly endorsed by the board of directors and certified by PWC and WSGR. This is the same date that Options and 2,000,000 CSE's were backdated to.

120. The public shareholders did not approve the 1999 Stock Plan.

121. Thus, Mr. Tate who was CEO and chairman of the Board of directors and also head of the "one-man" Stock Option Committee intentionally with the approval of the board of directors engineered the massive transfer of corporate capital assets to Rambus insiders in 2000 and 2001. WSGR and PWC certified the 1999 Stock Plan registration reports.

122. A review of the reported meetings of the Compensation Committee shows one meeting was held in FY2000. Thus, it appears that Mr. Tate simply preempted the Compensation Committee and the Board of Directors or they were acting as one committee in violation of the 162 (m) and the 1997 Stock Plan.

123. When the $171 million compensation charge was incurred and reported the Board of Directors and the Audit/Compensation Committee could not have failed to notice. It was a huge elephant in the boardroom. The stock tumbled down on the unexpected news as documented herein.

124. The year 2000 Audit and Compensation Committees consisting of Davidow, Dunlevie, and Geschke are liable for aiding and abetting the fraudulent SEC filings instead of correcting them.

125. Mr. Tate as an inside director and the CEO is liable also for violating the 162 (m), 1997 Stock Plan, the fraudulent backdating of employee stock options and new hire dates, insider trading while in the possession of materially adverse non-public information.

126. The Board of directors could have made appropriate corrections at the time these material errors were discovered but instead decided to cover up. As a consequence, both

45

the Board of Directors and the Compensation Committee are liable for the 1933 and 1934 Exchange Act violations. Thus Mark Horowitz, P. Michael Farmwald "inside" directors are implicated in the continuation of this fraud for all these years. Mr. Mooring who was also a director and an officer and a principal beneficiary of the fraud was also a control person in the fraud like Mr. Tate.

127.    The language in the 10-K, 10-Q and Proxy statements have been intentionally made ambiguous and deceptive by the attorneys and accountants that prepared these documents for Rambus and/or modified by Rambus personnel.

The purpose of these deceptions has been to draw the public shareholder's attention away from the massive transfer of corporate capital assets to Rambus insiders and deflect them from the path of inquiry with respect to the improprieties in the stock and option grant processes.

128.    WSGR is Rambus' corporate attorney and WSGR prepared the IPO and Convertible bond Registration documents as well as the 1997 and 2006 SOP and the 1999 Employee Stock Purchase Plan.

129.    WSGR is responsible for their contribution to the deceptive and misleading statements in the SEC reports for client Rambus in the violation of the 1933 and 1934 Exchange Acts by not reporting the matter and insisting on correction. Failing that, they could have resigned their responsibility. They did neither. Instead WSGR participated in concealment of Rambus' 10-year fraud.

130.    WSGR along with PWC and Rambus signatories are directly liable for violations of the 1933 Exchange Act with respect to the false statements contained in the SEC Convertible Bond registration report of 2005.

131.    PWC can not credibly claim that they were ignorant of these problems when they helped prepare the filings and attested to these same deceptions quarter after quarter and year after year and performed internal control audits in 2004 and 2005.

132.    The materially adverse set of grants on October 20, 1999 was not reported in the Form Def 14 A Proxy Statement filed on January 10, 2000 even though they were purportedly made October 20, 1999.

133.    There is evidence that the October 20, 1999 contracts for the Tate and Mooring's CSEs were backdated in addition to being in violation of the 1997 Stock Option Plan.[49]

Inspection of the closing prices for the 4th Quarter shows that the split adjusted closing price on October 20 ($15.67) was within one penny of the lowest closing price of the quarter. The lowest price of the quarter occurred on October 1, 1999 ($15.66). Rambus has admitted that the options were frequently backdated to the low price of the quarter.

134.    Exhibit B #10 strongly suggests that the other CSE's were backdated to October 20, 1999 as well. This is strong evidence of scienter by Tate, Mooring and Larson.

135.    The probability that 6 option grants could be dated at the low price of a quarter and one options grant could be priced at the low price of the year can easily be calculated by the formula $(1/250)*(1/63**6)$. This yields a probability of 1 chance in 15,630,875,552,250 that these specific option grants were not backdated. Thus there is overwhelming statistical proof of options backdating.[50][51]

136.    There is also extremely strong statistical evidence for spring-loading.

---

[49] The backdating of a common stock equivalent vesting contract is an illegal alteration of company documents and strengthens the scienter inference because it can only be a "willful and intentional" action.
[50] More sophisticated models using the T-test to accept or reject the backdating hypothesis lead to even stronger results.
[51] There are approximately 250 trading days per year and approximately 63 trading days per quarter.

47

1   If we require that price of the stock be higher at 2, 5, and 10 and 22 days after the grant day then

2   it is easy to calculate the probability. In exhibit B there are 14 grants that exhibit these strong

3   characteristics. Using the flip of the coin model, the probability of anyone of these events is 1

4   chance in 16. The probability of 14 of these events is $1/(16)^{**}14$ or 1 chance in

5   72,057,594,037,927,900. Again this is overwhelming statistical evidence of spring loading.[52]

6   137.    More refined probability models would take into account the closing price on

7   each successive day. However, this would lead to even stronger inferences of backdating and

8

9   spring loading of options by management. Thus, the simpler models are quite sufficient to

10  statistically prove backdating and springloading.

11  138.    There is evidence that the actual contracts signed by Mr. Tate, Mr. Mooring and

12  by Mr. Larsen were also backdated. Oct 20, 1999 is coincident with the backdating date of other

13  stock options granted to Tate, Mooring, Larsen and others by Tate.

14  139.    The backdating of these various instruments is further evidence of the scienter

15  and state of mind of Mr. Tate, Mr. Mooring and Mr. Larsen.

16

17  140.    Tate and Mooring got half as many common stock equivalents (warrants) as

18  was given to Intel Corporation as an incentive to promote RDRAM exclusively. Intel was

19  supposed to pay Rambus $2.50 per share when the CSE's vested. Tate and Mooring appeared to

20  have paid nothing. They simply took Rambus capital stock for themselves.

21  141.    By March 13, 2000 Tate's common stock equivalents were in the money

22  $108.7 million dollars as were Mr. Moorings with the stock closing at $111.27 per share.

23

24

25

26

27  [52] More sophisticated models using the T-test to accept or reject the spring-loading hypothesis lead to even stronger
     results.

28

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1   This constituted a massive diversion of corporate capital to the insiders and reveals the primary

2   motivation of management during this period of time.[53]

3       142.    Tate's October 20, 1999 employee options grant was in the money another

4   $95.6 million as was Mr. Mooring's by March 13, 2000.

5       143.    Mr. Larsen received 160,000 of the backdated October 20, 1999 options grants

6   that on March 13, 2000 were worth $15,296,000.

7       144.    When the stock options are valued at "fair value" under FAS123 the net income

8   of Rambus from 1997 through Q1 –2006 is –$109,398,000.

| Year | Net Income (thousands) | |
|------|------------------------|---|
| 1997 | $1,586 | |
| 1998 | $5,299 | |
| 1999 | $5,413 | |
| 2000 | -$117,846 | |
| 2001 | $3,098 | Q4 |
| 2002 | $12,141 | |
| 2003 | –$4,806 | |
| 2004 | –$492 | |
| 2005 | $3,056 | |
| 2006 | $1817 | Q1 |
| **Total** | -$109,398 | |

20      145.    The $ 190 million charge now expected by Rambus drives Rambus net income

21  to approximately -$ 300 million dollars. If this had been known the Plaintiffs would not have

22  invested in this stock. What a coincidence! This is the same amount of money borrowed with the

23  $300 million convertible bond.

24      146.    The 10-K for 2000 (September 30, 2000), states the following common stock

25  was issued (in thousands).

26

27  [53] It is still not known what profits were realized by  Mr. Tate and Mr. Mooring from the 1,000 CSE that vested in
    March 2000.

28                                  49

|  |  |
|---|---|
| Issuance of Common Stock upon exercise of options, net | 2,300 |
| Issuance of Stock Purchase Plan | 179 |
| Issuance of Common Stock from Common Stock Equivalents | 200 |

This shows that 200,000 of the common stock equivalents that allegedly vested in calendar CY: Q1-2000 was exercised by September 2000.

147.    The 10-K filed for the year 2000 shows that no money was paid to the company for the 200,000 Common Stock Equivalents that were exercised. This false and/or misleading statements below were reiterated until the 2004 10 K misleading the public into thinking that the strike price of these warrants was $2.50 per share as follows:

"

"In the first quarter of fiscal 2000, we granted our Chief Executive Officer and our President a combined total of 2,000,000 Common Stock Equivalents (CSEs) and to our employees approximately 2,160,000 options to purchase our Common Stock at $2.50 per share. An additional 494,500 of these options were granted to employees in fiscal year 2001."[54]

"In the first quarter of fiscal 2000, the Company granted to its Chief Executive Officer and to its President a combined total of 2,000,000 Common Stock Equivalents (CSEs) and to its employees approximately 2,160,000 options to purchase Rambus Common Stock for $2.50 per share. An additional 494,500 of these options were granted to employees in fiscal 2001."[55]

148.    The previous statement is changed in the 2004 and 2005 10-K but is still ambiguous, as it does not specify a strike price for the CSEs at all and contradicts the original statements.

