1    employee records demonstrates as a minimum that the CEO Tate and the VP of Human

2    Resources Larsen and Schroeder willfully and intentionally were evading Sarbanes Oxley and

3    fraudulently forging company employee records. It shows their utter contempt for the public

4    shareholders.

5         294.    The termination of the illicit "one man stock option" committee leaves little

6    doubt that Rambus executives and key members of its board of directors in 2003 were fully

7
     aware of the illicit practices and recklessly and willfully chose not to disclose them in violation
8
9    of Sarbanes-Oxley Act and the other state and federal laws.[78]

10        295.    Indeed, Rambus increased payments by more than a million dollars to the

11   PWC in 2004 and 2005 to perform Audits of Rambus' internal controls. The money was paid

12   and nothing material was reported to the public.

13        296.    The fraudulent financial statements, proxy statements, tax reports, and the fraud

14
     connected with the failure to disclose the "submarine patent" scheme to the public permitted the
15
     Rambus insiders to create the vision of a company that could collect a billion dollars per year in
16
17   royalties from its JEDEC patent portfolio. This misleading portrayal of the Rambus' prospective

18   revenues inflated the market for Rambus securities while the periodic and inevitable litigation

19   losses (due to fraud) caused the stock to fall back to its lows.

20        297.    During the Period, the Rambus board of directors and executive management

21   caused Rambus to file false and misleading statements with the Securities Exchange Commission

22
     ("SEC"), including but not limited to, Proxy Statements filed with the SEC, which stated as
23
24   follows:

25            "Unless otherwise indicated, options were granted at an exercise price equal to the
              fair market value of the Company's Common Stock at the date of grant."
26

27   ─────────────────
     [78] Mr. Tate, Mr. Mooring, Mr. Dunlevie, Dr. Davidow, Dr. Farmwald and Mr. Hughes.
28                                          90

1  The last statement is repeated in Rambus' Proxy Statements issued during the Period that
2  are detailed more fully below, was materially false and misleading. Furthermore, if the option
3  grant is backdated, the options value is not "fair" from the vantage point of the Company and its
4  shareholders because it denies the company the proper strike price money and exposes the
5  company to adverse tax consequences.

6  298.    The Compensation Committee backdating of options grants violated provisions
7  of the Internal Revenue Code relating to deduction of option payments and thereby rendered the
8  Rambus' financial statements in Form 10-K filings for the years 2002, 2003, 2004 and 2005
9  materially false and misleading. In addition, the Company's financial statements in Form 10-K
10 filings for the years 2002, 2003, 2004 and 2005 were rendered false and misleading in violation
11 of Generally Accepted Accounting Principles ("GAAP"). According to GAAP, the "in the
12 money" of an option grant must be expensed by the Company as an employment expense.
13
14 Rambus understated options expenses and thus overstated its net income.[79]
15

16 299.    Despite the "telltale signs of Fraud" beginning in 1998 and accelerating in 1999
17 and 2000, PWC continued to "attest" to the financial reports of Rambus and WSGR continued to
18 aid Rambus in covering up the fraud.

19 300.    The Compensation and Audit Committees and Mr. Tate and Mooring were
20 aware and the company has admitted that the practices employed by the Board of Directors
21 allowed the stock option grants to be backdated regularly when the Company's shares were
22
23 trading at or near the lowest price for the quarter. By 2004 Defendants' backdating scheme had
24 yielded stock option grants to the Rambus' executive officers worth hundreds millions of dollars
25 at the expense of the company and the shareholders.

26 301.    PWC elected to be a principal together with Rambus in its financial fraud by

27 ───────────────
[79] Mr. Hughes was an accounting expert at Rambus in 2003 and had been CFO of Intel prior to that.

28

1   "attesting" that Rambus accounting was correct and that its internal controls were effective in

2   "all material respects".

3       PWC audited and certified to the Rambus Board of Directors and Shareholders in the

4   Rambus 2006 10-K the 2004 and 2005 financial statements as follows:

5
6           "…In our opinion, the accompanying consolidated balance sheets and the
            related consolidated statements of operations, of stockholders' equity and
            comprehensive income, and of cash flows, <u>present fairly, in all material</u>
7           <u>respects, the financial position of Rambus</u> Inc. and its subsidiaries at
            December 31, 2005 and 2004."
8

9           "… management's assessment, included in Management's Report on
10          Internal Control Over Financial Reporting appearing under Item 9A, that
            <u>the Company maintained effective internal control over financial reporting</u>
11          as of December 31, 2005…. <u>is fairly stated, in all material respects</u>.…"

12      PWC has been Rambus' accountant in one or more of its corporate forms since 1990 and

13  they had a deep knowledge of Rambus' business and intentionally participated in this long-term

14  fraud.

15
16      302.    Rambus' stock price began its decline on April 20, 2006 following it earnings

17  report of April 19,2006 when the stock reached its peak value of $46.99. By April 20 the stock

18  had dropped to $38.55 as the materially adverse news began to make its way into the market.

19

20  **2006 Materially  False Public Statements**

21      303.    Rambus made an effort to "pump" up the company stock price beginning in the

22  January 2006.This effort peaked on April 24, 2006 and ceased May 10, 2006 at which time Mr.

23  Hughes stated that Rambus PE ratio was too high and the stock price dropped into the options

24
25  scandal.[80]

26

27  ---
[80] Plaintiffs allege that Rambus executives wanted the stock price to drop after May 10, 2006 so that the executive
option grants would be priced as low as possible.

28                              92

1    The motivation of Harold Hughes was to inflate and support Rambus' price while

2    Insiders sold their stock at inflated prices to the public.

3    304.    At the beginning of 2006, Rambus executives made extravagant, misleading

4    and false public statements without material qualifications as follows:

5        a.  Most mobile phones infringe Rambus patents.[81]

6        b.  Rambus has a 1.5 trillion dollar Total Available Market (TAM).[82]

7        c.  Rambus could win an over 10 billion dollar antitrust case.[83]

8

9

10

11

12

13    305.    On April 24, 2006 Rambus won the patent infringement suit against Hynix.

14    At that time Rambus Vice President and General Counsel Danforth publicly reiterated his false

15    and /or misleading claim that Rambus' antitrust lawsuit against the DRAM companies was a 10

16    billion dollar damage case. This was heard during the company's conference call and then

17    repeated in the news media.

18

19    306.    During the conference call, John Danforth stated the following 10 billion dollar

20    claim:

21        "So, summing up these two points, our hope and strong expectations are that
22        litigants and potential litigants will now see additional incentives to come
         to terms through settlement and will not let their fate be determined -- be
23        determined by a jury in the next patent case, or, for that matter, in the San
         Francisco antitrust case which is moving forward now. The antitrust case, by
24

25    81 Exhibit N: Most mobile phones infringe Rambus patents. Company to look at more
26    licensing deals. John Ribeiro, IDG news service 16 February 2006

27    [82] 6/1/2006 Rambus Analyst Meeting: Rambus inventions do not cover the total available market.

28                                     93

> the way, is the subject of numerous motions, and in 3 weeks, we may see some documents coming out in that case that I think will be of interest and will support our allegations in that over 10 billion dollar case."[84]

Mr. Danforth reinforced his comments with references to discovery documents not then available to the public.

307.    In the question and answer part of the conference call Mr. Danforth went on to say the following (emphasis added):

> "The fact of the matter is -- and their own documents, some of which I just shared with you, show it -- the industry expected that RDRAM was going to become the winner, if you will, among memory types in the late '90s and early '80s, and the fact that there's a criminal conspiracy which has been admitted to, and the fact that we think we can link that criminal conspiracy up very precisely to the efforts to push us from the market, mean that anybody who wants to kinda stay at the table and keep playing this game, this patent game, has to be aware that the time is running out for their an -- for their antitrust game, and that game, which is a 10 billion+ dollar exposure, is -- is even more serious than what they saw today. So, I -- I think and I hope and I -- and I very much, again, want to extend an olive branch [peace offering] to all of these companies. I hope people will look rationally at this and realize that the delay, delay, delay approach may not work."

These are materially false. Both statements are contradicted by the Rambus antitrust case that was under the direction of Mr. Danforth.

First, Mr. Danforth states that the industry[85] expected that RDRAM would be the dominant memory type. This is not true.[86] Indeed the PC Industry was just following Intel's lead. The industry was aware of SDRAM and DDR as alternatives. In fact, AMD never had a RDRAM based computer.

---

[84] Transcript by Edlee available at
http://rambus.org/cc/2006-04-24%20Hynix%20Jury%20Verdict%20Conference%20Call.txt
[85] The industry here refers to the PC computer manufacturers and not the Intel or the DRAM manufacturers because as the complaint later reveals: "On December 22, 1998, shortly after Intel announced that it would not rely solely on Direct RDRAM in future roadmaps and that Hynix (Hyundai) was engaged by Intel to help design computer memory successors to RDRAM… Page22, California Superior Court, Case No. 04-431105, May 5, 2004

94

1   Moreover, the litigation record and the FTC evidence shows that Rambus knew that

2   Intel was moving away from them as early as 1997. In fact, Rambus was also very much aware

3   of SDRAM and DDR as competitive products to RDRAM.

