1  • SAB 99 further elaborates on the importance of evaluating not only *quantitative*

2  measures, but *qualitative* measures, as well, by specifically referencing AU §312.11, which

3  states: "As a result of the interaction of quantitative and qualitative considerations in materiality

4  judgments, misstatements of relatively small amounts that come to the auditor's attention could

5  have a material effect on the financial statements."   In fact, the SEC lists specific examples

6  where even a "quantitatively small misstatement" is rendered qualitatively material, including in

7  relevant part:

8

9  a) Does the misstatement masks a change in earnings or other trends

10

11  b) Does the misstatement hide a failure to meet analysts' consensus expectations for

12  the enterprise?

13

14  c) Does the misstatement change a loss into income or vice versa?

15  d) Does the misstatement concern a segment or other portion of the registrant's

16  business that has been identified as playing a significant role in the registrant's

17  operations or profitability?

18

19  e) Does the misstatement affect the registrant's compliance with regulatory

20  requirements?

21

22  f) Does the misstatement have the effect of increasing management's compensation,

23  for example, by satisfying requirements for the award of bonuses or other forms of

24  incentive compensation?

25

26  g) Does the misstatement involve concealment of an unlawful transaction?

27

28

135

1  Rambus illicit practices as alleged herein cause the answers to all the above questions a-f
2  to be affirmative.

3  432.  Rambus' fraud led to numerous misstatements and misleading disclosures that
4  are what the SEC stipulates as "material". This is true from both a quantitative and a qualitative
5  perspective.  Any misstatement, which derives from an illegal act, is, according to SAB 99, per
6  se, material.
7
8  433.  Auditors must assess audit risk and materiality when planning and performing
9  an audit of a company's financial statements, as well as to assist in evaluating whether the
10 financial statements taken as a whole are presented fairly, in all material respects, and in
11 conformity with GAAP.  The auditor should consider audit risk and materiality in planning and
12 designing auditing procedures to obtain sufficient competent evidence on which to properly
13 evaluate the financial statements.[107]

14
15 434.  Audit Risk is made up of three distinct components:  inherent risk, control risk,
16 and detection risk.  Inherent risk relates to the possibility of a material misstatement of an
17 assertion prior to the consideration of a client's internal control structure. Inherent risk includes
18 such factors as the nature of a business' operations and its structure.  Rambus' inherent risk
19 relating to the accounting for stock options was extremely high considering the fact that Tate
20 served as the sole member of the Stock Option Committee and the amounts of stock option
21 compensation routinely granted by Rambus to the Defendants were huge, in comparison with
22 other income statement balances.
23
24 435.  Control risk is the possibility that a material misstatement will not be prevented
25 or detected on a timely basis by a client's internal control systems.  The amount of control risk
26

27 [107]  SAS No. 47, SAS No. 82, SAS No. 96, SAS No. 98, AU §312, Codification of Statements on Auditing Standards.

28

found within a company directly affects the level of acceptable detection risk, as discussed below. In the case of Rambus, control risk was unacceptably high regarding its accounting for stock options, since few, or no, controls existed.

436.    Detection risk is the risk that the auditors will fail to detect any material misstatements with their audit procedures. Detection risk is the risk that the auditor's procedures will lead them to conclude that a material misstatement does *not* exist when in fact such misstatement *does* exist. The level of detection risk governs the amount of substantive testing needed to detect misstatements or misrepresentations. The level of control risk directly relates to the level of acceptable detection risk. If control risk is extremely high, as was the case with Rambus' accounting for stock options, a correspondingly higher degree of substantive testing was required to minimize detection risk.

437.    Auditors must assess audit risk and materiality together when planning and performing an audit, as well as evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, and in conformity with GAAP.

438.    An auditor first determines the "materiality threshold" which a misstatement would render the financial statements as a whole, to be unfair.[108] This "materiality threshold" is then utilized to analyze the determination of the various components that create audit risk. It is only after the materiality thresholds and audit risk have been properly assessed that the auditor can develop the necessary procedures to render an opinion on the financial statements.

439.    The rampant accounting fraud that occurred at Rambus in connection with stock and options created such a high level of audit risk would have caused any competent, "independent" auditor to require a correction of the widespread misstatements or to issue an

---

[108] SAS 47 states, "Financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly in all material respects, in conformity with generally accepted accounting principles."

1  adverse opinion.

2      440.    PWC must bear the responsibility for the consequences of Rambus' systematic

3  and chronic material deception because PWC failed to apply appropriate standards of care in

4  planning and conducting the relevant audits. PWC's gross professional negligence and reckless

5  disregard of professional standards is manifest in the unqualified audit opinions attestations that

6
   were disseminated, along with Rambus' other disclosures, to the investing public. This lack of

7
   care is highlighted by the deceptive material contradictory statements made in the 2001 10-K405.

8

9      441.    The effects of the backdating fraud were such that, in addition to the material

10 departure from GAAP relating to the improper accounting for stock option compensation under

11 APB 25, numerous other accounts and financial statement items were materially affected. The

12 fact that there were numerous misstatements flies in the face of AU §312.38, which addresses the

13 proper auditing treatment when there are multiple misstatements within a client's financial

14
   statements. AU §312.38 stipulates:

15

16      If an auditor concludes, based on the accumulation of sufficient evidence, that the

17 effects of likely misstatements, individually or in the aggregate, cause the financial statements to

18 be materially misstated, the auditor should request management to eliminate the misstatement.

19      If the material misstatement is not eliminated, the auditor should issue a qualified

20 or an adverse opinion on the financial statements. Material misstatements may be eliminated by,

21 for example, application of appropriate accounting principles, other adjustments in amounts, or

22
   the addition of appropriate disclosure of inadequately disclosed matters.

23

24      442.    PWC was required to insist on a correction, or to otherwise alert the

25 marketplace by withholding its unqualified opinion regarding the fairness of the financial

26 statements.

27      Instead, during the relevant period, PWC consistently and inappropriately supplied

28

unqualified audit opinions that lulled the financial markets into believing that Rambus' reported financial results were fair.  On the contrary, the entire approximately $120 million cumulative net income of Rambus during the relevant period would have been correctly reported as a loss, but for the other Defendants' fraudulent conduct and PWC's acquiescence to their wrongdoing.

443.    AU §410 states the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles."[109] PWC's attestation that Rambus' fraudulent financial statements were presented in accordance with GAAP provided an aura of authenticity.  Because of Rambus' incorrect accounting for stock option compensation under APB 25, Rambus' financial statements were *not* presented fairly and in accordance with GAAP.[110]    Had PWC issued a proper opinion that stated that Rambus' accounting for stock option compensation under APB 25 was not presented in accordance with GAAP, or if PWC required Rambus to account for stock option compensation correctly under APB 25, the material fraud would have been publicly reported or corrected.  However, by issuing unqualified opinions, PWC intentionally facilitated the fraud.

444.    AU §431 states: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report."[111]  This standard also goes on to stipulate that proper presentation in conformity with GAAP includes adequate disclosures of material matters.[112]  That is, if the financials do not have adequate disclosures the financials cannot properly be deemed to be in conformity with GAAP. Rambus clearly financial disclosures clearly did not have adequate disclosure. This standard requires that the auditor issue

---

[109] SAS No. 1, section 410, SAS No. 62, AU §410.01, Codification of Statements on Auditing Standards.
[110] The improper accounting under APB 25 led to other material misstatements and departures from GAAP. These departures include, but are not limited to, APB 25 – Accounting for Stock Option Compensation, SFAS 109 issues – Deferred Taxes, numerous misstated expenses, overstated net income, misstated balance sheet accounts, and numerous problems with, among other things, Rambus' cash flow statements.
[111] AU §431.01
[112] AU §431.02

139

a qualified or adverse opinion if the disclosures are inadequate to meet GAAP standards.[113] As discussed previously, numerous Rambus' disclosures relating to the financial statements were fundamentally inadequate and materially false and misleading during the entire class period.

Regardless of the extreme materiality of the inappropriate accounting for stock options and the existence of illegal backdating during the entire class period, <u>Rambus never once disclosed the backdating to the public</u>[114]. In fact, numerous Rambus disclosures were tainted by the backdating fraud, and because of that fraud were, per se, false and misleading. [115] Because Rambus' disclosures were inadequate and/or false, the financial statements were, therefore, not presented in conformity with GAAP. Accordingly PWC should not have issued an unqualified opinion because of the inappropriate accounting for stock option compensation and the resultant inadequate disclosures.

