1
2
> "Semiconductor IP vendor Rambus Inc yesterday announced it had signed a patent license agreement with Fujitsu Ltd that covers Rambus' entire portfolio and may be worth as much as $198m.

3
4
> Los Altos, California-based Rambus said the agreement applies to both manufacture and sale and covers systems, semiconductors and all other segments of Fujitsu's business, past and future, on a worldwide basis."

5
6
> http://www.computerwire.com/industries/research/?pid=28A537DF-D678-4F36-BEED-23A2D55389E0

7    568.    The simultaneous exercise of an employee option and the sale of the resulting

8    stock are not protected by the automatic stock sale plan (10B) exceptions.

9        Other stock sales by employees may be protected by the 10B exceptions if there is

10
11   no fraud on the part of the employee.    Certain Defendants were using automatic plans for stock

12   already in their possession. However, fraud in concealing the material adverse information when

13   setting up the automatic plans voids the 10 (b) exception as is the case for Mr. Tate and Mr.

14   Mooring and the other control directors and officers at Rambus. Most of the other Defendants

15   did not use 10B automatic plans at all as is the case with Laura Stark.

16

17   **INSIDER TRADING ON APRIL 20, 2006**

18
19       569.    On April 20, 2006 while Rambus was awaiting the jury's verdict in the Federal

20   District court in San Jose, California. An entity engineered a surprise short attack on the stock

21   using an agent at the courthouse to give the signal. This short attack on the stock drove the stock

22   from $45 per share to $29 per share in 3 minutes. The stock recovered to about $38 per share in

23   another two minutes. The stock closed at about $38 per share that day. This attack wiped out

24   about $50 million of April options and reduced the capital value of Rambus stock by $700

25   million dollars.

26
27
28

570.    Unwittingly, the Plaintiff spoke with the agent of the April 20, 2006 attack at the courthouse, as did others. The outstanding question is whether the entity behind this attack was connected with Rambus or any of its agents or large investment groups?

571.    The agent claimed to be from Millennium Investments that was a holder of the convertible bond at that time. This same agent later told others at the courthouse that he was from Susquehanna Capital an options market maker.[126]

572.    Rambus through email sent to John Danforth was alerted to this price manipulation at the time. Inexplicably, Rambus later denied in writing that it was aware of this matter giving support to the suspicion that the company or someone at the company was involved in the misappropriation inside information.[127]

## COMPENSATION AND AUDIT COMMITTEE SCIENTER

573.    The Compensation Committee was aware of, or but for its reckless disregard should have been aware of, the backdating options scheme and the backdating of new employee hire dates. The Charter of the Compensation Committee of Rambus states that the purpose of the Compensation Committee is to "recommend and approve appropriate executive compensation" and to "make recommendations to the Board regarding director compensation."

The Committee is charged with annually reviewing and approving for the CEO and executive officers of the Company, the annual salary, bonuses, equity compensation, incentive bonuses and any other benefits, compensation or arrangements. Therefore, due to their intricate

---

[126] The agent claimed that his client was one of the biggest options players and that they never lost.
[127] CFO Rishii answer the letter sent to John Danforth.

181

1  involvement in the formulation and issuance of such options, the Compensation Committee

2  Directors possessed the scienter.

3      574.    The Audit Committee is responsible for maintaining the adequacy of internal

4  controls, and therefore, knew, or at a minimum recklessly disregarded, the impermissible option

5  backdating and new employee hire date backdating that the internal controls of the Company

6  should have detected.

7      The Audit Committee Charter of Rambus states that the Company has an obligation to

8  insure that it produces and publicly distributes financial statements which are consistent, fairly

9  presented and in conformance with generally accepted accounting principles. It is the duty of the

10  Audit Committee to oversee the Company's accounting and financial reporting process, its

11  system of internal accounting controls and the auditing of the Company's financial statements.

12

13      In addition, the Audit Committee had the duty to meet periodically with management to

14  review the adequacy of the Company's internal controls. The Audit Committee either

15  intentionally or recklessly failed to detect and correct the illicit option and new hire backdating

16  schemes. Therefore, the Audit Committee Directors possessed scienter.[128]

17

18

19

20  **2000 Insider Trading And Spring-Loaded Options**

21      575.    Mr. Tate with his "one man stock option" committee granted himself and Mr.

22  Mooring 500,000 Common Stock Equivalents (CSE) presumably on December 1, 1999 with a

23  strike price of $2.50 per share subject to a vesting requirement for half of the grant that the price

24  of Rambus stock exceed $200 per share for 30 consecutive days. The stock price on December 1,

25

26

[128] The membership of the Compensation and Audit Committees overlapped and both included Mr. Dunlevie, Dr. Geschke and Dr. Davidow and later Dr. Farmwald. Collectively these directors had ownership control of the company.

1   1999 closed at $17.56. The contracts made with Mr. Tate and Mr. Mooring for those CSE's are

2   dated October 20, 1999.

3       As noted earlier, there is no public accounting record that Mr. Tate or Mr. Mooring ever

4   paid the $2,500,000 strike price money for the CSEs that they were exercised.

5       576.    These "spring-loaded", heavily in the money, grants were made after Mr. Tate

6   had determined Rambus would demand royalties from Hitachi for their SDRAM and DDR

7   JEDEC parts. Later Rambus would demand royalties from all the other major JEDEC DRAM

8
    producers as part of the plan.
9

10      577.    In connection with the issue of springloaded options, Chancellor Chandler

11      ·   opined as follows:

12          "Whether a board of directors may in good faith grant spring-loaded options is a
            somewhat more difficult question than that posed by options backdating, a practice
13          that has attracted much journalistic, prosecutorial, and judicial thinking of late. At
            their heart, all backdated options involve a fundamental, incontrovertible lie:
14          directors who approve an option dissemble as to the date on which the grant was
            actually made. Allegations of spring-loading implicate a much more subtle
15          deception.
16

17          Granting spring-loaded options, without explicit authorization from shareholders,
            clearly involves an indirect deception. A director's duty of loyalty includes the duty
18          to deal fairly and honestly with the shareholders for whom he is a fiduciary. It is
            inconsistent with such a duty for a board of directors to ask for shareholder
19          approval of an incentive stock option plan and then later to distribute shares to
            managers in such a way as to undermine the very objectives approved by
20          shareholders. This remains true even if the board complies with the strict letter of a
            shareholder-approved plan as it relates to strike prices or issue dates.
21

22          The question before the Court is not, as plaintiffs suggest, whether spring-loading
            constitutes a form of insider trading as it would be understood under federal
23          securities law. The relevant issue is whether a director acts in bad faith by
            authorizing options with a market-value strike price, as he is required to do by a
24          shareholder-approved incentive option plan, at a time when he *knows* those shares
            are actually worth more than the exercise price. A director who intentionally uses
25          inside knowledge not available to shareholders in order to enrich employees while
26

27

28                                  183

1    avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary."[22]

2

3    578.    Exhibit J shows the outstanding CSE at the end of each quarter from 1998 until

4    2005. The table was drawn from the quarterly reports Rambus filed with the SEC.

5    579.    Inspection of the calendar 1999- Q4 entry shows that Rambus had 5,644,000

6    CSE's outstanding. By the end of the next quarter there were 12,504,000 CSEs outstanding.

7    Thus, 6,860,000 common stock equivalents appear to have been issued in a single quarter under

8    the 1997 Stock Plan.

9

10    580.    Exhibit J permits one to deduce that at least 995,000 CSE's were sold in CY

11    2000- Q2. All of these were both granted and sold on the basis of insider information.

12    581.    Exhibit J also informs us that the reports of the issuance of the 4,124,000 CSE's

13    to Rambus employees were just the tip of the CSE iceberg. There are another 6,859,000 CSE's

14    materially unaccounted for by Rambus in its disclosures to the SEC for CY 2000-Q1.

15

16    582.    By CY 2001-Q2 most of the 9,507,000 CSE's were apparently sold. Only

17    2,250,000 CSE's are reported as outstanding. However, we have no idea who sold them or what

18    otherwise happened to them.

19    583.    Exhibit J shows that the CSE's were used to pledge the transfer of a tremendous

20    amount of Rambus capital assets to largely unknown people and/or entities from the years 1998

21    through 2005.

