## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ | |
| HERBERT FRANCL, Derivatively on Behalf of RAMBUS INC., ) | No.  07 Civ. 7650 (GBD) |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PRICEWATERHOUSECOOPERS, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| -and- ) | |
| ) | |
| RAMBUS INC., a Delaware Corporation. ) | |
| ) | |
| Nominal Defendant. ) | |
| _____) | |

### DECLARATION OF BRIAN MURRAY

I am an attorney admitted to practice in this District.  I hereby certify, under penalty of perjury, as follows:

1.      I submit this Declaration in support of Plaintiff' Memorandum of Law in Opposition to PriceWaterhouseCooper's Motion to Transfer the Action.

2.      Attached hereto as Exhibit A is a true and correct copy of Nominal Defendant Rambus Inc.'s Motion to Terminate Derivative Litigation Pursuant to the Report of the Special Litigation Committee, filed in *In re Rambus, Inc. Derivative Litigation*, C-05-3513-JF.

3.      Attached hereto as Exhibit B is a Form 8-K filed, by Rambus, Inc., filed on September 7, 2007 with the Securities Exchange Commission.


Dated:  October 23, 2007                              _____/s/_____
                                                                    Brian P. Murray

# Exhibit A

1   BORIS FELDMAN, State Bar No. 128838
    DOUGLAS J. CLARK, State Bar No. 171499
2   IGNACIO E. SALCEDA, State Bar No. 164017
    BETTY CHANG ROWE, State Bar No. 214068
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100
6
    Attorneys for Nominal Defendant Rambus Inc.
7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  IN RE RAMBUS INC. DERIVATIVE          )   CASE NO.:  C-06-3513 JF
    LITIGATION                            )
13                                        )   **NOMINAL DEFENDANT RAMBUS**
                                          )   **INC.'S MOTION TO TERMINATE**
14  _____       )   **DERIVATIVE LITIGATION**
                                          )   **PURSUANT TO THE REPORT OF**
15  This Document Relates To:             )   **THE SPECIAL LITIGATION**
                                          )   **COMMITTEE**
        All Actions.                      )
16                                        )
                                          )   Date:      January 18, 2008
17                                        )   Time:      9:00 a.m.
                                          )   Judge:     Hon. Jeremy Fogel
18  _____       )

19

20

21

22

23

24

25

26

27

28

3188661_3.DOC

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................... 1

ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3)) ....................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

      A.    Rambus' Audit Committee Investigation ................................................ 3

      B.    The Shareholder Derivative Lawsuits ................................................... 4

      C.    The Formation Of Rambus' Special Litigation Committee .................... 5

      D.    The SLC Investigation .......................................................................... 6

      E.    The Conclusions Of The SLC ............................................................... 7

            1.    Ed Larsen ...................................................................................... 8

            2.    Robert Eulau, Gary Harmon, Geoff Tate, and David Mooring ................... 8

            3.    J. Thomas Bentley, Sunlin Chou and Abraham D. Sofaer ......................... 8

            4.    P. Michael Farmwald, Ph.D., Harold Hughes and Mark Horowitz, Ph.D. ............................................................................................. 9

            5.    William Davidow, Ph.D., Bruce Dunlevie, Charles Geschke, Ph.D., Kevin Kennedy, Ph.D. .............................................................. 10

            6.    John Danforth, Laura Stark, Sobodh Toprani ......................................... 11

ARGUMENT ........................................................................................................... 12

I.    THE SLC, NOT PLAINTIFFS, IS ENTITLED TO MANAGE THIS DERIVATIVE LITIGATION UNDER DELAWARE LAW .......................... 12

II.    THE STANDARD OF REVIEW ............................................................... 13

      A.    THE BUSINESS JUDGMENT RULE .............................................. 15

      B.    THE *ZAPATA* STANDARD OF REVIEW ...................................... 16

III.    THE RAMBUS SLC IS INDEPENDENT, ACTED IN GOOD FAITH AND HAD REASONABLE BASES FOR ITS CONCLUSIONS ...................... 17

      A.    THE SLC IS INDEPENDENT ......................................................... 17

      B.    THE SLC ACTED IN GOOD FAITH AND CONDUCTED A THOROUGH INVESTIGATION ....................................................... 20

C.    THE SLC HAD REASONABLE BASES FOR ITS CONCLUSIONS ............... 22

IV.    THE SLC'S REPORT SHOULD BE ADOPTED BY THE COURT UNDER STEP
       TWO OF THE *ZAPATA* TEST, IF APPLIED ................................................... 24

CONCLUSION ........................................................................................................ 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4   *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983) ............................ 13

5   *Abramowitz v. Posner*, 672 F.2d 1025 (2nd Cir. 1982) .......................................................... 13, 14

6   *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ................................................................. 15, 17, 18

7   *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ........................................................................... 15

8   *Burks v. Lasker*, 441 U.S. 471 (1979) ................................................................................... 12

9   *Carlton Inv. v. TLC Beatrice Intern. Holdings, Inc.*, No. CIV.A. 13950, 1997 WL
        305829 (Del. Ch. May 30, 1997) ........................................................................... 21, 22

10

11  *Furman v. Walton*, No. C06-3532 SBA, 2007 WL 1455904 (N.D. Cal. May 16,
        2007) ....................................................................................................................... 14

12  *Genzer v. Cunningham*, 498 F. Supp. 682 (E.D. Mich. 1980) ................................................. 21

13  *Grafman v. Century Broad. Corp.*, 762 F. Supp. 215 (N.D. Ill. 1991) ............................... *passim*

14  *In re Boston Scientific Corp. Shareholders Litig.*, No. 02 CIV 247 AKH, 2007 WL
        1696995 (S.D.N.Y. June 13, 2007) ........................................................... 12, 13, 14, 15

15

16  *In re Oracle Corp. Deriv. Litig.*, 808 A.2d 1206 (Del. Ch. 2002) ............................................ 13

    *In re Oracle Sec. Litig.*, 852 F. Supp. 1437 (N.D. Cal. 1994) ........................................... *passim*

17
    *Johnson v. Hui*, 811 F. Supp. 479 (N.D. Cal. 1991) .......................................................... *passim*

18
    *Kaplan v. Wyatt*, 484 A.2d 501 (Del. Ch. 1984) ....................................................... 14, 16, 19, 23

19
    *Kaplan v. Wyatt*, 499 A.2d 1184 (Del. 1985) ............................................................... 17, 18

20
    *Katell v. Morgan Stanley Group, Inc.*, No. CIV.A. 12343, 1995 WL 376952 (Del.
21      Ch. June 15, 1995) ........................................................................................... *passim*

22  *Kindt v. Lund*, No. CIV.A. 17751-NC, 2003 WL 21453879 (Del. Ch. May 30,
        2003) .................................................................................................................. *passim*

23
    *Scalisi v. Grills*, No. CV 04 5513, 2007 WL 2319079 (E.D.N.Y. July 26, 2007) ............ 13, 20, 21

24
    *Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) ..................................................................... 14, 15

25
    *Strougo v. Bassini*, 112 F. Supp. 2d 355 (S.D.N.Y. 2000) ................................................ *passim*

26
    *White v. Panic*, 783 A.2d 543 (Del. 2001) ............................................................................ 12

27
    *Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981) .............................................................. *passim*

28

1

**STATUTES**

2

8 DEL. C. § 102(b)(7) ............................................................................................................... 9

3

8 DEL. C. § 141(a) ............................................................................................................... 12

4

**RULES**

5

6

Civil Local Rule 7-4(a)(3) ......................................................................................................... 1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      **NOTICE OF MOTION AND MOTION**

2          PLEASE TAKE NOTICE that on January 18, 2008 at 9:00 a.m., before the Honorable

3   Jeremy Fogel, United States District Court for the Northern District of California, San Jose,

4   California, nominal defendant Rambus Inc. ("Rambus" or the "Company") will, and hereby

5   does, move for an order terminating the Amended Consolidated Derivative Shareholder

6   Complaint pursuant to the Report of the Special Litigation Committee of the Board of Directors

7   of Rambus.

8          This Motion is based on this Notice of Motion and Motion; the Memorandum of Points

9   and Authorities; the Declaration of Ignacio E. Salceda;[1] all pleadings and papers filed herein;

10  oral argument of counsel; and any other matter that may be properly submitted at the hearing.

11      **ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))**

12      1.      Whether the derivative actions should be terminated pursuant to the Report of the

13  Special Litigation Committee of the Board of Directors of Rambus?

14      **MEMORANDUM OF POINTS AND AUTHORITIES**

15          **INTRODUCTION**

16          This case is a textbook example of how the special litigation process ought to work.

17  Based on the recognition that *the board of directors* of a Delaware company (and not

18  shareholders) has the preeminent right to make decisions regarding the initiation and termination

19  of corporate litigation, the special litigation process permits an independent committee of the

20  board to review a shareholder's derivative claims and determine whether or not it is in the

21  company's best interest to prosecute those claims.

