10-K 1 d10k.htm FORM 10-K

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

# FORM 10-K

---

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2006

Or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 Or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 000-22339

---

# RAMBUS INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-3112828** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **4440 El Camino Real** | |
| **Los Altos, California** | **94022** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (650) 947-5000

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.001 Par Value | The NASDAQ Stock Market LLC |
| Preferred Share Purchase Rights | (The Nasdaq Global Select Market) |

Securities registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the

Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐    No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the Registrant's Common Stock held by non-affiliates of the Registrant as of June 30, 2006 was approximately $1.64 billion based upon the closing price reported for such date on The Nasdaq Global Select Market. For purposes of this disclosure, shares of Common Stock held by persons who hold more than 5% of the outstanding shares of Common Stock and shares held by officers and directors of the Registrant have been excluded because such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding shares of the Registrant's Common Stock, $.001 par value, was 103,820,383 as of May 31, 2007.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

Table of Contents

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| Special Note Regarding Forward-Looking Statements | | 3 |
| Explanatory Note Regarding Restatements | | 4 |
| **PART I** | | 6 |
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 27 |
| **PART II** | | 28 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6. | Selected Financial Data | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 56 |
| Item 8. | Financial Statements and Supplementary Data | 57 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 57 |
| Item 9A. | Controls and Procedures | 57 |
| Item 9B. | Other Information | 62 |
| **PART III** | | 63 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 63 |
| Item 11. | Executive Compensation | 70 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 89 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 92 |
| Item 14. | Principal Accountant Fees and Services | 94 |
| **PART IV** | | 95 |
| Item 15. | Exhibits and Financial Statement Schedules | 95 |
| SIGNATURES | | 166 |
| POWER OF ATTORNEY | | 167 |
| INDEX TO EXHIBITS | | 168 |

Page 2 of 170

Table of Contents

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K (Annual Report) contains forward-looking statements. These forward-looking statements include, without limitation, predictions regarding the following aspects of our future:

- Outcome and effect of current and potential future intellectual property litigation;
- Resolution of the Federal Trade Commission and European Commission matters involving us;
- Accounting, tax, regulatory, legal and other outcomes and effects of the stock option investigation;
- Consequences of the derivative, class-action and other lawsuits related to the stock option investigation;
- The actions of our Special Litigation Committee;
- Actions of governmental authorities and other regulators, including Nasdaq, the SEC and the IRS;
- Sources, amounts and concentration of revenue, including royalties;
- Product development;
- Improvements in technology;
- Engineering, marketing and general and administration expenses;
- Litigation expenses;
- Success in the markets of our or our licensees' products;
- Terms of our licenses;
- Success in renewing license agreements;
- Pricing policies of our licensees;
- Sources of competition;
- Protection of intellectual property;
- International licenses and operations, including our design facility in Bangalore, India;
- Indemnification and technical support obligations;
- Likelihood of paying dividends;
- Cash and cash equivalents position;
- Lease commitments;

Table of Contents

- Ability to attract and retain qualified personnel;
- Internal control environment;
- Adoption of new accounting pronouncements;
- Trading price of our Common Stock;
- Continued listing of our Common Stock on The Nasdaq Global Select Market;
- Operating results;
- Realization of deferred tax assets;
- Accounting estimates and procedures;
- The level and terms of our outstanding debt;
- Interest and other income, net;
- Effective tax rates; and
- Amortization of intangible assets.

You can identify these and other forward-looking statements by the use of words such as "may," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "intends," "potential," "continue," or the negative of such terms, or other comparable terminology. Forward-looking statements also include the assumptions underlying or relating to any of the foregoing statements.

Actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under Item 1A, "Risk Factors." All forward-looking statements included in this document are based on our assessment of information available to us at this time. We assume no obligation to update any forward-looking statements.

## EXPLANATORY NOTE REGARDING RESTATEMENTS

This Annual Report on Form 10-K for our fiscal year December 31, 2006 includes restatements of: (1) previously filed consolidated financial statements, financial data and related disclosures as of December 31, 2005 and for our fiscal years ended December 31, 2005 and 2004; (2) our selected consolidated financial data as of and for our fiscal years ended December 31, 2005, 2004, 2003, our quarter ended December 31, 2002 and our fiscal year ended September 30, 2002; (3) our management's discussion and analysis of financial condition and results of operations as of and for our fiscal years ended December 31, 2005 and 2004 contained in Item 7 of this Form 10-K; and (4) our unaudited quarterly financial data for the first quarter of fiscal year ended December 31, 2006 and for all quarters in our fiscal year ended December 31, 2005 located at the end of Item 15 of this Form 10-K. The restatements are the result of errors in the way we accounted for certain historical stock option grants that were discovered through our independent stock option investigation conducted by the Audit Committee of the Board of Directors. See Note 3, "Restatement of Consolidated Financial Statements," of Notes to Consolidated Financial Statements and Exhibit 99.1 for a detailed discussion of the effect of the restatements.

Table of Contents

Our previously issued consolidated financial statements for the fiscal years 2005 and prior, which are included in our Annual Reports on Form 10-K, our Quarterly Reports on Form 10-Q filed with respect to each of the applicable quarters in these fiscal years and the consolidated financial statements included in our Quarterly Report on Form 10-Q for the first quarter of fiscal year 2006, should no longer be relied upon.

As a result of an investigation of our historical stock option practices by the Audit Committee of our Board of Directors, and a concurrent internal review by our management under the oversight of the Audit Committee, we determined that our previous accounting should be adjusted for: (a) stock option grants for which the Audit Committee determined that the actual grant date for accounting purposes was different from the stated grant date for new hire grants to employees, annual and other grants to employees, and any grants to officers; (b) grants made to individuals who had extensions of option termination dates and, in some cases, extensions of vesting periods pursuant to separation agreements under which the individuals did not perform any significant duties during the separation period but were still listed as employees; (c) payroll tax withholding liabilities for certain repriced stock grants that no longer qualify for Incentive Stock Option ("ISO") tax treatment; and (d) other miscellaneous adjustments for modifications and errors, including adjustments for grants to non-employees providing consulting services and adjustments for continued vesting after an individual converted from an employee to a consultant role. For further information on the details of the investigation and related findings, see Note 3 "Restatement of Consolidated Financial Statements" of the Notes to Consolidated Financial Statements.

We previously applied Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," ("APB 25"), and its related interpretations and provided the required pro forma disclosures under Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation," ("SFAS 123"), through the fiscal year ended December 31, 2005. Under the provisions of APB 25, a non-cash, stock-based compensation expense was required to be recognized for any option granted for which the exercise price was below the market price on the actual grant date. Because most of our remeasured options had an exercise price below the market price on the actual grant date, there should have been a non-cash charge for each of these options under APB 25 equal to the number of option shares, multiplied by the difference between the exercise price and the market price on the actual grant date. That expense should have been amortized over the vesting period of the options. Starting in fiscal year 2006, we adopted Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment," ("SFAS 123(R)"). As a result, beginning in fiscal year 2006, the stock-based compensation expense required to be recorded for each remeasured option is equal to the fair value of the option on the actual grant date, amortized over the remaining expected requisite service period of the option. We did not record these stock-based compensation expenses under APB 25 or SFAS 123(R) in our previously issued consolidated financial statements and that is why we are restating them in this filing.

As a result of the issues identified, we recorded additional pre-tax, non-cash, stock-based compensation expense of $169.4 million under APB 25 for the period between May 13, 1997 (the date of our initial public offering) and December 31, 2005, comprised of $146.9 million related to remeasured stock options and $22.5 million related to other stock compensation adjustments. The cumulative tax benefit from the recording of these adjustments was $67.0 million. The impact of these adjustments, net of taxes, decreased our previously reported cumulative net income by $102.4 million for the same period. The tax benefit amount differs from the statutory tax benefit principally as a result of limitations on our ability to deduct certain executive stock-based compensation and changes in geographical mix of expenses.

For the year ended December 31, 2006, in accordance with SFAS 123(R), we recorded additional pre-tax, non-cash, stock-based compensation expense of $6.8 million, comprised of $6.3 million related to remeasured stock options and $0.5 million related to other stock compensation adjustments. As of December 31, 2006, we had $6.6 million of unrecognized pre-tax stock-based compensation costs calculated under SFAS 123(R) related to remeasured stock option grants that will be recorded as compensation expense over the remaining expected requisite service period of the options.