"As of December 31, 2004, there were 1,000,000 contingent unvested Common Stock Equivalents, or CSEs, and 845,846 contingent unvested options, which vest upon the achievement of certain milestones by Intel relating to shipment volumes of RDRAM chipsets. These CSEs were granted to our previous Chief

---

[54] Rambus 2000 10-K
[55] Rambus 10-Q For march 31, 2000 period

Executive Officer (CEO) and President in 1999 and the options were granted to certain of our employees in 1999 and 2001. The CSEs were granted with a term of 10 years and the options were granted with an exercise price of $2.50 and a term of 10 years."[56]

149.    The 10-K filed for the year 2001 shows that $1,000 was paid to the company for the 800,000 Common Stock Equivalents that were exercised. This is despite the reiterated claim that the strike price of these warrants was $2.50 per share. Thus it appears that Mr. Tate and Mr. Mooring kept $1,999,000 belonging to the company.

150.    By February 13, 2004, after the Board abolished the Stock Option Committee The language of the 10-K report relating to the options had been changed to the following:

"These CSEs were granted with a term of 10 years and these options were granted with an exercise price of $2.50 and a term of 10 years."

This restatement is acknowledgement that the former statements regarding Mr. Tate's and Mr. Mooring's CSE grants were misleading. It is notable that they do not say anything at all a strike price for Mr. Tate and Mr. Mooring CSE's when in fact it was zero. This is evidence of scienter.

151.    Rambus and the Defendants cannot credibly argue that the illicit backdating of option grants (among many other illicit actions) and the systematic concealment of these acts of fraud are protected under the business judgment rule.

152.    On February 6, 2007 Chancellor William Chandler of the Delaware Court of Chancery opined on the business judgment defense as follows in the Maxim case[57]:

"Backdating options qualifies as of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."

This court also opined on the breach of fiduciary duty implicit in these acts as follows:

---

[56] Rambus 2005 10-K
[57] Ryan v. Gifford, Civil action No. 2213-N

51

"…the intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith."

153.    Chancellor Chandler stated that the statute of limitations was tolled that to the extent that the date on which the grants were actually issued is not the same as the date that the Defendants in public SEC filings represented that the grants were issued. The Defendants acted affirmatively to conceal facts that prevented the Plaintiffs from gaining information in an attempt to put the Plaintiffs off the trail of inquiry.

154.    Plaintiffs plead that Rambus through its officers and directors affirmatively submitted false option grant filings and financial reports to conceal materially adverse facts with the intent to prevent the Plaintiffs from gaining information that would have put the Plaintiffs on the trail of inquiry.

155.    The Sarbanes-Oxley Act of 2002 directly addressed the options backdating paper work issues by tightening the SEC accounting and reporting requirements and increasing penalties for violations. In addition, the liability of accountants under section 18 was increased if the accountant knowingly and intentionally participated in a materially false or misleading financial report.

## IRS 162(M) VIOLATIONS BY RAMBUS

156.    In 1993 the IRS enacted section 162(m) which caps a corporations tax deductions at $1 million per year for each of its 5 top compensated executives. Section 162 (m) limits deductions for compensation paid to covered employees, which include the CEO and the next four highest-paid officers reported in the company's annual proxy statement.

157.    The most significant exception to the section 162(m) is the one for performance-based compensation. Employer tax deductions arising from executive bonuses and stock options exercises will be excluded from the $1 million limit if they are paid under a "performance-based plan."

158.    In general, compensation qualifies as being performance based only if it satisfies each of the following four requirements:

    1) It is paid solely because of the attainment of one or more pre-established and objective performance goals;

    2) The pre-established performance goal or goals used to determine the awards are established by a compensation committee consisting solely of two or more "outside directors";

    3) The material terms of the performance goal or goals under which compensation is paid are disclosed and later approved by the shareholders before compensating the executive; and

    4) The compensation committee certifies that the performance goals and other material terms were satisfied before paying the executive.

159.    The presence of Dr. Farmwald on the Compensation committee violates the requirements of 162 as noted earlier and presumptively disqualifies the 162 (m) deductions.[58]

160.    The "one–man" Stock Option Committee consisting of Mr. Tate in the years from 1999 till the second half of 2003 (when it was terminated) violates the requirement that the

---

[58] Indeed it may be argued that the presence of Dunlevie and Davidow on the compensation committee was improper and that they should be classified as "inside directors" by virtue of their controlling interest in Rambus.

53

1  awards be established by two or more outside directors. Mr. Tate and Mr. Mooring were "inside

2  directors" and officers of Rambus during the period of the 162 (m) violations.

3      161.    The material terms of the performance goals or goals under which many of the

4  options grants were made were not either not disclosed at all or were disclosed in a misleading

5  way as set forth herein.

6      162.    Furthermore, there is no evidence available, which shows that the

7
8  Compensation Committee certified the performance goals, and other material terms of the option

9  grants were satisfied before paying the covered executives. Backdated option grants require

10  shareholder approval of the performance goals under 162 (m).

11      163.    Thus the records of the Compensation Committee and the board of directors

12  must be examined to determine the whole truth of the Rambus' 162 (m) violations. But this may

13  not be possible because of the extensive destruction of corporate documents in 1998, 1999, and

14  2000.

15

16      164.    The 162 (m) performance-based plan rules are applied differently for awards

17  of stock options and stock appreciation rights (SARs). Under this special rule, grants of stock

18  options will qualify as performance-based compensation (and be excluded from the $1 million

19  limit) if the following three conditions are met:

20          1) the compensation committee must make the grant;

21          2) the compensation program governing the award of stock options
22
23          must state the maximum number of options that can be awarded to

24          any employee during a stated time period; and

25          3) the exercise price of the stock option must be at least equal

26          to the stock's fair market value at the time of the option grant.

27  Rambus' backdated options and new hire dates violate 3).

28                                        54

Rambus' Stock Option Committee grants either violate 1).

165.    Rambus failed to satisfy the requirement that "the exercise price be at least equal to the fair market value at the time of the option grant" when it backdated its options in violation of 162(m) and the 1997 Stock Plan.

166.    The October 20, 1999 Common Stock Equivalent Grants were made under ambiguously stated vesting conditions that were never resolved.

167.    The October 20, 1999  option grants under the 1997 Stock Plan to Tate and Mooring had no stated performance goals. Also, there are no stated performance goals for the other employees.

168.    The October 20, 1999 ESOP option grants' performance goals were never presented to the public shareholders for approval.

169.    Nor is there any other record of those performance goals for performance based compensation were ever presented for approval to the public shareholders prior to compensating any covered executives.

170.    The accounting for both the stock options granted and for the CSE's that were granted is intentionally materially deficient and misleading.

171.    WSGR had Rambus stock as reported below:

"As of September 30, 1997, certain members of Wilson Sonsini Goodrich & Rosati, Professional Corporation, beneficially owned 2000 shares of the Company's Common Stock." (S-8 report October 28, 1997)

"As of September 30, 1998, certain members of Wilson Sonsini Goodrich & Rosati, Professional Corporation, beneficially owned 1,000 shares of the Company's Common Stock." (S-8 report Nov 13, 1998)

"As of September 30, 1999, certain members of Wilson Sonsini Goodrich & Rosati, Professional Corporation, beneficially owned 1,000 shares of the Company's Common Stock." (S-8 report Dec 20, 1998)

"As of September 30, 1999, a member of Wilson Sonsini Goodrich & Rosati,

1    Professional Corporation, beneficially owned 1,000 shares of the Company's
     Common Stock." (S-8 report Dec 20, 1999)

2        The full extent of the stock granted to WSGR is not accounted for by Rambus or WSGR

3    and is the object of discovery.

4

5        172.    The failure of WSGR and/or its agents including WS Investments (in its many

6    reincarnations) to disclose their Rambus stock transactions is material to the evaluation of the

7    SEC reports and constitutes fraud under California law in that WSGR did not speak the full truth

8    about its involvement in Rambus stock in its registration statements.

9        173.    Additionally, the failure of Rambus to account for grants of stock, options

10   and/or stock warrants to consultants breaches their duty to disclose such matters to the public

11   shareholders. In light of the other illicit practices complained of herein the failure to report is

12   perfectly logical and given the magnitude of these grants this provides strong evidence of

13   scienter on the part of the audit committee and PWC.

14

15       174.    Incentive stock options under the 1997 Stock Plan had a 10-year life and could

16   be granted only to employees.

17       175.    Non-statutory stock options under the 1997 Stock Plan had a 5-year life and

18   could be granted to service providers.

19

20       176.    Common Stock Equivalents may be awarded to Service providers under the

21   1997 Stock Plan.