4   Therefore, Rambus hired Karp and Steinberg to obtain patents that would cover

5   SDRAM and DDR. Karp was hired in 1997 and Steinberg in 1998 to develop a patent portfolio.

6   Mr. Karp also developed a litigation strategy for Rambus called the "nuclear winter" scenario to

7   deal with Intel giving up support of RDRAM. Mr. Karp made Rambus "battle ready" with an

8   electronic document system and by destroying a huge amount of company documents. Finally,

9   Karp named the initiation of SDRAM/DDR litigation "Lexington-the shot heard around the

10  world."

11

12

13  Second, that the antitrust damages could be more than 10 billion dollars.[87]

14  It is clear that Mr. Danforth knew that both statements were untrue at the time he spoke.

15  He made these statements during company conference call April 24, 2006 and misled the

16  Plaintiffs into holding their stock positions during the subsequent price decline into the options

17  scandal.

18  308.    The news media picked up the Conference call and reported in a

19  BusinessWeek news release by Arik Hesseldahl on April 25 was as follows:

20

21  "Rambus Vice-President and General Counsel John Danforth promised to
22  press ahead to try and link the federal price-fixing investigation to the
    company's antitrust case against Micron, Hynix, and Samsung. "The fact that
23  there is a criminal conspiracy that has been admitted to, and we think we can

24

25  _____

26  [87] "Defendants' conduct thus deprived Rambus of royalties in an amount to be determined at trial,
    which potentially amounts to more than one billion dollars. Page 29, California Superior Court,
27  Case No. 04-431105, May 5, 2004

28  95

1    link that criminal conspiracy up very precisely to the efforts to push us from
     the market," Danforth said.

2

3    "This means that anyone who wants to stay at the table and keep playing this
     patent game has to be aware that the time is running out for their antitrust
4    game. And that game, in which there is a <u>$10-billion-plus exposure</u>, is even
     more serious than what they saw today."[88]

5

6    309.    As indicated above, the latter <u>public statement</u> by John Danforth <u>is materially</u>

7    <u>false and misleading</u>. The statement is a huge exaggeration which conflicts with the damages

8    claimed in the actual court case.

9    310.    The Anti-trust complaint filed in the California State Superior Court (04-

10   431105) actually estimates the damages as follows:  "<u>which potentially amounts to more than</u>

11   <u>one billion dollars</u>".

12

13   Interpreting the Mr. Danforth's statements in the most favorable light, his statements

14   were off by a factor of 1000 % from the court documents that he had had filed.

15   Mr. Danforth emphasized that the last company to settle would be responsible for paying

16   all the antitrust damages.

17   Mr. Danforth did this without any qualification of the material risks to Rambus of this

18   litigation, the limited range of jurisdiction of the California Superior Court. He made these false

19   statements disclosing that the FTC was about to rule against Rambus based on the new evidence

20   obtained from the 2005 Virginia trail and the "accidentally" recovered attic computer and

21

22   Rambus garage tapes.

23   311.    The motivation for these comments was to "pump up" and support the price of

24   the stock by inducing current and prospective shareholders to retain and/or purchase the stock.

25   Mr. Danforth exercised options and the sold stock after this.  Mr. Danforth knew at that time that

26

27   _____
     [88] Arik Hesseldahl, BusinessWeek, April 25, 2006, Rambus Patent Victory

28

Rambus faced a "conduct trial" and an imminent unfavorable FTC ruling[89]. He did not qualify the claim of more than 10 billion dollars in antitrust damages.

312.    Plaintiffs upon hearing the conference call, reading the press releases and considering the implications of Mr. Danforth's very strong comments combined with the infringement damage award of $306 million maintained their positions in Rambus stock and options. Mr. Danforth's false statements were pivotal in this determination.

313.    Rambus stock opened at $44.50 the next morning following the conference call. On May 10 during the Annual Shareholder's meeting Mr. Danforth revealed that any successor to the Infineon license deal would be relieved of antitrust liability by the Infineon license as follows:

"On the IFX settlement, that was done under difficult circumstances, and I appreciate your recognition of that. I think that by getting that where we got it, we were able to move forward in a constructive way. It is assignable in the extent it's described in the 10-Q, which is that if there is a another entity which takes over all of the DRAM operations -- and I'm paraphrasing here, so please don't treat this as gospel -- but if another entity acquires all of the DRAM operations of Infineon, then -- excuse me -- then that new entity will be able to -- enjoy is a word I hate to use in this context, buy I'll say enjoy -- enjoy a royalty rate which was in effect the Infineon royalty rate based on their volume of shipment extrapolated to the new larger volume of shipment of the new combined entity. In addition, the new entity will be relieved from antitrust liability, if there is any, and so I

---

[89] Mr. Danforth knew that the evidence added to the FTC case in 2005 documented Rambus "unfair business" and practices and "antitrust violations' and that it was likely on April 24, 2006 that the FTC would issue an unfavorable ruling against Rambus.
Mr. Danforth exercised his options and sold most of his vested stock by the annual shareholder's meeting on May 10, 2006.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1    think you recognize that those..."[90]

2    This statement by Mr. Danforth demonstrates that he had an intimate knowledge of both

3    the antitrust lawsuit and the Infineon license agreement that had been negotiated in 2005. The

4    stock price had by then closed at $35.60 that was a drop of 20% since the statements were

5    made.[91]

6    314.    In all, Rambus insiders exercised options and sold 3,770,279 shares at an

7    average strike price of $11.49 gross proceeds of approximately $120,000,000.[92] This constituted

8

9    3.7% dilution of the company capital stock. This was done while Mr. Danforth was promoting

10   the idea that there would be settlements forthcoming from the threat of future patent

11   infringement victories and the antitrust trust exposure.

12   315.    The patent infringement victory over Hynix was mistakenly viewed by the

13   public as being the key to the successful conclusion of all the Rambus litigation. It was widely

14

15   expected that this victory would spur rapid settlements of the remaining claims by the other

16   litigants. Such settlements would reasonably have been expected to increase the value of Rambus

17   stock as the royalty stream became more certain and was expected to increase more than $500

18   million per year. But for the concealed "conduct", FTC and "options" fraud issues the stock price

19   should have held or increased in an efficient market. Rambus executives concealed these

20   materially adverse issues from analysts and the public and profited enormously form the

21   concealment by selling their backdated options at inflated prices.

22   316.    Indeed Hambrecht & Quist was deceived as well and increased their target price

23

24   to $52 per share.

25   Press reports stated the following:

26   _____
[90] Edlee's transcript of the 2006 Annual Stockholders meeting.
27   [91] The is further evidence of Mr. Danforth's scienter.
[92] The vast majority of the options exercised and sold in Q1-2006 were backdated.
28

"Rambus Wins Patent Infringement Trial Against Hynix; Jury Awards
Rambus $306.5M in Damages for Infringing U.S. Sales; All Rambus Patent
Claims in Trial Found Valid and Infringed"

317.    Mr. Danforth and Mr. Hughes on April 24, 2006 misled the public into thinking
that the odds of a settlement had greatly increased and perceived value of the stock were greatly
increased by the "10 billion dollar antitrust lawsuit" and the Patent Infringement victory.

318.    The patent infringement triumph was short lived as the stock began an
inexplicable and inexorable decline into the Annual shareholders meeting. Materially adverse
information had been entering the market gradually from January 19, 2006. This information
found its source in Rambus' conduct, the new FTC evidence and the financial frauds. The public
shareholders had no knowledge of Rambus' concealment of this materially adverse information.

319.    The annual shareholder's meeting on May 10, 2006 was characterized by
controversy over Rambus' 2006 Employee Stock Option Program (ESOP). The ESOP was
contested by a significant number of public shareholders but passed on a majority vote.

320.    The CEO Harold Hughes was widely perceived as defiant and arrogant when
he told the public shareholders that he could not run a company without the option grants and
that if they did not like it they should buy Coke.

321.    Mr. Davidow sold more stock after the meeting and resigned as Director
Emeritus before the Center for Financial research and Analysis (CFRA) released it report
identifying Rambus as a probable backdating company.[93]

322.    Mr. Hughes also indicated during the Annual Meeting on May 10, 2006 that the
PE of the company was "too high". This is after "pumping" the stock during the first 4 months of
2006.

---

[93] It is customary for the CFRA to contact a company prior to publication of its reports. The same is true for the FTC
and the publication of the FTC opinions. Rambus knew ahead of the public when these events would be announced.

99

1    The Rambus executives and directors having completed their options exercises and stock

2  sales now needed the stock price to come down for the next round of insider option grants using

3  the newly approved 2006 ESOP.

4    323.    Rambus public shareholders had no knowledge that the options grant scandal

5  that was about to catch them by complete surprise. But the stock price continued downward

6  closing at $30.01 on May 15.