445.    AU §380 requires the auditor to report certain matters relating to the conduct of an audit to the audit committee. The auditor is required to report additional information regarding the scope and results of the audit to assist the audit committee in overseeing the financial reporting and disclosure process.[116]

446.    Although there were numerous reportable conditions and material weaknesses in Rambus' internal control system relating to stock option compensation, PWC did not call these material weaknesses to the attention of Rambus' Audit Committee, contrary to the requirements of GAAS. The system of internal controls pertaining to accounting for stock options at Rambus was completely unreliable. PWC breached GAAS principles by accepting unreliable accounting information regarding the stock options grants. PWC aided and abetted the deception of

---

[113] AU §431.03
[114] Until forced to do so by a public report from the CFRA on May 15, 2006.
[115] Rambus' inadequate, false, and misleading disclosures in its financial statements  the period include but are not limited to its SFAS 123 disclosure relating to EPS including fair value of stock option expense, its SFAS 128 disclosure relating to EPS, and its SFAS 109 disclosure relating to deferred taxes, among others.
[116] SAS No. 61, SAS No. 89, SAS No. 90, AU §380, Codification of Statements on Auditing Standards.

140

1  investors by presenting information in the form of audited financial statements that carried

2  PWC's unqualified opinion and, accordingly, attested to their fairness.

3      447.    PWC was required to issue an adverse opinion on Rambus' financial

4  statements:

5          The Codification of Auditing Standards, at AU §508.58,59 states:

6
7  "An adverse opinion states that the financial statements do not present fairly the
   financial position or the results of operations or cash flows in conformity with
8  generally accepted accounting principles. Such an opinion is expressed when, in
   the auditor's judgment, the financial statements taken, as a whole are not presented
9  fairly in conformity with generally accepted accounting principles.
   When the auditor expresses an adverse opinion, he or she should disclose in a
10 separate explanatory paragraph(s) preceding the opinion paragraph of the report (a)
   all of the substantive reasons for his or her adverse opinion, and (b) the principal
11 effects of the subject matter of the adverse opinion on financial position, results of
   operations, and cash flows, if practicable. If the effects are not reasonably
12 determinable, the report should so state."

13

14     448.    Rambus would have been forced to correct the material misstatements and

15 omissions attributable to its misconduct regarding the fraudulent backdating scheme if PWC had

16 rendered an adverse opinion. PWC was required to render an adverse opinion by GAAS.

17     449.    If the Rambus audit had been planned properly, control risk had been assessed

18 properly, and sufficient substantive testing had been performed to obtain sufficient competent
19
   evidential matter, it would have been impossible for PWC to overlook the material weaknesses
20
21 in Rambus' internal controls. However, because of PWC's reckless disregard and gross

22 negligence in performing the relevant audits of Rambus' financial statements and Rambus'

23 Internal Control over Financial Reporting, Rambus was able to succeed in concealing its illegal

24 backdating fraud from the public and the Plaintiffs.

25 **WSGR FACTS**
26
       450.    Information has been emerging recently regarding WSGR involvement in the
27
28 141

1  on-going options backdating scandal in the valley. WSGR has been added as a defendant to this
2  in response to these on-going disclosures. The facts emerging in the Brocade civil and criminal
3  cases are strikingly similar to the facts emerging in the Rambus case.

4      Indeed the violations by Rambus appear to be much more severe than the violations
5  reported in the Brocade case. The longer duration of the Rambus offenses, the amount of
6  company capital misappropriated and the hundreds of millions of dollars conferred on the
7  Rambus control persons are more extreme than the Brocade case where CEO Reyes did not
8  benefit in the egregious manner that Mr. Mooring and Mr. Tate did.
9

10     451.    WSGR has been accused of advising Brocade[117] to form a "one-man stock
11  option committee" in violation of 162 (m) and helping Brocade cover-up its SEC financial
12  statement transgressions as alleged herein.

13     452.    WSGR was Rambus corporate lawyer since at least 1997. Plaintiffs alleges that
14  WSGR advised Rambus on the adoption of the "one-man" committee. In fact WSGR continues
15  to justify this contemporaneously.
16

17     453.    An article in the March 29, 2007 edition of The Recorder states the following
18  (emphasis added):

19

20          "Wilson Sonsini Goodrich & Rosati has spent the past year trying to back
            away from the metastasizing stock option backdating mess, but an internal e-
21          mail now in regulators' hands is making it difficult.

22          In a 2004 message, Wilson Sonsini lawyer Roger Stern asks his partner to dig
            up a document from the time when a client was "using the time machine to
23          pick low strike prices."

24          That client, semiconductor maker KLA-Tencor, has since restated its earnings
25          by $370 million to account for backdating its options during the tech boom,

26

27  [117] Reyes stated that Larry Sonsini a partner of Wilson Sonsini Goodrich and Rosati, PV advised him to use a "one –
    man" stock option committee.

28                                        142

1

when Wilson Sonsini chief Larry Sonsini was the company's corporate secretary.

2

3

The firm was forced to cough up the internal exchange by a subpoena from the Securities and Exchange Commission, said people who've seen the e-mail.

4

5

That subpoena was sent to the firm in January as part of the government's probe of KLA's options. And it kicks off what promises to be an unpleasant process for Silicon Valley's top firm."

6

7

http://www.law.com/jsp/article.jsp?id=1175072645397

8

This email directly implicates the WSGR in the options backdating scandal.

9

10

454.    The Recorder article goes on to reveal that WSGR stands to profit from the options backdating practices of its clients.

11

12

13

14

15

" <u>Across a swath of companies</u> at which Sonsini had a leadership role, options were misdated on his watch by executives or lawyers close to him, by company officials consulting with Sonsini's firm, and -- in the high-profile Pixar case -- by Sonsini himself. Prominent among those companies are Brocade, Juniper Networks, Apple and Pixar, as well as KLA.

16

17

Complicating matters is the fact that, according to SEC records, <u>Sonsini and his firm may have profited immensely from stock awards by companies that admit to rampant options improprieties.</u>

18

19

With government investigations of options cases well under way, document requests, depositions and subpoenas private and governmental will force Sonsini to explain his role at numerous companies.

20

21

22

Separately, government investigators will meet this week with lawyers for Pixar, where -- according to people with direct knowledge of the company -- Sonsini was among the board members who signed off on backdated options paperwork.

23

24

25

Then there's the uncomfortable deposition Sonsini will endure next month, when lawyers for Brocade executives indicted on options charges will grill him in the presence of SEC officials.

26

27

Firm spokeswoman Courtney Dorman has said that the correlation between Wilson and the ethical lapses of the last tech boom is a function of market share: Wilson Sonsini represents more Valley companies than anyone else.

28

143

1

The firm declined to address a list of specific questions about its work with KLA, Pixar and Juniper.

2

"Based on direct experience with The Recorder, we have concerns that any information we provide will not be treated responsibly and fairly," Dorman wrote in an e-mail on Thursday. "For that reason, and because some of the matters about which you inquire concern clients, we are choosing not to participate in your reporting of this story."

3

4

5

6

455.   Another Recorder article dated March 29,2007 reports the details of Brocade

7

transactions in which Larry Sonsini received stock based compensation. The following is

8

excerpted from the article:

9

10

"Wilson Sonsini Goodrich & Rosati took Brocade Communications public on May 25, 1999. The shares were priced at $19 -- seen as a good deal at that time because Brocade was actually swinging a profit that year, when so many tech companies going through an IPO were not.

11

12

13

The shares were an even better deal for Larry Sonsini, Wilson Sonsini's name partner: He held pre-IPO options to buy more than 100,000 shares priced at $5, according to public filings with the Securities and Exchange Commission.

14

15

16

On Aug. 20, 1999, when the price hit $171.75, Sonsini exercised the options, and handed the resulting $18.7 million worth of Brocade stock over to WS Investment Co. -- his firm's private fund, filings show.

17

18

Over the next two years, Brocade stock soared alongside its earnings. It reported a profit of $67.9 million in its first post-IPO fiscal year. Now, of course, the story is different: When expenses for backdated stock options are factored in, the company actually lost hundreds of millions of dollars during that period.

19

20

21

In April 2001, a few months before the stock tanked, Brocade gave Sonsini 60,000 options -- a grant the SEC says was backdated to a five-month market low. Brocade's board had made a special exception to its compensation plan in order to grant these options to Sonsini and one other board member on that day, securities filings show. The grant ended up becoming mostly worthless because it vested after the company's stock price had plunged."

22

23

24

25

456.   On April 30, 2007 the recorder[118] reported the following:

26

27

[118] http://www.law.com/jsp/article.jsp?id=1177664681014

28

144

> "U.S. District Judge Charles Breyer raised concerns Friday that Wilson Sonsini Goodrich & Rosati may have a conflict of interest in litigation over options backdating at Brocade Communications Systems Inc..... At Friday's hearing, Breyer noted that former Brocade chief executive Gregory Reyes, now facing criminal charges over backdating, has publicly said Sonsini advised the CEO to create an options "committee of one."
>
> "There is evidence out there that Mr. Sonsini was involved in the mechanism ... which officers utilized in granting backdated options," Breyer said, addressing Wilson partner Nina "Nicki" Locker. "Is it appropriate for you as the law firm to negotiate the settlement?"