22

23    584.    Rambus' disclosures with respect to its grants of Common Stock equivalents

24    were fraudulent under California law because [129]Rambus disclosures of these grants were

25

26

27    _____

[129] *In re Tyson Foods, Inc. Consol. S'holder Litig.*, C.A. No. 1106-N (Del. Ch. Feb. 6, 2007)

28    184

1  misleading and deceitful and did not tell the whole truth about this part of Rambus 1997 stock
2  Plan.

3     585.    Plaintiff alleges that Rambus intentionally omitted to give a complete
4  accounting of these unjustified and materially adverse grants of CSE's in order to perpetuate its
5  fraud on the public to obscure the massive transfer of corporate capital to unknown persons and
6  entities as well as the corporate insiders.
7
8     586.    Plaintiff further alleges that PWC and WSGR were among the beneficiaries of
9  these undisclosed and unaccounted for grants in violation of the California, Federal and
10 Delaware laws.

11    587.    Mr. Tate and Mr. Mooring as well as PWC and WSGR also knew that public
12 would view Rambus' January assertion of SDRAM and DDR royalties as a potential worldwide
13 monopoly by Rambus on the DRAM market and that the price of the stock would be bid up as
14 the market digested its importance.
15
16    588.    They also knew that the introduction of the Willamette processor that
17 supported only RDRAM by Intel in February 2000 would be viewed as confirming Intel's
18 endorsement of RDRAM. Rambus sued Hitachi in late January and was asserting its patents over
19 the competing SDRAM and DDR JEDEC memory products. Thus by early February 2000,
20 Rambus was perceived as having a viable claim to a patent monopoly on all synchronous
21 DRAM. This was a $20-35 billion per year worldwide market.
22
23
24
25
26
27
28

185

**2000-2001 Insider Trading On Material Non Public Information**

589.    During the period from 2000 to 2001 the 2000 Insider Trading Defendants sold exercised options and/or sold stock as follows: (from http://www.wyca.com/complnts/rmbs-com.htm)[130]:

| Defendant | Time Period | Shares | Proceeds |
|---|---|---|---|
| Horowitz | 2/15/00-2/1/2001 | 380,000 | $18,133,240 |
| Larsen | 1/21/2000-2/1/2001 | 149,256 | $ 7,303,026 |
| Mooring | 2/16/2000-1/26/2001 | 420,000 | $23,967,000 |
| Tate | 2/2/2000-1/26/2001 | 540,000 | $31,578,795 |
| Harmon | 2/22/2000-1/24/2001 | 28,664 | $ 1,151,119 |
| Kanadjian | 7/25/2000-1/23/2001 | 74,000 | $ 4,633,020 |
| Donnelly | 2/25/2000-11/6/2000 | 111,264 | $ 6,753,190 |
| Toprani | 2/2/2000-2/29/2000 | 132,000 | $ 4,388,490 |
| Farmwald | 2/29/2000-8/28/2000 | 270,000 | $24,903,800 |
| Dunlevie | 7/27/2000 | 30,000 | $2,669,400 |
| **Total** | | | **$125,481,080** |

590.    The 2000 Insider trading Defendants are Horowitz, Larsen, Mooring, Tate, Harmon, Donnelly, Toprani, Farmwald and Dunlevie.

---

[130] It is not known whether these are all the sales.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

591.    Moreover, throughout the 1997-2006 period certain Defendants while in possession of materially adverse information concerning the backdated options and the JEDEC patent fraud exercised many of these stock options contributing to their ability to sell over 14 million shares of Rambus stock for gross proceeds of $400,084,332 as follows:

| Defendant | Time Period | Shares | Proceeds |
|-----------|-------------|--------|----------|
| Hughes | 7/19/05 | 50,457 | $670,321 |
| Danforth | 1/21/04-5/1/06 | 310,000 | $10,456,689 |
| Davidow | 7/26/04-5/12/06 | 363,702 | $8,173,359 |
| Dunlevie | 10/1/03-5/3/06 | 112,000 | $6,573,676 |
|  | 7/27/00 | 30,000 | $2,669,400 |
| Farmwald | 8/14/97-4/28/06 | 3,512,308 | $89,197,261 |
| Horowitz | 1/10/97-7/1/05 | 2,108,984 | $46,498,276 |
| Mooring | 8/14/97-3/6/06 | 3,342,461 | $106,662,668 |
| Tate | 8/14/97-9/20/05 |  | $61,030,631 |
| Eulau | 2003-2006 | 583,662 | $15,844,601 |
| Larsen | 2003-2005 | 479,391 | $14,348,892 |
|  | 1/21/00-2/1/01 | 149,256 | $7,303,026 |
| Schroeder | 2003-2006 | 17,500 | $601,280 |
| Stark | 2004-2006 | 355,128 | $10,911,461 |
| Patel | 2003-2005 | 352,752 | $5,775,654 |
| Donnelly | 2003-2005 | 236,456 | $8,305,457 |
|  | 2/25/00-11/6/00 | 111,264 | $6,753,190 |
| Toprani | 2/2/00-2/29/00 | 132,000 | $4,388,490 |
| **Total** |  |  | **$400,084,332** |

The receipts from sales prior to the Sarbanes-Oxley are not generally available. Also, the sales of illicit options by nonreporting Rambus employees are not publically available. Thus, these estimates of the proceeds from the backdated options are low.

187

592.    Insider trading volume by month in 2000 is shown below. This shows the controlling officers making misappropriating material non-public information in their sales of Rambus stock during the year 2000.

| Month | Shares Sold | Events |
|-------|-------------|--------|
| January | 8,276 | Rambus sues Hitachi late in January. |
| February | 615,345 | Rambus stock price more than triples On Perception that Intel is backing Rambus, analysts predict $125 per share. |
| April-May | 277,328 | Price declines due $171 million loss. |
| July | 109,000 | Sold shortly before Rambus sues Infineon. |
| August | 427,417 | Sold shortly before Micron sues Rambus. Mooring and Tate sell 200,000 shares. |
| November | 248,268 | Mr. Tate sells 200,000 shares shortly After Micron asks the FTC to investigate. |

593.    The simultaneous exercise of an employee option and the sale of the resulting stock are not protected by the automatic sale plan exceptions. The Defendants established their 10-B5 plans while concealing the materially adverse information about the illicit options scheme insider trading, submarine patents, and other forms of fraud being practiced.

**The Defendants' Scheme Is Exposed**

594.    There are early signs starting in 2005 that Rambus knew that there was an increasing probability that their fraudulent concealments were likely to be discovered and that the company delayed the disclosure of the materially adverse information as long as could. These signs show Rambus preparing to cover up

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A. Brocade Inc (another Santa Clara valley electronics company) was under investigation by the SEC and the DOJ for options backdating by 2005 and had the same corporate law firm as Rambus and also had the same "one-man" stock option committee allegedly recommended by Mr. Sonsini of Wilson Sonsini Goodrich and Rosati for Brocade. Brocade also had the same options and "new-hire" backdating practices.

B. Brocade's former CEO Mr. Reyes has been charged with criminal violations by the DOJ in connection with the backdating of employee stock options grants and new hire dates. Rambus has publicly admitted that its option grants were incorrectly dated and that new-hire employment dates were backdated.

C. With the same illicit backdating practices and the same law firm as Brocade, and the fact Rambus directors had invested in Brocade, Rambus was on notice of its impending exposure no later than 2005.

D. Mr. Tate and Mr. Horowitz terminated their automatic sales plans in September 2005 and did not reinstitute them.

E. Mr. Danforth negotiated a severance agreement with Rambus that was signed in early 2006 that essentially silenced him and forbade him from helping anyone sue the company. For this he was awarded about $1 million of restricted stock. (2006 10-K).

After signing this "gag" contract Mr. Danforth and Mr. Hughes were publicly misleading shareholders by referencing Mr. Danforth's stated goal to write

189

1
2

the story of Rambus in book form at the annual shareholders meeting 2006 and also at other times.[131]

3
4
5
6
7
8

F. Mr. Tate gave back millions of dollars worth of stock options in early January 2006 as well as the common stock equivalents that would never vest. In so doing, Mr. Tate attempted to make his egregious options grants legitimate by characterizing himself in the boards statement as a "service provider" instead of the CEO and Inside Director.

9
10
11

G. Mr. Mooring terminated his employment with the company in early 2006 and sold a very large amount of stock in Rambus in advance of the adverse news..