22          Consistent with established Delaware law, the Rambus Special Litigation Committee

23  ("SLC") – comprised of two independent members of the Rambus Board – investigated the

24  claims asserted in this action against eighteen of the Company's current and former officers and

25  directors.  The SLC's extensive investigation is now complete and its process, findings,

26

27  ──────────────

28          [1] References to "Ex. _" are exhibits to the Salceda Declaration, filed concurrently herein.

1    conclusions and bases for its conclusions are set forth in its 64-page Report, filed concurrently

2    with this motion.  *See* Ex. A.[2]

3          Unlike the results reached in many derivative actions, the SLC is not recommending a

4    wholesale dismissal of this action.  Rather, the SLC has concluded that it is in the best interest of

5    Rambus to pursue the claims asserted against defendant Ed Larsen, the former Vice President for

6    Human Resources.  The SLC has also concluded that it is in Rambus' best interest to settle the

7    claims asserted against defendants Robert Eulau and Gary Harmon (former Chief Financial

8    Officers), Geoff Tate (former Chief Executive Officer) and David Mooring (former President)

9    for an aggregate value to Rambus in excess of $28.5 million.  Rambus has entered into

10   settlement agreements with these defendants, which are conditioned upon the termination of the

11   derivative actions against them.  Lastly, the SLC has determined that it is in the best interest of

12   the Company to terminate the derivative actions against the remaining defendants because,

13   among other things, the claims lack merit and would fail for lack of evidentiary support.

14         Rambus files this motion to implement the SLC's conclusions.  The motion should be

15   granted under the business judgment rule or the more stringent *Zapata* standard of review, as the

16   record unequivocally establishes that the SLC conducted a good faith investigation and that its

17   conclusions rest on reasonable bases.  There is no doubt as to the independence of the two SLC

18   members, one a former U.S. District Court Judge and former chief legal advisor to the U.S.

19   Department of State and the other a distinguished and well-respected businessman.  Both joined

20   the Rambus Board well after the alleged misconduct and neither has any professional, personal

21   or familial ties to any of the defendants which would create a conflict of interest.  Nor can there

22   be any doubt as to the thoroughness and integrity of the investigation.  With the assistance of

23   independent counsel and forensic accountants, Rambus' Audit Committee (on which both SLC

24   members sit) and then the SLC reviewed and analyzed an enormous record that included over 1.5

25   million electronic documents, hundreds of thousands of pages of hard copy documents and

26

27        [2] The Report was also previously filed with the Court on August 24, 2007, as Exhibit A to the
     Joint Case Management Conference Statement, in anticipation of the Case Management

28   Conference held on September 7, 2007.

1    interviews of 56 individuals.  The members of the SLC personally spent numerous hours in

2    meetings considering and deliberating the courses of action to be taken as to each individual

3    defendant.  In sum, the record firmly shows that this SLC took all actions it determined were

4    necessary to impartially ascertain the factual and legal merits of the claims and to determine how

5    to proceed with the derivative actions in a manner that would be in the best interest of Rambus.

6    Based on the record, this Court should allow Rambus to exercise its right to control its own

7    litigation and grant the motion to terminate pursuant to the SLC's report.

8                                  **STATEMENT OF FACTS**

9          **A.       Rambus' Audit Committee Investigation**

10               On May 30, 2006, Rambus announced that the Audit Committee of its Board of Directors

11   had commenced an internal investigation of past option grants and other potentially related

12   issues.  Rpt. at 5.  The Audit Committee was composed of independent directors J. Thomas

13   Bentley, Abraham D. Sofaer and Sunlin Chou.  Each of these directors had joined the Board of

14   Directors and the Audit Committee after January 1, 2005.  The Audit Committee retained Heller

15   Ehrman LLP as independent legal counsel, and that firm engaged the outside accounting firm of

16   Ernst & Young LLP ("E&Y") to assist in the investigation.  *Id*. at 5-6.  Over the ensuing months,

17   the Audit Committee conducted a factual investigation and accounting analysis with respect to

18   the Company's stock option grants for the period beginning on May 14, 1997 (the date of

19   Rambus' initial public offering) through May 30, 2006 (the "Review Period").  *Id*. at 13-17.

20               On October 19, 2006, Rambus announced that the Audit Committee had substantially

21   completed the investigation and publicly disclosed the principal findings.  *Id.* at 6-7.  In short, the

22   Audit Committee determined that a significant number of Rambus stock option grants were not

23   correctly dated and accounted for, with the vast majority of the incorrectly dated grants occurring

24   between 1998 and 2001.  *Id*. at 6.  Rambus also disclosed that the results of the Audit

25   Committee's investigation confirmed its previous conclusion that certain of Rambus' financial

26   statements for prior fiscal years should no longer be relied upon and would be restated.  *Id*. at 7.

27

28

1

**B.      The Shareholder Derivative Lawsuits**

2

On May 31, one day after the disclosure of the Audit Committee investigation, the first of

3

several shareholder derivative complaints was filed in this Court.[3]  Other derivative suits were

4

filed in Santa Clara County Superior Court and Delaware Chancery Court.[4]  On July 14, 2006,

5

counsel for lead plaintiff Ruggieri sent a letter to counsel for Rambus, requesting that the

6

Company commence litigation against the individual defendants.  *See* Ex. B.  Rambus' counsel

7

responded to this demand letter on August 8, 2006, advising plaintiff that it would be premature

8

for the Board to respond substantively to plaintiff's letter or otherwise take legal action in light

9

of the ongoing Audit Committee investigation.  *See* Ex. C.  Following the consolidation and

10

appointment of lead plaintiffs and counsel, plaintiffs filed a consolidated complaint in this Court

11

on October 2, 2006.  Plaintiffs then filed the Amended Consolidated Derivative Shareholder

12

Complaint ("Complaint") on November 3, 2006.

13

The Complaint alleges sixteen instances of improperly dated stock option grants issued

14

between November 5, 1998 and October 8, 2001, and asserts claims purportedly on behalf of

15

Rambus against eighteen current and former officers and directors.  Plaintiffs seek recovery

16

against some or all of the defendants for alleged violations of §§ 10(b), 14(a) and 20(a) of the

17

Securities Exchange Act of 1934 and SEC Rules 10b-5 and 14a-9 (Counts I, II and III); an

18

accounting (Count IV); breach of fiduciary duty and/or aiding or abetting breach of fiduciary

19

duty (Count V); abuse of control (Count VI); gross mismanagement (Count VII); constructive

20

fraud (Count VIII); corporate waste (Count IX); unjust enrichment (Count X); rescission (Count

21

XI); breach of contract (Count XII); violations of California Corporations Code § 25402/25502.5

22

(Count XIII); and breach of fiduciary duties for insider selling and misappropriation of

23

information (Count XIV).

24

_____

25

[3] *See Chu v. Hughes, et al.*, No. C-06-3513-JF (filed May 31, 2006).  Other shareholder
derivative complaints followed.  *See Bibeau v. Hughes, et al.,* No. C-06-3921-FJ (filed June 23,

26

2006); *Ruggieri v. Hughes, et al.*, No. C-06-4153-RMW (filed July 5, 2006). The Court
consolidated these cases for all purposes on August 10, 2006.

27

[4] The Superior Court action was dismissed by order of the Court on October 20, 2006, in

28

deference to the federal action pending before this Court.  The Chancery Court action has been
stayed by agreement of the parties.

**C.     The Formation Of Rambus' Special Litigation Committee**

Immediately upon completion of the Audit Committee's investigation, on October 18, 2006, the Rambus Board of Directors established the SLC to evaluate potential claims or other actions arising from the stock option granting activities.  Rpt. at 9.  The Board empowered the SLC to conduct an independent evaluation of the merits of the derivative suits and to determine, in its sole discretion, the Company's best interests regarding the derivative lawsuits.  *See* Ex. D.  The SLC was not bound by any determinations or conclusions that the Board or any committee thereafter had or might reach regarding such matters.  Rpt. at 13.  In addition, the SLC was authorized to avail itself of any and all information prepared or collected by management, employees or agents of Rambus, by the Board or any committee thereof.  *Id.*; *see also* Ex. D.

The Board appointed J. Thomas Bentley and Abraham D. Sofaer, two independent directors, to comprise the SLC.  *Id*. at 9.  Messrs. Bentley and Sofaer were active members of the Audit Committee that had investigated the timing of past option grants and other potentially related issues and thus, have personal knowledge of that investigation and its findings.  *Id.*

*J. Thomas Bentley.*  Mr. Bentley co-founded the mergers and acquisitions firm SVB Alliant in 1990 and served as its Managing Director until October 2005.  He holds a B.A. in Economics from Vanderbilt University and Masters of Science in Management from MIT.  Mr. Bentley joined the Rambus Board in March 2005, well after the alleged misconduct occurred.  Prior to joining the Board, he had no professional, personal or familial ties to Rambus or any of the defendants that would create a conflict of interest under Delaware law and continues to have no such ties.  *Id.* at 9-10.