Restated selected quarterly unaudited consolidated financial data for the three months ended March 31, 2006 and 2005, the related revised management's discussion and analysis of financial condition and results of operations for these periods and restated tables and disclosures related to APB 25, SFAS 123 and SFAS 123(R) are included in Exhibit 13 of this Annual Report on Form 10-K. The previously filed consolidated financial statements for the quarters ended June 30 and September 30, 2005, are restated in the Quarterly Reports on Form 10-Q for the quarters ended June 30 and September 30, 2006, respectively.

Table of Contents

## PART I

Rambus, RDRAM, XDR, FlexIO and FlexPhase are trademarks or registered trademarks of Rambus Inc. Other trademarks that may be mentioned in this annual report on Form 10-K are the property of their respective owners.

Industry terminology, used widely throughout this annual report, has been abbreviated and, as such, these abbreviations are defined below for your convenience:

| | |
|---|---|
| Advanced Backplane | ABP |
| Double Data Rate | DDR |
| Dynamic Random Access Memory | DRAM |
| Fully Buffered-Dual In-line Memory Module | FB-DIMM |
| Gigabytes per second | Gb/s |
| Graphics Double Data Rate | GDDR |
| Input/Output | I/O |
| Peripheral Component Interconnect | PCI |
| Rambus Dynamic Random Access Memory | RDRAM |
| Single Data Rate | SDR |
| Synchronous Dynamic Random Access Memory | SDRAM |
| eXtreme Data Rate | XDR |

From time to time we will refer to the abbreviated names of certain entities and, as such, have provided a chart to indicate the full names of those entities for your convenience.

| | |
|---|---|
| Advanced Micro Devices Inc. | AMD |
| ARM Holdings plc | ARM |
| Cadence Design Systems, Inc. | Cadence |
| Cisco Systems, Inc. | Cisco |
| Elpida Memory, Inc. | Elpida |
| Fujitsu Limited | Fujitsu |
| GDA Technologies, Inc. | GDA |
| Hewlett-Packard Company | Hewlett-Packard |
| Hynix Semiconductor, Inc. | Hynix |
| Infineon Technologies AG | Infineon |
| Inotera Memories, Inc. | Inotera |
| Intel Corporation | Intel |
| International Business Machines Corporation | IBM |
| Joint Electron Device Engineering Council | JEDEC |
| Juniper Networks, Inc. | Juniper |
| Matsushita Electrical Industrial Co. | Matsushita |
| Micron Technologies, Inc. | Micron |
| Nanya Technology Corporation | Nanya |
| NEC Electronics Corporation | NECEL |
| Optical Internetworking Forum | OIF |
| Qimonda AG (formerly Infineon's DRAM operations) | Qimonda |
| Peripheral Component Interconnect -- Special Interest Group | PCI-SIG |
| Renesas Technology Corporation | Renesas |
| S3 Graphics, Inc. | S3 Graphics |
| Samsung Electronics Co., Ltd. | Samsung |

## Table of Contents

| | |
|---|---|
| Sony Computer Electronics | Sony |
| Spansion, Inc. | Spansion |
| ST Microelectronics | ST Micro |
| Synopsys Inc. | Synopsys |
| Tessera Technologies, Inc. | Tessera |
| Texas Instruments Inc. | Texas Instruments |
| Toshiba Corporation | Toshiba |
| Velio Communications | Velio |

## Item 1.    Business

Rambus Inc. ("we" or "Rambus") was founded in 1990 and reincorporated in Delaware in March 1997. Our principal executive offices are located at 4440 El Camino Real, Los Altos, California. Our Internet address is www.rambus.com. You can obtain copies of our Forms 10-K, 10-Q, 8-K, and other filings with the SEC, and all amendments to these filings, free of charge from our website as soon as reasonably practicable following our filing of any of these reports with the SEC. In addition, you may read and copy any material we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that contains reports, proxy, and information statements, and other information regarding registrants that file electronically with the SEC at www.sec.gov.

We design, develop and license chip interface technologies and architectures that are foundational to nearly all digital electronics products. Our chip interface technologies are designed to improve the time-to-market, performance, and cost-effectiveness of our customers' semiconductor and system products for computing, communications and consumer electronics applications.

As of May 31, 2007, our chip interface technologies are covered by more than 600 U.S. and international patents. Additionally, we have approximately 500 patent applications pending. These patents and patent applications cover important inventions in memory and logic chip interfaces, in addition to other technologies. We believe that our chip interface technologies provide a higher performance, lower risk, and more cost-effective alternative for our customers than can be achieved through their own internal research and development efforts.

We offer our customers two alternatives for using our chip interface technologies in their products:

First, we license our broad portfolio of patented inventions to semiconductor and system companies who use these inventions in the development and manufacture of their own products. Such licensing agreements may cover the license of part, or all, of our patent portfolio. Patent license agreements are royalty bearing.

Second, we develop "leadership" (which are Rambus-proprietary products widely licensed to our customers) and industry-standard chip interface products that we provide to our customers under license for incorporation into their semiconductor and system products. Because of the often complex nature of implementing state-of-the art chip interface technology, we offer our customers a range of engineering services to help them successfully integrate our chip interface products into their semiconductors and systems. Product license agreements may have both a fixed price (non-recurring) component and ongoing royalties. Engineering services are customarily bundled with our product licenses, and are performed on a fixed price basis. Further, under product licenses, our customers may receive licenses to our patents necessary to implement the chip interface in their products with specific rights and restrictions to the applicable patents elaborated in their individual contracts with us.

### Background

The performance of computers, consumer electronics and other electronic systems is often constrained by the speed of data transfer between the chips within the system. Ideally, the rate of the data transfer between chips should support the rate of data transfer on-chip. However, on-chip frequencies continue to exceed the frequency of communication between chips at a growing rate. The incorporation of multiple-cores in processor chips drives an even

Table of Contents

greater need for higher rates of data transfer. Further, the inability to scale packaging technology (number of signal pins on a package) at the rate at which transistor counts scale through improvements in semiconductor process technology only worsens the chip interface "bottleneck." As a result, continued advances to increase on-chip frequencies, number of cores or transistor densities face potentially diminishing returns in increasing overall system performance. Our technologies help semiconductor and system designers speed the performance of chip interfaces, thus helping to boost the overall performance of electronic systems.

## Our Offerings

### Patent Licensing

We derive the majority of our annual revenues by licensing our broad portfolio of patents for chip interfaces to our customers. Such licenses may cover part or all of our patent portfolio. Leading semiconductor and system companies such as AMD, Elpida, Fujitsu, Qimonda, Intel, Matsushita, NECEL, Renesas, Spansion and Toshiba have taken licenses to our patents for use in their own products. Examples of the many patented innovations in our portfolio include:

*Fully Synchronous DRAM* which is designed to allow precise timing from a DRAM system, improving memory transfer efficiency.

*Dual Edge Clocking* which is designed to allow data to be sent on both the leading and trailing edge of the clock pulse, effectively doubling the transfer rate out of a memory core without the need for higher system clock speeds.

*Variable Burst Length* which is designed to improve data transfer efficiency by allowing varying amounts of data to be sent per a memory read or write request in DRAMs and Flash memory.

*FlexPhase™* technology which synchronizes data output and compensates for circuit timing errors.

*Channel Equalization* which is designed to improve signal integrity and system margins by reducing inter-symbol interference in high speed parallel and serial link channels.

### Product Licensing

We license our leadership and industry-standard chip interface products to our customers for use in their semiconductor and system products. Our customers include leading companies such as Elpida, Fujitsu, IBM, Intel, Matsushita, Texas Instruments, Sony, ST Micro, Qimonda and Toshiba. Due to the complex nature of implementing our technologies, we provide engineering services under certain of these licenses to help successfully integrate our chip interface products into their semiconductors and systems. Additionally, product licensees receive, as an adjunct to their chip interface license agreements, patent licenses as necessary to implement the chip interface in their products with specific rights and restrictions to the applicable patents elaborated in their individual contracts.

Our leadership chip interface products include the XDR™, XDR2 and RDRAM™ memory chip interface products and the FlexIO™ processor bus.

*The XDR Memory Architecture* enables what we believe to be the world's fastest production DRAM with operation up to 6.4 Gb/s. XDR DRAM is the main memory solution for Sony Computer Entertainment's PLAYSTATION®3 as well as for Texas Instrument's latest generation of DLP front projectors.

*The XDR2 Memory Architecture* incorporates our DRAM micro-threading innovation and delivers the world's highest performance for graphics intensive applications such as gaming and digital video.

*RDRAM Memory* has shipped in the Sony PlayStation®2, Intel-based PCs, Texas Instruments DLP TVs and in Juniper routers. Our customers have sold over 500 million RDRAM devices across all applications to date. This product is approaching end-of-life, and we anticipate revenues from RDRAM will continue to decline.