22        "Common Stock Equivalents may be awarded to Service Providers either alone, in
          addition to, or in tandem with other Awards granted under the Plan and/or cash
23        awards made outside of the Plan. An Award of Common Stock Equivalents shall be
          made pursuant to a Common Stock Equivalent Agreement in such form as is
24        determined by the Administrator."

25

26

27

28                                56

177.    The following statement from the 2000 proxy statement is materially

misleading because it fails to state the extent of Mr. Tate's power to grant options and common

Stock Equivalents under the 1997 Stock plan:

> "Stock Option Committee. The Stock Option Committee, which was established in February 1997, has the authority (subject to limitations, if any, which may be established by the Company's Board of Directors) to administer the issuance of stock options under the Company's 1997 Stock Plan (the "1997 Stock Plan") and the 1999 NonStatutory Stock Option Plan (the "1999 Stock Plan") of up to 25,000 shares per employee per year, other than executive officers."

178.    Again the following statement from the 2000 proxy statement shows that the

issuance of the common stock equivalents is deceptive and misleading:

> "The 1997 Stock Plan permits the Board of Directors or the Committee to grant stock options, stock purchase rights and Common Stock equivalents to employees on such terms as the Board or the Committee may determine. ....The Committee has the authority to grant and administer stock options to all employees of the Company. In determining the size of a stock option grant to a new officer or other key employee, the Committee takes into account equity participation by comparable employees within the Company, external competitive circumstances and other relevant factors..... The vesting of these additional stock options usually will not begin until previous option grants have become fully vested..... The Committee believes that such stock plans align the interests of the employees with the long-term interests of the stockholders."

From this statement it is not possible to tell whether they are referring to the "one-man"

stock option Committee or the Compensation Committee but an analysis of the above statement

yields the following:

> The term "Stock Option Committee" implies that it can only grant options.

> The Common Stock Equivalents are not options they are basically warrants and thus one would conclude that Mr. Tate had no authority to issue the Common stock equivalents.

> The meaning is best taken as Committee is the Compensation Committee.

1    However, the statement is "misleading" and fraudulent under California because it does

2  not tell the whole truth. Under federal law it is also misleading and in violation of the intent of

3  the 1934 exchange act.

4

5    179.    There is also evidence that the 1997 Stock Plan was not administered properly

6  with respect to the designation of Incentive Stock Options versus Nonstatutory Stock Options as

7  follows from 6 (a):

8        "To the extent that the aggregate Fair Market Value of the Shares with respect to
9        which Incentive Stock Options are exercisable for the first time by the Optionee
         during any calendar year (under all plans of the Company and any Parent or
10       Subsidiary) exceeds $100,000, such Options shall be
         treated as Nonstatutory Stock Options."
11

12    All the ISO options were treated as ISO options under 162 (m) and not converted to

13  nonstatutory options when the $100,000 threshold was surpassed.

14    180.    No more than 1 million non-statutory stock options[59] could be granted under

15  the 1999 Non-statutory plan. The recipients of these options grants are unknown.

16    181.    WSGR disposed of most of its options prior to filing the S-8 registrations. The

17  options grants were transferred to WS Investments and/or sold prior to the filing of the

18  registration statements in order to conceal this from the public.

19

20    182.    WSGR was the author of all the employee stock option plans as well as all the

21  registration reports and options contracts. Thus, WSGR had an intimate knowledge of Rambus'

22  option grant process.

23    183.    Plaintiffs seeks discovery to determine the burden of responsibility WSGR

24  must bear for its acts with respect the 1933 and 1934 Exchange Act violations and also the

25  violations of California state law.

26

27  ──────────────
    [59] Non-split adjusted.

28                                58

184.    PWC either negligently or recklessly failed to audit the 162 (m) violations or it recklessly disregarded Rambus failure to comply with 162 (m).

185.    WSGR as Rambus corporate attorney also failed to act to correct Rambus 162 (m) violations. In fact, WSGR compounded the errors by failing to disclose these violations in preparing the registration statement for the Convertible Bond and in its preparation of the SEC filing.

## The Early Years: Fraud and Insider Trading

186.    The price of Rambus securities in 1999 and 2000 was highly dependent on the market's perception that Intel supported Rambus RDRAM.  It is now known that by 1998 Rambus knew that RDRAM was unpopular with the DRAM Manufacturers and might never achieve dominant market share. The DRAM manufacturers preferred the emerging JEDEC memory standards SDRAM and DDR.  Also, production of the RDRAM parts was not yet established sufficiently for Intel.

In fact, during this time, Intel was forced to pay a premium to semiconductor manufacturers to manufacture the new Rambus memory (RDRAM) to meet the needs of Intel. Due to the complexity of RDRAM and its high prices, semiconductor manufacturers resisted manufacturing such chips, and only did so after Intel had agreed to pay them a premium. *See Client Server News*, 1/24/00.

187.    In late 1999 and early 2000, Intel had difficulty launching its new microprocessors because it was experiencing difficulties integrating Rambus RDRAM memory into the Intel Camino PC Platform and because Rambus memory was relatively expensive and in short supply and difficult to test.

188.    As a consequence of these technical difficulties Toshiba and NEC

59

1   suspended production of RDRAM and shifted production to the JEDEC SDRAM as shown in

2   this DOW JONES news release on October 5, 1999:

3
            "TOKYO (Nikkei)--NEC Corp. (J.NEC or 6701), Toshiba Corp. (J.TOS or
            6502) and other companies are suspending production of Direct Rambus
4           DRAMs, The Nihon Keizai Shimbun reported in its Wednesday morning
            edition. The Rambus chip is seen as the next big thing in computer memory but
5           demand for use in PCs will likely fall short of expectations since Intel Corp.
            (INTC) has pushed back the release date for its 820 chipset.
6           NEC has stopped making Rambus chips and is refitting
7           facilities in Kumamoto and Scotland for synchronous DRAM
            production. The company had planned to ship
8           about one million Rambus chips monthly to PC makers from the
            October-December quarter, the newspapers said.
9           Toshiba halted output of Rambus chips it was making for PCs, but will
10          continue producing them for the PlayStation 2 game console to be
            marketed next spring by Sony Computer Entertainment
11          Inc. (7930), the report said. Samsung Electronics
            Co. will also refit a plant so it can switch to synchronous DRAM output.
12          Intel was to begin 820 chipset shipments at the end of September but has
            suspended plans for the moment and is not saying when it might
13          reschedule the release. It is not the first time Intel has delayed the 820's debut."

14
        189.    In fact, Rambus' ability to secure RDRAM licenses from the DRAM
15
16  manufacturers was largely dependent on the Rambus Intel contract. An exception to this was in

17  the game computer industry as exemplified by Sony and Nintendo.[60]

18      190.    In order for Rambus to succeed it had adopted a strategy of pushing RDRAM

19  and planned to assert its patents that covered the JEDEC standards beginning in early 2000 after

20  the launch of RDRAM in the Intel Camino platform.

21      191.    Evidence has emerged in the Rambus patent litigation that Mr. Karp and
22
    Steinberg as well as the other Rambus executives were fully aware that they were losing Intel's
23
24  commitment to RDRAM by the middle of 1999. This fact was not disclosed to the public

25  shareholders and it was a very adverse material fact. Had this been known publicly by 2000 the

26  perception of a DRAM monopoly would not have taken hold.

27
    ---
    [60] The game industry did not need large amounts of memory and benefited from RDRAM granularity.
28

192.     Karp had a battle plan to enforce JEDEC SDRAM /DDR patent portfolio on the industry if RDRAM failed.

193.     Instead, Rambus hid this material adverse fact from the public and used a clause in its RDRAM contract with Intel to prevent Intel from endorsing any alternative to RDRAM and this triggered the run up in the price of Rambus stock in early 2000. By that RDRAM contract, Intel was barred from openly supporting any other competitive DRAM memory technology publicly.

194.     Rambus- knowing fully this materially adverse non public information- issued insiders huge amounts of company stock that had vesting clauses that would be triggered by the run up in the stock price they knew would happen.

Rambus engineered the price run up by <u>omitting the materially adverse information</u> from the press releases and in discussions with industry analysts and the public that led to the speculative run up in the stock in early 2000. Rambus successfully suppressed the news that Intel was pulling out of exclusive support for RDRAM.

Rambus then sued Hitachi using the new JEDCE Patent portfolio and this created the impression that Rambus had a monopoly on all synchronous DRAM memory being manufactured. This greatly inflated the price of the stock to over $400 per share in February 2000.

195.     The memory industry and Rambus knew many of these facts but the facts were concealed from the public by Rambus and then exploited by Rambus insiders.

196.     Rambus against Hitachi filed a patent infringement lawsuit by the end of January 2000 in which Rambus asserted that the JEDEC standard SDRAM infringed their heretofore hidden patents. These infringement suits against the DRAM manufacturers served as disincentives to the manufacturers to reduce the cost of RDRAM.