7

8    324.    The Center for Financial research and Analysis (CFRA) issued a report on May

9  16, 2006 listing Rambus as one of a number of companies that probably had options grant

10  problems. This was a paid for report issued primarily to financial institutions but it was reported

11  on the news. The stock closed at $29.09 the following day. The stock continued downwards in a

12  series of ratcheting steps to close at $25.37 on May 22. Plaintiffs did not know initially how to

13  evaluate the CFRA report or its consequences for RAMBUS stock price.

14

15    325.    On May 30, 2006, Rambus announced that the Audit Committee had

16  commenced an internal investigation into the timing of the Company's stock option practices

17  issued in or before 2003. The Company has also announced that the Audit Committee had

18  uncovered discrepancies between the dates that some stock options went on the books and the

19  dates that they should have been recorded under applicable accounting rules. As reported in

20  BizJournal.Com on May 31, 2006, this announcement caused a 6.11% drop in Rambus' common

21  stock price to $24.26.

22

23    326.    On June 27, 2006 it was announced late in the afternoon that Rambus might

24  have to restate earnings for prior periods due the back dating of option grants. Rambus shares fell

25  5% in after hours trading.

26    327.    The June 28, 2006 edition of The Wall Street Journal reported that a

27  preliminary board review found improperly dated stock-option grants that may lead to a

28

restatement of prior financial results: "Rambus' board 'has reached a preliminary conclusion that

the actual measurement dates for certain stock option grants issued in prior years differ from the

recorded grant dates for such awards,' the company said." On June 27, 2006 Rambus common

stock traded at $23.13 per share, but on news of the above announcements Rambus common

shares declined to close at $20.55 per share on June 28, 2006. Plaintiffs and Plaintiffs have been

damaged as a result of the above declines in Rambus' share price.

328.    By July 19, 2006 the Audit Committee confirmed that Rambus financial

statements cannot be relied upon and will have to be restated.

Rambus issued the following statement:

> "As announced on July 19, 2006, the Audit Committee of the Rambus Board
> of Directors has reached a preliminary conclusion that the actual measurement
> dates for certain stock option grants issued in prior years differ from the
> recorded grant dates for such awards. During this period, Geoff was CEO and
> the sole member of the Stock Option Committee. Given these circumstances
> and to ensure that there is not even the appearance of a conflict of
> interest, Geoff felt he could best support the Company by resigning from his
> position on the Board as Rambus resolves these issues."

The stock price on July 18, 2006 opened at $20.89 and closed at $19.60.

The closing stock price on July 19, 2006 was $16.77.

The closing price on July 21, 2006 was $14.99.

329.    On July 19, 2006 the Audit Committee confirmed that Rambus financial

statement cannot be relied upon and will have to be restated.

Rambus issued the following statement:

> "As announced on July 19, 2006, the Audit Committee of the Rambus
> Board of Directors has reached a preliminary conclusion that the actual
> measurement dates for certain stock option grants issued in prior years
> differ from the recorded grant dates for such awards. During this
> period, Geoff was CEO and the sole member of the Stock Option
> Committee. Given these circumstances and to ensure that there is not even

101

the appearance of a conflict of interest, Geoff felt he could best support the Company by resigning from his position on the Board as Rambus resolves these issues."

The stock price on July 18, 2006 opened at $20.89 and closed at $19.60. The closing stock price on July 19, 2006 was $16.77. The closing price on July 21, 2006 was $14.99.

330.    On July 26, 2006 the FTC announced that it intended to release information to the public as part of its ruling which Rambus sought to keep out of the public eye. This information substantiated the Sherman Antitrust and section 5 ruling against Rambus. (This shows that Rambus management intentionally withheld this damaging information from the public).

331.    On July 27, 2006 John Danforth was demoted from his position as Vice President General Counsel and Secretary to senior legal advisor and the company's damage award in the Hynix case was reduced to $133.6 million. This employment action may have been related to the forthcoming FTC loss as well. The stock price further declined to $14.79.

332.    On August 2, 2006 the Federal Trade Commission issued its opinion that Rambus was guilty of violations of Section 5 of the FTC act and section 2 of Sherman Anti-trust Act as a consequence of Rambus willful deception of the JEDEC DRAM manufacturers. This deception began in 1992 and extended until the year 2000 and resulted in a Rambus patent monopoly after "lock in" had been achieved.

The FTC posted the following press release on August 2, 2006(excerpted):

"In an opinion by Commissioner Pamela Jones Harbour, the Commission found that, through a course of deceptive conduct, Rambus was able to distort a critical standard-setting process and engage in an anticompetitive "hold up" of the computer memory industry. The Commission held that Rambus's acts of deception constituted exclusionary conduct under Section 2 of the Sherman Act and contributed significantly to Rambus's acquisition of monopoly power in the four relevant markets. The Commission has ordered additional briefings

102

1    to determine the appropriate remedy for "the substantial competitive harm that Rambus's course of deceptive conduct has inflicted."

2

3    "We find that Rambus's course of conduct constituted deception under Section 5 of the FTC Act. Rambus's conduct was calculated to mislead JEDEC members by fostering the belief that Rambus neither had, nor was

4    seeking, relevant patents that would be enforced against JEDEC-compliant products. . . Under the circumstances, JEDEC members acted reasonably

5    when they relied on Rambus's actions and omissions and adopted the

6    SDRAM and DDR SDRAM standards."

7    "In a separate concurring statement, Commissioner Jon Leibowitz wrote, "Rambus's abuse of JEDEC's standard-setting process was intentional,

8    inappropriate, and injurious to competition and consumers alike." He adds that

9    Rambus's conduct not only ran afoul of the antitrust laws, but also constitutes an unfair method of competition in violation of the broader reach of the FTC

10    Act. "

11    The stock fell as shown in Exhibit C3 to a low of  $10.25 as the market digested this news.

12    333.    Exhibit C3 shows that by August 18, 2006 the Rambus stock price had declined

13    74 %from its April 19, 2006 earning report price of $46.60 per share. This caused serious direct

14    damage to the Plaintiffs' stock and options holdings in Rambus.

15

16    334.    On August 15, 2006 Geoffrey Tate resigned from the board of directors. Rambus in the October 19,2006 8-K filing said this:

17    "On August 15, 2006, Rambus announced the resignation of Geoff Tate, former Chief Executive Officer of Rambus from 1990 through 2005, from

18    its Board of Directors.

19    Mr. Tate was Chief Executive Officer and the sole member of the Stock Option Committee during the period that the Audit Committee had

20    preliminarily concluded that the majority of stock option irregularities

21    occurred. "

22

23    335.    On August 16, 2006, Rambus issued the following 8-K disclosure:

24    "Rambus Inc. (the "Company" or "Rambus") announced on August 16, 2006 that it plans to request a hearing before the Nasdaq Listing Qualifications

25    Panel (the "Panel") following the receipt of a NASDAQ Staff Determination notice on August 14, 2006 stating that Rambus is not in compliance with

26    Nasdaq Marketplace Rule 4310(c)(14). This notice was received because the Company was not timely in filing its Quarterly Report on Form 10-Q for the

27    period ended June 30, 2006.

28    103

The stock price that day closed at $11.68

336.    On August 23, 2006 Judge Whyte issued an order to delay the Hynix v. Rambus "conduct trial" which was scheduled to commence in September. The stock rallied on a Rambus news release by acting Rambus VP and General Counsel Kramer that suggested that an industry wide settlement might be effected. The following is excerpted from Infoworld news item:

> "The FTC presumably will set royalty rates and could prompt a settlement between the two companies, Whyte wrote in his ruling Tuesday. "This case cries out for a business solution, as the future success of each company would appear to depend, in significant part, on a business relationship between the two," the judge wrote.
>
> Rambus hopes "such an industry-wide resolution can be achieved," Robert Kramer, acting general counsel at Rambus, said in a statement. But if the case continues to trial, Rambus will argue that the FTC's decision should not affect the case, he said. "

The stock closed at $13.19.  By September 13 the stock price had risen to close at $18.51.

337.    On September 14, 2006, Rambus acknowledged that it had received notice of default on the 160 million convertible bond in an 8-k filing as follows:

> 'On September 8, 2006, Rambus Inc. (the "Company") received a notice (the "Notice") of purported defaults from U.S. Bank National Association, as trustee (the "Trustee") for the Company's Zero Coupon Convertible Senior Notes due 2010 (the "Notes").'

338.    On October 19, 2006 Rambus issued an 8-K stating the following (excerpted):

> "Rambus preliminarily estimates that the aggregate pre-tax, non-cash stock-based compensation charges in connection with these stock option grants will be in excess of $200 million."
>
> "Revenue for the third quarter was $45.9 million, up 28% over the third quarter last year and down 6% from the previous quarter. This increase over the third quarter last year was driven by new product licensing revenues and patent licensing revenues from agreements announced earlier this year.

104

1

2

> Cash, cash equivalents and marketable securities increased by $5.3 million in the third quarter to an ending balance of $421.2 million as of September 30, 2006."