457.    A further report March 29, 2007 indicates that Sonsini's appetite for stock in client companies was not limited to Brocade. The following is an excerpt:

> "In the months after Sonsini exercised his pre-IPO Brocade options, Brocade's stock split twice. If WS Investment Co. sold its shares at the height of the tech bubble; it could have netted more than $150 million.
>
> Brocade also reported that on April 17, 2001, the company changed its compensation plan for directors, giving Sonsini a grant of 60,000 options.
>
> The closing share price April 17, 2001 was $20.70, a five-month low that the SEC has identified as backdated in its civil complaint against Brocade executives. Furthermore, in response to a question that month from Brocade's HR chief about company options policy, CFO Anthony Canova instructed in an e-mail "not to make statements about the board granting shares at the lowest price," the SEC complaint alleges.
>
> This wasn't the only instance in which a company where Sonsini sat on the board changed its options policy to give directors an unscheduled grant. At Novell, where Sonsini sat on the board for nearly 15 years, the company gave directors unscheduled options three times, including once when the stock traded at a 17-month low. That grant became worthless before vesting.
>
> Novell retained Morgan, Lewis & Bockius last August to conduct an internal investigation of its stock option practices, but has not yet announced the results."

http://www.law.com/jsp/article.jsp?id=1175072645962

458.    Sonsini's alleged backdating of options at Pixar suggests that WSGR was from the top down promoting the illicit practice of undisclosed option backdating as well as options

145

1  spring-loading using unscheduled grants. It suggests an ugly contempt for the fiduciary duty of a

2  corporation to its shareholder and the law. We see this same contempt exhibited at Rambus.

3
4
> "While Sonsini's role in KLA and Juniper was limited to giving advice, he was more directly involved at Pixar, the animation company acquired last year by Disney.

5
6
> There, Sonsini actually signed the paperwork awarding backdated grants, said sources who have seen the documents.

7
8
> Sonsini was on the Pixar board of directors, along with Apple Inc. CEO Steven Jobs. While Pixar had a compensation committee to award options, SEC filings indicate that for years, the entire board of directors performed that role instead.

9
10
> Sonsini and Jobs were among board members who signed off on a series of sketchy awards — including a million-option grant to Chief Creative Officer John Lasseter that came at an annual low share price — said people with knowledge of the case.

11
12
> What that means to government investigators isn't clear yet."

13
> (http://www.law.com/jsp/ca/PubArticleCA.jsp?id=1175072636313)

14

15  459.    WSGR has substantial investments in firms like Rambus:

16
17
18
> "The law firm investments are, in some cases, substantial. For example, Deger notes that at the end of 1999, Wilson Sonsini Goodrich & Rosati, a California-based law firm, held stock worth $230 million in newly-public clients, representing $1.9 million per partner."

19
> (Renee Deger, Taking Stock: Hitting the Jackpot, RECORDER, Jan. 6, 2000)

20

21  460.    The Consulting firms taking equity interests in their clients new firms are

22  illustrated by the following:

23
24
25
26
27
> "Stock Becoming Payment of Choice for Professionals Servicing Dot-coms, MIAMI HERALD, May 16, 2000, available at LEXIS, News Library, Allnws File (stating that consultants, accountants, recruiters, public relations firms and advertising agencies are taking fees in the form of stock),
> and Jerry Useem, New Ethics or No Ethics? Questionable Behavior Is Silicon Valley's Next Big Thing, FORTUNE, Mar.20, 2000, at 82 (stating that consulting firms are taking fees in the form of equity and executive search firms are taking interests in their clients)"

28
146

461.    WSGR has profited by helping its clients to conceal materially adverse legal and financial problems from the public. The magnitude of these profits to WSGR has been enormous as the following article indicates:

> "The profits made by Silicon Valley law firms seem staggering when viewed both individually and in the aggregate. One often-cited example is Wilson Sonsini's representation of VA Linux in its initial public offering in December 1999. VA Linux stock was valued at $30 per share at the opening of the market, but closed that day at over $239 per share.125 In one day of trading, the value of Wilson Sonsini's 102,584 shares rocketed to $24.5 million.126 However, VA Linux was not the only winning card Wilson Sonsini held that year. The Palo Alto law firm also took Webvan public, and at the end of the first day of trading, the firm's shares in its client were worth more than $51 million.127 According to public securities filings, and not including any shares that may have been sold, shares held by Wilson Sonsini partners at the end of 1999 from clients they took public that year totaled $230 million.128 Moreover, the year 2000 did not have doomsday consequences for Wilson Sonsini; in February 2000, the firm took Avanex Corp. public. One month later, its shares were worth $109 million."

(http://moritzlaw.osu.edu/lawjournal/issues/volume64/number3/hurt.pdf)

462.    WS Investment Management company and WS Investment Company, LLC is the venture investment arm of WSGR. It has been investing in client firms since 1973:

> "The WS Investment Company is a series of venture capital/private equity funds operated by and for the benefit of the attorneys and staff of Wilson Sonsini Goodrich & Rosati, P. C. WSGR is the premier legal advisor to technology and growth business enterprises worldwide. WS Investment Company invests principally in equity and equity-oriented securities of privately held, early stage technology-related companies, as well as in venture capital and private equity funds which invest in technology companies."

(http://www.fidelissecurity.com/news/index.php?news=20)

463.    WSGR has many investment companies beginning with the WS Investments prefix. WS Investments in its many reincarnations has obtained waivers from the SEC so that it does not have to report its stock positions or gains. Thus WS Investments transaction are hidden from view preventing an analysis of the insider trading conduct that has no doubt been on-going.

464.    Rambus' failure to disclose options and/or stock grants to consultants including attorneys and accountants is qualitatively and quantitatively a material omission from their SEC reports. This additional form of concealment denies the public shareholders information required to address the credibility of the financial and legal reporting contained within the SEC reports. In addition, it conceals the risk of the misappropriation of non-public information by outside service providers.

465.    Undisclosed option and/or stock grants to Rambus' corporate accountants and attorneys or undisclosed purchases of Rambus stock by its corporate accountants and attorneys deny the public shareholders material information that bears on the weight and credibility of the accountants and attorneys opinion and certifications and indicate scienter on the part of Rambus management.

466.    Rambus' ongoing legal service fees to WSGR are also undisclosed. In fact, there is no mention of WSGR in Rambus 10-Q or 10-K or other financial reports.

467.    The fact that WSGR and PWC own or owned stock or options in Rambus by itself is not sufficient to prove a 10 B-5 violation. However, it does prove that the WSGR and PWC had motive and opportunity to commit securities fraud, which when combined with the other facts alleged herein about WSGR's and PWC's behavior with respect to other emerging companies and with the misleading legal statements in the SEC filings described herein should satisfy the Ninth Circuit's requirement that the Plaintiffss plead sufficient facts that constitute "strong circumstantial evidence" of intent.

468.    WSGR is still seeking stock in select emerging client corporations below the SEC reporting threshold as demonstrated in the following S1 registration statement for Ipsilon Systems, Inc in 2006:

> "The validity of the shares of common stock offered hereby will be passed upon for us by Wilson Sonsini Goodrich & Rosati, Professional Corporation, Seattle, Washington. Fenwick & West LLP, Mountain View, California, will act as counsel to the underwriters. Certain members of investment partnerships comprised

148

of members of, and persons associated with, Wilson Sonsini Goodrich & Rosati beneficially hold an aggregate of 110,619 shares of our common stock, which represents less than 0.1% of our outstanding shares of common stock."

469.    When a corporate attorney or accountant owns stock in a client company that is emerging in the market their independence is compromised. Compromise of independence is a material issue that must be disclosed to the public shareholders and the business community. Rambus has concealed the loss of independence of these service providers.

470.    WSGR represented Rambus in the resale registration under the Securities Act of 1933 of the $300 million convertible bond issue of January 2005. This bond issue would have been unnecessary but for the options and new hire backdating practices of Rambus which drained Rambus of its corporate assets.

471.    WSGR and PWC both lent their signatures of approval to the Convertible bond offering as shown in the Form 3 SEC filing dated April 29, 2005 as follows:

"LEGAL MATTERS

The validity of the securities offered by this prospectus was passed upon for us by Wilson Sonsini Goodrich & Rosati, Professional Corporation, Palo Alto, California.