12
13
14
15
16

H. Robert Eulau CFO resigned his position despite the fact he had been awarded another round of spring-loaded options, exercised his vested options and sold much if not all of his stock position by March 2006 in advance of the adverse news.

17
18

I.  Additional outside directors were appointed to the Board of Directors.

19
20
21

J.  Mr. Tate surrendered his position as Chairman of the Board in May 2006 just before the CFRA reported that Rambus was suspected of backdating options.

22
23
24

K. Mr. Davidow sold stock and then quit as Chairman Emeritus in May 2006 before the board commented on the options backdating.

25
26

L. Mr. Danforth was demoted in July 2006 after the bad news was revealed.

27
28

---

[131] Mr. Danforth was indirectly barred from writing the Rambus story by his employment contract.

190

595. The 1998-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1998 and 2006. In fact, it was not until the CFRA report that shareholders learned that the Proxy Statements that they had relied upon for year were false and misleading. Defendants have been unjustly enriched at the expense of public shareholders.

596. On May 16,2006, Rambus' stock dropped as the CFRA published a report on stock option backdating which listed Rambus as a company at risk for such practices. Then, on May 30, 2006, Rambus announced that it had commenced an internal investigation into the Company's historical stock option granting practices and related accounting issues, focusing on options issued in or before 2003.

597. Each dollar diverted to Defendants via the option-backdating scheme has come at the expense of the public shareholders. For example, if Tate's 360,000 options granted in November 1998 had not been manipulated, but rather had a strike price of $18.36 per share, which was the average for November 1998, instead of the $14.83 per share strike price, which was the trading low for the month, when Tate exercised those options the Company would receive $6.6 million instead of $5.3 million - a cost to the Company of $1.3 million from this single instance of option backdating. This theft of the company's capital reduced the book value of the company.

598. The statement of FTC Commissioner J. Thomas Rosch February 5, 2007 (page 7, footnote 30, docket 9302) contains evidence that Rambus would not license under RAND rates to JEDEC members. Rambus has maintained the public position that it would have issued licenses under RAND.

599. On July 21, 2006 the FTC issued a notice of intent to release evidence that had been provided in camera which was to be incorporated into to Commission opinion that was

191

1    subsequently released on August 2. This release shows that Rambus had concealed materially

2    adverse evidence from it shareholders and prospective shareholders for many years.

3    The Commission Opinion (page 118) states:

4         "We stress, however, that Rambus's extensive document destruction campaign had
          the potential to deny the Commission an opportunity to examine thoroughly
5         Rambus's conduct. In some instances, the Commission has relied on evidence that
          was preserved only fortuitously.[647]   If the record in this case had been marginal,
6         while simultaneously containing evidence that Rambus had destroyed potentially
7         relevant documents, we would have pursued the spoliation inquiry to its conclusion
          and, if appropriate, imposed a remedy..."
8

9    And in footnote 647 on the same page:

10        "For example, the only sources of Crisp's JEDEC-related e-mails were a hard drive
          found in Crisp's attic, see CX 5075 at 3-5 (deposition transcript at 296-302) (Crisp
11        2004 Infineon Dep.), and an old Rambus server that Crisp had used to transfer e-
          mails between his Macintosh and PC office computers. See Crisp, Tr. 3572-76,
12        3588-92; CX 5078 at 14 (trial transcript at 124). Likewise, although Rambus's
13        outside patent counsel, Vincent, destroyed most of his Rambus-related files, he
          retained certain relevant correspondence in his personal files. See CX 5066
14        (designated GCW F 3448). In addition, records that Rambus failed to produce in
          the normal course of discovery were retrieved from corrupted back-up files in the
15        subsequent Hynix litigation, and the Commission was able to add this evidence to
16        this proceeding's record on appeal. "

17        600.    The FTC prepared a detailed timeline based on both the available
18
     documentation and the concealed information recovered later. It is given at the following link:
19
          http://www.ftc.gov/os/adjpro/d9302/051028pubtimelined9302.pdf
20
21   The FTC Commission timeline chart shows that new evidence was obtained from Rambus

22   backup tapes that were presumably found in Rambus garage, from documents in the Infineon

23   "spoliation" case in Virginia (that were admitted in 2006) and from documents withheld or

24   missing from Rambus Privilege Log (CX5117).

25        Karp, Crisp, Tate, Davidow, Vincent, Larsen, Roberts, Toprani, Diepenbrock, Vincent,
26
27   Barth, Mooring, Harmon, and Garrett are named in this document which summarizes shows

28                                      192

1  Rambus submarine patent scheme,  its intention to deceive the industry until "the point of no

2  return" , and their awareness of the continuing equitable estoppel issues in connection with its

3  SDRAM and DDR patents.

4

5  **Tolling And The Statutes Of Limitations**

6      601.    In addition to fraudulently concealing the "backdating" of stock/options,

7
   employment documents, their insider-trading scheme and their fraudulent SEC reports, the
8
   company executives and directors also <u>concealed</u> their "<u>exclusionary</u> " antitrust conduct and their
9
10 "<u>deceptive</u>" and unfair business practices with respect to the JEDEC manufacturers from the

11 Plaintiffs. These were facts material to Rambus stock price and were required to be reported.

12 These highly material adverse omissions were concealed for 7 years from the plaintiffs and were

13 revealed in August 2, 2006. Rambus' fraudulent concealment tolls the statute of limitations until

14 the truth became known.

15
      602.    With respect whether to allow equitable tolling due to the issuance of spring-
16
   loaded options, Chancellor Chandler in the Tyson[22] case issued the following opinion (emphasis
17
18 added):

19          "Plaintiffs allege that Defendants knowingly spring-loaded options to key
            executives and directors while maintaining in public disclosures that such options
20          were issued at market rates. Such partial, selective disclosure - if not itself a lie,
            certainly exceptional parsimony with the truth - <u>constitutes an act of "actual</u>
21          <u>artifice"</u> that satisfies the requirements of the doctrine of fraudulent concealment.
            Even were this not the case, Defendants' roles as fiduciaries would justify tolling
22          the statute of limitations through the doctrine of equitable tolling. Plaintiffs were
            entitled to rely upon the competence and *good faith* of those protecting their
23          interests."
24
25      Plaintiffs in this complaint are also alleging that the CSE's and the other options issued

26 presumably on October 20, 1999 were spring-loaded and that this is a violation of the purpose of

27 ──────────────────────
   [22] In Re Tyson Foods, Inc. Consolidated Shareholder Litigation, 2007 Del. Ch. Lexis 19 (Del. Ch. Feb. 6, 2007)
28                                    193

an incentive stock plan.[132] Many other options grants were also spring-loaded and a number of them are marked in Exhibit B.

603.    Rambus had been warned by its own attorneys from 1992 onward of the equitable estoppel consequences of its deceptions in connection with JEDEC membership and with its business partners who were also JEDEC members.

604.    Rambus was first charged with actual fraud in Virginia in 2000. This specific charge involved the failure of Rambus to inform the JEDEC member companies of its patents or patent applications on the JEDEC standard while a member of JEDEC. Rambus was found guilty. However, the CAFC overturned the jury verdict because it determined that even though Rambus attempted to get patents on the JEDEC standards they did not succeed while Rambus was a member of JEDEC. Moreover the CAFC determined that the JEDEC rules were too vague to impose a "contractual duty" to disclose. The Plaintiff followed this case closely and felt correctly that Rambus would prevail ultimately on this actual fraud charge.

However, the Plaintiff wrongly believed that Rambus had adequately informed the industry of its intention to seek patents to protect its continuation rights flowing from the RDRAM patents. Rambus' withdrawal letter from JEDEC had stated generally that they would enforce their rights and encouraged this wrong belief. Later it was revealed that Rambus made no mention of JEDEC standard memory but did assert rights over SLDRAM in what has been construed as an act of deception under California law.

Rambus made no effort to correct this wrong belief despite the fact that Rambus executives and board members have admitted to monitoring the internet investment message boards where this wrong belief were being espoused by shareholders. Plaintiffs did not know

---

[132] Rambus knew the stock would rise due to the Intel scheduled and Rambus assertion of monopoly over synchronous DRAM by February 2000. Rambus insiders took advantage of this information to award huge amounts of Rambus stock and options to themselves.