*Abraham D. Sofaer.*  Mr. Sofaer has been the George P. Shultz Distinguished Scholar and Senior Fellow at the Hoover Institution since 1994.  He was previously a partner at Hughes, Hubbard & Reed and served as the chief legal advisor to the U.S. Department of State.  From 1979 to 1985, Mr. Sofaer served as a United States District Judge for the Southern District of New York.  Prior to that, Mr. Sofaer was a professor at the Columbia University School of Law and an Assistant U.S. Attorney in the Southern District of New York.  Mr. Sofaer graduated with a B.A. in history from Yeshiva College.  He earned his law degree from the New York

University School of Law, before beginning clerkships with the U.S. Court of Appeals for the District of Columbia Circuit and Justice William J. Brennan, Jr. of the U.S. Supreme Court. Mr. Sofaer joined the Rambus Board in May 2005, well after the alleged misconduct occurred. Prior to joining the Board, he had no professional, personal or familial ties to Rambus or any of the defendants that would create a conflict of interest under Delaware law and continues to have no such ties. *Id*. at 10-11.

The SLC retained Heller Ehrman as its independent legal counsel to assist with its investigation. *Id*. at 9. Heller Ehrman has served as counsel to numerous special litigation committees of board of directors and is experienced in conducting investigations. Heller Ehrman has not represented Rambus in any significant matter in the last five years, and has never represented Rambus in any matter in which any of the facts alleged in the derivative actions were in issue. *Id*. at 11. Heller Ehrman had assisted the Audit Committee in its investigation of stock option grants. *Id*.

### D. The SLC Investigation

In the connection with their work on the Audit Committee's investigation, the members of the SLC and their independent advisors collected and reviewed a vast amount of email and other documents relevant to option grants and the conduct of the individuals named as defendants in the Complaint. In sum, the Audit Committee reviewed all of the Company's stock option grants during the Review Period, which encompassed approximately 210 separate stock option granting actions relating to approximately 49 million underlying shares. *Id*. at 17. The Audit Committee also:

- identified, collected and reviewed over 1.5 million electronic documents and hundreds of thousands of pages of hard-copy files from 39 current and former employees and directors.

- collected hard copy files from the Company's finance, legal, stock administration and human resource departments, as well as from individual custodians.

- collected hard copy corporate governance documents, including Unanimous Written Consents, Board of Directors meeting minutes, Compensation Committee meeting minutes, Stock Option Committee approval memoranda and SEC forms 3, 4 and 5. The Audit Committee also collected electronic versions of these documents.

- imaged and searched the hard drives of 27 individual custodians.

- imaged and searched documents from the shared drives of the Company's human resources, finance and legal departments.

- analyzed the metadata attributes of documents to determine when they were created and to discover any other pertinent history or modifications.

- collected and analyzed data from the Company's Equity Edge database, which was used to track and manage stock option grants.

- interviewed 56 individuals who potentially had relevant knowledge, as identified in the SLC Report. In some instances, the Audit Committee members themselves conducted the interviews.

- met on numerous occasions, both in person and by telephone, interacted closely with its independent counsel, reviewed documents, attended interviews and asked questions of witnesses.

*Id*. at 14-17.

The SLC not only reviewed and analyzed a significant amount of pertinent evidence collected through the Audit Committee investigation, it took additional actions in order to determine how to proceed with regard to the named defendants. The SLC:

- participated or reviewed memoranda of interviews of numerous current or former Rambus personnel, including virtually all of the individual defendants.

- conducted numerous additional targeted document searches to further research facts regarding the individual defendants' conduct.

- met with counsel for several of the individual defendants to hear those defendants' respective positions on the facts alleged in the claims against them.

- met on at least 20 occasions, either in person or via telephone.

- met with its independent counsel on more than 20 occasions regarding the factual and legal aspects of the investigation.

- reviewed the specific facts regarding each individual defendant and his/her role in the underlying events against the backdrop of the legal, procedural and evidentiary rules applicable to the claims against them, as well as how any particular course of action would affect the Company.

*Id*. at 17-18.

### E. The Conclusions Of The SLC

On August 23, 2007, the SLC issued a 64-page report regarding its investigation, findings and conclusions on how to proceed with the claims asserted in the derivative actions. In making its determinations, the SLC was guided by a number of factors, including the merits of the

claims; the likelihood of recovery on those claims; the Company's obligations regarding
indemnification and advancement of defense costs; the Company's insurance coverage; the
Company's current and future business; and the Company's other litigation risks. *Id*. at 13.
Based on those considerations, the SLC, in the exercise of its business judgment, has concluded
that it is in the best interest of the Company to take the following actions with respect to each
defendant named in the derivative litigation.

     **1.    Ed Larsen.**  Mr. Larsen was Rambus' Vice President, Human Resources
from September 1996 until December 1999 and then served as Senior Vice President,
Administration until his retirement in 2004.  The SLC has concluded that it is in the best interest
of Rambus to pursue the claims against Mr. Larsen.  The SLC at this time seeks control over the
litigation of those claims and intends to seek a stay of further proceedings until any
governmental inquiries involving Mr. Larsen have been completed.  *Id*. at 19.

     **2.    Robert Eulau, Gary Harmon, Geoff Tate, and David Mooring.**  The
SLC has entered into settlement agreements with these defendants, each a former officer of
Rambus.  Mr. Eulau was CFO from May 2001 through February 2006. *Id.* at 19.  Mr. Harmon
served as CFO from March 1993 until the middle of 2001.  *Id*. at 22.  Mr. Tate was CEO from
May 1990 to January 2005 and a member of the Board until August 2006.  Mr. Tate was also the
sole member of the Stock Option Committee from May 1997 to October 2003.  *Id*. at 20.
Mr. Mooring served as Vice President of several Rambus business units from 1991 through
December 1999, President from December 1999 until January 2004, and a director from
December 1999 through May 2006.  *Id*. at 37.  The SLC has concluded that the settlements with
these defendants, which are conditioned upon the dismissal of the derivative actions against
them, are in the best interest of the Company.  *Id*. at 2.  The SLC believes the aggregate value of
these settlements exceeds $6.5 million in cash and cash equivalents *plus* substantial additional
benefit to Rambus relating to the relinquishment of claims to over 2.7 million stock options,
valued over $22 million.  *Id*.

     **3.    J. Thomas Bentley, Sunlin Chou and Abraham D. Sofaer.**  The SLC
has concluded that it is not in the best interest of the Company to pursue the claims against these

1    defendants, all current outside directors who did not join the Board until 2005.  These defendants

2    were not affiliated with Rambus at the time of the events at issue and there is no evidence that

3    any of them was involved in any of the relevant activities.  *Id*. at 2, 23.  Moreover, the

4    exculpatory provision in the Company's articles of incorporation would defeat the claims

5    asserted against these defendants.[5]  *Id.* at 2.

6             **4.    P. Michael Farmwald, Ph.D., Harold Hughes and Mark Horowitz,**

7    **Ph.D.**  The SLC has concluded that it is not in the best interest of the Company to pursue the

8    claims against these defendants, current members of the Board.  *Id.* at 3.  Mr. Hughes is Rambus'

9    CEO (since January 2005) and was acting CFO from March 2006 to April 2006.[6]  *Id.* at 24.  He

10   has been a member of the Board since June 2003 and served as a member of the Audit

11   Committee from July 2003 to January 2005.  *Id.*  Drs. Farmwald and Horowitz have been

12   members of the Board since co-founding Rambus in March 1990.  Dr. Farmwald served on the

13   Compensation Committee from October 2002 through July 2003 and March 2005 to October

14   2006.[7]  *Id.* at 43.  Dr. Horowitz has been serving as Rambus' Chief Scientist since May 2005

15   and, from March 1990 to May 1994, served as a Vice President of the Company.[8]  *Id.* at 31.

16

17

---

18       [5] Delaware law provides that a corporation's certificate of incorporation may eliminate the
     personal liability of a director for monetary damages for breach of fiduciary duty provided such
19   provision does not eliminate or limit a director's liability for breach of the duty of loyalty, bad
     faith, intentional misconduct, knowing violation of law and the like.  8 DEL. C. § 102(b)(7).
20   Rambus' articles of incorporation contain such an exculpatory provision.  *See* Ex. E at § IX.A.

21       [6] Mr. Hughes was a U.S. Army Officer from 1969 to 1972.  From 1974 to 1997, he served in
     a variety of positions within Intel Corporation, including Treasurer, Vice President of Intel
22   Capital, CFO, and Vice President of Planning and Logistics.  After Intel, Mr. Hughes was
     Chairman and CEO of Pandesic, LLC.  He earned a B.A. from the University of Wisconsin and
23   an M.B.A. from the University of Michigan.  Rpt. at 24.