Table of Contents

*The FlexIO Processor Bus* is a high speed chip-to-chip interface. It is one of our two key chip interface products that enable the Cell BE processor co-developed by Sony, Toshiba and IBM. In the PLAYSTATION®3, FlexIO provides the interface between the Cell BE, the RSX graphics processor and the SouthBridge chip.

In addition to our leadership products, we offer industry-standard chip interface products for versions of DDRx (where the "x" is a number that represents a version), GDDRx (where the "x" is a number that represents a version), and PCI Express. We also offer digital logic controllers for PCI Express and DDRx memory.

### Target Markets, Applications and Customers

We work with leading and emerging semiconductor and system customers to enable their next-generation products. We engage with our customers across the entire product life cycle, from system architecture development, to chip design, to system integration, to production ramp up through product maturation. Our chip interface technologies and patented inventions are incorporated into a broad range of high-volume applications in the computing, consumer electronics and communications markets. System level products that utilize our patented inventions and/or products include personal computers, servers, printers, video projectors, video game consoles, digital TVs, set-top boxes and mobile phones manufactured by such companies as Fujitsu, Hewlett-Packard, Matsushita, Toshiba and Sony.

### Our Strategy

The key elements of our strategy are as follows:

*Develop Core Technology*: Develop and patent our core technology to provide us with a fundamental competitive advantage in memory and logic chip interfaces and architectures.

*Develop Products:* Develop products which incorporate our core technology and provide our customers with the benefits of superior performance, faster time-to-market, lower risk and greater cost effectiveness for a range of applications in computing, communications and consumer electronics.

*Engage With Leading Companies*: Engage with leading semiconductor and system customers to solve their critical chip interface design problems and incorporate our high performance, low-risk, silicon-proven chip interfaces into their solutions.

*License our Chip Interface Patents and Technologies:* License our patented inventions and specific chip interface products to customers for use in their semiconductor and system products.

### Design and Manufacturing

Our chip interface technologies are developed with high-volume complementary metal-oxide semiconductor (CMOS) manufacturing processes in mind. Typically, our chip interface products are delivered as an implementation package or a custom development. We provide implementation packages to licensees who wish to port our chip interface designs to a manufacturing process being used to develop their semiconductor products. This package typically includes a specification, a generalized circuit layout database and test parameter software. We do custom development when licensees have contracted with us to produce a specific design implementation optimized for the licensee's manufacturing process. In such cases, the licensee provides specific design rules and transistor models for the licensee's process.

### Research and Development

Our ability to compete in the future will be substantially dependent on our ability to advance our chip interfaces and patented inventions in order to meet changing market needs. To this end, we have assembled a team of highly skilled engineers whose activities are focused on further development of our chip interfaces and patented inventions as well as adaptation of current chip interfaces to specific customers' processes. Our engineers are developing new chip interfaces and new versions of existing chip interfaces that we expect will allow chip data transfer at higher speeds, as well as

Table of Contents

provide other improvements and benefits. Our design and development process is a multi-disciplinary effort requiring expertise in system architecture, digital and analog circuit design and layout, semiconductor process characteristics, packaging, printed circuit board routing, signal integrity and high-speed testing techniques.

As of May 31, 2007, we had approximately 270 employees in our engineering departments, representing 65% of our total employees. A significant number of our engineers spend all or a portion of their time on research and development. For the years ended December 31, 2006, 2005, and 2004, research and development expenses were $69.0 million, $49.1 million and $38.3 million, respectively, including stock-compensation of $14.9 million, $8.1 million and $5.7 million, respectively. We expect to continue to invest substantial funds in research and development activities. In addition, because our license and customer service agreements often call for us to provide engineering support, a portion of our total engineering costs are allocated to the cost of contract revenues, even though some of these engineering efforts may have direct applicability to our technology development.

### Competition

The semiconductor industry is intensely competitive and has been impacted by price erosion, rapid technological change, short product life cycles, cyclical market patterns and increasing foreign and domestic competition. Some semiconductor companies have developed and support competing logic chip interfaces including their own serial link chip interfaces and parallel bus chip interfaces. We also face competition from semiconductor and intellectual property companies who provide their own DDR memory chip interface technology and solutions. In addition, most DRAM manufacturers, including our XDR licensees, produce versions of DRAM such as SDR, DDRx and GDDRx SDRAM which compete with XDR chips. We believe that our principal competition for memory chip interfaces may come from our licensees and prospective licensees, some of which are evaluating and developing products based on technologies that they contend or may contend will not require a license from us. In addition, our competitors are also taking a system approach similar to ours in seeking to solve the application needs of system companies. Many of these companies are larger and may have better access to financial, technical and other resources than we possess.

JEDEC has standardized what it calls extensions of DDR, known as DDR2 and DDR3. Additional efforts are underway to create other products including those sometimes referred to as GDDR4 and GDDR5, as well as new ways to integrate products such as system-in-package DRAM. To the extent that these alternatives might provide comparable system performance at lower than or similar cost to XDR memory chips, or are perceived to require the payment of no or lower royalties, or to the extent other factors influence the industry, our licensees and prospective licensees may adopt and promote alternative technologies. Even to the extent we determine that such alternative technologies infringe our patents, there can be no assurance that we would be able to negotiate agreements that would result in royalties being paid to us without litigation, which could be costly and the results of which would be uncertain.

In the serial link chip interface business, we face additional competition from semiconductor companies that sell discrete transceiver chips for use in various types of systems, from semiconductor companies that develop their own serial link chip interfaces, as well as from competitors, such as ARM and Synopsys, who license similar serial link chip interface products and digital controllers. At the 10 Gb/s speed, competition will also come from optical technology sold by system and semiconductor companies. There are standardization efforts underway or completed for serial links from standard bodies such as PCI-SIG and OIF. We may face increased competition from these types of consortia in the future that could negatively impact our serial link chip interface business.

Table of Contents

In the FlexIO processor bus chip interface market, we face additional competition from semiconductor companies who develop their own parallel bus chip interfaces, as well as competitors who license similar parallel bus chip interface products. As with our memory chip interface products, to the extent that competitive alternatives to our serial or parallel logic chip interface products might provide comparable system performance at lower or similar cost, or are perceived to require the payment of no or lower royalties, or to the extent other factors influence the industry, our licensees and prospective licensees may adopt and promote alternative technologies.

### *Employees*

As of May 31, 2007, we had approximately 415 full-time employees. We believe that our future success is dependent on our continued ability to identify, attract, motivate and retain qualified personnel. To date, we believe that we have been successful in recruiting qualified employees and that our relationship with our employees is excellent.

### *Patents and Intellectual Property Protection*

We maintain and support an active program to protect our intellectual property, primarily through the filing of patent applications and the defense of issued patents against infringement. As of May 31, 2007, we have more than 600 U.S. and international patents on various aspects of our technology, with expiration dates ranging from 2010 to 2025, and we have approximately 500 pending patent applications. In addition, we attempt to protect our trade secrets and other proprietary information through agreements with current and prospective licensees, and confidentiality agreements with employees and consultants and other security measures. We also rely on trademarks and trade secret laws to protect our intellectual property.

### *Business Segment Data, Customers and Our Foreign Operations*

We operate in a single industry segment, the design, development and licensing of chip interface technologies and architectures. Information concerning revenues, results of operations and revenues by geographic area is set forth in Item 6, "Selected Financial Data," in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in Note 13, "Business Segments, Exports and Major Customers," of Notes to Consolidated Financial Statements, all of which are incorporated herein by reference. Information concerning identifiable assets is also set forth in Note 13 of Notes to Consolidated Financial Statements. Information on customers that comprise 10% or more of our consolidated revenues and risks attendant to our foreign operations is set forth below in Item 1A, "Risk Factors."

### Item 1A.    Risk Factors

## RISK FACTORS

Because of the following factors, as well as other variables affecting our operating results, past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results or trends in future periods. See also "Special Note Regarding Forward-looking Statements" elsewhere in this report.

### Risks Related to Litigation and Regulation; Business Risks Related to our Intellectual Property

*We face current and potential adverse determinations in litigation stemming from our efforts to protect and enforce our patents and intellectual property, which could broadly impact our intellectual property rights, distract our management and cause a substantial decline in our revenues and stock price.*

We seek to diligently protect our intellectual property rights. In connection with the extension of our licensing program to SDR SDRAM-compatible and DDR SDRAM-compatible products in 2000 and 2001, we became involved in litigation related to such efforts. As of the date of this report, we are in litigation with four such potential SDR SDRAM-compatible and DDR SDRAM-compatible licensees. In each of these cases, we have claimed infringement of our

Table of Contents

patents, while the potential licensees have generally sought damages and a determination that certain of our patents at suit are invalid, unenforceable, and not infringed. These potential licensees have relied or may rely upon defenses and counterclaims (some not yet formally asserted) that our patents are unenforceable based on various allegations concerning our alleged conduct in the 1990's and early 2000's, including that we engaged in document spoliation, litigation misconduct and/or acted improperly during our 1991 to 1995 participation in the JEDEC standard setting organization (including allegations of antitrust violations and unfair competition).