61

197.    As RDRAM faltered in the market Rambus' stock price became highly dependent on its ability of to collect royalties on JEDEC compliant SDRAM and DDR memory and controllers. Without these royalties on JEDEC compliant parts, Rambus revenues and the price of Rambus securities would have been greatly reduced.

198.    Exhibit E4 shows the price action of Rambus stock in the year 2000. There are two major peaks corresponding to the hype after the Willamette processor announcement at the Intel Developers Forum in February and the Hitachi license/settlement in June. After that the stock deteriorated as the concealed truth became known that Intel was not committed to RDRAM.

199.    The rapid run up in price of Rambus stock beginning in the first few weeks of February 2000 was due in a most significant measure to Intel's announcement of the Willamette Processor. This was a processor that supported only RDRAM.  This created the public perception that Rambus would succeed in establishing RDRAM as the industry standard dynamic memory for PC and workstations.

200.    Moreover, as the market digested the news of the Hitachi JEDEC patent infringement suit, it perceived Rambus as being in a monopoly position for the collection of royalties in the worldwide DRAM market.

201.    Analysts were instrumental in the rapid run up in Rambus stock price during March 2000.  Rambus made no effort to caution the analysts. For example, the following news was released on March 22, 2000 by Michael Kanellos at CNET News.com:

> "Mark Edelstone, an analyst at Morgan Stanley Dean Witter, raised his target price for the stock from $110 to $500 today. Whether or not related to the Edelstone's statement, Rambus stock climbed today, erasing yesterday's perilous drop of more than $50.

At the end of regular trading today, Rambus had risen $83.86, more than 31 percent, to close at $350.38. The stock closed yesterday at $266. "

Most of these press releases occurred near the stock's high prices in March. and on March 14, 2000 Rambus chose to announce a stock split. Thus there was a flurry of activity by analysts and the company in March to drive the stock price up.  With a $100 million dollars at stake Rambus executives Tate and Mooring were working to get the stock price up even though they knew there were materially adverse information.

202.    Mr. Tate and Mr. Mooring by virtue of the senior management positions knew Intel's new 86 Processor "Willamette" was going to be released in 2000 long before most people in the industry and certainly before the public knew. They also knew when the Sony Playstation 2 was going to be released.

203.    The key issue behind this "spring-loading" of options grants is really disloyalty. Mr. Tate who was also a director and CEO of Rambus used this non-public knowledge to enrich himself while avoiding shareholder-imposed requirements. He cannot be said to have been acting in good faith as a fiduciary. While this complaint's charges do not rely on the good faith issues per se the persistent lack of good faith underlies the failure of Rambus executives to disclose. It is also the root of Rambus executive breach of their duty of candor to shareholders.

204.    In early March 2000 Sony launched the PS2 in Japan. Rambus also knew that the PS2 would be launched in 2000 before the public and this was no doubt a factor in their options grant strategy.

205.    Also in early March 2000, Samsung announced that it planned to increase RDRAM production by 500% over the course of a year to supply RDRAM. This caused the stock price to rise to with a perception that RDRAM was more likely to succeed.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1  Samsung was a recipient of Rambus incentive stock and therefore had a reason to make

2  this public statement on behalf of Rambus, as it would increase the value of its grants.

3  206.  Mr. Tate, Mr. Mooring and the board of Directors concealed from the public

4  the materially adverse fact that Rambus was at serious risk of equitable estoppel and could be

5  prevented from collecting royalties on JEDEC compliant memory and controllers.

6  Rambus had been warned many times of these estoppel issues from 1993 onward. In 1996,

7  Rambus withdrew from JEDEC because of this very issue.

8

9  207.  Rambus granted nearly 9 million backdated and spring-loaded options and

10  another 6,860,000 common stock equivalents in 2000. This was approximately 16% of the

11  capital stock of the company.

12  208.  Chancellor Chandler in the Delaware court on February 6, 2007 issued his

13  opinion regarding "spring-loaded" options as follows:

14

15  "Granting spring-loaded options, without explicit authorization from
   shareholders, clearly involves an indirect deception. A director's duty of
   loyalty includes the duty to deal fairly and honestly with the shareholders for

16  whom he is a fiduciary. It is inconsistent with such a duty for a board of
   directors to ask for shareholder approval of an incentive stock option plan and

17  then later to distribute shares to managers in such a way as to undermine the
   very objectives approved by shareholders. This remains true even if the board

18  complies with the strict letter of a shareholder-approved plan as it relates to

19  strike prices or issue dates."[61] (page 53)

20  209.  Rambus has systematically used "spring-loaded options" throughout its history

21  as a public company and continues to do so currently as is evidenced by Rambus' February 2007

22  stock options grant to insider's just days before the FTC Remedy was made public.

23

24  210.  The Rambus 10Q for December 31, 1999 which was filed February 11, 2000

25

26

27  _____
   [61] Delaware Case no. 1106-N

28  64

1  Shows that Rambus again attempted to mislead investors by implying that "the company" had

2  granted the stock when in fact only the board of directors or the Compensation Committee under

3  the 1997 Stock Option Plan had the right to issue such options to the top executives.

4      In the fourth quarter of fiscal 1999, **the Company granted** to its Chief
5  Executive Officer and to its President a combined total of 500,000 Common Stock
    Equivalents (CSEs) and to its employees approximately 531,000 options to
6      purchase Rambus common stock for $10.00 per share.

7      This statement is very misleading because it implies that the board of directors or the

8  compensation committee approved this grant. There is no evidence available to support

9  that position. In fact, there is just are two CSE contracts signed by Mr. Larsen a subordinate of

10  Mr. Tate. There is no approval by the board of directors appearing on the contract.

11
    Just below that text in the same 10Q is the following different statement (emphasis added):
12

13      "In October 1998, **the Company's Board of Directors authorized** an incentive
    **Program** in the form of warrants on a total of up to 400,000 shares of Rambus
14      common stock to be issued to various Rambus Direct DRAM partners upon the
    achievement of certain product qualification and volume production targets."
15

16  Clearly, the wording "the Company granted " is misleading.

17      211.    The following quarter's 10-Q also contains more false statements which are

18  underlined in the copied text:

19      "Employee Stock-Related Compensation Expense. In the fourth quarter of fiscal
20  1999, the Company granted to its Chief Executive Officer and to its President a
    combined total of 500,000 Common Stock Equivalents (CSEs) and to its
21      employees approximately 540,000 options to purchase Rambus common stock for
    $10.00 per share. Vesting of these CSEs and options was contingent upon the
22      achievement of key indicators of success for Rambus. In order to tie employee
    rewards to an increase in stockholder value, vesting for a portion of these CSEs and
23      options was contingent on an increase in the price of Rambus common stock to
    greater than $200 per share for 30 consecutive days. This target was achieved by
24      the end of the second quarter of fiscal 2000, and resulted in a $171.1 million
25      employee stock-related compensation charge taken in the same quarter. "

26

27

28                  65

The grants to Tate and Mooring were presumably made on October 20, 1999 (although it appears that the documents were backdated as explained herein). Thus the grants were made toward the end of the first quarter of fiscal 2000 and <u>not in the fourth quarter of fiscal 1999.</u>

This false statement has the effect of fooling the plaintiffs into thinking that these grants were made as incentive grants rather than as spring-loaded grants.

212.   Mr. Tate acting as a "one-man" Stock Option Committee issued himself and Mr. Mooring 1,000,000 common stock equivalents (split adjusted) each that were deep in the money by contract in October 20, 1999 while planning for the assertion of JEDEC patent infringement was underway.

213.   In addition,  Mr. Tate issued himself and Mr. Mooring each an additional 1,000,000 (split adjusted) backdated options from the 1997 Stock Plan on the same date (October 20, 1999).

There can be no doubt that both these huge options grants were spring-loaded and based on non-public material company information.

214.   Rambus had two plans for achieving monopoly in the DRAM market. The first plan was based on RDRAM patents. The alternate plan was to the patent the JEDEC compliant SDRAM and DDR parts and their successors.

First, Rambus had to successfully launch the Intel PC platforms. If this was successful it might not even be necessary to pursue the JEDEC compliant parts with new patents because RDRAM had become dominant.[62]

---

[62] In fact, RDRAM never achieved more than a 10% market share.

66

However, together with the JEDEC patent portfolio Rambus could presumptively collect royalties on the majority of DRAM being produced in the world. The market has ranged between $20 and $34 billion per year worldwide. The JEDEC patent portfolio would be valuable if it became the dominant form of memory instead of RDRAM.

215.    Rambus waited to see the JEDEC standards for SDRAM.  Joel Karp and Neil Steinberg (former Samsung employees) were hired to obtain "submarine patents" covering those standards beginning in 1997 and 1998.

216.    Joel Karp said during the Hynix infringement trial in 2006 that when he came to Rambus in late 1997 he thought that the existing undisclosed patents on the JEDEC parts would be insufficient. Thus his first job was to get patents on the JEDEC parts.

217.    By 1999 Rambus through Karp and Steinberg had secured the additional patents that they believed would effectively cover the JEDEC standards.