3    The stock closed at $18.29.

4    339.    On November 16, 2006 Rambus stock further soared on speculations by an

5    analyst that the FTC remedy will not affect DDR2, DDR3 and the successor memory standards.

6

7

8

> "Based on questions posed by FTC commissioners at a hearing Wednesday, any penalties imposed upon Rambus for past anti-competitive practices won't impact two types of memory-chip technology that the company licenses to other chipmakers, according to a note sent to clients by Jeff Schreiner, an analyst with American Technology Research.

9

10

11

> The analyst, who has a buy rating on the shares, raised his price target on Rambus to $32 from $28. A ruling from the FTC should come within 45 to 60 days, according to Schreiner. "

12    340.    On November 20, 2006 Rambus issued the following statement (excerpted):

13

14

> "On November 20, 2006, Rambus received an extension from the Listing Qualification Panel for the filing of its Second Quarter 10-Q and Third Quarter 10-Q until February 9, 2007. "

15    The stock closed at $21.20

16    341.    As a consequence of the drop in Rambus stock price (documented in 42-64),

17    the value of Plaintiffs' Rambus securities position declined and Plaintiffs was seriously damaged

18    financially. Moreover, Plaintiffs had to take costly defensive actions in the presence of the

19    uncertainties generated as the news of the FTC and financial fraud was incrementally exposed.

20

21    342.    On February 4, 2007 the FTC Commission released its remedy for Rambus

22    willful and intentional scheme by reducing royalties that Rambus could charge for SDRAM and

23    DDR. The brazen options grant culture at Rambus had not changed.  Rambus suspiciously issued

24    unscheduled options grants to insiders presumably on February 1, 2007 but these were not

25    reported to the SEC until February 5, 2007. Rambus has admitted that the FTC gives them

26    advance warning of its public opinions and ruling to allow the company to prepare.

27

28

105

343.    While no action was taken with respect to successive generations of DDR, i.e., DDR2, DDR3, DDR4, etc., it is now known what the result of Rambus' willful and intentional deception of the industry will have on these successor technologies that incorporate the preceding generations technology also become the object of continuing lawsuits.

344.    The Defendants above knew the adverse non-public information about the business of Rambus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, the Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

## False and Misleading Proxy Statements

345.    An examination of the Annual Proxy statements reveals yet another pattern of false and/or misleading statements with respect to company executive connections with the Compensation Committee and interlocks with other corporations. The following statements are taken form SEC Form 14:

> "During fiscal year 2005, no interlocking relationship existed between any member of our Compensation Committee and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. With the exception of Dr. Farmwald, during fiscal year 2005, no member of the Compensation Committee was, or was formerly, an officer or an employee of Rambus, Dr. Farmwald served as Vice President and Chief Scientist from March 1990 to November 1993"

However, from 1997 thru 2005 the Proxy statements contained materially incorrect and misleading statements as follows:

1997 Proxy

106

"The Compensation Committee is currently comprised of Dr. Davidow, Mr.Dunlevie and Dr. Geschke.  No interlocking relationship exists between any member of the Company's Compensation Committee and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is or was formerly an officer or an employee of the Company."

1998 Proxy

"The Compensation Committee is currently comprised of Dr. Davidow, Mr.Dunlevie and Dr. Geschke. No interlocking relationship exists between any member of the Company's Compensation Committee and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is or was formerly an officer or an employee of the Company."

2000 Proxy

"The Compensation Committee is currently comprised of Dr. Davidow, Mr.Dunlevie and Dr. Geschke. No interlocking relationship exists between any member of the Company's Compensation Committee and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is or was formerly an officer or an employee of the Company."

2002 Proxy

"The Compensation Committee is currently comprised of Dr. Davidow, Mr.Dunlevie and Dr. Geschke. No interlocking relationship exists between any member of the Company's Compensation Committee or any executive officer of the Company and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is or was formerly an officer or an employee of the Company."

2003 Proxy

"Our Compensation Committee is currently comprised of Drs. Farmwald and Geschke and Mr. Dunlevie. No interlocking relationship exists between any member of our Compensation Committee and any member of any other company's board of directors or compensation committee, nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is or was formerly an officer or an employee of Rambus."

Moreover, Defendant Davidow has had interlocking board relationships with Defendant Farmwald for many years starting in the 1990's. Thus two of the statements contained are overtly false.

107

2004 Proxy

"Our Compensation Committee is currently comprised of Drs. Geschke and Kennedy and Mr. Dunlevie. No interlocking relationship exists between any member of our Compensation Committee and any member of any other company's board of directors or compensation committee, <u>nor has any such interlocking relationship existed in the past. No member of the Compensation Committee is, or was formerly, an officer or an employee of Rambus.</u>"

The underlined statements are also false in 2004.

2005 Proxy

"During fiscal year 2004, no interlocking relationship existed between any member of our Compensation Committee and any member of any other company's board of directors or compensation committee, <u>nor has any such interlocking relationship existed in the past.</u> During fiscal year 2004, no member of the Compensation Committee is, or was formerly, an officer or an employee of Rambus."

Again the underlined false statement is repeated in 2005.

2006 Proxy

"During fiscal year 2005, no interlocking relationship existed between any member of our Compensation Committee and any member of any other company's board of directors or compensation committee, **nor has any such interlocking relationship existed in the past**. With the exception of Dr. Farmwald, <u>during fiscal year 2005, no member of the Compensation Committee was, or was formerly, an officer or an employee of Rambus.</u> Dr. Farmwald served as Vice President and Chief Scientist from March 1990 to November 1993."

In the 2006 proxy statement, Rambus finally acknowledges that Dr. Farmwald was an officer of Rambus and served on the Compensation Committee. Here Rambus again denies the existence of interlocking directorates in the past or present between Farmwald and Davidow.

However, Rambus again <u>fails to mention</u> that Defendant Farmwald was on the Compensation Committee in 2002 and 2003. As an "inside director" Dr. Farmwald could not be on the Compensation Committee under 162 (m).

346.    The association between Dr. Farmwald, Dr. Davidow and Mr. Dunlevie has

108

been extensive from the early 1990's. Mr. Dunlevie's Benchmark Capital has invested in at least 5 companies started by Dr. Farmwald. Dr. Davidow's Mohr Davidow venture has also invested in many of the same companies. These corporate interconnects are shown in Exhibit G.

347.    Dr Farmwald, Dr. Davidow and Mr. Dunlevie served in the capacities of directors at other companies both public and private during the period of this complaint. Thus interlocking relationships did exist although they were consistently denied in the proxy statements. WSGR was aware of these interconnections due to its own involvement with many of the companies.

348.    Both Dr. Davidow's and Mr. Dunlevie's venture capital companies were investors in Brocade. Brocade's option and new hire backdating practices along with the "one-man" stock option committee are identical to Rambus' practices. In addition WSGR is corporate counsel to both companies.

349.    The fact that Dr. Farmwald started 5 companies is sufficient proof that he was involved in the setting of compensation as well as selecting the boards of directors and the executive management of those other companies. This is in conflict with the disclosure requirements of SEC 402j(3). Thus the proxy statements were false and/or misleading as to the strong interlocks between the compensation directors and other companies.

350.    In addition, the statements are misleading and materially false in that many if not all the compensation functions were improperly delegated to Geoff Tate who was indeed an employee of Rambus. Delaware corporate law allows a "one-man" committee of "independent" directors. Mr. Tate while a director was CEO (an employee) of the company and therefore not independent.

351.    SEC 402 j (3) requires the disclosure of interlocking relationships between companies and the executives and directors of those companies as follows:

109

1    "The registrant shall describe any of the following relationships that existed during the last completed fiscal year:

2

3        i.    An executive officer of the registrant served as a member of the compensation committee (or other board committee performing equivalent functions or, in the absence of any such committee, the entire board of directors) of another entity, one of whose executive officers served on the compensation committee (or other board committee performing equivalent functions or, in the absence of any such committee, the entire board of directors) of the registrant;

4

5

6

7

8        ii.    An executive officer of the registrant served as a director of another entity, one of whose executive officers served on the compensation committee (or other board committee performing equivalent functions or, in the absence of any such committee, the entire board of directors) of the registrant; and

9

10

11        iii.    An executive officer of the registrant served as a member of the compensation committee (or other board committee performing equivalent functions or, in the absence of any such committee, the entire board of directors) of another entity, one of whose executive officers served as a director of the registrant."

12

13

14    Rambus disclosures were both false and misleading.

15    352.    The relationship between Dr. Davidow, Dr. Farmwald and Mr. Dunlevie was

16    material to Rambus' SEC disclosures. These three directors were involved together in many

17

18    companies outside of Rambus as venture capitalists and control persons in both public and

19    private companies. These personal and entity interconnections were not disclosed. Moreover,

20    Mr. Dunlevie and Mr. Davidow were to two most powerful directors by virtue of the stock

21    ownership and control.