EXPERTS

The financial statements and management's assessment of the effectiveness of internal control over financial reporting (which is included in Management's Report on Internal Control over Financial Reporting of Rambus Inc.) incorporated in this Prospectus by reference to the Annual Report on Form 10-K for the year ended December 31, 2004 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting. "[119]

## WSGR ALLEGATIONS

472.    Plaintiffs alleges that WSGR provided the legal advice to the firm with regard

---

[119] Investor.rambus.com/EdgarDetail.cfm?CIK=917273&FID=1193125-05-90664&SID=05-00

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)

to the use of a "one man stock option committee" and the illicit options and new employee hire date "backdating". WSGR was involved the creation and maintenance of the mechanism of options and new hire backdating and other related practices at Rambus to evade the purpose of Sarbanes-Oxley.

473.    Plaintiffs further alleges that WSGR was motivated to increase the profitability of their Rambus stock and/or option grant awards by recommending these illicit practices in order to inflate the value of their stock or option grants and prevent the public and Plaintiffs from learning about the illicit practices.

474.    WSGR as Rambus corporate attorney was privy to material non-public information and -as a consequence- any purchases, acceptances of grants of stock or options and any sales of Rambus stock by WSGR during the fraudulent period constitute insider trading under the Exchange Act of 1934 and the California insider trading laws.

475.    Plaintiffs further alleges that WSGR willfully in April 2005 filed false S3 report with the SEC in violation of the 1933 Exchange Act. This S3 report was the prospectus for the $300 million convertible bond.

476.    Harold Hughes, Robert Eulau, Geoffrey Tate, Bruce Dunlevie, P. Michael Farmwald, Mark Horowitz, Kevin Kennedy, and David Mooring signed the SEC Registration documents for the Convertible Bond on behalf of Rambus and PWC and WSGR signed on behalf of the public accountant and outside corporate lawyers.

477.    WSGR played a role in the placement of the convertible bond in that Credit Suisse First Boston is a client of WSGR and managed the private placement.

478.    Rambus repurchased half of the Convertible bond back from the initial purchasers at a profit to Rambus and a loss to the purchasers.

479.    PWC and WSGR signed as authorities for the prospectus and are therefore

150

1   subject to the "standard of reasonableness" in their investigation and the grounds for belief that

2   the would be required of a prudent man in the management of his own property.

3       480.    WSGR cannot meet either the "reasonableness" or the "scienter" standards

4   since evidence now shows that WSGR and/or its agents were aware of the options backdating

5   practices of their clients and even kept records of them and at times participated in the

6   backdating of options grants and Mr. Sonsini is alleged to have received backdated options.

7       481.    The Convertible Bond prospectus stated:

8

9           "We incorporate by reference into this prospectus the documents listed
            below and any future filings made with the SEC under Sections 13(a), 13(c),
10          14 or 15(d) of the Exchange Act, including any filings after the date of this
            prospectus and until this offering is complete (except information "furnished"
11          on a current report on Form 8-K). The information incorporated by reference is
            an important part of this prospectus. Any statement in a document incorporated
12          by reference into this prospectus will be deemed to be modified or superseded
            to the extent a statement contained in (1) this prospectus or (2) any other
13          subsequently filed document that is incorporated by reference into this
            prospectus, modifies or supersedes such statement.
14

15          Our Annual Report on Form 10-K for the fiscal year ended December 31,
            2004;
16

17          Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2005;

18          Our Current Reports on Form 8-K filed on January 13, 2005, January 18, 2005
            (only as to Item 3.01), January 26, 2005, January 27, 2005, February 8, 2005,
19          March 4, 2005, March 17, 2005, March 21, 2005 (only as to Item 1.01), April
            18, 2005 and May 3, 2005; and
20

21          Our revised definitive proxy statement on "Schedule 14A filed on March
            29, 2004."
22

23          Thus, the false statements contained in those reports form the basis of a 1933

24          Exchange Act violation.

25      482.    While the right of private action for damages goes to those who purchased the

26   Convertible Bond and not the Plaintiffs, for the violation of the 1933 Exchange Act by Rambus

27

28                                      151

1  Inc., PWC, and WSGR, these violations of the 1933 Act are further evidence of the reckless
2  states of mind of the signatory parties including PWC and WSGR.

3      483.    The other registration reports filed by Rambus from 1998 on were as a
4  minimum materially false due to the incorporation by reference of the associated false Proxy
5  statements and 10-K and 10-Q reports. Plaintiffs maintains a contributory right to private action
6  with respect to these materially false registration filings that enabled the massive transfer of
7  corporate capital to corporate insiders. Exercise and sale of these options caused the stock to fall
8  and Plaintiffs was damaged thereby.
9

10     484.    The changes in the board of directors and executive management at Rambus left
11  Harold Hughes in the position of CEO and only inside board member at the beginning of 2005
12  with the exception of Dr. Horowitz and Dr. Farmwald who were designated as inside directors in
13  the 1997 stock plan.

14     485.    Plaintiffs also allege that WSGR or its agents engaged in "insider trading" in
15  Rambus stock as it did with Brocade and other client companies. While the Brocade, KLA-
16  Tencor, PIXAR and other cases involving WSGR in options backdating and other related illicit
17  practices are not complete, the ever increasing evidence strongly suggests that WSGR benefited
18  from the stock and option transactions in these companies while in possession of materially
19  adverse non-public information misappropriated from its client companies.
20

21     486.    Plaintiffs allege that PWC and/or its agents used its inside knowledge of
22  Rambus' material adverse non-public information in trading Rambus stock and benefited in
23  undisclosed ways thereby.
24

25

26  **Rambus Misleads About The Materiality Of Options and Stock Grant Expenses**

27     487.    Rambus in its SEC filings stated that the options compensation expenses were
28
152

1  "non-cash charges". This recurring statement is materially misleading. Rambus' had the practice

2  of granting undisclosed "in-the-money" options. Such illicit grants transfer the strike price

3  money that should be going into the company treasury upon execution into the pockets of

4  corporate insiders.

5      This can hardly be considered a "non-cash charge". This statement had the effect of

6  lulling the shareholders and prospective shareholders into a false sense that there was no effect

7
8  on the Rambus' finances. This statement without further explanation is materially false and is a

9  violation of both the SEC requirements and California fraud law (it is not the whole truth).

10      488.    Rambus violated California fraud law in making the statements contained in its

11  10-Q, 10-K and DEF 14 Proxy Statements in the years 2000 and beyond.  Under California fraud

12  law:

13      "Even where no duty to disclose would otherwise exist, "where one does speak he
        must speak the whole truth to the end that he does not conceal any facts which
14      materially qualify those stated. One who is asked for or volunteers information
        must be truthful, and the telling of a half-truth calculated to deceive is fraud."13
15      Vega, 121 Cal. App. 4th at295 (citation omitted). "
16

17  **Additional Stock Option  Allegations**

18
19      489.    The gross proceeds from the exercise of options and sales of Rambus stock

20  between 1997 and Q1 2006 by Rambus Insiders and employees is approximately 1.2 billion

21  dollars. The pre-tax profit to the Rambus Insiders and employees is approximately 1.02 billion

22  dollars. For this capital stock the company received 125 million dollars. This shows the massive

23  diversion of Rambus' capital assets to the Defendants.

24      490.    Since 1998, 12 million shares have been repurchased under the stock

25  repurchase authorizations at Rambus.  $184 million dollars has been spent repurchasing stock.

26
27  $125 million dollars have been received from the exercise of stock options. As a consequence

28

1    Rambus has spent $ 59 million dollars more for the stock it has repurchased than it has received
2    thus further consuming corporate capital. This deficit would have been eliminated but for the
3    management's options manipulations.

4        491.    A company is in effect a seller of its options under 10B and the employee a
5    purchaser of an option grant when the option is exercised at the exercise price. There is the
6    element of a bargain here. The court in SEC vs. Texas Gulf Sulphur Co held that receiving
7    options while in possession of material non-public information violated 10B.
8

9        492.    From fiscal 2001 to 2006, the Compensation Committee granted certain
10   Rambus stock options to the Backdated Option Recipients and certain other executives of the
11   Company, as set forth in Exhibit A hereto. Frequently the grants were dated just after a sharp
12   drop in the Company's stock price and before a substantial rise in the Company's stock price.