194

1    until 2006 that Rambus misled Hynix and the industry from 1996 and had failed to assert its

2    claims to SDRAM and DDR royalties to which they would have been entitled under the Hynix

3    contract. Rambus disclosed nothing to its shareholders with regard to this intentional deception

4    of the DRAM industry. But for the publishing of the evidence of Rambus concealment by the

5    FTC Commissioners we still would not know of the intentional deception.

6
7    605.    There is now considerable circumstantial evidence that Rambus used to internet

8    investment message boards to promote a false view of the company and its SDRAM/DDR patent

9    prospects through agents connected to the company directly or indirectly. Some message board

10   participants have been asked if they are Rambus employees. They have refused to deny that they

11   are employed by Rambus directly or indirectly.  This is another form of deception directly

12   targeting the shareholders.[133]

13   606.    California law provides a 4-year statute of limitations in cases involving

14
15   breaches of fiduciary duty and also the CA17200. The statute of limitations begins to run when

16   Plaintiff discovers or should have discovered all the facts essential to this complaint through the

17   exercise of "reasonable diligence".

18   607.    Section 10 (b) of the 1934 Exchange Act is not tolled. The discovery date of the

19   options backdating fraud is taken to be the CFRA announcement May 2006. The revelation of

20   the FTC opinion on August 2, 2006 is taken to be the discovery date of the Rambus deception of

21   the DRAM manufacturers.

22
23   608.    The statute of limitations for the section 18 (a) of the 1934 exchange Act is as

24   follows:

25

26   ────────────────
     [133] In fact one poster -according to a confidential source- is Mr. Hughes the CEO of Rambus who is alleged to post
27   under the name "clarissamehitable". It turns out that this alias is an old Hughes family nickname going back into the
     19th century.  Link :  **http://www1.investorvillage.com/smbd.asp?mb=3666&pt=m**

28

"No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued."

609.    The Counts alleged herein are timely.  Defendants wrongfully concealed their submarine patent scheme, manipulation of the stock option plans through strategic timing and fraudulent backdating, fraudulent backdating of employee hire dates, by issuing false and misleading Proxy Statements, by falsely reassuring Rambus' public investors that Rambus' option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

610.    Plaintiff had no reason to suspect the Defendants', PWC's or WSGR's complicity until May 16, 2006, when CFRA issued its subscription report detailing the option practices of Rambus and the Company thereafter made its own announcement that it was commencing its own internal investigation into the Company's historical stock option granting practices and related accounting confirming the substance of the CFRA report.

611.    The initial acts of options fraud began in 1997 and is continuing due to the 10-year exercise period of some of the options. The completions of the fraudulent acts continue within the statute of limitations. Thus, options and warrants fraudulently granted in 1998 may continue to be exercised until 2008 where the fruit of the fraud is complete. Moreover, spring-loaded options issued in 2006 will continue to be exercised until 2016. Thus the acts of fraud were not consummated prior to the statute of limitations but are continuing.

196

## PLAINTIFFS DAMAGE PLEADING

612.    This section deals with transaction and loss causation and summarizes damages by account number.

613.    Plaintiffs' detailed Rambus transactions are attached as Exhibit O and summarized here. The total losses are given below for each account as specified:

Fidelity Investments (JK) X05-XXX173        -$ 2,296,496.78    (1999-2002)

Fidelity Investments (JK) X05-XXX172        - $ 830,233.58     (1999-2001)

Fidelity Investments (KL) Z85-XXX131        -$1,164,466.47    (4/1/06-3/1/07)

Fidelity Investments (JK) Z85-XXX769/801 -$ 839,172.61      (4/1/06-12/31/06)

Fidelity Investments (DK)        X94-15XX88 -$ 12,196.40       (1/1/04-8/31/04)

                                                                  -$ 358,920.55    (4/1/06-9/30/06)

Etrade Securities (DK)          XXXX-6310 -$ 361,099.65      (10/7/00-4/30/01)

614.    Plaintiffs' actual damages under California fraud charges are taken to be the losses indicated on brokerage statements.

615.    California fraud damages are calculated for all Rambus securities as the sales the purchase amounts. Calculated this way transaction costs are included but not margin costs.

616.    For 10(b) damages, the Plaintiffs follow the Dura[134] standard.  Rambus' stock prices in 2005 and 2006 were grossly inflated.[135] Under Dura, the plaintiffs are permitted to

---

[134] DURA PHARMACEUTICALS, INC., et al. v. BROUDO et al. certiorari to the united states court of appeals for the ninth circuit, No. 03-932.Argued January 12, 2005--Decided April 19, 2005

[135] In 2005, the truth of Rambus' concealed "spoliation" of records as part of their antitrust caused them to lose in Virginia federal court.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1    assert that Rambus' many misrepresentations "touch upon" the plaintiffs" economic losses in

2    that the price of Rambus stock was inflated as a consequence of its <u>omission of materially</u>

3    <u>adverse disclosures</u> and the <u>active but materially false stock price promotion</u> that has already

4    been documented herein especially for the years 2000 and 2001 as well as 2005 and 2006.

5         617.    10 B damages are the transaction losses from the time that the materially

6    adverse news began to leak into the market place causing Rambus securities to begin to react. In

7
8    April 2006, the resignations, changes in the board of directors and option grant givebacks, and

9    the heavy insider selling foreshadowed the revelation unexpected bad news of subsequent

10   months.

11        There are two news events in early 2005 causing the Rambus securities to react

12   negatively in the first half of the year. First, the $300 million Convertible bond private placement

13   was announced without warning.  Second, Rambus lost the 'spoliation" trial in Virginia without

14   warning on March 15, 2005.

15

16
17        618.    **1999-2002 Transaction Causation**:

18        Plaintiffs' initial purchases of Rambus securities in late 1999 and early 2000 were

19   initially decided based on the fact that Intel had selected Rambus' RDRAM memory for the vast

20   PC desktop and workstation market. A review of Rambus SEC financial reports and other public

21   disclosures such as news releases was made in advance of the decision to invest. This provided a

22   reasonable basis for investment and a promise of fast earnings growth as the new PC platforms

23   were sold.

24

25
          In 2006, Rambus was still concealing form its shareholders and the court evidence from the court of its
26   submarine patent scheme and spoliation as well as its insider trading and backdating practices. Had the truth been
     known Rambus stock price would never have reached $46 per share. This was revealed by the FTC release of sealed
27   evidence.

28                                                  198

1  If Rambus had disclosed the material issues related to their JEDEC patent ambush

2  or the fact that they already knew that Intel was moving away from Rambus RDRAM for PC's,

3  Plaintiffs would have not invested in Rambus.[136]

4  Plaintiffs relied on the truth of Rambus' assertions with respect to the superiority

5  of the RDRAM memory and later in January 2000 on the perceived strength of Rambus' JEDEC

6  Patent portfolio in making purchases of Rambus securities. Rambus'serious and long term

7
8  material omissions that are the direct cause of Plaintiffs purchases. Had Rambus not concealed

9  the materially adverse condition of the SDRAM and DDR patent portfolio, Plaintiffs would not

10  have invested in Rambus securities.

11  619.    Plaintiffs' damages were caused when they were forced to sell their securities

12  at greatly reduced prices or when their securities expired worthless when actual news events

13  revealing the material omissions occurred.  In other cases, the materially adverse non-public

14
15  information leaked onto the market or was inferred by portions of the market as a consequence

16  Rambus board of directors, management, consultants or industry actions. For example in 2006,

17  there were many insiders and consultants who knew Rambus' materially adverse information.[137]

18  The insiders and consultants had significant advantages over others in the purchase and sale of

19  Rambus securities.

20  620.    It is important to note here that the truth of Rambus deceptions is not yet fully

21  known because the company has been unable to complete its financial restatements for more than

22
23  a year since the initial disclosures in May 2006 and has not been candid with shareholders. In

24  fact, Rambus has resisted the lawful inspection of their records under California law.

25  ─────────────
[136] The FTC evidence timeline chart is available at

26  http://www.ftc.gov/os/adjpro/d9302/051028pubtimelined9302.pdf
[137] Dunlevie and Davidow were part of the venture capital community. The Rambus executives had to know to do

27  their jobs. WSGR and PWC had to know by virtue of their involvement in Rambus financial and legal affairs from
the beginning.

28  199

621.    Plaintiffs assert that they would not have invested in Rambus securities had they known of Rambus' false financial, proxy, and registration statements or its practices of backdating employee options, insider trading, backdating new employee hire dates, and failing to establish and maintain adequate internal control procedures.