24       [7] Dr. Farmwald has founded other companies besides Rambus.  He also co-founded Matrix
     Semiconductor, Inc. in 1997, and in 2000, founded Skymoon Ventures, a venture capital firm.
25   Dr. Farmwald holds a B.S. in Mathematics from Purdue University and a Ph.D. in Computer
     Science from Stanford University.  *Id*. at 43.
26

27       [8] Dr. Horowitz has taught at Stanford University since 1984, where he is currently a
     professor of Electrical Engineering and Computer Science.  He earned his B.S. and M.S. degrees
28   in Electrical Engineering from the Massachusetts Institute of Technology and his Ph.D. in
     Electrical Engineering from Stanford University.  *Id*. at 31.

1    After a comprehensive investigation, the SLC has found no evidence of bad faith or

2  improper behavior by any of these defendants. *Id.* at 25-36, 44-49. The SLC found no material

3  instances of improperly dated stock options during Mr. Hughes' tenure as CEO. *Id.* at 25.

4  Neither Mr. Hughes nor Dr. Farmwald received any mispriced options. *Id.* at 28, 30, 48. While

5  Dr. Horowitz did receive one insubstantial mispriced option, the SLC determined that there was

6  no evidence that he was involved in or was aware of the mispricing. *Id.* at 34-35. Moreover, Dr.

7  Horowitz has voluntarily agreed to the repricing of the grant. *Id.* at 36. Thus, the SLC has

8  concluded that pursuit of the claims against these defendants would not only be unjustified on

9  the merits, but also would be costly and disruptive to the Company's business. *Id.* at 24, 31.

10    **5.    William Davidow, Ph.D., Bruce Dunlevie, Charles Geschke, Ph.D.,**

11  **Kevin Kennedy, Ph.D.** These defendants are current or former outside directors of Rambus

12  who served on the Compensation Committee. Dr. Davidow was a director from March 1990

13  until May 2005 and Chairman of the Board from March 1990 to January 2005. He served on the

14  Compensation Committee from 1997 to October 2002 and on the Audit Committee from 1997 to

15  May 2005.[9] *Id.* at 42-43. Mr. Dunlevie is a current director (since March 1990) and served on

16  the Compensation Committee from 1997 to 2006 and on the Audit Committee from 1997 to

17  March 2005.[10] *Id.* at 43. Dr. Geschke was a director from February 1996 to March 2005, and

18  served on the Compensation Committee during that time period and on the Audit Committee

19  from February 1996 to July 2003.[11] *Id.* Dr. Kennedy is the current Chairman of the Board and

20

21    [9] Dr. Davidow has been a general partner of Mohr, Davidow Ventures (a venture capital
firm) since 1985. From 1973 to 1985, he held various management positions at Intel. Dr.

22  Davidow holds A.B. and M.S. degrees in Electrical Engineering from Dartmouth College, an
M.S. degree in Electrical Engineering from the California Institute of Technology, and a Ph.D. in

23  Electrical Engineering from Stanford University. *Id.* at 43.

24    [10] Mr. Dunlevie has been a general partner of Benchmark Capital (a venture capital firm)
since May 1995, and was a general partner of Merrill, Pickard, Anderson & Eyre (a venture

25  capital firm) from 1989 to 2000. *Id.*

26    [11] Dr. Geschke is also a co-founder of Adobe Systems Inc. and has served as a director of that
company since 1982, as its CEO from 1986 to 1995, as its President from 1989 to 2000, and as

27  its Chairman since 1997. Prior to 1982, Dr. Geschke held various positions with Xerox
Corporation's Palo Alto Research Center. He holds an A.B. degree in Classics and a M.S.

28  degree in Mathematics from Xavier University of Ohio, and earned his Ph.D. in Computer
Science from Carnegie-Mellon University. *Id.* at 43-44.

1   has been a director since April 2003.  He has served on the Compensation Committee since

2   July 2003, with the exception of a short period during mid-2006.[12]  *Id.* at 44.

3        The SLC has concluded that the claims against these defendants would fail for lack of

4   evidence of wrongful intent or bad faith conduct, and because of the exculpatory provision of the

5   Company's articles of incorporation.  *Id.* at 44-49.  The SLC determined that it was reasonable

6   for these Compensation Committee members to have relied on the Company's former Senior

7   Vice President of Human Resources and former CFO to ensure that the procedures for issuing

8   and accounting for stock option grants were appropriate.  *Id.* at 44.  Pursuit of these meritless

9   claims, the SLC has determined, would impose significant legal costs on Rambus and would

10  unjustifiably distract the Company from its current business.  *Id.* at 45.

11            **6.**      **John Danforth, Laura Stark, Sobodh Toprani**.  The SLC has concluded

12  that it is not in the best interest of the Company to pursue claims against these remaining officer

13  defendants.  Mr. Danforth was General Counsel from October 2001 through July 2006.  *Id.* at 49.

14  Ms. Stark is Senior Vice President, Platform Solutions (since February 2005), and held other

15  operational positions at Rambus since 1996.  *Id.* at 54.  Mr. Toprani was Senior Vice President,

16  New Ventures from December 1999 to July 2000; and was a Vice President in product and

17  marketing roles from 1994 to 1999.  *Id.* at 59.

18       The SLC has concluded that the claims against these defendants would fail for lack of

19  evidence of wrongdoing.  Mr. Danforth was not directly involved in the stock option granting

20  process, and there is no evidence that he had knowledge that the accounting for option grants

21  was incorrect.  *Id.* at 49.  Ms. Stark's only role in the option granting process was to recommend

22  the allocation of annual option grants to the employees she supervised.  *Id.* at 54.  There is no

23  evidence that she had knowledge that the option granting process was flawed or that the

24  accounting for stock options was improper.  *Id.*  Mr. Toprani had no role in the stock option

25  granting process, and there is no evidence that he had knowledge of any improperly dated

26  _____

27       [12] Dr. Kennedy is currently CEO and a director at JDS Uniphase Corporation.  From August
     2001 to September 2003, Dr. Kennedy was the CEO of Openwave Systems, Inc.  Prior to that, he
28   served in several positions for seven years at Cisco Systems, Inc., and 17 years at Bell
     Laboratories.  *Id.* at 44.

1  options.  *Id.* at 59.  Thus, the SLC has determined that it would not be in the Company's interest

2  to pursue claims against any of these defendants, which would impose significant costs on

3  Rambus and unjustifiably distract from its current business.

4      On September 14, 2007, Rambus completed its restatement and filed its restated financial

5  statements for the affected periods in 2002 through 2006.  *See* Ex. F.  In accordance with the

6  SLC's comprehensive review and conclusions, Rambus now seeks to put an end to most of this

7  litigation and press forward with the conduct of its business.

8                                          **ARGUMENT**

9  **I.    THE SLC, NOT PLAINTIFFS, IS ENTITLED TO MANAGE THIS DERIVATIVE
          LITIGATION UNDER DELAWARE LAW**

10

11     It is a cardinal precept of Delaware corporate law that directors, not shareholders, manage

12  the business and affairs of the corporation.[13]  Derived from 8 DEL. C. § 141(a),[14] the board of

13  director's managerial power includes the power and authority to make decisions regarding

14  corporate litigation.  *See, e.g., White v. Panic*, 783 A.2d 543, 550 (Del. 2001); *Zapata v.*

15  *Maldonado*, 430 A.2d 779, 782 (Del. 1981) ("Directors of Delaware corporations derive their

16  managerial decision making power, which encompasses decisions whether to initiate, or refrain

17  from entering, litigation, from 8 Del. C. § 141(a)").  Such control is particularly appropriate in

18  derivative litigation because, unlike a claim a plaintiff brings on his own behalf to enforce a

19  personal right, a derivative claim is brought *on behalf of* a corporation.  The corporation – not the

20  individual shareholder plaintiff – is the real plaintiff, and "any recovery obtained goes to the

21  _____

22     [13] Because Rambus is a Delaware corporation, this litigation is controlled by Delaware law.
    *Burks v. Lasker*, 441 U.S. 471, 478 (1979) ("'Corporations are creatures of state law,' and it is

23  state law which is the font of corporate directors' powers."); *In re Boston Scientific Corp.
    Shareholders Litig.*, No. 02 CIV 247 AKH, 2007 WL 1696995, at *4 (S.D.N.Y. June 13, 2007)

24  ("*BSC*") ("Because BSC is a Delaware corporation, Delaware law governs the substantive
    judicial review of BSC's decision to pursue or not pursue the suit that Plaintiffs have filed on its

25  behalf."); *Strougo v. Bassini*, 112 F. Supp. 2d 355, 361 (S.D.N.Y. 2000) ("A special litigation
    committee has the power to terminate a derivative action to the extent allowed by the state of

26  incorporation.").