For example, Hynix's claims attempt to include our 1990's relationship with Intel and our alleged disparagement of SDRAM and DDR SDRAM products in the 1990's and early 2000's. As further discussed below, Hynix has also asserted that the Federal Trade Commission's (the "FTC") finding that we acted improperly at JEDEC should be given prima facie evidentiary effect in the private action and/or should entitle it to summary judgment on certain counterclaims. Micron, Samsung, and Nanya (collectively with Hynix, the "Manufacturers") recently asserted similar arguments in support of their respective counterclaims. While we have opposed the Manufacturers' attempt to use the FTC's findings in private litigation, there can be no assurance that we will succeed. If any Manufacturer prevails, we could be limited in our ability to enforce certain of our patents. Furthermore, in August of 2007, the Company received a Statement of Objections from the European Commission, alleging violations of competition law arising from the same basic facts as the FTC decision. There is no assurance that the ultimate decision in that case will not restrict our ability to enforce certain of our patents. In addition, Micron, Hynix, Samsung and Nanya have alleged that we have unclean hands based on alleged litigation misconduct and document spoliation, allegations that overlap with those successfully used by Infineon to obtain the early 2005 dismissal of our patent claims in our case against Infineon in Virginia. Micron has also attempted to assert claims against us for violation of the federal civil Racketeer Influenced and Corrupt Organizations Act ("RICO") and Virginia state conspiracy laws based in part on the same allegations. Although we defeated Hynix's unclean hands and spoliation claims based on a subset of these allegations, a federal district court in Virginia subsequently found that we had spoliated evidence and engaged in litigation misconduct in the course of deciding, and ultimately denying, Samsung's motion for attorneys' fees. There can be no assurance that such claims or counterclaims will not again be reasserted or successfully used to defeat or limit our patent or other claims.

There can be no assurance that parties will not succeed, either at the trial or appellate level, with such claims or counterclaims against us or that they will not in some other way establish broad defenses against our patents, achieve conflicting results, or otherwise avoid or delay paying what we believe to be appropriate royalties for the use of our patented technology. In addition, there is the risk that the pending litigations and other circumstances may cause us to accept less than what we now believe to be fair consideration in settlement. Among other things, there can be no assurance that we will succeed in negotiating future settlements or licenses on terms better than those extended in our Infineon settlement. There can be no assurances that the circumstances under which we negotiated our Infineon settlement will turn out to be significantly different from the circumstances of future cases and future settlements, although we currently believe that significant differences do exist.

Any of these matters, whether or not determined in our favor or settled by us, is costly, may cause delays, will tend to discourage future design partners, will tend to impair adoption of our existing technologies and divert the efforts and attention of our management and technical personnel from other business operations. In addition, we may be unsuccessful in our litigation if we have difficulty obtaining the cooperation of former employees and agents who were involved in our business during the relevant periods related to our litigation and are now needed to assist in cases or testify on our behalf. Furthermore, any adverse determination or other resolution in litigation could result in our losing certain rights beyond the rights at issue in a particular case, including, among other things: our being effectively barred from suing others for violating certain or all of our intellectual property rights; our patents being held invalid or unenforceable or not infringed; our being subjected to significant liabilities; our being required to seek licenses from third parties; our being prevented from licensing our patented technology; or our being required to renegotiate with current licensees on a temporary or permanent basis. Delay or any or all of these adverse results could cause a substantial decline in our revenues and stock price.

*Litigation or other third-party claims of intellectual property infringement could require us to expend substantial resources and could prevent us from developing or licensing our technology on a cost-effective basis.*

Page 12 of 170

Table of Contents

Our research and development programs are in highly competitive fields in which numerous third parties have issued patents and patent applications with claims closely related to the subject matter of our research and development programs. We have also been named in the past, and may in the future be named, as a defendant in lawsuits claiming that our technology infringes upon the intellectual property rights of third parties. In the event of a third-party claim or a successful infringement action against us, we may be required to pay substantial damages, to stop developing and licensing our infringing technology, to develop non-infringing technology, and to obtain licenses, which could result in our paying substantial royalties or our granting of cross licenses to our technologies. We may not be able to obtain licenses from other parties at a reasonable cost, or at all, which could cause us to expend substantial resources, or result in delays in, or the cancellation of, new product.

*An adverse resolution by or with a governmental agency, such as the Federal Trade Commission or the European Commission, could result in severe limitations on our ability to protect and license our intellectual property, and would cause our revenues to decline substantially.*

If there were an adverse determination by, or other resolution with, a government agency, it might limit our ability to enforce our intellectual property rights or to obtain licenses, which would cause our revenues to decline substantially. For example, in June 2002, the FTC filed a complaint against us alleging, among other things, that we had failed to disclose certain patents and patent applications during our membership in JEDEC while it established SDRAM standards and that we, therefore, should be precluded from enforcing certain of our intellectual property rights in patents with a priority date prior to June 1996. In August 2006, the FTC found that our conduct at JEDEC was improper. On February 2, 2007, the FTC issued its remedy order, which among other things, imposes maximum royalty rates that we can charge for certain SDR and DDR SDRAM products made, used or sold in the United States; the FTC subsequently granted a partial stay of this order, which allows us to charge but not collect royalties above the FTC-imposed maximums, pending our anticipated appeal of the FTC's decision. The FTC has required that royalties above these maximums be placed into an escrow account or held through a contingent contractual agreement. Despite this partial stay, the FTC's remedy order may significantly limit our ability to enforce or license our patents or collect royalties from existing or potential licensees. The European Commission has issued a Statement of Objections, similar to the filing of a complaint under U.S. law, relating to similar topics. Proceedings by one of these agencies, or any other governmental agency, have already and may result in outcomes that could limit our ability to enforce or license our intellectual property, and could cause our revenues to decline substantially.

In addition, third parties have and may attempt to use the FTC's findings to limit our ability to enforce our patents in private litigations and to assert claims for monetary damages against us. Several class actions were filed in various federal courts against us alleging violations of federal and state antitrust laws, violations of state consumer protection laws and various common law claims based almost entirely on the same conduct as the FTC's findings. There can be no assurance that such third parties will not be successful or that additional claims or actions arising out of the FTC's findings will not be asserted against us.

Further, in Fall 2006, Samsung filed three inter partes reexamination requests with respect to three of our patents: U.S. Patent Nos. 6,426,916; 6,182,184; and 6,324,120. These requests ask the United States Patent & Trademark Office (the "PTO") to reconsider the patentability of the inventions claimed in the patents. An adverse decision by the PTO could invalidate some or all of these patent claims and could also result in additional adverse consequences affecting other related U.S. patents. If a sufficient number of such patents are impaired, our ability to enforce or license our intellectual property would be significantly weakened and this could cause our revenues to decline substantially. There can be no assurance that Samsung will not be successful or that additional inter partes reexamination requests will not be filed by Samsung or other third parties against us.

On May 13, 2004, a Technical Appeals Board of the European Patent Office issued its written opinion as to the revocation of European Patent No. 0525068. In addition, on January 13, 2005, an opposition board of the European Patent Office revoked our European Patent No. 1 004 956, and issued its written decision on February 9, 2005. We are appealing this decision to an appellate panel of the European Patent Office. While this result still leaves us with additional issued patents in Europe relating to one or both of SDR and DDR SDRAM memory products, there are similar pending opposition proceedings with respect to some of those patents as well. If a sufficient number of such patents are similarly impaired or revoked, our ability to enforce or license our intellectual property would be significantly impaired and this could cause our revenues to decline substantially.

Table of Contents

*If we are unable to successfully protect our inventions through the issuance and enforcement of patents, our operating results could be adversely affected.*

We have an active program to protect our proprietary inventions through the filing of patents. There can be no assurance, however, that:

- any current or future U.S. or foreign patent applications will be approved and not be challenged by third parties;
- our issued patents will protect our intellectual property and not be challenged by third parties;
- the validity of our patents will be upheld;
- our patents will not be declared unenforceable;
- the patents of others will not have an adverse effect on our ability to do business;
- the Congress or the U.S. courts or foreign countries will not change the nature or scope of rights afforded patents or patent owners or alter in an adverse way the process for seeking patents;
- new legal theories and strategies utilized by our competitors will not be successful; or
- others will not independently develop similar or competing chip interfaces or design around any patents that may be issued to us.