218.    Rambus elected not to attempt to enforce the JEDEC patents until Intel had successfully launched the RDRAM PC Platforms in late 1999. This was the "don't rock the boat" imperative at Rambus.

219.    Mr. Tate, Mr. Mooring and indeed the entire board of directors of Rambus knew that the assertion of monopoly over the industry standard memory parts would cause the perceived value of Rambus stock to rise dramatically. They granted themselves spring-loaded and backdated options based on this material non-public information.

220.    Early in the year 2000, after the successful launch of RDRAM on the Intel PC platform, Rambus sued Hitachi Computer for infringement of its JEDEC submarine patent portfolio. Hitachi settled this lawsuit in June 2000 and Rambus stock reached an all time high price as expected.

221.    In order for Rambus to prevail in its assertion of patent infringement over the equitable defenses Rambus had to and did successfully conceal the evidence of submarine patent fraud from the industry until 2006. The FTC Commission in its Opinion revealed the evidence in its ruling against Rambus August 2, 2006.

222.    Had the weaknesses in Rambus' "submarine patent" portfolio covering the JEDEC standard memory parts, the stock price would have been significantly discounted in the year 2000. Also, if it had been known that Rambus management was backdating and spring-loading the options and stock grants, the stock price would have been adversely affected as was demonstrated in 2006.

223.    As a consequence of the concealment of these and other materially adverse non-public facts Rambus stock was artificially inflated in value.

224.    Mr. Tate and Mr. Mooring claimed that half the common stock equivalents granted (presumably) on October 20, 1999 had vested by the end of March 2000. This resulted in a huge and unexpected loss reported on the FY Q2 10-Q.

225.    Rambus earnings were reported on April 12, 2000. On that April 11, 2000 the stock closed at $61.50 (split adjusted) and closed at $53.45 per share on April 12, 2006. This was a 14.56% drop in value as a result of the report of this huge loss.  The stock price had run up into the earning report on April 10, 2000 and reached a high of 71.25 intraday before closing at $65.75 that day.

Two day later on April 14, 2000 the stock closed at $39.06. This amounted to a fall of 36.49 % in value.

By options expiration on April 20, 2000 the stock had not recovered its losses and closed at $41.87.

1      226.    The Rambus document Retention/Destruction program destroyed most of the

2   evidence needed by the FTC. The documents found on an employee's attic computer and tapes

3   found in a Rambus garage supplied the evidence necessary to document the fraud "fortuitously"

4   according to the FTC commissioner.

5      227.    The Rambus document destruction/retention program from 1998 through 2000

6   resulted in the destruction of documents that are relevant to the securities fraud complained of

7
    herein. Hynix[63] reports "board of directors' presentations, business plans, and meeting notes as
8
    well as "unidentified e-mails and other electronic files" were destroyed.
9

10     228.    The first substantial public evidence of the "actual fraud" scheme that the

11  Plaintiffs found was contained in Document 2200 of the Hynix versus Rambus case in the

12  Federal court of the Northern District of California (5:00-cv-20905-RMW). This was an order

13  regarding Summary Judgment to Rambus for Breach of contract and fraud. The order denied

14
    Rambus Summary Judgment for actual fraud.
15
            This order pointed out the following undisputed facts:
16

17              "Hynix asserts, and Rambus does not appear to dispute, that the "Other
                DRAM" provision was intended to cover the SLDRAM and also applies to
18              SDRAM. Hynix's Opp. Def.'sMot. Summ. J. at 14." (footnote 10)
                "It is immaterial whether the alleged infringed patents were issued, pending or
19              planned. The crux of the issue is whether Rambus knowingly omitted facts
                material to Hynix when it chose to disclose that SLDRAM devices likely
20              infringed Rambus patent in the course of preliminary contract negotiations
                related to the alternative DRAM technologies.
21              Notably, Hynix had indicated a clear preference to know whether it had to pay
                royalties to Rambus. *See, e.g.*, Vega Decl., Ex. 22. Rambus has not otherwise
22              explained why it needed to disclose the potential infringement of SLDRAM
                but not SDRAM (and later DDR SDRAM), including after it had entered in
23              the License Agreement with Hynix." (footnote 14)

24
                "It is undisputed that Rambus did not claim that Hynix might owe
25

26

27  _____
    [63] Hynix's Post Trial Brief, October 17,2005, CV00-20905RMW, page 9,lines 3-4.
28                                         69

royalties for use of the SDRAM or DDR SDRAM standards from the December 1995 effective date of the License Agreement until its June 2000 notice of infringement to Hynix." (lines 16-18)

229.    The FTC opinion on August 2, 2006 cited further "new" evidence of Rambus' fraudulent concealment of material facts with respect to the Hynix and the rest of the JEDEC companies. The FTC opinion is that Rambus deception constituted violations of the Sherman antitrust act and section 5 unfair business practices (emphasis added):

"Rambus withheld information that would have been highly material to the standard-setting process within JEDEC.

JEDEC expressly sought information about patents to enable its members to make informed decisions about which technologies to adopt, and JEDEC members viewed early knowledge of potential patent consequences as vital for avoiding patent hold-up.

Rambus understood that knowledge of its evolving patent position would be material to JEDEC's choices, and avoided disclosure for that very reason.

We thus find that Rambus engaged in representations, omissions, and practices that were likely to mislead JEDEC members acting reasonably under the circumstances, to their substantial detriment, and we **conclude that Rambus intentionally and willfully engaged in deceptive conduct."** (page 68)

230.    Additional facts and a chronology are presented in a consumer class action lawsuit filed 1/12/07 in the Federal court in the Northern District of California[64].

231.    The preceding shows that Rambus had formulated a alternative strategy to patent JEDEC DRAM as early as May 1992 following upon a report by William Garret in February 1992 that JEDEC would be pursuing SDRAM not RDRAM for standardization. This alternative plan was not revealed until the year 2000 when Rambus sued Hitachi for Royalties on

---

[64] Case no. C06-4852- RMW

JEDEC SDRAM. This alternative covert strategy that gave rise to the "submarine patent" fraud was incorporated into the Rambus 5 year business plan in June 1992.

232.    The fraudulent "exclusionary conduct" scheme revealed in the FTC ruling on August 2, 2006 has diminished and perhaps eliminated the ability of the Rambus to collect royalties on the SDRAM and DDR patents developed in the late 1990's. The value of the Rambus as a company is significantly dependent on the validity and enforceability of the affected patents.

233.    Rambus failed to disclose the actual and/or constructive fraud in the execution of their "alternate plan" and did conceal this materially adverse information to the detriment of the Plaintiffs. The Defendants had a duty to disclose this materially adverse information regarding Rambus covert strategy. Without this disclosure the Plaintiffs could not effectively evaluate the management's performance or Rambus' prospects of success. There was no legitimate business reason for this failure to disclose to either the JEDEC companies or to the Plaintiffs.

234.    The Rambus board of Directors has benefited from the exercise and sale of stock options as the history of the stock options sales and grants shows from 1997 till 2007. They are therefore not disinterested directors.

235.    As additional evidence of scienter extending through all the years of Rambus as a public company, there have been no reported purchases of Rambus stock in the public market by either the officers or directors of Rambus. They knew the materially adverse information and they cashed in their stock by selling it into a run up to the unwitting plaintiffs.

**The Scheme Would Have Been Unsuccessful Without The Assistance of PWC**

1   236.    PWC knowingly participated in Rambus' financial fraud by "attesting" to

2   Rambus' Board of Directors and to Rambus stockholder's that Rambus' financial statements

3   "present fairly, in all material respects"...."the results" and that the Rambus internal controls

4   were "effectively maintained" over the period from 1997 to 2006.

5

6           The beginning of each report begins with the following:

7           "To the Board of Directors and Stockholders of Rambus Inc…"

8   PWC's "attestations" of the management's financial statements were false and misleading and

9   facilitated the Defendants in committing their fraud on the Plaintiffs and the public.

10  237.    PWC's motive in participating in Rambus financial fraud was to retain Rambus

11  as a client and to benefit from the fees..

12

13  238.    In addition, PWC and/or its agents had pre-IPO and/or Post IPO stock or

14  options and benefited from an inflated stock valuation that would result from the concealment of

15  the financial fraud.

16  239.    In 1999 PWC settled charges with the SEC as follows:

17      "PWC Settles SEC Charges It Violated Auditor Independence Rules, 31 Sec. Reg.
18      & L. Rep. (BNA) 119 (Jan. 22, 1999)."

19      "PricewaterhouseCoopers settled administrative charges brought by the Securities
20      and Exchange Commission (SEC), which alleged widespread violations of rules
        limiting interests in firms being audited."

21      http://webtest.cisworld.net/lawnet/docs/articles/international/HTML/BA29.html

22  240.    Rambus had the ability to issue both common stock equivalents and non-
23
24  statutory stock options to "consultants". None of the grants to named "consultants" has ever been

25  reported in any SEC report. Thus there has been no reporting of these very material stock or

26  option grants in any SEC filings and the recipients of these grants have not been revealed.