22    353.    The <u>Stock Option Committee</u> with Defendant Tate as the <u>only member</u> violates

23    the <u>independence</u> of the Compensation Committee. This Stock Option Committee was vested

24    with the power to grant common stock equivalents (CSE) that de facto made it an extension of

25

26    the Compensation Committee in that it was granting CSEs to executives. This is a function

27    reserved to the Compensation Committee. 2,160,000 CSEs were also awarded to employees.

28    110

1  As a consequence of this Defendant Tate was able to grant 2,000,000 deep in the money CSE at

2  $ 0.00 per share to himself and defendant Mooring in the last quarter 1999 when the stock price

3  ranged from $16 to $24 per share. [94]

4      Half of these options were subject to inappropriately lax and ambiguous vesting

5  conditions that were reached within 90 days after grant. These options were immediately worth

6  $31,320,000 dollars split evenly between Mooring and Tate.

7

8      354.    The 10-K and 10-Q reports of Tate and Mooring's CSE grants stated that they

9  were priced at $2.50 per share. This misled investors.

10     355.    Neither Mr. Mooring nor Mr. Tate appears ever paid the $2.50 per share strike

11  price of the CSEs. Inspection of the 10-K shows that the options vested and common stock was

12  issued but there is nothing to indicate that the $2,500,000 due Rambus was ever paid in the 10-K

13  reports for 2000 and 2001 or thereafter.

14

15     356.    Mr. Tate had Mr. Larsen sign the contracts granting himself and Mr. Mooring

16  the in the money stock options. This can be clearly seen on the CSE grant contracts which are

17  exhibits 10.11 and 10.12 attached to the January 2000 10-K405. There is no evidence of board

18  approval of these option grants and the contract does not represent that Mr. Larsen has the power

19  of attorney for the board of directors. In addition, neither the Mr. Harmon the CFO nor Rambus

20  corporate counsel seems involved in this huge capital transfer.

21     357.    These huge option grants were made in direct violation of the Rambus 1997

22  Stock Option Plan the which restricted grant-making authority to at least two persons, both

23

24  outside directors or, alternatively, to the Board itself to retain 162(m) status.

25     358.    The executives and board members knew that Rambus was starting a litigation

26  program to collect royalties on 80% of the worlds DRAM in early 2000 and that the stock price

27

[94] Adjusted for the 4:1 stock split

28

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1    would increase dramatically as the stock market digested the news.

2        As a consequence of these and other illicit grants to key executives, Rambus took a

3    $171.1 million employment compensation charge that was more than twice its gross revenues in

4    calendar year 2000. This diverted 171 million dollars to the executives and certain employees of

5    the company in the form of a "reward" rather than incentive option grants.

6        359.    The original purpose of the CSEs was to provide incentives to Rambus'

7    business partners. Rambus used these common stock equivalents by issuing Intel a warrant on

8    them that would be exercisable when RDRAM reached a certain objectives.

9

10       360.    The original use of the CSEs were to provide RDRAM production incentives to

11   the DRAM manufacturers who were incurring significant costs in starting up the manufacturing

12   of RDRAM and preferred to manufacture the JEDEC standard parts. The typical allocation of

13   these common stock equivalents was about 30,000 shares exercisable upon the achievement of

14   certain production targets.  This allocation had little incentive effect on the manufacturers.

15   Thus the CSEs were not used as strong incentives to the dram manufacturers. Rather the CSEs

16   were diverted instead Tate and Mooring and a handful of insiders at Rambus insuring the failure

17

18   of RDRAM to achieve its production targets.

19       361.    The <u>Stock Option Committee</u>   consisted of one member, Geoff Tate.

20       "The Stock Option Committee, was established in February 1997 and has the

21       authority (subject to limitations, if any, which may be established by the Board) to

22       administer the issuance of stock options under our 1997 Stock Plan (the "1997

23       Stock Plan") and our 1999 Non-Statutory Stock Option Plan (the "1999 Stock

24       Plan") of up to 100,000 shares per employee per year, other than executive officers.

25

26       <u>In addition, the Stock Option Committee has the authority to administer the</u>

27       <u>issuance of Common Stock Equivalents under the 1997 Stock Plan."</u>

28
112

> "In October 2003, the Board of Directors dissolved the Stock Option Committee and vested the power and authority of this committee in the Compensation Committee."

The following are excerpts from the SEC 10-K reports:

> "The Stock Option Committee acted by written consent 11 times during fiscal 2000."
>
> "The Stock Option Committee acted by written consent six times during fiscal 2001."
>
> "The Stock Option Committee acted by written consent ten times during fiscal 2002."
>
> "The Stock Option Committee acted by written consent thirteen times during 2003."

362.    Exhibit 10.11 of the Form 10K405 filed December 23, 1999 shows that Mr. Tate awarded himself the common stock equivalents without direct board approval. The contract is signed only by Mr. Tate and Mr. Larsen (who worked for Mr. Tate) on October 20, 1999.

363.    The <u>2006 Insider Selling Defendants</u> include Danforth, Davidow, Dunlevie, Farmwald, Mooring, Larson, Schroeder, Stark, Patel, Harmon, Eulau, and Donnelly.

364.    PWC and WSGR are both considered insider traders due to their superior knowledge of Rambus material non-public information and because they received 'service provider" options and/or stock grants. These grants were never accounted for and have not been denied by either PWC or WSGR.

### CONTROL PERSONS OF RAMBUS

365.    The control person liability created under § 20(a) of the 1934 exchange Act applies to all violations of the Exchange Act including § 10(b) and § 10(b-5) violations.

366.    The SEC has defined control person as one who has the "power to exercise a controlling influence over the management or policies of a company whether through ownership

113

1  of securities, by contract, or otherwise," with 25% ownership triggering a presumption of

2  control.

3      367.    All Rambus officers and directors who were signatories of the SEC registration

4  report for the convertible bond and the incorporated false and /or misleading SEC financial and

5  proxy reports were in positions to control and influence the violations of the 1933 and 1934

6  Exchange Act. Plaintiffs have already noted that some directors were more powerful than others

7  by virtue of their long history with Rambus and their ownership positions.

8

9      368.    By certifying and signing the proxy statements, 10-K, 10-Q, registration

10  Statements, and other SEC forms which were false and/or misleading these officers and directors

11  demonstrated their control. All they had to do was refuse to sign the SEC reports until they were

12  corrected. Their certifications and signatures gave them significant power to influence the

13  corporation and to correct the abuses alleged herein.

14

15     369.    The officers were in a position to control by reason of their participation in the

16  management of Rambus' day-to-day operations. Some of these officers were also directors of

17  Rambus.[95]

18     370.    Any Rambus director had and has the right to inspect the corporate records at

19  any time investigate and attempt correct any violation or potential violation of the applicable

20  state and federal laws.

21     371.    Mr. Danforth as Rambus' Secretary and General Counsel had the power to

22  influence and control all legal affairs within Rambus. Mr. Danforth as an attorney also had the

23  duty to attempt to correct Rambus violations. Instead he participated in perpetuating the

24  violations.

25

26     372.    Mr. Hughes by virtue of his role as a director and Chairman of the Audit

27  _____

[95] Mooring, Tate were employees and directors and the major beneficiaries of the options grant abuses.

28
114

1 Committee and later as the CEO of the corporation was also in a position to control and

2 influence and correct the violations complained of herein. Instead he participated in a long-term

3 cover-up. He certified the false and misleading SEC reports by his signature.

4      373.    Mr. Tate, Mr. Mooring, Dr. Farmwald, Dr. Davidow, Mr. Dunlevie and Mr.

5 Geschke were also- by virtue of being the long-term directors of Rambus and substantial

6 stockowners and  - Control Persons under the Ninth's Circuit's standard. They also signed the

7 false and misleading SEC reports.

8

9      374.    Dr. Davidow, Mr. Dunlevie, Mr. Geschke, Kennedy and Dr. Farmwald by

10 virtue of the ownership positions and membership on the Compensation and Audit Committees

11 are control persons. The certified the effectiveness of the internal controls and correctness the

12 false and/or misleading SEC reports of Rambus with their signatures.

13      375.    Mr. Tate and Mr. Mooring in particular seem to have been the implementers of

14 the various backdating schemes used to enrich the insider officers and directors. However, it is

15 clear that PWC and WSGR and the board of directors as well as other insiders had knowledge of

16 the scheme. It is also clear that Mr. Tate and Mr. Mooring served at the discretion Mr. Dunlevie

17 and Mr. Davidow the two most powerful directors. Thus, Mr. Tate and Mr. Mooring could not

18

19 have done what they did without the knowledge and approval of Mr. Davidow and Mr. Dunlevie.

20      376.    PWC and WSGR also had the power and influence and to demand correction of

21 the Exchange Act violations complained of herein and in that sense they can be designated as

22 Control Persons. Instead they aided and abetted the violations by covering them up. The motive

23

24 for PWC and WSGR illicit behavior were the option and/or stock grants to provide by Rambus

25 under the 1997 Stock Plan.