13       493.    For example, as demonstrated on Exhibit A, the Company's Proxy statement
14
15   filed with the SEC March 19, 2004 reported that on November 25, 2003, Defendants Tate,
16   Mooring and Eulau, in addition to Rambus officers, John D. Danforth, the Company's Sr. Vice-
17   President, General Counsel and Secretary and Ed Larsen, the Company's Sr. Vice-president for
18   Administration, received options for 760,000 common shares of Rambus at an exercise price of
19   $25.16, or the price of shares on the date of grant. However, a mere three days later, on
20   November 28, the price had risen to close at $30.00 per share, thus creating an almost instant
21   profit for the recipients of these options of nearly $3,800,000.
22

23       494.    On August 23, 2001 options were issued at $4.86 and the next day the price
24   went to $5.67 per share and three days after that, on August 27, to $7.37 per share. More
25   extraordinary, the price of Rambus shares had been $5.35 per share on the day before the option
26   grant date. In fact, the exercise price of $4.86 per share is the lowest trading price of Rambus
27   stock for the year.  Defendants Tate and Mooring each received options to purchase 600,000

28

1    shares of Rambus and realized virtually instant profits of over $1.5 million dollars each. The

2    Compensation Committee ratified these actions either directly or by their inaction.

3        495.    The reason for the extraordinary pattern of stock option grants as alleged herein

4    is that many, if not all, of the purported grant dates set forth therein were not the actual dates on

5    which the stock option grants were made.

6        496.    From the available public documentation, 31 option grant dates have been

7    determined for directors and executives of Rambus. Of these 31 option grants, all but 3 show

8

9    signs of one or more of the grant date manipulations described in 2.

10            These options grants are shown in Exhibit B.

11            a. There have been 53 million options issued and 12 million cancelled between 1997

12   and 2006.  Between 1998 and 2006, the average exercise price reduction netted in employee

13   options by "repricing" is $2.17 per option granted for an employee gain of $ 26,165,647.  This is

14   evidence of "repricing".

15

16            b. Evidence of "spring-loading" of the options is obtained by examining increases in

17   stock price at 5, 10 and 22 days after the date of the grant.  20 out of 27 options showed the

18   telltale signs of "spring-loading" at 22 days after grant. The average improvement in stock price

19   was 58.4 %. If 28 out of the 29 options are included in the calculation the average gain is still

20   37.7%.

21            c. Evidence of "backdating" is obtained by examining the stock price 5 days before

22   the alleged grant date.  15 of 27 options grants show a higher price 5 days earlier than at the time

23

24   of the grant. There are 9 spring-loaded options that were not backdated.  Thus there are 24 out

25   the eligible 27 option grants that show backdating or spring-loading.

26

27

28                                    155

1             d. The use of "unscheduled" options grants makes it simple to spring-load and

2    backdates options grants. Rambus uses unscheduled options grants almost exclusively with the

3    possible exception of the employee stock plan.

4             e. The illicit management of the options grants is made clearer by referencing the

5    news events that precede or are coincident with the spring-loaded option.  It is clear that the

6    option grants were frequently timed with respect to news releases.

7

8             Charts E1-E10 provided in the appendix show the price grant history of the options

9    in Exhibit B.

10          . Options 12, 20 and 21 do not show the characteristics of manipulation. An

11   examination of the news events reveals why this is.

12            Option 12 was granted with a date of 12/12/2000.  The stock dipped on rumors of a

13   possible Rambus-Intel lawsuit. Also, the Infineon trial began in Virginia on December 22. After

14   Intel denied intent to sue Rambus January 3, 2001 and agreed to publicly push RDRAM.  The

15   stock began it recovery to 51.88 by January 30, 2001.

16

17            Option 20 was granted with a date of 6/7/2004. Option 21 was granted with a date

18   of 8/2/2004. Both these options were issued as the Infineon appeal and the FTC case were

19   becoming very active during the months of June, July and August. The stock price became

20   unpredictable.

21            Timing of options grants with "backdating" and "spring-loading techniques defeats

22   the purpose of an "incentive" stock option program by changing it into a "reward" program.

23

24   When options grants are used as a reward rather than an incentive they are improper.[120]

25         497.     Rambus executives and directors received stock options while in possession of

26   materially adverse non-public information (the unfair business practices, Sherman antitrust

27   _____

[120] Analog Devices Vs. The SEC

28

violations, the option grant violations, the fraudulent proxy and financial statements) in violation of 10B.

498.     A company is in effect a seller of its options under 10B and the employee a purchaser of an option grant when the option is exercised at the exercise price. As noted earlier, the court in SEC vs. Texas Gulf Sulphur Co held that <u>receiving options while in possession of material</u> non-public information violated 10B.

499.     The improper stock option backdating violated the terms of the Company's shareholder-approved stock option plan. Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the closing price of Rambus stock on the date of grant.

Stock Option Backdating improperly increased the value of the options to the recipients and gave them an immediate paper profit that undermined the incentive purpose of such options, improperly reduced the amounts the recipients had to pay the Company upon exercise of the options, and unfairly transferred shareholder equity to Defendants.

500.     On or about June 6, 1997 Rambus filed with the SEC a Registration Statement on Form S-8 registering its 1990 Stock Plan, 1997 Stock Plan and 1997 Employee Stock Purchase Plan. The 1997 Stock Plan stated that options granted under the Plan may be Incentive Stock Options or Nonstatutory Stock Options. The Plan at Section 9 defines the "Exercise Price" as follows:

"9     Option Exercise Price and Consideration.

(a) Exercise Price. The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following (emphasis added):

(i)      In the case of an Incentive Stock Option

(A) granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(B) granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant,"

(ii)     In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator. In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant,"

501.     Defendants' conduct also violated the terms of the Company's own corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy. For example, the Company's Code of Business Conduct and Ethics provides the Company's Code of Business Conduct and Ethics provides that each director, officer and employee may not profit from possession of significant, non-public information; and must engage in "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships." The Code further states that Rambus has a responsibility to communicate effectively with shareholders so that they are provided with full and accurate information in all material respects, about Rambus' financial condition and results of operations.

502.    Rambus communications with shareholders have been materially misleading and false and Rambus has not been able to restate its financials after more than one year of audit and the shareholders has suffered as a consequence thereof.

**Materially False and Misleading Proxy Statements**

503.    Defendants' backdating schemes also rendered the Company's Proxy Statements issued in connection with shareholder meetings held from 1999 to 2006 materially false and misleading. The Proxy Statements falsely reported the dates of the stock option grants and falsely represented that the options were granted at fair market value. If the option grant was backdated, the options value was not fair from the vantage point of the Company and its shareholders.

504.    For example, a report on the 2003 executive compensation contained in Rambus' 2004 Proxy Statement falsely represented that "non-cash compensation [to executives] should be closely aligned with shareholder interests." This statement is extraordinarily misleading in that the interests of the shareholders was damaged by the huge transfer of Rambus' capital assets to corporate insiders.

505.    In addition, Rambus Proxy's statement filed in 2005 was also false and misleading due to the continuing concealment of the Company's illicit practice of backdating options and employee hiring dates.

506.    Rambus issued its Proxy Statement dated December 20, 2001 for the annual meeting of stockholders to be held February 5, 2002. This proxy statement disclosed certain information regarding stock options granted to each of the named executive officers for the fiscal year ended September 30, 2001, and stated further, in a footnote, "Unless otherwise indicated, options were granted at an exercise price equal to the fair market value of the Company's

1   Common Stock at the date of the grant." This proxy statement, signed by defendant Danforth, on
2   behalf of the Board of Directors, including Defendants Tate, Mooring, Eulau, Dunlevie,
3   Farmwald, Horowitz, Geschke and Davidow, was false and misleading as no mention was made
4   that some or all of the options granted to members of management during the current and prior
5   fiscal years may have been backdated or otherwise manipulated.

6   507.    Rambus issued its Proxy Statement dated December 19, 2002 for the annual
7   meeting of stockholders to be held January 30, 2003. This proxy statement disclosed certain
8
9   information regarding stock options granted to each of the named executive officers for the fiscal
10  year ended September 30, 2002, and stated further, in a footnote, "Unless otherwise indicated,
11  options were granted at an exercise price equal to the fair market value of the Company's
12  Common Stock at the date of the grant." This proxy statement, signed by defendant Danforth on
13  behalf of the Board of Directors, including Defendants Tate, Mooring, Eulau, Dunlevie,
14
15  Farmwald, Horowitz, Geschke and Davidow, was false and misleading as no mention was made
16  that some or all of the options granted to members of management during the current and prior
17  fiscal years may have been backdated or otherwise manipulated.

18  508.    Rambus issued its Proxy Statement dated March 19, 2004 for the annual
19  meeting of stockholders to be held May 4, 2004. This proxy statement disclosed certain
20  information regarding stock options granted to each of the named executive officers during 2003,
21  and the transitional period October 1, 2002 to December 1, 2002 (due to change of reporting
22  period), including the exercise price and stated further, in a footnote, "Unless otherwise
23  indicated, options were granted at an exercise price equal to the fair market value of the
24  Company's Common Stock at the date of the grant." This proxy statement, signed by defendant
25  Danforth on behalf of the Board of Directors, which included Defendants Hughes, Kennedy,
26  Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and Davidow, was false and

28

160

1  misleading as no mention was made that some or all of the options granted to members of

2  management during the current and prior periods may have been backdated or otherwise

3  manipulated.