Plaintiffs assert that they would not have invested in Rambus had they known of Rambus "unfair business practices" and "violations of antitrust law" as described in detail by the FTC in its finding published August 2, 2006 Opinion[138].

Plaintiffs would not have invested in Rambus had they known that PWC was failing to perform its public accounting functions and that WSGR was helping to setup and provide legal cover for Rambus' illicit stock and option grant practices while accepting stock and/or options from Rambus.[139]

Plaintiffs would not have invested if they had known that Rambus had negotiated a clause in its contract with Intel that forbade Intel from publicly endorsing any other RDRAM competitors and that Intel was to be paid royalties by Rambus in excess of 1.5% on RDRAM sales while holding 4,000,000 Rambus common stock equivalents with a strike price of $2.50 per share.

Plaintiffs at all times attended to all the public information they could reasonably obtain access to in evaluating Rambus as an investment. They even attended some of the court proceedings.[140]

Rambus' many concealments of the material adverse non-public information denied Plaintiffs the right to make an informed investment decision based on appropriate and complete

---

[138] Indeed the FTC findings have put a cap on the royalties that Rambus can recover for their JEDEC patents that is much lower than the royalty rate Rambus was demanding. The FTC finding strongly supports the charge fraud in the Rambus' dealings with its shareholders.
[139] WSGR is alleged to have recommended the "one-man stock option committee" to Rambus board of directors.

PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

1  material disclosures. Rambus management successfully perpetuated this stock fraud on the

2  plaintiffs for 6 years.

3      622.    **Materially Adverse Omissions**:

4          Plaintiffs had no way of knowing that Rambus was intentionally and willfully omitting to

5  state many materially adverse facts about the company and its practices as follows:

6              a)  Intel was already moving away from using Rambus
7                  RDRAM.[141]
8
9              b)  Rambus' contract with Intel prevented Intel from endorsing
10                 any competitive memory other than RDRAM in public
11                 statements. Rambus had from the beginning set out to
12                 prevent the public from gaining access to the material non-
13                 public information.[142]
14
15             c)  Rambus was engaged in "unfair business" and "antitrust
16                 violations" in connection with the submarine patent ambush
17                 of the DRAM manufacturers.[143]
18             d)  Rambus financial, proxy and registration Statements and later
19                 their other option grant disclosures (S3, S4) were false and
20                 misleading.
21             e)  Rambus executives and managers were engaging
22                 systematically in insider trading while in possession of
23                 materially adverse non-public information about the
24                 company for 7 years.
25

26
27  [141] Plaintiffs even purchased RDRAM based PC's for evaluation in the year 2000 (an 820 and an 850 PC)
    [142] This goes further to establishing scienter on the part of Rambus executive management and its board of directors.
    [143] This has led to the collapse in the value of Rambus JEDEC patent portfolio.
28
PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)

f)   Mr. Tate and Mr. Mooring were taking common stock

equivalents and options grants before they vested in CY Q1-

2000 while in the possession of materially adverse non-

public information and while misappropriating company

information for their own benefit.[144]

g)   The convertible bond placement (in 2005) for $300,000,000

was made to replace the strike price money not paid to

Rambus as a consequence of its options backdating

practices.[145]

h)   Key members of Rambus board of directors and executive

management were covering up the false financial reports,

illicit options grants, employment record backdating, and

backdating of options and common stock equivalent exercise

dates in 2005 and 2006.[146]

i)   Mr. Tate was replaced as CEO by Mr. Dunlevie, Dr.

Davidow and Mr. Hughes as a consequence of the

Internal control audit performed in 2004 by the Audit

Committee. The board of directors approved this change and

PWC did not report what it found to the public or the SEC.

j)   Mr. Hughes in 2006 initiated a public campaign to support

And run up Rambus stock price in the first 4 ½ months of the

---

[144] The record shows that 200,000 of the CSE were exercised and sold by September 30, 2000.
[145] This bond placement was made using Rambus false financial statements.
[146] To wit Dunlevie, Davidow, Farmwald, Tate, Mooring, Hughes, Bentley, Kennedy and Geschke.
Mr. Davidow was justifying the options grants in 2002 at the annual shareholders meeting in 2006 to plaintiff.

202

1    year. At the same time Rambus insiders were selling their

2    stock.

3

4    623.    Plaintiffs would not have invested any money with Rambus had any of these

5    material omissions become known at the time because the management would have been

6    adjudged dishonest and the investment risky as it has proven to be.

7    624.    2000-2001 News event Disclosures:

8

9        a)  Rambus sues Hitachi.

10       b)  Rambus asserts monopoly over synchronous DRAM.

11       c)  Intel launches Willamette at IDF.

12       d)  Rambus announces a surprise $171.1 million loss due to

13           stock and option grants.

14       e)  Hitachi countersues Rambus.

15       f)  Toshiba Licenses Rambus

16       g)  Hitachi settle Rambus lawsuit

17

18       h)  Rambus sues Infineon.

19       i)  Hynix sues Rambus.

20       j)  Micron sues Rambus

21       k)  Intel chooses DDR over RDRAM for servers.

22       l)  Intel takes RDRAM off its product roadmap.

23       m)  FTC begins inquiries regarding Rambus

24       n)  Rambus loses to Infineon on JEDEC fraud.

25

26       o)  Intel pays $200 million to buyout Rambus contract for in

27           return for royalty free license and a release.

28                        203

**THE 10 (b) PLEADING STANDARD**

625.    In order to plead a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiffs must plead:

> A) a misrepresentation or omission of a material fact;[147]
> B) reliance thereon;[148]
> C) causation;[149]
> D) damages[150];
> E) fraud (a "strong inference" scienter)[151];
> F) in connection with the purchase or sale of a security.[152]

The Supreme Court Summary Prescriptions[153]:

> 1) Courts must accept all factual allegations in the complaint as true.
>    a) Allegations must be considered collectively
>    b) The court's job is not to scrutinize each allegation in isolation.
> 2) Courts must consider
>    a) the complaint in its entirety
>    b) documents incorporated by reference;
>    c) matters incorporated by judicial notice
>
> 3) Courts in determining whether the pleaded facts give rise to a strong inference of scienter
>    a) must take into account plausible nonculpable opposing inferences.
>    b) The significance of an allegation depends on the entirety of the complaint.

---

[147] Plaintiffs have pled material misrepresentations or omissions of fact by Rambus that were made to induce the plaintiffs to purchase and hold the stock. These include material misrepresentations of the value of SDRAM and DDR patent portfolios, false financial and Proxy and registration statements, other false SEC filings, alteration of company documents, backdating and springloading of options and stock grants while concealing spoliation and antitrust activities.

[148] Plaintiffs have pled reliance on Rambus false financial statements. Rambus' highly material concealment the weakness in its asserted monopoly over the DRAM market. Plaintifffs have also pled that the misleading and false statements made by Mr. Hughes, Mr. Danforth and Ms. Holt were instrumental in Plaintiffs retaining positions in Rambus stock which resulted in losses in 2006.

[149] Plaintiffs have adequately pled loss causation by showing news events and the leakage of adverse news that caused drops in the Rambus' securities prices and caused losses in plaintiffs' accounts.

[150] Plaintiffs have shown that their damages are in excess of $5,000,000and have alleged sufficient specific events that caused their losses that are directly tied to Rambus concealments of the many materially adverse facts as well as many materially misleading public statements by company officers. The false and misleading statements were designed to keep the shareholders in the stock while company insiders benefited from the selling their stock.

[151] The Supreme Court has now prescribed the scienter standard.

[152] Plaintiffs have adequately alleged the purchase and sale of Rambus stock and options by providing account transactions tied to the material events.

[153] Tellabs, Inc. v. Makor Issues & Rights, Ltd., *No. 06-484 (U.S.), decided June 21, 2007*

204

     c) Omissions and ambiguities may count against scienter but the court's job is not to
"to scrutinize each allegation in isolation but to assess all the allegations holistically."

     d) Scienter must be argued for each defendant with facts that are sufficient to show a culpable state of mind with regard to his/her violations.