27     [14] Section 141(a) states, in pertinent part, "[t]he business and affairs of a corporation . . . shall
    be managed by or under the direction of a board of directors except as may be otherwise

28  provided in this chapter or in its certificate of incorporation."  8 DEL C. § 141(a).

NOM. DEF. RAMBUS' MOTION TO TERMINATIVE          -12-                    3188661_3.DOC
DERIVATIVE LIT. PURSUANT TO SLC REPORT;
CASE NO. C-06-3513

1    corporation." *Zapata*, 430 A.2d at 784.  In this action, all of the claims asserted are derivative in

2    nature.  AC ¶ 98.  Thus, Rambus is the real party in interest here, not the various derivative

3    plaintiffs.  Any claim that exists belongs to Rambus.

4           The landmark decision of *Zapata* established that the board of directors may delegate its

5    authority to control derivative litigation to a special litigation committee.  *Zapata*, 430 A.2d at

6    785-86.  The power of a special litigation committee to decide on the course of derivative

7    litigation has been firmly engrained in Delaware corporate law for more than twenty years[15] and

8    is well recognized by federal courts applying Delaware law.[16]  Here, Rambus' formation of the

9    SLC was in full accordance with this well settled body of law.  The SLC, after a comprehensive

10   good faith investigation, has now exercised its recognized authority to terminate most of this

11   lawsuit brought on Rambus' behalf for the reasons stated in its Report.

12   **II.      THE STANDARD OF REVIEW**

13          A SLC's motion to terminate is neither a motion to dismiss under Federal Rule of Civil

14   Procedure 12(b) nor is it a motion for summary judgment under Rule 56.  *Strougo*, 112 F. Supp.

15   2d at 361 (applying Delaware law).  Rather, it is "hybrid summary judgment motion for

16   dismissal."  *Zapata*, 430 A.2d at 787.  Such motion is "analog[ous] to a settlement in that there is

17   a request to terminate litigation without a judicial determination of the merits."  *Id.* at 779.

---

[15] *See, e.g., Zapata*, 430 A.2d at 785 ("it must be clear that an independent committee possesses the corporate power to seek the termination of a derivative suit."); *In re Oracle Corp. Deriv. Litig.*, 808 A.2d 1206, 1210 (Del. Ch. 2002) (special litigation committee is "empowered to decide whether and in what manner a derivative suit should proceed."); *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 375-76 (Del. Ch. 1983) (purpose of the special litigation committee is "to determine whether or not a derivative plaintiff's pending suit brought on behalf of the corporation should be maintained").

[16] *See, e.g., Johnson v. Hui*, 811 F. Supp. 479, 482 (N.D. Cal. 1991) ("Delaware law endows [defendant-company] with the power to form a special litigation committee (SLC) of the board of directors, and to either terminate or assume prosecution of the suit based upon the SLC's review and recommendation"); *see also Abramowitz v. Posner,* 672 F.2d 1025, 1034 (2nd Cir. 1982) (affirmed lower court's termination of derivative suit based on unanimous refusal of corporation's disinterested directors to prosecute suit); *BSC*, 2007 WL 1696995, at *1 (dismissing derivative suit upon recommendation of independent committee of directors); *Scalisi v. Grills*, No. CV 04 5513, 2007 WL 2319079 (E.D.N.Y. July 26, 2007) (upholding special committee's recommendation to dismiss derivative action); *Grafman v. Century Broad. Corp.*, 762 F. Supp. 215, 221 (N.D. Ill. 1991) (granting summary judgment motion in defendants' favor on derivative claims based on report of independent committee).

1   The basis of the motion is "the best interests of the corporation, as determined by the

2   [special litigation] committee." *Kaplan v. Wyatt*, 484 A.2d 501, 506 (Del. Ch. 1984), *aff'd*, 499

3   A.2d 1184 (Del. 1985). When considering an SLC's motion to terminate a derivative suit, courts

4   have applied one of two standards of review, depending on whether the case is one in which

5   demand was made or whether it is a case where demand was excused.[17]

6       Where, as here, a litigation demand on the board was made, courts apply the deferential

7   business judgment rule to an SLC's motion to terminate. *Zapata*, 430 A.2d at 784 & n.10;

8   *Abramowitz*, 672 F.2d at 1031 ("Where demand upon the corporation has been made and

9   refused, a court will defer to the company's business judgment to forgo litigation unless the

10  shareholder can show that the directors acted wrongfully") (analyzing Delaware law); *BSC*, 2007

11  WL 1696995, at *4 ("when demand on a board has been made and refused, review under

12  Delaware law is governed by the business judgment rule."); *Furman v. Walton*, No. C06-3532

13  SBA, 2007 WL 1455904, at *2 (N.D. Cal. May 16, 2007) ("If a demand is made and rejected,

14  the board rejecting the demand is entitled to the presumption of the business judgment rule")

15  (applying Delaware law). As the Delaware Supreme Court explained, "[b]y electing to make a

16  demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to

17  respond." *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990).[18] In such case, "if the

18  requirements of the traditional business judgment rule are met, the board of directors' decision

19  not to pursue the derivative claim will be respected by the courts," absent an abuse of discretion.

20  *Id*.

21      If the case is one in which demand is excused, then the two-step standard of review

22  articulated in *Zapata* applies. *Zapata*, 430 A.2d at 787-89.

23  _____

24      [17] Under Delaware law, shareholders seeking to assert a claim on the company's behalf are
    required to first exhaust intracorporate remedies by making a demand on the directors to obtain

25  the action desired, or to plead with particularity why demand is excused. *See, e.g., Zapata*, 430
    A.2d at 783. The demand requirement is a recognition that the shareholder's ability to institute

26  an action on behalf of a corporation inherently impinges on the directors' powers to manage the
    affairs of the company.

27      [18] *See also Furman*, 2007 WL 1455904, at *4 ("it is settled law in Delaware that a
    shareholder who makes a demand concedes the disinterestedness and independence of a majority

28  of the board to respond.").

**A.    THE BUSINESS JUDGMENT RULE**

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Under this standard, the Court's inquiry is limited to a "review [of] the good faith and reasonableness of the board's investigation, for 'the challenge under Delaware law must be not to the underlying transaction, but to the board's decision not to bring the lawsuit.'"  *BSC*, 2007 WL 1696995, at *4 (citation omitted); *see Spiegel*, 571 A.2d at 777 (when a board refuses a demand made by the stockholder plaintiff, "the only issues to be examined are the good faith and reasonableness of its investigation.").  Thus, in order to survive a motion to terminate, a derivative plaintiff must bear the "considerable burden of showing that the decision not to bring the lawsuit was made in bad faith or was based on an unreasonable investigation."  *BSC*, 2007 WL 1696995, at *4.

The business judgment standard applies to this motion because demand was actually made in this case by one of the lead plaintiffs (*i.e.,* demand was not excused as plaintiff conceded by actually making a demand).  Specifically, on July 14, 2006, counsel for Lead Plaintiff Ruggieri wrote to Rambus' counsel making a demand that Rambus commence litigation against the individual defendants.  *See* Ex. B.  Under the business judgment rule, the SLC's decision to terminate this derivative litigation for the reasons stated in its Report must be upheld.  There is nothing in the record to suggest that either Mr. Sofaer or Mr. Bentley, each an independent director, acted with self-interest or in bad faith.  The extensive and thorough investigation conducted by the SLC is a testament to Messrs. Sofaer and Bentley's diligence and resolve to uncover all facts relevant to the asserted claims.  The SLC's conclusions themselves exemplify a reasonable exercise of business judgment.  Accordingly, this Court should terminate this derivative litigation pursuant to the SLC's Report.  *See BSC*, 2007 WL 1696995, at *5-6 (upholding under the business judgment rule recommendation of an independent committee of the board to dismiss derivative lawsuit); *Spiegel*, 571 A.2d at 778 (affirming dismissal of

1    derivative complaint; SLC's decision to refuse plaintiff's demand was subject to review

2    according to the business judgment rule).

3    **B.    THE *ZAPATA* STANDARD OF REVIEW**

4          If the Court determines that Mr. Ruggieri's demand letter is not enough to warrant

5    application of the deferential business judgment standard and, instead, decides to examine this

6    case as one in which demand is excused, then it must apply the two-step analysis articulated in

7    *Zapata*.  Under the first, mandatory, step, the Court "should inquire into the independence and

8    good faith of the committee and the bases supporting its conclusions."  *Zapata*, 430 A.2d at 788.

9    The company bears the burden of proving the independence, good faith and reasonableness of

10   the SLC's review.  *Id*.  The Court's review, under this step, does not reach the merits of the

11   underlying claims.  Rather, it is limited only to whether the SLC was independent, proceeded in

12   good faith and had a reasonable basis for its conclusions.  *See Kaplan*, 484 A.2d at 519 ("it is the

13   Special Litigation Committee which is under examination at this first-step stage of the

14   proceedings, and not the merits of the plaintiff's cause of action").