If any of the above were to occur, our operating results could be adversely affected.

*Our inability to protect and own the intellectual property we create would cause our business to suffer.*

We rely primarily on a combination of license, development and nondisclosure agreements, trademark, trade secret and copyright law, and contractual provisions to protect our non-patentable intellectual property rights. If we fail to protect these intellectual property rights, our licensees and others may seek to use our technology without the payment of license fees and royalties, which could weaken our competitive position, reduce our operating results and increase the likelihood of costly litigation. The growth of our business depends in large part on the use of our intellectual property in the products of third party manufacturers, and our ability to enforce intellectual property rights against them to obtain appropriate compensation. In addition, effective trade secret protection may be unavailable or limited in certain foreign countries. Although we intend to protect our rights vigorously, if we fail to do so, our business will suffer.

*We might experience payment disputes for amounts owed to us under our licensing agreements, and this may harm our results of operations.*

Many of our license agreements require our licensees to document the manufacture and sale of products that incorporate our technology and report this data to us on a quarterly basis. While licenses with such terms give us the right to audit books and records of our licensees to verify this information, audits can be expensive, time consuming, and potentially detrimental to our ongoing business relationship with our licensees. We have performed royalty audits from time to time, using accounting firms other than our independent registered public accounting firm, but we primarily rely on the accuracy of the reports from licensees without independently verifying the information in them. Our failure to audit our licensees' books and records may result in our receiving more or less royalty revenues than we are entitled to under the terms of our license agreements. The result of such royalty audits could result in an increase, as a result of a licensee's underpayment, or decrease, as a result of a licensee's overpayment, to previously reported royalty revenues. Such adjustments are recorded in the period they are determined. Any adverse material adjustments resulting from royalty audits or dispute resolutions may result in us missing analyst estimates and causing our stock price to decline. Royalty audits may also trigger disagreements over contract terms with our licensees and such disagreements could hamper customer relations, divert the efforts and attention of our management from normal operations and impact our business operations and financial condition.

Table of Contents

***We may not be able to satisfy the requirements under the Qimonda settlement and license agreement that would require Qimonda to pay us up to an additional $100.0 million in royalty payments.***

On March 21, 2005, we entered into a settlement and license agreement with Infineon (and its former parent Siemens), which was assigned to Qimonda in October 2006 in connection with Infineon's spin-off of Qimonda. The settlement and license agreement, among other things, requires Qimonda to pay to us aggregate royalties of $50.0 million in quarterly installments of approximately $5.85 million, which started on November 15, 2005. The settlement and license agreement further provides that if we enter into licenses with certain other DRAM manufacturers, Qimonda will be required to make additional royalty payments to us that may aggregate up to $100.0 million. We may not succeed in entering into these additional license agreements necessary to trigger Qimonda's obligations under the settlement and license agreement to pay to us additional royalty payments, thereby reducing the value of the settlement and license agreement to us.

***An acquisition of all of Qimonda's DRAM operations could make it more difficult for us to obtain royalty rates we believe are appropriate and could reduce the number of companies in our antitrust litigation.***

Our license with Qimonda (formerly Infineon's DRAM operations), which was part of our settlement with Infineon, provides for the extension of certain benefits under that license to a successor in interest that, under certain conditions, acquires all of Qimonda's DRAM operations. If such an acquisition were to occur, such successor would be entitled to the extension of such benefits, including the ability to pay a royalty calculated by multiplying the Qimonda rate by the percentage increase in DRAM volume represented by the successor company's combined operations. Such an extension of benefits could also make it more difficult for us to obtain the royalty rates we believe are appropriate from the market as a whole. Such an extension of benefits would, in addition, also operate to extend a release of claims to such successor, thus reducing the number of companies from which we may seek compensation for the antitrust injury alleged by us in our pending price-fixing action in San Francisco.

***Any dispute regarding our intellectual property may require us to indemnify certain licensees, the cost of which could severely hamper our business operations and financial condition.***

In any potential dispute involving our patents or other intellectual property, our licensees could also become the target of litigation. While we generally do not indemnify our licensees, some of our license agreements provide limited indemnities, some require us to provide technical support and information to a licensee that is involved in litigation involving use of our technology, and we may agree to indemnify others in the future. Our indemnification and support obligations could result in substantial expenses. In addition to the time and expense required for us to indemnify or supply such support to our licensees, a licensee's development, marketing and sales of licensed semiconductors could be severely disrupted or shut down as a result of litigation, which in turn could severely hamper our business operations and financial condition.

## Risks Related to the Investigation of Past Stock Option Practices and the Related Restatement of our Prior Financial Results.

***The matters relating to the independent investigation of our historical stock option granting practices and the restatement of our financial statements have required, and may continue to require, a significant amount of management time and accounting, financial and legal resources, which could adversely affect our business, financial condition and results of operations.***

On May 30, 2006, we announced the commencement of our Audit Committee's internal investigation of the timing of stock option grant practices and related accounting issues. The Audit Committee has determined that a significant number of our historical stock option grants were not correctly dated and our previous accounting should be adjusted. As a result of the Audit Committee's investigation and our own review of our historical financial statements, we concluded that our previously filed financial statements should no longer be relied upon. We have restated the affected periods by filing this Annual Report on Form 10-K for the year ended December 31, 2006, which includes restatements of the various previously filed financial statements as detailed herein. For a discussion of the investigation, its findings and the effects of this restatement on our previously filed financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Restatement of Consolidated Financial Statements, Audit Committee, Special Litigation Committee and Company Findings, Remedial Measures and Related Proceedings," Note 3, "Restatement of Consolidated Financial Statements," of Notes to Consolidated Financial Statements and Exhibit 99.1.

Table of Contents

On October 18, 2006, our Board of Directors established a Special Litigation Committee (the "SLC") to evaluate potential claims or other actions arising from our stock option granting activities. The SLC has now concluded its review of claims relating to stock option practices that are asserted in derivative actions against a number of our present and former officers and directors and filed a written report setting out its findings with the U.S. District Court for the Northern District of California. For additional information about the findings of the SLC, please see Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Shareholder Litigation Related to Historical Stock Option Practices."

Addressing all the matters related to the Audit Committee's investigation, the SLC's work and the financial restatement has and will continue to require significant management and financial resources which could otherwise be devoted to the operation of our business. The costs of becoming current with our periodic reports and any settlements, payment of claims, fines, taxes and other costs of the stock option investigation as detailed throughout these risk factors and this report will cause us to incur substantial expenses and could materially affect our cash balance and cash flow from operations. In addition, the recent restatement of our financial results, the ongoing investigations and any negative outcome that may occur from these investigations could impact our reputation, including our relationships with our investors and our licensees, our ability to hire and retain qualified personnel, our ability to acquire new licensees and other business partners and, ultimately, our ability to generate revenue. Furthermore, considerable legal and accounting expenses related to these matters have been incurred to date and significant expenditures may continue to be incurred in the future.

*We have been named as a party to several lawsuits arising from matters relating to the investigation which may result in unfavorable outcomes and significant judgments, settlements and legal expenses which could cause our business, financial condition and results of operations to suffer.*

Several shareholder derivative actions were filed in state and federal courts against certain of our current and former officers and directors related to the stock option granting actions under investigation by the Audit Committee and the SLC. The actions were brought by persons identifying themselves as shareholders and purporting to act on our behalf. We are named solely as a nominal defendant against whom the plaintiffs seek no recovery. The complaints allege that certain of these defendants violated securities laws and/or breached their fiduciary duties to us and obtained unjust enrichment in connection with grants of stock options to certain of our officers that were allegedly improperly dated. The SLC was formed to evaluate potential claims or other actions arising from the stock option granting activities. The complaints seek unspecified monetary damages and disgorgement from the defendants, as well as unspecified equitable relief.

Additionally, several securities fraud class actions and individual lawsuits were filed in federal court against us and certain of our current and former officers and directors. The complaints generally allege that the defendants violated the federal securities laws by filing documents with the SEC containing false statements regarding our accounting treatment of the stock option granting actions under investigation. The complaints seek unspecified monetary relief from the defendants. The class actions have been consolidated into a single proceeding. The individual lawsuits allege not only federal and state securities law violations, but also state law claims for fraud and breach of fiduciary duty.