27

28                                  72

241.    Plaintiffs submit that the stock and option grants to <u>outside consultants</u> are qualitatively and quantitatively material to Rambus financial reports. The failure to report the grants has been intentional and adverse to the Plaintiffs evaluation of the company reports.

242.    PWC, its agents or investment entities exercised options and/or sold Rambus stock while in possession of materially adverse non-public information.

243.    PWC as auditor is required to comply with SAS No. 99 as follows:

        a)    "The auditor is looking for an "intentional act that results in a <u>material</u> misstatement in financial statements that are the subject of an audit" (AU 316.05).

        b)    "The auditor is responsible for reporting. "Whenever the auditor has determined that there is evidence that fraud may exist, that matter should be brought to the attention of an appropriate level of management" (AU 316.79)

Management and shareholders who use the financial statements understand that an audit is only looking for fraud that may have a <u>material</u> impact on the financial statements. A misstatement of more than $200 million dollars is a material misstatement.

244.    PWC was fully aware of the materially adverse impact of stock options on the financial statements of Rambus. By September 2000, Rambus had incurred a $171 million dollar loss due to the grant and exercise of "in the money " stock options.

In fact, the materiality of stock option grants was greater than any other single expense in Rambus financial statements.

        "Employee Stock-Related Compensation Expense. As discussed below in the section entitled "Contingent Warrants, and Options,"
        a $171.1 million employee stock-related compensation charge was taken in fiscal 2000  related to Common Stock Equivalents granted to the Company's Chief Executive Officer and President and options granted to the Company's employees."

245.    Rambus revenues for the calendar year 2000 were only $95.1 million. Rambus recorded a loss of 191.9 million in CY2000.

73

1    246.    Rambus has admitted option-misdating practices continued from the years from

2  1997 to 2004. PWC intentionally or recklessly reported nothing material about the stock option

3  expenses from the audits in 1997 or any subsequent year. PWC in 2004 was fully aware of the

4  fraudulent practices of option backdating in its various forms. In fact, the Sarbanes–Oxley Act

5  (2002) directly addressed the issue of option backdating by tightening the reporting

6  requirements.

7    There were also legal cases of option backdating appearing as early as 2004. PWC was

8  required to deal with the expensing of the options in the year 2000 and subsequent years yet

9  either recklessly or intentionally did not audit Rambus options grants or did not report their audit

10  or having reported the results of their audit still attested to the accuracy of the false financial

11  statements.

12

13    247.    Rambus has admitted material misstatements on its financial statements in

14  excess of $200 million dollars. Despite nine years of audits not a single material misstatement or

15  disagreement between PWC and Rambus has been brought to the shareholders' attention and

16  PWC has continued to fraudulently, negligently and/or recklessly attest to the financial reports.

17

18    248.    PWC intentionally failed to report the results of audits of the options grant

19  practices and internal control procedures throughout the years from 1997 through 2006.

20    249.    The long association between Rambus and its PWC has resulted in a loss of

21  independence of PWC from Rambus Executives and their special interests.

22  Rambus states in its 2006 Proxy statement the following:

23

24    "PricewaterhouseCoopers LLP (or its predecessor, Coopers & Lybrand
     L.L.P.) has audited our financial statements since 1991. Representatives of
25     PricewaterhouseCoopers LLP may be present at the Annual Meeting to
     respond to appropriate questions and to make a statement if they so
26     desire."

27

28                                            74

The "continuous representation doctrine" allows that the statute of limitations may be tolled against PWC. Plaintiffs attended several annual meetings and PWC was not represented there.

250.    Rambus violated the Sarbanes-Oxley Act (2002) section 203 (j) by retaining the same lead auditor for PWC for more than Five years of audits. This action on the part of Rambus and PWC signals the loss of independence of PWC as follows:

Sarbanes-Oxley section 203 (j) requires Audit partner Rotation as follows:

> "(j) AUDIT PARTNER ROTATION—It shall be unlawful for a registered public accounting firm to provide audit services to an issuer if the lead (or coordinating) audit partner (having primary responsibility for the audit), or the audit partner responsible for reviewing the audit, has performed audit services for that issuer in each of the 5 previous fiscal years of that issuer."

251.    PWC audited Rambus annual statements for the years 1991 through 2005 as well as all the many of the quarterly reports until Q1-2006. The total net income reported by Rambus was $128,135,000 for those years.[65] The magnitude of the financial misstatements has been acknowledged by Rambus to be in excess of $200,000,000.

252.    Rambus issued a Form 8-K to re-price 59,445 options for John Danforth as follows:

> "On December 31, 2006, Rambus Inc. ("Rambus") entered into an amendment (the "Amendment") to two Stock Option Agreements, each dated October 8, 2001, between Rambus and John D. Danforth, Senior Legal Advisor to Rambus. The Amendment increases the exercise price per share from $8.00 to $11.72 for outstanding, unexercised options to purchase 59,445 shares of Rambus common stock held by Mr. Danforth.
>
> The two modified stock option grants are among those that Rambus has initially concluded appear to have been among those not fully and formally approved on the stated grant dates by the Rambus Compensation Committee so as to be among the options that will require a restatement of Rambus' financial statements as previously announced by Rambus on October 19, 2006. The modified grants were dated October 8, 2001, the

---

[65] When Compensation expenses are accounted for by FAS123, Rambus lost more than $109 million throughout those years.

initial date of Mr. Danforth's employment. However, Rambus has now
initially concluded that the two grants do not appear to have been fully and
formally approved by the Rambus Compensation Committee until eight
days later. Mr. Danforth was Rambus' General Counsel from October 8,
2001 to July 27, 2006 and continues to serves as Rambus' Senior Legal
Advisor."

The above 8-K release fails to inform us that Mr. Danforth was hired as the Senior Vice

President, General counsel and Secretary of the corporation. He was Rambus' chief compliance

officer. The 8-K also fails to inform us that the original grant was for 400,000 shares

$8.00 per share for an instant paper profit to Mr. Danforth of $1,488,000 in violation of the

shareholder approved option plan. Thus one of Mr. Danforth's first acts as a senior officer and

secretary was to violate the 1997 Stock Option Plan he was hired to protect.

253.    PWC was paid an extra $531,700 and $602,600 in 2005 and 2004 to audit the

effectiveness of Rambus' internal controls over financial reporting.   Rambus has now admitted

that their internal controls were defective. PWC failed to report "significant deficiencies" of the

internal controls or having reported the failure went ahead and "attested" to the effectiveness of

those controls as well as the bogus financial statements.

"Audit Fees consist of fees for professional services rendered for the audit of
the Company's consolidated annual financial statements and review of the
interim consolidated financial statements included in quarterly reports. In
2005 and 2004, audit fees also included $531,700 and $602,600, respectively,
in fees for professional services rendered for the audits of (i) management's
assessment of the effectiveness of internal controls over financial reporting;
and (ii) the effectiveness of internal control over financial reporting."

These audits were performed after Rambus dissolved the "one man stock option committee" in

late 2003.

254.    The Rambus Audit Committee is required by Public Company Accounting

Oversight Board (PCOAB) Auditing Standard No.2 to pre-approve the engagement after

determining that the Auditor's  "independence" can be maintained.

1  The Rambus Audit Committee could have selected another audit firm but chose PWC in spite of

2  the Sarbanes –Oxley section 203 (j) violation alleged herein.[66]

3      255.    PWC has a duty under Sarbanes-Oxley Act section 204 to make timely reports

4  to the Audit Committee of "all critical accounting policies and practices to be used".

5  PWC aided and abetted Rambus directors and management in "attesting" the audits of financial

6  reports and internal controls without including the results of their audits.

7
8      256.    It is clear that PricewaterhouseCoopers, LLP and its predecessor Coopers &

9  Lybrands; LLP (1997) has "continuously represented Rambus since 1991. The errors made in the

10  reporting the Rambus financials as attested by PricewaterhouseCoopers and Rambus tax returns

11  from 1997 on to 2006 were carried over from year to year and accumulated.  Moreover, the error

12  in one year's tax return or financial report is directly related to each successive year's error.

13      257.    The PCAOB cited PWC on December 15,2006 for audit deficiencies as

14  follows:

15

16          **"PCAOB Finds Problems At PricewaterhouseCoopers (PwC),"**
            by David Reilly, The Wall Street Journal, December 16, 2006; Page A

17          "The Public Company Accounting Oversight Board, in an inspection
18          report released Friday, cited PricewaterhouseCoopers LLP for
            deficiencies in some of its audits of public companies.
19
            The PCAOB noted the firm had failed in some cases to catch or address
20          errors in the way companies applied accounting rules or lacked sufficient
            evidence to back up some of its decisions. The PCAOB singled out for
21          criticism nine audits done by PricewaterhouseCoopers, saying in a
            number of the cases the firm failed to adequately check the value of
22          revenue, inventory and accounts receivable at companies whose books it
            was approving. The board's inspections entail reviews of a sampling of
23          audits, not every audit done by a firm."

24

25

26

27  [66] A different accounting firm would have uncovered the weaknesses in internal controls. Rambus could not afford
     for that to happen in the midst of their patent litigation.