26      377.    The operational officers who participated in the insider trading but who had no

27 control over the preparation of the false and/or misleading SEC filings and who did not certify

28

115

the false and/or misleading SEC reports are not considered control persons in this complaint. The Defendants Laura stark, Kevin Donnelly, Sharon Holt, Samir Patel, and Subodh Toprani are excluded from the control person designation. These officers accepted stock and /or options while in possession of material non-public information and traded on the basis of the misappropriated material non-public information. The FTC evidence clearly show that Patel, Donnelly and Toprani were fully aware of the dangers of the submarine patent scheme and participated in the concealment of it. All benefitted from this knowledge because they knew to sell and not hold their options.

378.    The CFO's Harmon and Eulau are control persons by virtue of their significant shareholdings and their central roles in the preparation of the SEC registration and reports and their certification of the SEC reports are control persons. Harmon knew about the submarine patent scheme and participated in the cover-up. Both knew about the falsified SEC filings as a consequence of the backdating practices at Rambus during their tenures. Both benefitted by concealing these frauds and received huge profits from their option grants.

379.    To the extent the initial Exchange act violations fall outside of the statute of limitations they are brought back within the statute of limitations by the fact that the material effects of the false and /or misleading statements are perpetuated through the 2006 DEC filings from their beginning in 1998.

## The Defendants' Fiduciary Duty To RAMBUS and Its Shareholders

380.    Rambus officers and the Board of directors managed willfully and recklessly to violate every one of their fiduciary duties as listed below. By virtue of such fiduciary duties, the officers and directors of Rambus were required, among other things, to:

(a) Manage, conduct, supervise and direct the business affairs of Rambus in accordance with applicable law (including federal and state taws, government rules and regulations and the charter and bylaws of Rambus);

(b) Neither engage in self-dealing nor knowingly permit any officer, director or employee of Rambus to engage in self-dealing;

(c) Neither violate nor knowingly permit any officer, director or employee of Rambus to violate applicable laws, rules and regulations;

(d) Remain informed as to the status of Rambus' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as arc necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e) Prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein

(f) Establish and maintain systematic and accurate records and reports of the business and affairs of Rambus and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g) Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Rambus' financial statements - including its expenses, accounting for stock option grants and other financial information - would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h) Exercise control and supervision over the public statements to the securities markets and trading in Rambus stock by the officers and employees of Rambus; and

(i) Supervise the preparation and filing of any financial reports or other information required by law from Rambus and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Rambus and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

117

381.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Rambus, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The Defendants were motivated by excessive greed.

382.    Under the Delaware General Corporation Law (DGCL), the Directors have a duty of candor to the shareholders <u>to disclose fully and fairly all material information when seeking shareholder action</u>. The issuance of materially false Proxy statements and financial reports prior to stockholder votes violates this duty.

The concealment by the Defendants of the extensive violations of the employee stock option plans were material to the issues being voted upon by the shareholders including the approvals of the accounting firm, the directors and the actual employee stock option plans. Had the Plaintiffs known the extent of the concealment (more than $200 million) they would not have approved the directors or the employee stock option plans or the choice of PWC.

383.    Under the Delaware General Corporation Law (DGCL), the Directors have a duty of candor to the shareholders <u>to disclose fully and fairly all material information when seeking shareholder action</u>. The issuance of materially false Proxy statements and financial reports prior to stockholder votes violates this duty. Under the Delaware General Corporation Law (DGCL), the Directors and Officers have a duty of care to the Rambus and its shareholders to perform their responsibilities in good faith with reasonable care. The fraudulent concealments of the stock options and employee backdating and the other material violations of the federal and state tax laws, the federal securities laws are direct material breaches of the Directors and Officers Duty of care.

384.     In committing the wrongful acts alleged herein. Defendants and PWC have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

385.     During all times relevant hereto. Defendants and PWC collectively and individually initiated a course of conduct which was designed to and did:

> (a)     Conceal that the Company was improperly allowing its directors and senior officers to divert hundreds of millions of dollars to Rambus insiders and directors and causing Rambus to misrepresent its financial results;

> (b)     Maintain Defendants' executive and directorial positions at Rambus and the profits, power and prestige which Defendants enjoyed as a result of these positions;

> (c)     Deceive the investing public regarding Defendants' compensation practices and Rambus financial performance and its litigation prospects;

386.     The choice of APB25 by Rambus had the effect of concealing the material impact of the huge options grants on the financial statements of the company. In fact the use of APB25 actually caused Rambus to pay higher taxes than it would have otherwise had to pay if it had chosen SFAS123. SFAS 123 treatment of the stock options grants would have eliminated all the profit from the company and reduced both federal and state taxes.  It can be therefore immediately inferred that Rambus executives were willing to have the company pay millions in extra taxes to obscure the impact on the net income of the company resulting from the massive transfer of corporate capital to the insiders at the expense of the company and its public shareholders.

387.     The purpose and effect of Defendants' and PWC's common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Rambus common stock so the Defendants could dispose of

119

1  hundreds of millions of dollars of their own Rambus stock, and enhance their executive and
2  directorial positions and receive the substantial compensation they obtained as a result thereof.
3  As a consequence, the Plaintiffs has been damaged both by the elevated securities prices paid
4  and by the sudden deflation in the value of their securities as these abuses were gradually and
5  sometimes suddenly made public.

6
7      388.    Defendants accomplished their common enterprise and/or common course of
8  conduct by causing the Company to purposefully and/or recklessly engage in the option grant
9  timing and insider selling scheme alleged herein and misrepresent Rambus' financial results and
10 prospects. Each of the Defendants was a direct, necessary, and substantial participant in the
11 common enterprise and/or common course of conduct complained of herein. PWC fraudulently
12 bestowed public credibility on the materially false financial reports and thereby facilitated the
13 Defendants.

14
15     389.    Each of the Defendants and PWC aided and abetted and rendered substantial
16 assistance in the wrongs complained of herein. In taking such actions to substantially assist the
17 commission of the wrongdoing complained of herein, each Defendant and PWC acted with
18 knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
19 wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

20     390.    PWC failed to detect material high-level fraud with regard to the options and
21 employment backdating and was negligent within the scope of its auditing engagements over a
22 course of nine years. (The "imputation " defense is not appropriate since the fraud alleged did
23 not benefit the corporation.)
24

25     391.    PWC also audited "Rambus management's assessment of effectiveness of
26 internal control over financial reporting" and attested to its "effectiveness" despite the signs of
27 fraud.

28                                      120

**The Calendar Year 2000 Transfer Of $236 Million To Insiders**

392.    Rambus executives Tate and Mooring caused a huge amount Common Stock Equivalents to be granted to themselves in the form of a reward rather than an incentive as called for by the 1997 Stock Option Plan.

393.    The public was misled into believing that the Common Stock Equivalents (CSEs) were intended for "outside service providers" and not "inside employees" as demonstrated in this complaint. The definition of "service provider" appears on only one line in the 1997 Stock plan. Thereafter, Rambus makes repeated assertions that the CSE's were intended to create incentives for the "outside service providers' that appears to have included the DRAM companies as well as Intel.

394.    Rambus executives caused Common Stock Equivalent grants to unlawfully vest in Q1 of calendar year 2000 before the actual vesting conditions could be satisfied as follows (From Rambus 10-Q for March 31, 2000-filed - May 11,2000):

> "In the fourth quarter of fiscal 1999, the Company granted to its Chief Executive Officer and to its President a combined total of 500,000 Common Stock Equivalents (CSEs) and to its employees approximately 540,000 options to purchase Rambus common stock for $10.00 per share. Vesting of these CSEs and options was contingent upon the achievement of key indicators of success for Rambus. Vesting for a portion of these CSEs and options was contingent on an increase in the price of Rambus common stock to greater than $200 per share for 30 consecutive days. This target was achieved by the end of the second quarter of fiscal 2000, and resulted in a $171.1 million employee stock-related compensation charge taken in the same quarter. Except for a $1.2 million employer payroll tax liability, this was a non-cash charge."

395.    The vesting terms could not have followed the contract shown at 10.11 and 10.12 of the exhibits. Indeed, these common stock equivalents could have never properly vested under the literal terms of the Mooring and Tate's contracts. An examination of the language of the contract reveals why this is so (emphasis added).

"125,000 of the Common Stock Equivalents shall vest in the event that the **closing sales price** of the Company's Common Stock on Nasdaq (or on any successor exchange upon which the Company's shares of common stock are principally traded) **equals or exceeds $200.00** (with such price target adjusted appropriately for any stock splits, stock dividends or other changes in capitalization effected by the Company without receipt of consideration) **for thirty (30) consecutive calendar days**, subject to the Recipient remaining a Service Provider at such time."

Literally there is <u>no closing price</u> for NASDAQ stocks on weekends or holidays and therefore there can never be 30 consecutive calendar days in which the closing price was greater than or equal to $200 per share. As such it was literally impossible for the common stock equivalents to vest under the literal terms of this contract.

If the <u>calendar day restriction</u> is dropped then the vesting would be taken to occur on the <u>30 consecutive day of closing prices of $200 per share or greater</u> then the CSE's would not have vested calendar Q1 2000 at all.