4          509.     The 2004 Proxy Statement also acknowledges that 162 (m) compliance

5  requires that all the members of the compensation committee be "outside directors" as follows:

6
7
8
9
> "The Compensation Committee has considered the potential future effects of Section 162(m) of the Internal Revenue Code of 1986, as amended. Section 162(m) limits the deductibility by public companies of certain executive compensation in excess of $1 million per executive per year, but excludes from the calculation of such $1 million limit certain elements of compensation, including performance-based compensation, provided that certain requirements are met.

10
11
12
13
14
15
> This result can be avoided if the plans under which such options are granted comply with certain requirements at the time of grant, including administration by a committee consisting solely of two or more outside directors and stockholder approval of the terms of the plan, including approval of an annual limit stated in the plan on the number of shares with respect to which options may be granted to any employee. Our 1997 Stock Plan has been designed and administered to meet these requirements. We have not attempted to structure other elements of executive compensation to qualify as performance-based compensation for purposes of Section 162(m)."

16  Thus, Dr. Farmwald's membership on the Compensation Committee was a violation of the

17  162(m) conditions in 2002, 2003 and 2005 because he was designated in the 1997 Stock Plan to

18  be an "inside director".

19

20          510.     Invalidation of the tax deductions pursuant to 162 (m) from 1997 Stock Option

21  grants to executives in 2002, 2003, 2005 and 2006 causes Rambus earnings to be materially

22  overstated and its compensation expenses understated and subjects Rambus to tax penalties.

23          511.     Rambus issued its Proxy Statement dated March 29, 2005 for the annual

24  meeting of stockholders to be held May 3, 2005. This proxy statement disclosed certain

25  information regarding stock options granted including the exercise price to each of the named

26
27  executive officers during 2004 including the purported exercise price, and stated further, in a

28                                                161

1    footnote, "Unless otherwise indicated, options were granted at an exercise price equal to the fair

2    market value of the Company's Common Stock at the date of the grant." This proxy statement,

3    signed by defendant Danforth on behalf of the Board of Directors, which included Defendants

4    Hughes, Kennedy, Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and

5    Davidow, was false and misleading as no mention was made that some or all of the options

6
     granted to members of management during the current and prior years were backdated or
7
     otherwise manipulated.
8

9         512.    Despite the fact that Dr. Farmwald is defined to be an "inside director" in the

10   1997 Stock Plan and is named as a member of the Compensation Committee in the March 2005

11   Proxy Statement which contains the following false assertion:

12

13            "All members of the Compensation Committee are non-employee, outside

14            directors."

15

16   This is a false statement and it is material because it violates the 162 (m) tax deduction

17   requirements for executive stock option grants.

18   This false statement is reiterated in the March 2006 Proxy statement and Mr. Farmwald is

19   named as a member of the 2006 compensation Committee.

20        513.    Thus, there are numerous false and misleading statements contained in the

21   proxy statements from 1997 through 2006. Some of these false statements are violations of 162

22
     (m) and have a material effect on the Rambus income and expenses in the years 2002, 2003,
23
     2005 and 2006 and therefore its taxes. All this can be Seen in Exhibit L in the 2001 10-K401
24
25   comparison.

26

27   **Materially False and Misleading FORMs 10-K, 10-Q, 4 AND 8**

28                                        162
                     PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

514.    Defendants' backdating scheme also caused the Company's financial statements in Form 10-K filings for fiscal years 2000, 2001, 2002, 2003 and 2004 to be materially false and misleading.

515.    All the SEC Form 4's filed in connection with every backdated option issued to the Defendants are false. The SEC Form 4's are false because they have the incorrect dates and prices of the grants and they purport to be at the money incentive grants instead of compensation.

516.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense, thereby reducing the company's net income.

517.    In addition, as set forth in the Company's Proxy Statements, the Company has adopted IRS§162(m) (Section 162(m) of the Tax Code, 26 U.S.C. §162) that permits the Company to deduct for federal income taxes purposes compensation paid under the Bonus Plan.

518.    The Company's Proxy Statements claimed that the 1997 Stock Plan was designed and administered to meet the requirements of Section 162(m). Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before payment of the compensation, and (iv) before any

163

payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

519.    There is no evidence available that the compensation committee ever verified that the performance goals were achieved or that the Compensation Committee even determined the performance goals as required by the 1997 Stock Plan and IRS Section 162(m).

520.    Moreover, as a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Defendants, violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted; violated §162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans.

521.    On or about December 4, 2001 the Company filed its Form 10-K report for the fiscal year ended September 30, 2001 with the SEC. The 10-K report was contemporaneously distributed to the public including its shareholders. This Form 10-K. report contained the Company's comparative financial statements for the current and prior fiscal years which were materially false and misleading and were not prepared in accordance with generally accepted accounting principles due to the improper accounting for stock option grants which were backdated. Rambus' net earnings and stockholders' equity were overstated and the compensation costs attributable to the backdated stock options were understated due to the false reporting of the options expenses.

522.    The Company in a footnote to the financial statements stated the following (emphasis added):

> "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, Accounting for Stock Issued to Employees. Stock options are generally granted

164

with exercise prices equivalent to fair market value, and no compensation cost is recognized. <u>When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."</u>

Rambus in violation APB 25 and 162 (m) failed to recognize the in the money compensation expenses attributable to the forged backdated options and backdated employment contracts.

523.    On or about November 26, 2002 the Company filed its Form 10-K. report for the fiscal year ended September 30, 2002 with the SEC. This 10-K was signed by Defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke and Horowitz. The 10-K report was contemporaneously distributed to the public including its shareholders. This Form 10-K report contained the Company's comparative financial statements for the current and prior fiscal years that were materially false and misleading and were not prepared in accordance with GAAP due to the improper accounting for stock option grants that were backdated. Also, the Company stated in a footnote to the financial statements as follows:

"Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, 'Accounting for Stock Issued to Employees.' Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized. When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."

524.    In its November 2002 10-K report, the Company submitted to the SEC the certifications of its principal executive officer, defendant Tate, and its principal financial officer, defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Each such certification of Defendants Tate and Eulau stated as follows:

"Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

165

525.    On or about February 13, 2004 the Company filed its Form 10-K report for the year ended December 31, 2003. This 10-K. was signed by Defendants Tate, Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke, Horowitz, Hughes and Kennedy. The 10-K report was contemporaneously distributed to the public including its shareholders. This Form 10-K report contained the Company's comparative financial statements for the years 2003 and 2002 and three months ended December 31, 2002 and 2001 which were materially false and misleading and were not prepared in accordance with GAAP due to the improper accounting for stock option grants which were backdated.

Also, the Company falsely stated in a footnote to the financial statements that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25,

> "Accounting for Stock Issued to Employees. Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized. When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."

526.    The Company submitted the February 2004 Form 10-K to the SEC with the certifications of its chief executive officer, defendant Tate, and its chief financial officer, defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Tate and Eulau falsely stated the following:

> "Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

527.    The Company filed its February 17, 2005 Form 10-K report for the year ended December 31, 2004 with the SEC. The 10-K report was contemporaneously distributed to the public including its shareholders. This Form 10-K report contained the Company's comparative

166

financial statements for the current and prior two years which were materially false and misleading and were not prepared in accordance with generally accepted accounting principles due to the improper accounting for stock option grants which were backdated. The Company also falsely stated in a footnote to the financial statements the following:

> "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, 'Accounting for Stock Issued to Employees.' Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized. When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."

528.    The Company submitted its February 2005 10-K to the SEC with the certifications of its principal executive officer, defendant Hughes, and its principal financial officer, defendant Eulau, respectively, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants Hughes and Eulau falsely stated the following:

> "Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

529.    The Company filed its February 21, 2006 Form 10-K report for the year ended December 31, 2005 with the SEC. This 10-K was signed by Defendants Hughes, Eulau, Tate, Dunlevie, Farmwald, Horowitz, and Mooring. The 10-K report was contemporaneously distributed to the public including its shareholders. This Form 10-K report contained the Company's comparative financial statements for the prior two years. The financial statements were materially false and misleading and were not prepared in accordance with generally accepted accounting principles (GAAP) due to the improper accounting for stock option grants that were backdated and backdated employee fire dates.

The Company submitted to the SEC the certifications of its chief executive officer and its chief financial officer as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Each such certification of Defendants Hughes, Eulau, Tate, Dunlevie, Farmwald, Horowitz, and Mooring stated as follows:

> "Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

530.    As a result of the wrongful conduct with respect the illicit option grant and new hire date backdating practices the foregoing SEC 10-K filings were materially false and misleading. Rambus' net earnings and stockholders' equity for a prior year was overstated and the compensation costs attributable to the backdated stock options were correspondingly understated.