    The facts in the Rambus case show much more than false and misleading statements. There are a range of abusive stock option practices including backdating and a pattern of unscheduled option and stock grants in front of materially positive news events over a long period from 1998. Moreover, there is the illegal alteration of company hiring documents.[154] The Defendants also filed false Form 4 disclosures for their backdated options.[155] In addition stock and/or option grants to consultants such as PWC and WSGR were not accounted for. The compensation and stock or option grants to very high-level service providers such

    Mr. Karp (vice President) and Mr. Steinberg (Vice President) were specifically not accounted for at all[156]. Mr. Karp and Mr. Steinberg were the two most important Rambus employees responsible for the Rambus' submarine patents on the JEDEC SDRAM and DDR that the FTC has ruled was an antitrust offense. The omission of their compensation cannot be an accident and is very suspicious.

    Finally, the evidence sealed at the request of Rambus was published by the FTC over Rambus objections after its ruling on August 2., 2006, proves that Rambus did engage in "willful and intentional" deception of the DRAM manufacturers. Rambus not only deceived the industry, it also deceived the plaintiffs, analysts, and public shareholders and the federal courts by not

---

[154] Rambus has admitted to backdating employment hire dates to obtain low price options for new employees

[155].See for example the John Danforth employment grant 10/8/2001 exhibit B of the complaint.

[156] There is no record of stock or option grants to either Mr. Karp or Mr. Steinberg in connection with their development of the RAMBUS JEDEC patent portfolio despite its overwhelming importance to Rambus and its impact on Rambus' stock price.

205

1  making this evidence available in the 2000, 2005 and 2006 to the federal courts hearing the

2  "spoliation" cases. The FTC evidence proves the fraudulent intentions of Rambus its board of

3  directors and its management. Thus the FTC ruling and the evidence that was published

4  supporting the findings satisfy the requirements of both the 10 B and also the California fraud

5  allegations.

6

7

8  ## THE FRAUD PLEADING STANDARD

9      626.    Allegations of deceit and fraud against Plaintiff under California Civil Code

10 sections 1709 and 1572 must meet the heightened pleading standards of Federal Rule Civil

11 Procedure 9(b). Plaintiffs are required to plead facts in the complaint such as the times, dates,

12 places, benefits received, and other details of the alleged fraudulent activity. Statements of the

13 time, place and nature of the alleged fraudulent activities are sufficient whereas mere conclusory

14 allegations of fraud are insufficient. Plaintiffs believe those requirements have been met in this

15 complaint.

16

17

18

19

20

21 ### COUNT I
### VIOLATIONS OF §10(B) AND RULE 10 B-5 OF THE 1934 SECURITIES EXCHANGE ACT
(Against All Defendants)

22

23     627.    Plaintiff incorporates by reference and realleges each and every allegation set

24 forth above, as though fully set forth herein.

25     628.    During the statutory period the individual Defendants, WSGR and PWC carried

26 out a plan, scheme and course of conduct that was intended to and/or did: (i)

27

28

deceive the investing public, including plaintiff as alleged herein; (ii) artificially inflate the market price of Rambus common stock; and (iii) cause plaintiff to buy Rambus stock at artificially inflated prices.

629.    Plaintiff was unaware of the Rambus' option backdating and insider trading scheme, SDRAM/DDR patent deception and other Rambus' deceptive practices. Plaintiff purchased securities that were artificially inflated in value due Rambus' misrepresentation of its legitimate prospects and by concealment of the materially adverse information relating to their options backdating, insider trading and submarine patent scheme. These concealments allowed Rambus executives and board members to benefit enormously from the cyclic price swings in Rambus' stock by exploiting their inside knowledge of litigation and other events material to the company.

630.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making, or participation in the making of false and/or misleading statements of material facts and/or omitting material facts necessary in order to make their statements about Rambus not misleading.

631.    The Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of the Defendants was able and did control the conduct complained of herein and the content of the public statements disseminated by Rambus.

632.    Defendants acted with scienter throughout the relevant period, in that they had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein. Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

633.    Each of the Defendants, PWC and WSGR participated in a scheme to defraud with the purpose and effect of defrauding Rambus and its Plaintiffs in order to enrich themselves.

634.    By virtue of the foregoing. Defendants have violated § 10(b) of the Exchange Act, and Rule l0b-5 promulgated thereunder and have thereby caused the Plaintiff to sustain damages as alleged herein.

**COUNT II**
**VIOLATIONS OF§14(A) OF THE 1934 EXCHANGE ACT**
(Against PWC, WSGR, and the Rambus Board of directors and John Danforth)

635.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

636.    The § 14(a) Defendants are PWC, WSGR, and the Rambus Board of directors and John Danforth. PWC and WSGR knowingly participated in the preparation of the Proxy statements and their inclusions. John Danforth signed the Proxy statement on behalf of the board of directors.

637.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to

208
**PRIVATE SECURITIES COMPLAINT   C-07-1238-JF (HRL)**

any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

638.    The 1998-2006 Proxy Statements violated §14(a) and Rule 14a-9 by intentionally omitting material facts, including the fact that Defendants were causing Rambus to engage in an option backdating scheme, a fact that certain of the defendants were aware of and participated in from 1998 to the current time.

639.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

640.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff in voting on each Proxy Statements. The materially false Proxy Statements were essential to the accomplishment of Defendants' unlawful stock option backdating and insider trading scheme. Any revelations of the material truth would have immediately thwarted continuation of plaintiffs' endorsement of the directors' positions, the executive officers' and the Company's compensation policies and the Plaintiff' choice of Rambus securities as an investment. Indeed plaintiff would have had the option to not invest or to liquidate the investment in Rambus.

641.    The Plaintiff was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

642.    As a consequence, PWC, WSGR, and John Danforth are liable for these false proxy statements.

## COUNT III
## VIOLATIONS OF §18(A) OF THE 1934 EXCHANGE ACT
(Against the § 18 Defendants)

209

643.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

644.    The § 18 Defendants consist of the board of directors and other signatories of the false and or misleading SEC reports in the statutory years.

645.    PWC by attesting to the unqualified accuracy of Rambus financial statements made itself a section 18 defendant.

646.    Thus, Farmwald, Horowitz, Kennedy, Tate, Davidow, Dunlevie, Hughes, Mooring and the other signatories of the false SEC reports are to the same extent as Danforth and Eulau subject to the section 18 count for the same reasons and scienter is not required.

647.    Plaintiff read the 10-K and 10-Q reports in deciding to build and/or retain positions in Rambus securities.

648.    Plaintiff also read and discussed the public media releases of Rambus Financial results and relied on this information in deciding whether to build or retain Rambus securities positions.

649.    Plaintiff has been damaged as a consequence of reliance on the false and misleading Rambus SEC reports intermittently over a period of 7 years.

1

**COUNT IV**

2

<u>VIOLATIONS OF §20(A) AND (E) OF THE 1934
EXCHANGE ACT</u>

3

(Against Control Defendants)

4

650.    Plaintiff incorporates by reference and realleges each and every allegation set

5

forth above, as though fully set forth herein.

6

7

651.    The control Defendants, by virtue of their positions within Rambus and their

8

specific acts, were, at the time of the wrongs alleged herein, controlling persons of

9

Rambus within the meaning of §20(a) of the Exchange Act. They had the power to

10

influence and exercised the power to cause Rambus to engage in the illegal conduct

11

and practices complained of herein.

12

652.    During the relevant statutory periods Defendants Hughes, Eulau, Mooring,

13

Tate, Dunlevie, Farmwald, Horowitz, Kennedy, Danforth, Davidow, Geschke and

14

15

Harmon were "controlling persons" of defendant Rambus, within the meaning of

16

Section 20(a) of the Exchange Act.

17

653.    The Defendants were "controlling persons" of Rambus because, due to the

18

officer and/or director positions they held with Rambus and they had the influence

19

and power over Rambus to cause or prevent, and did cause, Rambus to engage in

20

the wrongful conduct complained of herein.

21

654.    As set forth above in Count I, the Defendants violated Section 10(b) of the

22

23

Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions

24

as alleged in this Complaint. By virtue of their status as a "controlling person" of

25

Rambus, the Defendants are liable, to the same extent as is Rambus for its

26

violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

27

thereunder, pursuant to Section 20(a) of the Exchange Act.

28

211

655.    As set forth in Count II, Rambus violated Section 14(a) of the Exchange Act by its acts and omissions.  By virtue of their status as a "controlling person" of Rambus, the Individual Defendants are liable, to the same extent as is Rambus for its violations of Section 14(a) of the Exchange Act, pursuant to Section 20(a) of the Exchange Act.

656.    As a consequence the Control Defendants are jointly and severally liable for damages to the Plaintiff under §20 (a) (e).