15         If the company satisfies its burden under step one, the Court may take one of two actions.

16   It may grant the motion to enforce the SLC's conclusions or, alternatively, the Court may, *in its*

17   *discretion*, proceed to the second, optional step in which the Court applies its own "independent

18   business judgment" in reviewing the SLC's conclusions.  *Zapata*, 430 A.2d at 789; *Kaplan*,

19   484 A.2d at 508.  This second step is to be applied only in unusual or "egregious" circumstances,

20   where the SLC's recommendations, if followed, "would simply prematurely terminate a

21   stockholder grievance deserving of further consideration in the corporation's interest."  *Zapata*,

22   430 A.2d at 789; *see also Kaplan*, 499 A.2d at 1192.

23         As mentioned above, demand was not excused in this case and, in fact, was made.

24   Therefore, the deferential business judgment rule applies and, as shown above, requires dismissal

25   of the derivative actions in accordance with the SLC's Report.  However, even if the Court were

26   to apply the *Zapata* standard, dismissal of this suit would be entirely appropriate as demonstrated

27   in Section IV below.

28

1    **III.    THE RAMBUS SLC IS INDEPENDENT, ACTED IN GOOD FAITH AND HAD**
         **REASONABLE BASES FOR ITS CONCLUSIONS**
2

3        **A.    THE SLC IS INDEPENDENT**

4        An SLC is independent if its members are "in a position to base [their] decision on the

5    merits of the issue rather than . . . extraneous considerations or influences." *Kaplan*, 499 A.2d at

6    189.  To determine whether the SLC acted independently, the Court must review "the totality of

7    the circumstances." *Johnson*, 811 F. Supp. at 486.  Courts generally examine six factors to

8    determine whether a committee's members are independent: (1) the director's status as a

9    defendant, and potential liability; (2) the director's participation in or approval of alleged

10   wrongdoing; (3) the director's past or present business dealings with the corporation; (4) the

11   director's past or present business or social dealings with the individual defendants; (5) the

12   number of directors on the SLC; and (6) "structural bias" of the SLC.  *In re Oracle Sec. Litig.*,

13   852 F. Supp. 1437, 1441 (N.D. Cal. 1994)*; Johnson*, 811 F. Supp. at 486.  A review of the

14   totality of the circumstances does not require the complete absence of any of these factors.

15   Rather, the Court only needs to satisfy itself that the members of the SLC are capable of reaching

16   an objective conclusion.  *Oracle*, 852 F. Supp. at 1442*; Johnson*, 811 F. Supp. at 486; *Strougo*,

17   112 F. Supp. 2d at 362.

18       There is no question that Messrs. Bentley and Sofaer are each independent and well

19   qualified to serve on the SLC, as a review of these factors demonstrates.

20       As to the first factor, while Messrs. Bentley and Sofaer are named as defendants in this

21   case, it is well settled that the mere fact a director is named as a defendant does not establish lack

22   of independence.  *Johnson*, 811 F. Supp. at 486 ("Courts have found SLC's independent and

23   unbiased even though a member of the SLC is a nominal defendant or subject to small or indirect

24   liability.").[19]  Indeed, even though they are named defendants, it was Messrs. Bentley and Sofaer

25   _____

26       [19] *See also Aronson*, 473 A.2d at 818 (the "bootstrap argument" that directors lack
     independence because they "otherwise would have to sue themselves" "has been made to and
27   dismissed by other courts")*; Kindt v. Lund*, No. CIV.A. 17751-NC, 2003 WL 21453879, at *3
     (Del. Ch. May 30, 2003) ("The fact that Senator Garn was on the board and approved the
28   transactions does not negate his independence.  Nor does his being named as a defendant cause
     [him] to lack independence."); *Katell v. Morgan Stanley Group, Inc.*, No. CIV.A. 12343, 1995
                                                                                    (continued...)

1   who, as active Audit Committee members, determined in the first instance that the actual

2   measurement dates for certain past option grants differed from the recorded grant dates for such

3   awards and that a restatement would be necessary.

4         Second, plaintiffs do not allege that either Mr. Bentley or Mr. Sofaer was involved at all

5   in, or approved, the improper granting of stock options.  Indeed, neither has ever served on the

6   Compensation Committee of the Board.  Nor do plaintiffs allege that either received any

7   improper option grants or improperly sold stock.  The most plaintiffs allege is the blanket

8   assertion that each, as a director and Audit Committee member, "approved the filing of and

9   signed false financial statements and other false SEC filings."  AC ¶ 102a. & g.  Such an

10  allegation is insufficient to strip these outside directors of their independence.  *Aronson*,

11  473 A.2d at 815 (mere directorial approval of a transaction does not show lack of independence);

12  *Kaplan,* 499 A.2d at 1189 ("Even a director's approval of the transaction in question does not

13  establish a lack of independence.").[20]  As described above and in the SLC Report, Messrs.

14  Bentley and Sofaer have had long and distinguished careers in business and the law, respectively,

15  completely unrelated to Rambus.  Both joined the Rambus Board well after the alleged misdating

16  of options occurred.  *See Strougo,* 112 F. Supp.2d at 363-64 (finding SLC members disinterested

17  where they joined the board after alleged wrongdoing occurred).

18        Nor do Messrs. Bentley and Sofaer have any business or personal links to Rambus or the

19  individual defendants which would defeat their independence.  Prior to and since joining the

20  Board, neither gentlemen has had any professional, personal or familial ties which would create a

21  conflict of interest to any of the defendants.  *See Johnson,* 811 F. Supp. at 486 (finding SLC

22  member independent where he had no identified business or personal relationship with company

23  or defendants); *Kindt*, 2003 WL 21453879, at *3 (finding SLC member independent where only

24  ─────────────────

25        (...continued from previous page)
    WL 376952, at *7 (Del. Ch. June 15, 1995) (the status of sole member of SLC "as a
26  Defendant . . . does not render it incapable of deciding whether to pursue this litigation").

27      [20] Nor can plaintiffs claim that the presence of these gentlemen as defendants somehow
    tainted the SLC's process as each recused himself from the deliberations and decision-making
28  regarding how to proceed with the derivative claims brought against him. Rpt. at 24.

1   connection with defendants was through service on company's board).  Thus, the third and fourth

2   factors support the finding of independence.  The fifth factor – number of directors on the SLC –

3   does as well.  Delaware courts have accepted committee reports of only one member.  *See*

4   *Kaplan*, 484 A.2d at 512; *Katell*, 1995 WL 376952 at *5; *see also Grafman*, 762 F. Supp. a 219

5   ("this court cannot see any reason why a one man committee cannot be independent, or is any

6   less independent than a two or multiple member committee.").  Here, the SLC is comprised of

7   two members, which provides further assurance of the independence of the committee.  *See*

8   *Oracle*, 852 F. Supp. at 1441 (finding both members of SLC disinterested); *Johnson*, 811 F.

9   Supp. at 487 (same).

10        Lastly, the ability of Messrs. Bentley and Sofaer to serve as independent, unbiased SLC

11   members is further confirmed by the lack of "structural bias" of the SLC and of its conclusions.

12   In considering the "structural bias" factor, the Court is to determine whether the "manner in

13   which the SLC was appointed and proceeded was one which was inevitably bound to be

14   empathetic to defendants, and, therefore, biased in favor of terminating the litigation."  *Johnson*,

15   811 F. Supp. at 486.  In this case, Rambus has consistently handled the issue of stock option

16   misdating in a manner that demonstrates a *lack* of bias.  The Audit Committee began

17   investigating Rambus' past stock option granting practices *before* these derivative suits were

18   even filed.  This shows that Rambus was intent on learning the truth of possible wrongdoing with

19   regard to option grants, and *not* in an attempt to absolve any officers or directors from a

20   derivative suit.  That the Board promptly approved the formation of the SLC following the

21   completion of the Audit Committee investigation and selected as members two independent

22   outside directors already familiar with the factual findings demonstrates Rambus' determination

23   to root out culpability, if any, in an efficient and timely manner.  Moreover, in concluding that

24   the derivative claims should be terminated as to certain defendants, settled as to others (at

25   exceptional values), and pursued as to one defendant, the SLC has demonstrated its ability to

26   parse the derivative claims in an impartial manner that is in the best interests of the Company.

27        In short, there is no doubt that this SLC is independent.

28

## B.  THE SLC ACTED IN GOOD FAITH AND CONDUCTED A THOROUGH INVESTIGATION

Similarly, there is no question that the SLC acted in good faith and conducted a reasonable, thorough investigation.  The SLC retained experienced counsel – Heller Ehrman – as independent outside counsel, which is one indicator of good faith and reasonableness of the investigation.[21]  As previously mentioned, Heller Ehrman has not represented Rambus in any significant matter in the last five years.