There can be no assurance that further lawsuits by parties who allege they suffered injury as a consequence of our past stock option granting practices will not be filed in the future. The amount of time to resolve these current and any future lawsuits is uncertain, and these matters could require significant management and financial resources which could otherwise be devoted to the operation of our business. Although we have accrued an estimate of certain liabilities that we believe will result from certain of these actions, the actual costs and expenses to defend and satisfy all of these lawsuits and any potential future litigation will exceed our current estimated accruals, possibly significantly. Unfavorable outcomes and significant judgments, settlements and legal expenses in the litigation related to our past stock option granting practices could have material adverse impacts on our business, financial condition, results of operations and the trading price of our Common Stock.

Page 16 of 170

Table of Contents

*We are subject to the risk of regulatory proceedings, actions or litigation in connection with the investigation and the restatement of our financial statements, which could require significant management time and result in unfavorable outcomes and significant judgments, settlements and legal expenses which could have an adverse effect on our business, financial condition and results of operations.*

We have periodically met and discussed the results of the stock option investigation with the staff of the SEC and the United States Attorney's Office for the Northern District of California. Such government agencies will likely review such findings and may pursue inquiries of their own, which could lead to further investigations and government action, such as fines or injunctions. At this time, we cannot predict what, if any, government actions may result from the completion of the investigation of stock option grants. We are also under remote examination by the Internal Revenue Service ("IRS") on the various tax reporting implications resulting from the investigation. There is no assurance that other regulatory inquiries will not be commenced by other U.S. federal, state or foreign regulatory agencies, including the IRS and other tax authorities. In addition, while we believe that we have made appropriate judgments in determining the correct measurement dates for our stock option grants, the SEC may disagree with the manner in which we accounted for and reported, or failed to report, the corresponding financial impact. Accordingly, there is a risk that we may have to further restate our prior financial statements, amend prior filings with the SEC, or take other actions not currently contemplated. Any potential regulatory proceeding or action may be time consuming, expensive and distracting from the conduct of our business. An unfavorable outcome or significant judgments, settlements and legal expenses related to resolution of any potential regulatory proceeding or action, or further restatement of our financial statements, could have a material adverse effect on our business, financial condition and results of operations.

*We may suffer adverse tax consequences in connection with our historical stock option practices, which could have a negative impact on our results of operations and financial condition.*

As a result of our investigation into historical stock option practices, we have determined that certain options that had formerly been classified as ISO grants did not qualify for such ISO tax treatment because the grants had an exercise price below the fair market value of our Common Stock on the actual grant date. The IRS is currently auditing us with respect to this issue. In addition, we could face penalties, certain payment obligations for our employees or other costs in connection with the treatment of certain stock options impacted by the deferred compensation rules under Section 409A of the Internal Revenue Code (and other similar provisions of the California and other state tax laws).Also, we were unable to record additional deferred tax assets related to stock-based compensation in accordance with limits imposed by Section 162(m) of the Internal Revenue Code which reduced our available tax net operating loss carry-forwards for certain historical periods. These and other tax consequences related to our historical stock option practices could give rise to monetary liabilities for us and/or our current and former employees which may have to be satisfied in a future period. There can be no assurance that further regulatory inquiries or actions will not be commenced by the IRS or other state or foreign regulatory taxation authorities regarding the tax implications of our historical stock option practices. The unfavorable resolution of any potential tax regulatory proceeding or action could require us to make significant payments in overdue taxes, penalties and fines or otherwise record charges (or reduce tax assets) that may adversely affect our results of operations and financial condition.

*We may be required to indemnify our current and former directors, officers and employees in connection with the litigation and other actions related to the investigation which could result in significant legal expenses and other costs to us.*

Our bylaws and certain indemnification agreements require us to indemnify our current and former directors, officers, employees and agents against most actions of a civil, criminal, administrative or investigative nature unless such person acted criminally, in a manner opposed to our best interests or did not act in good faith. Generally, we are required to advance indemnification expenses prior to any final adjudication of an individual's culpability. Therefore, the expense of indemnifying our current and former directors, officers and employees and agents in their defense or related expenses as a result of the derivative, class action and any regulatory actions related to the investigation and financial restatement may be significant. While we have a director and officer insurance policy that in some circumstances limits our exposure and enables us to recover a portion of any amounts to be paid, our insurance coverage will not be sufficient to cover our liabilities in all of the current actions. Furthermore, the underwriters of our directors and officer insurance

Table of Contents

policy may seek to rescind or otherwise deny coverage in some or all of these matters, in which case we may be required to pay the indemnification amounts owed to such directors and officers without any insurance coverage. Finally, we may be delayed or otherwise unable to recover any indemnification that we advanced to persons that are finally determined not to be protected by our indemnification obligations due to their actions. Therefore, our indemnification obligations could result in the diversion of our financial resources that adversely affects our business, financial condition and results of operations.

### *It may be difficult or costly to obtain director and officer insurance coverage in the future as a result of our stock options problems.*

We expect that the issues arising from our historical stock option granting practices will make it more difficult to obtain director and officer insurance coverage in the future. If we are able to obtain this coverage, it could be significantly more costly than in the past, which would have an adverse effect on our financial results and cash flow. In the event that we are unable to obtain sufficient director and officer insurance coverage, as a result of this and related factors, our directors and officers could face increased risks of personal liability in connection with the performance of their duties. As a result, we may have difficultly attracting and retaining qualified directors and officers, which could adversely affect our business.

### *We have not been in compliance with SEC reporting requirements and The Nasdaq Global Select Market listing requirements and may continue to face compliance issues with both. If we are unable to return to or remain in compliance with SEC reporting requirements and The Nasdaq Global Select Market listing requirements, there may be a material adverse effect on the Company and our stockholders.*

Due to the stock option investigation and resulting restatements, we have not been able to file all of our periodic reports with the SEC on a timely basis and face the possibility of delisting of our stock from The Nasdaq Global Select Market. We have not yet filed our required Quarterly Report on Form 10-Q for the quarters ended March 31 and June 30, 2007. The Nasdaq Board has determined to grant us until October 17, 2007 to file all delinquent periodic reports necessary for us to regain compliance with our Nasdaq filing requirements. Even after filing all required reports with the SEC and receiving concurrence from Nasdaq that we are in compliance with applicable listing requirements, we may still face comments from the SEC that may require us to file amended reports. As a result, we may not be able to maintain an effective listing of our Common Stock on The Nasdaq Global Select Market or any other national securities exchange. A delisting would likely reduce the liquidity in the market for our Common Stock. Any possible delisting may adversely affect the market price of our Common Stock, which may make it difficult for holders to resell their shares when desired or at attractive prices. In addition, we would be subject to a number of restrictions or delays regarding the registration of our Common Stock under federal securities laws, and we may not be able to issue certain equity awards to our employees or allow them to exercise their outstanding options, which could adversely affect our ability to hire and retain our employees and, thus, our business.

### Risks Associated With Our Business, Industry and Market Conditions

### *If market leaders do not adopt our chip interface products, our results of operations could decline.*

An important part of our strategy is to penetrate market segments for chip interfaces by working with leaders in those market segments. This strategy is designed to encourage other participants in those segments to follow such leaders in adopting our chip interfaces. If a high profile industry participant adopts our chip interfaces but fails to achieve success with its products or adopts and achieves success with a competing chip interface, our reputation and sales could be adversely affected. In addition, some industry participants have adopted, and others may in the future adopt, a strategy of disparaging our memory solutions adopted by their competitors or a strategy of otherwise undermining the market adoption of our solutions.

By way of example, we target system companies to adopt our chip interface technologies, particularly those that develop and market high volume business and consumer products such as PCs and video game consoles. We are subject to many risks beyond our control that influence whether or not a particular system company will adopt our chip interfaces, including, among others:

  • competition faced by a system company in its particular industry;

Table of Contents

- the timely introduction and market acceptance of a system company's products;
- the engineering, sales and marketing and management capabilities of a system company;
- technical challenges unrelated to our chip interfaces faced by a system company in developing its products;
- the financial and other resources of the system company;
- the supply of semiconductors from our licensees in sufficient quantities and at commercially attractive prices;
- the ability to establish the prices at which the chips containing our chip interfaces are made available to system companies; and
- the degree to which our licensees promote our chip interfaces to a system company.

Our strategy also includes gaining acceptance of our technology in high volume consumer applications, including video game consoles, such as the Sony PlayStation®2 and Sony PLAYSTATION®3, digital TVs and set top boxes. There can be no assurance that consumer products that currently use our technology will continue to do so, nor can there be any assurance that the consumer products that incorporate our technology will be successful in their segments thereby generating expected royalties, nor can there be any assurance that any of our technologies selected for licensing will be implemented in a commercially developed or distributed product.