28                                      77

258.    There is evidence that the big 5 accounting firms were giving their approval to the options backdating practices. Deloitte & Touche settled a malpractice suit with Micrel in March 2007. The Micrel case is almost identical to the Microsoft malpractice case. These practices date back to 1992 at Microsoft and 1996 at Micrel.

259.    The practices at Microsoft and Micrel were nearly identical and are described below[67]:

> "Under Microsoft's program, new employees were granted options that, at first, conformed to the norm: they had an exercise price equal to the price of a share of Microsoft at the market close the day before. But for the next 30 days, if the stock price fell, the option price would be "reset" to the lower price. In the end, new employees would get their options at the lowest trading price for the 30-day period following their date of hire. Using a similar mechanism, existing employees regularly received additional options priced at the lowest price for the month of July. An unidentified Microsoft official told the *Journal* that Microsoft's accountants at Deloitte had approved the programs, evidently opining that such options grants could be considered "at-the-money" grants — options priced at fair market value as of the day of the grant. Such options would not need to be expensed at all under the accounting rules of that time. (A Deloitte spokesperson says in an email that the firm "can't comment on advice the firm has given to a client.")
>
> In 1996, Micrel, in San Jose, began using a nearly identical 30-day pricing program, also allegedly blessed by its lead outside accountant at Deloitte, according to Micrel's complaint."

260.    Microsoft discontinued this practice in 1999 concluding it was illegal and taking a $217 million charge. Micrel continued the practice until November 2001 as follows:

> "Meanwhile, Micrel kept using its own 30-day pricing policy for two more years, until November 2001. By that time, however, according to Micrel's complaint, the lead Deloitte partner on the Micrel account had changed. The second Deloitte partner then allegedly disavowed his predecessor's opinion, and advised Micrel to discontinue the policy and make a restatement, which the company did. (The revisions added more than $50 million in expenses to its financial statements.) In

---

[67] Deloitte & Touche settles suit alleging that it approved options backdating, Roger Parloff, Legal pad, March 8,2007

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)

2003 Micrel sued Deloitte for malpractice, seeking reimbursement for all the costs that resulted from the first Deloitte partner's allegedly bad advice."

261.    Rambus has admitted to backdating options and new employee hire dates. The backdating was not simply within a 30-day period as in the case of Micrel and Microsoft but actually the quarter and in one case the entire year.

262.    The Micrel case demonstrates that the accounting firms knew about option backdating practices and that some public accountants were approving them.

263.    Plaintiffs allege that PWC approved Rambus backdating practices.

264.    Rambus[68] has now publicly admitted that is having difficulty accounting for the vesting of employee stock options due to a failure to account for impact of leaves of absence on the vesting clock.  It has also made further statements to the effect that it is looking at equities now that they have finished with the options.

265.    PWC was negligent or reckless and failed to report high-level fraud within the scope of its auditing engagements to uncover or to report the fraud of corporate officers and directors. The Rambus financial have been admitted to be incorrect. PWC failed to perform their duties and chose to ignore the red flags of material fraud.

266.    The "red flags were as follows:

    a)  The huge options grants to executives and certain employees in advance of new product launches, litigation successes, new licenses announcements;

    b)  The backdating of option grants;

---

[68] Satish Rishi, February 2007

79

c) The use of a one man stock option committee to transfer huge amounts of corporate capital;

d) Missing documents supporting the options grants;

e) Rambus granted more options in 2000 and 2001 than were authorized by the 1997 and 1999 Stock Plans.

f) The huge grants on October 20, 1999 were coincident with the approval of the modification of the 1997 plan to allow common stock equivalent grants and the creation of the 1999 Stock Plan that added 4 million non-statutory options to be given out annually.

g) The backdating of employee hire dates after Sarbanes Oxley was yet another red flag practice at Rambus.

h) Another red flag was the was Dr. Farmwald's service on the Compensation Committee in 2002, 2003 and 2005 and 2006.

Dr. Farmwald is designated as an "inside director" in the 1997 Stock Plan and is not allowed to serve on the Compensation Committee as it would be a violation of the 162 (m) requirements.

267.    The Sarbanes-Oxley Act tightened reporting requirements for employee stock options and this was not audited or reported since 2002.

The Following is excerpted (emphasis added) from Rambus' January 2006 10-K:

80

"We have completed integrated audits of Rambus Inc.'s 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2005, and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below."

"In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of stockholders' equity and comprehensive income, and of cash flows, present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiaries at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. ....."[69]

"Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control—Integrated Framework* issued by COSO." [70]

268.    The PWC audited of Rambus' internal controls in 2004 and 2005. The standards for the audit required that they look at the receipts and records relating to the transfer of the capital assets of the company, e.g., the employee stock option grants due to their huge effect on the financial statements and tax returns. They stated in the 10-K for the year 2004 the following:

"A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with

---

[69] The report has now been disavowed as unreliable by Rambus.
[70] Rambus has now acknowledged that the internal controls were inadequate.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements."

Despite costly internal control audits in 2004 and 2005, PWC found or reported nothing.

269.    When stock options are awarded, the exercise price of the options ordinarily is set equal to the share price on the day of the award. In this way, the executives of a company are supposed to have their interests aligned with the shareholders, whose holdings are diluted each time an option is exercised. Executives can "time" the grant day exercise price of an employee stock option in a number of ways. All of these methods produce equivalent results as follows:

    a.  The release negative information prior to the granting of an employee stock option can result in a lower exercise price. This is called "bullet dodging".

    b.  The timing of the "unscheduled" option grant days at the beginning or just prior to the release of positive information will result in a lower exercise price. This is referred to as "spring-loading".[71]

    c.  "Backdating" the option grant so that the exercise price is at a low for the grant period results in a lower exercise price.

        Prior to Sarbanes-Oxley this could be as much as a year.

        Post Sarbanes-Oxley the backdating could span 3 business days.[72]

    d.  The "backdating" of employment offer letters so that new hires can receive options that were dated at low points in the company share price that predated their first day of work.[73]

---

[71] There are many examples of this in this complaint.
[72] Many of Rambus option grants were backdated to the low of the quarter and in one case the low of the year.

82

  e. The "Backdating" of Board of directors' minutes so that it appears that the compensation committee granted options on dates that Rambus' stock price was relatively low.

  f. "Repricing" of options refers to the lowering of the exercise price of old options and/or canceling old options and issuing new options at a lower price after the stock price drops substantially.[74]

  g. "Forward-dating" is approving option grants before the actual grant date is selected. This requires that the minutes of the compensation committee be dated in the future.

  h. "Exercise date backdating" is used by executives to claim that the options were exercised at a date earlier than they were in order to achieve a lower tax rate. This transfers the tax from the person exercising the options to the company.[75] (This fraud is beneficial when the option is exercised but the stock is not immediately sold.)

270. Rambus has acknowledged various illicit option grant practices in their 8-K filed on October 19, 2006 as follows (excerpted):

> "On October 17, 2006, the Audit Committee completed its findings with respect to the pricing of Rambus' stock option grants.
>
> The Audit Committee presented its findings to the Board of Directors on October 18, 2006.
>
> As indicated above, the Audit Committee has determined that a significant number of Rambus stock option grants were not correctly dated and accounted for, with the vast majority of incorrectly dated grants occurring between 1998 and 2001.

---

[73] Rambus has admitted to backdating employment documents that directly implicate Mr. Larson and Mr. Schroeder.
[74] Rambus has many cases of options repricing.
[75] Aside from other insurmountable difficulties with Mr. Tate's and Mr. Mooring's common stock equivalents, the vesting is at best "backdated".

1

> Virtually all of the incorrectly dated stock option grants fit into three categories:

2

3

4

5

> Between 1998 and 2001, <u>a substantial number of stock options were granted by Rambus for which the appropriate measurement dates differ from the recorded grant dates</u>. The majority of the non-cash compensation expense associated with Rambus' financial restatement will relate to grants on five dates within this time period.

6

7

8

> In addition, the Audit Committee found that during the period from 1999 through 2003, Rambus had <u>a regular practice for grants to new hire non-executive employees of selecting the lowest price of the quarter between the employee's start date and the end of the quarter</u>.

9

10

> On certain occasions<u>, individual employees had a formal employment start date which preceded the date on which they actually began working for Rambus</u>.

11

12

13

> The result of this practice was that an employee would receive the new hire grant at a grant price that was lower than the price of the stock on the employee's actual start date."

14        271.    In 2002, the Sarbanes-Oxley act was passed which gave a company 2 business

15   days after the date of a grant to file a Form 4 with the SEC. Prior to Sarbanes-Oxley the

16   reporting period was required to be within 45 days of the end of the fiscal year.

17        272.    "Unscheduled awards" increase the potential for grant date stock price

18   manipulation. Rambus has "unscheduled" employee option grant dates.

19

20        273.    The illicit <u>backdating of exercise dates</u> has been practiced at Rambus, e.g., the

21   vesting of the October 20, CSE's and the option grants at the end of CY Q1-2000.