Nevertheless the Defendants vested themselves the common stock equivalents and took the $171.1 million charge in that quarter and PWC turned a blind eye to the illicit transaction. This is demonstrated in Exhibit F.

Gary Harmon was the CFO of Rambus at that time. Ed Larsen a subordinate employee to Tate and Mooring signed the CSE contracts for Tate and Mooring.

396.    Simple inspection of the historical Rambus price quotes in Q2 of fiscal year 2000 (Q1 calendar year 2000) reveals that the price of Rambus stock had only exceeded the $200 per share for 25 consecutive stock market days by the end of FY Q2-2000. See Exhibit

397.    There is no available record of the board having approved this huge and egregious transfer of corporate capital assets. Only Mr. Larsen, Mr. Tate and Mr. Mooring signed the two contracts. The CFO at that time Mr. Harmon did not sign the contract. The Corporate Counsel did not sign the contracts either.

398.    There is no statement that the board of directors or the Compensation Committee approved this massive transfer of capital. There is simply an ambiguous statement that the "Company" granted the options to Tate and Mooring.

399.    There is no detailed accounting for the CSE's given to outside service providers. Thus, there is no record of how many CSE's were granted to WSGR, PWC or any other service providers.

400.    The fiscal year 2000 annual report was audited and attested to by PWC despite the easily discovered unlawful CSE option grants which allegedly vested by FY Q2-2000 as follows:

" REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Stockholders of
Rambus Inc. and Subsidiary

In our opinion, the consolidated financial statements listed in the index appearing under item 14 (a) (1) on page 26 present fairly, in all material respects, the financial position of Rambus Inc. and its subsidiary at September 30, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2000, in conformity with accounting principles generally accepted in the United States. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 14 (a) (2) on page 26 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

123

1      /s/ PricewaterhouseCoopers LLP

2      San Jose, California
3      October 18, 2000"

4
5      401.    The Rambus 2000 proxy statement filed April 24, 2000 affirms that Mr. Tate
6  and Mr. Mooring's Common Stock equivalents had vested in Q2 of 2000 as follows:
7  Mr. Tate's ownership:

8      "Includes 125,000 vested common stock equivalents. Also includes 36,500
       shares subject to options exercisable within 60 days of March 30, 2000,
9      of which 5,249 shares were vested and 31,251 shares were unvested as of
10     March 30, 2000."

11 Mr. Mooring's ownership:

12     "Includes 125,000 vested common stock equivalents."

13 This rendered the Proxy statement materially false and misleading. Making matters worse,
14 Rambus failed to point out the CSE grants in the proxy statement filed February 2000. Rambus
15 reported (after the fact) this huge transfer of corporate capital April 11, 2000 after the half of the
16 October 20, 1999 grants vested.
17

18 **PWC Fails To Audit A $236 Million Transfer Of Corporate Capital**

19     402.    PWC either <u>failed to audit the most significant expense</u> of calendar year 2000
20 (or any other year for that matter) or <u>it intentionally failed to report this unlawful taking of the</u>
21 <u>common Stock Equivalents</u> by the Rambus executives before the conditions for vesting had been
22 met. Instead PWC carried over this negligent or intentional fraud in every subsequent audit and
23 either failed to detect or intentionally failed to report any failures in the Rambus internal controls
24 in 2004 and 2005 internal controls audits for which they were paid over $ 1 million dollars.
25

26     403.    During that period, by issuing unqualified opinions on Rambus' financial
27 statements, and by attesting that Rambus' internal controls were effective, PWC led the Plaintiffs
28                                      124

to believe that Rambus' financial reporting could be relied upon and that Rambus' financial statements were issued in conformity with GAAP. However, there were numerous material deviations from GAAP, including Rambus' falsified accounting for backdated stock options under APB 25, during the entire class period.

404.    Inspection of the Consolidated Statements of Stockholders' Equity and Comprehensive Income for September 30, 2000 and September 30, 2001 shows that 200,000 and 800,000 shares of Rambus stock were issued from the Common Stock Equivalents on the 10-K and 10-Q reports.

405.    As reported elsewhere herein the 2001 10-K405 contradicts the 2000 10-K and it even contradicts itself. This was an intentional effort to confuse the public shareholders in both FY 2000 and FY2001. This is added evidence of scienter on the part of PWC and Rambus.

406.    The Common Stock Equivalents are no longer reported on the Consolidated Statements of Stockholders' Equity and Comprehensive Income from 2003 onward. However, as reported in Exhibit J the existence of the Common Stock Equivalents and the number that are outstanding continue to be reported without any explanation.

407.    PWC failed to properly conduct its audits in accordance with the requirements of GAAS. According to the Codification of Statements on Auditing Standards, at AU §150.02, there are ten standards of auditing which have been approved and adopted by the American Institute of Certified Public Accountants (AICPA). Of these ten standards of auditing, PWC breached a minimum of seven. The ten standards of auditing are broken down into three separate categories including the general standards (3), the standards of fieldwork (3), and the standards of reporting (4). It is apparent that PWC breached one standard of reporting, all three standards of fieldwork.

These breaches were fundamental and inexcusable, but are not necessarily limited to,

125

the following: the third general standard relating to <u>due professional care</u>; the first standard of fieldwork relating to <u>adequate planning of the audit</u>; the second standard of field work relating to <u>gaining an understanding of internal controls</u>; the third standard of fieldwork relating to <u>obtaining sufficient competent evidential matter</u>; the first standard of reporting relating to whether the <u>client's financials are presented in accordance with GAAP</u>; the second standard of reporting relating to <u>the identification of GAAP departures</u>; and the fourth standard of reporting relating to <u>the expression of an opinion</u>.

408.    AU §230, "Due Professional Care in the Performance of Work", states the requirements for the independent auditor to plan and perform his work with "due professional care."  The due "professional care" requirement imposes a responsibility upon the independent auditor to observe the standards of fieldwork and reporting.[96]  Due professional care requires the auditor to exercise professional skepticism as well as obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.

409.    PWC did not exercise due professional care in its audits of Rambus during the class period, as evident through its inappropriate issuance of unqualified opinions in each period, respectively.  Had PWC exercised the proper level of due professional care in its audits, it would have reported the backdating fraud to Rambus' Audit Committee, and required the proper accounting for stock options per APB 25 or FAS123, and/or issued an adverse audit opinion.  The transgressions and departures from GAAP[97] and GAAS discussed herein provide overwhelming evidence that PWC recklessly failed to plan and perform its audits of Rambus during the class period with the requisite due professional care.

---

[96] SAS No. 1, section 230, SAS No. 41, SAS No. 82, SAS No. 99, AU §230.02, Codification of Statements on Auditing Standards.
[97] GAAP is the set of conventions, rules and procedures that constitute the professional standards of the accounting profession. Regulations S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

126

410.    AU §230.07 states that due professional care requires an auditor to exercise professional skepticism throughout the entire audit and defines professional skepticism as "…an attitude that includes a questioning mind and a critical assessment of audit evidence." Again, it is clear that PWC, as exemplified by its failure to report the backdating fraud and to identify concomitant, massive, financial misstatements, as well as profound weaknesses in Rambus' internal control systems, <u>failed to exercise the appropriate degree of professional skepticism</u> that is required by generally accepted auditing standards. AU §230.10 states that, "The exercise of due professional care allows the auditor to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud." In view of the overtly material implications of the backdating fraud perpetrated by the Defendants, <u>PWC failed to obtain the reasonable assurance</u> (and, therefore, failed to exercise the due professional care) necessary to properly issue the unqualified opinions that were issued for each and every period relevant to the instant litigation.

411.    Under AU §311, Audit planning requires developing an overall strategy for the expected conduct and scope of the audit. The nature, extent and timing of planning vary with the size and complexity of the entity, experience with the entity, and knowledge of the entity's business. In planning the audit the auditor should consider, among other things: [98]

- Matters relating to the entity's business and the industry in which it operates;

- The entity's accounting policies and procedures;

- The methods used by the entity to process significant accounting

- Information, including the use of service organizations;

---

[98] SAS No. 22, SAS No. 47, SAS No. 48, SAS No. 77, AU §311.03, Codification of Statements on Auditing Standards.

- Assessed level of control risk;

- Preliminary judgment about materiality levels for audit purposes;

- Financial statement items likely to require adjustment;

- Conditions that may require extension or modification of audit tests,

    such as the risk of material error or fraud or the existence of related party

    transactions; and

- The nature of reports expected to be rendered.

412.    Procedures that an auditor must consider in planning the audit require a review of the records relating to the entity and discussion with other accounting firm personnel and personnel of the entity.  The auditor is also required to obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with GAAS.

**PWC Fails to Audit Backdated Option Grants And Hire Dates**

413.    It is clear that either <u>PWC did not identify the backdating fraud</u> or it failed to report it to management. PWC either failed to assess, or chose to ignore, the illicit status of Rambus' internal controls over accounting for stock options and the persistent risk of CEO Tate's service as the sole member of the Stock Option Committee as a consequence all the option grants are violating IRS CODE 162 (m).