**Application of Fraud-on-the-Market Theory**

531.    At all relevant times, the market for Rambus' common stock was an efficient market for the following reasons, among others:

a.    Rambus' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Rambus filed periodic public reports with the SEC and the NASDAQ;

c.    Rambus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

168

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1        d.        Rambus was followed by securities analysts, including those who were

2    employed by major brokerage firms, who wrote reports that were distributed to the sales force

3    and certain customers of their respective brokerage firms. Each of these reports was publicly

4    available and entered the public marketplace.

5        532.    As a result of the foregoing, the market for Rambus' promptly digested current

6    information regarding Rambus from all publicly available sources and reflected such information

7    in Rambus' stock price. Under these circumstances, all purchasers of Rambus common stock

8    during the Period suffered similar injury through their purchase of Rambus' common stock at

9    artificially inflated prices and a presumption of reliance applies.

10

11

12    **Additional 2006 Allegations And Scienter Evidence**

13

14        533.    Plaintiffs read and relied on these false financial and proxy statements in

15    purchasing Rambus securities. Due to the proxy fight over the 2006 Employee Stock Option Plan

16    prior to the May 10, 2006 Annual Shareholder's meeting, the Plaintiffs began to examine in

17    detail the options practices of Rambus. This examination was motivated by the unusually high

18    and relentless exercise of options and sale of stock prior to and during to the infringement trial

19    that concluded April 24, 2006. These sales are reported on Sec Form-4. Notably, these SEC 4-K

20    reports do not reflect sales by all employees.

21

22        534.    The massive exercise of options and selling of stock on the part of insiders

23    seemed illogical to public shareholders in view of the fact that most industry observers believed

24    that Rambus would succeed in its infringement case against Hynix and that that success would

25    carry the company to higher valuation. Plaintiffs monitored this trial closely and was able to

26    correctly predict the outcome.

27

28    169

535.    At the Annual shareholders meeting (May 10, 2006) in a conversation with Plaintiffs, Dr. Davidow Chairman Emeritus of Rambus defended Mr. Tate's use of employee options grants in 2002 to hire and retain employees. He did not respond at all to comments made by Plaintiffs during the conversation that the options grants had no relationship at all to the production of discounted cash flow for the company. Neither he nor Mr. Hughes responded to a two-page list of shareholder questions that was submitted by the Plaintiffs to Mr. Hughes before the beginning of the Shareholder's meeting. Mr. Davidow resumed sales of Rambus stock after the stockholders meeting.

536.    Conversations with other large shareholders indicated that some Rambus executives were aware that they had a significant problem with options no later than January 2006. One relatively new, outside director- Sofaer- has indicated in a private conversation with a large shareholder that he was not informed about the problem.

537.    Rambus has also falsely argued in their Shareholders class action "motion to dismiss" that they are not responsible for any losses after June 27, 2006 because the news was out. Unfortunately, all the news is still not out.

538.    Plaintiffs are alleging that the multiple frauds by Rambus led to a ratcheting set of price drops in 2006 due to the release of the concealed materially adverse news both with respect to the companies backdating and its fraudulent and unfair business practices.

539.    Professor Horowitz has of course been involved in Rambus since its inception and must have known about many if not all the improprieties at Rambus. However, he was not involved in the day-to-day management at Rambus and did not seek to involve himself in the boards governing committees. Nevertheless, negligence on the part of a director is not excusable and selling stock while in possession of materially adverse non-public information is wrong.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

Professor Horowitz' abstention from stock sales in 2006 suggests also that he knew of the improprieties and he elected correctly to abstain from sales of his founders stock unlike Dr. Farmwald.

However, Professor Horowitz could not have missed the significance of the illicit practices of late 1999 and 2000 and there is evidence of insider trading on his part in earlier years. Yet he did nothing about it and continued to sign the SEC reports through 2005. Professor Horowitz had scienter.

540.    Dr. Farmwald has been intimately involved both as an officer and a director in Rambus from the earliest days of the company. To claim that he had no knowledge of the long running frauds perpetuated by Rambus is simply incredible. Rambus is a small company (~300 employees) by any standard and it was even smaller (<100 employees) when these abuses began. Not only that the abuses have continued even after they were uncovered. Dr Farmwald served on the governing committees of the board and had full scienter.

541.    Dr. Farmwald's stock sales in 2006 strongly support the inference of scienter with regard to all the various forms of fraud alleged in this complaint.

542.    Kevin Kennedy as a member of the board of directors of the board of directors certified the false SEC reports put out by Rambus with his signature. He also failed to even attempt to correct the insider trading abuses at Rambus. He demonstrated negligent scienter.

543.    Rambus has falsely argued in other their Class Action "motions to dismiss" that the repurchase of Rambus stock on the open market by Rambus negates the inference scienter.

In fact, the purchasers of the $300 million convertible bond required the purchase of 4.1 million shares of Rambus stock in February 2005. This stock was repurchased at an average

171

1   price of $18.29 per share, which was no bargain and was done only to guarantee the hedge funds

2   a stable shorting price.

3       Again, in 2006 Rambus repurchased shares on the open market to support the price of

4   Rambus stock while company insiders were selling huge amounts of Rambus stock. The price of

5   the purchase was about $30 per share again a very bad deal for the company and the public

6   shareholders. The 10-Q for Q1 2006 shows that Rambus spent $20.956 million repurchasing

7   (insiders stock).

8

9       This is strong evidence of scienter on the part of Mr. Hughes and Mr. Tate as well as the

10  board of directors and senior officers of Rambus. They are all helping themselves at the expense

11  of the company and the public.

12

13

14  **Insider Trading And "Pump And Dump" Allegations**

15

16      544.    The fact that executive managers and directors at Rambus are having private

17  meetings in 2006 with some of the very largest shareholders about Rambus' critical legal

18  problems while refusing to answer the written questions of other shareholders is a probable

19  violation of regulation FD. Some of these conversations have been reported on the public

20  bulletin boards in part but after the fact.

21      545.    There is no private right of action against Rambus under regulation FD. The

22  facts included here are provided herein only for a broader perspective.

23

24      546.    An East Coast shareholder who had conversations with Harold Hughes told

25  Plaintiffs in July 2006 that Mr. Hughes claimed the options problem was discovered in January.

26  Mr. Hughes is reported to have said that he thought that employees should not exercise and sell

27

28                                172

their stock as a consequence. [121] The same outside shareholder told the Plaintiffs that Mr. Danforth expected to be exonerated in the investigation. [122]

Mr. Sofaer a new director claimed also to have been surprised by the "problem" in a private meeting with the source. [123]

Plaintiffs was made aware that Rambus held private meetings with Rick Currin of the Hager report in 2006 after the Rambus options scandal broke. The Hager report is a private investment newsletter that is sent (on information and belief) to 15,000 subscribers and this newsletter has been consistently long Rambus stock for many years to the detriment and sometime ruination of its subscribers. This is yet another instance of a probable Regulation FD violation. At that time Rambus was not answering any questions from its public shareholders.

547.    Further, there is evidence of a long-term effort by Rambus to manipulate public opinion through the Internet investment message boards where the Rambus stock is discussed.

In fact, one such influential poster is Robert Breuninger. Mr. Breuninger goes by the alias "stk_hawk" on the Yahoo message boards and by "stkhawk" on the InvestorVillage message board.

548.    Mr. Breuninger when asked publicly (many times) if he has ever worked for Rambus directly or indirectly has refused to answer this question. Instead he has chosen to deflect such inquiries. See exhibit G for an example.

549.    Mr. Breuninger showed up on the message boards in October of 1999 as a strong defender of Rambus patents and also their legal positions. (see Exhibit H for an example)

---

[121] This is extremely unlikely because Mr. Hughes was on the Audit committee from 2003-2005.
[122] Mr. Danforth is implicated in the options backdating and pump and dump insider trading.
[123] This is possible because Mr. Sofaer was a relatively new director and had no part in the early abuses.

173

550.    Mr. Breuninger maintained regular contact by telephone with East Coast Group investors that controlled 10% or more of the company's stock at one time. Plaintiffs participated in some of these calls during 2006 to discuss the litigation events and prognosis.

551.    The SEC expressed just the following concern when adopting the new FD rules.

> "Regulation FD is also designed to address another threat to the integrity of our markets: the potential for corporate management to treat material information as a commodity to be used to gain or maintain favor with particular analysts or investors. As noted in the Proposing Release, in the absence of a prohibition on selective disclosure, analysts may feel pressured to report favorably about a company or otherwise slant their analysis in order to have continued access to selectively disclosed information. We are concerned, in this regard, with reports that analysts who publish negative views of an issuer are sometimes excluded by that issuer from calls and meetings to which other analysts are invited."