**COUNT V**

**BREACH OF FIDUCIARY DUTY OF CANDOR AGAINST THE DEFENDANTS
UNDER CALIFORNIA LAW**

657.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

658.    The fiduciaries of Rambus are the board of directors and the officers of the company.

659.    As fiduciaries of the plaintiff , the Defendants owed the highest duty of good faith that includes the duty to fully disclose the existence and nature of all material facts in their possession or control with respect to Rambus' prospects as a business.

660.    The Defendants have violated fiduciary duty of candor owed to Plaintiff, and have engaged promulgating false and misleading proxy statements, financial statements and press releases to Plaintiff and the public and other forms of fraud.

661.    Defendants failed to exercise the candor owed to Plaintiff, and they failed to disclose materially adverse information and/or made material misrepresentations to Plaintiff regarding Rambus true prospects including its legal and financial conditions. Instead they concealed the actual condition of the company from the plaintiff and the public.

662.    There can be no doubt that disclosure of the aforementioned materially adverse information would have caused a reasonable shareholder to change their vote and reconsider any Rambus investments.

663.    By reason of the foregoing acts, practices and course of conduct, the Defendants have breached   their fiduciary obligation of candor towards Plaintiff.

664.    As. a proximate result of the Defendants' conduct Plaintiff has been injured and is entitled to damages.

213

1

2

3

**COUNT VI**
**VIOLATION OF CALIFORNIA CORPORATIONS CODE 25401**
(The 2000 and 2006 Insider-Selling Defendants, PWC and WSGR)

4       665.    Plaintiff incorporates by reference and realleges each and every allegation set

5              forth above, as though fully set forth herein.

6       666.    The 25401 Defendants are the 2000 and 2006 Insider-Selling Defendants, PWC

7              and WSGR.

8

9       667.    PWC and WSGR accepted stock or options grants from Rambus and exercised

10             or sold the stock derived thereby while in possession of material non-public

11             information. Service providers under the 1997 Stock Plan they each could receive

12             up to 1-million stock options or common stock equivalents per year.

13      668.    Acting individually and pursuant to a scheme or conspiracy or aiding and

14             abetting each other, the 2000 and 2006 Insider Selling Defendants had access to

15             highly material adverse information regarding Rambus' various fraudulent

16             practices and sold their Rambus common stock to the public market in violation of

17             California Code 25401.

18

19      669.    Each of the Insider Selling Defendants had actual knowledge of one or more of

20             these fraudulent practices and thus the material adverse non-public information and

21             willfully sold their Rambus common stock in violation of California Corporations

22             Code § 25402.

23

24      670.    The Insider selling Defendants misappropriated material company information

25             in timing the exercise and sale their stock options before that information was

26             available to the public in violation of California Corporations Code § 25402.

27

28                                    214

671.    Pursuant to California Corporations Code § 25500, the Insider Selling

Defendants and each of them are liable to the Plaintiff for damages as follows:

"Any person who willfully participates in any act or transaction in violation of
Section 25400 shall be liable to any other person who purchases or sells any
security at a price which was affected by such act or transaction for the
damages sustained by the latter as a result of such act or transaction. Such
damages shall be the difference between the price at which such other person
purchased or sold securities and the market value which such securities would
have had at the time of his purchase or sale in the absence of such act or
transaction, plus interest at the legal rate. "

672.    The 2000 and 2006 Insider Selling Defendants, in furtherance of selling or

offering for sale Rambus' stock, made statements that were at the time and in light

of the circumstances under which they were made, false or misleading in order to

inflate the price of Rambus securities.

673.    In furtherance of their selling the 2000 and 2006 Insider Selling Defendants

willfully and intentionally made the misleading and false statements and withheld

adverse material information in order to secure the highest possible price for their

stock. The resulting stock price inflation damaged plaintiff in purchasing Rambus

securities.

**COUNT VII**
**VIOLATION OF §25403 (B) OF THE CALIFORNIA CORPORATIONS**
**CODE BY PWC AND WSGR**

674.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

675.    PWC intentionally aided and abetted the Defendants in their options scheme by

using its professional status as a registered independent accountant to" certify" or

"attest" to the accuracy and truthfulness of Rambus false financial statements from

1998 to 2006.

215

676.    This PWC's "attestation" is directed to the Rambus Board of Directors and to the Rambus shareholders. Without such certification Rambus could not have effectuated its options backdating scheme that resulted in Rambus' profits being materially overstated. Thus, PWC knew that the financial statements would be communicated to Rambus' shareholders.

677.    PWC knew that both shareholders and those evaluating purchase of the company's stock rely upon their audits of the financial statements.

678.    WSGR willfully participated in the SEC and IRS and insider trading fraud by preparing and reviewing the misleading and false SEC filings to confuse the public about the true status of Rambus financial and corporate legal affairs as demonstrated herein.

679.    WSGR crafted misleading, false and ambiguous wording of the SEC financial, proxy, and registration reports to cover-up Rambus 162 (m) and other violations as shown and alleged herein..

680.    WSGR also certified the fraudulent Convertible Bond Prospectus that was filed with the SEC under the 1933 Exchange Act in 2005 thereby aiding and abetting another fraud.

681.    California Corporations Code §25403(b) provides as follows:

> "Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided. "

682.    Plaintiff relied on the false attestations and was misled by the false and misleading wording of the SEC reports alleged herein and was damaged thereby.

## COUNT IIX
### FOR CALIFORNIA COMMON LAW FRAUD AGAINST ALL DEFENDANTS

683.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

684.    The Defendants intentionally produced and distributed false Rambus financial statements from 1998 to 2006 and concealed the ineffectiveness of Rambus' internal controls.

685.    The Defendants had knowledge of the falsity of the financial and proxy statements and the illicit options and new employee "hire date" backdating practices because they planed and executed these frauds and benefited from them.

686.    The Defendants profited egregiously from their access to material non-public information in their options grant practices and in the timing of the exercise of options and sale of stock at the expense of the public from whom the material information was concealed.

687.    The Defendants knew that the financial reports would be communicated to purchasers and holders of Rambus securities and that they would act them upon. PWC willfully participated in the fraud as did WSGR.

688.    Plaintiff justifiably relied on the false statements alleged herein and was damaged thereby.

689.    The Defendants are liable for the Plaintiff's compensatory and punitive damages as a consequence of these continuing acts of fraud.

217

**COUNT IX**
**FOR CALIFORNIA COMMON LAW AIDING AND ABETTING NEGLIGENT**
**MISREPRESENTATION AGAINST THE INDIVIDUAL DEFENDANTS**

690.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

691.    The Defendants negligently produced and distributed false SEC financial and proxy statements from 1998 to 2006.

692.    The Defendants should have had knowledge of the falsity of the financial statements by virtue of their knowledge of their own actions in granting and receiving backdating options and backdating employment hire dates for many years.

693.    The Defendants knew that the financial reports would be communicated to purchasers and holders of Rambus securities and that they would act them upon.

694.    Plaintiff justifiably relied on one or more of the false financial and/or proxy statements as alleged herein and was damaged thereby.

695.    The Defendants are liable for the Plaintiff's actual damages as a consequence of their negligent misrepresentations.

**COUNT X**
**FOR CALIFORNIA COMMON LAW AIDING AND ABETTING FRAUD**
**AGAINST THE PWC AND WSGR**

696.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

697.    PWC aided and abetted the Defendants in their options scheme by using their professional status as registered independent accountants to "certify" or "attest" to the accuracy and truthfulness of Rambus false financial statements from 1998 to 2006 and the effectiveness of its internal controls in 2004 and 2005.

218

698.    PWC had knowledge of the falsity of the financial statements as a consequence of its many years of auditing or reviewing Rambus financial statements and internal controls.

699.    PWC knew that the financial reports would be communicated to purchasers and holders of Rambus securities and that they would act them upon.

700.    This PWC's "attestation" is directed to the Rambus Board of Directors and to the Rambus shareholders. This "attestation" was essential to the continuation of the Defendants unlawful options Backdating scheme.

701.    WSGR willfully crafted the misleading and/or false wording of the financial, proxy, and registration reports to mislead and confuse the public and cover-up Rambus violations of the Exchange Acts.

702.    WSGR was aware of and advised Rambus on the options and hire date backdating that was a direct violation of 162(m) of the internal revenue code and Willfully helped Rambus cover-up these violations by crafting the misleading and false wording in the SEC filings complained of herein.