With the assistance of independent counsel, the SLC built upon the extensive record compiled by the Audit Committee.  *See* Rpt. 14-17.  During the course of the investigation, Messrs. Bentley, Sofaer and Chou, as the Audit Committee, met on numerous occasions (both in person and by telephone), interacted closely with independent counsel, reviewed documents, attended interviews, and asked questions of witnesses.  *Id.* at 17.  Even though the Complaint challenges only sixteen option grants made between November 5, 1998 and October 8, 2001 (AC ¶ 42), the Audit Committee reviewed *all* of the Company's stock option grants *from May 17, 1997 through May 30, 2006,* which encompassed approximately *210* separate stock option granting actions relating to approximately 49 million shares.  *Id.*  Thus, the Audit Committee's investigation went well *beyond* the options challenged by plaintiffs.  *See Kindt*, 2003 WL 21453879, at *4 (process used by SLC was thorough where, among other things, "SLC also rooted out additional facts not even alleged by plaintiff.").

The SLC then took numerous additional steps to determine how to proceed with regard to the individual defendants.  The SLC, among other things, (i) personally participated in or reviewed memoranda of interviews of numerous current or former Rambus personnel, including virtually all of the individuals named as defendants in the derivative actions; (ii) conducted

---

[21] *See, e.g., Grafman*, 762 F. Supp. at 220 ("another indicia of good faith and reasonableness of the investigation is the use of capable counsel"); *Oracle*, 852 F. Supp. at 1442 (fact that SLC retained independent outside counsel was a factor supporting finding of independence and good faith); *Scalisi*, 2007 WL 2319079, at *5 (that special committee engaged independent counsel to assist in investigation was one factor supporting a finding that committee investigation was in good faith and thorough); *Katell,* 1995 WL 376952, at *10 (good-faith investigation found where SLC "selected capable counsel to assist their investigation and relied heavily on that counsel").

1  additional targeted document searches to further research facts regarding the individual

2  defendants' conduct; (iii) instructed SLC counsel to meet with counsel for several of the

3  individual defendants to hear those defendants' respective positions on the claims against them;[22]

4  (iv) held in-person or telephonic meetings on at least twenty occasions;[23] (v) held numerous

5  meetings and discussions with SLC counsel regarding the factual and legal aspects of its

6  investigation; and (vi) reviewed and evaluated specific facts regarding each of the individual

7  defendants and his or her role in the underlying events and analysis of the legal, procedural and

8  evidentiary rules applicable to the claims as well as how any particular course of action would

9  affect the Company.  Rpt. at 17-18.  By all measures, this is a record of diligence, good faith and

10  thorough work by the SLC.[24]

11        The SLC's exhaustive work is published in its 64-page report, which sets forth the SLC's

12  procedures, reasoning, findings and conclusions.  The SLC Report and the conclusions reached

13  therein are the best evidence of the SLC's good faith and thorough investigation.

---

[22] *See Oracle*, 852 F. Supp. at 1442 (investigation was in good faith where SLC, "directed its counsel to conduct extensive interviews of counsel for the parties," among other things).

[23] *See Scalisi*, 2007 WL 2319079, at *7 (fact that special committee met in formal sessions on ten separate occasion was "sufficient to satisfy the reasonableness prong of the investigation."); *Genzer v. Cunningham*, 498 F. Supp. 682, 694 (E.D. Mich. 1980) (finding sufficient for the reasonableness inquiry that committee met a dozen times).

[24] *See Scalisi*, 2007 WL 2319079, at *6 (fact that special committee, through counsel, conducted interviews of 19 persons and reviewed over 375,000 pages of documents supported conclusion that committee's investigation was in good faith and thorough); *Oracle*, 852 F. Supp. at 1442 (SLC investigation held to be proper and in good faith where SLC reviewed large numbers of pleadings, transcripts, depositions, filings, corporate documents, and notes of interviews); *Strougo*, 112 F. Supp. 2d at 365 (good faith investigation where SLC reviewed 36,000 pages of documents and interviewed 11 persons); *Grafman*, 762 F. Supp. at 220 ("The court is satisfied that the investigation was thorough" where report included review of over 20,000 documents, evaluation of financial transactions and interviews of 20 witnesses); *Kindt*, 2003 WL 21453879, at *3-4 (5-month SLC investigation with assistance of independent legal and financial advisors was thorough and in good faith where over 26 persons were interviewed, 50,000 pages of documents reviewed, and SLC made conservative legal assumptions); *Carlton Inv. v. TLC Beatrice Intern. Holdings, Inc.*, No. CIV.A. 13950, 1997 WL 305829, at *8 (Del. Ch. May 30, 1997) (good faith investigation where SLC or its counsel reviewed over 100,000 pages of documents and interviewed 23 witnesses, in addition to reviewing deposition transcripts and procuring and reviewing supplemental expert analyses).

## C.   THE SLC HAD REASONABLE BASES FOR ITS CONCLUSIONS

The record further shows that the SLC had reasonable bases for its conclusions.  It is important to note that "[i]n reviewing the SLC's conclusions, the Court does not take an independent look at the merits of the lawsuit."  *Strougo*, 112 F. Supp. 2d at 367; *see also Katell*, 1995 WL 376952, at *12 (same); *Carlton*, 1997 WL 305829, at *16 ("The *Zapata* procedure does not require [the court] to adjudicate the correctness of [the SLC's] determination").  Rather, the Court's inquiry is limited to whether "the SLC's consideration of the merits of the claims was reasonable."  *Strougo*, 112 F. Supp. 2d at 367; *Katell*, 1995 WL 376952, at *12.  Thus, the relevant question is whether the SLC's review and conclusions were reasonable.  "In making this determination, the *Zapata* rule forces the court to rely upon the record generated by the SLC."  *Strougo*, 112 F. Supp. 2d at 367.

The substantial record generated by the SLC here clearly shows that its review of the merits of the claims was reasonable.  As the SLC Report makes clear, the SLC carefully distinguished among the various defendants and the specific claims against them.  The SLC also considered the legal obstacles to potential recovery and the effect a given course of action would have on the Company.  With respect to the settlements with four of the defendants, the SLC explained in detail the reasons why it believed the settlements reached are in the best interest of the Company.  *See* Rpt. at 19-23, 37-42.  Such reasons include, among other things, concerns regarding whether the evidence is sufficient to prove the necessary state of mind element of the various causes of action, the percentage of fault, the potential imputation of various facts to the Company, statute of limitations issues, and the ability to prove damages and loss causation.  *Id.* at 19-20, 22, 37-38.  With regard to each defendant for whom the SLC recommends dismissal, the SLC conducted a good faith factual and legal analysis of the underpinnings of each asserted claim, and concluded that each claim would likely fail due to significant legal deficiencies and lack of evidentiary support.  *Id.* at 23-36, 42-64.  Given these determinations, and the finding that continuation of meritless claims would be inappropriate and disruptive to the Company,[25] it was

---

[25] Disruption of the company's business is a legitimate factor to be considered by an SLC. *See Oracle*, 852 F. Supp. at 1443 ("Derivative litigation is unavoidably distracting to corporate

(continued...)

1  entirely reasonable for the SLC to conclude that it is in Rambus' best interest to terminate the

2  derivative actions as to those defendants.  *See Johnson,* 811 F. Supp. at 487-88 (SLC's

3  conclusion to terminate had reasonable basis in the record where SLC's conclusions appeared

4  well reasoned and substantially supported by evidence relied on in its Report.).[26]

5                                    *                *                *

6            Where, as here, the company has satisfied the first step of the *Zapata* test, courts have

7  adopted the course of action recommended by the SLC without engaging in the discretionary

8  second step.[27]  This Court should, in the exercise of its discretion, do likewise.  Indeed, the

9  second step is used only when the first step is satisfied but "the result still appears 'irrational' or

10  'egregious' or some other such extreme word."  *Kindt*, 2003 WL 21453879, at *3; *see also*

11  *Johnson*, 811 F. Supp. at 485 (inquiry under second-step is appropriate where "unique

12  circumstances" present reasons for allowing the stockholder to pursue the action further).[28]

13  Here, the results reached by the SLC after a comprehensive investigation are hardly "irrational"

14

15  _____

16            (...continued from previous page)
    officials whose efforts might more profitably be devoted to the company's business."); *Johnson*,
    811 F. Supp. at 489 (recognizing "the disruptive affect of litigation on day-to-day management").

17

18  [26] *See also Grafman*, 762 F.Supp. at 221 (independent committee's conclusion to terminate
    was reasonable where there were legal problems associated with any ultimate recovery and
    litigation costs would exceed company's costs in pursuing the action); *Katell*, 1995 WL 376952,
19  at *10 (special committee's recommendation of dismissal had reasonable basis where committee
    concluded that plaintiffs were unlikely to recover money damages on their claims); *Kaplan*, 499
20  A.2d at 1191 (affirming district court's dismissal of derivative suit under *Zapata*, where
    Committee examined all of the allegations in the complaint and submitted a detailed report).