If any of these events occur and market leaders do not successfully adopt our technologies, our strategy may not be successful and, as a result, our results of operations could decline.

***Our revenue is concentrated in a few customers, and if we lose any of these customers, our revenues may decrease substantially.***

For the years ended December 31, 2006, 2005 and 2004, revenues from our top five licensees accounted for approximately 63%, 73% and 74% of our revenues, respectively. For the year ended December 31, 2006, revenues from Fujitsu, Elpida, Qimonda and Intel each accounted for greater than 10% of our total revenues. For the year ended December 31, 2005, revenues from Intel, Elpida Toshiba and Matsushita each accounted for greater than 10% of our total revenues. For the year ending December 31, 2004, revenues from Intel, Toshiba and Elpida each accounted for greater than 10% of our total revenues. We may continue to experience significant revenue concentration for the foreseeable future.

Substantially all of our licensees have the right to cancel their licenses. Failure to renew licenses and/or the loss of any of our top five licensees would cause revenues to decline substantially. Intel has been one of our largest customers and is an important catalyst for the development of new memory and logic chip interfaces in the semiconductor industry. We have a patent cross-license agreement with Intel for which we received quarterly royalty payments through the second quarter of 2006. The patent cross-license agreement expired in September 2006. Intel now has a paid up license for the use of all of our patents which claimed priority prior to September 2006. We have other licenses with Intel, in addition to the patent cross-license agreement, for the development of serial link chip interfaces. If we do not continue to replace the revenues we previously received under the Intel contract, our results of operations may decline significantly.

In addition, some of our commercial agreements require us to provide certain customers with the lowest royalty rate that we provide to other customers for similar technologies, volumes and schedules. These clauses may limit our ability to effectively price differently among our customers, to respond quickly to market forces, or otherwise to compete on the basis of price. The particular licensees which account for revenue concentration have varied from period to period as a result of the addition of new contracts, expiration of existing contracts, industry consolidation, the expiration of deferred revenue schedules under existing contracts, and the volumes and prices at which the licensees have recently sold licensed semiconductors to system companies. These variations are expected to continue in the foreseeable future, although we anticipate that revenue will continue to be concentrated in a limited number of licensees.

We are in negotiations with licensees and prospective licensees to reach SDR and DDR patent license agreements. We expect SDR and DDR patent license royalties will continue to vary from period to period based on our success in renewing existing license agreements and adding new licensees, as well as the level of variation in our licensees'

Table of Contents

reported shipment volumes, sales price and mix, offset in part by the proportion of licensee payments that are fixed. If we are unsuccessful in renewing any of our SDR and DDR-compatible contracts, our results of operations may decline significantly.

*If we cannot respond to rapid technological change in the semiconductor industry by developing new innovations in a timely and cost effective manner, our operating results will suffer.*

The semiconductor industry is characterized by rapid technological change, with new generations of semiconductors being introduced periodically and with ongoing improvements. We derive most of our revenue from our chip interface technologies that we have patented. We expect that this dependence on our fundamental technology will continue for the foreseeable future. The introduction or market acceptance of competing chip interfaces that render our chip interfaces less desirable or obsolete would have a rapid and material adverse effect on our business, results of operations and financial condition. The announcement of new chip interfaces by us could cause licensees or system companies to delay or defer entering into arrangements for the use of our current chip interfaces, which could have a material adverse effect on our business, financial condition and results of operations. We are dependent on the semiconductor industry to develop test solutions that are adequate to test our chip interfaces and to supply such test solutions to our customers and us.

Our continued success depends on our ability to introduce and patent enhancements and new generations of our chip interface technologies that keep pace with other changes in the semiconductor industry and which achieve rapid market acceptance. We must continually devote significant engineering resources to addressing the ever increasing need for higher speed chip interfaces associated with increases in the speed of microprocessors and other controllers. The technical innovations that are required for us to be successful are inherently complex and require long development cycles, and there can be no assurance that our development efforts will ultimately be successful. In addition, these innovations must be:

- completed before changes in the semiconductor industry render them obsolete;
- available when system companies require these innovations; and
- sufficiently compelling to cause semiconductor manufacturers to enter into licensing arrangements with us for these new technologies.

Finally, significant technological innovations generally require a substantial investment before their commercial viability can be determined. There can be no assurance that we have accurately estimated the amount of resources required to complete the projects, or that we will have, or be able to expend, sufficient resources required for these types of projects. In addition, there is market risk associated with these products, and there can be no assurance that unit volumes, and their associated royalties, will occur. If our technology fails to capture or maintain a portion of the high volume consumer market, our business results could suffer.

If we cannot successfully respond to rapid technological changes in the semiconductor industry by developing new products in a timely and cost effective manner our operating results will suffer.

*We face intense competition that may cause our results of operations to suffer.*

The semiconductor industry is intensely competitive and has been impacted by price erosion, rapid technological change, short product life cycles, cyclical market patterns and increasing foreign and domestic competition. Some semiconductor companies have developed and support competing logic chip interfaces including their own serial link chip interfaces and parallel bus chip interfaces. We also face competition from semiconductor and intellectual property companies who provide their own DDR memory chip interface technology and solutions. In addition, most DRAM manufacturers, including our XDR licensees, produce versions of DRAM such as SDR, DDRx and GDDRx SDRAM which compete with XDR chips. We believe that our principal competition for memory chip interfaces may come from our licensees and prospective licensees, some of which are evaluating and developing products based on technologies that they contend or may contend will not require a license from us. In addition, our competitors are also taking a system approach similar to ours in seeking to solve the application needs of system companies. Many of these companies are larger and may have better access to financial, technical and other resources than we possess.

Table of Contents

JEDEC has standardized what it calls extensions of DDR, known as DDR2 and DDR3. Other efforts are underway to create other products including those sometimes referred to as GDDR4 and GDDR5, as well as new ways to integrate products such as system-in-package DRAM. To the extent that these alternatives might provide comparable system performance at lower or similar cost than XDR memory chips, or are perceived to require the payment of no or lower royalties, or to the extent other factors influence the industry, our licensees and prospective licensees may adopt and promote alternative technologies. Even to the extent we determine that such alternative technologies infringe our patents, there can be no assurance that we would be able to negotiate agreements that would result in royalties being paid to us without litigation, which could be costly and the results of which would be uncertain. In the industry standard and leadership serial link chip interface business, we face additional competition from semiconductor companies that sell discrete transceiver chips for use in various types of systems, from semiconductor companies that develop their own serial link chip interfaces, as well as from competitors, such as ARM and Synopsys, who license similar serial link chip interface products and digital controllers. At the 10 Gb/s speed, competition will also come from optical technology sold by system and semiconductor companies. There are standardization efforts under way or completed for serial links from standard bodies such as PCI-SIG and OIF. We may face increased competition from these types of consortia in the future that could negatively impact our serial link chip interface business.

In the FlexIO processor bus chip interface market segment, we face additional competition from semiconductor companies who develop their own parallel bus chip interfaces, as well as competitors who license similar parallel bus chip interface products. We may also see competition from industry consortia or standard setting bodies that could negatively impact our FlexIO processor bus chip interface business.

As with our memory chip interface products, to the extent that competitive alternatives to our serial or parallel logic chip interface products might provide comparable system performance at lower or similar cost, or are perceived to require the payment of no or lower royalties, or to the extent other factors influence the industry, our licensees and prospective licensees may adopt and promote alternative technologies, which could negatively impact our memory and logic chip interface business.

If for any of these reasons we cannot effectively compete in these primary market segments, our results of operations could suffer.

*Some of our revenue is subject to the pricing policies of our licensees over whom we have no control.*

We have no control over our licensees' pricing of their products and there can be no assurance that licensee products using or containing our chip interfaces will be competitively priced or will sell in significant volumes. One important requirement for our memory chip interfaces is for any premium charged by our licensees in the price of memory and controller chips over alternatives to be reasonable in comparison to the perceived benefits of the chip interfaces. If the benefits of our technology do not match the price premium charged by our licensees, the resulting decline in sales of products incorporating our technology could harm our operating results.

*Future revenues are difficult to predict for several reasons, including our lengthy and costly license negotiation cycle, and our failure to predict revenues accurately may cause us to miss analysts' estimates and result in our stock price declining.*

The process of persuading system companies to adopt and license our chip interface technologies can be lengthy and, even if successful, there can be no assurance that our chip interfaces will be used in a product that is ultimately brought to market, achieves commercial acceptance, or results in significant royalties to us. In addition, a portion of our revenue comes from development and support services provided to our licensees. Depending upon the nature of the services, a portion of the related revenue may be recognized ratably over the support period, or may be recognized according to contract accounting. Contract revenue accounting may result in deferral of the service fees to the completion of the contract, or may be recognized over the period in which services are performed on a percentage-of-completion basis. There can be no assurance that the product development schedule for these projects will not be changed or delayed. All of these factors make it difficult to predict future licensing revenue and may result in our missing analysts' estimates which would likely cause our stock price to decline.