22        274.    As further alleged below, Defendants improperly timed (and/or had knowledge

23   of such timing) stock option grants to various officers of the Rambus to make it appear that they

24   were made on dates when the market price of Rambus stock was lower than the market price on

25   the actual grant dates.

26

27        This improper backdating resulted in option grants with lower exercise prices and thereby

28                                          84

1    improperly increased the value of the options and improperly reduced the amounts the recipients

2    had to pay the Rambus upon exercise of the options, and unfairly transferred shareholder equity

3    to Defendants. Defendants' conduct also violated the Rambus' shareholder-approved stock

4    option plans, the Rambus' corporate governance guidelines, the Rambus' standards of business

5    conduct and the Rambus' conflicts of interest policy.

6        275.    When Grants are fraudulently timed for the secret enrichment of managers and

7
8    directors, the resulting harm implicates protection concerns of 10B. Stock option awards to

9    insiders with an exercise price that does not fully reflect material non-public information

10   imposes direct costs on shareholders. The resulting wealth transfer from investors to insiders is

11   the same type of harm suffered by investors who sell their shares to an insider where the insider

12   possesses favorable non-public information about an issuer that the seller does not know. In both

13   cases, the information has been concealed from the shareholder that if disclosed would have

14   affected the value of the securities and eliminated the windfall to the insider.

15

16       276.    The capital flow to the Rambus derived from the exercise prices of the options

17   was reduced significantly by the manipulation of the option dates thereby reducing the book

18   value of the Rambus and reducing the capital available to the company for its operation.

19   Additional capital was drained from the Rambus through the "repricing" of options and the

20   backdating of exercise dates.

21       277.    Rambus borrowed $300 million in 2005 in the form of a "convertible bond".

22
23   This amount of money after deducting the $75 million spent on a stock repurchase approximates

24   the more than  $200 million that is owed the Rambus from the options backdating.

25       Thus, this convertible debt would have been unnecessary but for the illicit stock and

26   options grant practices of Rambus executives and board members.

27       278.    The Convertible Bond was sold based on fraudulent SEC registration report in

28

1  violation of the 1933 Exchange Act. The registration report was false because it included the

2  false SEC financial reports and failed to report materially adverse facts.[76]

3        279.    The Convertible Bond registration report was prepared by WSGR and

4  endorsed by WSGR, PWC and Rambus.

5        280.    WSGR played a large role in obtaining the Convertible Bond for Rambus.

6  WSGR lists Credit Suisse First Boston -one of the bonds sponsors- as an institutional client.

7
        281.    WSGR and/or its agents or proxy investment company profited by exercising
8
9  options and/or selling Rambus stock while in the possession of material non-public information.

10        282.    The Rambus press release for the convertible bond was made January 27, 2006

11  as follows:

12                    **"RAMBUS PRICES $300 MILLION OFFERING**
                       **OF ZERO COUPON CONVERTIBLE SENIOR NOTES**
13

14        LOS ALTOS, Calif.—January 27, 2005—Rambus Inc. (NASDAQ: RMBS)
          announced today the pricing of its offering of $300 million aggregate principal
15        amount of Zero Coupon Convertible Senior Notes due 2010 to qualified
          institutional buyers pursuant to Rule 144A under the Securities Act of 1933 (the
16        "Act") and to persons in offshore transactions in reliance on Regulation S under the
          Act. The sale of the notes to the initial purchasers is expected to close on February
17        1, 2005.

18
          The notes will be convertible into cash or a combination of cash and shares of the
19        company's common stock. The initial conversion price of the notes is
          approximately $26.84 per share. The notes are subject to repurchase in the event of
20        a fundamental change involving the company at a price of 100% of the principal
          amount.
21

22        The company has also granted the initial purchasers a 30-day option to purchase up
          to an additional $60 million aggregate principal amount of the notes.
23

24        The company intends to use a portion of the net proceeds of the offering to
          repurchase up to $75 million of its common stock. The company plans to use the
25        balance of the net proceeds for working capital and general corporate purposes,
          which may include the funding of developing and protecting its intellectual
26

27  ─────────────────
[76] This is a scienter argument for WSGR, PWC, Mr. Hughes, the Compensation Committee members, and the Audit
    Committee members in 2003,2004 and 2005.

28                                              86

property, and the acquisition of businesses, products, product rights or technologies.

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of these securities and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation or sale is unlawful.

The securities have not been registered under the Act or any state securities laws, and unless so registered, may not be offered or sold in the United States except pursuant to an exemption from the registration requirements of the Act and applicable state laws. "

283.    Exhibit C1 shows the price decline immediately following the alleged vesting of the part of the October 20, 1999 CSE grant which was reported publicly May 11, 2000 in Rambus 10-Q.

Also, there is a price drop starting the week beginning Monday April 10, 2000 when the press release associated with the $171 million loss was released. This caused the stock price to drop 36.3% through options expiration. The stock dropped from $65.57 to $41.87 through options expiration causing the Plaintiffs' securities losses.

284.    Exhibit C2 shows the price decline due to the initial convertible bond placement and the subsequent unsuccessful attempt to borrow another $60 million.

The Rambus convertible loan caused the stock price to drop due to the following factors: First, the Plaintiffs perceived the convertible bond as diluting the capital stock by approximately 9%. Second, the hedge funds purchasing the Convertible bond shorted Rambus' stock as part of their convertible arbitrage practices.

The price drop was delayed initially by the requirement that Rambus purchase 4.1 million shares of its own stock in the open market while the Hedge funds were shorting the stock. Rambus was guaranteeing the bond purchasers a shorting price by buying the 4.1 million shares from Credit Suisse First Boston in a single $75,000,000 pre–market transaction.

87

285.    It is possible in exhibit C2 to show when the purchases had to take place from the data available and this is indicated in the shaded potion of the table. After this was completed Rambus announced an extension of time in the unsuccessful attempt to replace the $75 million spent buying its own stock at a relatively high price. The price drop resumed immediately following the Rambus announcement.

286.    The price drop was 42.7% from the beginning of the year until the convertible bond placement was done. As a consequence of these unexpected drops in price Plaintiffs investment in Rambus securities consisting of stock and options was damaged.

287.    Initially, the convertible bond was an private placement and the Plaintiffs were not aware that this placement was underway until its announcement in late January 2005. By then it was too late for the plaintiffs to take defensive action.

288.    Rambus stated (8-K Jan26, 2005) that the purpose of this loan was:

> "The company intends to use a portion of the net proceeds of the offering to repurchase up to $75 million of its common stock. The company plans to use the balance of the net proceeds for working capital and general corporate purposes, which may include additional repurchases of its common stock and the acquisition of businesses, products, product rights or technologies."

Effectively the company is borrowing money to buy back $75 million or more in stock that was obtained from illicit stock grants. Rambus stock price dropped from $21.58 on January 20, 2005 to $17.52. Thus, it follows that Rambus was borrowing money in order to cover up the "looting" of the Rambus' capital by the concealed illicit options backdating practices.

Rambus stock price continued its drop until March 18, 2005 when it closed at $13.12 as the market digested the news. Plaintiffs suffered losses as a consequence of this concealed action.

289.    The manipulation of the option grant dates enhanced the profits to the

88

1    executives, directors and outside consultants while at the same time reducing the capital flow to

2    the company.

3            290.    The convertible bond placement caused the short interest in the stock to

4    increase. The increase in short interest in significant part caused the decline of Rambus stock

5    price by January 29, 2005.

6

7

8

9

10

| Date | Short Interest | Average Volume | Closing Price |
|------|----------------|----------------|---------------|
| 1/14/2005 | 4,433,247 | 3,067,491 | $21.14 |
| 2/15/2005 | 8,811,748 | 3,319,412 | $18.42 |
| 3/15/2005 | 10,460,773 | 2,301,203 | $13.75 |
| 4/15/2005 | 10,996,331 | 1,263,288 | $13.78 |

11

12

13

14

15            291.    Rambus has now admitted (October 19, 2006) that from 1997 through 2003, it

16    regularly granted "in-the-money" options to newly hired employees at the lowest price of the

17    quarter without proper disclosure and in violation of the shareholder approved stock options

18    plans. This practice has been confirmed in Exhibit B.

19

20            292.    Rambus has also admitted that it "backdated" new employee hire dates in order

21    to grant "in the money options" to those employees. This practice apparently started after

22    Sarbanes Oxley went into effect in 2002.  This practice had the effect of neutralizing the

23    Sarbanes Oxley's tightened reporting requirements.[77]

24            293.    The evasion of the Sarbanes Oxley reporting requirements by backdating

25    _____

[77] This supports an inference of scienter on the part of Mr. Tate, Mr. Larson, Mr. Schroeder, Dr. Farmwald, Dr.
26    Davidow, and Mr. Dunlevie. All these people had top be aware to design a "backdating method" to get around
Sarbanes Oxley Act reporting requirements by virtue of being the person granting the options or being on the
27    Compensation Committee or Audit Committee.

28                                                      89