414.    <u>PWC failed to adequately plan its audits</u> in a manner that would support its audit opinions issued from 1998 to 2006.  PWC by ignoring its responsibility to exercise due diligence and adequate professional care in planning the audit, enabled the continuing fraud. Specifically, among other things, PWC failed to properly analyze and/or plan for the assessed

128

1    level of control risk, as required by AU §311.03(d) (see also the following discussion of internal

2    controls per AU §319).

3        415.    PWC willfully and intentionally turned a blind eye to the Defendants' fraud

4    and, thereby, actively colluded in order to preserve its lucrative professional fee arrangement; or

5    whether PWC's was being reckless and negligent in its disregard for auditing standards.  In either

6    case PWC breached its basic responsibility to render a competent and informed opinion on the

7
     fairness of Rambus' financial statements.

8
9        416.    AU §319 codifies Statement of Auditing Standard (SAS) No. 55 and guides the

10   independent auditor's consideration of internal controls in a financial statement audit.  SAS No.

11   55 defines "internal control" as follows:

12           Internal control is a process – effected by an entity's board of directors,

13   management and other personnel – designed to provide reasonable assurance regarding the

14
     achievement of objectives in the following categories: (a) reliability of financial reporting, (b)

15
     effectiveness and efficiency of operations, and (c) compliance with applicable laws and

16
     regulations.[99]

17
18       417.    A company must adopt policies and procedures that encourage employees to

19   follow and meet established Internal control objectives.  AU §319.07(a) through AU §319.07(e),

20   internal control consists of five interrelated components:

21
             Control environment sets the tone of an organization, which influences the control

22
     consciousness of its employees.   The control environment is the foundation for all other

23
     components of internal control, because it provides discipline and structure.

24
25
26
27   ――――――――――――――――
     [99]  AU §319.06.

28                                    129

Risk assessment is the process that an entity must conduct to identify and assess any relevant risks to its accounting objectives. Once this is done, management must determine how the risks should be managed.

Control activities are the policies and procedures that help ensure that management directives are carried out.

Information and communication are two key elements that help management carry out its accounting responsibilities. Management must establish a timely and effective process for relaying information.

Monitoring is a process that an entity uses to assess the quality of its internal control performance over time.

418.    Rambus had defective systems of internal control relating to its stock options that failed demonstrably in each of the five areas of internal control highlighted by AU §319. In this case, Rambus' dysfunctional accounting system, including Rambus' complete lack of meaningful checks and balances, permeated its accounting for stock options. The existence of these problems should have heightened the awareness of PWC and caused them to identify and report the blatant financial misstatements. Absent Rambus' correction of the numerous accounting misstatements, PWC would have been precluded from issuing its unqualified opinions on Rambus' financial statements. The absence of PWC's unqualified opinion would have alerted the marketplace to Rambus' widespread defalcations.

419.    The Codification of Statements on Auditing Standards provides guidance to the independent auditor for identifying and reporting conditions that indicate weaknesses in an entity's internal control observed during the course of an audit of the financial statements. According to AU §325, in the course of an audit, an auditor may become aware of matters relating to internal control that should be of interest to the audit committee, referred to as

130

reportable conditions. Specifically, these are matters coming to the auditor's attention that, in his or her judgment, should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management and the financial statements. Such deficiencies may involve aspects of any of the five internal control components discussed above.[100] This standard goes on to describe reportable conditions that are considered to be material weaknesses, as follows:

A reportable condition may be of such magnitude has to be considered a material weakness. A material weakness in internal control is a reportable condition in which the design or operation of one or more of the internal control components doesn't reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.[101]

420.    PWC should have reported that Rambus had fundamental weaknesses in its internal control system relating to its accounting for stock options and Common stock Equivalents. Instead PWC improperly issued unqualified audit opinions in reliance on information generated by Rambus' deficient financial reporting systems. Extremely high audit risk and materiality surrounds the accounting for stock options at Rambus. The extreme materiality is underscored by comparing the greater than $200 million understatement of expense (as admitted by Rambus) with the less than $120 million in cumulative net income (before taxes) reported by Rambus from 1998 through the most current 2006 quarterly report.

421.    PWC's failure in its responsibilities could not have been accidental.    PWC's

---

[100] AU §325.02
[101] AU §325.15

131

1  continuing failure to identify the profound weaknesses in the Rambus financial reporting system

2  was both reckless and collusive. Rambus' accounting misrepresentations regarding its stock

3  option expense and vast overstatement of its financial results were only made possible by the

4  PWC's failures to apply the appropriate GAAS and GAAP standards. Had defendant PWC done

5  its duty according to its professional standards, the Plaintiffs would not have been damaged.

6       422.    PWC was hired specifically to audit the deficient internal controls and was

7  paid more than $1 million for those audits and failed to raise any red flags whatsoever regarding

8  Rambus' flawed internal control system.

9

10      423.    PWC failed to understand Rambus' internal controls sufficiently to properly

11  plan the audit and perform appropriate control testing procedures, as required by AU §319.02.

12  PWC did not properly assess control risk, as required in AU §319.02 through AU §319.04; or

13  use the information available to properly determine the nature and extent of substantive testing

14  required as a result of the assessed level of control risk per AU §319.05.

15

16      424.    PWC did not perform adequate testing of controls as required by GAAS.[102]

17  Had the audits been conducted in accordance with GAAS, the increased substantive testing

18  would have caused PWC to discover and report the backdating fraud, thereby preventing the

19  false and misleading dissemination of financial information to the markets. Only now, too late,

20  does Rambus seek atonement through its impending accounting restatement. Such action does

21  not repair the damage to Plaintiffs who were deceived by Rambus.

22

23      425.    AU §326 provides information on the third standard of fieldwork regarding

24  evidence. Much of the independent auditor's work in forming an opinion on financial statements

25  consists of obtaining and evaluating evidence concerning the reported items in financial

26  statements. In obtaining evidence to support financial statement assertions, the auditor develops

27  _____
[102] AU §319.75-.79 discusses performing tests of controls in an audit.

28

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1  specific audit objectives. The independent auditor's goal is to obtain sufficient competent
2  evidence to provide a reasonable basis for forming an opinion. The auditor should be thorough
3  in his search for evidence and unbiased in his evaluation.[103] It is obvious that PWC failed this
4  requirement.

5      426.    PWC consistently ignored the accounting manipulations that materially
6  distorted Rambus' financial results. PWC did not have "sufficient competent evidence" to
7  substantiate the unqualified opinions issued during the class period. Instead, PWC either failed
8  to properly conduct the audit by not obtaining sufficient competent evidential matter, as required
9  by AU §326, or knowingly relied on "evidence" contrived to support the inappropriate
10  accounting for stock options.
11

12      427.    PWC should have discovered and reported the backdating fraud by reviewing
13  items such as Rambus' relevant Stock Plans; information specifically relating to the granting of
14  options; and minutes from the Board of Directors meetings and any relevant subcommittees of
15  the Board.[104]    Had PWC properly planned its audit and, as required, obtained sufficient
16  competent evidential matter during the class period, it would have been precluded from
17  providing unqualified audit opinions for each period because of the material departures from
18  GAAP and the numerous material misstatements and omitted disclosures engendered by
19  Rambus' inappropriate accounting for stock options under APB 25.
20

21      428.    AU §316 establishes standards and provides guidance to auditors in fulfilling
22  the responsibility of planning and performing an audit. This standard instructs the auditor
23  regarding the characteristics of fraud, the importance of professional skepticism, identifying and
24  assigning risks of material misstatements due to fraud, responding to the results of the
25
26

---

27  [103]  SAS No. 31, SAS No. 48, SAS No. 80, AU §326, Codification of Statements on Auditing Standards.
    [104]  AU §326.17

28  PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

assessment, evaluating audit evidence, communicating about fraud to management, and documenting the auditor's consideration of fraud.[105]

429.    Rambus' has acknowledged that the backdating fraud played a major role and had significant, material effects on Rambus' financial statements. PWC was oblivious to not only the possibility of fraud, but also the actual existence of rampant fraud within Rambus' financial reporting system.  By disregarding professional standards of care, PWC played an essential role in perpetrating the fraud and misleading investor. This has been demonstrated herein in the 2001 10-K405 and the 2000 10-K reports.

430.    AU §312 provides standards regarding audit risk and materiality in conducting an audit.  Materiality is defined in the FASB Statement of Financial Accounting Concepts No. 2 as the "magnitude of an omission or misstatement of account information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement." Audit risk is defined as "the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."[106]

431.    The SEC also provides authoritative guidance on materiality via its Staff Accounting Bulletin No. 99 (SAB 99).  At the foundation of its analysis, the staff concludes that the use of only quantitative measures in the determination of materiality is imprudent and inappropriate. SAB 99 specifically states "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  Further, SAB 99 refers to the FASB's concept of materiality taken from CON 2, as discussed above.

---

[105]  SAS No. 99, AU §316, Codification of Statements on Auditing Standards.
[106]  AU §312.02

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)