## 2006 INSIDER TRADING

552.    Mr. Hughes, Ms. Holt, and Mr. Tate exercised no options and made no sales of stock during the period from January to May 2006 despite the rapidly rising stock prices.

553.    Ms. Holt's handling of her options grants seems to be a unique at Rambus. SEC Form 4 reports show that she has received 387,000 (shares) option grants. However, there is no SEC report showing that she has exercised any of those options or disposed of them. However, the outstanding number of options reported has consistently shown that she had no grants in her possession as of the next grant date other than the ones she has just been given. Where did they all go? The 1997 Stock Option Plan states that the grants are not transferable.

554.    Defendant Tate made an agreement with Rambus January 13, 2006. This agreement cancelled the valuable unvested portions of the 655,000 options grants (N0002976, N0003109, N0003111, and N0003379) that were made in the years from 2001 to 2004. Defendant Tate also cancelled 500,000 unvested common stock equivalents awarded October 20,

1  1999. Apparently, Mr. Tate exercised the other 500,000 CSE's in 2000 and 2001. The unvested

2  common stock equivalents were essentially worthless.

3      Defendant Tate who was chairman of the Board of Rambus at the time was acting

4  to protect himself from the emerging options backdating scandal. The board of directors was

5  fully informed and did not disclose this material matter to Rambus shareholders. Instead it

6  victimized its public shareholders in subsequent months.

7      555.    Certain members of Rambus' management listed below, including Defendants

8  Dunlevie, and Davidow as 2006 Insider Sales Defendants, in the months preceding the May 30,

9  2006 announcement (from January 1, 2006), sold a total of 3,057,737 Rambus shares at inflated

10 prices while in the possession of materially adverse inside knowledge regarding backdating

11 options scheme, as described herein. Many of these shares were acquired by the exercise of stock

12 options for gross proceeds of $99,723,070 as follows:

2006 TOTAL SHARES AND PROCEEDS:

|  | Shares | Proceeds | Average price per Share |
|---|---|---|---|
| Mooring | 1,608,666 | $51,318,571 | $31.90 |
| Eulau | 392,040 | $10,063,475 | $25.67 |
| Danforth | 170,000 | $ 6,096,610 | $35.86 |
| Stark | 183,100 | $ 6,843,233 | $37.37 |
| Patel | 148,431 | $5,376,712 | $36.25 |
| Schroeder | 17,500 | $601,281 | $34.36 |
| Donnelly | 152,324 | $5,651,696 | $37.10 |
| Farmwald | 190,000 | $6,467,460 | $34.04 |
| Dunlevie | 104,000 | $3,684,594 | $35.43 |
| Davidow | 100,000 | $3,619,438 | $36.19 |

175

| | | | |
|---|---|---|---|
| TOTALS | 3,057,737 | $99,723,070 | $32.42 |

556.    A reported[124] total of 3,770,000 options were exercised and sold in Q1-2006 for estimated gross receipts of $122,223,400. This accounts all employees and directors exercising and selling options. This does not account for non-reporting sales of employee or consultant stock.

557.    Sales by 2006 Insider Sales Defendants between January and May 12, 2006 in almost all cases represented significant percentage if not all of their of their stock holdings. On May 16, 2006 the CFRA report identified Rambus as likely option backdater.

| | Shares Sold | Remaining | % Total |
|---|---|---|---|
| Mooring | 1,608,666 | 760,622 | 67.9 % |
| Eulau | 392,040 | 71,906 | 82.4 % |
| Danforth | 170,000 | 78,132 | 72.6 % |
| Stark | 183,100 | 23,916 | 88.4% |
| Patel | 148,431 | 85,898 | 63.6% |
| Schroeder | 17,500 | 0 | 100% |
| Donnelly | 152,324 | 28,042 | 84.4% |
| Farmwald | 190,000 | 2,782,336 | 6.39 % |
| Dunlevie | 104,000 | 365,492 | 22.15 % |
| Davidow | 100,000 | 584,000 | 14.6% |

558.    The issuance of "spring loaded options in January 2006 is further evidence of scienter on the part of Mr. Hughes and the board of directors of Rambus. It is well known that "spring-loaded ' options are highly questionable, yet they did it 2006 and then they did it again in February of 2007 just before the FTC ruling.

559.    Defendant Tate stopped sales of stock in September 2005. January 13, 2006 while Defendant Tate was still Chairman of the Board of directors he gave back options valued at $22 million dollars to the company.

---

[124] Q1-2006 quarterly report.

560.    Defendants Mooring and Eulau left the company in 2006. Defendant Danforth had negotiated a severance agreement for approximately $1 million worth of restricted stock with the company and has stayed on as a legal advisor. Mooring, Danforth and Eulau exercised and sold most of their stock. The severance agreement included a clause that Danforth could not sue or help anyone sue Rambus.

561.    It is significant that none of the officers or directors of Rambus ever reported the purchase of Rambus stock in the public market from 1997 to the 2007. Instead the insider behavioral pattern is one of insider grants of options or warrants and the exercise and sale the stock obtained thereby to the public market. Some officers and directors retained some of their stock others sold all of it but none reported purchases of Rambus stock in the public market. The company on January 23, 2006 announced a stock buy back program that was designed to support the stock price as the insiders began to sell intensively their stock positions. This in combination with the other facts supports strongly scienter. No one believed in the company enough to purchase its stock in the public market.

562.    In late January 2006, the company purchased 500,000 shares on the open market countering in part the sale of 530,000 shares by defendant Mooring.  This suggests that the insiders were trying to assure that Mooring could get a good price for his stock at the company expense. Defendant Tate was chairman of the board at that time and approved the buyback for his long-term co-worker defendant Mooring. This is in effect self-dealing which is prohibited by the company code of ethics and also constitutes a breech of fiduciary duty.

The company purchased another 200,000 shares on the open market in February as intensive insider sales continued. As a consequence of these buybacks, the company paid a much higher price than it otherwise would have had to pay for the stock and this artificially inflated the stock price.

177

563.    On February 14, 2006, Harold Hughes began pumping the company's present and future prospects as follows:

> "Rambus plans to increase the number of engineers at its design center in Bangalore, India, from 50 to more than 100 by the end of this year, the company said Tuesday.
>
> The company also plans to increase that number to more than 200 by the end of 2008. Bangalore is the only location outside the U.S. where Rambus has a design center."
>
> "The company is, however, not moving design work from the U.S. to India, Hughes said. "We are growing everywhere, although we are growing faster in Bangalore," he added."
>
> http://www.infoworld.com/article/06/02/14/75358_HNrambusdoubles_1.html

564.    On February 15, 2006, as Rambus CEO Harold Hughes knowing that the company insiders were distributing their stock to the public assisted the insiders by "pumping" the stock with statements to the effect that the majority of the worlds cell phones infringed Rambus patents.[125]    These statements were widely repeated in the press at that time. These statements without qualification were materially false and/ or misleading.

565.    Mr. Hughes also "pumped" the stock by suggesting that Intel would sign a license agreement with Rambus on Rambus terms. This was a materially misleading statement when made without qualification because Intel already had a paid up license to all Rambus patent and patent applications as of the completion of their contract. Rambus US patents are valid only in the US and its European patents are valid only in Europe. Rambus does not have worldwide patents. Moreover, Rambus because of its conduct has been able to collect from only a small part of the DRAM manufacturers.

http://www.infoworld.com/article/06/02/14/75358_HNrambusdoubles_1.html

---

[125] See Exhibit N.

178

566.    The content of the press releases (which were reiterated on subsequent days) was as follows:

"Rambus Inc. owns the patents on memory interfaces used in most mobile phones on the market, and most of those phones violate the company's patents, according to Chief Executive Officer Harold Hughes."

Hughes went on to say the following:

"We have technology that we invented literally 10 to 15 years ago, that is going into just about every mobile phone, so that will be an opportunity for us to find patent licences," Hughes said. Many people thought that Rambus would not survive patent infringement lawsuits it is involved in "and to a certain extent our technology was then incorporated wantonly," Hughes said."

"It is also likely that Intel will get a better deal than competitor Advanced Micro Devices AMD of Sunnyvale, California, which signed a $75 million five-year patent licensing agreement with Rambus in January. Rambus would endeavour to make the terms of the deal with Intel comparable with the agreement with AMD, but it is unlikely that will happen as the volumes Intel offers are far higher than what AMD can offer, and Intel is a tough negotiator, Hughes said."

http://www.techworld.com/mobility/news/index.cfm?newsid=5388&pagtype=same chan

567.    On March 21, 2006 Rambus announced that it had licensed Fujitsu.

179