703.    Plaintiff justifiably relied on one or more of the false reports and/or attestations alleged herein and was damaged thereby.

704.    PWC's is liable for the Plaintiff's damages as a consequence of the false financial statements.

# COUNT XI
## VIOLATION OF §§1709-1710 OF THE CALIFORNIA CIVIL CODE –DECEIT
(Against all Defendants)

705.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

219

706.    §§1709-1710 Defendants are the officers and directors of Rambus and WSGR and PWC.

707.    For the purpose of inducing public investors, including Plaintiff to purchase or otherwise acquire Rambus securities, and with intent to deceive such investors, the Defendants employed a scheme and conspiracy to defraud as a part of which said Defendants made, participated in the making of, or aided and abetted the making of, the misrepresentations of fact and concealed the true facts and omitted to state material facts as set forth above. Said representations and statements were not true or were misleading when made and Defendants did not believe them to be true. Said acts by Defendants were fraudulent, oppressive and malicious.

708.    The assertions of the financial, registration and proxy statements as fact when they were known to be false were intentional and/or negligent material misrepresentations by PWC, WSGR and the Defendants.

709.    The Defendants concealed the stock option and new employee hire date backdating violations.

710.    The Defendants profited from misappropriated material non-public information.

711.    Plaintiff relied on one or more of the false statements alleged herein and was damaged thereby.

## COUNT XII
**Violation Of §§1753 Of The California Civil Code –Constructive Fraud**
(Against all officer and director Defendants)

712.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220

713.   Defendants within the scope of this charge mean all the Rambus officers and directors who were signatories to the false SEC reports and/or control persons for Rambus.

714.   The Defendants in violation of their duty of disclosure intentionally concealed the backdating of hundreds of millions of dollars worth of stock options from the shareholders and the Plaintiff.

715.   The Plaintiff relied on the false financial, proxy and public statements of the Rambus in making decisions on whether and what amount of Rambus securities to buy.

716.   The Plaintiff was damaged as a consequence of his reliance on Rambus misrepresentations and concealments that violated Defendants' fiduciary duties of disclosure and good faith to Plaintiff.


## COUNT XIII
## VIOLATION OF 1933 EXCHANGE ACT  §11 , §12 AND §15
(Against all Signatory Defendants)

717.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

718.   All SEC registration statements filed since 1998 have incorporated false and/or misleading financial and proxy statements including false profit and loss statements signed by the directors and officers of Rambus and attested to by WSGR and PWC.

719.   This action is brought within the one-year statute of limitations of discovery.

720.    Plaintiff was damaged by the issuance of excess securities based on fraudulent registration statements.

## COUNT XIV
## VIOLATION OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE §§17200 AND §§17500. ET SEQ.-
(Against all Defendants)

721.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

722.    Based on the plain language of the CA §§17200-17209, California's unfair competition law extends to securities transactions as it does to every other kind of violation not expressly excluded.[23]

723.    Defendants knowingly and intentionally issued materially false and misleading financial reports, proxy statements, press releases and media interviews that constitute unlawful, unfair and/or fraudulent business acts or practices under CA 17200, et seq. and CA 17500, et seq.

724.    Defendants knowingly concealed materially adverse information concerning how they obtained their JEDEC patent portfolio from the industry, public shareholders and the Plaintiff until August 2, 2006 when the FTC Commission unanimously, unequivocally and emphatically determined Rambus to have "intentionally and willfully engaged in deceptive conduct violative of § 5." Without more, the section 5 violation establishes "unlawful" conduct under CA 17200.

---

[23] Also, Spinner (849 F.2d 388, 9th Cir. 1988) and Corbin (136 Ariz. 589, 1983)

222

725. Defendants also knew that their concealment of this materially adverse information would allow them to defeat fraud and unfair business practice charges brought against them.

726. Concealment of this materially adverse information from the public served to greatly inflate the value of the Rambus stock and options and the insider selling Defendants benefited unjustly thereby at the expense of the Plaintiffs.[24] PWC's acts of "attesting to" the fraudulent financial statements and inadequate internal controls served to mislead public investors and deny them access to the information owed them and required by them to formulate sound investment decision and strategies and constitutes an unlawful, unfair and/or fraudulent business acts or practices by the Defendants under CA §§17200, et seq. and CA §§17500, et seq.

727. WSGR's acts in crafting the misleading and false wording of the fraudulent SEC reports to mislead public investors and deny them access to the information owed them and required by them to formulate sound investment decision and strategies and constitutes unlawful, unfair and/or fraudulent business acts or practices by the Defendants under CA §§17200, et seq. and CA §§17500, et seq.

728. Without the assistance of WSGR and PWC, Rambus could not have been successful in perpetrating its acts of financial, securities fraud and insider trading.

729. WSGR and PWC's certification of the false and misleading registration reports beginning in 1998 constituted a violations of the 1933 Exchange Act and as such are predicates for this charge.

---

[24] Defendants were essentially in unfair competition with their Rambus stockholders.

223

730.    Rambus did not report or otherwise account for option and stock grants to accounting and legal service providers' thereby denying Rambus' shareholders access to material information that could be used to determine the credibility of Rambus' SEC filings. This constitutes an unfair business practice under California law.

731.    PWC, WSGR, and the directors and officers of Rambus who accepted stock options or stock from Rambus and/or exercised options and/or sold Rambus stock Violated 10 b and 10 b-5 of the 1934 Exchange Act by using material non-public information including the information about Rambus various concealed frauds.

732.    Defendants acts giving rise to the violations of the California civil code as recited in the counts they are charged with herein when combined with the Rambus FTC section 5 violations constitute methods of unfair and unlawful competition the securities market.

733.    The Plaintiffs have been directly injured by the individual Defendants' unlawful and unfair conduct and by PWC and WSGR's aiding and abetting of Rambus fraud. The Defendants have been unjustly enriched at the Plaintiffs' expense.

734.    The individual Defendants, PWC and WSGR conspired with each other and PWC and WSGR aided and abetted the acts as alleged herein, and encouraged, ratified, and/or accepted the benefits of the acts of each other.

735.    Plaintiff is entitled to the full disclosure of Defendants other hidden collaborators, full disclosure of the false and misleading nature of the Defendants' statements regarding Rambus and restitution from PWC, WSGR and any other

1    collaborators of all the Plaintiff's losses as well as attorney's fees and prejudgment

2    interest.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a.        Finding that the designated Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Sections 20(a), 18 (a) and 14(a) by their acts and omissions as alleged in this Complaint;

b.        Finding that the designated Defendants violated California Codes 25401, 25403(b), 1709-1710, 17200 and 17500 et seq. as well as California common law by their acts and omissions as alleged in this Complaint;

c.        Finding that the Rambus, PWC and WSGR violated the 1933 Exchange Act sections 11, 12 15, by issuing the materially false registration SEC filings;

d.        Finding that the Defendants breached their fiduciary duty of candor under both California and Delaware law by their acts and omissions as alleged in this Complaint;

e.        Finding that the "spring-loading" of options grants violates the conditions for performance based incentive compensation under IRS code 162 (m) because it is a "reward" rather than an "incentive" and defeats the purpose of incentive based stock option plans and is based on a lie;

f.        Awarding plaintiff equitable damages, together with interest thereon for the nonstatutory years;

g.      Awarding plaintiff compensatory damages, together with interest thereon for the statutory years;

h.      Awarding of punitive damages to deter the Defendants, PWC and WSGR and Rambus from further fraudulent acts in recognition of the fact that their wrongful acts were intentional and willful and of a continuing nature from 1998 until discovered in 2006 and that their behavior undermines public confidence in the securities markets.

i.      Awarding plaintiff costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

j.      Granting such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury of all issues so triable under the law.

227

Dated:  July 24, 2007                                                    PRO SE

_____                              _____

 Douglas B. Kelley                                              James Madison. Kelley

1887 Saint Andrews Place

San Jose, California 95132

Telephone: (408) 929-2142

Facsimile: (408) 872-1464


                                                                          _____

                                                                          Miki W. Larsson


                                                                          14390 Douglass Lane

                                                                          Saratoga, California 95070

                                                                          Telephone: (408) 867-3395

                                                                          Facsimile: (408) 872-1464

PRIVATE SECURITIES COMPLAINT    C-07-1238-JF (HRL)