21

22  [27] *See, e.g., Grafman*, 762 F. Supp. at 221 ("Because the report was a thorough analysis of all
    potentially suspect transactions, and there is no doubt of the committee's independence, the court
23  will accept the report of the independent committee."); *Kindt*, 2003 WL 21453879, at *5 ("The
    SLC's actions were not egregious, irrational or unwarranted.  Therefore, I will not conduct the
    second step analysis."); *Katell*, 1995 WL 376952, at *13 ("I believe the Special Committee's
24  recommendation for dismissal results from the process anticipated by … *Zapata*.  Therefore, I
    decline to undertake an independent review of the merits of Plaintiffs' claims."); *Kaplan*, 484
25  A.2d at 520 ("I find it unnecessary to proceed to the discretionary, second-step analysis
    authorized by *Zapata*.").

26

27  [28] As *Zapata* explained, the "second step is intended to thwart instances where corporate
    actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where
    corporate actions would simply prematurely terminate a stockholder grievance deserving of
28  further consideration in the corporation's interest."  *Zapata*, 430 A.2d at 789.

1   or "egregious."  The Court should dismiss the derivative actions pursuant to the SLC's Report

2   without conducting its own analysis.

3   **IV.    THE SLC'S REPORT SHOULD BE ADOPTED BY THE COURT UNDER STEP
        TWO OF THE *ZAPATA* TEST, IF APPLIED**

4

5       If the Court were to engage in the second step of the *Zapata* analysis, the Court must

6   "determine, through the exercise of its independent business judgment, whether the facts and

7   legal authorities placed before the court establish that continuing the derivative litigation will

8   benefit of the corporation on whose behalf the derivative claim is presented."  *Johnson*, 811

9   F. Supp. at 490.  The answer in this case is a resounding no.

10      The asserted theories of liability and evidentiary record are summarized in the SLC

11  Report.  As the SLC Report makes clear, the claims alleged against thirteen defendants are

12  deficient on the merits, are largely stale as the result of the passage of time, mostly fall within the

13  Company's exculpatory provisions, are without sufficient evidentiary support, and would be

14  adverse to the Company's business interests if pursued.  To the extent some of the claims alleged

15  against four defendants may have merit, the SLC has secured settlement agreements that would

16  bring to Rambus over $28.5 million of value.  By any measure, this is an extraordinary result

17  accomplished only through the dedicated work of the SLC.

18      On the other hand, continued litigation is costly and risky for the Company.[29]  For

19  example, because of indemnification obligations, Rambus would face not only the costs it

20  incurred in connection with ongoing litigation, but also the defense costs for the individual

21  defendants.  Under these circumstances, it cannot be said that "continuing the derivative

22  litigation will benefit" Rambus "on whose behalf the derivative claim is presented."  *Johnson*,

23  811 F. Supp. at 490.  Thus, if the Court chooses to exercise its objective second-step review, the

24

25

26      [29] *Strougo*, 112 F. Supp. 2d at 368 ("the Court may review the direct costs and benefits of
        litigation for the corporation under *Zapata's* second step."); *see also Oracle*, 852 F. Supp. at
27      1444 ("The obvious benefit of settlement to the corporation and its shareholders is the
        termination of all subsequent legal fees and other expenses associated with the derivative
28      litigation").

1   Court should conclude that Rambus' motion to terminate the derivative actions pursuant to the

2   SLC's Report should be granted.

3                                          **CONCLUSION**

4          For the reasons stated above and in the SLC's Report, Rambus respectfully requests that

5   the Court grant its motion to terminate and (i) dismiss the derivative actions with prejudice

6   against Ms. Stark, Messrs. Bentley, Chou, Danforth, Dunlevie, Eulau, Harmon, Hughes,

7   Mooring, Tate, Toprani, Sofaer and Drs. Davidow, Farmwald, Geschke, Horowitz and Kennedy,

8   and (ii) allow Rambus to take control of the process of asserting claims against Mr. Larsen and

9   realign Rambus as the plaintiff in this action.

10

11  Dated: October 5, 2007                    WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
12

13                                           By:  /s/    Boris Feldman
                                                        Boris Feldman
14
                                             Attorneys for Nominal Defendant Rambus Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      I, Ignacio E. Salceda, am the ECF User whose identification and password are being used

2  to file the Nominal Defendant Rambus Inc.'s Motion to Terminate Derivative Litigation

3  Pursuant to the Report of the Special Litigation Committee.  I hereby attest that Boris Feldman

4  has concurred in this filing.

5

6  Dated: October 5, 2007                    WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
7

8                                           By:  /s/    Ignacio E. Salceda
                                                      Ignacio E. Salceda
9
                                            Attorneys for Nominal Defendant Rambus Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit B

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

———————

# FORM 8-K

———————

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 7, 2007**

———————

# Rambus Inc.
**(Exact name of registrant as specified in its charter)**

———————

| | | |
|---|---|---|
| **Delaware** | **000-22339** | **94-3112828** |
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I. R. S. Employer Identification No.)** |

**4440 El Camino Real, Los Altos CA 94022**
**(Address of principal executive offices) (Zip Code)**

**Registrant's telephone number, including area code: (650) 947-5000**

**N/A**
**(Former name or former address, if changed since last report)**

———————

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

∗   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

∗   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

∗   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

∗   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

On September 7, 2007, Rambus issued a press release announcing that it had reached a settlement in principle regarding the consolidated securities class action filed in July 2006 pertaining to its accounting for option grants and related disclosures. The settlement, which is subject to final documentation as well as review by the court, provides for a payment by Rambus of $18 million and would lead to a dismissal with prejudice of all claims against all defendants in the litigation. In addition, Rambus has been and will continue to be in discussions with its insurers concerning their contribution of a portion of the settlement amount.

A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated by reference herein.

**Item 9.01 Financial Statements and Exhibits.**

(d)     Exhibits

99.1   Press release dated September 7, 2007.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: September 7, 2007                                 Rambus Inc.

                                                        /s/ Satish Rishi
                                                        _____
                                                        Satish Rishi, Senior Vice President, Finance and
                                                        Chief Financial Officer

**Exhibit Index**

| Exhibit Number | Exhibit Title |
|---|---|
| 99.1 | Press release dated September 7, 2007. |

EX-99.1 2 dex991.htm PRESS RELEASE

**Exhibit 99.1**



**NEWS RELEASE**

### RAMBUS REACHES SETTLEMENT IN SECURITIES CLASS ACTION

**LOS ALTOS, Calif. – September 7, 2007 –** Rambus Inc. (Nasdaq:RMBS) today announced that it has reached a settlement in principle regarding the consolidated securities class action filed in July 2006 pertaining to the Company's accounting for option grants and related disclosures. The settlement, which is subject to final documentation as well as review by the court, provides for a payment by Rambus of $18 million and would lead to a dismissal with prejudice of all claims against all defendants in the litigation. In addition, Rambus has been and will continue to be in discussions with its insurers concerning their contribution of a portion of the settlement amount.

This settlement is subject to final documentation as well as preliminary and final court approval.

#### Forward-Looking Statements

This release contains forward-looking statements under the Private Securities Litigation Reform Act of 1995 relating to Rambus' settlement in principle regarding the securities class action filed against the Company. There is no assurance that Rambus will be able to reach an agreement with its insurers for their contribution toward the settlement, nor is there any assurance that the court overseeing this matter will accept the settlement terms. Such forward-looking statements are based on current expectations, estimates and projections, management's beliefs, and certain assumptions made by Rambus' management. Actual results may differ materially. Rambus' business generally is subject to a number of risks which are described in Rambus' periodic reports filed with the SEC. Rambus undertake no obligation to update forward-looking statements to reflect events or circumstances after the date hereof.

#### About Rambus Inc.

Rambus is one of the world's premier technology licensing companies specializing in the invention and design of high-speed chip architectures. Additional information is available at www.rambus.com.

###

RMBSLN

**Press Contact:**
Linda Ashmore
Rambus Inc.
(650) 947-5411
lashmore@rambus.com

## <u>DECLARATION OF SERVICE</u>

      I am an attorney admitted to practice in this district. I hereby certify, under penalty of perjury, that on this 23rd day of October, 2007, I caused a true and correct copy of the foregoing document to be served, by ECF and e-mail, to the following:

James H.R. Windels, Esq.
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
e-mail: james.windels@dpw.com

**Attorneys for Defendant PriceWaterhouseCoopers LLP**


Gideon Schor, Esq.
WILSON SONSINI GOODRICH & ROSATI P.C.
1301Avenue of the Americas
New York, NY 10019
e-mail: gschor@wsgr.com

Ignacio Salceda, Esq.
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
e-mail: ISalceda@wsgr.com

**Attorneys for Nominal Defendant Rambus, Inc.**


_____/s/_____
Gregory B. Linkh (GL-0477)