Table of Contents

*The price of our Common Stock may fluctuate significantly, which may make it difficult for holders to resell their shares when desired or at attractive prices.*

Our Common Stock currently is listed on The Nasdaq Global Select Market under the symbol "RMBS." The trading price of our Common Stock has been subject to wide fluctuations which may continue in the future in response to, among other things, the following:

- any progress, or lack of progress, in the development of products that incorporate our chip interfaces;
- our signing or not signing new licensees;
- new litigation or developments in current litigation as discussed above;
- announcements of our technological innovations or new products by us, our licensees or our competitors;
- developments related to the stock option investigation;
- positive or negative reports by securities analysts as to our expected financial results;
- developments with respect to patents or proprietary rights and other events or factors; and
- any delisting of our Common Stock from The Nasdaq Global Select Market

In addition, the equity markets have experienced volatility that has particularly affected the market prices of equity securities of many high technology companies and that often has been unrelated or disproportionate to the operating performance of such companies.

*Our quarterly and annual operating results are unpredictable and fluctuate, which may cause our stock price to be volatile and decline.*

Since many of our revenue components fluctuate and are difficult to predict, and our expenses are largely independent of revenues in any particular period, it is difficult for us to accurately forecast revenues and profitability. Factors other than those set forth above, which are beyond our ability to control or assess in advance, that could cause our operating results to fluctuate include:

- semiconductor and system companies' acceptance of our chip interface products;
- the success of high volume consumer applications, such as the Sony PLAYSTATION®3;
- the dependence of our royalties upon fluctuating sales volumes and prices of licensed chips that include our technology;
- the seasonal shipment patterns of systems incorporating our chip interface products;
- the loss of any strategic relationships with system companies or licensees;
- semiconductor or system companies discontinuing major products incorporating our chip interfaces;
- the unpredictability of the timing and amount of any litigation expenses;
- changes in our chip and system company customers' development schedules and levels of expenditure on research and development;
- our licensees terminating or failing to make payments under their current contracts or seeking to modify such contracts; and
- changes in our strategies, including changes in our licensing focus and/or possible acquisitions of companies with business models different from our own.

For the years ended December 31, 2006, 2005 and 2004, royalties accounted for 87%, 83% and 83% of our total revenues, respectively, and we believe that royalties will continue to represent a majority of total revenues for the foreseeable future. Royalties are recognized in the quarter in which we receive a report from a licensee regarding the sale of licensed chips in the prior quarter; however, royalties are only recognized if collectibility is reasonably assured. As a result of these uncertainties and effects being outside of our control, royalty revenues are difficult to predict and make accurate financial forecasts difficult to achieve, which could cause our stock price to become volatile and decline.

Table of Contents

*A substantial portion of our revenues is derived from sources outside of the United States and these revenues and our business generally are subject to risks related to international operations that are often beyond our control.*

For the years ended December 31, 2006, 2005 and 2004, revenues from our sales to international customers constituted approximately 75%, 71% and 69% of our total revenues, respectively. We currently have international operations in India (design), Japan (business development), Taiwan (business development), Germany (business development) and Korea (business development). As a result of our continued focus on international markets, we expect that future revenues derived from international sources will continue to represent a significant portion of our total revenues.

To date, all of the revenues from international licensees have been denominated in U.S. dollars. However, to the extent that such licensees' sales to systems companies are not denominated in U.S. dollars, any royalties which are based as a percentage of the customer's sales, that we receive as a result of such sales could be subject to fluctuations in currency exchange rates. In addition, if the effective price of licensed semiconductors sold by our foreign licensees were to increase as a result of fluctuations in the exchange rate of the relevant currencies, demand for licensed semiconductors could fall, which in turn would reduce our royalties. We do not use financial instruments to hedge foreign exchange rate risk.

Our international operations and revenues are subject to a variety of risks which are beyond our control, including:

- export controls, tariffs, import and licensing restrictions and other trade barriers;
- profits, if any, earned abroad being subject to local tax laws and not being repatriated to the United States or, if repatriation is possible, limited in amount;
- changes to tax codes and treatment of revenues from international sources, including being subject to foreign tax laws and potentially being liable for paying taxes in that foreign jurisdiction;
- foreign government regulations and changes in these regulations;
- social, political and economic instability;
- lack of protection of our intellectual property and other contract rights by jurisdictions in which we may do business to the same extent as the laws of the United States;
- changes in diplomatic and trade relationships;
- cultural differences in the conduct of business both with licensees and in conducting business in our international facilities and international sales offices;
- operating centers outside the United States;
- hiring, maintaining and managing a workforce remotely and under various legal systems; and
- geo-political issues.

We and our licensees are subject to many of the risks described above with respect to companies which are located in different countries, particularly home video game console and PC manufacturers located in Asia and elsewhere. There can be no assurance that one or more of the risks associated with our international operations could not result in a material adverse effect on our business, financial condition or results of operations.

*Our results of operations could vary as a result of the methods, estimates, and judgments we use in applying our accounting policies.*

The methods, estimates, and judgments we use in applying our accounting policies have a significant impact on our results of operations, as described elsewhere in this report. Such methods, estimates, and judgments are, by their nature, subject to substantial risks, uncertainties, and assumptions, and factors may arise over time that lead us to change

Table of Contents

our methods, estimates, and judgments. Changes in those methods, estimates, and judgments could significantly affect our results of operations. In particular, the calculation of share-based compensation expense under Statement of Financial Accounting Standards No. 123(R) ("SFAS 123(R)"), requires us to use valuation methodologies which were not developed for use in valuing employee stock options and a number of assumptions, estimates, and conclusions regarding matters such as expected forfeitures, expected volatility of our share price, and the exercise behavior of our employees. Furthermore, there are no means, under applicable accounting principles, to compare and adjust our expense if and when we learn about additional information that may affect the estimates that we previously made, with the exception of changes in expected forfeitures of share-based awards. Factors may arise that lead us to change our estimates and assumptions with respect to future share-based compensation arrangements, resulting in variability in our share-based compensation expense over time. Changes in forecasted share-based compensation expense could impact our cost of contract revenues, research and development expenses, marketing, general and administrative expenses and our effective tax rate, which could have an adverse impact on our results of operations.

### *Our results of operations could vary as a result of the implementation of changes in accounting rules.*

Our financial statements are prepared in accordance with U.S. generally accepted accounting principles. These principles are subject to interpretation by various governing bodies, including the FASB and the SEC, who create and interpret appropriate accounting standards. A change from current accounting standards could have a significant effect on our results of operations.

### *Our business and operating results will be harmed if we are unable to manage growth in our business.*

Our business has experienced periods of rapid growth that have placed, and may continue to place, significant demands on our managerial, operational and financial resources. In order to manage this growth, we must continue to improve and expand our management, operational and financial systems and controls. We also need to continue to expand, train and manage our employee base. We cannot assure you that we will be able to timely and effectively meet demand and maintain the quality standards required by our existing and potential customers and licensees. If we ineffectively manage our growth or we are unsuccessful in recruiting and retaining personnel, our business and operating results will be harmed.

### *We may make future acquisitions or enter into mergers, strategic transactions or other arrangements that could cause our business to suffer.*

We may continue to make investments in companies, products or technologies or enter into mergers, strategic transactions or other arrangements. If we buy a company or a division of a company, we may experience difficulty integrating that company's or division's personnel and operations, which could negatively affect our operating results. In addition:

- the key personnel of the acquired company may decide not to work for us;
- we may experience additional financial and accounting challenges and complexities in areas such as tax planning, cash management and financial reporting;
- our ongoing business may be disrupted or receive insufficient management attention;
- we may not be able to recognize the cost savings or other financial benefits we anticipated; and
- our increasing international presence resulting from acquisitions may increase our exposure to international currency, tax and political risks.

In connection with future acquisitions or mergers, strategic transactions or other arrangements, we may incur substantial expenses regardless of whether the transaction occurs. In addition, we may be required to assume the liabilities of the companies we acquire. By assuming the liabilities, we may incur liabilities such as those related to intellectual property infringement or indemnification of customers of acquired businesses for similar claims, which could materially and adversely affect our business. We may have to incur debt or issue equity securities to pay for any future acquisition, the issuance of which could involve restrictive covenants or be dilutive to our existing stockholders.

Page 24 of 170